

Neal A. Potischman (SBN 254862)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
neal.potischman@davispolk.com

*Attorneys for Plaintiff*
*Credit Suisse Securities (USA) LLC*

Vincent J. Marella (SBN 57702)
Mark T. Drooks (SBN 123561)
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
vjm@birdmarella.com
mtd@birdmarella.com

*Attorneys for Plaintiff VLS Securities LLC*

[Additional Attorneys Listed on Following Page]

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| CREDIT SUISSE SECURITIES (USA) LLC and VLS SECURITIES LLC, Plaintiffs, v. KENNETH BRICKMAN, GREG AND JESSICA BULETTE, NELSON CHIA, INDIVIDUALLY AND AS TRUSTEE OF THE NELSON P. CHIA LIVING TRUST, LILI XU, INDIVIDUALLY AND AS TRUSTEE OF THE DR. LILI XU DEFINED BENEFIT PENSION PLAN, TERESA DYKZEUL, MICHAEL GADAMS, GARY AND SHERRIE KAY, AS TRUSTEES OF THE GARY S. AND SHERRIE M. KAY TRUST, PETER Y.C. LAU, | CASE NO. CV13- 3085 DSF (AJW x) **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
|---|---|

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

KHOSROW MEHRANY, JAMES NG, TONY SCHIFANO, HUA SUN, LIMING SUN, ZEWEI ZENG, MANOJ WAZARKAR, YUE XU, SHAO XUANHAO, HONGHUA AND JIN YANG, XUN HE, HASAN T. ABU-KHAJEEL, 4077997 CANADA INC., COHLORS PACK INC., LAREX MANAGEMENT, INC., and SHAWN M. ROYLE,

Defendants.

James H.R. Windels
*(pro hac vice application forthcoming)*
Emmet P. Ong
*(pro hac vice application forthcoming)*
Melissa C. King
*(pro hac vice application forthcoming)*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:   (212) 701-5800
james.windels@davispolk.com
emmet.ong@davispolk.com
melissa.king@davispolk.com

*Attorneys for Plaintiff*
*Credit Suisse Securities (USA) LLC*

Raymond Banoun
*(pro hac vice application forthcoming)*
Thomas A. Kuczajda
*(pro hac vice application forthcoming)*
Sharon A. Rose (SBN 253653)
*(admission pending)*
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 862-2426
Facsimile:    (202) 862-2271
ray.banoun@cwt.com
tom.kuczajda@cwt.com
sharon.rose@cwt.com

*Attorneys for Plaintiff VLS Securities LLC*

2

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs Credit Suisse Securities (USA) LLC ("Credit Suisse") and VLS Securities LLC ("VLS") (together, the "Plaintiffs"), by their counsel, Davis Polk & Wardwell LLP, Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C., and Cadwalader, Wickersham & Taft LLP, state their complaint for declaratory relief and for preliminary and permanent injunctive relief against Defendants,[1] as follows:

## **INTRODUCTION**

1.      Plaintiffs seek to enjoin Defendants, a group of investors with no prior or current relationship with either Credit Suisse or VLS, from pursuing an arbitration proceeding they have filed against Plaintiffs before the Financial Industry Regulatory Authority ("FINRA").  Plaintiffs also seek a declaration that Defendants are not Plaintiffs' "customers" under the FINRA Code of Arbitration Procedure for Customer Disputes (the "FINRA Code").

2.      As alleged more fully below, on November 30, 2012, Defendants commenced an arbitration proceeding before FINRA captioned *Brickman et al. v. Credit Suisse Securities (USA) LLC and VLS Securities, LLC* (FINRA Arbitration No. 12-04094) (the "FINRA Arbitration").

3.      Defendants assert in their January 22, 2013 operative Statement of Claim (the "Statement of Claim")[2] that Plaintiffs violated the federal securities laws and the FINRA rules by making certain alleged misrepresentations in connection with the offering of VelocityShares Daily 2x VIX Short Term Exchange Traded Notes ("TVIX").  TVIX is a financial product issued by Credit

---

[1] For a complete list of Defendants, see *infra* ¶¶ 12-35.
[2] Without admitting or incorporating any of the allegations therein, Plaintiffs attach hereto as Exhibit 1 a true and correct copy of the Statement of Claim.

3

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Suisse AG that Defendants purchased on the secondary market through accounts or advisors unaffiliated with Credit Suisse or VLS.

4.    Defendants' factual and legal claims in the FINRA Arbitration substantially overlap with allegations made against Credit Suisse in a putative class action currently pending in the United States District Court for the Southern District of New York entitled *In re TVIX Securities Litigation*, Master File No. 12 Civ. 4191 (LTS) (the "Class Action").  VLS initially was named as a defendant therein but was subsequently dropped, when it was not named as a defendant in the Amended Complaint.  Defendants filed the FINRA Arbitration after the Class Action had been filed and after Credit Suisse and its co-defendants had filed a motion to dismiss the Class Action, which is currently pending before the court.

5.    Defendants have (i) never entered into an agreement with Plaintiffs to obtain investment advice or conduct business; (ii) never held an account with Plaintiffs; (iii) never purchased TVIX or any other security from Plaintiffs; (iv) never paid any fee to Plaintiffs; (v) never suffered any losses in any account maintained with Plaintiffs; and (vi) never entered into any agreement with Plaintiffs to arbitrate any claims between them.

6.    Credit Suisse is the underwriter of TVIX.  VLS performs certain marketing services solely to institutional investors and other services to the issuer of TVIX.  Defendants Credit Suisse and VLS do not have, and did not have, any relationship with Defendants or any involvement in Defendants' secondary market purchases of TVIX, which were made through accounts or advisors unaffiliated with Credit Suisse or VLS.

4

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

7.    Plaintiffs have no agreement or relationship with Defendants that would allow Defendants to compel arbitration of any claim regarding TVIX. Arbitration is a creature of contract.  None of Defendants has an explicit arbitration agreement with Credit Suisse or VLS.  Additionally, none of the Defendants has *any* relationship with either Plaintiff, much less a relationship sufficient to confer "customer" status unto Defendants under FINRA Code Rule 12200, which creates an implicit arbitration agreement between FINRA members and their customers.

8.    The issue of Defendants' putative ability to compel Plaintiffs to proceed with the FINRA Arbitration is ripe for decision by this Court now because being compelled to arbitrate a dispute one has not agreed to arbitrate constitutes irreparable harm as a matter of law.  Federal court precedents establish the necessity of intervening before arbitration to protect a party from being forced to participate in arbitration proceedings to which it did not agree.  Accordingly, Defendants' pursuit of their claims in the FINRA Arbitration should be enjoined, and this Court should issue a declaratory judgment that no Defendant is a "customer" of either Plaintiff.

## THE PARTIES

9.    Plaintiff Credit Suisse is a Delaware limited liability company with its principal place of business in New York.  It is wholly owned by Credit Suisse (USA) Inc., a Delaware corporation with its principal place of business in New York.

10.    Plaintiff VLS is a Delaware limited liability company with its principal place of business in Connecticut.  It is wholly owned by VelocityShares LLC, a Delaware limited liability company with its principal place of business in

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Connecticut.  VelocityShares LLC is wholly owned by VS Holdings Inc., a Delaware corporation with its principal place of business in Connecticut.

11.    Defendants' residences are pled on information and belief, based on the information in the Statement of Claim.

12.    Defendant Kenneth Brickman is a resident of Lafayette, California.

13.    Defendants Greg and Jessica Bulette are residents of Woodinville, Washington.

14.    Defendant Nelson Chia, Individually and as Trustee of the Nelson P. Chia Living Trust, is a resident of Oakland, California.

15.    Defendant Lili Xu, DDS, Individually and as Trustee of the Dr. Lili Xu Defined Benefit Pension Plan, is a resident of Oakland, California.

16.    Defendant Teresa Dykzeul is a resident of Los Angeles, California.

17.    Defendant Michael Gadams is a resident of Antioch, California.

18.    Defendants Gary and Sherrie Kay, as Trustees of the Gary S. and Sherrie M. Kay Trust, are residents of Tucson, Arizona.

19.    Defendant Peter Y.C. Lau is a resident of San Francisco, California.

20.    Defendant Khosrow Mehrany works in Modesto, California.

21.    Defendant James Ng is a resident of Alhambra, California.

22.    Defendant Tony Schifano is a resident of Chandler, Arizona.

23.    Defendant Hua Sun is a resident of Coquitlam, British Columbia, Canada.

24.    Defendant Liming Sun is a resident of Vancouver, British Columbia, Canada.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

25.    Defendant Zewei Zeng is a resident of Vancouver, British Columbia, Canada.

26.    Defendant Manoj Wazarkar is a resident of Sunnydale, California.

27.    Defendant Yue Xu is a resident of Los Angeles, California.

28.    Defendant Shao Xuanhao is a resident of Chaogang District, Beijing, China.

29.    Defendants Honghua and Jin Yang are residents of Portland, Oregon.

30.    Defendant Xun He is a resident of Bellevue, Washington.

31.    Defendant Hasan T. Abu-Khajeel is a resident of Seattle, Washington.

32.    Defendant 4077997 Canada Inc. is a Canadian corporation with its registered office in Terrebonne, Canada.

33.    Defendant Cohlors Pack Inc. is a Colorado corporation with its principal address in Centennial, Colorado.

34.    Defendant Larex Management, Inc. is a Nevada corporation with its principal address in Las Vegas, Nevada.

35.    Defendant Shawn M. Royle is a resident of San Diego, California.

## JURISDICTION AND VENUE

36.    This is an action for declaratory relief under Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201-2202, and injunctive relief pursuant to Federal Rule of Civil Procedure 65(a) and Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.

37.    The Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Defendants assert claims in the FINRA Arbitration for violations of the federal securities laws, namely, Section 11 of the

7

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k; Section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b); and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. *See Vaden v. Discover Bank*, 556 U.S. 49, 62, 129 S. Ct. 1262, 173 L. Ed. 2d. 206 (2009) ("[A] federal court should determine its jurisdiction by 'looking through' a § 4 petition to the parties' underlying substantive controversy.").

38.    This Court also has original subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

39.    This Court has personal jurisdiction over each of the Defendants because they have availed themselves of a forum located in the state of California by requesting that the FINRA Arbitration occur in Los Angeles. *See* Statement of Claim, Ex. 1, 19.  FINRA has selected Los Angeles, California as the location for the FINRA Arbitration.[3]

40.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants designated this district as the site of the FINRA Arbitration, and Defendants are subject to this Court's personal jurisdiction.

## **FACTUAL BACKGROUND**

41.    On or about November 30, 2012, Defendants initiated the FINRA Arbitration against Credit Suisse and VLS.  The initial Statement of Claim was served on Credit Suisse and VLS on or about January 4, 2013.  The amended

---

[3] A copy of the designation of Los Angeles as the arbitral location is attached hereto as Exhibit 2.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Statement of Claim, which added claimants, was subsequently served on Plaintiffs on or about January 22, 2013.

42.   In the Statement of Claim, Defendants requested that an arbitration be held in Los Angeles, California.  FINRA has selected Los Angeles, California as the location for the FINRA Arbitration.

43.   In the FINRA Arbitration, Defendants assert claims against Credit Suisse and VLS arising from their alleged purchases of TVIX on the secondary market or through accounts or advisors unaffiliated with Credit Suisse or VLS. Defendants did not purchase their securities through Credit Suisse or VLS.

44.   The Statement of Claim alleges that TVIX did not perform as Defendants expected and that Credit Suisse, as underwriter, and VLS, as marketing agent to institutional investors, knew of the risks of investing in TVIX but did not adequately disclose these risks in the offering materials, in violation of Section 11 of the 1933 Act, Section 10(b) of the 1934 Act, SEC Rule 10b-5, and the FINRA rules.  For these alleged violations, upon information and belief, Defendants are seeking a cumulative arbitration award exceeding $75,000 in compensatory damages, costs, punitive damages, attorney's fees and costs, and other relief. Credit Suisse and VLS deny that they have any liability relating to these claims.

45.   Defendants have never entered into any agreement with Credit Suisse or VLS to arbitrate any claims, including the claims asserted in Defendants' Statement of Claim.  Therefore, Credit Suisse and VLS have no obligation to arbitrate any claims brought by Defendants.

46.   Lacking any agreement with Credit Suisse or VLS to arbitrate, Defendants are attempting to force Credit Suisse and VLS, as FINRA members, to

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

arbitrate pursuant to the FINRA Code.  The FINRA Code acts as an agreement to arbitrate only between FINRA members and their "customers."

47.    Absent a written arbitration agreement, an investor can only compel a FINRA member to arbitrate if it is a "customer" of that FINRA member as set forth in FINRA Code Rule 12200, which provides:

> Parties must arbitrate a dispute under the Code if:
> - Arbitration under the Code is either:
>   - (1)    Required by a written agreement, or
>   - (2)    Requested by the customer;
> - The dispute *is between a customer and a member* or associated person of a member; and
> - The dispute *arises in connection with the business activities of the member* or the associated person except disputes involving the insurance business activities of a member that is also an insurance company. (Emphases added.)

48.    To compel arbitration under FINRA Code Rule 12200, Defendants must show that they are "customers" of both Credit Suisse and VLS.

49.    Whether the FINRA Code requires Credit Suisse and VLS to arbitrate Defendants' claims because Defendants are "customers" of Credit Suisse is a question for the Court to decide.

50.    Defendants are not now and have never been "customers" of Credit Suisse or VLS.  Defendants purchased their TVIX ETNs on the secondary market, through accounts or advisors unaffiliated with Credit Suisse or VLS.  Defendants do not allege in their Statement of Claim that they have ever:  (i) opened or maintained any accounts at Credit Suisse or VLS; (ii) purchased any of the securities at issue in their Statement of Claim from Credit Suisse or VLS; (iii) engaged in business transactions with Credit Suisse or VLS; (iv) paid any fees to Credit Suisse or VLS; or (v) had any direct relationship with Credit Suisse or VLS.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

51.     There is no contractual, business, or investment relationship between Credit Suisse and Defendants or VLS and Defendants that could form the legal basis upon which Defendants can compel Credit Suisse and VLS to arbitrate their claims in the FINRA Arbitration.

52.     Credit Suisse and VLS will be irreparably harmed if they are compelled to arbitrate Defendants' claims when neither has agreed to do so.

53.     The harm to Credit Suisse and VLS is immediate and pronounced. Credit Suisse and VLS would be forced to spend substantial time and resources defending Defendants' claim before FINRA.  Moreover, if Credit Suisse and VLS are compelled to arbitrate, it may have the effect of waiving their rights to be heard by a judge, to obtain full and fair discovery, and to a trial by jury.

54.     A declaratory judgment that Defendants cannot compel Credit Suisse or VLS to arbitrate their claims in the FINRA Arbitration and preliminary and permanent injunctions enjoining Defendants from pursuing their FINRA Arbitration again Credit Suisse and VLS are proper and warranted.

## COUNT ONE
## (DECLARATORY JUDGMENT)

55.     Credit Suisse and VLS repeat and re-allege the allegations in paragraphs 1 to 54 as if fully set forth herein.

56.     No written arbitration agreement exists between Defendants and Credit Suisse or Defendants and VLS to arbitrate the claims asserted by Defendants in the FINRA Arbitration.

57.     Defendants seek to arbitrate their claims based on FINRA Code Rule 12200.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

58.     To compel arbitration under FINRA Code Rule 12200, Defendants must show that (1) the "dispute is *between a customer and a member*," and (2) the "dispute arises in connection with the business activities of the member." (Emphasis added.)

59.     Defendants are not, and have never been, "customers" of Credit Suisse or VLS.

60.     Accordingly, Credit Suisse and VLS lack any obligation to arbitrate Defendants' claims, including with respect to the FINRA Arbitration.

61.     Declaratory relief from this Court will resolve these controversies.

62.     As alleged herein, a real, substantial, and immediate controversy is presented regarding the rights, duties, and liabilities of the parties.

63.     Credit Suisse and VLS therefore request a declaratory judgment from this Court pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 that Credit Suisse and VLS have no obligation to arbitrate Defendants' claims before FINRA.

## COUNT TWO
## (INJUNCTIVE RELIEF PURSUANT TO 9 U.S.C. § 4)

64.     Credit Suisse and VLS repeat and re-allege the allegations in paragraphs 1 to 63 as if fully set forth herein.

65.     Credit Suisse and VLS are likely to succeed on the merits because neither Credit Suisse nor VLS has any obligation to arbitrate Defendants' claims asserted in the FINRA Arbitration, as there is no arbitration agreement between either Credit Suisse and Defendants or VLS and Defendants, and Defendants are not "customers" of Credit Suisse or VLS as required by FINRA Code Rule 12200.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

66.    Unless Defendants are enjoined from pursuing their claims in the FINRA Arbitration, Credit Suisse and VLS will suffer irreparable harm if they are compelled to arbitrate claims they did not agree to arbitrate.  Credit Suisse and VLS will be forced to incur the expense of defending themselves in the arbitration proceeding or risk an adverse outcome in those proceedings, in which Defendants seek compensatory and punitive damages, even though neither Credit Suisse nor VLS is compelled to arbitrate the claims.

67.    Credit Suisse and VLS have no adequate remedy at law.  Any post-arbitration challenge by Credit Suisse or VLS to an arbitrator's award would still require Credit Suisse and VLS to defend themselves in an arbitration proceeding to which they did not consent.

68.    Defendants will not suffer irreparable harm in the event an injunction issues.

69.    The balance of equities weighs in favor of an injunction.

70.    The public interest would be served by enjoining Defendants from pursuing their claims against Credit Suisse and VLS in arbitration when neither Credit Suisse nor VLS is legally bound to arbitrate.

71.    Credit Suisse and VLS, pursuant to Federal Rule of Civil Procedure 65 and 9 U.S.C. § 4, are entitled to preliminary and permanent injunctive relief enjoining Defendants from proceeding with the FINRA Arbitration.

## **PRAYER FOR RELIEF**

WHEREFORE, Credit Suisse and VLS respectfully request:

A.    Entry of a declaratory judgment that Credit Suisse and VLS have no obligation to arbitrate the FINRA Arbitration initiated by Defendants;

13

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

B. Entry of orders preliminarily and permanently enjoining Defendants from further proceedings against Credit Suisse and VLS in the FINRA Arbitration; and

C. Such other and further relief as this Court may deem appropriate.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Dated:  May 1, 2013

Respectfully Submitted,

DAVIS POLK & WARDWELL LLP

By:  _____
            Neal A. Potischman

1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

*Attorneys for Plaintiff Credit Suisse
Securities (USA) LLC*

BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS &
LINCENBERG, P.C.

By:  _____
            Mark T. Drooks

1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110

*Attorneys for Plaintiff VLS Securities  LLC*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# Exhibit 1

**FINRA DISPUTE RESOLUTION**

_____

**In the Matter of Arbitration Between:**

**Kenneth Brickman, Greg and Jessica Bulette, Nelson Chia, Individually and as Trustee of the Nelson P. Chia Living Trust, Lili Xu, DDS, Individually and as Trustee of the Dr. Lili Xu Defined Benefit Pension Plan, Teresa Dykzeul, Michael Gadams, Gary and Sherrie Kay, as Trustees of the Gary S. and Sherrie M. Kay Trust, Peter Lau, Khosrow Mehrany, James Ng, Tony Schifano, Hua Sun, Liming Sun, Zewei Zeng, Manoj Wazarkar, Yue Xu, Shao Xuanhao, Honghua & Jin Yang, Xun He, Hasan T. Abu-Khajeel, 4077997 Canada Inc., Cohlors Pack Inc., Larex Management, Inc., and Shawn M. Royle**

Claimants,

**v.**                                                           **Case No. 12-04094**

**Credit Suisse Securities (USA) LLC, and VLS Securities, LLC**

Respondents.

_____

## FIRST AMENDED STATEMENT OF CLAIM

Claimants Kenneth Brickman, Greg and Jessica Bulette, Nelson Chia, Individually and as Trustee of the Nelson P. Chia Living Trust, Lili Xu, DDS, Individually and as Trustee of the Dr. Lili Xu Defined Benefit Pension Plan, Teresa Dykzeul, Michael Gadams, Gary and Sherrie Kay, as Trustees of the Gary S. and Sherrie M. Kay Trust, Peter Lau, Khosrow Mehrany, James Ng, Tony Schifano, Hua Sun, Liming Sun, Zewei Zeng, Manoj Wazarkar, Yue Xu, Shao Xuanhao, Honghua & Jin Yang, Xun He, Hasan T. Abu-Khajeel, 4077997 Canada Inc., Cohlors Pack Inc., Larex Management, Inc., and

Exhibit 1

15

Shawn M. Royle (collectively, "Claimants") file this First Amended Statement of Claim against Defendants Credit Suisse Securities (USA) LLC and VLS Securities, LLC (together, "Respondents").

## INTRODUCTION

All Claimants purchased VelocityShares Daily 2x VIX Short Term Exchange Traded Notes ("TVIX") between February 22, 2012 and March 22, 2012.  According to a November 29, 2010 pricing supplement (the "Pricing Supplement" and, together with a March 25, 2009 Registration Statement and Prospectus, the "Offering Documents"),[1] TVIX was linked to twice (2x) the daily performance of the S&P 500 VIX Short-Term Futures Index (the "VIX Futures Index").  The Offering Documents stated TVIX was "designed for investors who seek exposure to the applicable underlying index."  Credit Suisse Securities (USA) LLC ("Credit Suisse") was the underwriter for the issuance of the TVIX ETNs.  Claimants purchased TVIX pursuant to the Offering Documents.

VLS Securities, LLC ("VLS") was responsible for marketing and placing the TVIX ETNs under the VelocityShares brand.  VLS received all or part of the 1.65% Daily

---

[1]    The November 29, 2010 Pricing Supplement was amended, restated, and superseded by Pricing Supplement No. VLS ETN-1/A dated December 8, 2010, Pricing Supplement No. VLS ETN-1/A2 dated March 30, 2011, Pricing Supplement No. VLS ETN-1/A3 dated April 8, 2011, Pricing Supplement No. VLS ETN-1/A4 dated May 31, 2011, Pricing Supplement No. VLS ETN-1/A5 dated June 27, 2011, Pricing Supplement No. VLS ETN-1/A6 dated July 1, 2011, Pricing Supplement No. VLS ETN-1/A7 dated August 10, 2011, Pricing Supplement No. VLS ETN-1/A8 dated January 19, 2012, Pricing Supplement No. VLS ETN-1/A9 dated January 27, 2012, Pricing Supplement No. VLS ETN-1/A10 dated February 2, 2012, Pricing Supplement No. VLS ETN-1/A11 dated February 3, 2012, Pricing Supplement No. VLS ETN-1/A12 dated February 16, 2012, and Pricing Supplement No. VLS ETN-1/A13 dated March 7, 2012, and Pricing Supplement No. VLS ETN-1/A14 dated March 23, 2012.  Each of the Pricing Supplements refers back to, and incorporates by reference, the March 25, 2009 Registration and Prospectus and each is substantially similar, with the exception of the March 7, 2012 and March 23, 2012 Pricing Supplements, which contain additional information regarding Credit Suisse's TVIX issuance decisions during the first quarter of 2012.  Specifically, the March 7, 2012 Pricing Supplement includes a notice regarding Credit Suisse's decision to suspend further issuances of TVIX on February 21, 2012, and the March 23, 2012 Pricing Supplement includes a notice regarding Credit Suisse's decision to reopen issuance beginning on March 23, 2012. and restated Pricing Supplements, the last dated March 7, 2012.  These restated Pricing Supplements are also included in the definition of "Offering Documents."

Exhibit 1

16

Investor Fee charged to ETN holders. VLS marketed TVIX as an ETN that was "linked to twice (2x) the daily performance of the S&P 500 VIX Short-Term Futures Index ER less the investor fee."[2] VLS represented that TVIX "may be used to express short-term views on the direction of volatility."[3]

Despite the promises in the Offering Documents and marketing materials, TVIX failed to track the VIX Futures Index during several weeks in February and March 2012. Most dramatically, in a matter of hours on March 22, 2012, the price of TVIX fell over twenty-nine percent (29%) even as the VIX Futures Index *went up* in value. TVIX failed to track the VIX Futures Index and, therefore, failed to perform as represented, resulting in millions of dollar in losses to investors, including Claimants. Although the Offering Documents and marketing materials warned about certain risks, Respondents altogether failed to caution Claimants about potential circumstances, known to Respondents, that could lead to a sudden loss in the value of their TVIX investments — in this case, a drop resulting in losses to Claimants totaling millions of dollars.

## PARTIES

Claimants Kenneth Brickman, Greg and Jessica Bulette, Nelson Chia, Individually and as Trustee of the Nelson P. Chia Living Trust, Lili Xu, DDS, Individually and as Trustee of the Dr. Lili Xu Defined Benefit Pension Plan, Teresa Dykzeul, Michael Gadams, Gary and Sherrie Kay, as Trustees of the Gary S. and Sherrie M. Kay Trust, Peter Lau, Khosrow Mehrany, James Ng, Tony Schifano, Hua Sun, Liming Sun, Zewei Zeng, Manoj Wazarkar, Yue Xu, Shao Xuanhao, Honghua & Jin Yang, Xun He, Hasan T. Abu-Khajeel, 4077997 Canada Inc., Cohlors Pack Inc., Larex Management, Inc., and

---

[2] *See, e.g.,* TVIX Product Information Sheet, dated Dec. 9, 2010, Ex. A.
[3] *See id.*

Exhibit 1

17

Shawn M. Royle purchased TVIX pursuant to the Offering Documents thereby suffering actual losses as a result of Credit Suisse's material misrepresentations and omissions.

Claimant Kenneth Brickman is a resident of Lafayette, California.

Claimants Greg and Jessica Bulette are residents of Woodinville, Washington.

Claimants Nelson Chia, Individually and as Trustee of the Nelson P. Chia Living Trust, and Lili Xu, DDS, Individually and as Trustee of the Dr. Lili Xu Defined Benefit Pension Plan, are residents of Oakland, California.

Claimant Teresa Dykzeul is a resident of Los Angeles, California.

Claimant Michael Gadams is a resident of Antioch, California.

Claimants Gary and Sherrie Kay, as Trustees of the Gary S. and Sherrie M. Kay Trust, are residents of Tucson, Arizona.

Claimant Peter Y.C. Lau is a resident of San Francisco, California.

Claimant Khosrow Mehrany works in Modesto, California.

Claimant James Ng is a resident of Alhambra, California.

Claimant Tony Schifano is a resident of Chandler, Arizona.

Claimant Hua Sun is a resident of Coquitlam, British Columbia, Canada.

Claimants Liming Sun and Zewei Zeng are residents of Vancouver, British Columbia, Canada.

Claimant Manoj Wazarkar is a resident of Sunnydale, California.

Claimant Yue Xu is a resident of Los Angeles, California.

Claimant Shao Xuanhao is a resident of Chaogang District, Beijing, China.

Claimant Honghua & Jin Yang is a resident of Portland, Oregon.

Claimant Xun He is a resident of Bellevue, Washington.

-4-

Exhibit 1

18

Claimant Hasan T. Abu-Khajeel is a resident of Seattle, Washington.

Claimant 4077997 Canada Inc. is a Canadian corporation with its registered office in Terrebonne, Canada.

Claimant Cohlors Pack Inc. is a Colorado corporation with its principal street address in Centennial, Colorado.

Claimant Larex Management, Inc. is a Nevada corporation with its principal street address in Las Vegas, Nevada.

Claimant Shawn M. Royle is a resident of San Diego, California.

Respondent Credit Suisse is a Delaware Limited Liability Company with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010.  Credit Suisse is the agent and underwriter for the TVIX offering.  Credit Suisse is a FINRA member firm, CRD# 816, and may be served with the Statement of Claim at 11 Madison Avenue, 24th Floor, New York, New York  10010.

Respondent VLS is a Delaware Limited Liability Company with its principal place of business at 19 Old Kings Highway South, Suite 120, Darien, Connecticut 06820.  VLS is the marketer and placement agent for the TVIX offering.  VLS is a FINRA member firm, CRD# 151145, and may be served with the Statement of Claim at 19 Old Kings Highway South, Suite 120, Darien, Connecticut 06820.

### LOCATION OF HEARING

Claimants request the hearing to be held in Los Angeles, California.

Exhibit 1

19

## FACTUAL BACKGROUND

**A.    Exchange-traded notes have become popular vehicles for investors seeking to trade volatility.**

Over the past few years, the desire to measure and execute trades based on the volatility of the markets has grown in popularity, leading to the creation of new investment products supposedly designed to track certain volatility indexes.  Once such index, the Chicago Board Options Exchange Market Volatility Index ("VIX"), measures the implied volatility of S&P 500 index options.  The VIX represents one measure of the market's expectation of the volatility of the S&P 500 over the next thirty (30) day period.  Thus, the level of the VIX on any given day — known as spot VIX — is quoted in percentage points and provides an indication of the expected movement in the S&P 500 index over the upcoming thirty-day period, which is then annualized.

The VIX itself is merely is the output of a mathematical equation that cannot be traded directly.  Although it is calculated and disseminated in real-time by the Chicago Board Options Exchange ("CBOE"), investors must use derivative vehicles, such as options or futures, to trade the VIX.  One such instrument, TVIX, became an investment instrument of choice for investors seeking to trade volatility.

TVIX is an exchange-traded note ("ETN") that, according to its Offering Documents, tracks twice the return (2x) of the S&P 500 VIX Short-Term Futures Index.  Often confused with exchange-traded funds ("ETFs"),[4] ETNs are unsecured debt securities issued by an underwriting bank and registered as securities with the

---

[4]    Unlike an ETN, an ETF is an investment fund traded on stock exchanges, which holds assets, such as stocks, commodities, or bonds, and trades close to its net asset value over the course of the trading day.  ETFs are similar to mutual funds in that they offer public investors an undivided interest in a pool of securities and are similar to stocks in that ETF shares can be bought and sold throughout the day on a securities exchange through a broker-dealer.  Many ETFs track an index, such as the S&P 500.

-6-

Exhibit 1
20

Securities and Exchange Commission ("SEC").   Rather than owning a collection of securities like ETF investors, ETN investors own a "promise" that the ETN will track a designated index and that the issuer will pay the note according to the terms contained in the underlying offering documents.   An ETN investor therefore assumes the credit risk that the issuer may be unable to pay its obligations as well as the market risk of the underlying index linked to the ETN.

Investors opting to hold their ETNs until maturity receive a cash payment from the issuer.  Many ETNs, however, including TVIX, are traded in secondary markets and, therefore, investors can trade their ETNs before maturity.  In addition, ETNs often allow early redemption of large blocks of notes (usually 50,000 or more).   This early-redemption feature can be employed as an arbitrage vehicle in some circumstances to keep market prices of the ETN closely linked to the "indicative value" (the value computed according to a formula derived from the benchmark the note is designed to track).

**B.     Respondents falsely promised that TVIX would track the VIX Futures Index and provide a short-term trading vehicle for management of portfolios on a daily basis.**

On November 30, 2010, Credit Suisse AG and its underwriter Credit Suisse Securities (USA) LLC, began issuing TVIX pursuant to the Offering Documents. Throughout the Offering Documents, Credit Suisse makes its potential investors the promise that TVIX will track twice the daily performance of the S&P 500 VIX Short-Term Futures Index (the "VIX Futures Index").  This promise proved to be false.

Credit Suisse's promise that TVIX is linked to the VIX Futures Index is replete, making almost two dozen distinct appearances in the Pricing Supplement:

-7-

Exhibit 1
21

- We are offering six separate series of exchange traded notes (collectively, the "ETNs") [including] the VelocityShares[TM] Daily 2x VIX Short Term ETN *linked to* the S&P 500 VIX Short-Term Futures[TM] Index due December 4, 2030 . . . .[5]

- The ETNs are designed for investors who seek exposure to the applicable underlying index. . . . For each ETN, investors will receive a cash payment at maturity, upon early redemption or upon acceleration by us that *will be linked* to the performance of the applicable underlying index . . . .[6]

- The ETNs are medium-term notes of Credit Suisse AG ("Credit Suisse"), the return on which *is linked to* the performance of either the S&P 500 VIX Short-Term Futures[TM] Index ER or the S&P 500 VIX Mid-Term Futures[TM] Index ER . . . .[7]

- The return on the ETNs of any series *will be based* on the performance of the applicable underlying Index during the term of such ETNs.  Each series of ETNs tracks the daily performance of either the S&P 500 VIX Short-Term Futures[TM] Index ER or S&P 500 VIX Mid-Term Futures[TM] Index ER . . . .[8]

- The return on each series of ETNs *is linked to* the performance of an applicable underlying Index which, in turn is linked to the performance of one or more futures contracts on the VIX Index.[9]

- The ETNs may be a suitable investment for you if . . . [y]ou seek an investment with a return linked to the performance of the applicable underlying Index.[10]

- Two of the most important factors that will affect the value of your ETNs are the directional change in the level of the applicable underlying Index (either up or down) and the annualized volatility of the applicable underlying Index itself.[11]

---

[5]    Pricing Supplement No. VLS ETN-1/A13 dated March 7, 2012 (hereinafter, "Pricing Supplement A13"), at 1, a copy of which is hereby attached to this Statement of Claim as Exhibit B and is incorporated by reference as if fully set forth within.  *See also* Pricing Supplement A13, at PS-8 (emphasis added).

[6]    *Id.* at 2; *see also id.* at PS-8 (emphasis added).

[7]    *Id.* at PS-1.

[8]    *Id.* at 2 (emphasis added).

[9]    *Id.* at PS-8 (emphasis added).

[10]    *Id.* at PS-9.

[11]    *Id.* at PS-12 (emphases added).

Exhibit 1

22

- The return on the ETNs of any series *will be based* on the performance of the applicable underlying Index.[12]

- The Early Redemption Amount, Accelerated Redemption Amount and Maturity Redemption Amount, as applicable (each, a "Redemption Amount"), will depend on the change in the level of the applicable underlying Index.[13]

- [T]he ETNs *track* an index of futures on the VIX Index.[14]

- [T]he ETNs are meant *to provide daily exposure* to the underlying futures . . .[15]

- The ETNs *are linked* to the daily performance of the applicable underlying Index, which in turn *is linked* to prices of futures contracts on the VIX Index.[16]

- The Closing Indicative Value and the Intraday Indicative Value of the ETNs *are based on* the value of the applicable underlying Index, which is based on the relevant futures on the VIX Index.[17]

- The payment amount, if any, for each of your ETNs *is linked* to the performance of the applicable underlying Index, each of which was launched in January 2009 with an inception date of January 22, 2009 . . . .[18]

- Because the Inverse ETNs and 2x Long ETNs *are linked* to the daily performance of the applicable underlying Index and include either inverse or leveraged exposure, changes in the market price of the underlying futures will have a greater likelihood of causing such ETNs to be worth zero than if such ETNs were not linked to the inverse or leveraged return of the applicable underlying Index.[19]

- Each ETN seeks to provide a return *which is related* to the daily performance of its Index (as adjusted for costs and fees).[20]

- The return on the ETNs *is linked to* the daily performance of one of the Indices. Each of the Indices models returns from a long position in VIX

---

[12] *Id.* at PS-26 (emphasis added).
[13] *Id.* (emphasis added).
[14] *Id.* (emphasis added).
[15] *Id.* (emphasis added).
[16] *Id.* at PS-28 (emphasis added).
[17] *Id.* (emphasis added).
[18] *Id.* at PS-32 (emphasis added).
[19] *Id.* at PS-37-PS-38 (emphasis added).
[20] *Id.* at PS-38 (emphasis added).

Exhibit 1

23

futures contracts that is rolled continuously throughout the period between futures expiration dates.  The S&P 500 VIX Short-Term Futures[TM] Index ER measures the return from a rolling long position in the first and second month VIX futures contracts, and rolls continuously throughout each month from the first month VIX futures contract into the second month VIX futures contract.[21]

- We expect that generally the level of the applicable underlying Index on any day will affect the market value of the ETNs *more than any other factor.*[22]

- If you hold your ETNs to maturity, you will receive a cash payment on December 4, 2030 (the "Maturity Date") *that is linked to* the percentage change in the closing level of the applicable underlying Index from the inception date to the closing level calculated on the Final Valuation Date.[23]

Similarly, Credit Suisse represented in the Offering Documents that TVIX provides a short-term trading vehicle that tracks the *daily* performance of the VIX Futures Index:

- Each series of ETNs tracks the *daily performance* of either the S&P 500 VIX Short-Term Futures[TM] Index ER or S&P 500 VIX Mid-Term Futures[TM] Index ER . . . .[24]

- The ETNs are designed as short-term trading vehicles for investors managing their portfolios on a *daily basis.*[25]

- The return on the ETNs is linked to the *daily performance* of one of the Indices.[26]

Credit Suisse's promise that TVIX will track the VIX Futures Index on a daily basis is the essential character of the investment.

Like Credit Suisse, VLS also represented that TVIX was linked to the VIX Futures Index on a daily basis:

---

[21]  *Id.* at PS-39 (emphasis added).
[22]  *Id.* at PS-48 (emphasis added).
[23]  *Id.* at PS-50 (emphasis added).
[24]  *Id.* at 2 (emphasis added).
[25]  *Id.* (emphasis added).
[26]  *Id.* at PS-39 (emphasis added).

Exhibit 1
24

- The return on the ETNs is linked to twice (2x) the daily performance of the S&P 500 VIX Short-Term Futures Index ER less the investor fee.[27]

- The ETNs provide traders with an exchange traded instrument enabling them to efficiently express their market views on the short-term futures contracts on the CBOE SPX Volatility Index (the "VIX").[28]

- Volatility ETNs may be used to express short-term views on the direction of volatility.[29]

- The ETNs are designed to obtain their stated investment objectives on a daily basis.[30]

**C.    In a matter of hours, TVIX lost almost one-third of its value even as the VIX Futures Index *gained* in value.**

From its inception until February 21, 2012, TVIX generally tracked the VIX Futures Index and rarely departed from its indicative value by more than a few percent. On February 21, 2012, however, the issuer decided to suspend further issuances of TVIX due to "internal limits" on the size of the TVIX ETNs — a choice it knew would affect the value of TVIX and render the promises to investors false:

> Credit Suisse announced today that it has temporarily suspended further issuances of the Velocity Shares Daily 2x VIX Short-Term ETNs (Ticker Symbol: "TVIX") due to internal limits on the size of the ETNs. This suspension does not affect the Early Redemption rights of noteholders as described in the pricing supplement. Other ETNs issued by Credit Suisse are not affected by this suspension.[31]

As a result of Credit Suisse's sudden and unexpected suspension, shares of TVIX traded at prices uncorrelated to the VIX Futures Index — the index Credit Suisse promised TVIX would track on a daily basis. This decoupling lasted nearly one (1)

---

[27]    *See* Ex. A.

[28]    *See* Ex. A.

[29]    *See* Ex. A.

[30]    *See* Ex. A.

[31]    Credit Suisse, Press Release: Credit Suisse Temporarily Suspends Further Issuance of Velocity Shares Daily 2x Long VIX Short-Term ETN (Ticker Symbol: "TVIX") (Feb. 21, 2012) (hereinafter, "Feb. 21 Press Release"), a copy of which is attached as Exhibit C and incorporated by reference as if fully set forth within.

-11-

Exhibit 1

25

month, with the disparity increasing throughout that period.  Indeed, on the day after the press release, TVIX's market value closed at a more than 6% premium to the indicative value.  Less than a month later, on March 21, 2012, the premium above indicative value had risen to a shocking 89%.  The following chart illustrates the gap between TVIX's market price and the indicative value that began on February 22 and suddenly disappeared on March 22-23.



Moreover, the issuer's decision, based on undisclosed internal benchmarks, to cease issuance of TVIX drove an aggressive increase in the number of TVIX shares shorted[32] by investors.  Tellingly, securities on loan went from 500,000 to 2,265,067 in a

---

[32]    Shorting, or short selling, is the practice of selling assets, such as securities, that have been borrowed from a third party, such as a broker, with the intention of buying identical assets back at a later

Exhibit 1
26

Case 2:13-cv-03085-DSF-AJW   Document 1   Filed 05/01/13   Page 29 of 409   Page ID #:71

matter of days.[33]  Because of this unexpected rise in shorting interest, on March 20, 2012, TVIX appeared on the NYSE Arca threshold securities list — a list of securities that have experienced repeated "failures to deliver" — and as broker-dealers closed out the failure-to-deliver positions, TVIX's already-substantial premium over indicative value rose precipitously to 89%.

Then, on March 22, 2012, the unhinged TVIX began its crash back toward indicative value.  That day, rumors circulated that Credit Suisse would begin to issue TVIX again.  TVIX plummeted in price while at the same time, the VIX Futures Index (ticker SPVXSPID:IND) rose 1.4%, increasing from 6,633.56 to 6,727.24.  That evening, after trading hours, Credit Suisse announced it planned to reopen issuance of TVIX shares as soon as the following day on a limited basis:

> New York, March 22, 2012 Credit Suisse announced today that it plans to reopen issuance of the Velocity Shares Daily 2x VIX Short-Term ETNs (Ticker Symbol:  "TVIX") on a limited basis.  The ETNs were temporarily suspended from further issuance by Credit Suisse on February 21, 2012 due to internal limits on the size of the ETNs.  At present, the ETNs are trading at a premium to their indicative value.

> Beginning on March 23, 2012, Credit Suisse may from time to time issue the ETNs into inventory of its affiliates to make the ETNs available for lending at or about rates that prevailed prior to the temporary suspension of issuances of the ETNs.  Also, beginning as soon as March 28, 2012, Credit Suisse may issue additional ETNs from time to time to be sold solely to authorized market makers. . . .[34]

---

date to return to that third party.  Generally, this strategy allows investors to speculate on downward market trends by selling an asset or security at a high value now to be replaced with an identical asset purchased later at a lower price thereby resulting in a profit for the investor.  That is, the short seller hopes to profit from a decline in the price of the assets between the sale and the repurchase.

[33]  Interestingly, Respondents may have benefited from this rise in shorting interest by "double dipping" — lending TVIX shares to traders shorting them while simultaneously collecting fees from TVIX investors long (buying) the product.

[34]  Credit Suisse, Press Release:  Credit Suisse Plans to Reopen Issuance of Velocity Shares Daily 2x Long VIX Short-Term ETN (Ticker Symbol:  "TVIX") on a Limited Basis (Mar. 22, 2012) (hereinafter, "Mar. 22 Press Release"), a copy of which is hereby attached as Exhibit D and is incorporated by reference as if fully set forth within.

-13-

Exhibit 1

27

Following the announcement, when TVIX opened for trading on March 23, 2012, shares of TVIX declined further by nearly thirty-percent (30%) and the gap between TVIX's market price and its indicative value shrunk again by twenty-five percent (25%). In all, the premium over the indicative value that peaked at 89% on March 21 plunged to approximately seven-percent (7%) a mere two days later.[35]   As a result of Credit Suisse's actions and failure to ensure that TVIX performed as promised in the Offering Documents and marketing, investors lost over $340 million as the value of TVIX dropped more than fifty-percent (50%) in a matter of hours.  From a high of $14.81 on March 22, TVIX reached a low of $5.84 only two trading days later.



_____

[35]   More specifically, on Friday, March 23, 2012, the market price of TVIX dropped 29% to close at $10.20 per ETN.  By Monday, March 26, 2012, the market price had dropped to $5.88 per ETN.

-14-

Exhibit 1
28

**D.     In addition to Respondents' false promises, the Offering Documents and marketing materials include numerous false and misleading statements and omit material information concerning the risks associated with investing in TVIX.**

Although the Pricing Supplement devotes over fourteen pages and 10,000 words to various risks of investing in TVIX, it fails to provide meaningful disclosure of the greatest risk of all — that Credit Suisse's actions would cause TVIX to unhinge from its underlying index.   Instead, the Offering Documents warn that "[t]wo of the most important factors that will affect the value of [TVIX] are the directional change in the level of the applicable underlying Index (either up or down) and the annualized volatility of the applicable underlying Index itself."[36]   Neither of these factors had anything to do with TVIX's artificially inflated value in late February and early March 2012, or its steep drop in value on March 22-23, 2012.

In reality, the month-long unhinging of TVIX and its subsequent collapse in value were caused by Credit Suisse's "internal limits on the size of the ETNs."[37]   That is, rather than continuing to find counterparties to absorb the rising costs and risks of TVIX, or absorbing those costs and risks itself, Credit Suisse decided to stop issuance entirely, an act akin to a captain abandoning a sinking ship and leaving the passengers (*i.e.*, the investors) to fend for themselves.

In January and February 2012, TVIX had net inflows of $642 million as its volume increased to surpass Barclays' VXX ETN as the volume leader in volatility exchange-traded products.  Because TVIX is a 2x leveraged fund, this increase in net inflows was not an entirely positive experience for Credit Suisse.  In order for a 2x leveraged fund to

---

[36]   Pricing Supplement A13, at PS-12.
[37]   Feb. 21 Press Release.

-15-

Exhibit 1
29

maintain its leverage factor, the issuer needs to adjust its market exposure on a daily basis. Thus, if the daily value of the underlying index (here, the VIX Futures Index) goes up ten percent (10%), then Credit Suisse's note obligations increase by twenty percent (20%) that same day. Rather than risking these rising financial obligations, Credit Suisse forced the risk onto the market participants — its customers.

More specifically, based on information and belief, Credit Suisse does not manage its TVIX hedging directly, but instead outsources that function to third parties using volatility or variance swaps. Difficulties with this risk-management arrangement, however, arise if such third parties default on their swap obligations — particularly in cases where volatility spikes with little warning — or if third parties become unwilling to participate in the swaps. Rather than absorb the increased costs of hedging its TVIX obligations as TVIX continued to grow, Credit Suisse opted first to stop issuance of TVIX altogether and then to push the problem onto market makers.

Indeed, when Credit Suisse announced that it may resume issuance in the March 22 Press Release, Credit Suisse included an additional caveat regarding hedging instruments and market makers:

> Also, beginning as soon as March 28, 2012, Credit Suisse may issue additional ETNs from time to time to be sold solely to authorized market makers. Credit Suisse may condition its acceptance of a market maker's offer to purchase the ETNs on its agreeing to sell to Credit Suisse specified hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps. Any such hedging instruments will be executed on the basis of the indicative value of the ETNs at that time, will not reflect any premium or discount in the trading price of the ETNs over their indicative value and will be on terms acceptable to Credit Suisse, including the counterparty meeting Credit Suisse's creditworthiness requirements, margin requirements, minimum

Exhibit 1
30

size and duration requirements and such other terms as Credit Suisse deems appropriate in its sole discretion.[38]

This further confirms Credit Suisse's risk-management mechanism that caused TVIX to unhinge from the VIX Futures Index and then suddenly drop in value literally overnight. Importantly, this language was added to the March 23, 2012 Pricing Supplement but does not appear in earlier versions.

Yet Credit Suisse did not even mention this "internal limit" or what would happen once it was exceeded in the Offering Documents.  Nor did VLS disclose these risks in TVIX's marketing materials.  To the detriment of TVIX investors, Respondents omitted material information concerning what would occur if, in the face of heavy demand for TVIX, the product surpassed Credit Suisse's internal issuance limits thereby triggering a decision to no longer issue TVIX because Credit Suisse was unable to hedge its underlying exposure.  Respondents' failure to disclose this material risk continued even as the TVIX offering grew from the $15 million described in the November 2010 Pricing Supplement to over *$4 billion* reported in the Pricing Supplement dated March 7, 2012.

Perhaps even more fundamentally, Respondents failed to disclose that Credit Suisse had an internal limit on the number of TVIX ETNs it would issue based on its ability to enter into offsetting hedging arrangements, as described above.  Simply put, Respondents failed to even mention that TVIX could grow to a size Credit Suisse would find unmanageable and, as a result, it would cease issuing TVIX.

In addition, Respondents failed to disclose in the Offering Documents and marketing materials important information concerning the probability that TVIX would dislocate from the relevant VIX Futures Index benchmark or more specifically, its

---

[38]    Mar. 22 Press Release.

-17-

Exhibit 1

31

indicative value, when and if Credit Suisse decided to no longer issue the ETNs. Respondents continuously failed to disclose this highly material risk even through the March 7 Pricing Supplement, two weeks after Credit Suisse had suspending issuing new TVIX ETNs.   This risk remained undisclosed until the March 23 Pricing Supplement, which stated, *inter alia*:

- If we stop selling additional ETNs, the price and liquidity in the secondary market could be materially and adversely affected.[39]

- The trading price of any series of the ETNs at any time may vary significantly from the Indicative Value of such series of ETNs at such time.[40]

- The Indicative Value of the ETNs is not the same as the trading price of the ETNs in the secondary market at such time. The trading price of the ETNs at any time is the price at which you may be able to sell your ETNs in the secondary market at such time, if one exists. The trading price of any series of the ETNs at any time may vary significantly from Indicative Value of such ETNs at such time. Paying a premium purchase price over the Indicative Value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when such premium is no longer present in the market place . . . .[41]

- Furthermore, any ETNs held by us or an affiliate in inventory may be resold at prevailing market prices or lent to market participants who may have made short sales of the ETNs. Accordingly, the liquidity of the market for the ETNs could vary materially over the term of the ETNs.[42]

- The trading price of the ETNs at any time is the price that you may be able to sell your ETNs in the secondary market at such time, if one exists. The trading price of any series of the ETNs at any time may vary significantly from the Intraday Indicative Value of such ETNs at such time. Paying a premium purchase price over the Intraday Indicative Value of the ETNs could lead to significant losses in the

---

[39]   Pricing Supplement No. VLS ETN-1/A14 dated March 23, 2012 (hereinafter, "Pricing Supplement A14"), at 2, a copy of which is hereby attached as Exhibit E and is incorporated by reference as if fully set forth within.
[40]   Pricing Supplement A14, at 3.
[41]   Pricing Supplement A14, at PS-7.
[42]   Pricing Supplement Dent A14, at PS-33.

Exhibit 1
32

event the investor sells such ETNs at a time when such premium is no longer present in the market place . . . .[43]

These risk disclosures had **not** been made to investors in the Offering Documents or marketing materials before March 23, 2012.

Moreover, Credit Suisse's new hedging conditions for issuance of TVIX to market makers that first appeared in its March 22 Press Release and then in its March 23 Pricing Supplement, confirm Respondents' failure to earlier disclose material risks associated with the structure of the platform of TVIX.  Specifically, Respondents failed to disclose that Credit Suisse's ability to hedge its exposure to TVIX was limited thus rendering it highly likely Credit Suisse would reach its internal risk exposure limits and requiring it stop issuance of TVIX.

In addition, Respondents failed to disclose the risk that arbitrageurs would be rendered essentially useless in eliminating market premiums for TVIX if they could not obtain shares to sell short.  And, perhaps most fundamentally, Respondents failed to disclose the risk that once it was revealed (through a public announcement or otherwise) that Credit Suisse would resume TVIX issuances, the premium (which could not be sufficiently reduced by arbitrageurs) could collapse immediately.

In essence, the false and misleading statements set forth above, which were disseminated widely to the securities markets, investment analysts, and the investing public, materially misrepresented the true nature and true risks of TVIX.  As a result of their purchases of TVIX, Claimants have suffered economic harm and are entitled to damages under the securities laws.

---

[43]   Pricing Supplement A14, at PS-34.

-19-

Exhibit 1
33

## COUNT 1
## VIOLATION OF § 11 OF THE 1933 ACT

This Claim is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k.

Credit Suisse AG is the issuer of TVIX ETNs sold pursuant to the Offering Documents.

Credit Suisse is the underwriter of the TVIX ETNs sold pursuant to the Offering Documents.

Credit Suisse is strictly liable for the misrepresentations and omissions of material fact in the Offering Documents.

Claimants purchased TVIX ETNs issued pursuant to, or traceable to, the Offering Documents.  On information and belief, the TVIX ETNs issued by Credit Suisse before March 23, 2012, were all issued under the Offering Documents.

Claimants relied on the misrepresentations and omissions in the Offering Documents.  They would not have purchased the TVIX ETNs had they known the true facts, including that TVIX would not perform in a manner linked to the VIX Futures Index, as represented by Respondents.

Claimants are entitled to recover their actual damages against Respondents pursuant to § 11 of the Securities Act of 1933.

Less than one year has elapsed since Claimants purchased the TVIX ETNs and the time Claimants first filed the Statement of Claim.  This proceeding is timely filed under § 13 of the Securities Act of 1933.

## COUNT 2
## VIOLATION OF RULE 10b-5 UNDER THE 1934 ACT

This Claim is brought pursuant to Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

-20-

Exhibit 1

34

Respondents' misrepresentations and omissions, as described above, constitute a manipulative or deceptive device or contrivance in connection with the sale of a security registered on a national securities exchange, in violation of Rule 10b-5. Respondents' misrepresentations and omissions were made through the use of means or instrumentalities of interstate commerce. The misrepresentations and omissions were made by Respondents either with knowledge that the disclosures were thereby misleading, or with reckless disregard for their truth. Claimants relied on the misrepresentations or omissions and would not have purchased the TVIX ETNs had they known the true facts, including that TVIX would not perform in a manner linked to the VIX Futures Index, as represented by Respondents. Claimants have suffered an economic loss as a result of Respondents' misrepresentations and omissions, caused by having purchased TVIX at an artificially inflated price in reliance on Respondents' promises that TVIX would perform in a manner linked to the VIX Futures Index.

Claimants are entitled to recover their actual damages from Respondents. In the alternative, Claimants request rescission, or disgorgement of Respondents' profits.

Less than one year has elapsed since Claimants purchased the TVIX ETNs and the time Claimants first filed the Statement of Claim. This proceeding is timely filed.

## COUNT 3
## NEGLIGENCE AND GROSS NEGLIGENCE

As FINRA members, Respondents had a duty to act in accordance with federal law and the FINRA rules. By their conduct as set forth above, Respondents failed to abide by these rules, including Rule 2010 ("Standards of Commercial Honor and Principles of Trade") and Rule 2020 ("Use of Manipulative, Deceptive or Other

Exhibit 1
35

Fraudulent Devices"). The failure to act in accordance with these rules and other industry standards of conduct constitutes negligence and gross negligence.

As a proximate result of Respondents' negligence, Claimants suffered damages. Respondents are liable to Claimants for their actual damages and for punitive damages.

Less than one year has elapsed since Claimants purchased the TVIX ETNs and the time Claimants first filed the Statement of Claim. This proceeding is timely filed.

## PRAYER FOR RELIEF

WHEREFORE, Claimants pray for relief and an award, as follows:

A.   Awarding compensatory damages in favor of Claimants against both Respondents, jointly and severally, for all damages sustained as a result of Respondents' wrongdoing, in an amount to be proven at the hearing, including interest thereon;

B.   In the alternative, awarding Claimants rescission of their investments, or rescissory damages;

C.   Awarding punitive or exemplary damages against Respondents;

D.   Awarding Claimants their reasonable costs and expenses incurred in this proceeding, including counsel fees and expert fees;

E.   Awarding Claimants prejudgment interest; and

F.   Such equitable, injunctive, or other relief as deemed appropriate by the Panel.

DATED January 22, 2013

Exhibit 1

36

Respectfully submitted,

MOULTON & ARNEY, LLP

By: _____

Cynthia R. Levin Moulton
State Bar No. 12253450
Lance C. Arney
State Bar No. 00796137
800 Taft Street
Houston, Texas 77019
Telephone:  (713) 353-6699
Telecopier:  (713) 353-6698

ATTORNEYS FOR CLAIMANTS

-23-

Exhibit 1

37

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served on counsel for all parties in accordance with the FINRA Code of Arbitration Procedure for Customer Disputes on this 22nd day of January, 2013.

Raymond Banoun
Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: 202-862-2200
Facsimile: 202-862-2400
Email: ray.banoun@cwt.com

James H.R. Windels
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212-450-4978
Facsimile: 212-701-5978
Email: james.windels@davispolk.com

_____
Lance C. Arney

-24-

Exhibit 1

38

**VelocityShares**

Filed pursuant to Rule 433
Registration Statement No. 333-158199-10
December 9, 2010

# TVIX

## TVIX: VelocityShares Daily 2x VIX Short-Term ETN

**Note Information**

| | |
|---|---|
| Exchange Ticker | TVIX |
| Exposure | Leveraged (2x) |
| Reset Period | Daily |
| Indicative Value Ticker | TVIXIV |
| Inception Date | 11/29/2010 |
| Maturity Date | 12/04/2030 |
| CUSIP | 22542D761 |
| Primary Exchange | NYSE Arca |
| Investor Fee * | 1.65% |

**Issuer Information**

| | |
|---|---|
| Issuer | Credit Suisse AG |

**Index Information**

Index - S&P 500 VIX Short-Term Futures™ Index ER
Bloomberg Index Ticker    SPVXSP
Futures Weighted Average Maturity – 1 Month

*On any calendar day, the Daily Investor Fee is equal to the product of (1) the Closing Indicative Value on the immediately preceding calendar day multiplied by (2) the Daily ETN Performance for that series on such calendar day multiplied by (3) the quotient of (a) 0.0165 divided by (b) 365.

The VelocityShares Daily 2x VIX Short-Term ETNs (the "ETNs") are senior, unsecured obligations of Credit Suisse AG ("Credit Suisse") acting through its Nassau branch. The return on the ETNs is linked to twice (2x) the daily performance of the S&P 500 VIX Short-Term Futures™ Index ER less the investor fee. The ETNs provide traders with an exchange traded instrument enabling them to efficiently express their market views on the short-term futures contracts on the CBOE SPX Volatility Index® (the "VIX®"). The ETNs do not guarantee any return of principal at maturity and do not pay any interest during their term.

The index was designed to provide investors with exposure to one or more maturities of futures contracts on the VIX®, which reflects implied volatility of the S&P 500® Index at various points along the volatility forward curve. The calculation of the VIX® is based on prices of put and call options on the S&P 500® Index. The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average maturity of 1 month. The ETNs are linked to a multiple (2x) of the daily return of the index and do not represent an investment in the VIX®.

### Benefits of Trading Volatility

- Volatility ETNs may be used to express short-term views on the direction of volatility
- Volatility is often negatively correlated to the performance of US equity markets
- Volatility appears to revert to the mean, which indicates at historically low VIX® levels, there is a higher probability that the next big move will be up rather than down. Conversely, at historically high VIX® levels, the next big move is more likely to be down rather than up

### Risks Associated with the ETNs

- You may lose all or a significant part of your investment in the ETNs if the index decreases or does not increase by an amount sufficient to offset the applicable fees and charges
- The ETNs and payment of any amount due on the ETNs are subject to the credit risk of Credit Suisse. Any payment on the ETNs is subject to the ability of Credit Suisse AG to satisfy its obligations as they become due

- The ETNs are intended to be trading tools for sophisticated investors and should be purchased only by knowledgeable investors who understand the potential consequences of investing in a volatility index and of seeking leveraged investment results
- The ETNs may be redeemed at the investor's option subject to certain restrictions described in the prospectus such as a minimum number of ETNs required for redemption and redemption being limited to certain dates. Redemption prior to maturity may result in the imposition of a charge that would reduce the amount an investor receives to less than the full amount of the Closing Indicative Value
- The return at maturity, upon repurchase or early redemption will be reduced by the fees and charges associated with the ETN
- The ETNs are not linked to the VIX®
- The ETNs are designed to obtain their stated investment objectives on a daily basis
- If you hold your ETN as a long term investment, it is likely that you will lose all or a substantial portion of your investment

Exhibit 1
39

# **TVIX**: VelocityShares Daily 2x VIX Short-Term ETN

**Risks (continued from prior page)**

- The issuer has the right to call your ETNs
- The market price of your ETNs may be influenced by many unpredictable factors
- Although we intend to list the ETNs on NYSE Arca, a trading market for your ETNs may not develop
- Daily rebalancing will impair the performance of the ETNs if the underlying index experiences volatility

- Because the 2x Long ETNs are linked to the daily performance of the applicable underlying Index and include leveraged exposure, changes in the market price of the underlying futures will have a greater likelihood of causing such ETNs to be worth zero than if such ETNs were not linked to the leveraged return of the applicable underlying Index

The risks set forth in the section entitled "Risks Associated with the ETNs" on the preceding page and "Risks (continued from prior page)" on this page are only intended as summaries of some of the risks relating to an investment in the ETNs. Prior to investing in the ETNs, you should, in particular, review the "Risks Factors" section in the applicable pricing supplement, which set forth risks related to an investment in the ETNs.

Credit Suisse has filed a registration statement (including a pricing supplement, prospectus supplement and prospectus) with the Securities and Exchange Commission, or SEC, for the offering of securities. Before you invest, you should read the applicable pricing supplement, the prospectus supplement dated March 25, 2009, prospectus dated March 25, 2009 (File No. 333-158199-10), to understand fully the terms of the notes and other considerations that are important in making a decision about investing in the securities. You may get these documents without cost by visiting EDGAR on the SEC website at www.sec.gov. Alternatively, Credit Suisse or VLS Securities LLC or any agent or dealer participating in an offering will arrange to send you the applicable terms sheet or pricing supplement, prospectus supplement and prospectus if you so request by calling toll-free 1 800-221-1037.

Information contained in the VelocityShares website (www.velocityshares.com) is not incorporated by reference in, and should not be considered a part of, this free writing prospectus or any pricing supplement of Credit Suisse AG, and to the extent any of such information has not been filed by Credit Suisse AG, we have not participated in the preparation of, or verified, such publicly available information.

"Standard & Poor's®", "S&P®", "S&P 500®", "Standard & Poor's 500™", "S&P 500 VIX Short-Term Futures™" and "S&P 500 VIX Mid-Term Futures™" are trademarks of Standard & Poor's Financial Services LLC ("S&P") and have been licensed for use by VelocityShares LLC. "VIX" is a trademark of the Chicago Board Options Exchange, Incorporated ("CBOE") and has been licensed for use by S&P. The ETNs are not sponsored, endorsed, sold or promoted by S&P or CBOE and S&P and CBOE make no representation regarding the advisability of investing in the ETNs.

Exhibit 1

40

(continued from previous page)

**PRICING SUPPLEMENT No. VLS ETN-1/A13**[†]
To the Prospectus Supplement dated March 25, 2009 and
Prospectus dated March 25, 2009

Filed Pursuant to Rule 424(b)(2)
Registration Statement No. 333-158199-10
March 7, 2012



## Issued by Credit Suisse AG

$1,500,000,000* VelocityShares™ Daily Inverse VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030
$100,000,000* VelocityShares™ Daily Inverse VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030
$500,000,000*[††] VelocityShares™ VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030
$100,000,000* VelocityShares™ VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030
$5,880,000,000* VelocityShares™ Daily 2x VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030[±]
$100,000,000* VelocityShares™ Daily 2x VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030

| ETNs | Leverage Amount | ETN Type | Exchange Ticker | Indicative Value Ticker | CUSIP | ISIN |
|---|---|---|---|---|---|---|
| Inverse VIX Short Term ETNs | -1 | "Inverse" | XIV | XIVIV | 22542D795 | US22542D7957 |
| Inverse VIX Medium Term ETNs | | | ZIV | ZIVIV | 22542D829 | US22542D8294 |
| Long VIX Short Term ETNs | 1 | "Long" | VIIX | VIIXIV | 22542D811 | US22542D8112 |
| Long VIX Medium Term ETNs | | | VIIZ | VIIZIV | 22542D787 | US22542D7874 |
| 2x Long VIX Short Term ETNs[±] | 2 | "2x Long" or "Leveraged" | TVIX | TVIXIV | 22542D761 | US22542D7619 |
| 2x Long VIX Medium Term ETNs | | | TVIZ | TVIZIV | 22542D779 | US22542D7791 |

[±] On February 21, 2012, we temporarily suspended further issuances of the 2x Long VIX Short Term ETNs due to internal limits on the size of ETNs. This suspension remains in place as of the date of this pricing supplement, but we may commence issuing the 2x Long VIX Short Term ETNs at any time. This suspension does not affect the early redemption right of holders as described herein. The other ETNs issued by us are not affected by this suspension.

We are offering six separate series of exchange traded notes (collectively, the "**ETNs**"), the VelocityShares™ Daily Inverse VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030 (the "**Inverse VIX Short Term ETNs**"), the VelocityShares™ Daily Inverse VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030 (the "**Inverse VIX Medium Term ETNs**" and collectively with the Inverse VIX Short Term ETNs, the "**Inverse ETNs**"), the VelocityShares™ VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030 (the "**Long VIX Short Term ETNs**"), the VelocityShares™ VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030 (the "**Long VIX Medium Term ETNs**" and collectively with the VIX Short Term ETNs, the "**Long ETNs**"), the VelocityShares™ Daily 2x VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030 (the "**2x Long VIX Short Term ETNs**") and the VelocityShares™ Daily 2x VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030 (the "**2x Long VIX Medium Term ETNs**" and collectively with the Leveraged Short Term ETNs, the "**2x Long ETNs**").

**The ETNs, and in particular the 2x Long ETNs, are intended to be trading tools for sophisticated investors to manage daily trading risks. They are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives. The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day. Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable. Investors should actively and frequently monitor their investments in the ETNs, even intra-day.**

**As explained in "Risk Factors" in this pricing supplement, because of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment. In almost any potential scenario the Closing Indicative Value (as defined below) of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity.**

[†]This amended and restated pricing supplement amends and restates and supersedes Pricing Supplement No. VLS ETN-1 dated November 29, 2010, Pricing Supplement No. VLS ETN-1/A dated December 8, 2010, Pricing Supplement No. VLS ETN-1/A2 dated March 30, 2011, Pricing Supplement No. VLS ETN-1/A3 dated April 8, 2011, Pricing Supplement No. VLS ETN-1/A4 dated May 31, 2011, Pricing Supplement No. VLS ETN-1/A5 dated June 27, 2011, Pricing Supplement No. VLS ETN-1/A6 dated July 1, 2011, Pricing Supplement No. VLS ETN-1/A7 dated August 10, 2011, Pricing Supplement No. VLS ETN-1/A8 dated January 19, 2012, Pricing Supplement No. VLS ETN-1/A9 dated January 27, 2012, Pricing Supplement No. VLS ETN-1/A10 dated February 2, 2012, Pricing Supplement No. VLS ETN-1/A11 dated February 3, 2012 and Pricing Supplement No. VLS ETN-1/A12 dated February 16, 2012. We refer to this amended and restated pricing supplement as the "pricing supplement."

**Investing in the ETNs involves a number of risks. See "Risk Factors" beginning on page PS-26 of this pricing supplement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined that this pricing supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

* The agent for this offering, Credit Suisse Securities (USA) LLC ("CSSU"), is our affiliate. We have issued $486,500,000 in principal amount of the Inverse VIX Short Term ETNs (48,650,000 Inverse VIX Short Term ETNs), $8,375,000 in principal amount of the Inverse VIX Medium Term ETNs (670,000 Inverse VIX Medium Term ETNs), $30,000,000 in principal amount of the Long VIX Short Term ETNs (300,000 Long VIX Short Term ETNs), $10,000,000 in principal amount of the Long VIX Medium Term ETNs (100,000 Long VIX Medium Term ETNs), $4,072,500,000 in principal amount of the 2x Long VIX Short Term ETNs (40,725,000 2x Long VIX Short Term ETNs) and $15,000,000 in principal amount of the 2x Long VIX Medium Term ETNs (150,000 2x Long VIX Medium Term ETNs), in each case from the initial settlement date through March 6, 2012, through CSSU and through one or more dealers purchasing as principal through CSSU. On June 16, 2011, Credit Suisse AG announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011. Accordingly, as of the date of this pricing supplement, we have issued 48,650,000 Inverse VIX Short Term ETNs outstanding with stated principal amount of $10 each and 670,000 Inverse VIX Medium Term ETNs with stated principal amount of $12.50 each.

Additional ETNs of each series may be issued and sold from time to time through CSSU and one or more dealers at a price that is higher or lower than the stated principal amount, based on the indicative value of the ETNs of such series at that time. We will receive proceeds equal to 100% of the offering price of the ETNs issued and sold after the initial settlement date. Delivery of the ETNs in book-entry form only will be made through The Depository Trust Company ("DTC").

[††] Amount represents an increase of $400,000,000 in principal amount of the Long VIX Short Term ETNs (4,000,000 Long VIX Short Term ETNs) from the amount set forth in the Pricing Supplement No. VLS ETN-1/A12 dated February 16, 2012.

CSSU is expected to charge normal commissions for the purchase of the ETNs. In exchange for providing certain services relating to the distribution of the ETNs, CSSU, a member of the Financial Industry Regulatory Authority ("**FINRA**"), may receive all or a portion of the investor fee. In addition, CSSU may charge investors a redemption charge of up to 0.05% of the stated principal amount of any ETN that is redeemed at the investor's option. Please see "Supplemental Plan of Distribution (Conflicts of Interest)" in this pricing supplement for more information.

*The securities are not deposit liabilities and are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction.*

## Credit Suisse

March 7, 2012

Exhibit 1

41

**General**

- The ETNs are designed for investors who seek exposure to the applicable underlying Index.  The ETNs do not guarantee any return of principal at maturity and do not pay any interest during their term.  For each ETN, investors will receive a cash payment at maturity, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee (each as defined herein).  Investors should be willing to forgo interest payments and, if the applicable underlying Index declines or increases, as applicable, be willing to lose up to 100% of their investment.  Any payment on the ETNs is subject to our ability to pay our obligations as they become due.

- The ETNs are senior medium-term notes of Credit Suisse AG, acting through its Nassau Branch, maturing December 4, 2030 (the "**Maturity Date**").[**]

- Prior to June 27, 2011, the denomination and stated principal amount of each ETN was $100.  On June 16, 2011, Credit Suisse AG announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011.  On and after June 27, 2011, the denomination and stated principal amount will be $10 for the Inverse VIX Short Term ETNs, $12.50 for the Inverse VIX Medium Term ETNs and $100 for each of the Long VIX Short Term ETNs, the Long VIX Medium Term ETNs, the 2x Long VIX Short Term ETNs and the 2x Long VIX Medium Term ETNs.  Any ETNs issued in the future may be issued at a price that is higher or lower than the stated principal amount, based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs.

- The initial issuance of ETNs of each series priced on November 29, 2010 (the "**Inception Date**") and settled on December 2, 2010 (the "**Initial Settlement Date**").  Delivery of the ETNs in book-entry form only will be made through The Depository Trust Company ("**DTC**").

On the Inception Date, the issue price to the public per ETN was 100% of the principal amount of such ETN.  We sold a portion of the ETNs on the Inception Date at 100% of their stated principal amount.  We expect to receive proceeds equal to 100% of the issue price to the public of the ETNs we issue and sell after the Inception Date.

VLS Securities, LLC ("**VLS**") will receive all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing the securities under the "VelocityShares™" brand.  See "Supplemental Plan of Distribution" in this pricing supplement for further information.

This pricing supplement provides specific pricing information in connection with the issuance of each series of the ETNs.  Prospective investors should read this pricing supplement together with the prospectus supplement dated March 25, 2009 and the prospectus dated March 25, 2009 for a description of the specific terms and conditions of the ETNs.  This pricing supplement amends and supersedes the accompanying prospectus supplement and prospectus to the extent that the information provided in this pricing supplement is different from the terms set forth in the prospectus supplement or the prospectus.

We may offer further issuances of ETNs of each series at offering prices based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs.  If there is a substantial demand for the ETNs, we may issue additional ETNs frequently.  Any further issuances of ETNs of any series will form a single series with the offered ETNs of such series, will have the same CUSIP number and will trade interchangeably with the offered ETNs of such series upon settlement. Any further issuances will increase the outstanding aggregate principal amount of the applicable series of the ETNs.  See "Supplemental Plan of Distribution" in this pricing supplement for further information.

**Key Terms**

| | |
|---|---|
| Issuer: | Credit Suisse AG ("**Credit Suisse**"), acting through its Nassau Branch |
| Index: | The return on the ETNs of any series will be based on the performance of the applicable underlying Index during the term of such ETNs.  Each series of ETNs tracks the daily performance of either the S&P 500 VIX Short-Term Futures™ Index ER or S&P 500 VIX Mid-Term Futures™ Index ER (each such index, an "**Index**" and collectively the "**Indices**").  The Indices are designed to provide investors with exposure to one or more maturities of futures contracts on the CBOE Volatility Index® (the "**VIX Index**"), which reflect implied volatility of the S&P 500® Index at various points along the volatility forward curve.  The calculation of the level of the VIX Index is based on prices of put and call options on the S&P 500® Index.  Futures contracts on the VIX Index allow investors the ability to invest in forward volatility based on their view of the future direction of movement of the VIX Index.  Each Index is intended to reflect the returns that are potentially available through an unleveraged investment in the relevant futures contract or contracts on the VIX Index.  The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average futures contracts maturity of one month and the S&P 500 VIX Mid-Term Futures™ Index ER targets a constant weighted average futures contracts maturity of five months.  The Indices were created by Standard & Poor's Financial Services LLC ("**S&P**" or the "**Index Sponsor**").  The Index Sponsor calculates the level of the relevant Index daily when the Chicago Board Options Exchange, Incorporated (the "**CBOE**") is open (excluding holidays and weekends) and publishes it on the Bloomberg pages specified below as soon as practicable thereafter.  Each Index, or any successor index to such Index, may be modified, replaced or adjusted from time to time, as determined by the Calculation Agents as set forth below.  See "The Indices" in this pricing supplement for further information on the Indices. |

| ETNs | Underlying Index | Underlying Index Ticker |
|---|---|---|
| Inverse VIX Short Term ETNs, Long VIX Short Term ETNs, 2x Long VIX Short Term ETNs | S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| Inverse VIX Medium Term ETNs, Long VIX Medium Term ETNs, 2x LongVIX Medium Term ETNs | S&P 500 VIX Mid-Term Futures™ Index ER | SPVXMP |

| | |
|---|---|
| | The Calculation Agents, may modify, replace or adjust the Indices under certain circumstances even if the Index Sponsor continues to publish the applicable Index without modification, replacement or adjustment.  See "Specific Terms of the ETNs—Discontinuance or Modification of the Index" and "Risk Factors—The Calculation Agents may modify the applicable underlying Index" in this pricing supplement for further information. |
| Payment at Maturity: | If your ETNs have not been previously redeemed or accelerated, on the Maturity Date you will receive for each $100 stated principal amount of your ETNs (for each $10 stated principal amount in the case of Inverse VIX Short Term ETNs and for each $12.50 stated principal amount in the case of Inverse VIX Medium Term ETNs) a cash payment equal to the applicable Closing Indicative Value on the Final Valuation Date (the "**Final Indicative Value**"), as calculated by the Calculation Agents.  We refer to the amount of such payment as the "**Maturity Redemption Amount**." *If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero.* |

---

[**] The Maturity Date will be postponed if such date is not a Business Day or if the scheduled Final Valuation Date is not an Index Business Day or if a Market Disruption Event occurs and is continuing on the Final Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.  See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1
42

| | |
|---|---|
| Closing Indicative Value: | The Closing Indicative Value for any series of ETNs on the Inception Date equaled $100 (the "**Initial Indicative Value**").  The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day.  The Closing Indicative Value will never be less than zero.  **The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value equals zero at any time or Closing Indicative Value equals zero.** The Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs underwent a 10-for-1 split and an 8-for-1 split, respectively, effective June 27, 2011.  The Closing Indicative Value of the Inverse VIX Short Term ETNs on June 24, 2011 was 157.89294145 and the Closing Indicative Value of the Inverse VIX Medium Term ETNs on June 24, 2011 was 127.46917437.  Such values were divided by 10 and 8, respectively, and rounded to 8 decimal places, prior to the open of trading on June 27, 2011.  On and after June 27, 2011, the Closing Indicative Value for the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs will be expressed in an amount per denomination and stated principal amount of $10 and $12.50, respectively. If the ETNs undergo any subsequent splits or reverse splits, the Closing Indicative Value will be adjusted accordingly (see "Description of the ETNs— Split or Reverse Split of the ETNs" in this pricing supplement).  VLS or its affiliate is responsible for computing and disseminating the Closing Indicative Value. |
| Daily ETN Performance: | The Daily ETN Performance for any series of ETNs on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Daily Index Performance on such Index Business Day *times* (b) the Leverage Amount.  The Daily ETN Performance is deemed to be one on any day that is not an Index Business Day. |
| Daily Accrual: | The Daily Accrual represents the rate of interest that could be earned on a notional capital reinvestment at the three month U.S. Treasury rate as reported on Bloomberg under ticker USB3MTA.  The Daily Accrual for any series of ETNs on any Index Business Day will equal: |

$$\left( \frac{1}{1 - Tbills_{t-1} * \frac{91}{360}} \right)^{\frac{d}{91}} - 1$$

| | |
|---|---|
| | Where $Tbills_{t-1}$ is the three month treasury rate reported on Bloomberg on the prior Index Business Day and $d$ is the number of calendar days that have elapsed since the prior Index Business Day.  The Daily Accrual is deemed to be zero on any day that is not an Index Business Day. |
| Daily Index Performance: | The Daily Index Performance for any series of ETNs on any Index Business Day will equal (1)(a) the closing level of the applicable underlying Index on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index on the immediately preceding Index Business Day *minus* (2) the number one.  If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event.  The Daily Index Performance is deemed to be zero on any day that is not an Index Business Day. |
| Leverage Amount: | The Leverage Amount for each series of ETNs is as follows: |

| | |
|---|---|
| Inverse VIX Short Term ETNs: | -1 |
| Inverse VIX Medium Term ETNs: | -1 |
| Long VIX Short Term ETNs: | 1 |
| Long VIX Medium Term ETNs: | 1 |
| 2x Long VIX Short Term ETNs: | 2 |
| 2x Long VIX Medium Term ETNs: | 2 |

| | |
|---|---|
| Daily Investor Fee: | On any calendar day (the "**calculation day**"), the Daily Investor Fee for any series of ETNs will be equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Daily ETN Performance for that series on the calculation day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365. The "**Daily Investor Fee Factor**" will be equal to (i) 0.0089 for each of the Long ETNs, (ii) 0.0135 for each of the Inverse ETNs and (iii) 0.0165 for each of the 2x Long ETNs. **If the level of the Index decreases or does not increase sufficiently in the case of the Long ETNs or 2x Long ETNs or if it increases or does not decrease sufficiently in the case of the Inverse ETNs (in each case in addition to the Daily Accrual) to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over the term of the ETNs, you will receive less than the principal amount of your investment at maturity or upon early redemption or acceleration of the ETNs.**  See "Risk Factors — Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the applicable underlying Index on the date of your investment, you may receive less than the principal amount of your ETNs" and "Hypothetical Examples" in this pricing supplement for additional information on how the Daily Investor Fee affects the overall value of the ETNs. |
| Intraday Indicative Value: | The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor.  The Intraday Indicative Value at any time is based on the most recent intraday level of the underlying Index.  **If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero.  See "Description of the ETNs—Intraday Indicative Value" in this pricing supplement.**  VLS or its affiliate is responsible for computing and disseminating the Intraday Indicative Value. |
| Valuation Dates: | November 30, 2030 or, if such date is not an Index Business Day, the next following Index Business Day (the "**Final Valuation Date**"), any Early Redemption Valuation Date and the Accelerated Valuation Date. |
| Secondary Market: | We have listed each series of the ETNs on the NYSE Arca under the ticker symbols as set forth in the table above.  However, there is no assurance that our application will be approved. If an active secondary market in the ETNs develops, we expect that investors will purchase and sell the ETNs primarily in this secondary market.  We have no obligation to maintain any listing on NYSE Arca or any other exchange. |
| Early Redemption: | Prior to maturity, you may, subject to certain restrictions described below, offer the applicable minimum number of your ETNs to us for redemption on an Early Redemption Date during the term of the ETNs until November 28, 2030.  If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount. You must offer for redemption at least 25,000 ETNs, or an integral multiple of 25,000 ETNs in excess thereof, at one time in order to exercise your right to cause us to redeem your ETNs on any Early Redemption Date (the "**Minimum Redemption Amount**"); provided that we or Credit Suisse International ("**CSI**") as one of the Calculation Agents, may from time to time reduce, in part or in whole, the Minimum Redemption Amount.  Any such reduction will be applied on a consistent basis for all holders of the relevant series of ETNs at the time the reduction becomes effective.  If the ETNs undergo a split or reverse split, the minimum number of ETNs needed to exercise your right to redeem will remain the same. |
| Early Redemption Mechanics: | You may exercise your early redemption right by causing your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein).  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.   See "Specific Terms of the ETNs—Redemption Procedures" in this pricing supplement. |
| Early Redemption Date: | The third Business Day following an Early Redemption Valuation Date.** |
| Early Redemption Amount: | A cash payment per ETN equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge. |

Exhibit 1

43

| Early Redemption Charge: | The Early Redemption Charge will be equal to 0.05% *times* the Closing Indicative Value on the Early Redemption Valuation Date. |
|---|---|
| Acceleration at Our Option or Upon Acceleration Event: | We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date.  In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration.  In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day).  The Accelerated Redemption Amount will be payable on the third Business Day following the Accelerated Valuation Date (such third Business Day the "**Acceleration Date**").\*\*\*  We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes. |
| Acceleration Event: | As discussed in more detail under "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" in this pricing supplement, an Acceleration Event includes any event that adversely affects our ability to hedge or our rights in connection with the ETNs, including, but not limited to, if the Intraday Indicative Value is equal to or less than 20% of the prior day's Closing Indicative Value. |
| Business Day: | Any day that is not (a) a Saturday or Sunday or (b) a day on which banking institutions generally are authorized or obligated by law or executive order to close in New York. |
| Index Business Day: | An Index Business Day, with respect to the applicable underlying Index, is a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on NYSE Arca, in each case as determined by VLS, as one of the Calculation Agents. |
| Calculation Agents: | CSI and VLS. See "Specific Terms of the ETNs—Role of Calculation Agents" in this pricing supplement. |

\*\* An Early Redemption Date will be postponed if a Market Disruption Event occurs and is continuing on the applicable Early Redemption Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of any Early Redemption Date.  See "Specific Terms of the ETNs—Market Disruption Events".

\*\*\* The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date.  See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1

44

**TABLE OF CONTENTS**

|  | **Page** |
|---|---|
| SUMMARY .......................................................................................................................... | PS-1 |
| HYPOTHETICAL EXAMPLES.......................................................................................... | PS-12 |
| RISK FACTORS .................................................................................................................. | PS-26 |
| THE INDICES...................................................................................................................... | PS-39 |
| DESCRIPTION OF THE ETNs .......................................................................................... | PS-48 |
| SPECIFIC TERMS OF THE ETNs...................................................................................... | PS-50 |
| CLEARANCE AND SETTLEMENT.................................................................................... | PS-57 |
| USE OF PROCEEDS AND HEDGING ............................................................................... | PS-57 |
| CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS..................................... | PS-59 |
| SUPPLEMENTAL PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST)........................................ | PS-64 |
| BENEFIT PLAN INVESTOR CONSIDERATIONS ........................................................... | PS-65 |
| ANNEX A ............................................................................................................................ | A-1 |

You should read this pricing supplement together with the accompanying prospectus supplement dated March 25, 2009 and the prospectus dated March 25, 2009, relating to our Medium-Term Notes of which these ETNs are a part.  You may access these documents on the SEC website at www.sec.gov as follows (or if such address has changed, by reviewing our filings for the relevant date on the SEC website):

- • Prospectus supplement dated March 25, 2009:

http://www.sec.gov/Archives/edgar/data/1053092/000104746909003093/a2191799z424b2.htm

- • Prospectus dated March 25, 2009:

http://www.sec.gov/Archives/edgar/data/1053092/000104746909003289/a2191966z424b2.htm

Our Central Index Key, or CIK, on the SEC website is 1053092.

This pricing supplement, together with the documents listed above, contains the terms of the ETNs of any series and supersedes all other prior or contemporaneous oral statements as well as any other written materials including preliminary or indicative pricing terms, fact sheets, correspondence, trade ideas, structures for implementation, sample structures, brochures or other educational materials of ours. You should carefully consider, among other things, the matters set forth in "Risk Factors" in this pricing supplement and the accompanying prospectus supplement and prospectus, as the ETNs of any series involve risks not associated with conventional debt securities.  You should consult your investment, legal, tax, accounting and other advisers before deciding to invest in the ETNs of any series.  You should rely only on the information contained in this document or in any documents to which we have referred you. We have not authorized anyone to provide you with information that is different.  This document may only be used where it is legal to sell these ETNs.  The information in this document may only be accurate on the date of this document.

The distribution of this pricing supplement and the accompanying prospectus supplement and prospectus and the offering of the ETNs of any series in some jurisdictions may be restricted by law.  If you possess this pricing supplement, you should find out about and observe these restrictions.

In this pricing supplement and the accompanying prospectus supplement and prospectus, unless otherwise specified or the context otherwise requires, references to "Credit Suisse", the "Company", "we", "us" and "our" are to Credit Suisse AG, acting through its Nassau Branch, and references to "dollars" and "$" are to United States dollars.

i

Exhibit 1

45

## SUMMARY

The following is a summary of terms of the ETNs, as well as a discussion of risks and other considerations you should take into account when deciding whether to invest in any of the series of the ETNs. References to the "prospectus" mean our accompanying prospectus, dated March 25, 2009 and references to the "prospectus supplement" mean our accompanying prospectus supplement, dated March 25, 2009.

We may, without providing you notice or obtaining your consent, create and issue ETNs of each series in addition to those offered by this pricing supplement having the same terms and conditions as the ETNs of such series. We may consolidate the additional ETNs to form a single class with the outstanding ETNs of such series.

**What are the ETNs and how do they work?**

The ETNs are medium-term notes of Credit Suisse AG (**"Credit Suisse"**), the return on which is linked to the performance of either the S&P 500 VIX Short-Term Futures™ Index ER or the S&P 500 VIX Mid-Term Futures™ Index ER (each such index, an "**Index**" and collectively the "**Indices**").

We will not pay you interest during the term of the ETNs. The ETNs do not have a minimum payment at maturity or acceleration amount and are fully exposed to any decline or increase, as applicable, in the applicable underlying Index.

If you invest in the Long ETNs or the 2x Long ETNs, depreciation of the applicable underlying Index will reduce your payment at maturity, upon redemption or acceleration, and you could lose your entire investment.

If you invest in the Inverse ETNs, appreciation of the applicable underlying Index will reduce your payment at maturity, upon redemption or acceleration, and you could lose your entire investment.

The ETNs, and in particular the 2x Long ETNs, are intended to be trading tools for sophisticated investors to manage daily trading risks. They are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives. The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day. Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable. Investors should actively and frequently monitor their investments in the ETNs, even intra-day.

**As explained in "Risk Factors" in this pricing supplement, because of the way in which the Closing Indicative Value of the ETNs and the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment. In almost any potential scenario the Closing Indicative Value (as defined below) of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity.**

For a description of how the payment at maturity, upon redemption or upon acceleration is calculated, please refer to the "Specific Terms of the ETNs—Payment at Maturity," "—Payment Upon Early Redemption" and "—Acceleration at Our Option or Upon an Acceleration Event" sections herein.

Prior to June 27, 2011, the denomination and stated principal amount of each ETN was $100. On June 16, 2011, Credit Suisse AG announced that it expected to implement a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011. On and after June 27, 2011, the denomination and stated principal amount will be $10 for the Inverse VIX Short Term ETNs, $12.50 for the Inverse VIX Medium Term ETNs and $100 for each of the Long VIX Short Term ETNs, the Long VIX Medium Term ETNs, the 2x Long VIX Short Term ETNs and the 2x Long VIX Medium Term ETNs. Any ETNs issued in the future may be issued at a price higher or lower than the stated principal amount, based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs. You will not have the right to receive physical

PS-1

Exhibit 1

46

certificates evidencing your ownership except under limited circumstances.  Instead, we will issue the ETNs in the form of a global certificate, which will be held by DTC or its nominee.  Direct and indirect participants in DTC will record beneficial ownership of the ETNs by individual investors.  Accountholders in the Euroclear or Clearstream Banking clearance systems may hold beneficial interests in the ETNs through the accounts those systems maintain with DTC.  You should refer to the section "Description of Notes—Book-Entry, Delivery and Form" in the accompanying prospectus supplement and the section "Description of Debt Securities—Book-Entry System" in the accompanying prospectus.

**What are the Indices and who publishes the level of the Indices?**

The Indices are designed to provide investors with exposure to one or more maturities of futures contracts on the CBOE Volatility Index® (the "**VIX Index**"), which reflect implied volatility of the S&P 500® Index at various points along the volatility forward curve.  The calculation of the level of the VIX Index is based on prices of put and call options on the S&P 500® Index.  Futures contracts on the VIX Index allow investors the ability to invest in forward volatility based on their view of the future direction of movement of the VIX Index.  Each Index is intended to reflect the returns that are potentially available through an unleveraged investment in the relevant futures contract or contracts on the VIX Index.  The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average futures maturity of one month and the S&P 500 VIX Mid-Term Futures™ Index ER targets a constant weighted average futures maturity of five months.

The Indices were created by Standard & Poor's Financial Services LLC ("**S&P**" or the "**Index Sponsor**").  The Index Sponsor calculates the level of the relevant Index daily when the Chicago Board Options Exchange, Incorporated (the "**CBOE**") is open (excluding holidays and weekends) and publishes it on the Bloomberg pages specified herein as soon as practicable thereafter.  Each Index, or any successor index to such Index, may be modified, replaced or adjusted from time to time, as determined by the Calculation Agents as set forth below.  See "The Indices" in this pricing supplement for further information on the Indices.

| ETNs | Underlying Index | Underlying Index Ticker |
|---|---|---|
| Inverse VIX Short Term, Long VIX Short Term, 2x VIX Short Term | S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| Inverse VIX Medium-Term, Long VIX Medium Term, 2xVIX  Medium Term | S&P 500 VIX Medium-Term Futures™ Index ER | SPVXMP |

The Calculation Agents, may modify, replace or adjust the Indices under certain circumstances even if the Index Sponsor continues to publish the applicable Index without modification, replacement or adjustment.  See "Specific Terms of the ETNs—Discontinuation or Modification of the Index" and "Risk Factors—The Calculation Agents may modify the Indices" in this pricing supplement for further information.

**How have the Indices performed historically?**

The inception date for the Indices is January 22, 2009 at the market close.  The Indices were not in existence prior to that date.  The chart below shows the closing level of each Index since the base date, December 20, 2005 through March 5, 2012.  The historical performance is presented from January 22, 2009 through March 5, 2012.  The closing levels from the base date of December 22, 2005 through January 22, 2009 represents hypothetical values determined by S&P, as the Index Sponsor, as if the relevant Index had been established on December 20, 2005 each with a base value of 100,000 on such date and calculated according to the methodology described below since that date.  The closing levels from January 22, 2009 through March 5, 2012 represent the actual closing levels of the Indices as calculated on such dates.  We obtained the levels below from Bloomberg, without independent verification.  We have derived all information regarding each of the Indices contained in this pricing supplement, including, without limitation, their make-up, method of calculation and changes to their components, from publicly available information, and we have not participated in the preparation of, or verified, such publicly available information.  We make no representation or warranty as to the accuracy or completeness of this publicly available

Exhibit 1

47

information.  Such information reflects the policies of, and is subject to change by the Index Sponsor.  We and our affiliates make no representation or warranty as to, and assume no responsibility for, the accuracy or completeness of such information.  **The hypothetical and historical Index performance should not be taken as an indication of future performance, and no assurance can be given as to the level of either Index on any given date.  See "The Indices" in this pricing supplement for more information on the Indices.**



**Will I receive interest on the ETNs?**

You will not receive any interest payments on your ETNs.  The ETNs are not designed for investors who are looking for periodic cash payments.  Instead, the ETNs are designed for investors who are willing to forgo cash payments and, if the applicable underlying Index declines or does not increase enough (or increases or does not decline enough in the case of the Inverse ETNs) to offset the effect of the Daily Investor Fee as described below, are willing to lose some or all of the their principal.

**How will payment at maturity, at redemption or upon acceleration be determined for the ETNs?**

Unless your ETNs have been previously redeemed or accelerated, the ETNs will mature on December 4, 2030 (the "**Maturity Date**").

*Payment at Maturity*

If your ETNs have not been previously redeemed or accelerated, on the Maturity Date you will receive a cash payment per ETN equal to the applicable Closing Indicative Value on the Final Valuation Date (the "**Final Indicative Value**"), as calculated by the Calculation Agents.  We refer to the amount of such payment as the "**Maturity Redemption Amount**."  If the scheduled Maturity Date is not a Business Day, the Maturity Date will be postponed to the first Business Day following the scheduled Maturity Date.  If the scheduled Final Valuation Date is not an Index Business Day, the Final Valuation Date will be postponed to the next following Index Business Day, in which case the Maturity Date will be postponed to the third Business Day following the Final Valuation Date as so postponed.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.

**If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero.**

Exhibit 1

48

The "**Closing Indicative Value**" for any given series of ETNs on any given calendar day will be calculated in the following manner:  The Closing Indicative Value on the Inception Date will equal $100 (the "**Initial Indicative Value**").  The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day.  The Closing Indicative Value will never be less than zero.  **The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value equals zero at any time or Closing Indicative Value equals zero.**

The Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs underwent a 10-for-1 split and an 8-for-1 split, respectively, effective June 27, 2011.  The Closing Indicative Value of the Inverse VIX Short Term ETNs on June 24, 2011 was 157.89294145 and the Closing Indicative Value of the Inverse VIX Medium Term ETNs on June 24, 2011 was 127.46917437.  Such values were divided by 10 and 8, respectively, and rounded to 8 decimal places, prior to the open of trading on June 27, 2011.  On and after June 27, 2011, the Closing Indicative Value for the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs will be expressed in an amount per denomination and stated principal amount of $10 and $12.50, respectively.

If the ETNs undergo any subsequent splits or reverse splits, the Closing Indicative Value will be adjusted accordingly (see "Description of ETNs—Split or Reverse Split of the ETNs" herein).  VLS Securities, LLC ("**VLS**") or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

The "**Daily ETN Performance**" for any series of ETNs on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Daily Index Performance on such Index Business Day *times* (b) the Leverage Amount.  The Daily ETN Performance is deemed to be one on any day that is not an Index Business Day.

An "**Index Business Day**", with respect to the applicable underlying Index, is a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on NYSE Arca, in each case as determined by VLS, as one of the Calculation Agents.

The "**Daily Accrual**" represents the rate of interest that could be earned on a notional capital reinvestment at the three month U.S. Treasury rate as reported on Bloomberg under ticker USB3MTA.  The Daily Accrual for any series of ETNs on any Index Business Day will equal:

$$\left( \frac{1}{1 - Tbills_{t-1} * \frac{91}{360}} \right)^{\frac{d}{91}} - 1$$

Where $Tbills_{t-1}$ is the three month treasury rate reported on Bloomberg on the prior Index Business Day and $d$ is the number of calendar days which have elapsed since the prior Index Business Day.  The Daily Accrual is deemed to be zero on any day which is not an Index Business Day.

The "**Daily Index Performance**" for any series of ETNs on any Index Business Day will equal (1)(a) the closing level of the applicable underlying Index for that series on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index for that series on the immediately preceding Index Business Day *minus* (2) the number one.  If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event.  The Daily Index Performance is deemed to be zero on any day that is not an Index Business Day.

The "**Leverage Amount**" for each series of ETNs is as follows:

PS-4

Exhibit 1

49

Daily Inverse VIX Short Term ETN:       -1
Daily Inverse VIX Medium Term ETN:   -1
VIX Short Term ETN:                           1
VIX Medium Term ETN:                        1
Daily 2x VIX Short Term ETN:               2
Daily 2x VIX Medium Term ETN:            2

On any calendar day (the "**calculation day**"), the "**Daily Investor Fee**" for any series of ETNs will be equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Daily ETN Performance for that series on the calculation day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365.

The "**Daily Investor Fee Factor**" will be equal to (i) 0.0089 for each of the Long ETNs, (ii) 0.0135 for each of the Inverse ETNs and (iii) 0.0165 for each of the 2x Long ETNs.

**If the level of the applicable underlying Index decreases or does not increase sufficiently in the case of the Long or 2x Long ETNs or if it increases or does not decrease sufficiently in the case of the Inverse ETNs (in each case in addition to Daily Accrual) to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over the term of the ETNs, you will receive less than the principal amount of your investment at maturity, upon early redemption or acceleration of the ETNs.**  See "Risk Factors—Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the Index on the date of your investment, you may receive less than the principal amount of your ETNs" and "Hypothetical Examples" in this pricing supplement for additional information on how the Daily Investor Fee affects the overall value of the ETNs.

The closing level of the applicable underlying Index on any Index Business Day will be the closing level reported by the Index Sponsor on the applicable Bloomberg page as set forth in the table below or any successor page on Bloomberg or any successor service, as applicable, as determined by the Calculation Agents, provided that in the event a Market Disruption Event is continuing on an Index Business Day, the Calculation Agents will determine the closing level of the applicable underlying Index for such Index Business Day according to the methodology described below in "Specific Terms of the ETNs—Market Disruption Events."

| Index | Bloomberg Page Ticker |
|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| S&P 500 VIX Mid-Term Futures™ Index ER | SPVXMP |

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

For a further description of how your payment at maturity will be calculated, see "Hypothetical Examples" and "Specific Terms of the ETNs" in this pricing supplement.

*Payment Upon Early Redemption*

Prior to maturity, you may, subject to certain restrictions described below, offer the applicable Minimum Redemption Amount or more of your ETNs to us for redemption on an Early Redemption Date during the term of the ETNs until November 28, 2030.  If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount.

Exhibit 1

50

You may exercise your early redemption right by causing your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein).  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  See "Specific Terms of the ETNs—Redemption Procedures" in this pricing supplement.

You must offer for redemption at least 25,000 ETNs, or an integral multiple of 25,000 ETNs in excess thereof, at one time in order to exercise your right to cause us to redeem your ETNs on any Early Redemption Date (the "**Minimum Redemption Amount**"); provided that we or CSI as one of the Calculation Agents may from time to time reduce, in part or in whole, the Minimum Redemption Amount.  Any such reduction will be applied on a consistent basis for all holders of the relevant series of ETNs at the time the reduction becomes effective.  If the ETNs undergo a split or reverse split, the minimum number of ETNs needed to exercise your right to redeem will remain the same.

The "**Early Redemption Date**" is the third Business Day following an Early Redemption Valuation Date.[*]

The "**Early Redemption Charge**" is equal to 0.05% *times* the Closing Indicative Value on the Early Redemption Valuation Date.

The "**Early Redemption Amount**" is a cash payment per ETN equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge and will be calculated by the Calculation Agents.

*Payment Upon Acceleration*

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date.  In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration.  In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day).  The Accelerated Redemption Amount will be payable on the third Business Day following the Accelerated Valuation Date (such third Business Day the "**Acceleration Date**").[*] We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.  See "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" in this pricing supplement.

Any ETNs previously redeemed by us at your or our option or accelerated following an Acceleration Event will be cancelled on the Early Redemption Date or the Acceleration Date, as applicable.  Consequently, as of such Early Redemption Date or the Acceleration Date, as applicable, the redeemed ETNs will no longer be considered outstanding.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

---

[*] An Early Redemption Date will be postponed if a Market Disruption Event occurs and is continuing on the applicable Early Redemption Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of any Early Redemption Date.  See "Specific Terms of the ETNs—Market Disruption Events".

[*] The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date.  See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1

51

For a further description of how your payment at maturity, on redemption or upon acceleration will be calculated, see "Hypothetical Examples" and "Specific Terms of the ETNs" in this pricing supplement.

**What will be the Intraday Indicative Value of the ETNs?**

The "**Intraday Indicative Value**" of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor.  The Intraday Indicative Value at any time is based on the most recent intraday level of the underlying Index.  **If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero.  See "Description of the ETNs—Intraday Indicative Value" in this pricing supplement.**  VLS or its affiliate is responsible for computing and disseminating the Intraday Indicative Value.

**How do you sell your ETNs?**

We have listed each series of the ETNs on the NYSE Arca under the ticker symbols as set forth in the table on the cover of this pricing supplement.  However, there is no assurance that the ETNs will continue to be listed.  If an active secondary market in the ETNs develops, we expect that investors will purchase and sell the ETNs primarily in this secondary market.  We have no obligation to maintain any listing on NYSE Arca or any other exchange.

**How do you offer your ETNs for redemption by Credit Suisse?**

If you wish to offer your ETNs to Credit Suisse for redemption, your broker must follow the following procedures:

- Deliver a notice of redemption, in substantially the form as Annex A (the "**Redemption Notice**"), to VLS (the "**Redemption Agent**") via email or other electronic delivery (including, without limitation, the Redemption Agent's proprietary technology system, TENZING) as requested by the Redemption Agent.  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  If the Redemption Agent receives your Redemption Notice no later than 4:00 p.m., New York City time, on any Business Day, the Redemption Agent will respond by sending your broker an acknowledgment of the Redemption Notice accepting your redemption request by 7:30 p.m., New York City time, on the Business Day prior to the applicable Early Redemption Valuation Date.  The Redemption Agent or its affiliate must acknowledge to your broker acceptance of the Redemption Notice in order for your redemption request to be effective;

- Cause your DTC custodian to book a delivery vs. payment trade with respect to the ETNs on the applicable Early Redemption Valuation Date at a price equal to the applicable Early Redemption Amount, facing us; and

- Cause your DTC custodian to deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. New York City time, on the applicable Early Redemption Date (the third Business Day following the Early Redemption Valuation Date).

You are responsible for (i) instructing or otherwise causing your broker to provide the Redemption Notice and (ii) your broker satisfying the additional requirements as set forth in the second and third bullet above in order for the redemption to be effected.  Different brokerage firms may have different deadlines for accepting instructions from their customers. Accordingly, you should consult the brokerage firm through which you own your interest in the ETNs in respect of such deadlines.  If the Redemption Agent does not (i) receive the Redemption Notice from your broker by 4:00 p.m. and (ii) deliver an acknowledgment of such Redemption Notice to your broker accepting your redemption request by 7:30 p.m., on the Business Day prior to the applicable Early Redemption Valuation

Exhibit 1

52

Date, such notice will not be effective for such Business Day and the Redemption Agent will treat such Redemption Notice as if it was received on the next Business Day.  Any redemption instructions for which the Redemption Agent receives a valid confirmation in accordance with the procedures described above will be irrevocable.

**What are some of the risks of the ETNs?**

An investment in the ETNs involves risks.  Some of these risks are summarized here, but we urge you to read the more detailed explanation of risks in "Risk Factors" in this pricing supplement.

- **Uncertain Principal Repayment**—The ETNs are designed for investors who seek exposure to the applicable underlying Index.  The ETNs do not guarantee any return of principal at maturity.  For each ETN, investors will receive a cash payment at maturity, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee.  If the applicable underlying Index declines or increases, as applicable, investors should be willing to lose up to 100% of their investment.  Any payment on the ETNs is subject to our ability to pay our obligations as they become due.  **As explained in "Risk Factors" in this pricing supplement, because of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment.  In almost any potential scenario the Closing Indicative Value (as defined below) of your ETNs is likely to be close to zero after 20 years and we do not intend or expect that any investor to hold the ETNs from inception to maturity.**

- **Credit Risk of the Issuer**—Any payments you are entitled to receive on your ETNs are subject to the ability of Credit Suisse to pay its obligations as they come due.

- **Market and Volatility Risk**—The return on each series of ETNs is linked to the performance of an applicable underlying Index which, in turn is linked to the performance of one or more futures contracts on the VIX Index.  The VIX Index measures the 30-day forward volatility of the S&P 500® Index as calculated based on the prices of certain put and call options on the S&P 500® Index.  The level of the S&P 500® Index, the prices of options on the S&P 500® Index, and the level of the VIX Index may change unpredictably, affecting the value of futures contracts on the VIX Index and, consequently, the level of each Index and the value of your ETNs in unforseeable ways.

- **No Interest Payments**—You will not receive any periodic interest payments on the ETNs.

- **Long Holding Period Risk**—The ETNs, and in particular the 2x Long ETNs, are intended to be trading tools for sophisticated investors to manage daily trading risks.  They are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives.  The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day.  Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.  Investors should actively and frequently monitor their investments in the ETNs, even intra-day.

- **A Trading Market for the ETNs May Not Develop**—Although the ETNs are currently listed on NYSE Arca, a trading market for your ETNs may not develop.  We are not required to maintain any listing of the ETNs on NYSE Arca or any other exchange.

- **Requirements on Redemption by Credit Suisse**—You must offer at least the applicable Minimum Redemption Amount to Credit Suisse and satisfy the other requirements described herein for your offer for redemption to be considered.

Exhibit 1

53

- **Your Offer for Redemption Is Irrevocable**—You will not be able to rescind your offer for redemption after it is received by the Redemption Agent, so you will be exposed to market risk in the event market conditions change after the Redemption Agent receives your offer.

- **Uncertain Tax Treatment—**No ruling is being requested from the Internal Revenue Service ("**IRS**") with respect to the tax consequences of the ETNs.  There is no direct authority dealing with securities such as the ETNs, and there can be no assurance that the IRS will accept, or that a court will uphold, the tax treatment described in this pricing supplement.  In addition, you should note that the IRS and the U.S. Treasury Department have announced a review of the tax treatment of prepaid forward contracts.  Accordingly, no assurance can be given that future tax legislation, regulations or other guidance may not change the tax treatment of the ETNs.  Potential investors should consult their tax advisors regarding the U.S. federal income tax consequences of an investment in the ETNs, including possible alternative treatments.

- **Acceleration Feature**—Your ETNs may be accelerated by us at any time on or after the Inception Date or accelerated by us at any time if an Acceleration Event occurs, and upon any such acceleration you may receive less, and possibly significantly less, than your original investment in the ETNs.

**Is this the right investment for you?**

The ETNs may be a suitable investment for you if:

- You seek an investment with a return linked to the performance of the applicable underlying Index.

- You are willing to accept the risk of fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You are a sophisticated investor seeking to manage daily trading risk using a short-term investment, and are knowledgeable and understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.

- You believe the level of the applicable underlying Index will increase (if you invest in the Long ETNs or 2x Long ETNs) or decline (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You do not seek current income from this investment.

- You do not seek a guaranteed return of principal.

- You are a sophisticated investor using the ETNs to manage daily trading risks and you understand that the ETNs are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives.

- You understand that the Daily Investor Fees and the Early Redemption Charge, if applicable, will reduce your return (or increase your loss, as applicable) on your investment.

The ETNs may not be a suitable investment for you if:

- You are not willing to be exposed to fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You seek a guaranteed return of principal.

Exhibit 1

54

- You seek a long-term investment objective.

- You believe the level of the applicable underlying Index will decrease (if you invest in the Long ETNs or 2x Long ETNs) or increase (if you invest in the Inverse ETNs) or will not increase (if you invest in the Long ETNs or 2x Long ETNs) or decrease (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You prefer the lower risk and therefore accept the potentially lower returns of fixed income investments with comparable maturities and credit ratings.

- You seek current income from your investment.

- You are not a sophisticated investor and you seek an investment for other purposes than managing daily trading risks.

- You seek an investment with a longer duration than a daily basis.

- You do not want to pay Daily Investor Fees and the Early Redemption Charge, if applicable, which are charged on the ETNs and which will reduce your return (or increase your loss, as applicable) on your investment.

**Will the ETNs be distributed by our affiliates?**

Our affiliate, Credit Suisse Securities (USA) LLC ("**CSSU**"), a member of the Financial Industry Regulatory Authority ("**FINRA**") has participated in the distribution of the ETNs from the initial settlement date to the date of this pricing supplement, and will likely participate in any future distribution of the ETNs.  CSSU is expected to charge normal commissions for the purchase of any ETNs and may also receive all or a portion of the investor fee. Any offering in which CSSU participates will be conducted in compliance with the requirements of FINRA Rule 5121 of FINRA regarding a FINRA member firm's distribution of the securities of an affiliate and related conflicts of interest. In accordance with FINRA Rule 5121, CSSU may not make sales in offerings of the ETNs to any of its discretionary accounts without the prior written approval of the customer. Please see the section entitled "Supplemental Plan of Distribution (Conflicts of Interest)" in this pricing supplement.

**What is the U.S. Federal income tax treatment of an investment in the ETNs?**

Please refer to "Certain U.S. Federal Income Tax Considerations" on page PS-59 for a discussion of certain U.S. federal income tax considerations for making an investment in the ETNs.

**What is the role of our affiliates?**

Our affiliate, CSSU, is the underwriter for the offering and sale of the ETNs of each series.  After the initial offering, CSSU and/or other of our affiliated dealers currently intend, but are not obligated, to buy and sell the ETNs of any series to create a secondary market for holders of the ETNs of any such series, and may engage in other activities described in the section "Supplemental Plan of Distribution" in this pricing supplement, the accompanying prospectus supplement and prospectus.  However, neither CSSU nor any of these affiliates will be obligated to engage in any market-making activities, or continue those activities once it has started them.

CSI will also act as one of the Calculation Agents for the ETNs.  In addition, we may in the future become a minority investor in an affiliate of VLS, and may in connection with such investment obtain customary rights to nominate a director of such affiliate.  As Calculation Agents CSI and VLS will make determinations with respect to the ETNs.  The determinations may be adverse to you.  You should refer to "Risk Factors—There Are Potential Conflicts of Interest Between You and the Calculation Agents" in this pricing supplement for more information.

PS-10

Exhibit 1

55

**Can you tell me more about the effect of Credit Suisse's hedging activity?**

We expect to hedge our obligations under the ETNs through one or more of our affiliates.  This hedging activity will likely involve purchases or sales of equity securities underlying the S&P 500® Index and/or trading in instruments, such as options, swaps or futures, related to the VIX Index (including the VIX futures contracts which are used to calculate the Indices), the S&P 500® Index (including the put and call options used to calculate the level of the VIX Index) and the equity securities underlying the S&P 500® Index.  The costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the ETNs.  Moreover, this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the ETNs declines.  You should refer to "Risk Factors—Trading and other transactions by us, our affiliates or third parties with whom we transact, in securities or financial instruments related to the applicable underlying Index may impair the market value of the ETNs" and "Risk Factors—There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents" and "Use of Proceeds and Hedging" in this pricing supplement.

**Does ERISA Impose Any Limitations on Purchases of the ETNs?**

Employee benefit plans subject to ERISA, entities the assets of which are deemed to constitute the assets of such plans, governmental or other plans subject to laws substantially similar to ERISA and retirement accounts (including Keogh, SEP and SIMPLE plans, individual retirement accounts and individual retirement annuities) are permitted to purchase the ETNs as long as either (A) (1) no CSSU affiliate or employee is a fiduciary to such plan or retirement account that has or exercises any discretionary authority or control with respect to the assets of such plan or retirement account used to purchase the ETNs or renders investment advice with respect to those assets, and (2) such plan or retirement account is paying no more than adequate consideration for the ETNs or (B) its acquisition and holding of the ETNs is not prohibited by any such provisions or laws or is exempt from any such prohibition. However, individual retirement accounts, individual retirement annuities and Keogh plans, as well as employee benefit plans that permit participants to direct the investment of their accounts, will not be permitted to purchase or hold the ETNs if the account, plan or annuity is for the benefit of an employee of CSSU or a family member and the employee receives any compensation (such as, for example, an addition to bonus) based on the purchase of ETNs by the account, plan or annuity. Please refer to the section "ERISA Matters" in this pricing supplement for further information.

Exhibit 1

56

**HYPOTHETICAL EXAMPLES**

**Hypothetical Examples**

The following examples show how the ETNs would perform in hypothetical circumstances. These hypothetical examples are meant to illustrate the effect that different factors may have on the Maturity Redemption Amount. These factors include fees, compounding of returns, underlying futures volatility, and underlying T-Bill rates. Many other factors may affect the value of your ETNs, and these figures are provided for purposes of illustration only. They should not be taken as an indication or prediction of future investment results and are intended merely to illustrate a few of the potential possible Closing Indicative Values for the ETNs. The figures in these examples have been rounded for convenience.

The information in the tables reflects hypothetical rates of return on the ETNs assuming that they are purchased on the Inception Date at the Closing Indicative Value and disposed of on the Maturity Date for the Maturity Redemption Amount. We have not considered early redemption or acceleration for simplicity. Your ETNs may be accelerated early under certain circumstances. Although your payment upon redemption or acceleration would be based on the Closing Indicative Value of the ETNs, which is calculated in the manner illustrated in the examples below, your payment upon early redemption would be subject to the Early Redemption Charge.

Any rate of return you may earn on an investment in the ETNs may be lower than that which you could earn on a comparable investment in the underlying futures. The examples below assume no Market Disruption Event occurs. Also, the hypothetical rates of return shown below do not take into account the effects of applicable taxes. Because of the U.S. tax treatment applicable to your ETN, tax liabilities could affect the after-tax rate of return on your ETNs to a comparatively greater extent than the after-tax return on the underlying futures.

The prices of the futures contracts underlying the Indices have been highly volatile in the past and the performance of the Indices cannot be predicted for any future period. The actual performance of the Indices over the life of the ETNs, as well as the amount payable at the relevant Early Redemption Date, Acceleration Date or the Maturity Date, as applicable, may bear little relation to the hypothetical return examples set forth below or to the hypothetical historical closing levels of the Index set forth elsewhere in this pricing supplement. The examples included below are broken into sections to highlight some of the most significant factors that may affect the return on your ETNs. Each section is based upon numerous assumptions related to interest rate levels, interest rate volatilities, interest rate spreads, underlying futures returns, underlying futures volatilities, and underlying futures funding and borrow costs. No single example can easily capture all the possible influences on the value of your ETNs, and each example is a simplified hypothetical example intended purely to illustrate the effect of various key factors which can influence the value of your ETNs. Many of the factors will primarily affect the value of your ETNs by affecting the level of the Index. These factors include, among others, interest rate levels, interest rate volatilities, interest rate spreads, underlying futures returns, underlying futures volatilities, and underlying futures funding and borrow costs.

Two of the most important factors that will affect the value of your ETNs are the directional change in the in the level of the applicable underlying Index (either up or down) and the annualized volatility of the applicable underlying Index itself. The annualized volatility of each underlying Index is a measure of the magnitude and frequency of changes in the underlying Index closing level, and is equal to the standard deviation of the underlying Index's daily returns over twenty years, annualized by multiplying by the square root of 252. When we refer to "volatility in the daily change in Index levels" we mean that the annualized volatility of the daily closing levels of the applicable underlying Index over the relevant term. We therefore provide four examples below that reflect four different scenarios related to these two factors. The hypothetical examples highlight the negative impact of higher annualized volatility of the applicable underlying Index on the rate of return on your ETNs. In Example 1 we show increasing Index levels with 10.21% annualized volatility in the daily change in Index levels over the relevant term. In example 2 we show decreasing Index levels with 10.10% annualized volatility in the daily change in Index levels over the relevant term. In example 3 we show increasing Index levels with 60.53% annualized volatility in the daily change in Index levels over the relevant term. In Example 4 we show decreasing Index levels with 49.69% annualized volatility in the daily change in Index levels over the relevant term. Because the Investor Fee is

Exhibit 1

57

calculated on a daily basis, its effect on the value of your ETNs is dependent upon the path the applicable underlying Index takes rather than just the endpoint of the applicable underlying Index.  Each of these four examples is a random possibility generated by a computer among an infinite number of possible outcomes.  Your return may be materially worse.  As explained in "Risk Factors—The ETNs do not pay interest nor guarantee return of principal and you may lose all or a significant part of your investment in the ETNs" in this pricing supplement, in almost any potential scenario the Closing Indicative Value of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

Exhibit 1

58

Example 1. This example assumes the index increases by 478% with 10.21% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At year end | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 109.74 | 5.01% | 9.74% | -5.22% | $1.25 | $93.51 | 9.74% | -6.49% |
| 02 | 104.37 | 5.48% | -4.89% | 9.87% | $1.30 | $101.30 | -4.89% | 8.33% |
| 03 | 122.23 | 5.63% | 17.11% | -11.73% | $1.31 | $89.25 | 17.11% | -11.90% |
| 04 | 138.52 | 4.80% | 13.32% | -8.49% | $1.19 | $80.71 | 13.32% | -9.57% |
| 05 | 155.58 | 4.57% | 12.32% | -7.72% | $1.07 | $73.47 | 12.32% | -9.00% |
| 06 | 189.37 | 4.77% | 21.72% | -15.75% | $0.95 | $61.80 | 21.72% | -16.08% |
| 07 | 253.09 | 5.50% | 33.64% | -22.99% | $0.75 | $47.73 | 33.64% | -23.78% |
| 08 | 280.79 | 5.02% | 10.95% | -5.93% | $0.63 | $44.12 | 10.95% | -7.55% |
| 09 | 270.35 | 5.06% | -3.72% | 8.07% | $0.63 | $47.05 | -3.72% | 5.07% |
| 10 | 295.24 | 5.60% | 9.21% | -3.62% | $0.59 | $44.40 | 9.21% | -5.63% |
| 11 | 304.69 | 5.62% | 3.20% | 0.54% | $0.64 | $44.36 | 3.20% | -0.09% |
| 12 | 331.19 | 5.40% | 8.70% | -5.35% | $0.58 | $42.06 | 8.70% | -5.73% |
| 13 | 317.61 | 4.50% | -4.10% | 7.83% | $0.56 | $44.78 | -4.10% | 6.46% |
| 14 | 387.27 | 4.73% | 21.93% | -16.04% | $0.57 | $37.58 | 21.93% | -16.08% |
| 15 | 491.85 | 4.98% | 27.00% | -18.92% | $0.46 | $30.36 | 27.00% | -19.20% |
| 16 | 514.06 | 4.68% | 4.52% | -1.69% | $0.40 | $29.69 | 4.52% | -2.23% |
| 17 | 471.37 | 4.42% | -8.30% | 12.00% | $0.43 | $33.05 | -8.30% | 11.32% |
| 18 | 448.43 | 4.53% | -4.87% | 8.22% | $0.46 | $35.42 | -4.87% | 7.81% |
| 19 | 499.34 | 5.07% | 11.35% | -6.15% | $0.48 | $32.67 | 11.35% | -7.77% |
| 20 | 577.98 | 4.61% | 15.75% | -9.95% | $0.42 | $28.90 | 15.75% | -11.56% |

| Total Return | 477.98% | -71.10% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount. The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

Exhibit 1

59

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At year end | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 109.74 | 5.01% | 9.74% | 15.37% | $0.99 | $114.36 | 9.74% | 14.36% |
| 02 | 104.37 | 5.48% | -4.89% | 0.49% | $1.02 | $113.87 | -4.89% | -0.42% |
| 03 | 122.23 | 5.63% | 17.11% | 25.35% | $1.11 | $139.83 | 17.11% | 22.79% |
| 04 | 138.52 | 4.80% | 13.32% | 19.12% | $1.30 | $164.78 | 13.32% | 17.84% |
| 05 | 155.58 | 4.57% | 12.32% | 17.57% | $1.57 | $192.00 | 12.32% | 16.54% |
| 06 | 189.37 | 4.77% | 21.72% | 29.24% | $1.87 | $242.81 | 21.72% | 26.83% |
| 07 | 253.09 | 5.50% | 33.64% | 43.64% | $2.51 | $339.80 | 33.64% | 41.85% |
| 08 | 280.79 | 5.02% | 10.95% | 16.31% | $3.20 | $392.87 | 10.95% | 15.62% |
| 09 | 270.35 | 5.06% | -3.72% | 1.27% | $3.42 | $394.33 | -3.72% | 1.85% |
| 10 | 295.24 | 5.60% | 9.21% | 14.65% | $3.93 | $451.39 | 9.21% | 14.47% |
| 11 | 304.69 | 5.62% | 3.20% | 9.99% | $3.99 | $488.36 | 3.20% | 8.19% |
| 12 | 331.19 | 5.40% | 8.70% | 16.64% | $4.65 | $555.33 | 8.70% | 14.47% |
| 13 | 317.61 | 4.50% | -4.10% | 0.46% | $5.20 | $552.12 | -4.10% | -0.58% |
| 14 | 387.27 | 4.73% | 21.93% | 29.51% | $5.36 | $699.51 | 21.93% | 26.70% |
| 15 | 491.85 | 4.98% | 27.00% | 34.85% | $7.18 | $925.48 | 27.00% | 32.30% |
| 16 | 514.06 | 4.68% | 4.52% | 10.43% | $8.80 | $1,004.59 | 4.52% | 8.55% |
| 17 | 471.37 | 4.42% | -8.30% | -3.42% | $8.65 | $954.20 | -8.30% | -5.02% |
| 18 | 448.43 | 4.53% | -4.87% | 0.02% | $8.39 | $941.44 | -4.87% | -1.85% |
| 19 | 499.34 | 5.07% | 11.35% | 16.77% | $8.65 | $1,093.03 | 11.35% | 16.10% |
| 20 | 577.98 | 4.61% | 15.75% | 20.69% | $10.69 | $1,313.01 | 15.75% | 20.13% |

| Total Return | 477.98% | 1213.01% |
|---|---|---|

PS-15

Exhibit 1

60

2x Long ETNs

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At year end | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 109.74 | 5.01% | 9.74% | 25.25% | $1.99 | $123.21 | 9.74% | 23.21% |
| 02 | 104.37 | 5.48% | -4.89% | -5.52% | $2.00 | $114.49 | -4.89% | -7.08% |
| 03 | 122.23 | 5.63% | 17.11% | 46.79% | $2.21 | $161.52 | 17.11% | 41.08% |
| 04 | 138.52 | 4.80% | 13.32% | 33.88% | $2.82 | $211.93 | 13.32% | 31.21% |
| 05 | 155.58 | 4.57% | 12.32% | 30.76% | $3.85 | $272.54 | 12.32% | 28.67% |
| 06 | 189.37 | 4.77% | 21.72% | 57.65% | $5.22 | $412.17 | 21.72% | 52.06% |
| 07 | 253.09 | 5.50% | 33.64% | 93.19% | $8.96 | $757.40 | 33.64% | 88.70% |
| 08 | 280.79 | 5.02% | 10.95% | 27.16% | $13.56 | $953.33 | 10.95% | 25.87% |
| 09 | 270.35 | 5.06% | -3.72% | -3.55% | $14.54 | $904.39 | -3.72% | -2.28% |
| 10 | 295.24 | 5.60% | 9.21% | 22.74% | $18.12 | $1,108.24 | 9.21% | 22.54% |
| 11 | 304.69 | 5.62% | 3.20% | 12.98% | $17.32 | $1,213.37 | 3.20% | 9.49% |
| 12 | 331.19 | 5.40% | 8.70% | 27.46% | $22.31 | $1,473.17 | 8.70% | 22.97% |
| 13 | 317.61 | 4.50% | -4.10% | -4.58% | $26.26 | $1,379.15 | -4.10% | -6.38% |
| 14 | 387.27 | 4.73% | 21.93% | 58.22% | $26.38 | $2,091.65 | 21.93% | 51.66% |
| 15 | 491.85 | 4.98% | 27.00% | 71.15% | $44.78 | $3,451.46 | 27.00% | 65.01% |
| 16 | 514.06 | 4.68% | 4.52% | 15.00% | $63.26 | $3,841.11 | 4.52% | 11.29% |
| 17 | 471.37 | 4.42% | -8.30% | -11.67% | $57.65 | $3,286.80 | -8.30% | -14.43% |
| 18 | 448.43 | 4.53% | -4.87% | -5.61% | $51.69 | $3,024.54 | -4.87% | -8.97% |
| 19 | 499.34 | 5.07% | 11.35% | 28.20% | $51.73 | $3,839.70 | 11.35% | 26.95% |
| 20 | 577.98 | 4.61% | 15.75% | 37.82% | $74.63 | $5,250.19 | 15.75% | 36.73% |

| Total Return | | |
|---|---|---|
| | 477.98% | 5150.19% |

Exhibit 1

61

Example 2. This example assumes the index decreases by 67% with 10.10% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 90.39 | 4.92% | -9.61% | 15.19% | $1.46 | $113.64 | -9.61% | 13.64% |
| 02 | 77.69 | 4.21% | -14.05% | 20.31% | $1.62 | $134.66 | -14.05% | 18.49% |
| 03 | 87.35 | 3.02% | 12.43% | -9.04% | $1.75 | $120.50 | 12.43% | -10.52% |
| 04 | 74.30 | 2.99% | -14.94% | 19.31% | $1.81 | $142.57 | -14.94% | 18.32% |
| 05 | 72.83 | 3.46% | -1.98% | 4.48% | $1.96 | $146.94 | -1.98% | 2.96% |
| 06 | 64.19 | 3.37% | -11.86% | 15.28% | $2.30 | $168.08 | -11.86% | 13.61% |
| 07 | 61.89 | 3.42% | -3.58% | 5.01% | $2.33 | $175.97 | -3.58% | 3.93% |
| 08 | 53.73 | 3.41% | -13.18% | 17.05% | $2.41 | $204.55 | -13.18% | 16.24% |
| 09 | 53.90 | 3.13% | 0.32% | 1.68% | $2.76 | $205.19 | 0.32% | -0.56% |
| 10 | 47.05 | 3.69% | -12.71% | 17.91% | $2.97 | $237.98 | -12.71% | 15.98% |
| 11 | 42.97 | 3.90% | -8.67% | 12.11% | $3.47 | $264.49 | -8.67% | 11.14% |
| 12 | 36.83 | 4.30% | -14.29% | 22.30% | $3.82 | $314.77 | -14.29% | 19.84% |
| 13 | 43.33 | 4.07% | 17.65% | -12.02% | $3.90 | $272.16 | 17.65% | -13.54% |
| 14 | 40.43 | 3.53% | -6.69% | 10.32% | $3.92 | $294.97 | -6.69% | 8.38% |
| 15 | 37.88 | 3.23% | -6.31% | 9.42% | $4.15 | $317.61 | -6.31% | 7.68% |
| 16 | 36.11 | 2.97% | -4.67% | 6.99% | $4.27 | $335.77 | -4.67% | 5.72% |
| 17 | 32.83 | 3.33% | -9.08% | 11.78% | $4.80 | $372.29 | -9.08% | 10.88% |
| 18 | 35.77 | 3.35% | 8.96% | -4.96% | $5.04 | $344.90 | 8.96% | -6.76% |
| 19 | 30.57 | 3.27% | -14.54% | 19.75% | $4.85 | $407.13 | -14.54% | 18.05% |
| 20 | 32.56 | 3.29% | 6.51% | -4.34% | $5.52 | $385.23 | 6.51% | -5.38% |

| Total Return | -67.44% | 285.23% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount.  The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

PS-17

Exhibit 1

62

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 90.39 | 4.92% | -9.61% | -5.05% | $0.85 | $94.11 | -9.61% | -5.89% |
| 02 | 77.69 | 4.21% | -14.05% | -10.43% | $0.82 | $83.62 | -14.05% | -11.14% |
| 03 | 87.35 | 3.02% | 12.43% | 15.56% | $0.78 | $96.04 | 12.43% | 14.85% |
| 04 | 74.30 | 2.99% | -14.94% | -11.89% | $0.78 | $83.43 | -14.94% | -13.13% |
| 05 | 72.83 | 3.46% | -1.98% | 1.47% | $0.76 | $83.90 | -1.98% | 0.65% |
| 06 | 64.19 | 3.37% | -11.86% | -8.30% | $0.67 | $75.78 | -11.86% | -9.04% |
| 07 | 61.89 | 3.42% | -3.58% | 0.89% | $0.67 | $74.94 | -3.58% | -0.34% |
| 08 | 53.73 | 3.41% | -13.18% | -9.54% | $0.67 | $66.72 | -13.18% | -10.97% |
| 09 | 53.90 | 3.13% | 0.32% | 3.51% | $0.61 | $68.44 | 0.32% | 3.48% |
| 10 | 47.05 | 3.69% | -12.71% | -9.68% | $0.58 | $61.44 | -12.71% | -10.23% |
| 11 | 42.97 | 3.90% | -8.67% | -4.56% | $0.52 | $57.83 | -8.67% | -5.88% |
| 12 | 36.83 | 4.30% | -14.29% | -11.68% | $0.49 | $51.28 | -14.29% | -11.89% |
| 13 | 43.33 | 4.07% | 17.65% | 22.15% | $0.51 | $62.28 | 17.65% | 21.45% |
| 14 | 40.43 | 3.53% | -6.69% | -3.73% | $0.53 | $59.67 | -6.69% | -4.20% |
| 15 | 37.88 | 3.23% | -6.31% | -3.46% | $0.52 | $57.23 | -6.31% | -4.09% |
| 16 | 36.11 | 2.97% | -4.67% | -1.64% | $0.52 | $55.70 | -4.67% | -2.67% |
| 17 | 32.83 | 3.33% | -9.08% | -5.47% | $0.48 | $51.89 | -9.08% | -6.84% |
| 18 | 35.77 | 3.35% | 8.96% | 11.38% | $0.47 | $57.95 | 8.96% | 10.98% |
| 19 | 30.57 | 3.27% | -14.54% | -11.72% | $0.51 | $50.72 | -14.54% | -12.48% |
| 20 | 32.56 | 3.29% | 6.51% | 10.37% | $0.46 | $55.33 | 6.51% | 9.10% |

| Total Return | -67.44% | -44.67% |
|---|---|---|

PS-18

Exhibit 1

63

2x Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 90.39 | 4.92% | -9.61% | -14.93% | $1.47 | $83.68 | -9.61% | -16.32% |
| 02 | 77.69 | 4.21% | -14.05% | -23.91% | $1.30 | $62.77 | -14.05% | -24.99% |
| 03 | 87.35 | 3.02% | 12.43% | 28.19% | $1.13 | $79.59 | 12.43% | 26.80% |
| 04 | 74.30 | 2.99% | -14.94% | -25.42% | $1.07 | $57.79 | -14.94% | -27.40% |
| 05 | 72.83 | 3.46% | -1.98% | -1.60% | $0.96 | $55.92 | -1.98% | -3.04% |
| 06 | 64.19 | 3.37% | -11.86% | -19.65% | $0.72 | $43.67 | -11.86% | -20.83% |
| 07 | 61.89 | 3.42% | -3.58% | -2.78% | $0.69 | $40.85 | -3.58% | -5.02% |
| 08 | 53.73 | 3.41% | -13.18% | -21.83% | $0.68 | $30.98 | -13.18% | -24.17% |
| 09 | 53.90 | 3.13% | 0.32% | 2.65% | $0.52 | $31.28 | 0.32% | 2.76% |
| 10 | 47.05 | 3.69% | -12.71% | -22.26% | $0.46 | $24.06 | -12.71% | -23.09% |
| 11 | 42.97 | 3.90% | -8.67% | -13.34% | $0.35 | $20.30 | -8.67% | -15.60% |
| 12 | 36.83 | 4.30% | -14.29% | -26.03% | $0.30 | $15.17 | -14.29% | -26.27% |
| 13 | 43.33 | 4.07% | 17.65% | 41.75% | $0.31 | $21.30 | 17.65% | 40.37% |
| 14 | 40.43 | 3.53% | -6.69% | -11.48% | $0.31 | $18.69 | -6.69% | -12.22% |
| 15 | 37.88 | 3.23% | -6.31% | -10.67% | $0.29 | $16.51 | -6.31% | -11.70% |
| 16 | 36.11 | 2.97% | -4.67% | -6.87% | $0.28 | $15.07 | -4.67% | -8.70% |
| 17 | 32.83 | 3.33% | -9.08% | -14.59% | $0.23 | $12.52 | -9.08% | -16.93% |
| 18 | 35.77 | 3.35% | 8.96% | 18.65% | $0.21 | $14.96 | 8.96% | 17.97% |
| 19 | 30.57 | 3.27% | -14.54% | -25.37% | $0.23 | $10.99 | -14.54% | -26.53% |
| 20 | 32.56 | 3.29% | 6.51% | 16.50% | $0.18 | $12.53 | 6.51% | 13.98% |

| Total Return | -67.44% | -87.47% |
|---|---|---|

PS-19

Exhibit 1

64

Example 3. This example assumes the index increases by 3973% with 60.53% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 188.36 | 5.58% | 88.36% | -61.68% | $0.81 | $37.80 | 88.36% | -62.20% |
| 02 | 215.66 | 5.27% | 14.49% | -29.76% | $0.38 | $24.86 | 14.49% | -34.24% |
| 03 | 335.67 | 4.59% | 55.65% | -50.69% | $0.17 | $11.63 | 55.65% | -53.22% |
| 04 | 158.43 | 4.17% | -52.80% | 49.70% | $0.15 | $17.11 | -52.80% | 47.15% |
| 05 | 74.70 | 4.60% | -52.85% | 52.51% | $0.26 | $25.74 | -52.85% | 51.11% |
| 06 | 31.32 | 5.39% | -58.07% | 64.61% | $0.41 | $43.27 | -58.07% | 58.33% |
| 07 | 52.63 | 5.51% | 68.03% | -57.57% | $0.55 | $18.87 | 68.03% | -56.47% |
| 08 | 34.20 | 4.99% | -35.02% | 5.03% | $0.19 | $19.26 | -35.02% | 2.04% |
| 09 | 85.79 | 5.41% | 150.88% | -69.55% | $0.13 | $5.79 | 150.88% | -70.02% |
| 10 | 131.01 | 6.52% | 52.71% | -53.54% | $0.05 | $2.64 | 52.71% | -54.30% |
| 11 | 168.71 | 5.48% | 28.78% | -44.95% | $0.03 | $1.46 | 28.78% | -44.61% |
| 12 | 867.35 | 4.41% | 414.10% | -85.25% | $0.01 | $0.20 | 414.10% | -85.84% |
| 13 | 878.95 | 2.78% | 1.34% | -42.71% | $0.00 | $0.12 | 1.34% | -36.89% |
| 14 | 1168.16 | 2.31% | 32.90% | -50.87% | $0.00 | $0.06 | 32.90% | -50.53% |
| 15 | 911.00 | 2.58% | -22.01% | -3.30% | $0.00 | $0.06 | -22.01% | -8.37% |
| 16 | 493.33 | 3.20% | -45.85% | 34.34% | $0.00 | $0.07 | -45.85% | 29.49% |
| 17 | 450.78 | 3.02% | -8.62% | -21.55% | $0.00 | $0.05 | -8.62% | -24.76% |
| 18 | 898.54 | 3.56% | 99.33% | -59.15% | $0.00 | $0.02 | 99.33% | -61.55% |
| 19 | 1995.54 | 3.46% | 122.09% | -68.16% | $0.00 | $0.01 | 122.09% | -68.96% |
| 20 | 4073.34 | 2.27% | 104.12% | -65.32% | $0.00 | $0.00 | 104.12% | -64.66% |

| Total Return | | |
|---|---|---|
| | 3973.34% | -100.00% |

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount.  The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

PS-20

Exhibit 1

65

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 188.36 | 5.58% | 88.36% | 99.13% | $1.48 | $197.37 | 88.36% | 97.37% |
| 02 | 215.66 | 5.27% | 14.49% | 14.29% | $2.16 | $236.09 | 14.49% | 19.61% |
| 03 | 335.67 | 4.59% | 55.65% | 56.47% | $3.76 | $381.29 | 55.65% | 61.50% |
| 04 | 158.43 | 4.17% | -52.80% | -50.95% | $3.15 | $186.02 | -52.80% | -51.21% |
| 05 | 74.70 | 4.60% | -52.85% | -50.61% | $1.34 | $91.04 | -52.85% | -51.28% |
| 06 | 31.32 | 5.39% | -58.07% | -54.35% | $0.61 | $39.92 | -58.07% | -53.58% |
| 07 | 52.63 | 5.51% | 68.03% | 84.98% | $0.36 | $70.25 | 68.03% | 76.47% |
| 08 | 34.20 | 4.99% | -35.02% | -32.69% | $0.72 | $47.56 | -35.02% | -32.30% |
| 09 | 85.79 | 5.41% | 150.88% | 164.79% | $0.89 | $124.82 | 150.88% | 162.94% |
| 10 | 131.01 | 6.52% | 52.71% | 62.50% | $1.46 | $201.60 | 52.71% | 61.51% |
| 11 | 168.71 | 5.48% | 28.78% | 38.72% | $2.18 | $271.78 | 28.78% | 34.81% |
| 12 | 867.35 | 4.41% | 414.10% | 389.96% | $6.72 | $1,446.76 | 414.10% | 399.12% |
| 13 | 878.95 | 2.78% | 1.34% | 15.14% | $17.56 | $1,494.10 | 1.34% | 3.27% |
| 14 | 1168.16 | 2.31% | 32.90% | 38.77% | $14.79 | $2,014.06 | 32.90% | 34.80% |
| 15 | 911.00 | 2.58% | -22.01% | -23.25% | $18.38 | $1,597.61 | -22.01% | -20.68% |
| 16 | 493.33 | 3.20% | -45.85% | -45.39% | $9.97 | $885.45 | -45.85% | -44.58% |
| 17 | 450.78 | 3.02% | -8.62% | -8.50% | $7.64 | $826.51 | -8.62% | -6.66% |
| 18 | 898.54 | 3.56% | 99.33% | 84.68% | $9.39 | $1,692.01 | 99.33% | 92.29% |
| 19 | 1995.54 | 3.46% | 122.09% | 127.29% | $21.63 | $3,855.10 | 122.09% | 127.84% |
| 20 | 4073.34 | 2.27% | 104.12% | 115.49% | $49.46 | $7,978.48 | 104.12% | 106.96% |

| Total Return | | |
|---|---|---|
| | 3973.34% | 7878.48% |

PS-21

Exhibit 1

66

2x Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 188.36 | 5.58% | 88.36% | 157.83% | $3.85 | $253.62 | 88.36% | 153.62% |
| 02 | 215.66 | 5.27% | 14.49% | -10.32% | $5.33 | $250.38 | 14.49% | -1.28% |
| 03 | 335.67 | 4.59% | 55.65% | 64.52% | $11.55 | $440.22 | 55.65% | 75.82% |
| 04 | 158.43 | 4.17% | -52.80% | -84.28% | $5.51 | $68.56 | -52.80% | -84.43% |
| 05 | 74.70 | 4.60% | -52.85% | -84.04% | $0.65 | $10.76 | -52.85% | -84.45% |
| 06 | 31.32 | 5.39% | -58.07% | -86.75% | $0.09 | $1.32 | -58.07% | -86.27% |
| 07 | 52.63 | 5.51% | 68.03% | 127.84% | $0.02 | $2.74 | 68.03% | 107.95% |
| 08 | 34.20 | 4.99% | -35.02% | -72.67% | $0.05 | $0.76 | -35.02% | -72.30% |
| 09 | 85.79 | 5.41% | 150.88% | 383.39% | $0.05 | $3.61 | 150.88% | 377.34% |
| 10 | 131.01 | 6.52% | 52.71% | 65.26% | $0.08 | $5.90 | 52.71% | 63.49% |
| 11 | 168.71 | 5.48% | 28.78% | 24.21% | $0.11 | $6.93 | 28.78% | 17.52% |
| 12 | 867.35 | 4.41% | 414.10% | 1432.36% | $0.79 | $126.23 | 414.10% | 1493.73% |
| 13 | 878.95 | 2.78% | 1.34% | -19.23% | $3.38 | $82.90 | 1.34% | -34.33% |
| 14 | 1168.16 | 2.31% | 32.90% | 22.97% | $1.38 | $96.35 | 32.90% | 16.23% |
| 15 | 911.00 | 2.58% | -22.01% | -59.58% | $1.46 | $41.73 | -22.01% | -56.68% |
| 16 | 493.33 | 3.20% | -45.85% | -80.15% | $0.31 | $8.55 | -45.85% | -79.52% |
| 17 | 450.78 | 3.02% | -8.62% | -45.05% | $0.11 | $4.90 | -8.62% | -42.68% |
| 18 | 898.54 | 3.56% | 99.33% | 133.21% | $0.11 | $14.16 | 99.33% | 153.82% |
| 19 | 1995.54 | 3.46% | 122.09% | 237.68% | $0.40 | $48.14 | 122.09% | 239.91% |
| 20 | 4073.34 | 2.27% | 104.12% | 226.79% | $1.42 | $145.43 | 104.12% | 202.12% |

| Total Return | 3973.34% | 45.43% |
|---|---|---|

PS-22

Exhibit 1

67

Example 4. This example assumes the index decreases by 99% with 49.69% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 44.21 | 3.30% | -55.79% | 75.99% | $1.69 | $173.64 | -55.79% | 73.64% |
| 02 | 35.88 | 3.42% | -18.85% | 1.08% | $2.11 | $170.95 | -18.85% | -1.55% |
| 03 | 34.53 | 2.64% | -3.76% | -13.60% | $2.09 | $143.92 | -3.76% | -15.81% |
| 04 | 18.35 | 2.74% | -46.86% | 52.35% | $2.52 | $212.67 | -46.86% | 47.77% |
| 05 | 16.25 | 2.59% | -11.42% | -11.17% | $2.42 | $186.35 | -11.42% | -8.17% |
| 06 | 14.11 | 2.97% | -13.20% | -10.46% | $2.24 | $164.26 | -13.20% | -9.65% |
| 07 | 7.82 | 3.44% | -44.60% | 51.04% | $2.26 | $234.36 | -44.60% | 48.84% |
| 08 | 6.55 | 4.17% | -16.20% | -6.25% | $2.48 | $222.57 | -16.20% | -5.03% |
| 09 | 5.68 | 4.16% | -13.21% | -8.04% | $2.69 | $201.92 | -13.21% | -9.95% |
| 10 | 13.53 | 4.06% | 138.03% | -65.70% | $2.33 | $67.36 | 138.03% | -66.64% |
| 11 | 10.98 | 2.85% | -18.87% | -4.46% | $1.18 | $65.86 | -18.87% | -2.22% |
| 12 | 11.53 | 2.96% | 5.00% | -22.83% | $0.82 | $51.15 | 5.00% | -23.64% |
| 13 | 13.91 | 2.79% | 20.71% | -36.75% | $0.79 | $33.06 | 20.71% | -35.37% |
| 14 | 9.89 | 2.39% | -28.89% | 4.29% | $0.55 | $36.89 | -28.89% | 11.58% |
| 15 | 7.44 | 2.75% | -24.75% | 7.68% | $0.42 | $38.14 | -24.75% | 3.39% |
| 16 | 3.91 | 2.01% | -47.49% | 54.14% | $0.62 | $56.48 | -47.49% | 48.07% |
| 17 | 5.60 | 1.68% | 43.36% | -44.62% | $0.60 | $30.68 | 43.36% | -45.67% |
| 18 | 3.98 | 2.13% | -29.03% | 12.73% | $0.59 | $34.20 | -29.03% | 9.18% |
| 19 | 3.22 | 2.41% | -19.03% | -6.12% | $0.43 | $32.45 | -19.03% | -5.11% |
| 20 | 1.11 | 2.29% | -65.39% | 121.57% | $0.79 | $72.84 | -65.39% | 124.44% |

| Total Return | -98.89% | -27.16% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount.  The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

Exhibit 1

68

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| Year | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 44.21 | 3.30% | -55.79% | -54.30% | $0.68 | $45.30 | -55.79% | -54.70% |
| 02 | 35.88 | 3.42% | -18.85% | -17.06% | $0.42 | $37.71 | -18.85% | -16.76% |
| 03 | 34.53 | 2.64% | -3.76% | -2.42% | $0.34 | $36.93 | -3.76% | -2.07% |
| 04 | 18.35 | 2.74% | -46.86% | -46.31% | $0.24 | $19.99 | -46.86% | -45.87% |
| 05 | 16.25 | 2.59% | -11.42% | -9.09% | $0.19 | $18.01 | -11.42% | -13.86% |
| 06 | 14.11 | 2.97% | -13.20% | -10.87% | $0.17 | $15.96 | -13.20% | -13.60% |
| 07 | 7.82 | 3.44% | -44.60% | -45.16% | $0.13 | $9.07 | -44.60% | -45.60% |
| 08 | 6.55 | 4.17% | -16.20% | -10.29% | $0.10 | $7.85 | -16.20% | -13.41% |
| 09 | 5.68 | 4.16% | -13.21% | -9.52% | $0.07 | $7.04 | -13.21% | -9.67% |
| 10 | 13.53 | 4.06% | 138.03% | 144.35% | $0.07 | $17.30 | 138.03% | 145.69% |
| 11 | 10.98 | 2.85% | -18.87% | -13.50% | $0.11 | $14.31 | -18.87% | -17.27% |
| 12 | 11.53 | 2.96% | 5.00% | 10.37% | $0.13 | $15.35 | 5.00% | 9.05% |
| 13 | 13.91 | 2.79% | 20.71% | 28.49% | $0.11 | $18.88 | 20.71% | 23.03% |
| 14 | 9.89 | 2.39% | -28.89% | -21.49% | $0.12 | $13.63 | -28.89% | -27.81% |
| 15 | 7.44 | 2.75% | -24.75% | -24.76% | $0.13 | $10.45 | -24.75% | -23.33% |
| 16 | 3.91 | 2.01% | -47.49% | -47.86% | $0.07 | $5.55 | -47.49% | -46.90% |
| 17 | 5.60 | 1.68% | 43.36% | 44.98% | $0.06 | $8.02 | 43.36% | 44.49% |
| 18 | 3.98 | 2.13% | -29.03% | -27.37% | $0.05 | $5.76 | -29.03% | -26.66% |
| 19 | 3.22 | 2.41% | -19.03% | -15.04% | $0.05 | $4.74 | -19.03% | -17.79% |
| 20 | 1.11 | 2.29% | -65.39% | -63.65% | $0.02 | $1.66 | -65.39% | -64.89% |

| Total Return | -98.89% | -98.34% |
|---|---|---|

PS-24

Exhibit 1

69

2x Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 44.21 | 3.30% | -55.79% | -84.90% | $0.94 | $14.85 | -55.79% | -85.15% |
| 02 | 35.88 | 3.42% | -18.85% | -47.95% | $0.24 | $7.80 | -18.85% | -47.49% |
| 03 | 34.53 | 2.64% | -3.76% | -26.06% | $0.11 | $5.82 | -3.76% | -25.42% |
| 04 | 18.35 | 2.74% | -46.86% | -78.44% | $0.05 | $1.28 | -46.86% | -78.05% |
| 05 | 16.25 | 2.59% | -11.42% | -38.57% | $0.02 | $0.77 | -11.42% | -44.66% |
| 06 | 14.11 | 2.97% | -13.20% | -42.22% | $0.01 | $0.44 | -13.20% | -45.61% |
| 07 | 7.82 | 3.44% | -44.60% | -77.60% | $0.01 | $0.11 | -44.60% | -77.93% |
| 08 | 6.55 | 4.17% | -16.20% | -40.17% | $0.00 | $0.06 | -16.20% | -44.12% |
| 09 | 5.68 | 4.16% | -13.21% | -40.06% | $0.00 | $0.04 | -13.21% | -40.17% |
| 10 | 13.53 | 4.06% | 138.03% | 346.42% | $0.00 | $0.16 | 138.03% | 352.05% |
| 11 | 10.98 | 2.85% | -18.87% | -43.39% | $0.00 | $0.08 | -18.87% | -48.08% |
| 12 | 11.53 | 2.96% | 5.00% | -5.06% | $0.00 | $0.07 | 5.00% | -7.19% |
| 13 | 13.91 | 2.79% | 20.71% | 23.31% | $0.00 | $0.08 | 20.71% | 13.36% |
| 14 | 9.89 | 2.39% | -28.89% | -53.05% | $0.00 | $0.03 | -28.89% | -60.05% |
| 15 | 7.44 | 2.75% | -24.75% | -58.06% | $0.00 | $0.01 | -24.75% | -56.36% |
| 16 | 3.91 | 2.01% | -47.49% | -79.57% | $0.00 | $0.00 | -47.49% | -78.77% |
| 17 | 5.60 | 1.68% | 43.36% | 60.14% | $0.00 | $0.00 | 43.36% | 59.27% |
| 18 | 3.98 | 2.13% | -29.03% | -59.69% | $0.00 | $0.00 | -29.03% | -58.82% |
| 19 | 3.22 | 2.41% | -19.03% | -46.53% | $0.00 | $0.00 | -19.03% | -49.83% |
| 20 | 1.11 | 2.29% | -65.39% | -90.12% | $0.00 | $0.00 | -65.39% | -90.77% |

| Total Return | -98.89% | -100.00% |
|---|---|---|

Exhibit 1

70

**RISK FACTORS**

The ETNs are senior unsecured debt obligations of Credit Suisse AG ("**Credit Suisse**"). The ETNs are Senior Medium-Term Notes as described in the accompanying prospectus supplement and prospectus and are riskier than ordinary unsecured debt securities. The return on the ETNs of any series will be based on the performance of the applicable underlying Index. Investing in the ETNs is not equivalent to investing directly in the Index itself. See "The Indices" below for more information.

This section describes the most significant risks relating to an investment in the ETNs. **We urge you to read the following information about these risks, together with the other information in this pricing supplement and the accompanying prospectus supplement and prospectus before investing in the ETNs.**

**The ETNs do not pay interest nor guarantee return of principal and you may lose all or a significant part of your investment in the ETNs**

The terms of the ETNs differ from those of ordinary debt securities in that the ETNs neither pay interest nor guarantee payment of the stated principal amount at maturity, on early redemption or upon acceleration, and may incur a loss of principal due to fluctuations in the Closing Indicative Value. Because the payment due at maturity may be less than the amount originally invested in the ETNs, the return on the ETNs (the effective yield to maturity) may be negative. Even if it is positive, the return payable on the ETNs may not be enough to compensate you for any loss in value due to inflation and other factors relating to the value of money over time.

The Early Redemption Amount, Accelerated Redemption Amount and Maturity Redemption Amount, as applicable (each, a "**Redemption Amount**"), will each depend on the change in the level of the applicable underlying Index. Because of the manner in which the underlying Indices are calculated and because the ETNs are linked to the daily returns of the applicable underlying Index *(including inverse or leveraged exposure for the Inverse ETNs and 2x Long ETNs respectively)*, the applicable redemption amount is very likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment.

Each Index seeks to replicate exposure to one or more maturities of futures contracts on the VIX Index, which reflect implied volatility of the S&P 500® Index at various points along the volatility forward curve. The calculation of the level of the VIX Index is based on prices of put and call options on the S&P 500® Index. Futures on the VIX Index allow investors the ability to invest in forward volatility based on their view of the future direction of movement of the VIX Index. Each underlying Index is intended to reflect the returns that are potentially available through an unleveraged investment in the futures contract or contracts on the VIX Index. The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average futures maturity of one month. The S&P 500 VIX Mid-Term Futures™ Index ER targets a constant weighted average futures maturity of five months. *Because of the large and sudden price movement associated with futures on the VIX Index, and the daily objective of the ETNs (including inverse or leveraged exposure), the ETNs are intended specifically for short term trading.* You should monitor the performance of your ETNs as frequently as possible, even intraday.

The ETNs do not accurately provide exposure to the level of the VIX Index (and, in any event, are subject to fees and other costs). Instead the ETNs track an index of futures on the VIX Index. The impact of rolling futures contracts, compounding of returns *(including inverse and leveraged exposure for the Inverse ETNs and 2x Long ETNs respectively)*, and volatility will very likely erode any potential returns of the VIX Index.

Investors with a horizon longer than one Index Business Day should carefully consider whether the ETNs are appropriate for their investment portfolio. As discussed above, because the ETNs are meant to provide daily exposure *(including inverse or leveraged exposure for the Inverse ETNs and 2x Long ETNs respectively)* to the underlying futures, their performance over any period of time—over days, weeks, months or years—can differ significantly from the performance of the applicable underlying Index during the same period of time. *Therefore, it is likely that you will suffer significant losses even if the long-term performance of the applicable underlying Index was in the desired direction. For instance, it is possible for the level of the applicable underlying Index to decrease while the market value of the Inverse ETNs declines, or for the level of the applicable underlying Index to increase while the market value of the Long ETNs or 2x Long ETNs declines.* <u>You should proceed with extreme caution in considering an investment in the ETNs.</u>

Exhibit 1

71

Even if the amount payable on your ETNs on the Early Redemption Date, Acceleration Date or the Maturity Date, as applicable, is greater than the price you paid for your ETNs, it may not compensate you for a loss in value due to inflation and other factors relating to the value of money over time. Thus, even in those circumstances, the overall return you earn on your ETNs may be less than what you would have earned by investing in a debt security that bears interest at a prevailing market rate.

**The ETNs are subject to the credit risk of Credit Suisse**

Although the return on the ETNs of each series will be based on the performance of the applicable underlying Index, the payment of any amount due on the ETNs, including any payment at maturity, is subject to the credit risk of Credit Suisse. Investors are dependent on Credit Suisse's ability to pay all amounts due on the ETNs, and therefore investors are subject to our credit risk. In addition, any decline in our credit ratings, any adverse changes in the market's view of our creditworthiness or any increase in our credit spreads is likely to adversely affect the market value of the ETNs prior to maturity.

**The ETNs may not be a suitable investment for you**

The ETNs may not be a suitable investment for you if:

- You are not willing to be exposed to fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You seek a guaranteed return of principal.

- You seek a long-term investment objective.

- You believe the level of the applicable underlying Index will decrease (if you invest in the Long ETNs or 2x Long ETNs) or increase (if you invest in the Inverse ETNs) or will not increase (if you invest in the Long ETNs or 2x Long ETNs) or decrease (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You prefer the lower risk and therefore accept the potentially lower returns of fixed income investments with comparable maturities and credit ratings.

- You seek current income from your investment.

- You are not a sophisticated investor and you seek an investment for other purposes than managing daily trading risks.

- You seek an investment with a longer duration than a daily basis.

- You do not want to pay Daily Investor Fees and the Early Redemption Charge, if applicable, which are charged on the ETNs and which will reduce your return (or increase your loss, as applicable) on your investment.

**Long holding period risk**

The ETNs are only suitable for a very short investment horizon. The relationship between the level of the VIX Index and the underlying futures on the VIX Index will begin to break down as the length of an investor's holding period increases, even within the course of a single Index Business Day. The relationship between the level of the applicable underlying Index and the Closing Indicative Value and Intraday Indicative Value of the ETNs will also begin to break down as the length of an investor's holding period increases. The ETNs are not long term substitutes for long or short positions in the futures underlying the VIX Index. Further, over a longer holding period, the applicable underlying Index is more likely to experience a dramatic price movement that may result in

PS-27

Exhibit 1

72

the Intraday Indicative Value becoming equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value.  Upon such an event, your ETNs would be subject to acceleration and you will likely lose all or a substantial portion of your investment.  **The long term expected value of your ETNs is zero.  If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment.**

**The ETNs are not linked to the VIX Index**

The ETNs are linked to the daily performance of the applicable underlying Index, which in turn is linked to prices of futures contracts on the VIX Index.  The applicable underlying Index takes notional long positions in futures contracts on the VIX Index.  The Index and these futures will not necessarily track the performance of the VIX Index.  Your ETNs may not benefit from increases (or in the case of the Inverse ETNs, decreases) in the level of the VIX Index because such increases (or in the case of the Inverse ETNs, decreases) will not necessarily cause the level of the relevant futures contracts on the VIX Index to increase (or in the case of the Inverse ETNs, decrease). Additionally, the rolling of the futures contracts reflected in the applicable underlying Index may decrease your returns.  A hypothetical investment that was linked directly to the performance of the VIX Index could generate a higher return than your ETNs.

**Your ETNs are not linked to the options used to calculate the VIX Index, to the actual volatility of the S&P 500® Index or to the equity securities included in the S&P 500® Index**

The VIX Index measures the 30-day forward volatility of the S&P 500® Index as calculated based on the prices of certain put and call options on the S&P 500® Index.  The actual volatility of the S&P 500® Index may differ significantly from the level predicted by the VIX Index.  The Closing Indicative Value and the Intraday Indicative Value of the ETNs are based on the value of the applicable underlying Index, which is based on the relevant futures on the VIX Index.  Your ETNs are not linked to the realized volatility of the S&P 500® Index and will not reflect the return you would realize if you owned, or held a short position in, the equity securities underlying the S&P 500® Index or if you traded the put and call options used to calculate the level of the VIX Index.

**The VIX Index is a theoretical calculation and is not a tradable index**

The VIX Index is a theoretical calculation and cannot be traded on a spot price basis.  The settlement price at maturity of the futures contracts on the VIX Index contained in the Indices is based on this theoretically derived calculation.  As a result the behavior of the futures contracts may be different from futures contracts whose settlement price is based on a tradable asset.

**Changes in the Treasury Bill Rate may affect the value of your ETNs**

The value of the ETNs is linked, in part, to the rate of interest that could be earned on an investment of the Closing Indicative Value of the ETNs at the T-Bill rate, which comprises the weekly investment rate for 90-day U.S. Treasury bills (as described in further detail under "Daily Accrual").  Changes in the prevailing investment rate for U.S. Treasury bills, and therefore the T-Bill rate, may affect the amount payable on your ETNs at maturity or upon redemption and, therefore, the market value of your ETNs. Any decrease in T-Bill rate will decrease the rate at which the accrued interest increases and will, therefore, adversely affect the amount payable on your ETNs at maturity or upon redemption.

**Lower or higher prices for futures contracts underlying the Indices relative to the level of the VIX Index may adversely affect the Closing Indicative Value of the ETNs**

The Indices are linked to futures contracts on the spot level of the VIX Index.  Some of these futures contracts are rolled forward every day.  If the value of the futures contracts being bought is less than the value of the futures contracts being sold, the level of the applicable underlying Index may increase relative to the VIX Index. This increase in the level of the applicable underlying Index would adversely affect the Closing Indicative Value of the Inverse ETNs.  If the value of the futures contracts being bought is more than the value of the futures contracts being sold, the applicable underlying Index may decrease relative to the VIX Index.  This decrease in the level of the applicable underlying Index would adversely affect the Closing Indicative Value of the Long ETNs and 2x Long ETNs.

**Daily rebalancing of the Indices may impact trading in the underlying futures contracts**

The daily rebalancing of the futures contracts underlying the Indices may cause the Issuer, our affiliates, or third parties with whom we transact to adjust their hedges accordingly.  The trading activity associated with these

Exhibit 1

73

hedging transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying Index.

**If the Closing Indicative Value for an ETN increases above its denomination and stated principal amount, at any time, any subsequent adverse daily performance of the applicable underlying Index will result in a larger decrease in the level of such Closing Indicative Value than if the current respective Closing Indicative Value had remained constant at its denomination and stated principal amount**

If the current Closing Indicative Value for an ETN increases above its denomination and stated principal amount, the amount of decrease of such Closing Indicative Value resulting from an adverse daily performance of the applicable underlying Index will increase accordingly. This is because the applicable Daily Index Performance will be applied to a Closing Indicative Value larger than its denomination and stated principal amount.  As such, the amount of decrease from any adverse daily performance of the applicable underlying Index will be more than if the Closing Indicative Value were maintained constant at its denomination and stated principal amount.  This means that if the Closing Indicative Value increases above its denomination and stated principal amount, it will take smaller adverse daily performances to decrease the Closing Indicative Value (and subsequently the value of your investment) back to the amount of the Initial Indicative Value than would have been the case if the Closing Indicative Value were maintained at its denomination and stated principal amount.  Further, if you invest in the Inverse ETNs or 2x Long ETNs, you could lose more than 1% of your initial investment for each 1% of adverse daily performance of the applicable underlying Index and if you invest in the 2x Long ETNs, you could lose more than 2% of your initial investment for each 1% of adverse daily performance of the applicable underlying Index.

**If the Closing Indicative Value for an ETN decreases below its denomination and stated principal amount, at any time, any subsequent beneficial daily performance of the applicable underlying Index will result in a smaller increase in the level of such Closing Indicative Value than if the current respective Closing Indicative Value had remained constant at its denomination and stated principal amount**

If the current Closing Indicative Value for an ETN decreases below its denomination and stated principal amount, the amount of increase of such Closing Indicative Value resulting from a beneficial daily performance of the applicable underlying Index will decrease correspondingly.  This is because the applicable Daily Index Performance will be applied to a smaller Closing Indicative Value than its denomination and stated principal amount.  As such, the amount of increase from any beneficial daily performance of the applicable underlying Index will be less than if the Closing Indicative Value were maintained constant at its denomination and stated principal amount.  This means that if the Closing Indicative Value decreases below its denomination and stated principal amount, it will take larger beneficial daily performances to restore the Closing Indicative Value (and subsequently the value of your investment) back to the amount the Initial Indicative Value than would have been the case if the Closing Indicative Value were maintained at its denomination and stated principal amount.  Further, if you invest in the Inverse ETNs or 2x Long ETNs, you could gain less than 1% of your initial investment for each 1% of beneficial daily performance of the applicable underlying Index and if you invest in the 2x Long ETNs, you could gain less than 2% of your initial investment for each 1% of beneficial daily performance of the Index.

**If the Intraday Indicative Value is zero at any time or the Closing Indicative Value is zero you will lose all of your investment**

If the Intraday Indicative Value is equal to or less than zero at any time or the Closing Indicative Value is equal to zero on any Index Business Day, the Closing Indicative Value on that day, and all future days, will be zero and you will lose all of your investment in the ETNs.

**It is possible that your ETNs will be accelerated due to a fall in the Intraday Indicative Value to 20% or less than the prior day's Closing Indicative Value and your investment will be lost before the scheduled maturity of the ETNs**

Because the Intraday Indicative Value is calculated throughout each Index Business Day, adverse daily performances of the applicable underlying Index on an Index Business Day will be reflected in the current Closing Indicative Value rather than only upon redemption, acceleration or at maturity.  If there are severe or repeated adverse daily performances for the applicable underlying Index during the term of the ETNs, the Intraday Indicative Value on any Index Business Day could be reduced to 20% or less of the prior day's Closing Indicative Value.  If this occurs, the ETNs will automatically accelerate for an amount equal to that day's Closing Indicative Value and you may not receive any of your initial investment.

Exhibit 1

74

**Your ETNs may be accelerated at any time on or after the Inception Date or if an Acceleration Event has occurred**

We have the right to accelerate the ETNs and pay you an amount equal to the Closing Indicative Value on the applicable Accelerated Valuation Date, on any Business Day occurring on or after the Inception Date or if an Acceleration Event has occurred in our or the Calculation Agents' determination.  As discussed in the section "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" the type of events that may trigger this acceleration are (a) an amendment to or change (including any officially announced proposed change) in the laws, regulations or rules of the United States (or any political subdivision thereof), any jurisdiction in which a Primary Exchange or Related Exchange (each as defined herein) is located that (i) makes it illegal to hold, acquire or dispose of the applicable underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on any of these party's ability to perform their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents; (b) any official administrative decision, judicial decision, administrative action, regulatory interpretation or other official pronouncement interpreting or applying those laws, regulations or rules that is announced on or after the Inception Date that (i) makes it illegal to hold, acquire or dispose of the applicable underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on the Issuer's, our affiliates, third parties with whom we transact or similarly situated third party's ability to perform our or their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents; (c) any event, as determined by us or the Calculation Agents that we or any of our affiliates or a similarly situated party would, after using commercially reasonable efforts, be unable to, or would incur a materially increased amount of tax, duty, expense or fee (other than brokerage commissions) to acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction or asset it deems necessary to hedge the risk of the ETNs, or realize, recover or remit the proceeds of any such transaction or asset; (d) if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value; (e) if the primary exchange or market for trading for the ETNs, if any, announces that pursuant to the rules of such exchange or market, as applicable, the ETNs cease (or will cease) to be listed, traded or publicly quoted on such exchange or market, as applicable, for any reason and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as such exchange or market, as applicable.   If we accelerate the ETNs, you will only receive the Closing Indicative Value and will not receive any other compensation or amount for the loss of the investment opportunity of holding the ETNs; or (f) VLS exercises their right to cause an early acceleration due to the termination of our agreement with them under certain circumstances. See "Supplemental Plan of Distribution" in this pricing supplement for further information.

**The Calculation Agents may modify the applicable underlying Index**

The Calculation Agents may modify the applicable underlying Index or adjust the method of its calculation if they determine that the publication of the applicable underlying Index is discontinued and there is no Successor Index.  In that case, the Calculation Agents will determine the applicable level of the applicable underlying Index as the case may be, and thus the applicable Redemption Amount by a computation methodology that the Calculation Agents determine will as closely as reasonably possible replicate the applicable underlying Index.

If the Calculation Agents determine that the applicable underlying Index, the underlying futures or the method of calculating the applicable underlying Index is changed at any time in any respect — including whether the change is made by the Index Sponsor under its existing policies or following a modification of those policies, is due to the publication of a Successor Index, is due to events affecting the underlying futures or its issuer, or is due to any other reason and is not otherwise reflected in the level of the applicable underlying Index by the Index Sponsor pursuant to the methodology described herein, then the Calculation Agents will be permitted (but not required) to make such adjustments in the applicable underlying Index or the method of its calculation as they believe are appropriate to ensure that the applicable closing level of the applicable underlying Index used to determine the applicable Redemption Amount is equitable. The Calculation Agents may make any such modification or adjustment even if the Index Sponsor continues to publish the applicable underlying Index without a similar modification or adjustment.

Exhibit 1

75

Any modification to the applicable underlying Index or adjustment to its method of calculation will affect the amount you will receive upon redemption or maturity and will result in the ETNs having a value different (higher or lower) from the value they would have had if there had been no such modification or adjustment.

**Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the applicable underlying Index on the date of your investment, you may receive less than the principal amount of your ETNs**

Because the Daily Investor Fee (and in the case of Early Redemption, the Early Redemption Charge) reduces the amount of your return upon redemption, acceleration or maturity, the level of the applicable underlying Index must increase significantly (or decrease significantly in the case of the Inverse ETNs) in order for you to receive at least the principal amount of your investment upon redemption, acceleration or maturity of your ETNs. If the level of the applicable underlying Index decreases or does not increase sufficiently (increases or does not decrease sufficiently in the case of the Inverse ETNs) to offset the effect of the Daily Investor Fee over the term of the ETNs (and in the case of Early Redemption, the Early Redemption Charge), you will receive less than the principal amount of your investment upon redemption, acceleration or maturity of your ETNs. For more information on how the Daily Investor Fee affects the value of the ETNs, see "Hypothetical Examples".

**There are restrictions on the minimum number of ETNs you may redeem and on the dates on which you may redeem them**

You must redeem at least 25,000 ETNs, the Minimum Redemption Amount, at one time and you must cause your broker to deliver a notice of redemption, substantially in the form as Annex A (the "**Redemption Notice**"), to VLS (the "**Redemption Agent**") via email or other electronic delivery (including, without limitation, the Redemption Agent's proprietary technology system, TENZING) as requested by the Redemption Agent.  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  If the Redemption Agent receives your Redemption Notice no later than 4:00 p.m., New York City time, on any Business Day, the Redemption Agent will respond by sending your broker an acknowledgment of the Redemption Notice accepting your redemption request by 7:30 p.m., New York City time, on the Business Day prior to the applicable Early Redemption Valuation Date.  The Redemption Agent or its affiliate must acknowledge to your broker acceptance of the Redemption Notice in order for your redemption request to be effective.

Also, because of the timing requirements of your offer for early redemption, settlement of any early redemption by us will be prolonged when compared to a sale and settlement in the secondary market. As your Redemption Notice is irrevocable, this will subject you to market risk in the event the market fluctuates after the Redemption Agent receives your offer.

The redemption feature is intended to induce arbitrageurs to counteract any trading of the ETNs at a premium or discount to their indicative value. There can be no assurance that arbitrageurs will employ the redemption feature in this manner.

**An Early Redemption Charge of up to 0.05% per ETN will be charged upon an early redemption**

We will charge a fee of up to 0.05% *times* the Closing Indicative Value per ETN upon an early redemption. The imposition of the fee will mean that you will not receive the full amount of the Closing Indicative Value upon an early redemption at your election.

**You will not know the Early Redemption Amount for any ETNs you elect to redeem prior to maturity at the time you make such election**

In order to exercise your right to redeem your ETNs prior to maturity you must cause your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein) by no later than 4:00 p.m., New York City time, on the Business Day prior to your desired Valuation Date. The Early Redemption Amount cannot be determined until the Valuation Date, and as such you will not know the Early Redemption Amount for your ETNs at the time you make an irrevocable election to redeem your ETNs. The Early Redemption Amount for your ETNs on the relevant Valuation Date may be substantially less than it would have been on the prior day and may be zero.

Exhibit 1

76

**You will not benefit from any change in the level of the applicable underlying Index if such change is not reflected in the level of the applicable underlying Index on the applicable Valuation Date**

If the applicable underlying Index does not increase (or decrease in the case of the Inverse ETNs) by an amount sufficient to offset the effect of the Daily Investor Fee and, in the case of an early redemption, the Early Redemption Charge, between the Trade Date and the applicable Valuation Date, we will pay you less than the principal amount of your ETNs upon redemption. This will be true even if the level of the applicable underlying Index as of some date or dates prior to the applicable Valuation Date would have been sufficiently high (or low in the case of the Inverse ETNs) to offset the effect of the Daily Investor Fee and Early Redemption Charge.

**Past performance of the Indices is no guide to future performance, and the Indices and VIX Futures have limited historical information**

The actual performance of the applicable underlying Index over the term of the offered ETNs, as well as the amount payable on the relevant Early Redemption Date, Acceleration Date or the Maturity Date, may bear little relation to the historical values of that Index or to the hypothetical return examples set forth elsewhere in this pricing supplement. We cannot predict the future performance of the Indices.

The payment amount, if any, for each of your ETNs is linked to the performance of the applicable underlying Index, each of which was launched in January 2009 with an inception date of January 22, 2009 at the market close and has limited history. Because the Indices have no historical performance information prior to that date, very limited historical index level information is available for you to consider in making an independent investigation of the performance of the Indices, which may make it difficult for you to make an informed decision with respect to an investment in your ETNs. The Index Sponsor has calculated hypothetical historical performance data to illustrate how the Indices may have performed had it been created in the past, but those calculations are subject to many limitations. Unlike actual historical performance, such calculations do not reflect actual trading, liquidity constraints, fees and other costs. In addition, the models used to calculate these hypothetical returns are based on certain data, assumptions and estimates. Different models or models using different data assumptions, and estimates might result in materially different hypothetical performance.

In addition, prior to April 2008 not all consecutive first to seventh month futures contracts on the VIX Index have been listed and not all futures of relevant maturities have traded consistently during that time. This lack of historical information makes it even more difficult to perform an independent investigation of the likely performance of the index or make an informed decision with respect to an investment in your ETNs.

**The formula for determining the applicable Redemption Amount does not take into account all developments in the applicable underlying Index**

Changes in the levels of the applicable underlying Index during the term of the ETNs before the applicable Valuation Date will not necessarily be reflected in the calculation of the applicable Redemption Amount. The Calculation Agents will calculate the applicable Redemption Amount by utilizing the Closing Indicative Value on the applicable Valuation Date. No other levels of the applicable underlying Index, Closing Indicative Values or Intraday Indicative Values will be taken into account. As a result, you may lose a significant part of your initial investment even if the level of the applicable underlying Index has risen (or declined in the case of the Inverse ETNs) at certain times during the term of the ETNs.

**Any decline in our credit ratings may affect the market value of your ETNs**

Our credit ratings are an assessment of our ability to pay our obligations, including those on the offered ETNs. Consequently, actual or anticipated declines in our credit ratings may affect the market value of your ETNs.

**The ETNs do not give you rights in the underlying futures or the component securities of the S&P 500® Index**

As an owner of the ETNs, you will not have rights that investors in the underlying futures may have. Your ETNs will be paid in cash, and you will have no right to receive delivery of any components of the applicable underlying Index.  You will have no right to receive delivery of any equity securities comprising the S&P 500® Index, of any dividends or distributions relating to such securities, of payment or delivery of amounts in respect of the options used to calculate the level of the VIX Index or of payment or delivery of amounts in respect of the futures contracts included in the Index underlying your ETNs.

Exhibit 1

77

**The Calculation Agents will have the authority to make determinations that could affect the market value of your ETNs and the amount you receive at maturity**

The Calculation Agents for your ETNs will have discretion in making various determinations that affect your ETNs, including the Closing Indicative Values, the applicable Redemption Amount, the occurrence and effects of an Acceleration Event and the existence and effects of Market Disruption Events. The exercise of this discretion by the Calculation Agents could adversely affect the value of your ETNs and may present the Calculation Agents with a conflict of interest of the kind described below under "There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents".

**The market price of your ETNs may be influenced by many unpredictable factors**

The market value of your ETNs will fluctuate between the date you purchase them and the applicable Valuation Date. You may also sustain a significant loss if you sell the ETNs in the secondary market. In addition to others, the following factors, many of which are beyond our control, will influence the market value of your ETNs, as well as the applicable Redemption Amount:

- the level of the applicable underlying Index at any time,

- the volatility of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures,

- the liquidity of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures,

- economic, financial, regulatory, political, judicial, military and other events that affect stock markets generally, the applicable underlying Index, the equity securities included in the S&P 500® Index, the S&P 500® Index, the VIX Index or the relevant futures contracts on the VIX Index,

- supply and demand for the ETNs in the secondary market, including but not limited to, inventory positions with any market maker or other person or entity who is trading the ETNs (supply and demand for the ETNs will be affected by the total issuance of ETNs, and we are under no obligations to issue additional ETNs to increase the supply),

- interest and yield rates and rate spreads in the markets,

- the time remaining until your ETNs mature, and

- the actual or perceived creditworthiness of Credit Suisse.

You cannot predict the future performance of the Indices based on the historical performance of the option or futures contracts relating to the Indices, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. The factors interrelate in complex ways, and the effect of one factor on the market value of your ETNs may offset or enhance the effect of another factor.

**Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the applicable underlying Index may impair the value of your ETNs**

We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index,

Exhibit 1
78

or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

**We may sell additional ETNs at a different issue price**

In our sole discretion, we may decide to sell additional ETNs subsequent to the Trade Date. The issue price of the ETNs in the subsequent sale may differ substantially (higher or lower) from the issue price you paid on the Trade Date.

**There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents**

CSI will also act as one of the Calculation Agents for the ETNs.  In addition, we may in the future become a minority investor in an affiliate of VLS, and may in connection with such investment obtain customary rights to nominate a director of such affiliate.  As Calculation Agents CSI and VLS will make determinations with respect to the ETNs.  Among other things, VLS or one of its affiliates is responsible for computing and disseminating the Closing Indicative Value.  The determinations may be adverse to you.

As noted above, we, our affiliates, or third parties with whom we transact, including VLS, may engage in trading activities related to the applicable underlying Index and underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. These trading activities may present a conflict between your interest in your ETNs and the interests we, our affiliates, or third parties with whom we transact, including VLS, will have in our or their proprietary accounts, in facilitating transactions, including block trades, for our or their customers and in accounts under our or their management. These trading activities, if they influence the level of the applicable underlying Index, could be adverse to your interests as a beneficial owner of your ETNs.

We, our affiliates, or third parties with whom we transact, the Redemption Agent, the Calculation Agents and their affiliates may have published, and in the future may publish, research reports with respect to the underlying futures and with respect to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index. Any of these activities by us, our affiliates, or third parties with whom we transact, the Redemption Agent, the Calculation Agents or any of their affiliates may affect the levels of the Index and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

Exhibit 1

79

**The policies of the Index Sponsor or CBOE and changes that affect the S&P 500® Index, the VIX Index or any underlying Index could affect the applicable Redemption Amount of your ETNs and their market value**

The policies of the Index Sponsor or CBOE concerning the calculation of the level of the applicable underlying Index and the manner in which changes affecting the underlying futures or option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index or the underlying futures, are reflected in the level of the applicable underlying Index could affect the applicable Redemption Amount of your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date and the market value of your ETNs prior to that date. The applicable Redemption Amount of your ETNs and their market value could also be affected if the Index Sponsor or CBOE changes these policies, for example by changing the manner in which it calculates the level of the applicable underlying Index, or if the Index Sponsor or CBOE discontinues or suspends calculation or publication of the level of the applicable underlying Index, in which case it may become difficult to determine the market value of your ETNs. If events such as these occur, or if the level of the applicable underlying Index is not available because of a Market Disruption Event or for any other reason, the Calculation Agents for your ETNs may determine the level of the applicable underlying Index on the applicable Valuation Date (including, without limitation, the Final Valuation Date, Accelerated Valuation Date or Early Redemption Valuation Date), as the case may be.

**The occurrence of a Market Disruption Event will affect certain valuations and delay certain payments under the ETNs**

If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event.  In addition, if a Market Disruption Event occurs or is continuing on a Valuation Date, the Maturity Date, the corresponding Early Redemption Date or the Acceleration Date, as the case may be, will be postponed until the date three Business Days following the earlier of (i) the first Index Business Day following such Valuation Date on which no Market Disruption Event occurs or is continuing or (ii) the fifth Index Business Day following such Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date, any Early Redemption Date or the Acceleration Date.  See "Specific Terms of the ETNs—Market Disruption Events" in this Pricing Supplement.

**The Maturity Date may be postponed**

In addition to the postponement for Market Disruption Events described above, if the scheduled Maturity Date is not a Business Day, the Maturity Date will be postponed to the first Business Day following the scheduled Maturity Date.  If the scheduled Final Valuation Date is not an Index Business Day, the Final Valuation Date will be postponed to the next following Index Business Day, in which case the Maturity Date will be postponed to the third Business Day following the Final Valuation Date as so postponed.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.

**Your ETNs may not have an active trading market, and may not continue to be listed over the life of your ETNs**

Although we have listed the ETNs on the NYSE Arca, there is no assurance that a trading market for the offered ETNs will develop. Even if there is a secondary market for your ETNs, it may not be sufficiently liquid to enable you to sell your ETNs readily and you may suffer substantial losses and/or sell your ETNs at prices substantially less than their Intraday Indicative Value or Closing Indicative Value, including being unable to sell them at all or only for a price of zero in the secondary market.

No assurance can be given as to the continuation of the listing for the life of the offered ETNs, or the liquidity or trading market for the offered ETNs. We are not required to maintain any listing of your ETNs on the NYSE Arca and the liquidity of the market for any series of ETNs could vary materially over the term of the ETNs.

**Suspension or disruptions of market trading in futures contracts may adversely affect the value of your notes**

Futures markets like the CBOE, the market for the VIX futures, are subject to temporary distortions or other disruptions due to various factors, including the lack of liquidity in the markets, the participation of speculators, and government regulation and intervention. In addition, some U.S. futures have regulations that limit the amount of fluctuation in some futures contract prices that may occur during a single business day. These limits are generally referred to as "daily price fluctuation limits" and the maximum or minimum price of a contract on any

Exhibit 1

80

given day as a result of these limits is referred to as a "limit price." Once the limit price has been reached in a particular contract, no trades may be made at a price beyond the limit, or trading may be limited for a set period of time. Limit prices have the effect of precluding trading in a particular contract or forcing the liquidation of contracts at potentially disadvantageous times or prices. These circumstances could affect the value of the Index and therefore could adversely affect the value of your notes.

**Concentration risks associated with the Indices may adversely affect the value of your securities**

Each Index is comprised of futures contracts on the VIX Index and thus is less diversified than other funds, investment portfolios or indices investing in or tracking a broader range of products and, therefore, could experience greater volatility. You will not benefit, with respect to the securities, from any of the advantages of a diversified investment and will bear the risks of a highly concentrated investment.

**The U.S. Federal income tax treatment on the ETNs is uncertain and the terms of the ETNs require you to follow the treatment that we will adopt**

The U.S. Federal income tax consequences of an investment in your ETNs are uncertain, both as to the timing and character of any inclusion in income in respect of your ETNs. Some of these consequences are summarized below but you should read the more detailed discussion in "Certain U.S. Federal Income Tax Considerations" in this pricing supplement and in the accompanying prospectus supplement and prospectus and also consult your tax advisor as to the tax consequences of investing in the ETNs.

By purchasing an ETN, you and us agree, in the absence of a change in law, an administrative determination or a judicial ruling to the contrary, to characterize such ETN for all tax purposes as a pre-paid forward contract with respect to the Index. Under this characterization of the ETNs, you generally should recognize capital gain or loss upon the sale, redemption or maturity of your ETNs in an amount equal to the difference between the amount you receive at such time and the amount you paid for the ETNs.

Notwithstanding our agreement to treat the ETNs as a pre-paid forward contract with respect to the Index, the Internal Revenue Service ("**IRS**") could assert that the ETNs should be taxed in a manner that is different than described in this pricing supplement. As discussed further below, on December 7, 2007, the IRS issued a notice indicating that it and the Treasury Department ("**Treasury**") are actively considering whether, among other issues, you should be required to accrue ordinary income over the term of an instrument such as the ETNs even though you will not receive any payments with respect to the ETNs until maturity and whether all or part of the gain you may recognize upon sale or maturity of an instrument such as the ETNs could be treated as ordinary income. The outcome of this process is uncertain and could apply on a retroactive basis.

<u>**Additional Risk Factors Related to the Inverse ETNs and/or 2x Long ETNs**</u>

**Intraday purchase risk for Inverse ETNs or 2x Long ETNs**

The ETNs may be purchased in the secondary market at prices other than the Closing Indicative Value, which will have an effect on the effective leverage amount of any Inverse ETNs or 2x Long ETNs. Because the exposure is fixed each night and does not change intraday as the level of the applicable underlying Index moves in favor of the relevant ETN (*i.e.*, the level of the applicable underlying Index decreases for the Inverse ETNs, or the level of the applicable underlying Index increases for the 2x Long ETNs), the actual exposure in the applicable ETNs decreases. The reverse is also true. The table below presents the hypothetical exposure an investor has (ignoring all costs, fees and other factors) when purchasing an ETN intraday given the movement of the applicable underlying Index since the prior Index Business Day's market close. The resulting effective exposure amount will then be constant for that purchaser until the earlier of (i) a sale or (ii) the end of the Index Business Day.

| A: Index level | B: % change in Index | C: hypothetical inverse ETN price C=A*(1-B) | D: hypothetical inverse ETN notional exposure D=A*-1 | E: Inverse ETN effective leverage amount E=D/C | F: hypothetical 2x ETN price E=A*(1+2B) | G: hypothetical 2x Long ETNs notional exposure G=A*2 | E: 2x Long ETNs effective leverage amount E=G/F |
|---|---|---|---|---|---|---|---|
| 120.00 | 20% | $80.00 | -$120.00 | -1.50 | $140.00 | $240.00 | 1.71 |
| 115.00 | 15% | $85.00 | -$115.00 | -1.35 | $130.00 | $230.00 | 1.77 |
| 110.00 | 10% | $90.00 | -$110.00 | -1.22 | $120.00 | $220.00 | 1.83 |

Exhibit 1

81

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 105.00 | 5% | $95.00 | -$105.00 | -1.11 | $110.00 | $210.00 | 1.91 |
| 104.00 | 4% | $96.00 | -$104.00 | -1.08 | $108.00 | $208.00 | 1.93 |
| 103.00 | 3% | $97.00 | -$103.00 | -1.06 | $106.00 | $206.00 | 1.94 |
| 102.00 | 2% | $98.00 | -$102.00 | -1.04 | $104.00 | $204.00 | 1.96 |
| 101.00 | 1% | $99.00 | -$101.00 | -1.02 | $102.00 | $202.00 | 1.98 |
| 100.00 | 0% | $100.00 | -$100.00 | -1.00 | $100.00 | $200.00 | 2.00 |
| 99.00 | -1% | $101.00 | -$99.00 | -0.98 | $98.00 | $198.00 | 2.02 |
| 98.00 | -2% | $102.00 | -$98.00 | -0.96 | $96.00 | $196.00 | 2.04 |
| 97.00 | -3% | $103.00 | -$97.00 | -0.94 | $94.00 | $194.00 | 2.06 |
| 96.00 | -4% | $104.00 | -$96.00 | -0.92 | $92.00 | $192.00 | 2.09 |
| 95.00 | -5% | $105.00 | -$95.00 | -0.90 | $90.00 | $190.00 | 2.11 |
| 85.00 | -15% | $115.00 | -$85.00 | -0.74 | $70.00 | $170.00 | 2.43 |
| 80.00 | -20% | $120.00 | -$80.00 | -0.67 | $60.00 | $160.00 | 2.67 |

The above chart shows that if the level of the applicable underlying Index increases during the Index Business Day, your effective exposure (a) increases from one times inverse for the Inverse ETNs and (b) decreases from two times leveraged for the 2x Long ETNs. For example, if the level of the applicable underlying Index increases by 20%, your effective exposure increases from negative 1 to negative 1.5 for the Inverse ETNs and decreases from 2 to 1.71 for the 2x Long ETNs.

The above chart also shows that if the level of the applicable underlying Index decreases during the Index Business Day, your effective exposure (a) decreases from one times inverse for the Inverse ETNs and (b) increases from two times leveraged for the 2x Long ETNs. For example, if the level of the applicable underlying Index decreases by 20%, your effective exposure decreases from negative 1 to negative 0.67 for the Inverse ETNs and increases from 2 to 2.67 for the 2x Long ETNs.

The following table shows the leverage amounts for an intraday purchaser based on the percentage change in the level of the Index since the close of the prior Index Business Day.

| % change in the level of the Index | Effective Leverage Amount for Inverse ETNs | Effective Leverage Amount for 2x ETNs |
|---|---|---|
| 20% | -1.50 | 1.71 |
| 15% | -1.35 | 1.77 |
| 10% | -1.22 | 1.83 |
| 5% | -1.11 | 1.91 |
| 4% | -1.08 | 1.93 |
| 3% | -1.06 | 1.94 |
| 2% | -1.04 | 1.96 |
| 1% | -1.02 | 1.98 |
| 0% | -1.00 | 2.00 |
| -1% | -0.98 | 2.02 |
| -2% | -0.96 | 2.04 |
| -3% | -0.94 | 2.06 |
| -4% | -0.92 | 2.09 |
| -5% | -0.90 | 2.11 |
| -15% | -0.74 | 2.43 |
| -20% | -0.67 | 2.67 |

**Sensitivity of the ETNs to large changes in the market price of the underlying futures contracts**

Because the Inverse ETNs and 2x Long ETNs are linked to the daily performance of the applicable underlying Index and include either inverse or leveraged exposure, changes in the market price of the underlying

Exhibit 1

82

futures will have a greater likelihood of causing such ETNs to be worth zero than if such ETNs were not linked to the inverse or leveraged return of the applicable underlying Index.  In particular, any significant increase in the market price of the underlying futures on any Index Business Day will result in a significant decrease in the Closing Indicative Value and Intraday Indicative Value of the Inverse ETNs, and any significant decrease in the market price of the underlying futures on any Index Business Day will result in a significant decrease in the Closing Indicative Value and Intraday Indicative Value of the 2x Long ETNs.

If the price of the underlying futures contracts increases by more than 80% in a day, it is extremely likely that the Inverse ETNs will depreciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration.  If the price of the underlying futures contracts decreases by more than 40% in a day, it is extremely likely that the 2x Long ETNs will depreciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration.  If the price of the underlying futures contracts decreases by more than 80% in a day, it is extremely likely that the Long ETNs will depreciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration.

**Daily rebalancing of the leverage amount may impact trading in the underlying futures contracts**

The daily rebalancing of the leverage amount of each ETN back to its target may cause us, our affiliates, or third parties with whom we transact to adjust their hedges accordingly.  The trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures and may adversely affect the market price of such underlying futures.

**Daily rebalancing and market volatility risk**

Each ETN seeks to provide a return which is related to the daily performance of its Index (as adjusted for costs and fees). The ETNs do not attempt to, and should not be expected to, provide returns which achieve the inverse or 2x leveraged return of the Index for periods other than a single day.  Each of the Inverse ETNs and 2x Long ETNs rebalances its theoretical exposure on a daily basis, increasing exposure in response to that day's gains or reducing exposure in response to that day's losses.

Daily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility and such performance will be dependent on the path of daily returns during the holder's holding period. At higher ranges of volatility, there is a significant chance of a complete loss of the value of the ETNs even if the performance of the applicable underlying Index is flat. ***The ETNs are designed as short-term trading vehicles for investors managing their portfolios on a daily basis***. They are not intended to be used by, and are not appropriate for, investors who intend to hold positions in an attempt to generate returns over longer periods of time.

Exhibit 1

83

**THE INDICES**

We have derived all information regarding each of the Indices, the S&P 500® Index and the VIX Index contained in this pricing supplement, including, without limitation, their make-up, method of calculation and changes to their components, from publicly available information, and we have not participated in the preparation of, or verified, such publicly available information. We make no representation or warranty as to the accuracy or completeness of this publicly available information. Such information reflects the policies of, and is subject to change by, the Index Sponsor, in the case of the Indices and the S&P 500® Index, and the CBOE, in the case of the VIX Index. We and our affiliates make no representation or warranty as to, and assume no responsibility for, the accuracy or completeness of such information.

**Description of the Indices**

The return on the ETNs is linked to the daily performance of one of the Indices. Each of the Indices models returns from a long position in VIX futures contracts that is rolled continuously throughout the period between futures expiration dates. The S&P 500 VIX Short-Term Futures™ Index ER measures the return from a rolling long position in the first and second month VIX futures contracts, and rolls continuously throughout each month from the first month VIX futures contract into the second month VIX futures contract. The S&P 500 VIX Mid-Term Futures™ Index ER measures the return from a rolling long position in the fourth, fifth, sixth and seventh month VIX futures contracts, and rolls continuously throughout each month from the fourth month contract into the seventh month contract while maintaining positions in the fifth month and sixth month contracts.

As described in more detail below, the roll for each VIX futures contract occurs on each Index Business Day according to a pre-determined schedule that has the effect of keeping constant the weighted average maturity of the relevant VIX futures contracts. The constant weighted average maturity for the futures underlying the S&P 500 VIX Short-Term Futures™ Index ER is one month and for the futures underlying the S&P 500 VIX Mid-Term Futures™ Index ER is five months.

The Index Sponsor calculates, publishes and disseminates the daily closing levels of each of the Indices. All determinations made by the Index Sponsor will be at its sole discretion and will be conclusive for all purposes, absent manifest error. The Index Sponsor employs the methodology described herein and its application of the methodology shall be conclusive and binding. The index committee of the Index Sponsor is responsible for reviewing the design, composition and calculation of each of the Indices. The Index Sponsor has no obligation to continue to publish, and may discontinue or suspend publication of, the Indices at any time.

**Index Values**

The level of each Index is calculated in accordance with the method described below. The value of each Index will be published by Bloomberg in real time and after the close of trading on each Index Business Day under the following ticker symbols:

| Index Name | End of Day Ticker | Intraday Ticker |
|---|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP | SPVXSPID |
| S&P 500 VIX Medium-Term Futures™ Index ER | SPVXMP | SPVXMPID |

The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day using the same methodology as for calculation of the closing level but applying real time prices of the relevant VIX futures contracts.

**The S&P 500® Index**

The S&P 500® Index is intended to provide a performance benchmark for the U.S. equity markets. The calculation of the level of the S&P 500® Index is based on the relative value of the aggregate market value of the common stocks of 500 companies as of a particular time as compared to the aggregate average market value of the common stocks of 500 similar companies during the base period of the years 1941 through 1943. Historically, the

Exhibit 1

84

market value of any S&P 500® component stock was calculated as the product of the market price per share and the number of the then outstanding shares of such S&P 500® component stock. As discussed below, on March 21, 2005, S&P began to use a new methodology to calculate the market value of the component stocks and on September 16, 2005, S&P completed its transition to the new calculation methodology. The 500 companies are not the 500 largest companies listed on the NYSE and not all 500 companies are listed on such exchange. S&P chooses companies for inclusion in the S&P 500® Index with an aim of achieving a distribution by broad industry groupings that approximates the distribution of these groupings in the common stock population of the U.S. equity market. S&P may from time to time, in its sole discretion, add companies to, or delete companies from, the S&P 500® Index to achieve the objectives stated above. Relevant criteria employed by S&P include the viability of the particular company, the extent to which that company represents the industry group to which it is assigned, the extent to which the market price of that company's common stock is generally responsive to changes in the affairs of the respective industry and the market value and trading activity of the common stock of that company. The S&P 500® Index is reported by Bloomberg under the ticker symbol "SPX."

**The VIX Index**

The VIX Index is a benchmark index designed to measure the market price of volatility in large cap U.S. stocks over 30 days in the future, and is calculated based on the prices of certain put and call options on the S&P 500® Index. The VIX Index measures the premium paid by investors for certain options linked to the level of the S&P 500® Index. During periods of market instability, the implied level of volatility of the S&P 500® Index typically increases and, consequently, the prices of options linked to the S&P 500® Index typically increase (assuming all other relevant factors remain constant or have negligible changes). This, in turn, causes the level of the VIX Index to increase. The VIX Index has historically had negative correlations to the S&P 500® Index.

The VIX Index was developed by the CBOE and is calculated, maintained and published by the CBOE. The CBOE has no obligation to continue to publish, and may discontinue the publication of, the VIX Index. The VIX Index is reported by Bloomberg L.P. under the ticker symbol "VIX."

The calculation of the VIX Index involves a formula that uses the prices of a weighted series of out-of-the money put and call options on the level of the S&P 500® Index ("**SPX Options**") with two adjacent expiry terms to derive a constant 30-day forward measure of market volatility. The VIX Index is calculated independent of any particular option pricing model and in doing so seeks to eliminate any biases that may otherwise be included in using options pricing methodology based on certain assumptions.

Although the VIX Index measures the 30-day forward volatility of the S&P 500® Index as implied by the SPX Options, 30-day options are only available once a month. To arrive at the VIX Index level, a broad range of out-of-the money SPX Options expiring on the two closest nearby months ("near term options" and "next term options," respectively) are selected in order to bracket a 30-day calendar period. SPX Options having a maturity of less than eight days are excluded at the outset and, when the near term options have eight days or less left to expiration, the VIX Index rolls to the second and third contract months in order to minimize pricing anomalies that occur close to expiration. The model-free implied volatility using prices of the near term options and next term options are then calculated on a strike price weighted average basis in order to arrive at a single average implied volatility value for each month. The results of each of the two months are then interpolated to arrive at a single value with a constant maturity of 30 days to expiration.

**Overview of Futures Markets**

Each of the Indices is composed of one or more futures contracts on the VIX Index. Futures contracts on the VIX Index are traded on regulated futures exchanges, in the over-the-counter market and on various types of electronic trading facilities and markets. At present, all of the contracts included in each of Indices are exchange-traded futures contracts. An exchange-traded futures contract provides for the purchase and sale of a specified type and quantity of an underlying asset or financial instrument during a stated delivery month for a fixed price. Because the VIX Index is not a tangible item that can be purchased and sold directly, a futures contract on the VIX Index provides for the payment and receipt of cash based on the level of the VIX Index at settlement or liquidation of the contract.

Exhibit 1

85

No purchase price is paid or received on the purchase or sale of a futures contract. Instead, an amount of cash or cash equivalents must be deposited with the broker as "initial margin". This amount varies based on the requirements imposed by the exchange clearing houses, but may be lower than 5% of the notional value of the contract. This margin deposit provides collateral for the obligations of the parties to the futures contract. By depositing margin, which may vary in form depending on the exchange, with the clearing house or broker involved, a market participant may be able to earn interest on its margin funds, thereby increasing the total return that it may realize from an investment in futures contracts.

In the United States, futures contracts are traded on organized exchanges known as "designated contract markets." At any time prior to the expiration of a futures contract, a trader may elect to close out its position by taking an opposite position on the exchange on which the trader obtained the position, subject to the availability of a liquid secondary market. This operates to terminate the position and fix the trader's profit or loss. Futures contracts are cleared through the facilities of a centralized clearing house and a brokerage firm, referred to as a "futures commission merchant", which is a member of the clearing house.

Unlike equity securities, futures contracts, by their terms, have stated expirations. As a result, at a specified point in time prior to expiration, trading in a futures contract for the current delivery month will cease. As a result, a market participant wishing to maintain its exposure to a futures contract on a particular asset or financial instrument with the nearest expiration must close out its position in the expiring contract and establish a new position in the contract for the next delivery month, a process referred to as "rolling". For example, a market participant with a long position in November VIX Index futures that wishes to maintain a position in the nearest delivery month will, as the November contract nears expiration, sell November futures, which serves to close out the existing long position, and buy December futures. This will "roll" the November position into a December position, and, when the November contract expires, the market participant will still have a long position in the nearest delivery month.

Futures exchanges and clearing houses in the United States are subject to regulation by the Commodities Futures Trading Commission. Exchanges may adopt rules and take other actions that affect trading, including imposing speculative position limits, maximum price fluctuations and trading halts and suspensions and requiring liquidation of contracts in certain circumstances. Futures markets outside the United States are generally subject to regulation by comparable regulatory authorities. The structure and nature of trading on non-U.S. exchanges, however, may differ from this description.

**Calculation of the Levels of the Indices**

On any S&P 500 VIX Futures Business Day, $t$, the level of each Index is calculated as follows:

$$IndexER_t = IndexER_{t-1} * (1 + CDR_t)$$

where:

$IndexER_t$ = The Index Excess Return on the preceding business day, defined as any date on which such Index is calculated.

$CDR_t$ = Contract Daily Return, as determined by the following formula for each of the Indices:

$$CDR_t = \frac{TDWO_t}{TDWI_{t-1}} - 1$$

where:

$t\text{-}1$ = the preceding business day

$TDWO_t$ = Total Dollar Weight Obtained on $t$, as determined by the following formula for each of the Indices:

$$TDWO_t = \sum_{i=m}^{n} CRW_{i,t-1} * DCRP_{i,t}$$

Exhibit 1

86

$TDWI_{t-1}$ = Total Dollar Weight Invested on *t-1*, as determined by the following formula for each of the Indices:

$$TDWI_{t-1} = \sum_{i=m}^{n} CRW_{i,t-1} * DCRP_{i,t-1}$$

where:

$CRW_{i,t}$ = Contract Roll Weight of the *i*th VIX Futures Contract on date *t*.

$DCRP_{i,t}$ = Daily Contract Reference Price of the *i*th VIX Futures Contract on date *t*.

For the S&P 500 VIX Short-Term Futures™ Index ER *m* =1. For the S&P 500 VIX Mid-Term Futures™ Index ER *m* =4.

For the S&P 500 VIX Short-Term Futures™ Index ER *n* = 2. For the S&P 500 VIX Mid-Term Futures™ Index ER *n* =7.

**Contract Rebalancing**

The Roll Period for each Index starts on the Tuesday prior to the monthly CBOE VIX Futures Settlement Date (the Wednesday falling 30 calendar days before the S&P 500 option expiration for the following month), and runs through the Tuesday prior to the subsequent month's CBOE VIX Futures Settlement Date. Thus, the Indices are rolling on a continual basis. On the business day after the current Roll Period ends the following Roll Period will begin.

In calculating the Excess Return of each of the Indices, the Contract Roll Weights (*CRWi,t*) of each of the contracts in the index, on a given day, *t*, are determined as follows:

*S&P 500 VIX Short-Term Futures Index*

$$CRW_{1,t} = 100 * \frac{dr}{dt}$$

$$CRW_{2,t} = 100 * \frac{dt - dr}{dt}$$

where:

dt = The total number of business days in the current Roll Period beginning with, and including, the starting CBOE VIX Futures Settlement Date and ending with, but excluding, the following CBOE VIX Futures Settlement Date. The number of business days will not change for purposes of this calculation in cases of a new holiday introduced intra-month or an unscheduled market closure.

dr =The total number of business days within a roll period beginning with, and including, the following business day and ending with, but excluding, the following CBOE VIX Futures Settlement Date. The number of business days includes a new holiday introduced intra-month up to the business day preceding such a holiday.

At the close on the Tuesday corresponding to the start of the Roll Period, all of the weight is allocated to the first month contract. On each subsequent business day a fraction of the first month VIX futures contracts are sold and an equal notional amount of the second month VIX futures contracts is bought. The fraction, or quantity, is proportional to the number of first month VIX futures contracts as of the previous index roll day, and inversely proportional to the length of the current Roll Period. In this way the initial position in the first month contract is

PS-42

Exhibit 1

87

progressively moved to the second month over the course of the month, until the next following Roll Period starts when the old second month VIX futures contract becomes the new first month VIX futures contract.

In addition to the transactions described above, the weight of each index component is also adjusted every day to ensure that the change in total dollar exposure for the index is only due to the price change of each contract and not due to using a different weight for a contract trading at a higher price.

## S&P 500 VIX Mid-Term Futures Index

$$CRW_{4,t} = 100 * \frac{dr}{dt}$$

$$CRW_{5,t} = 100$$

$$CRW_{6,t} = 100$$

$$CRW_{7,t} = 100 * \frac{dt - dr}{dt}$$

At the close on the Tuesday corresponding to the start of the Roll Period, an equal weight is allocated to the fourth, fifth and sixth month contracts. Then on each subsequent business day a fraction of the fourth month VIX futures are sold and an equal notional amount of the seventh month VIX futures is bought. The fraction, or quantity, is proportional to the number of fourth month VIX futures contracts as of the previous index roll day, and inversely proportional to the length of the current Roll Period. In this way the initial position in the fourth month contract is progressively moved to the seventh month contract over the course of the month, until the next following Roll Period starts when the old fifth month VIX futures contract becomes the new fourth month VIX futures contract.

In addition to the transactions described above, the weight of each index component is also adjusted every day to ensure that the change in total dollar exposure for the index is only due to the price change of each contract and not due to using a different weight for a contract trading at a higher price.

*Index Maintenance*

**Base Date**

The base date for the S&P 500 VIX Short-Term Futures™ Index ER and the S&P 500 VIX Mid- Term Futures™ Index ER is December 20, 2005 and the base value for each of the Indices is 100,000.

**Historical Assumptions and Performance**

Prior to April 2008, not all consecutive first to seventh month VIX futures were listed. For the purpose of the historical calculations for the Indices, the following assumptions have been made in interpolating VIX futures contract prices from near-by listed contracts.

When the *ith* VIX future contract was not listed, but *i th+1* and *i th-1* VIX futures contracts were listed, the following interpolation has been assumed:

$$DCRP_{i,t}^2 = DCRP_{i-1,t}^2 + \frac{BDays(T_i - T_{i-1})}{BDays(T_{i+1} - T_{i-1})}(DCRP_{i+1,t}^2 - DCRP_{i-1,t}^2)$$

When *ith* and *i th+1* VIX futures contracts were not listed, but *i th+2* and *i th-1* VIX futures contracts were listed, the following interpolation has been assumed:

Exhibit 1

88

$$DCRP_{i,t}^{\,2} = DCRP_{i-1,t}^{\,2} + \frac{BDays(T_i - T_{i-1})}{BDays(T_{i+2} - T_{i-1})}(DCRP_{i+2,t}^{\,2} - DCRP_{i-1,t}^{\,2})$$

When *i th*, *i th+1* and *i th+2* VIX futures contracts were not listed, the following interpolation has been assumed:

$$DCRP_{i,t}^{\,2} = DCRP_{i-1,t}^{\,2} + \frac{BDays(T_i - T_{i-1})}{BDays(T_{i-1} - T_{i-2})}(DCRP_{i-1,t}^{\,2} - DCRP_{i-2,t}^{\,2})$$

where:

$T_i$ = Expiration Day of the *ith* VIX futures contract

*BDays* = Number of business days between VIX Futures Expiration Days

The inception date for the Indices is January 22, 2009 at the market close. The Indices were not in existence prior to that date. The chart below shows the closing level of each Index since the base date, December 20, 2005 through March 5, 2012. The historical performance is presented from January 22, 2009 through March 5, 2012. The closing levels from the base date of December 22, 2005 through January 22, 2009 represents hypothetical values determined by S&P, as the Index Sponsor, as if the relevant Index had been established on December 20, 2005 each with a base value of 100,000 on such date and calculated according to the methodology described below since that date. The closing levels from January 22, 2009 through March 5, 2012 represent the actual closing levels of the Indices as calculated on such dates. **The hypothetical and historical Index performance should not be taken as an indication of future performance, and no assurance can be given as to the level of either Index on any given date.**



PS-44

Exhibit 1

89

**Index Committee**

The S&P 500 VIX Futures Index Committee maintains the Indices. The Index Committee meets regularly and at each meeting, the Index Committee reviews any significant market events.  In addition, the Index Committee may revise index policy for timing of rebalancings or other matters.

Standard & Poor's considers information about changes to its Indices and related matters to be potentially market moving and material. Therefore, all Index Committee discussions are confidential.

**Announcements**

Announcements of the daily values for each Index are made after the market close each day.

**Holiday Schedule**

The value of each Index is calculated daily when the CBOE Futures Exchange is open, excluding holidays and weekends.

**Unscheduled Market Closures and New Holidays**

If the Index Sponsor determines, in its sole discretion, that an exchange is forced to close early due to unforeseen events, such as computer or electric power failures, weather conditions or other events, the Index Sponsor will calculate the value of each Index based on the most recent prior closing futures price published by the CBOE Futures Exchange and the roll for that day will be carried to the next Business Day when the CBOE Futures Exchange is open as described above under "—Contract Rebalancing."

If an exchange fails to open due to unforeseen circumstances, the Index Sponsor may determine not to publish a value of an Index for that day.  In situations where an exchange introduces a holiday during the month of an index calculation the value of the Indices will not be published and the roll for that day will be carried to the next business day when the CBOE Futures Exchange is open as described above under "—Contract Rebalancing."

**Delisting of Futures Contracts**

If one or more futures contracts included in one of the Indices is no longer listed, the Index Sponsor may choose to cease publication of the effected index at that time.

**License Agreement**

We intend to enter into a non-exclusive license agreement with the Index Sponsor providing for the license to us, in exchange for a fee, of the right to use each of the Indices, which are owned by the Index Sponsor, in connection with certain securities, including the ETNs.

Standard & Poor's®", "S&P®", "S&P 500®", "Standard & Poor's 500™", "S&P 500 VIX Short-Term Futures" and "S&P 500 VIX Mid-Term Futures" are trademarks of Standard & Poor's Financial Services LLC ("Standard & Poor's") and have been licensed for use by Credit Suisse. "VIX" is a trademark of the Chicago Board Options Exchange, Incorporated and has been licensed for use by Standard & Poor's. The ETNs are not sponsored, endorsed, sold or promoted by Standard & Poor's or CBOE and neither Standard & Poor's nor CBOE make any representation regarding the advisability of investing in the ETNs.

The ETNs are not sponsored, endorsed, sold or promoted by Standard & Poor's ("S&P") or its third party licensors.  Neither S&P nor its third party licensors makes any representation or warranty, express or implied, to the owners of the ETNs or any member of the public regarding the advisability of investing in securities generally or in the ETNs particularly or the ability of the Indices to track general stock market performance. S&Pss and its third party licensor's only relationship to Credit Suisse is the licensing of certain trademarks and trade names of S&P and the third party licensors and of the Indices which are determined, composed and calculated by S&P or its third party licensors without regard to Credit Suisse or the ETNs. S&P and its third party licensors have no obligation to take the needs of Credit Suisse or the owners of the ETNs into consideration in determining, composing or calculating

Exhibit 1

90

the Indices. Neither S&P nor its third party licensors is responsible for and has not participated in the determination of the prices and amount of the ETNs or the timing of the issuance or sale of the ETNs or in the determination or calculation of the equation by which the ETNs are to be converted into cash. S&P has no obligation or liability in connection with the administration, marketing or trading of the ETNs.

NEITHER S&P, ITS AFFILIATES NOR THEIR THIRD PARTY LICENSORS GUARANTEE THE ADEQUACY, ACCURACY, TIMELINESS OR COMPLETENESS OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY COMMUNICATIONS, INCLUDING BUT NOT LIMITED TO, ORAL OR WRITTEN COMMUNICATIONS (INCLUDING ELECTRONIC COMMUNICATIONS) WITH RESPECT THERETO.  S&P, ITS AFFILIATES AND THEIR THIRD PARTY LICENSORS SHALL NOT BE SUBJECT TO ANY DAMAGES OR LIABILITY FOR ANY ERRORS, OMISSIONS OR DELAYS THEREIN. S&P MAKES NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE MARKS, THE INDICES OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT WHATSOEVER SHALL S&P, ITS AFFILIATES OR THEIR THIRD PARTY LICENSORS BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, TRADING LOSSES, LOST TIME OR GOODWILL, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE.

**VELOCITYSHARES LLC**

We have entered into a non-exclusive license agreement with VelocityShares Index & Calculation Services, ("VIC"), an affiliate of VelocityShares LLC, the parent entity of VLS, to license to us, in exchange for a fee, the right to use certain trade names, trademarks and servicemarks, which are owned by VelocityShares, in connection with certain securities, including the ETNs.

The license agreement between VIC and us provides that the following language must be set forth in this pricing supplement:

"VelocityShares", "Geared for Traders", the "V Logo" and the "V VelocityShares Logo" are trademarks of Velocity Shares Index and Calculation Services, a division of VelocityShares, LLC and have been licensed for use by Credit Suisse AG.  The ETNs are not sponsored, endorsed, sold or promoted by VelocityShares, LLC, nor does VelocityShares, LLC make any representation regarding the advisability of investing in any of the ETNs.

Neither VelocityShares Index & Calculation Services, VelocityShares, LLC (together, "VelocityShares") nor any other party makes any representation or warranty, express or implied, to the owners of the ETNs or any member of the public regarding the advisability of investing in the ETNs generally or the similarities or variations between the performance of the ETNs or the Index and the performance of the underlying securities or Financial instruments. VelocityShares is the licensor of certain trademarks, service marks and trade names of VelocityShares.  Neither VelocityShares nor any other party guarantees the accuracy and/or the completeness of the indices or any data included therein or any calculations made with respect to the ETNs.  VelocityShares disclaims all warranties of merchantability or fitness for any particular purpose with respect to the indices or any data included therein.

NEITHER VELOCITYSHARES NOR ANY OTHER PARTY GUARANTEES THE ACCURACY AND/OR THE COMPLETENESS OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE ETNs.  NEITHER VELOCITYSHARES NOR ANY OTHER PARTY MAKES ANY WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY LICENSEE, LICENSEE'S CUSTOMERS AND COUNTERPARTIES, HOLDERS OF THE ETNs, OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE ETNs IN CONNECTION WITH THE RIGHTS LICENSED HEREUNDER OR FOR ANY OTHER USE.  NEITHER VELOCITYSHARES NOR ANY OTHER PARTY MAKES ANY EXPRESS OR IMPLIED WARRANTIES, AND VELOCITYSHARES HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE ETNs.  WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT

Exhibit 1

91

SHALL VELOCITYSHARES OR ANY OTHER PARTY HAVE ANY LIABILITY FOR ANY DIRECT, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR ANY OTHER DAMAGES (INCLUDING LOST PROFITS) EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

PS-47

Exhibit 1

92

### DESCRIPTION OF THE ETNs

The market value of the ETNs will be affected by several factors, many of which are beyond our control. We expect that generally the level of the applicable underlying Index on any day will affect the market value of the ETNs more than any other factor.  Other factors that may influence the market value of the ETNs include, but are not limited to, prevailing market prices and forward volatility levels of the U.S. stock markets, the equity securities included in the S&P 500® Index and the S&P 500® Index, the prevailing market prices of options on the S&P 500® Index, options on the VIX Index or and other financial instruments related to the S&P 500® Index and the VIX Index, supply and demand for the ETNs including inventory positions with any market maker, the volatility of the applicable underlying Index, prevailing rates of interest, the volatility of securities markets, economic, financial, political, regulatory or judicial events that affect the level of the applicable underlying Index or the market price or forward volatility of the U.S. stock markets, the equity securities included in the S&P 500® Index, the S&P 500® Index, the VIX Index or the relevant futures contracts on the VIX Index, the general interest rate environment, the perceived creditworthiness of Credit Suisse, supply and demand in the listed and over-the-counter equity derivative markets, or supply and demand as well as hedging activities in the equity-linked structured product markets.  See "Risk Factors" in this pricing supplement for a discussion of the factors that may influence the market value of the ETNs prior to maturity.

**Intraday Indicative Value**

The "**Intraday Indicative Value**" of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor, and will be equal to (1) (a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Intraday ETN Performance for that series at such time on such Index Business *minus* (2) the Intraday Investor Fee at such time on such Index Business Day. The "**Intraday ETN Performance**" for any series of ETNs at any time on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Intraday Index Performance at such time on such Index Business Day *times* (b) the Leverage Amount.  The "**Intraday Index Performance**" for any series of ETNs at any time on any Index Business Day will equal (1)(a) the most recent published intraday level of the applicable underlying Index at such time on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index on the immediately preceding Index Business Day *minus* (2) the number one.  At any time on any Index Business Day, the "**Intraday Investor Fee**" for any series of ETNs is equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Intraday ETN Performance for that series at such time on such Index Business Day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365.  **If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero.**

| ETNs | Indicative Value Ticker |
|---|---|
| Inverse VIX Short Term ETNs | XIVIV |
| Inverse VIX Medium Term ETNs | ZIVIV |
| Long VIX Short Term ETNs | VIIXIV |
| Long VIX Medium Term ETNs | VIIZIV |
| 2x Long VIX Short Term ETNs | TVIXIV |
| 2x Long VIX Medium Term ETNs | TVIZIV |

The Intraday Indicative Value calculation is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of your ETNs, nor will it reflect hedging or transaction costs, credit considerations, market liquidity or bid-offer spreads.  Published underlying Index levels from the Index Sponsor may occasionally be subject to delay or postponement.  Any such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of your ETNs.  The actual trading price of the ETNs of any series may be different from their Intraday Indicative Value.  VLS or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

Exhibit 1

93

**The actual trading prices of the ETNs may vary significantly from their Intraday Indicative Values**

As discussed in "Specific Terms of the ETNs—Payment Upon Early Redemption" below, you may, subject to certain restrictions, choose to offer your ETNs for redemption by Credit Suisse on any Business Day during the term of the ETNs beginning on December 2, 2010 (for an anticipated December 3, 2010 Early Redemption Valuation Date and an anticipated Early Redemption Date of December 6, 2010) through November 28, 2030 (for an anticipated November 29, 2030 Early Redemption Valuation Date and an anticipated Early Redemption Date of December 4, 2030). If you elect to offer your ETNs to Credit Suisse for redemption, you must offer at least the applicable Minimum Redemption Amount at one time for redemption by Credit Suisse on any Redemption Date. In addition, we have the right to accelerate the ETNs in whole but not in part at any time on any Business Day occurring on or after the Inception Date or upon the occurrence of certain events described herein. If your ETNs are redeemed or accelerated, on the corresponding Early Redemption Date or Acceleration Date, as applicable, you will receive a cash payment on such date in an amount equal to the Early Redemption Amount, which is the Closing Indicative Value of the ETNs on the applicable Early Redemption Valuation Date, or the Accelerated Redemption Amount, which is the Closing Indicative Value on the Accelerated Valuation Date, as applicable. The last date on which Credit Suisse will redeem your ETNs at your option will be December 4, 2030. As such, you must offer your ETNs for redemption no later than November  28, 2030. The daily redemption feature is intended to induce arbitrageurs to counteract any trading of the ETNs at a premium or discount to their intraday indicative value, although there can be no assurance that arbitrageurs will employ the redemption feature in this manner.

**Split or Reverse Split of the ETNs**

VLS as one of the Calculation Agents may initiate a split or reverse split of the ETNs on any trading day. If VLS, as one of the Calculation Agents, decides to initiate a split or reverse split, the Calculation Agents will issue a notice to holders of the ETNs and a press release announcing the split or reverse split, specifying the effective date of the split or reverse split. The Calculation Agents will determine the ratio of such split or reverse split, as the case may be, using relevant market indicia, and will adjust the terms of the ETNs accordingly. Any adjustment of the closing value will be rounded to 8 decimal places.

In the case of a reverse split, we reserve the right to address odd numbers of ETNs (commonly referred to as "partials") in a manner determined by the Calculation Agents in their sole discretion. For example, if the ETNs undergo a 1 for 4 reverse split, holders who own a number of ETNs on the record date that is not evenly divisible by 4 will receive the same treatment as all other holders for the maximum number of ETNs they hold that is evenly divisible by 4, and we will have the right to compensate holders for their remaining or "partial" ETNs in a manner determined by the Calculation Agents in their sole discretion. Our current intention is to provide holders with a cash payment for their partials in an amount equal to the appropriate percentage of the Closing Indicative Value of the ETNs on a specified trading day following the announcement date.

A split or reverse split of the ETNs will not affect the aggregate principal amount of ETNs held by an investor, other than to the extent of any "partial" ETNs, but it will affect the number of ETNs an investor holds and the denominations used for trading purposes on the exchange.

On June 16, 2011, Credit Suisse announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs in accordance with the procedures described above. The record date for the split of each of the ETNs was June 23, 2011 and the splits became effective prior to the opening of trading on June 27, 2011.

Exhibit 1

94

**SPECIFIC TERMS OF THE ETNs**

In this section, references to "holders" mean those who own the ETNs registered in their own names, on the books that we or the trustee maintain for this purpose, and not those who own beneficial interests in the ETNs registered in street name or in the ETNs issued in book-entry form through The Depository Trust Company ("**DTC**") or another depositary. Owners of beneficial interests in the ETNs should read the section entitled "Description of Notes—Book-Entry, Delivery and Form" in the accompanying prospectus supplement.

The ETNs are Senior Medium-Term Notes as described in the accompanying prospectus supplement and prospectus which also contain a detailed summary of additional provisions of the ETNs and of the senior indenture, dated as of March 29, 2007, as amended, between Credit Suisse AG (formerly Credit Suisse) and The Bank of New York Mellon (formerly The Bank of New York), as trustee, under which the ETNs will be issued (the "**indenture**"). You should read all the provisions of the accompanying prospectus and prospectus supplement, including information incorporated by reference, and the indenture.

Please note that the information about the price to the public and the proceeds to Credit Suisse on the front cover of this pricing supplement relates only to the initial sale of the ETNs. If you have purchased the ETNs after the initial sale, information about the price and date of sale to you will be provided in a separate confirmation of sale.

**Coupon**

We will not make any coupon or interest payment during the term of the ETNs.

**Denomination**

Prior to June 27, 2011, the denomination and stated principal amount of each ETN was $100. On June 16, 2011, Credit Suisse announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011. On and after June 27, 2011, the denomination and stated principal amount will be $10 for the Inverse VIX Short Term ETNs, $12.50 for the Inverse VIX Medium Term ETNs and $100 for each of the Long VIX Short Term ETNs, the Long VIX Medium Term ETNs, the 2x Long VIX Short Term ETNs and the 2x Long VIX Medium Term ETNs. ETNs of any series issued in the future may be issued at a price higher or lower than the stated principal amount, based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs.

**Payment at Maturity**

If you hold your ETNs to maturity, you will receive a cash payment on December 4, 2030 (the "**Maturity Date**") that is linked to the percentage change in the closing level of the applicable underlying Index from the inception date to the closing level calculated on the Final Valuation Date. Your cash payment at maturity will be equal to the Closing Indicative Value of the ETNs on the Final Valuation Date (the "**Final Indicative Value**"), as calculated by the Calculation Agents. We refer to the amount of such payment as the "**Maturity Redemption Amount**." If the scheduled Maturity Date is not a Business Day, the Maturity Date will be postponed to the first Business Day following the scheduled Maturity Date. If the scheduled Final Valuation Date is not an Index Business Day, the Final Valuation Date will be postponed to the next following Index Business Day, in which case the Maturity Date will be postponed to the third Business Day following the Final Valuation Date as so postponed. No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.

**If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero.**

The "**Closing Indicative Value**" for any given series of ETNs on any given calendar day will be calculated in the following manner: The Closing Indicative Value on the Inception Date will equal $100 (the "**Initial Indicative Value**"). The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day. The Closing Indicative Value will never be less than zero. **The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value is less than or equal to zero at any time or Closing Indicative Value equals zero.** The Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs underwent a 10-for-1 split and an 8-for-1 split, respectively, effective June 27, 2011. The Closing Indicative Value of the Inverse VIX Short Term ETNs on June 24, 2011 was

Exhibit 1

95

157.89294145 and the Closing Indicative Value of the Inverse VIX Medium Term Notes on June 24, 2011 was 127.46917437.  Such values were divided by 10 and 8, respectively, and rounded to 8 decimal places, prior to the open of trading on June 27, 2011.  On and after June 27, 2011, the Closing Indicative Value for the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs will be expressed in an amount per denomination and stated principal amount of $10 and $12.50, respectively.  If the ETNs undergo any subsequent splits or reverse splits, the Closing Indicative Value will be adjusted accordingly (see "Description of ETNs—Split or Reverse Split of the ETNs" herein).  VLS Securities, LLC ("**VLS**") or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

The "**Daily ETN Performance**" for any series of ETNs on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Daily Index Performance on such Index Business Day *times* (b) the Leverage Amount.  The Daily ETN Performance is deemed to be one on any day that is not an Index Business Day.

An "**Index Business Day**", with respect to the applicable underlying Index, is a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on NYSE Arca, in each case as determined by VLS, as one of the Calculation Agents.

The "**Daily Accrual**" represents the rate of interest that could be earned on a notional capital reinvestment at the three month U.S. Treasury rate as reported on Bloomberg under ticker USB3MTA.  The Daily Accrual for any series of ETNs on any Index Business Day will equal:

$$\left( \frac{1}{1 - Tbills_{t-1} * \frac{91}{360}} \right)^{\frac{d}{91}} - 1$$

Where *Tbills_{t-1}* is the three month treasury rate reported on Bloomberg on the prior Index Business Day and *d* is the number of calendar days which have elapsed since the prior Index Business Day.  The Daily Accrual is deemed to be zero on any day which is not an Index Business Day.

The "**Daily Index Performance**" for any series of ETNs on any Index Business Day will equal (1)(a) the closing level of the applicable underlying Index for that series on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index for that series on the immediately preceding Index Business Day *minus* (2) the number one.  If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event.  The Daily Index Performance is deemed to be zero on any day that is not an Index Business Day.

The "**Leverage Amount**" for each series of ETN is as follows:

Daily Inverse VIX Short Term ETN:       -1
Daily Inverse VIX Medium Term ETN:   -1
VIX Short Term ETN:                                 1
VIX Medium Term ETN:                            1
Daily 2x VIX Short Term ETN:                  2
Daily 2x VIX Medium Term ETN:             2

On any calendar day (the "**calculation day**"), the "**Daily Investor Fee**" for any series of ETNs will be equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Daily ETN Performance for that series on the calculation day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365.

The "**Daily Investor Fee Factor**" will be equal to (i) 0.0089 for each of the Long ETNs, (ii) 0.0135 for each of the Inverse ETNs and (iii) 0.0165 for each of the 2x Long ETNs.

**If the level of the applicable underlying Index decreases or does not increase sufficiently in the case of the Long or 2x Long ETNs or if it increases or does not decrease sufficiently in the case of the Inverse ETNs (in each case in addition to Daily Accrual) to offset the sum of the Daily Investor Fees (and in the case of**

Exhibit 1

96

**Early Redemption, the Early Redemption Charge) over the term of the ETNs, you will receive less than the principal amount of your investment at maturity, upon early redemption or acceleration of the ETNs.** See "Risk Factors—Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the Index on the date of your investment, you may receive less than the principal amount of your ETNs" and "Hypothetical Examples" in this pricing supplement for additional information on how the Daily Investor Fee affects the overall value of the ETNs.

The closing level of the applicable underlying Index on any Index Business Day will be the closing level reported by the Index Sponsor on the applicable Bloomberg page as set forth in the table below or any successor page on Bloomberg or any successor service, as applicable, as determined by the Calculation Agents, provided that in the event a Market Disruption Event is continuing on an Index Business Day, the Calculation Agents will determine the closing level of the applicable underlying Index for such Index Business Day according to the methodology described below in "Specific Terms of the ETNs—Market Disruption Events."

| Index | Bloomberg Page Ticker |
|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| S&P 500 VIX Mid-Term Futures™ Index ER | SPVXMP |

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

For a further description of how your payment at maturity will be calculated, see "Hypothetical Examples" and "Specific Terms of the ETNs" in this pricing supplement.

**Payment Upon Early Redemption**

Prior to maturity, you may, subject to certain restrictions described below, offer the applicable Minimum Redemption Amount or more of your ETNs to us for redemption on an Early Redemption Date during the term of the ETNs until November 28, 2030. If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount.

You may exercise your early redemption right by causing your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein). If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**". Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date. See "—Redemption Procedures."

You must offer for redemption at least 25,000 ETNs, or an integral multiple of 25,000 ETNs in excess thereof, at one time in order to exercise your right to cause us to redeem your ETNs on any Early Redemption Date (the "**Minimum Redemption Amount**"); provided that we or CSI as one of the Calculation Agents may from time to time reduce, in part or in whole, the Minimum Redemption Amount. Any such reduction will be applied on a consistent basis for all holders of the relevant series of ETNs at the time the reduction becomes effective. If the ETNs undergo a split or reverse split, the minimum number of ETNs needed to exercise your right to redeem will remain the same.

The "**Early Redemption Date**" is the third Business Day following an Early Redemption Valuation Date.[*]

The "**Early Redemption Charge**" is equal to 0.05% *times* the Closing Indicative Value on the Early Redemption Valuation Date.

The "**Early Redemption Amount**" is a cash payment per ETN equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge and will be calculated by the Calculation Agents.

---

[*] An Early Redemption Date will be postponed if a Market Disruption Event occurs and is continuing on the applicable Early Redemption Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of any Early Redemption Date. See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1
97

**Redemption Procedures**

If you wish to offer your ETNs to Credit Suisse for redemption, your broker must follow the following procedures:

- Deliver a notice of redemption, in substantially the form as Annex A (the "**Redemption Notice**"), to VLS (the "**Redemption Agent**") via email or other electronic delivery (including, without limitation, the Redemption Agent's proprietary technology system, TENZING) as requested by the Redemption Agent.  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  If the Redemption Agent receives your Redemption Notice no later than 4:00 p.m., New York City time, on any Business Day, the Redemption Agent will respond by sending your broker an acknowledgment of the Redemption Notice accepting your redemption request by 7:30 p.m., New York City time, on the Business Day prior to the applicable Early Redemption Valuation Date.  The Redemption Agent or its affiliate must acknowledge to your broker acceptance of the Redemption Notice in order for your redemption request to be effective;

- Cause your DTC custodian to book a delivery vs. payment trade with respect to the ETNs on the applicable Early Redemption Valuation Date at a price equal to the applicable Early Redemption Amount, facing us; and

- Cause your DTC custodian to deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. New York City time, on the applicable Early Redemption Date (the third Business Day following the Early Redemption Valuation Date).

You are responsible for (i) instructing or otherwise causing your broker to provide the Redemption Notice and (ii) your broker satisfying the additional requirements as set forth in the second and third bullet above in order for the redemption to be effected.  Different brokerage firms may have different deadlines for accepting instructions from their customers. Accordingly, you should consult the brokerage firm through which you own your interest in the ETNs in respect of such deadlines.  If the Redemption Agent does not (i) receive the Redemption Notice from your broker by 4:00 p.m. and (ii) deliver an acknowledgment of such Redemption Notice to your broker accepting your redemption request by 7:30 p.m., on the Business Day prior to the applicable Early Redemption Valuation Date, such notice will not be effective for such Business Day and the Redemption Agent will treat such Redemption Notice as if it was received on the next Business Day.  Any redemption instructions for which the Redemption Agent receives a valid confirmation in accordance with the procedures described above will be irrevocable.

If the Redemption Agent cease to perform its role described in this pricing supplement, we will either, at our sole discretion, perform such role or appoint another party to do so.

Any ETNs previously redeemed by us at your option will be cancelled on the Early Redemption Date. Consequently, as of such Early Redemption Date, the redeemed ETNs will no longer be considered outstanding.

**Acceleration at Our Option or Upon an Acceleration Event**

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date.  In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration.  In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day).  The Accelerated Redemption Amount will be payable on the third

Exhibit 1

98

Business Day following the Accelerated Valuation Date (such third Business Day the "**Acceleration Date**").[*] We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

An "**Acceleration Event**" means:

(a) an amendment to or change (including any officially announced proposed change) in the laws, regulations or rules of the United States (or any political subdivision thereof), any jurisdiction in which a Primary Exchange or Related Exchange (each as defined herein) is located that (i) makes it illegal to hold, acquire or dispose of the underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on any of these party's ability to perform their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents;

(b) any official administrative decision, judicial decision, administrative action, regulatory interpretation or other official pronouncement interpreting or applying those laws, regulations or rules that is announced on or after the Inception Date that (i) makes it illegal to hold, acquire or dispose of the underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on the Issuer's, our affiliates, third parties with whom we transact or similarly situated third parties ability to perform our or their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents;

(c) any event, as determined by us or the Calculation Agents that we or any of our affiliates or a similarly situated party would, after using commercially reasonable efforts, be unable to, or would incur a materially increased amount of tax, duty, expense or fee (other than brokerage commissions) to acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction or asset it deems necessary to hedge the risk of the ETNs, or realize, recover or remit the proceeds of any such transaction or asset;

(d) if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value;

(e) if the primary exchange or market for trading for the ETNs, if any, announces that pursuant to the rules of such exchange or market, as applicable, the ETNs cease (or will cease) to be listed, traded or publicly quoted on such exchange or market, as applicable, for any reason and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as such exchange or market, as applicable;

(f) if any of the initial Calculation Agents ceases to be a Calculation Agent hereunder; or

(g) VLS exercises their right to cause an early acceleration due to the termination of our agreement with them in certain circumstances. See "*Supplemental Plan of Distribution*" in this pricing supplement for further information.

If VLS exercises their right to cause an early acceleration due to a termination of our agreement with them in certain circumstances, we will be obligated to accelerate all of the outstanding ETNs within ten (10) calendar days of such termination.

"**Primary Exchange**" means the CBOE.

---

[*] The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date. See "Specific Terms of the ETNs—Market Disruption Events".

PS-54

Exhibit 1

99

"**Related Exchange**" means each exchange or quotation system where trading has a material effect (as determined by the Calculation Agents) for the overall market for futures or options contracts relating to (i) the Index or (ii) the underlying futures.

Any ETNs accelerated following an Acceleration Event will be cancelled on the Acceleration Date. Consequently, as of such Acceleration Date, the ETNs will no longer be considered outstanding.

**Market Disruption Events**

A "**Market Disruption Event**" will be any event that, in the determination of the Calculation Agents, could materially interfere with our, our affiliates, third parties with whom we transact, or similarly situated third party's ability to establish, maintain or unwind all or a material portion of a hedge that could be effected with respect to the ETNs, including, but not limited to:

- a suspension, absence or material limitation of trading in option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,

- option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, if available, not trading on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,

- the Index Sponsor or the CBOE fails to publish or compute the Indices or VIX Index, or

- any trading restriction imposed upon, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange due to a price change in that respective instrument exceeding limits set by that market before the close of trading in that market on any day, as determined by the Calculation Agents.

The following events will not be a Market Disruption Event:

- a limitation on the hours or numbers of days of trading, but only if the limitation results from a previously announced change in the regular business hours of the relevant market, and

- a decision to permanently discontinue trading in the option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures.

For this purpose, an "absence or material limitation of trading" in, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange will not include any time when that market is itself closed for trading under ordinary circumstances.  In contrast, a suspension or limitation of trading in such instruments, by reason of:

- a price change exceeding limits set by that market, or

- an imbalance of orders relating to that stock, instrument or those contracts, or

- a disparity in bid and ask quotes relating to that stock, instrument or those contracts,

will constitute a suspension or material limitation of trading in, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, in that primary market.

If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event.  In addition, if a Market Disruption Event occurs or is continuing on a Valuation Date, the Maturity Date, the corresponding Early Redemption Date or the Acceleration Date, as the case may be, will be postponed until the date three Business Days following the earlier of (i) the first Index Business Day following such Valuation Date on which no Market Disruption Event occurs or is continuing or (ii) the fifth Index Business Day

Exhibit 1

100

following such Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date, any Early Redemption Date or the Acceleration Date.

**Default Amount on Acceleration**

For the purpose of determining whether the holders of our senior medium-term notes, of which the ETNs are a part, are entitled to take any action under the indenture, we will treat the stated principal amount of each ETN of any series outstanding as the principal amount of that ETN.  Although the terms of the ETNs may differ from those of the other senior medium-term notes, holders of specified percentages in principal amount of all senior medium-term notes, together in some cases with other series of our debt securities, will be able to take action affecting all the senior medium-term notes, including the ETNs of any series.  This action may involve changing some of the terms that apply to the senior medium-term notes, accelerating the maturity of the senior medium-term notes (in accordance with the acceleration provisions set forth in the accompanying prospectus) after a default or waiving some of our obligations under the indenture.

In case an event of default (as defined in the accompanying prospectus) with respect to ETNs of any series shall have occurred and be continuing, the amount declared due and payable upon any acceleration of the ETNs of such series will be determined by the Calculation Agents and will equal, for each ETN of such series that you then hold, the Closing Indicative Value determined by the Calculation Agents occurring on the-Index Business Day following the date on which the ETNs of such series were declared due and payable.

**Further Issuances**

We may, from time to time, without notice to or the consent of the holders of the ETNs, create and issue additional securities having the same terms and conditions as the ETNs offered by this pricing supplement, and ranking on an equal basis with the ETNs in all respects. If there is substantial demand for the ETNs, we may issue additional ETNs frequently. We anticipate that the maximum aggregate principal amount of ETNs linked to the Indices that we will issue will be $1,500,000,000 in principal amount of the Inverse VIX Short Term ETNs (150,000,000 Inverse VIX Short Term ETNs), $100,000,000 in principal amount of the Inverse VIX Medium Term ETNs (8,000,000 Inverse VIX Medium Term ETNs), $500,000,000 in principal amount of the Long VIX Short Term ETNs (5,000,000 Long VIX Short Term ETNs), $100,000,000 in principal amount of the Long VIX Medium Term ETNs (1,000,000 Long VIX Medium Term ETNs), $5,880,000,000 in principal amount of the 2x Long VIX Short Term ETNs (58,800,000 2x Long VIX Short Term ETNs) and $100,000,000 in principal amount of the 2x Long VIX Medium Term ETNs (1,000,000 2x Long VIX Medium Term ETNs).  However, we have no obligation to issue up to this amount or any specific amount of ETNs and, in our sole discretion, may issue ETNs in excess of this amount.  On February 21, 2012, we temporarily suspended further issuances of the 2x Long VIX Short Term ETNs due to internal limits on the size of ETNs. This suspension remains in place as of the date of this pricing supplement, but we may commence issuing the 2x Long VIX Short Term ETNs at any time. This suspension does not affect the early redemption right of holders as described herein.  The other ETNs issued by us are not affected by this suspension.  This suspension does not affect the early redemption right of holders as described herein.  Such additional ETNs will be consolidated and form a single series with the ETNs of the applicable series.  We have no obligation to take your interests into account when deciding to issue additional securities.  If, on any valuation date on which we price an additional ETN creation, a Market Disruption Event occurs or is occurring, we will determine the closing level of the applicable underlying Index applicable to such creation in accordance with the procedures under "—Market Disruption Events" in this pricing supplement.

**Discontinuation or Modification of the Index**

If the Index Sponsor discontinues publication of the applicable underlying Index and the Index Sponsor or anyone else publishes a substitute index that the Calculation Agents determine is comparable to that Index, then the Calculation Agents will determine the Early Redemption Amount, Accelerated Redemption Amount or Maturity Redemption Amount (each a "**Redemption Amount**"), as applicable, by reference to the substitute index (the "**Successor Index**").

If the Calculation Agents determine that the publication of the applicable underlying Index is discontinued and there is no Successor Index, the Calculation Agents will determine the applicable level of the applicable underlying Index as the case may be, and thus the applicable Redemption Amount by a computation methodology that the Calculation Agents determine will as closely as reasonably possible replicate the applicable underlying Index.

Exhibit 1

101

If the Calculation Agents determine that the applicable underlying Index, the underlying futures contracts or the method of calculating the applicable underlying Index is changed at any time in any respect — including whether the change is made by the Index Sponsor under its existing policies or following a modification of those policies, is due to the publication of a Successor Index, is due to events affecting the underlying futures contracts, or is due to any other reason and is not otherwise reflected in the level of the applicable underlying Index by the Index Sponsor pursuant to the methodology described herein, then the Calculation Agents will be permitted (but not required) to make such adjustments in the applicable underlying Index or the method of its calculation as they believe are appropriate to ensure that the applicable closing level of the applicable underlying Index used to determine the applicable Redemption Amount is equitable.

**Manner of Payment and Delivery**

Any payment on or delivery of the ETNs at maturity will be made to accounts designated by you and approved by us, or at the office of the trustee in New York City, but only when the ETNs are surrendered to the trustee at that office. We also may make any payment or delivery in accordance with the applicable procedures of the depositary.

**Role of Calculation Agents**

Credit Suisse International ("**CSI**"), an affiliate of ours, and VLS will serve as the Calculation Agents. The Calculation Agents will, in their reasonable discretion, make all calculations and determinations regarding the value of the ETNs, including at maturity or upon redemption by Credit Suisse, Market Disruption Events (see "—Market Disruption Events"), Business Days and Index Business Days, the Daily Investor Fee amount, the Daily Accrual, the closing level of the applicable underlying Index on any Index Business Day, the Maturity Date, any Early Redemption Dates, the Acceleration Date, the amount payable in respect of your ETNs at maturity, upon redemption or upon acceleration by Credit Suisse and any other calculations or determinations to be made by the Calculation Agents as specified herein.  CSI will have the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and calculation of default amounts.  VLS will have the sole ability to calculate and disseminate the Closing Indicative Value, make determinations regarding an Index Business Day, and determinations of splits and reverse splits. All other determinations will be made by the Calculation Agents jointly.  Absent manifest error, all determinations of the Calculation Agents will be final and binding on you and us, without any liability on the part of the Calculation Agents. You will not be entitled to any compensation from us for any loss suffered as a result of any of the above determinations by the Calculation Agents.

Although VLS obtains information for including in or for use in calculations related to the ETNs from sources that VLS considers reliable, neither VLS nor any other party guarantees the accuracy and/or the completeness of the Indices or any data included therein or any calculations made with respect to the ETNs. Neither VLS nor any other party makes any warranty, express or implied, as to the data included therein or any calculations made with respect to the ETNs. Neither VLS nor another other party makes any express or implied warranties, and VLS hereby expressly disclaims all warranties of merchantability or fitness for a particular purpose with respect to the Indices or any data included therein or any calculations made with respect to the ETNs. Without limiting any of the foregoing, in no event shall VLS or any other party have any liability for any direct, indirect, special, punitive, consequential or any other damages (including lost profits) even if notified of the possibility of such damages.

If any of the Calculation Agents cease to perform their respective roles described in this pricing supplement, we will either, at our sole discretion, perform such roles, appoint another party to do so or accelerate the relevant series of ETNs.

<strong>CLEARANCE AND SETTLEMENT</strong>

DTC participants that hold the ETNs of any series through DTC on behalf of investors will follow the settlement practices applicable to equity securities in DTC's settlement system with respect to the primary distribution of the ETNs of any series and secondary market trading between DTC participants.

<strong>USE OF PROCEEDS AND HEDGING</strong>

We intend to use the net proceeds from this offering for our general corporate purposes, which may include the refinancing of our existing indebtedness outside Switzerland. We may also use some or all of the net proceeds from this offering to hedge our obligations under the ETNs of the applicable series.

Exhibit 1

102

One or more of our affiliates before and following the issuance of the ETNs of any series may acquire or dispose of the futures contracts underlying the applicable Index, or listed or over-the-counter options contracts in, or other derivatives or synthetic instruments related to, the applicable underlying Index or the S&P 500® Index or the VIX Index to hedge our obligations under the ETNs of such series. In the course of pursuing such a hedging strategy, the price at which such positions may be acquired or disposed of may be a factor in determining the levels of the applicable underlying Index. Although we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index, there can be no assurance that the level of the applicable underlying Index will not be affected.

From time to time after issuance and prior to the maturity of any series of ETNs, depending on market conditions (including the level of the applicable underlying Index), in connection with hedging certain of the risks associated with the ETNs of the series, we expect that one or more of our affiliates will increase or decrease their initial hedging positions using dynamic hedging techniques and may take long or short positions in listed or over-the-counter options contracts in, or other derivative or synthetic instruments related to, the applicable underlying Index, or the S&P 500® Index. In addition, we or one or more of our affiliates may take positions in other types of appropriate financial instruments that may become available in the future. To the extent that we or one or more of our affiliates have a hedge position in the applicable underlying Index or S&P 500® Index, we or one or more of our affiliates may liquidate a portion of those holdings on or before the Final Valuation Date. Depending, among other things, on future market conditions, the aggregate amount and the composition of such positions are likely to vary over time. Our or our affiliates' hedging activities will not be limited to any particular securities exchange or market.

The hedging activity discussed above may adversely affect the level of the applicable underlying Index and, as a consequence, the market value of the ETNs and the amount payable at maturity, upon redemption or upon acceleration. See "Risk Factors" in this pricing supplement for a discussion of possible adverse effects related to our hedging activities.

Exhibit 1

103

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain U.S. federal income tax consequences of owning and disposing of securities that may be relevant to holders of securities that acquire their securities from us as part of the original issuance of the securities. This discussion applies only to holders that hold their securities as capital assets within the meaning of the Internal Revenue Code of 1986, as amended (the "**Code**"). Further, this discussion does not address all of the U.S. federal income tax consequences that may be relevant to you in light of your individual circumstances or if you are subject to special rules, such as if you are:

- a financial institution,
- a mutual fund,
- a tax-exempt organization,
- a grantor trust,
- certain U.S. expatriates,
- an insurance company,
- a dealer or trader in securities or foreign currencies,
- a person (including traders in securities) using a mark-to-market method of accounting,
- a person who holds securities as a hedge or as part of a straddle with another position, constructive sale, conversion transaction or other integrated transaction, or
- an entity that is treated as a partnership for U.S. federal income tax purposes.

The discussion is based upon the Code, law, regulations, rulings and decisions, in each case, as available and in effect as of the date hereof, all of which are subject to change, possibly with retroactive effect. Tax consequences under state, local and foreign laws are not addressed herein. No ruling from the U.S. Internal Revenue Service (the "**IRS**") has been or will be sought as to the U.S. federal income tax consequences of the ownership and disposition of securities, and the following discussion is not binding on the IRS.

**You should consult your tax advisor as to the specific tax consequences to you of owning and disposing of securities, including the application of federal, state, local and foreign income and other tax laws based on your particular facts and circumstances.**

**IRS CIRCULAR 230 REQUIRES THAT WE INFORM YOU THAT ANY TAX STATEMENT HEREIN REGARDING ANY U.S. FEDERAL TAX IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES. ANY SUCH STATEMENT HEREIN WAS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTION(S) OR MATTER(S) TO WHICH THE STATEMENT RELATES. A PROSPECTIVE INVESTOR (INCLUDING A TAX-EXEMPT INVESTOR) IN THE SECURITIES SHOULD CONSULT ITS OWN TAX ADVISOR IN DETERMINING THE TAX CONSEQUENCES OF AN INVESTMENT IN THE SECURITIES, INCLUDING THE APPLICATION OF STATE, LOCAL OR OTHER TAX LAWS AND THE POSSIBLE EFFECTS OF CHANGES IN FEDERAL OR OTHER TAX LAWS.**

### Characterization of the Securities

There are no statutory provisions, regulations, published rulings, or judicial decisions addressing the characterization for U.S. federal income tax purposes of securities with terms that are substantially the same as those of your securities. Thus, we intend to treat the securities, for U.S. federal income tax purposes, as a prepaid forward contract, with respect to the Index that is eligible for open transaction treatment. In the absence of an administrative or judicial ruling to the contrary, we and, by acceptance of the securities, you, agree to treat your securities for all tax purposes in accordance with such characterization. In light of the fact that we agree to treat the securities as a prepaid forward contract, the balance of this discussion assumes that the securities will be so treated.

You should be aware that the characterization of the securities as described above is not certain, nor is it binding on the IRS or the courts. Thus, it is possible that the IRS would seek to characterize your securities in a manner that results in tax consequences to you that are different from those described above. For example, the IRS

Exhibit 1

104

might assert that the securities constitute debt instruments that are "contingent payment debt instruments" that are subject to special tax rules under the applicable Treasury regulations governing the recognition of income over the term of your securities.  If the securities were to be treated as contingent payment debt instruments (one of the requirements of which is that they have a term of more than one year), you would be required to include in income on an economic accrual basis over the term of the securities an amount of interest that is based upon the yield at which we would issue a non-contingent fixed-rate debt instrument with other terms and conditions similar to your securities, or the comparable yield.  The characterization of securities as contingent payment debt instruments under these rules is likely to be adverse.  However, if the securities had a term of one year or less, the rules for short-term debt obligations would apply rather than the rules for contingent payment debt instruments.  Under Treasury regulations, a short-term debt obligation is treated as issued at a discount equal to the difference between all payments on the obligation and the obligation's issue price.  A cash method U.S. Holder that does not elect to accrue the discount in income currently should include the payments attributable to interest on the security as income upon receipt.  Under these rules, any contingent payment would be taxable upon receipt by a cash basis taxpayer as ordinary interest income.  You should consult your tax advisor regarding the possible tax consequences of characterization of the securities as contingent payment debt instruments or short-term debt obligations.

It is also possible that the IRS would seek to characterize your securities as regulated futures contracts or options that may be subject to the provisions of Code section 1256.  In such case, the securities would be marked to market at the end of each taxable year and 40% of any gain or loss would be treated as short-term capital gain or loss, and the remaining 60% of any gain or loss would be treated as long-term capital gain or loss.  We are not responsible for any adverse consequences that you may experience as a result of any alternative characterization of the securities for U.S. federal income tax or other tax purposes.

**You should consult your tax advisor as to the tax consequences of such characterization and any possible alternative characterizations of your securities for U.S. federal income tax purposes.**

**U.S. Holders**

For purposes of this discussion, the term "U.S. Holder," for U.S. federal income tax purposes, means a beneficial owner of securities that is (1) a citizen or resident of the United States, (2) a corporation (or an entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust, if (a) a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has in effect a valid election to be treated as a domestic trust for U.S. federal income tax purposes.  If a partnership (or an entity treated as a partnership for U.S. federal income tax purposes) holds securities, the U.S. federal income tax treatment of such partnership and a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership.  If you are a partnership, or a partner of a partnership, holding securities, you should consult your tax advisor regarding the tax consequences to you from the partnership's purchase, ownership and disposition of the securities.

In accordance with the agreed-upon tax treatment described above, upon receipt of the redemption amount of the securities from us, a U.S. Holder will recognize gain or loss equal to the difference between the amount of cash received from us and the U.S. Holder's tax basis in the security at that time.  For securities with a term of more than one year, such gain or loss will be long-term capital gain or loss if the U.S. Holder has held the security for more than one year at maturity.  For securities with a term of one year or less, such gain or loss will be short-term capital gain or loss.  The deductibility of capital losses is subject to certain limitations.

Upon the sale or other taxable disposition of a security, a U.S. Holder generally will recognize capital gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and the U.S. Holder's tax basis in the security (generally its cost).  For securities with a term of more than one year, such gain or loss will be long-term capital gain or loss if the U.S. Holder has held the security for more than one year at the time of disposition.  For securities with a term of one year or less, such gain or loss will be short-term capital gain or loss. The deductibility of capital losses is subject to certain limitations.

However, even if the agreed-upon tax characterization of the securities (as described above) were upheld, it is possible that the IRS could assert that each reconstitution or rebalancing (collectively, "**Rebalancing**") of the

Exhibit 1

105

applicable underlying Index is considered a taxable event to you.  If the IRS were to prevail in treating each Rebalancing of the Index as a taxable event, you would recognize capital gain or, possibly, loss on the securities on the date of each Rebalancing to the extent of the difference between the fair market value of the securities and your adjusted basis in the securities at that time.  Such gain or loss generally would be short-term capital gain or loss.

**Legislation Affecting Securities Held Through Foreign Accounts**

Under the "Hiring Incentives to Restore Employment Act" (the "**Act**"), a 30% withholding tax is imposed on "withholdable payments" made to foreign financial institutions (and their more than 50% affiliates) unless the payee foreign financial institution agrees, among other things, to disclose the identity of any U.S. individual with an account at the institution (or the institution's affiliates) and to annually report certain information about such account.  "Withholdable payments" include payments of interest (including original issue discount), dividends, and other items of fixed or determinable annual or periodical gains, profits, and income ("**FDAP**"), in each case, from sources within the United States, as well as gross proceeds from the sale of any property of a type which can produce interest or dividends from sources within the United States.  The Act also requires withholding agents making withholdable payments to certain foreign entities that do not disclose the name, address, and taxpayer identification number of any substantial U.S. owners (or certify that they do not have any substantial United States owners) to withhold tax at a rate of 30%.  We will treat payments on the securities as withholdable payments for these purposes.

Withholding under the Act will apply to all withholdable payments without regard to whether the beneficial owner of the payment is a U.S. person, or would otherwise be entitled to an exemption from the imposition of withholding tax pursuant to an applicable tax treaty with the United States or pursuant to U.S. domestic law.  Unless a foreign financial institution is the beneficial owner of a payment, it will be subject to refund or credit in accordance with the same procedures and limitations applicable to other taxes withheld on FDAP payments provided that the beneficial owner of the payment furnishes such information as the IRS determines is necessary to determine whether such beneficial owner is a United States owned foreign entity and the identity of any substantial United States owners of such entity.  Generally, the Act's withholding and reporting regime will apply to payments made after December 31, 2012.  Thus, if you hold your securities through a foreign financial institution or foreign corporation or trust, a portion of any of your payments made after December 31, 2012 may be subject to 30% withholding.

**Non-U.S. Holders Generally**

In the case of a holder of the securities that is not a U.S. Holder and has no connection with the United States other than holding its securities (a "**Non-U.S. Holder**"), payments made with respect to the securities will not be subject to U.S. withholding tax, provided that such Non-U.S. Holder complies with applicable certification requirements.  Any gain realized upon the sale or other disposition of the securities by a Non-U.S. Holder will generally not be subject to U.S. federal income tax unless  (i) such gain is effectively connected with a U.S. trade or business of such Non-U.S. Holder or (ii) in the case of an individual, such individual is present in the United States for 183 days or more in the taxable year of the sale or other disposition and certain other conditions are met.

Non-U.S. Holders that are subject to U.S. federal income taxation on a net income basis with respect to their investment in the securities should refer to the discussion above relating to U.S. Holders.

*Legislation Affecting Substitute Dividend and Dividend Equivalent Payments*

The Act treats a "dividend equivalent" payment as a dividend from sources within the United States.  Under the Act, unless reduced by an applicable tax treaty with the United States, such payments generally would be subject to U.S. withholding tax.  A "**dividend equivalent**" payment is (i) a substitute dividend payment made pursuant to a securities lending or a sale-repurchase transaction that (directly or indirectly) is contingent upon, or determined by reference to, the payment of a dividend from sources within the United States, (ii) a payment made pursuant to a "specified notional principal contract" that (directly or indirectly) is contingent upon, or determined by reference to, the payment of a dividend from sources within the United States, and (iii) any other payment determined by the IRS to be substantially similar to a payment described in the preceding clauses (i) and (ii).  These changes will apply to payments made on or after September 14, 2010.  In the case of payments made after March 18,

Exhibit 1

106

2012, a dividend equivalent payment includes a payment made pursuant to any notional principal contract unless otherwise exempted by the IRS.  Where the securities reference an interest in a fixed basket of securities or an index, such fixed basket or index will be treated as a single security.  Where the securities reference an interest in a basket of securities or an index that may provide for the payment of dividends from sources within the United States, absent guidance from the IRS, it is uncertain whether the IRS would determine that payments under the securities are substantially similar to a dividend.  If the IRS determines that a payment is substantially similar to a dividend, it may be subject to U.S. withholding tax, unless reduced by an applicable tax treaty.

**U.S. Federal Estate Tax Treatment of Non-U.S. Holders**

The securities may be subject to U.S. federal estate tax if an individual Non-U.S. Holder holds the securities at the time of his or her death.  The gross estate of a Non-U.S. Holder domiciled outside the United States includes only property situated in the United States. Individual Non-U.S. Holders should consult their tax advisors regarding the U.S. federal estate tax consequences of holding the securities at death.

**IRS Notice on Certain Financial Transactions**

On December 7, 2007, the IRS and the Treasury Department issued Notice 2008-2, in which they stated they are considering issuing new regulations or other guidance on whether holders of an instrument such as the securities should be required to accrue income during the term of the instrument.  The IRS and Treasury Department also requested taxpayer comments on (1) the appropriate method for accruing income or expense (*e.g.*, a mark-to-market methodology or a method resembling the noncontingent bond method), (2) whether income and gain on such an instrument should be ordinary or capital, and (3) whether foreign holders should be subject to withholding tax on any deemed income accrual.

Accordingly, it is possible that regulations or other guidance may be issued that require holders of the securities to recognize income in respect of the securities prior to receipt of any payments thereunder or sale thereof.  Any regulations or other guidance that may be issued could result in income and gain (either at maturity or upon sale) in respect of the securities being treated as ordinary income.  It is also possible that a Non-U.S. Holder of the securities could be subject to U.S. withholding tax in respect of the securities under such regulations or other guidance.  It is not possible to determine whether such regulations or other guidance will apply to your securities (possibly on a retroactive basis).  You are urged to consult your tax advisor regarding Notice 2008-2 and its possible impact on you.

**Information Reporting Regarding Specified Foreign Financial Assets**

The Act requires individual U.S. Holders with an interest in any "specified foreign financial asset" to file a report with the IRS with information relating to the asset, including the maximum value thereof, for any taxable year in which the aggregate value of all such assets is greater than $50,000 (or such higher dollar amount as prescribed by Treasury regulations).  Specified foreign financial assets include any depository or custodial account held at a foreign financial institution; any debt or equity interest in a foreign financial institution if such interest is not regularly traded on an established securities market; and, if not held at a financial institution, (i) any stock or security issued by a non-U.S. person, (ii) any financial instrument or contract held for investment where the issuer or counterparty is a non-U.S. person, and (iii) any interest in an entity which is a non-U.S. person.  Depending on the aggregate value of your investment in specified foreign financial assets, you may be obligated to file an annual report under this provision.  The requirement to file a report is effective for taxable years beginning after March 18, 2010.  Penalties apply to any failure to file a required report.  Additionally, in the event a U.S. Holder does not file the information report relating to disclosure of specified foreign financial assets, the statute of limitations on the assessment and collection of U.S. federal income taxes of such U.S. Holder for the related tax year may not close before such information is filed.  You should consult your own tax advisor as to the possible application to you of this information reporting requirement and related statute of limitations tolling provision.

**Backup Withholding and Information Reporting**

A holder of the securities (whether a U.S. Holder or a Non-U.S. Holder) may be subject to information reporting requirements and to backup withholding with respect to certain amounts paid to such holder unless it

Exhibit 1

107

provides a correct taxpayer identification number, complies with certain certification procedures establishing that it is not a U.S. Holder or establishes proof of another applicable exemption, and otherwise complies with applicable requirements of the backup withholding rules.

Exhibit 1

108

**SUPPLEMENTAL PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST)**

We sold a portion of the ETNs of each series on the Inception Date to investors at 100% of their stated principal amount. After the Inception Date, additional ETNs of any series may be offered and sold from time to time at then prevailing prices through agents and to dealers acting as principals for resale to investors. We intend to receive proceeds equal to 100% of the offering price of the ETNs sold after the Inception Date.  We may deliver ETNs against payment therefore on a date that is greater than three Business Days following the date of sale of any ETNs. Under Rule 15c6-1 of the Securities Exchange Act of 1934, trades in the secondary market generally are required to settle in three Business Days, unless parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade ETNs that are to be issued more than three Business Days prior to the related issue date will be required to specify alternative settlement arrangements to prevent a failed settlement.

Any agent in the initial and any subsequent distribution are expected to charge normal commissions for the purchase of ETNs.

Broker-dealers may make a market in the ETNs of any series, although none of them are obligated to do so and any of them may stop doing so at any time without notice. This prospectus (including this pricing supplement and the accompanying prospectus supplement and prospectus) may be used by such dealers in connection with market-making transactions. In these transactions, dealers may resell an ETN covered by this prospectus that they acquire from other holders after the original offering and sale of the ETNs of any series, or they may sell an ETN covered by this prospectus in short sale transactions.

Broker-dealers and other persons are cautioned that some of their activities may result in their being deemed participants in the distribution of the ETNs of any series in a manner that would render them statutory underwriters and subject them to the prospectus delivery and liability provisions of the Securities Act of 1933. Among other activities, broker-dealers and other persons may make short sales of the ETNs of any series and may cover such short positions by borrowing ETNs of such series from us or our affiliates or by purchasing ETNs of such series from us or our affiliates subject to our obligation to redeem such ETNs at a later date. As a result of these activities, these market participants may be deemed statutory underwriters. If these activities are commenced, they may be discontinued at any time. A determination of whether a particular market participant is an underwriter must take into account all the facts and circumstances pertaining to the activities of the participant in the particular case, and the example mentioned above should not be considered a complete description of all the activities that would lead to designation as an underwriter and subject a market participant to the prospectus-delivery and liability provisions of the Securities Act. This prospectus will be deemed to cover any short sales of ETNs of any series by market participants who cover their short positions with ETNs of such series borrowed or acquired from us or our affiliates in the manner described above.

We have retained VLS Securities, LLC ("**VLS**"), a member of the Financial Industry Regulatory Authority ("**FINRA**"), to provide certain services relating to the placement and marketing of the ETNs of any series.  VLS will receive all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing the securities. The actual amount received by VLS in a given year will depend on the number of ETNs of any series then outstanding and the number of other then outstanding ETNs of any series issued by us and marketed and/or placed by VLS. From time to time, VLS and its affiliates have, and in the future may, engage in transactions with and perform services for us for which they have been, and may be, paid customary fees. The terms of our agreement with VLS give them the right to cause an early acceleration should that agreement be terminated.  VLS or its affiliates are responsible for computing and disseminating the Closing Indicative Value and Intraday Indicative Value.

Exhibit 1

109

**BENEFIT PLAN INVESTOR CONSIDERATIONS**

The Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and Section 4975 of the Internal Revenue Code of 1986, (the "Code"), impose certain requirements on (a) employee benefit plans subject to Title I of ERISA, (b) individual retirement accounts, Keogh plans or other arrangements subject to Section 4975 of the Code, (c) entities whose underlying assets include "plan assets" by reason of any such plan's or arrangement's investment therein (we refer to the foregoing collectively as "Plans") and (d) persons who are fiduciaries with respect to Plans. In addition, certain governmental, church and non-U.S. plans ("Non-ERISA Arrangements") are not subject to Section 406 of ERISA or Section 4975 of the Code, but may be subject to other laws that are substantially similar to those provisions (each, a "Similar Law").

In addition to ERISA's general fiduciary standards, Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of a Plan and persons who have specified relationships to the Plan, *i.e.*, "parties in interest" as defined in ERISA or "disqualified persons" as defined in Section 4975 of the Code (we refer to the foregoing collectively as "parties in interest") unless exemptive relief is available under an exemption issued by the U.S. Department of Labor. Parties in interest that engage in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and Section 4975 of the Code. We, and our current and future affiliates, including Credit Suisse Securities (USA) LLC and Credit Suisse International, may be parties in interest with respect to many Plans. Thus, a Plan fiduciary considering an investment in ETNs should also consider whether such an investment might constitute or give rise to a prohibited transaction under ERISA or Section 4975 of the Code. For example, the ETNs may be deemed to represent a direct or indirect sale of property, extension of credit or furnishing of services between us and an investing Plan which would be prohibited if we are a party in interest with respect to the Plan unless exemptive relief were available under an applicable exemption.

In this regard, each prospective purchaser that is, or is acting on behalf of, a Plan, and proposes to purchase ETNs, should consider the exemptive relief available under the following prohibited transaction class exemptions, or PTCEs: (A) the in-house asset manager exemption (PTCE 96-23), (B) the insurance company general account exemption (PTCE 95-60), (C) the bank collective investment fund exemption (PTCE 91-38), (D) the insurance company pooled separate account exemption (PTCE 90-1) and (E) the qualified professional asset manager exemption (PTCE 84-14). In addition, ERISA Section 408(b)(17) and Section 4975(d)(20) of the Code provide a limited exemption for the purchase and sale of ETNs and related lending transactions, provided that neither the issuer of the ETNs nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Plan involved in the transaction and provided further that the Plan pays no more, and receives no less, than adequate consideration in connection with the transaction (the so-called "service provider exemption"). There can be no assurance that any of these statutory or class exemptions will be available with respect to transactions involving the ETNs.

Each purchaser or holder of a security, and each fiduciary who causes any entity to purchase or hold a security, shall be deemed to have represented and warranted, on each day such purchaser or holder holds such ETNs, that either (i) it is neither a Plan nor a Non-ERISA Arrangement and it is not purchasing or holding ETNs on behalf of or with the assets of any Plan or Non-ERISA Arrangement; or (ii) its purchase, holding and subsequent disposition of such ETNs shall not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or any provision of Similar Law.

Fiduciaries of any Plans and Non-ERISA Arrangements should consult their own legal counsel before purchasing the ETNs. We also refer you to the portions of the offering circular addressing restrictions applicable under ERISA, the Code and Similar Law.

Each purchaser of a security will have exclusive responsibility for ensuring that its purchase, holding and subsequent disposition of the security does not violate the fiduciary or prohibited transaction rules of ERISA, the Code or any Similar Law. Nothing herein shall be construed as a representation that an investment in the ETNs would meet any or all of the relevant legal requirements with respect to investments by, or is appropriate for, Plans or Non-ERISA Arrangements generally or any particular Plan or Non-ERISA Arrangement.

Exhibit 1
110

**ANNEX A**

## FORM OF OFFER FOR REDEMPTION

Email: ETNOrders@velocityshares.com

The undersigned holder of VelocityShares™        Exchange Traded Notes due December 4, 2030  issued by Credit Suisse AG ("**Credit Suisse**") CUSIP No.         (the "**VelocityShares™ ETNs**") hereby irrevocably offers to Credit Suisse for redemption the VelocityShares™ ETNs in the amounts and on the date set forth below as described in the pricing supplement relating to the VelocityShares™ ETNs (the "**Pricing Supplement**").  Terms not defined herein have the meanings given to such terms in the Pricing Supplement.

**Name:**

**DTC Account Number:**

**Ticker:**

**Number of VelocityShares™ ETNs offered for redemption:**

**Desired valuation date:**

In addition to any other requirements specified in the Pricing Supplement being satisfied, the undersigned acknowledges that the VelocityShares™ ETNs specified above will not be redeemed unless (i) this offer for redemption is delivered to VLS Securities, LLC on a Business Day, (ii) the Redemption Agent has responded by sending an acknowledgment of the Redemption Notice accepting the redemption request, (iii) the DTC Participant has booked a "delivery vs. payment" ("**DVP**") trade on the applicable Early Redemption Valuation Date facing Credit Suisse AG, DTC #355, and (iv) the DTC Participant instructs DTC to deliver the DVP trade for settlement via DTC at or prior to 10:00 a.m. New York City time on the applicable Early Redemption Date (the third Business Day following the Early Redemption Valuation Date, subject to postponement if such Early Redemption Valuation Date is not an Index Business Day or if a Market Disruption Event occurs or is continuing on such date).

The undersigned acknowledges that the redemption obligation is solely an obligation of Credit Suisse and VLS Securities, LLC is acting only to facilitate the redemption for Credit Suisse.

Exhibit 1

111

**Credit Suisse AG,**

**Acting through its Nassau Branch**

**Exchange Traded Notes**

**due December 4, 2030**

**March 7, 2012**

**Credit Suisse**

Exhibit 1

112

**PROSPECTUS SUPPLEMENT TO PROSPECTUS DATED MARCH 25, 2009**

# Credit Suisse

## Senior Medium-Term Notes
## Subordinated Medium-Term Notes

———————

We may offer from time to time our medium-term notes, which may be senior or subordinated (collectively, the "notes"), directly or through any one of our branches.

The notes will bear interest, if any, at either a fixed or a floating rate. Interest will be paid on the dates stated in the applicable pricing supplement.

The notes may be either callable by us or puttable by you, if specified in the applicable pricing supplement.

The specific terms of each note offered will be described in the applicable pricing supplement, and the terms may differ from those described in this prospectus supplement.

Investing in the notes may involve risks. See "Foreign Currency Risks" on page 39 of the accompanying prospectus, the risk factors we describe in the combined Annual Report on Form 20-F of Credit Suisse Group AG and us incorporated by reference herein, and any additional risk factors we describe in future filings we make with the Securities and Exchange Commission, or the SEC, under the Securities Exchange Act of 1934, as amended.

Unless otherwise provided in the applicable pricing supplement, we will sell the notes to the public at 100% of their principal amount. Unless otherwise provided in the applicable pricing supplement, we will receive between 99.875% and 99.250% of the proceeds from the sale of the senior notes and between 99.500% and 99.125% of the proceeds from the sale of the subordinated notes, after paying the agents' commissions or discounts of between 0.125% and 0.750% for senior notes and between 0.500% and 0.875% for subordinated notes; provided that, commissions with respect to notes with a stated maturity of more than thirty years from date of issue will be negotiated at the time of sale.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement or any accompanying prospectus or pricing supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

The notes are not deposit liabilities and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction. Unless otherwise provided in the applicable pricing supplement, the notes will not have the benefit of any agency or governmental guarantee.

## Credit Suisse

**The date of this prospectus supplement is March 25, 2009.**

Exhibit 1

113

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **PROSPECTUS SUPPLEMENT** |  |
| DESCRIPTION OF NOTES .............. | S-3 |
| PLAN OF DISTRIBUTION............... | S-7 |
| INCORPORATION BY REFERENCE ........ | S-9 |

|  | Page |
|---|---|
| **PROSPECTUS** |  |
| ABOUT THIS PROSPECTUS .............. | 1 |
| LIMITATIONS ON ENFORCEMENT OF U.S. LAWS ............................. | 2 |
| WHERE YOU CAN FIND MORE INFORMATION ..................... | 2 |
| FORWARD-LOOKING STATEMENTS ....... | 3 |
| USE OF PROCEEDS .................. | 5 |
| RATIO OF EARNINGS TO FIXED CHARGES . | 6 |
| CAPITALIZATION .................... | 6 |
| CREDIT SUISSE GROUP .............. | 7 |
| CREDIT SUISSE ..................... | 7 |
| CREDIT SUISSE (USA) ............... | 7 |
| THE FINANCE SUBSIDIARIES .......... | 8 |
| THE TRUSTS....................... | 8 |
| THE COMPANIES.................... | 9 |
| DESCRIPTION OF DEBT SECURITIES ...... | 9 |
| SPECIAL PROVISIONS RELATING TO FOREIGN CURRENCY DENOMINATED DEBT SECURITIES ................. | 36 |
| FOREIGN CURRENCY RISKS ........... | 39 |
| DESCRIPTION OF WARRANTS .......... | 40 |
| DESCRIPTION OF SHARES ............. | 43 |
| DESCRIPTION OF CAPITAL SECURITIES OF CREDIT SUISSE GROUP ............. | 45 |
| DESCRIPTION OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA) ................... | 55 |
| DESCRIPTION OF THE GUARANTEES OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA) ........... | 58 |
| ERISA .......................... | 60 |
| TAXATION ........................ | 62 |
| PLAN OF DISTRIBUTION............... | 71 |
| MARKET-MAKING ACTIVITIES .......... | 77 |
| LEGAL MATTERS ................... | 77 |
| EXPERTS ......................... | 77 |

Exhibit 1

114

## DESCRIPTION OF NOTES

**General**

The notes will be direct and unsecured, senior or subordinated, obligations of Credit Suisse. At our option, we may issue senior notes or subordinated notes. We will issue the senior notes under a senior indenture, dated as of March 29, 2007, as supplemented by a second supplemental indenture, dated as of March 25, 2009, in each case between Credit Suisse and The Bank of New York Mellon (formerly known as The Bank of New York) (together, the "senior indenture"), and we will issue the subordinated notes under a subordinated indenture, dated as of March 29, 2007, as supplemented by a sixth supplemental indenture, dated as of March 25, 2009, in each case between Credit Suisse and The Bank of New York Mellon (formerly known as The Bank of New York) (together, the "subordinated indenture," and together with the senior indenture, the "indentures"). The indentures may be further amended or supplemented from time to time. The following description of the particular terms of the notes offered by this prospectus supplement (referred to in the accompanying prospectus as the debt securities, the senior debt securities or the subordinated debt securities) supplements the description of the general terms and provisions of the debt securities set forth in the accompanying prospectus, which description you should also read. If this description differs in any way from the description in the accompanying prospectus, you should rely on this description.

The following summaries of certain provisions of the indentures do not purport to be complete, and are subject to, and are qualified in their entirety by reference to, all the provisions of the applicable indenture, including the definitions in the applicable indenture of certain terms.

The senior notes will constitute a single series of senior notes under the senior indenture. The subordinated notes will constitute a single series of subordinated notes under the subordinated indenture. The indentures do not limit the amount of senior notes, subordinated notes or other debt securities that we may issue under the indentures.

We will use the accompanying prospectus, this prospectus supplement and any pricing supplement in connection with the offer and sale from time to time of the notes.

The pricing supplement relating to a note will describe the following terms:

- the branch, if any, through which we are issuing the notes;

- the currency or currency unit in which the note is denominated and, if different, the currency or currency unit in which payments of principal and interest on the note will be made (and, if the specified currency is other than U.S. dollars, any other terms relating to that foreign currency denominated note and the specified currency);

- if the note bears interest, whether the note bears a fixed rate of interest or bears a floating rate of interest (including whether the note is a regular floating rate note, a floating rate/fixed rate note or an inverse floating rate note (each as described in the accompanying prospectus));

  - if the note is a fixed rate note, the interest rate and interest payment dates;

  - if the note is a floating rate note, the interest rate basis (or bases), the initial interest rate, the interest reset dates, the interest reset period, the interest payment dates, the index maturity, if any, the spread and/or spread multiplier, if any (each as defined in the accompanying prospectus), the maximum interest rate and minimum interest rate, if any; the index currency, if any, and any other terms relating to the particular method of calculating the interest rate for that note;

- whether the note is senior or subordinated and, if not specified, the note will be senior;

- the issue price;

Exhibit 1

115

- the issue date;

- the maturity date, if any, and whether we can extend the maturity of a note;

- if the note is an indexed note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is a dual currency note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is a renewable note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is a short-term note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is an amortizing note (as defined in the accompanying prospectus), the amortization schedule and any other terms relating to the particular note;

- whether the note is an original issue discount note (as defined in the accompanying prospectus);

- whether the note may be redeemed at our option, or repaid at the option of the holder, prior to its stated maturity as described under "Description of Debt Securities—Redemption at the Option of the Relevant Issuer" and "Description of Debt Securities—Repayment at the Option of the Holders; Repurchase" in the accompanying prospectus and, if so, the provisions relating to redemption or repayment, including, in the case of any original issue discount notes, the information necessary to determine the amount due upon redemption or repayment;

- whether we may be required to pay "additional amounts" in respect of payments on the notes as described under "Description of Debt Securities—Payment of Additional Amounts" in the accompanying prospectus and whether the notes may be redeemed at our option as described under "Description of Debt Securities—Tax Redemption" in the accompanying prospectus;

- any relevant tax consequences associated with the terms of the notes which have not been described under "Taxation" in the accompanying prospectus; and

- any other terms not inconsistent with the provisions of the applicable indenture.

Subject to the additional restrictions described under "Special Provisions Relating to Foreign Currency Denominated Debt Securities" in the accompanying prospectus, each note will mature on a day specified in the applicable pricing supplement. Except as may be provided in the applicable pricing supplement and except for indexed notes, all notes will mature at par.

We are offering the notes on a continuing basis in denominations of $2,000 and any integral multiples of $1,000 in excess thereof unless otherwise specified in the applicable pricing supplement, except that notes in specified currencies other than U.S. dollars will be issued in the denominations set forth in the applicable pricing supplement. We refer you to "Special Provisions Relating to Foreign Currency Denominated Debt Securities" in the accompanying prospectus.

**Interest and Interest Rates**

Unless otherwise specified in the applicable pricing supplement, each note will bear interest at either:

- a fixed rate specified in the applicable pricing supplement; or

Exhibit 1

116

- a floating rate specified in the applicable pricing supplement determined by reference to an interest rate basis, which may be adjusted by a spread and/or spread multiplier. Any floating rate note may also have either or both of the following:

  - a maximum interest rate limitation, or ceiling, on the rate at which interest may accrue during any interest period; and

  - a minimum interest rate limitation, or floor, on the rate at which interest may accrue during any interest period.

In addition, the interest rate on floating rate notes will in no event be higher than the maximum rate permitted by New York or other applicable state law, as such law may be modified by United States law of general application.

Unless otherwise specified in the applicable pricing supplement for a fixed rate note, in the event that any date for any payment on any fixed rate note is not a business day, payment of interest, premium, if any, or principal otherwise payable on such fixed rate note will be made on the next succeeding business day. Credit Suisse will not pay any additional interest as a result of the delay in payment.

Unless otherwise specified in the applicable pricing supplement for a floating rate note, if an interest payment date (other than the maturity date, but including any redemption date or repayment date) would fall on a day that is not a business day (as defined in the accompanying prospectus), such interest payment date (or redemption date or repayment date) will be the following day that is a business day, and interest shall accrue to, and be payable on, such following business day, except that if the interest rate basis is LIBOR and such business day falls in the next calendar month, the interest payment date (or redemption date or repayment date) will be the immediately preceding day that is a business day and interest shall accrue to, and be payable on, such preceding business day.

Unless otherwise specified in the applicable pricing supplement for a floating rate note, if the maturity date falls on a day that is not a business day, the required payment of principal, premium, if any, and interest shall be made on the next succeeding business day with the same force and effect as if made on the date such payment was due, and interest shall not accrue and be payable with respect to such payment for the period from and after the maturity date to the date of such payment on the next succeeding business day.

### Subordination

Unless otherwise specified in the applicable pricing supplement, the subordinated notes will be direct, unconditional, unsecured and subordinated obligations of Credit Suisse. In the event of any dissolution, liquidation or winding-up of Credit Suisse, in bankruptcy or otherwise, the payment of principal and interest on the subordinated notes will be subordinated to the prior payment in full of all of Credit Suisse's present and future unsubordinated creditors but not further or otherwise.

Credit Suisse may not create or permit to exist any pledge or other security interest over Credit Suisse's assets to secure Credit Suisse's obligations in respect of any subordinated notes.

Subject to applicable law, no holder of subordinated notes shall be entitled to exercise, claim or plead any right of set-off, compensation or retention in respect of any amount owed to it by Credit Suisse or by the branch through which it has issued the subordinated notes, arising under or in connection with a tranche of subordinated notes and each holder shall, by virtue of being a holder of such notes, be deemed to have waived all such rights of set-off, compensation or retention.

Exhibit 1

117

**Currency Indemnity**

If the notes are denominated in U.S. dollars, the U.S. dollar will be the sole currency of account and payment for all sums payable by Credit Suisse under or in connection with such notes, including damages. Any amount received or recovered in a currency other than the U.S. dollar by any holder in respect of any sum expressed to be due to it from Credit Suisse shall only constitute a discharge to Credit Suisse to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any such note, Credit Suisse shall indemnify it against any resulting loss sustained by the recipient. In any event, Credit Suisse shall indemnify the recipient against the cost of making any such purchase. For the purposes of this condition, it will be sufficient for a holder to demonstrate that it would have suffered a loss had an actual purchase been made. These indemnities constitute a separate and independent obligation from Credit Suisse's other obligations, shall be subordinated to the claims of Credit Suisse's unsubordinated creditors to the same extent as the notes, shall give rise to a separate and independent cause of action, shall apply irrespective of any waiver granted by any holder of the notes and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under the notes or any other judgment or order.

**Governing Law**

The notes and the indentures will be governed by and construed in accordance with the laws of the State of New York, except for, in the case of subordinated notes, the subordination provisions thereof, which will be governed by Swiss law.

**Other Provisions; Addenda**

Any provisions with respect to notes, including the determination of an interest rate basis, the specification of interest rates bases, calculation of the interest rate applicable to a floating rate note, interest payment dates or any other matter relating thereto may be modified by the terms specified under "Other Provisions" on the face of the note in an addendum relating thereto, if so specified on the face thereof and in the applicable pricing supplement.

**Book-Entry, Delivery and Form**

We will issue the notes in the form of one or more fully registered global certificates, or global notes. Unless we state otherwise in the applicable pricing supplement, we will deposit the notes with, or on behalf of, The Depository Trust Company, New York, New York, or DTC, as the depositary, and will register the notes in the name of Cede & Co., DTC's nominee. Your beneficial interests in the global notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. Except under the circumstances described in the accompanying prospectus under the caption "Description of Debt Securities— Book-Entry System," book-entry notes will not be exchangeable for certificated notes and will not otherwise be issuable as certificated notes.

Unless we state otherwise in an applicable pricing supplement, you may elect to hold interests in the global securities through either DTC (in the United States) or Clearstream Banking, société anonyme, which we refer to as Clearstream, Luxembourg, or Euroclear Bank, S.A./N.V., or its successor, as operator of the Euroclear System, which we refer to as Euroclear (outside of the United States), if you are participants of such systems, or indirectly through organizations which are participants in such systems. Interests held through Clearstream, Luxembourg and Euroclear will be recorded on DTC's books as being held by the U.S. depositary for each of Clearstream, Luxembourg and Euroclear, which U.S. depositaries will in turn hold interests on behalf of their participants' customers' securities accounts.

For a further description of procedures regarding global securities representing book-entry notes, we refer you to "Description of Debt Securities—Book-Entry System" in the accompanying prospectus.

Exhibit 1
118

## PLAN OF DISTRIBUTION

Under the terms of a distribution agreement for senior notes dated May 7, 2007, and a distribution agreement for subordinated notes dated March 25, 2009 (together, the "distribution agreements"), we are offering the applicable notes on a continuing basis through Credit Suisse Securities (USA) LLC, which we refer to as the agent, which has agreed to use its reasonable efforts to solicit purchases of the notes. Except as otherwise agreed by us and the agent with respect to a particular note, we will pay the agent a commission or discount ranging from 0.125% to 0.750% of the principal amount of each senior note and a commission or discount ranging from 0.500% to 0.875% of the principal amount of each subordinated note, depending on its maturity, sold through the agent. We will have the sole right to accept offers to purchase notes and may reject any offer in whole or in part. The agent shall have the right, in its sole discretion, to reject any offer to purchase notes received by it, in whole or in part, that it reasonably considers to be unacceptable.

We also may sell notes to the agent, acting as principal, at a discount or concession to be agreed upon at the time of sale, for resale to one or more investors or other purchasers at a fixed offering price or at varying prices related to prevailing market prices at the time of such resale or otherwise, as determined by the agent and specified in the applicable pricing supplement. The agent may offer the notes it has purchased as principal to other dealers. The agent may sell notes to any dealer at a discount and, unless otherwise specified in the applicable pricing supplement, the discount allowed to any dealer will not be in excess of the discount to be received by the agent from us. Unless otherwise indicated in the applicable pricing supplement, any note sold to the agent as principal will be purchased by the agent at a price equal to 100% of the principal amount less a percentage equal to the commission applicable to any agency sale of a note of identical maturity, and may be resold by the agent to investors and other purchasers from time to time in one or more transactions, including negotiated transactions as described above. After the initial public offering of notes to be resold to investors and other purchasers, the public offering price, concession and discount may be changed.

We may also sell notes directly to investors (other than broker-dealers) in those jurisdictions in which we are permitted to do so. We will not pay any commission on any notes we sell directly. We may also sell notes to one or more banks, acting as agents for their customers, in jurisdictions where we are permitted to do so. Unless otherwise indicated in the applicable pricing supplement, any note sold to a bank as agent for its customer will be sold at a price equal to 100% of the principal amount and we, or one of our affiliates, will pay such bank a commission equal to the commission applicable to a sale of a note of identical maturity through the agent.

We may appoint, from time to time, one or more additional agents with respect to particular notes or with respect to the senior or subordinated notes in general, acting either as agent or principal, on substantially the same terms as those applicable to sales of notes to or through Credit Suisse Securities (USA) LLC pursuant to the distribution agreements. In the case of the senior notes, we have appointed Merrill Lynch, Pierce, Fenner & Smith Incorporated and Nuveen Investments, LLC as additional agents under the distribution agreement for senior notes, in connection with notes issued under Merril Lynch's "ELEMENTS" platform, and JPMorgan Chase Bank, National Association and J.P. Morgan Securities, Inc. to act as agents under the distribution agreement for senior notes for certain limited purposes.

We reserve the right to withdraw, cancel or modify the offer made hereby without notice.

Each purchaser of a note will arrange for payment as instructed by the agent. The agent is required to deliver the proceeds of the notes to us in immediately available funds, to a bank designated by us in accordance with the terms of the distribution agreement, on the date of settlement.

Exhibit 1

119

We estimate that the total expenses for the offering, excluding underwriting commissions, discounts and SEC registration fees (which are deferred in accordance with Rules 456(b) and 457(r)) will be approximately $500,000.

The agent, whether acting as agent or principal, may be deemed to be an "underwriter" within the meaning of the Securities Act of 1933, as amended, or the Securities Act. We have agreed to indemnify the agent against liabilities under the Securities Act, or contribute to payments which the agent may be required to make in that respect. We have also agreed to reimburse the agent for certain expenses.

No note will have an established trading market when issued. Unless otherwise specified in the applicable pricing supplement, the notes will not be listed on a national securities exchange in the United States. We have been advised that Credit Suisse Securities (USA) LLC intends to make a market in the notes, as permitted by applicable laws and regulations. Credit Suisse Securities (USA) LLC is not obligated to do so, however, and may discontinue making a market at any time without notice. No assurance can be given as to how liquid the trading market for the notes will be.

Any of our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, may use this prospectus supplement, together with the accompanying prospectus and applicable pricing supplement, in connection with offers and sales of notes related to market-making transactions by and through our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, at negotiated prices related to prevailing market prices at the time of sale or otherwise. Any of our broker-dealer subsidiaries and affiliates, including Credit Suisse Securities (USA) LLC, may act as principal or agent in such transactions. None of our broker-dealer subsidiaries and affiliates has any obligation to make a market in the notes and may discontinue any market-making activities at any time without notice, at its sole discretion. Credit Suisse Securities (USA) LLC, one of our wholly-owned subsidiaries, is our affiliate. The offering therefore is being conducted in accordance with the applicable provisions of Section 2720 of the Rules of the Financial Industry Regulatory Authority. The broker-dealers will not confirm sales to any accounts over which they exercise discretionary authority without first receiving a written consent from their accounts.

No action has been or will be taken by us or the agent that would permit a public offering of the notes or possession or distribution of this prospectus supplement and the accompanying prospectus or any pricing supplement in any jurisdiction other than the United States except in accordance with the distribution agreements.

Concurrently with the offering of the notes through the agent as described in this prospectus supplement, we may issue other securities from time to time as described in the accompanying prospectus.

The agents and their affiliates have engaged and may in the future engage in commercial banking and investment banking and other transactions with us and our affiliates in the ordinary course of business.

Exhibit 1

120

**INCORPORATION BY REFERENCE**

We file annual and current reports and other information with the SEC. For information on the documents we incorporate by reference in this prospectus supplement and the accompanying prospectus, we refer you to "Where You Can Find More Information" on page 2 of the accompanying prospectus.

We incorporate by reference in this prospectus supplement the combined Annual Report on Form 20-F of Credit Suisse Group AG and us for the year ended December 31, 2008 and any future documents we file with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act from the date of this prospectus supplement until the offering of the securities is completed.

Exhibit 1

121

**Credit Suisse Group AG**
Debt Securities
Warrants
Guarantees

**Credit Suisse**
Debt Securities
Warrants
Guarantees

**Credit Suisse (USA), Inc.**
Certain Guaranteed Senior Debt Securities issued previously and further described herein

**Credit Suisse Group Finance (Delaware) LLC I**
**Credit Suisse Group Finance (Guernsey) Limited**
Guaranteed Debt Securities

**Credit Suisse Group Capital (Delaware) Trust I**
**Credit Suisse Group Capital (Delaware) Trust II**
**Credit Suisse Group Capital (Delaware) Trust III**
Trust Preferred Securities

**Credit Suisse Group Capital (Delaware) LLC I**
**Credit Suisse Group Capital (Delaware) LLC II**
**Credit Suisse Group Capital (Delaware) LLC III**
**Credit Suisse Group Capital (Guernsey) Limited**
**Credit Suisse Group Capital (Guernsey) IX Limited**
**Credit Suisse Group Capital (Guernsey) X Limited**
Company Preferred Securities

Credit Suisse Group AG (Credit Suisse Group) or Credit Suisse (in each case, acting through its head office or any one of its branches) may from time to time offer to sell debt securities, which may consist of senior and subordinated notes or other types of debt, including capital securities and debt convertible into or exchangeable for shares or American depositary shares of Credit Suisse Group (in the case of Credit Suisse Group only), securities of any entity unaffiliated with Credit Suisse Group, a basket of such securities, an index or indices of such securities or any combination of the foregoing.

In addition, Credit Suisse Group or Credit Suisse (in each case, acting through its head office or any one of its branches) may from time to time offer to sell any of the following securities:

- warrants or warrants in the form of subscription rights to purchase equity securities or debt securities of Credit Suisse Group, securities of any entity unaffiliated with Credit Suisse Group, a basket of such securities, an index or indices of such securities or any combination of the foregoing; and

- guarantees of debt securities.

Credit Suisse Group and Credit Suisse have fully and unconditionally guaranteed all the obligations of Credit Suisse (USA), Inc. (Credit Suisse (USA)) under its guaranteed senior debt securities, or the Guaranteed Senior Debt Securities, further described in "Description of the Guaranteed Senior Debt Securities of Credit Suisse (USA)" and "Description of the Guarantees of the Guaranteed Senior Debt Securities of Credit Suisse (USA)." The obligations of Credit Suisse Group under its guarantees of these securities are subordinated as described in this prospectus.

Credit Suisse Group Finance (Delaware) LLC I and Credit Suisse Group Finance (Guernsey) Limited may offer and sell debt securities, including senior and subordinated debt securities and debt securities convertible or exchangeable into shares or American depositary shares of Credit Suisse Group, securities of any entity unaffiliated with Credit Suisse Group, a basket of such securities, an index or indices of such securities or any combination of the foregoing, that are fully and unconditionally guaranteed by Credit Suisse Group.

Credit Suisse Group Capital (Delaware) Trust I, Credit Suisse Group Capital (Delaware) Trust II and Credit Suisse Group Capital (Delaware) Trust III may offer and sell trust preferred securities representing beneficial interests in the relevant trust, in one or more offerings.

Credit Suisse Group Capital (Delaware) LLC I, Credit Suisse Group Capital (Delaware) LLC II, Credit Suisse Group Capital (Delaware) LLC III, Credit Suisse Group Capital (Guernsey) Limited, Credit Suisse Group Capital (Guernsey) IX Limited and Credit Suisse Group Capital (Guernsey) X Limited may offer and sell company preferred securities, in one or more offerings.

Each of the trust preferred securities and company preferred securities, which we sometimes collectively refer to as capital securities of Credit Suisse Group, will be fully and unconditionally guaranteed on a subordinated basis by Credit Suisse Group.

We will provide the specific terms of these securities in supplements to this prospectus. You should read this prospectus and any supplement carefully before you invest. We will not use this prospectus to issue any securities unless it is attached to a prospectus supplement.

Unless we state otherwise in a prospectus supplement, we will not list any of these securities on any securities exchange.

These securities may be offered directly or to or through underwriters, agents or dealers, including Credit Suisse Securities (USA) LLC. The names of any other underwriters, agents or dealers will be included in a supplement to this prospectus.

### Investing in our securities involves risks. We may include specific risk factors in an applicable prospectus supplement under the heading "Risk Factors."

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus or any accompanying prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.

The debt securities of Credit Suisse are not deposit liabilities and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction. Unless otherwise provided in the applicable prospectus supplement, the debt securities will not have the benefit of any agency or governmental guarantee.

Any of our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, may use this prospectus and our prospectus supplements in connection with offers and sales of our securities, including outstanding securities of Credit Suisse (USA), in connection with market-making transactions by and through our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, at prices that relate to the prevailing market prices of our securities at the time of the sale or otherwise. Any of our broker-dealer subsidiaries and affiliates, including Credit Suisse Securities (USA) LLC, may act as principal or agent in these transactions. None of our broker-dealer subsidiaries and affiliates has any obligation to make a market in any of our offered securities and may discontinue any market-making activities at any time without notice, at its sole discretion.

### Credit Suisse
The date of this prospectus is March 25, 2009.

Exhibit 1
122

**Table of Contents**

ABOUT THIS PROSPECTUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

LIMITATIONS ON ENFORCEMENT OF U.S. LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

WHERE YOU CAN FIND MORE INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

FORWARD-LOOKING STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

USE OF PROCEEDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

RATIO OF EARNINGS TO FIXED CHARGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

CAPITALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

CREDIT SUISSE GROUP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

CREDIT SUISSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

CREDIT SUISSE (USA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

THE FINANCE SUBSIDIARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

THE TRUSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

THE COMPANIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

DESCRIPTION OF DEBT SECURITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

SPECIAL PROVISIONS RELATING TO FOREIGN CURRENCY DENOMINATED DEBT
      SECURITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

FOREIGN CURRENCY RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

DESCRIPTION OF WARRANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

DESCRIPTION OF SHARES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

DESCRIPTION OF CAPITAL SECURITIES OF CREDIT SUISSE GROUP . . . . . . . . . . . . . .   45

DESCRIPTION OF THE GUARANTEED SENIOR DEBT SECURITIES OF
      CREDIT SUISSE (USA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

DESCRIPTION OF THE GUARANTEES OF THE GUARANTEED SENIOR DEBT
      SECURITIES OF CREDIT SUISSE (USA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

TAXATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

PLAN OF DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

MARKET-MAKING ACTIVITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

———————————

YOU SHOULD RELY ONLY ON THE INFORMATION INCORPORATED BY REFERENCE OR PROVIDED IN THIS PROSPECTUS, ANY PROSPECTUS SUPPLEMENT OR ANY OTHER STATEMENT OR FREE WRITING PROSPECTUS WE AUTHORIZE IN THE FUTURE. AT THE DATE OF THIS PROSPECTUS, WE HAVE NOT AUTHORIZED ANYONE ELSE TO PROVIDE YOU WITH DIFFERENT INFORMATION. WE ARE NOT MAKING AN OFFER OF THESE SECURITIES IN ANY STATE WHERE THE OFFER IS NOT PERMITTED. YOU SHOULD NOT ASSUME THAT THE INFORMATION IN THIS PROSPECTUS OR ANY PROSPECTUS SUPPLEMENT IS ACCURATE AS OF ANY DATE OTHER THAN THE DATE ON THE FRONT OF THESE DOCUMENTS.

———————————

Exhibit 1

123

## ABOUT THIS PROSPECTUS

In this prospectus, the term "trust" refers to Credit Suisse Group Capital (Delaware) Trust I, Credit Suisse Group Capital (Delaware) Trust II or Credit Suisse Group Capital (Delaware) Trust III, each a Delaware statutory trust organized, in the event of certain offerings of capital securities, to issue trust preferred securities representing beneficial interests in the relevant trust, fully and unconditionally guaranteed on a subordinated basis by Credit Suisse Group.

The term "company" refers to Credit Suisse Group Capital (Delaware) LLC I, Credit Suisse Group Capital (Delaware) LLC II or Credit Suisse Group Capital (Delaware) LLC III, each a Delaware limited liability company (collectively, the "Delaware companies"), and Credit Suisse Group Capital (Guernsey) Limited, Credit Suisse Group Capital (Guernsey) IX Limited or Credit Suisse Group Capital (Guernsey) X Limited, each a Guernsey limited company (collectively, the "Guernsey companies"), formed, in the event of certain offerings of capital securities, to issue company preferred securities and company common securities, fully and unconditionally guaranteed on a subordinated basis by Credit Suisse Group.

The term "finance subsidiary" refers to Credit Suisse Group Finance (Delaware) LLC I, a Delaware limited liability company, and Credit Suisse Group Finance (Guernsey) Limited, a Guernsey limited company, each of which may issue debt securities fully and unconditionally guaranteed by Credit Suisse Group. Credit Suisse Group Finance (Guernsey) Limited and Credit Suisse Group Finance (Delaware) LLC I are 100% owned finance subsidiaries of Credit Suisse Group. Credit Suisse Group has guaranteed the securities previously issued by Credit Suisse Group Finance (Guernsey) Limited and will fully and unconditionally guarantee any securities issued by the finance subsidiaries pursuant to this registration statement. There are no significant restrictions on the ability of Credit Suisse Group to obtain funds from its subsidiaries by dividends or loans.

Credit Suisse Group does not expect any of the trusts, companies or finance subsidiaries to file reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, with the Securities and Exchange Commission, or the SEC. None of the trusts, companies or Credit Suisse Group Finance (Delaware) LLC I has commenced operations and each has only nominal assets and liabilities as of the date of this prospectus.

As permitted by Rule 12h-5 under the Exchange Act, Credit Suisse (USA) no longer files reports under the Exchange Act with the SEC. In accordance with Rule 3-10 of Regulation S-X under the Securities Act of 1933, as amended, or the Securities Act, Credit Suisse Group's financial statements include condensed consolidating financial information for Credit Suisse (USA) in a footnote to those financial statements.

The terms "we," "our," and "us" refer to Credit Suisse Group and, unless the context requires otherwise, will include Credit Suisse Group's wholly-owned bank subsidiary, Credit Suisse, the trusts, the companies, the finance subsidiaries and our other subsidiaries. In the section of this prospectus entitled "Description of Warrants," the terms "we," "our," and "us" refer to Credit Suisse Group or Credit Suisse, as issuer of the securities described in such sections. In the sections of this prospectus entitled "Description of Shares," "Description of Capital Securities of Credit Suisse Group—Description of Subordinated Guarantees in Connection with Capital Securities of Credit Suisse Group" and "Description of Capital Securities of Credit Suisse Group—Description of Subordinated Debt Securities in Connection with Certain Capital Securities of Credit Suisse Group," the terms "we," "our" and "us" refer to Credit Suisse Group, as issuer of the securities described in such sections.

Credit Suisse Group's and Credit Suisse's financial statements, which are incorporated by reference into this prospectus, have been prepared in accordance with accounting principles generally accepted in the United States of America, which we refer to as U.S. GAAP. Credit Suisse Group's and Credit Suisse's financial statements are denominated in Swiss francs, the legal tender of Switzerland. When we refer to "CHF," we mean Swiss francs. When we refer to "USD" or "$," we mean U.S. dollars.

Exhibit 1

124

This prospectus is part of a registration statement on Form F-3 that we filed with the SEC using a "shelf" registration process. Under this shelf process, we may sell any combination of the securities described in this prospectus in one or more offerings. This prospectus provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with the additional information described under the heading "Where You Can Find More Information."

## LIMITATIONS ON ENFORCEMENT OF U.S. LAWS

Credit Suisse Group is a global financial services company, and Credit Suisse is a bank, domiciled in Switzerland. Many of their directors and executive officers (as well as certain directors, managers and executive officers of the finance subsidiaries, the trusts and the companies), and certain experts named in this prospectus, are resident outside the United States, and all or a substantial portion of their assets and the assets of such persons are located outside the United States. As a result, it may be difficult for you to serve legal process on Credit Suisse Group, Credit Suisse or their respective directors and executive officers (as well as certain directors, managers and executive officers of the finance subsidiaries, the trusts and the companies) or have any of them appear in a U.S. court. We have been advised by Homburger AG, Swiss counsel to Credit Suisse Group and Credit Suisse, and Carey Olsen, Guernsey counsel to the companies organized in Guernsey, that there is doubt as to enforceability in Switzerland and Guernsey, as applicable, in original actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the federal securities laws of the United States.

## WHERE YOU CAN FIND MORE INFORMATION

Credit Suisse Group and Credit Suisse file periodic reports and other information with the SEC. You may read and copy any document Credit Suisse Group or Credit Suisse files at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference room. In addition, the SEC maintains an Internet site at *http://www.sec.gov* that contains information regarding issuers that file electronically with the SEC. Reports and other information concerning the business of Credit Suisse Group or Credit Suisse may also be inspected at the offices of the New York Stock Exchange at 11 Wall Street, New York, New York 10005.

The SEC allows Credit Suisse Group and Credit Suisse to "incorporate by reference" the information they file with the SEC, which means that Credit Suisse Group and Credit Suisse can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that Credit Suisse Group and Credit Suisse file later with the SEC and which is incorporated by reference will automatically update and supersede this information.

Credit Suisse Group and Credit Suisse incorporate by reference into the registration statement of which this prospectus forms a part, their combined annual report on Form 20-F for the year ended December 31, 2008 as filed with the SEC and any future filings they make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act. Credit Suisse Group's and Credit Suisse's reports on Form 6-K (or portions thereof) are incorporated by reference in this prospectus only to the extent that the reports expressly state such reports are filed with the SEC and Credit Suisse Group or Credit Suisse, as the case may be, incorporates them (or such portions) by reference in the registration statement of which this prospectus forms a part.

2

Exhibit 1

125

You may request a copy of these filings, at no cost, by writing or telephoning Credit Suisse Group or Credit Suisse at their principal executive offices at the following address:

| Credit Suisse Group AG | Credit Suisse |
|---|---|
| Paradeplatz 8, P.O. Box 1 | Paradeplatz 8 |
| CH–8070 Zurich, Switzerland | CH–8070 Zurich, Switzerland |
| Attention: Investor Relations | Attention: Investor Relations |
| +41 44 212 1616 | +41 44 333 1111 |

Internet: *http://www.credit-suisse.com/investors/en/index.html*

We are not incorporating the contents of the website into this prospectus.

We have filed or incorporated by reference exhibits to the registration statement of which this prospectus forms a part. You should read the exhibits carefully for provisions that may be important to you.

## FORWARD-LOOKING STATEMENTS

This prospectus, any prospectus supplement and the information incorporated by reference in this prospectus include forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. You should not place undue reliance on these statements. In addition, in the future we, and others on our behalf, may make statements that constitute forward-looking statements. Such forward-looking statements may include, without limitation, statements relating to the following:

- our plans, objectives or goals;

- our future economic performance or prospects;

- the potential effect on our future performance of certain contingencies; and

- assumptions underlying any such statements.

Words such as "believes," "anticipates," "expects," "intends" and "plans" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. We do not intend to update these forward-looking statements except as may be required by applicable securities laws.

By their very nature, forward-looking statements involve inherent risks and uncertainties, both general and specific, and risks exist that predictions, forecasts, projections and other outcomes described or implied in forward-looking statements will not be achieved. We caution you that a number of important factors could cause results to differ materially from the plans, objectives, expectations, estimates and intentions expressed in such forward-looking statements. These factors include:

- the ability to maintain sufficient liquidity and to access capital markets;

- market and interest rate fluctuations;

- the strength of the global economy in general and the strength of the economies of the countries in which we conduct our operations, in particular the risk of a continued US or global economic downturn in 2009 and beyond;

- the direct and indirect impacts of continuing deterioration of subprime and other real estate markets;

- further adverse rating actions by credit rating agencies in respect of structured credit products or other credit-related exposures or of monoline insurers;

Exhibit 1

126

- the ability of counterparties to meet their obligations to us;

- the effects of, and changes in, fiscal, monetary, trade and tax policies, and currency fluctuations;

- political and social developments, including war, civil unrest or terrorist activity;

- the possibility of foreign exchange controls, expropriation, nationalization or confiscation of assets in countries in which we conduct our operations;

- operational factors such as systems failure, human error or the failure to implement procedures properly;

- actions taken by regulators with respect to our business and practices in one or more of the countries in which we conduct our operations;

- the effects of changes in laws, regulations or accounting policies or practices;

- competition in geographic and business areas in which we conduct our operations;

- the ability to retain and recruit qualified personnel;

- the ability to maintain our reputation and promote our brand;

- the ability to increase market share and control expenses;

- technological changes;

- the timely development and acceptance of our new products and services and the perceived overall value of these products and services by users;

- acquisitions, including the ability to integrate acquired businesses successfully, and divestitures, including the ability to sell non-core assets;

- the adverse resolution of litigation and other contingencies;

- the ability to achieve our cost efficiency goals and other cost targets; and

- our success at managing the risks involved in the foregoing.

We caution you that the foregoing list of important factors is not exclusive. When evaluating forward-looking statements, you should carefully consider the foregoing factors and other uncertainties and events, as well as the risk factors and other information set forth in Credit Suisse Group's and Credit Suisse's annual report on Form 20-F for the year ended December 31, 2008, and subsequent annual reports on Form 20-F filed by Credit Suisse Group and Credit Suisse with the SEC; Credit Suisse Group's and Credit Suisse's reports on Form 6-K filed with the SEC; and the risk factors relating to Credit Suisse Group and Credit Suisse, a particular security offered by this prospectus or a particular offering discussed in the applicable prospectus supplement.

4

Exhibit 1

127

**USE OF PROCEEDS**

Unless we tell you otherwise in a prospectus supplement, we will use the net proceeds from the sale of the securities described in this prospectus by Credit Suisse Group, Credit Suisse or the finance subsidiaries for general corporate purposes, including refinancing existing indebtedness, outside Switzerland. We may also invest the net proceeds temporarily in short-term securities.

In the event of any offering of capital securities by Credit Suisse Group, except as we may otherwise describe in a prospectus supplement, we will use the net proceeds for general corporate purposes outside Switzerland. In addition, the relevant trust may use the net proceeds from the sale of any trust preferred securities to purchase corresponding company preferred securities, subordinated debt securities of Credit Suisse Group or one of its branches or subsidiaries or other eligible investments. The relevant company may use the net proceeds from the sale of company preferred securities to the relevant trust or directly to investors and company common securities to Credit Suisse Group or one of its branches or subsidiaries to purchase corresponding subordinated debt securities of Credit Suisse Group or one of its branches or subsidiaries, or other eligible investments, and to pay certain expenses related to any such offering.

The proceeds of any issuance of capital securities of Credit Suisse Group will be included in the Tier 1 capital of Credit Suisse Group, calculated on a consolidated (*Finanzgruppe*) basis, in accordance with and to the extent permitted by Swiss banking law and regulations. The proceeds of any issuance of capital securities of Credit Suisse that qualify as Tier 1 capital of Credit Suisse will be included in Tier 1 capital of Credit Suisse on an unconsolidated (*Stammhaus*) or consolidated basis (*Finanzgruppe*) to the extent permitted by Swiss banking law and regulations.

None of Credit Suisse Group, Credit Suisse or Credit Suisse (USA) will receive any of the proceeds from the sale of the outstanding Guaranteed Senior Debt Securities of Credit Suisse (USA). All offers and sales of these securities will be for the accounts of the broker-dealer subsidiaries of Credit Suisse Group in connection with market-making transactions.

Exhibit 1

128

## RATIO OF EARNINGS TO FIXED CHARGES

The following table sets forth Credit Suisse Group's and Credit Suisse's ratio of earnings to fixed charges for the periods indicated:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| Ratio of Earnings to Fixed Charges(1) | | | | | |
| Credit Suisse Group ................... | 0.70(2) | 1.16 | 1.24 | 1.17 | 1.31 |
| Credit Suisse........................ | 0.69(3) | 1.13 | 1.21 | 1.13 | 1.27(4) |

(1) For purposes of calculating the ratio of earnings to fixed charges, earnings consist of profit/loss from continuing operations before taxes, extraordinary items, cumulative effect of changes in accounting principles and minority interests less income from investments in associates plus fixed charges. Fixed charges for these purposes consist of (a) interest expense, (b) a portion of premises and real estate expenses, deemed representative of the interest factor and (c) preferred dividend requirements in connection with preferred securities of subsidiaries.

(2) The deficiency in the coverage of fixed charges by earnings before fixed charges was CHF 12,201 million for the year ended December 31, 2008.

(3) The deficiency in the coverage of fixed charges by earnings before fixed charges was CHF 12,362 million for the year ended December 31, 2008.

(4) Based on the combined statements of income of Credit Suisse, which represent the combined statements of operations of the former Credit Suisse First Boston and Credit Suisse, which were merged in May 2005, with Credit Suisse First Boston as the surviving entity (the name of which was changed to Credit Suisse).

## CAPITALIZATION

The table below shows the consolidated capitalization of Credit Suisse Group and Credit Suisse as of December 31, 2008. You should read this table along with our consolidated financial statements and other financial information, which are included in the documents incorporated by reference in this prospectus.

| | As of December 31, 2008 | |
|---|---|---|
| | **Credit Suisse Group** | **Credit Suisse** |
| | (in CHF millions) | |
| Debt: | | |
| Short-term borrowings ............................... | 10,964 | 10,182 |
| Long-term borrowings................................ | 150,714 | 148,550 |
| Other liabilities.................................... | 976,370 | 966,069 |
| Total liabilities.................................. | 1,138,048 | 1,124,801 |
| Shareholder's Equity: | | |
| Common shares ................................... | 47 | 4,400 |
| Additional paid-in capital ........................... | 25,166 | 25,059 |
| Retained earnings ................................. | 18,780 | 5,132 |
| Treasury shares, at cost ............................. | (752) | 18 |
| Accumulated other comprehensive income/(loss) .............. | (10,939) | (7,741) |
| Total shareholder's equity ........................... | 32,302 | 26,868 |
| Total capitalization ............................... | 1,170,350 | 1,151,669 |

Exhibit 1

129

## CREDIT SUISSE GROUP

Credit Suisse Group is a global financial services company domiciled in Switzerland. Its activities are operated and managed in three reporting segments: Investment Banking, Private Banking and Asset Management.

Credit Suisse Group is a publicly held corporation and its registered shares are listed on the SIX Swiss Exchange (and traded since June 25, 2001 through SWX Europe (formerly known as virt-x)) and, in the form of American depositary shares, on the New York Stock Exchange. Credit Suisse Group's registered head office is located at Paradeplatz 8, P.O. Box 1, CH-8070 Zurich, Switzerland, and its telephone number is 41-44-212-1616.

Credit Suisse Group, Guernsey branch, was established in 1986 and is a vehicle for various funding activities of Credit Suisse Group. The Guernsey branch exists as part of Credit Suisse Group and is not a separate legal entity, although it has independent status for certain tax and Guernsey regulatory purposes. The Guernsey branch is located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey, Channel Islands, GY1 3WF, and its telephone number is 44-1481-724-605.

Credit Suisse Group may act through its Guernsey branch in connection with the debt securities and the subordinated debt securities issued in connection with certain capital securities as described in this prospectus and the applicable prospectus supplement.

## CREDIT SUISSE

Credit Suisse, a corporation established under the laws of, and licensed as a bank in, Switzerland, is a wholly-owned subsidiary of Credit Suisse Group. Credit Suisse's registered head office is in Zurich, and it has additional executive offices and principal branches located in London, New York, Hong Kong, Singapore and Tokyo. Credit Suisse's registered head office is located at Paradeplatz 8, CH−8070 Zurich, Switzerland, and its telephone number is 41-44-333-1111.

Credit Suisse may act through any of its branches in connection with the debt securities, warrants and guarantees as described in this prospectus and the applicable prospectus supplement. Credit Suisse, Guernsey branch, was established in 1997 in Guernsey, Channel Islands, and is, among other things, a vehicle for various funding activities of Credit Suisse. The Guernsey branch exists as part of Credit Suisse and is not a separate legal entity, although it has independent status for certain tax and Guernsey regulatory purposes. The Guernsey branch is located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey, Channel Islands, GY1 3WF, and its telephone number is 44-1481-724-605.

Credit Suisse, Nassau branch, was established in Nassau, Bahamas in 1971 and is, among other things, a vehicle for various funding activities of Credit Suisse. The Nassau branch exists as part of Credit Suisse and is not a separate legal entity, although it has independent status for certain tax and regulatory purposes. The Nassau branch is located at Shirley & Charlotte Streets, Bahamas Financial Centre, 4th Floor, P.O. Box N-4928, Nassau, Bahamas, and its telephone number is 242-356-8125.

Credit Suisse, New York branch, was established in 1940 in New York, New York, and is, among other things, a vehicle for various funding activities of Credit Suisse. The New York branch exists as part of Credit Suisse and is not a separate legal entity, although it has independent status for certain tax and regulatory purposes. The New York branch is located at Eleven Madison Avenue, New York, New York 10010, and its telephone number is (212) 325-2000.

## CREDIT SUISSE (USA)

Credit Suisse (USA) is a leading integrated investment bank serving institutional, corporate, government and high-net-worth individual clients. Credit Suisse (USA) is an indirect wholly-owned subsidiary of Credit Suisse Group. Credit Suisse (USA)'s principal executive office is in New York. Credit Suisse (USA)'s principal subsidiary is Credit Suisse Securities (USA) LLC, Credit Suisse Group's

7

Exhibit 1

130

principal U.S. registered broker-dealer subsidiary. Effective January 16, 2006, Credit Suisse (USA) changed its name from Credit Suisse First Boston (USA), Inc. to Credit Suisse (USA), Inc.

The principal executive offices of Credit Suisse (USA) are located at Eleven Madison Avenue, New York, New York 10010, and its telephone number is (212) 325-2000.

## THE FINANCE SUBSIDIARIES

Credit Suisse Group Finance (Delaware) LLC I is a Delaware limited liability company. Credit Suisse Group Finance (Guernsey) Limited (registration number 28538) is a Guernsey limited company. The finance subsidiaries exist for the purpose of issuing debt securities, the proceeds of which will be advanced to, or otherwise invested in, subsidiaries or affiliates of Credit Suisse Group. In the event that a finance subsidiary issues any debt securities covered by this prospectus, Credit Suisse Group will guarantee such debt securities on a full and unconditional basis.

The principal executive offices of the Delaware and Guernsey finance subsidiaries are located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey, Channel Islands GY1 3WF. Their telephone number is 44-1481-724-605.

## THE TRUSTS

Each of Credit Suisse Group Capital (Delaware) Trust I, Credit Suisse Group Capital (Delaware) Trust II and Credit Suisse Group Capital (Delaware) Trust III is a Delaware statutory trust. Our Delaware companies are grantors of the trusts. The trusts exist, in the event of certain offerings of capital securities of Credit Suisse Group, to issue trust preferred securities representing a beneficial interest in the relevant trust, together with rights under a subordinated guarantee of Credit Suisse Group, corresponding company preferred securities and/or subordinated debt securities issued by Credit Suisse Group or one of its branches or subsidiaries or other eligible investments. The trusts may pass the dividends or other payments they receive on company preferred securities or interest or other payments they receive on the subordinated debt securities, as the case may be, through to holders as distributions on trust preferred securities. The trusts cannot engage in other activities (other than those incidental to the foregoing activities). Company preferred securities or subordinated debt securities, if any, and rights under the subordinated guarantee will be the only assets of the trusts. Credit Suisse Group will pay all expenses and liabilities of the trusts.

Each trust will be treated as a grantor trust for U.S. federal income tax purposes. As a result, holders will be treated as beneficial owners of interests in company preferred securities or subordinated debt securities, if any, and rights under a subordinated guarantee for U.S. federal income tax purposes.

The principal executive offices of each trust are located at c/o BNY Mellon Trust of Delaware, White Clay Center, Route 273, Newark, Delaware, 19711. Their telephone number is (302) 283-8905.

Exhibit 1
131

**THE COMPANIES**

Each of Credit Suisse Group Capital (Delaware) LLC I, Credit Suisse Group Capital (Delaware) LLC II and Credit Suisse Group Capital (Delaware) LLC III is a Delaware limited liability company, and each of Credit Suisse Group Capital (Guernsey) Limited (registration number 43980), Credit Suisse Group Capital (Guernsey) IX Limited (registration number 44573) and Credit Suisse Group Capital (Guernsey) X (registration number 44574) Limited is a Guernsey limited company. The companies are wholly owned by Credit Suisse Group. The companies may, in the event of certain offerings of capital securities of Credit Suisse Group, acquire and hold subordinated debt securities issued by Credit Suisse Group or one of its branches or subsidiaries or other eligible investments, and will issue company common securities and company preferred securities. The company preferred securities may or may not give investors in such securities any beneficial interest in the underlying assets of the relevant company but will afford them rights under a subordinated guarantee of Credit Suisse Group. Credit Suisse Group or one of its branches or subsidiaries will purchase all the company common securities, which represent 100% of the voting rights in the relevant company. Each company may apply the cash generated by the subordinated debt securities or other eligible investments, if any, to pay dividends to the applicable trust, as the initial holder of the company preferred securities, or directly to investors, and to Credit Suisse Group, as the holder of the company common securities.

The principal executive offices of each company are located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey, Channel Islands GY1 3WF. Their telephone number is 44-1481-724-605.

**DESCRIPTION OF DEBT SECURITIES**

This section describes the general terms that will apply to any debt securities that may be offered by Credit Suisse Group or Credit Suisse, directly or through one of its branches, or the finance subsidiaries pursuant to this prospectus (each referred to herein as a "relevant issuer"). The specific terms of the offered debt securities, and the extent to which the general terms described in this section apply to debt securities, will be described in the related prospectus supplement at the time of the offer.

**General**

As used in this prospectus, "debt securities" means the senior and subordinated debentures, notes, bonds, guarantees and other evidences of indebtedness, including capital securities (in the case of Credit Suisse only), that the relevant issuer issues and, if applicable, Credit Suisse Group fully and unconditionally guarantees (as described below under "—Credit Suisse Group Guarantees") and, in each case, the trustee authenticates and delivers under the applicable indenture.

Credit Suisse Group may issue senior debt securities or subordinated debt securities (including convertible or exchangeable debt securities), directly or through one of its branches or finance subsidiaries. Convertible or exchangeable debt securities of Credit Suisse Group may be converted or exchanged into shares of Credit Suisse Group. Credit Suisse may issue senior debt securities, subordinated debt securities, including convertible debt securities and debt securities that qualify as Tier 1 capital or other capital securities, directly or through one of its branches. Any convertible debt securities issued by Credit Suisse will not be convertible into shares of Credit Suisse Group or Credit Suisse. Senior debt securities, subordinated debt securities, including debt securities that qualify as Tier 1 capital and other capital securities, other than any subordinated debt securities or subordinated guarantees issued in connection with capital securities of Credit Suisse Group, will be issued in one or more series under the senior indenture or the subordinated indenture between Credit Suisse Group and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to JPMorgan Chase Bank, N.A., as trustee (in the case of Credit Suisse Group) or the senior indenture or subordinated indenture (each as may be amended or supplemented from time to time) between Credit Suisse and The Bank of New York Mellon, formerly known as The Bank of New York, as trustee (in the case of Credit Suisse). The senior indentures and the subordinated indentures have been qualified under the Trust Indenture Act of 1939, as amended, or the Trust Indenture Act.

9

Exhibit 1
132

The finance subsidiaries may issue either senior guaranteed debt securities or subordinated guaranteed debt securities. Senior guaranteed debt securities and subordinated guaranteed debt securities will be issued in one or more series under either the senior indenture or the subordinated indenture among the relevant finance subsidiary, The Bank of New York Mellon, as trustee, and Credit Suisse Group, as guarantor. The senior indenture and the subordinated indenture of each of the finance subsidiaries have been qualified under the Trust Indenture Act.

In the following discussion, we sometimes refer to these indentures collectively as the "indentures."

This prospectus briefly outlines the provisions of the indentures. The terms of the indentures will include both those stated in the indentures and those made part of the indentures by the Trust Indenture Act. The forms of the indentures have been filed as exhibits to the registration statement of which this prospectus forms a part, and you should read the indentures for provisions that may be important to you.

Credit Suisse Group is a holding company and depends upon the earnings and cash flow of its subsidiaries to meet its obligations under the debt securities and guarantees. Since the creditors of any of its subsidiaries would generally have a right to receive payment that is superior to Credit Suisse Group's right to receive payment from the assets of that subsidiary, holders of debt securities will be effectively subordinated to creditors of Credit Suisse Group's subsidiaries. In addition, there are various regulatory requirements applicable to some of Credit Suisse Group's and Credit Suisse's subsidiaries that limit their ability to pay dividends and make loans and advances to Credit Suisse Group and Credit Suisse, as the case may be.

The indentures do not contain any covenants or other provisions designed to protect holders of the debt securities against a reduction in the creditworthiness of the relevant issuer in the event of a highly leveraged transaction or that would prohibit other transactions that might adversely affect holders of the debt securities, including a change in control of the relevant issuer or the guarantor (if any).

**Issuances in Series**

The indentures do not limit the amount of debt that may be issued. The debt securities may be issued in one or more series with the same or various maturities, at a price of 100% of their principal amount or at a premium or a discount. Not all debt securities of any one series need be issued at the same time and, unless otherwise provided, any series may be reopened for issuances of additional debt securities of that series. The debt securities will not be secured by any property or assets of the relevant issuer or the finance subsidiaries.

The terms of any authorized series of debt securities will be described in a prospectus supplement. These terms may include:

- whether the debt securities are issued by Credit Suisse Group or Credit Suisse, or by a finance subsidiary and guaranteed by Credit Suisse Group;

- whether the debt securities are senior or subordinated, whether they are capital securities and whether they qualify as Tier 1 capital;

- the total principal amount of the debt securities;

- the percentage of the principal amount at which the debt securities will be issued and whether the debt securities will be "original issue discount" securities for U.S. federal income tax purposes. If original issue discount debt securities are issued (securities that are issued at a substantial discount below their principal amount because they pay no interest or pay interest that is below market rates at the time of issuance), the special U.S. federal income tax and other considerations of a purchase of original issue discount debt securities will be described (to the extent not already described herein);

10

Exhibit 1

133

- the date or dates on which principal will be payable and whether the debt securities will be payable on demand by the holders on any date;

- the manner in which payments of principal, premium or interest will be calculated and whether any rate will be fixed or based on an index or formula or the value of one or more securities, commodities, currencies or other assets, including but not limited to:

  - whether the debt security bears a fixed rate of interest or bears a floating rate of interest, including whether the debt security is a regular floating rate note, a floating rate/fixed rate note or an inverse floating rate note (each as described below);

  - if the debt security is an indexed note (as defined below) the terms relating to the particular series of debt securities;

  - if the debt security is an amortizing note (as defined below), the amortization schedule and any other terms relating to the particular series of debt securities;

- the interest payment dates;

- whether any sinking fund is required;

- optional or mandatory redemption terms;

- authorized denominations, if other than $2,000 and integral multiples of $1,000 in excess thereof;

- the terms on which holders of the debt securities may or are required to exercise, convert or exchange these securities into or for securities of Credit Suisse Group or one or more other entities and any specific terms relating to the exercise, conversion or exchange feature;

- the currency in which the debt securities will be denominated or principal, premium or interest will be payable, if other than U.S. dollars;

- whether the debt securities are to be issued as individual certificates to each holder or in the form of global certificates held by a depositary on behalf of holders;

- information describing any book-entry features;

- whether and under what circumstances additional amounts will be paid on any debt securities as a result of withholding taxes and whether the debt securities can be redeemed if additional amounts must be paid;

- the names and duties of any co-trustees, depositaries, authenticating agents, paying agents, transfer agents or registrars for any series; and

- any other terms consistent with the above.

The prospectus supplement relating to any series of debt securities may also include, if applicable, a discussion of certain U.S. federal income tax considerations and considerations under the Employee Retirement Income Security Act of 1974, as amended, or ERISA.

**Interest and Interest Rates**

Each series of debt securities that bears interest will bear interest from its date of issue or from the most recent date to which interest on that series of debt securities has been paid or duly provided for, at the fixed or floating rate specified in the series of debt securities, until the principal amount has been paid or made available for payment. Interest will be payable on each interest payment date (except for certain original issue discount notes (as defined below) and except for a series of debt securities issued between a regular record date and an interest payment date) and at maturity or on redemption or repayment, if any. Unless otherwise provided in the applicable prospectus supplement, in the event that the maturity date of any series of debt securities is not a business day, principal and interest payable at maturity will be paid on the next succeeding business day with the same effect as if that following business day were the date on which the payment were due, except that the relevant

11

Exhibit 1

134

issuer or the guarantor (if any) will not pay any additional interest as a result of the delay in payment except as otherwise provided under "—Payment of Additional Amounts." Unless otherwise indicated in the applicable prospectus supplement, interest payments in respect of a series of debt securities will equal the amount of interest accrued from and including the immediately preceding interest payment date in respect of which interest has been paid or duly made available for payment (or from and including the date of issue, if no interest has been paid with respect to the applicable series of debt securities) to but excluding the related interest payment date, maturity date or redemption or repayment date, if any, as the case may be.

Interest will be payable to the person in whose name a debt security is registered at the close of business on the regular record date next preceding the related interest payment date, except that:

- if the relevant issuer fails to pay the interest due on an interest payment date, the defaulted interest will be paid to the person in whose name the debt security is registered at the close of business on the record date the relevant issuer will establish for the payment of defaulted interest; and

- interest payable at maturity, redemption or repayment will be payable to the person to whom principal shall be payable.

The first payment of interest on any series of debt securities originally issued between a regular record date and an interest payment date will be made on the interest payment date following the next succeeding regular record date to the registered owner on such next succeeding regular record date.

### Fixed Rate Notes

Each fixed rate debt security, which we refer to as a fixed rate note, will bear interest at the annual rate specified in the applicable prospectus supplement. The interest payment dates for fixed rate notes will be specified in the applicable prospectus supplement and the regular record dates will be the fifteenth calendar day (whether or not a business day) prior to each interest payment date unless otherwise specified in the applicable prospectus supplement. Unless otherwise specified in the applicable prospectus supplement, interest on fixed rate notes will be computed and paid on the basis of a 360-day year of twelve 30-day months. In the event that any date for any payment on any fixed rate note is not a business day, payment of interest, premium, if any, or principal otherwise payable on such fixed rate note will be made on the next succeeding business day. The relevant issuer will not pay any additional interest as a result of the delay in payment.

### Floating Rate Notes

Unless otherwise specified in an applicable prospectus supplement, floating rate debt securities, which we refer to as floating rate notes, will be issued as described below. Each applicable prospectus supplement will specify certain terms with respect to which such floating rate note is being delivered, including:

- whether the floating rate note is a regular floating rate note, an inverse floating rate note or a floating rate/fixed rate note (if not specified, the floating rate note will be a regular floating rate note);
- the interest rate basis or bases;
- initial interest rate;
- interest reset dates;
- interest reset period;
- interest payment dates;
- index maturity, if any;

12

Exhibit 1
135

- maximum interest rate and minimum interest rate, if any;

- the spread and/or spread multiplier, if any; and

- if one or more of the specified interest rate bases is LIBOR, the index currency, if any, as described below.

Unless otherwise specified in the applicable prospectus supplement, each regular record date for a floating rate note will be the fifteenth calendar day (whether or not a business day) prior to each interest payment date.

The interest rate borne by the floating rate notes will be determined as follows:

- Unless a floating rate note is a floating rate/fixed rate note or an inverse floating rate note, the floating rate note will be a regular floating rate note and, except as described below or in an applicable prospectus supplement, will bear interest at the rate determined by reference to the applicable interest rate basis or bases:

  - plus or minus the applicable spread, if any; and/or

  - multiplied by the applicable spread multiplier, if any.

Unless otherwise specified in the applicable prospectus supplement, commencing on the initial interest reset date, the rate at which interest on such regular floating rate note will be payable will be reset as of each interest reset date; provided, however, that the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate.

If a floating rate note is a floating rate/fixed rate note, then, except as described below or in an applicable prospectus supplement, the floating rate/fixed rate note will initially bear interest at the rate determined by reference to the applicable interest rate basis or bases:

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Commencing on the initial interest reset date, the rate at which interest on the floating rate/fixed rate note will be payable shall be reset as of each interest reset date, except that:

- the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate; and

- the interest rate in effect commencing on, and including, the fixed rate commencement date (as specified in the applicable prospectus supplement) to the maturity date will be the fixed interest rate specified in the applicable prospectus supplement, or if no fixed interest rate is so specified and the floating rate/fixed rate note is still outstanding on the fixed rate commencement date, the interest rate in effect on the floating rate/fixed rate note on the day immediately preceding the fixed rate commencement date.

If a floating rate note is an inverse floating rate note, then, except as described below or in an applicable prospectus supplement, the inverse floating rate note will bear interest equal to the fixed interest rate specified in the applicable prospectus supplement:

- minus the rate determined by reference to the interest rate basis or bases;

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Unless otherwise specified in the applicable prospectus supplement, the interest rate on an inverse floating rate note will not be less than zero. Commencing on the initial interest reset date, the rate at which interest on such inverse floating rate note is payable will be reset as of each interest reset date; provided, however, that the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate.

Exhibit 1

136

Unless otherwise provided in the applicable prospectus supplement, each interest rate basis will be the rate determined in accordance with the applicable provisions below. Except as set forth above or in the applicable prospectus supplement, the interest rate in effect on each day will be:

- if such day is an interest reset date, the interest rate as determined on the interest determination date (as defined below) immediately preceding such interest reset date; or

- if such day is not an interest reset date, the interest rate determined on the interest determination date immediately preceding the next preceding interest reset date.

Except for the fixed rate period described above for floating rate/fixed rate notes, interest on floating rate notes will be determined by reference to an interest rate basis, which may be one or more of:

- the CD rate;

- the Commercial Paper rate;

- the Federal Funds rate/Federal Funds open rate;

- LIBOR;

- the Prime rate;

- the Treasury rate; or

- any other interest rate basis or interest rate formula described in the applicable prospectus supplement.

The "spread" is the number of basis points to be added to or subtracted from the related interest rate basis or bases applicable to a floating rate note. The "spread multiplier" is the percentage of the related interest rate basis or bases applicable to a floating rate note by which such interest rate basis or bases will be multiplied to determine the applicable interest rate on such floating rate note. The "index maturity" is the period to maturity of the instrument or obligation with respect to which the interest rate basis or bases will be calculated.

Each applicable prospectus supplement will specify whether the rate of interest on the related floating rate note will be reset daily, weekly, monthly, quarterly, semi-annually, annually or such other specified interest reset period and the dates on which such interest rate will be reset. Unless otherwise specified in the applicable prospectus supplement, the interest reset date will be, in the case of floating rate notes which reset:

- daily, each business day;

- weekly, a business day that occurs in each week as specified in the applicable prospectus supplement (with the exception of weekly reset Treasury rate notes, which will reset the Tuesday of each week except as specified below);

- monthly, a business day that occurs in each month as specified in the applicable prospectus supplement;

- quarterly, a business day that occurs in each third month as specified in the applicable prospectus supplement;

- semi-annually, a business day that occurs in each of two months of each year as specified in the applicable prospectus supplement; and

- annually, a business day that occurs in one month of each year as specified in the applicable prospectus supplement.

If any interest reset date for any floating rate note would otherwise be a day that is not a business day, that interest reset date will be postponed to the next succeeding day that is a business day, except that in the case of a floating rate note as to which LIBOR is an applicable interest rate basis, if that

14

Exhibit 1

137

business day falls in the next succeeding calendar month, the interest reset date will be the immediately preceding business day.

The term "business day" means, unless otherwise specified in the applicable prospectus supplement, any day that is not a Saturday or Sunday and that is not a day on which banking institutions are generally authorized or obligated by law, regulation or executive order to close in The City of New York and any other place of payment with respect to the applicable series of debt securities and:

- with respect to LIBOR notes, "business day" will also include a London business day;

- with respect to any series of debt securities denominated in euros, "business day" will also include any day on which the TransEuropean Real-Time Gross Settlement Express Transfer (TARGET) System is in place; and

- with respect to any series of debt securities denominated in a specified currency other than U.S. dollars or euros, "business day" will not include a day on which banking institutions are generally authorized or obligated by law, regulation or executive order to close in the principal financial center of the country of the specified currency.

- "London business day" means any day that is both a business day and a day on which dealings in deposits in any currency specified in the applicable prospectus supplement are transacted, or with respect to any future date are expected to be transacted, in the London interbank market.

Except as provided below or in an applicable prospectus supplement, interest will be payable on the maturity date and in the case of floating rate notes which reset:

- daily, weekly or monthly, on a business day that occurs in each month as specified in the applicable prospectus supplement;

- quarterly, on a business day that occurs in each third month as specified in the applicable prospectus supplement;

- semi-annually, on a business day that occurs in each of two months of each year as specified in the applicable prospectus supplement; and

- annually, on a business day that occurs in one month of each year as specified in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, if any interest payment date for any floating rate note (other than the maturity date, but including any redemption date or repayment date) would otherwise be a day that is not a business day, that interest payment date or redemption date or repayment date will be the next succeeding day that is a business day and interest shall accrue to, and be payable on, such following business day, except that if a floating rate note is a LIBOR note and if the next business day falls in the next succeeding calendar month, the interest payment date or redemption date or repayment date will be the immediately preceding business day and interest shall accrue to, and be payable on, such preceding business day. If the maturity date of a floating rate note falls on a day that is not a business day, the payment of principal, premium, if any, and interest, if any, will be made on the next succeeding business day, and we will not pay any additional interest for the period from and after the maturity date.

All percentages resulting from any calculation on floating rate notes will be to the nearest one hundred-thousandth of a percentage point, with five one millionths of a percentage point rounded upwards (e.g., 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655)), and all dollar amounts used in or resulting from such calculation will be rounded to the nearest cent (with one-half cent being rounded upward).

15

Exhibit 1

138

With respect to each floating rate note, accrued interest is calculated by multiplying its face amount by an accrued interest factor. The accrued interest factor is computed by adding the interest factor calculated for each day from and including the later of (a) the date of issue and (b) the last day to which interest has been paid or duly provided for to but excluding the last date for which accrued interest is being calculated. Unless otherwise specified in the applicable prospectus supplement, the interest factor for each such day will be computed by dividing the interest rate applicable to such day by 360, in the case of floating rate notes for which the interest rate basis is the CD rate, the Commercial Paper rate, the Federal Funds rate, the Federal Funds open rate, LIBOR or the Prime rate, or by the actual number of days in the year in the case of floating rate notes for which the interest rate basis is the Treasury rate. The accrued interest factor for floating rate notes for which the interest rate may be calculated with reference to two or more interest rate bases will be calculated in each period by selecting one such interest rate basis for such period in accordance with the provisions of the applicable prospectus supplement.

The interest rate applicable to each interest reset period commencing on the interest reset date with respect to that interest reset period will be the rate determined as of the interest determination date. Unless otherwise specified in the applicable prospectus supplement, the interest determination date with respect to the CD rate, the Commercial Paper rate, the Federal Funds rate, the Federal Funds open rate and the Prime rate will be the second business day preceding each interest reset date for the related floating rate note; and the interest determination date with respect to LIBOR will be the second London business day preceding each interest reset date. With respect to the Treasury rate, unless otherwise specified in an applicable prospectus supplement, the interest determination date will be the day in the week in which the related interest reset date falls on which day Treasury bills (as defined below) are normally auctioned (Treasury bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is normally held on the following Tuesday, except that such auction may be held on the preceding Friday); provided, however, that if an auction is held on the Friday on the week preceding the related interest reset date, the related interest determination date will be such preceding Friday; and provided, further, that if an auction falls on any interest reset date then the related interest reset date will instead be the first business day following such auction. Unless otherwise specified in the applicable prospectus supplement, the interest determination date pertaining to a floating rate note, the interest rate of which is determined with reference to two or more interest rate bases, will be the latest business day which is at least two business days prior to each interest reset date for such floating rate note. Each interest rate basis will be determined and compared on such date, and the applicable interest rate will take effect on the related interest reset date, as specified in the applicable prospectus supplement.

Unless otherwise provided for in the applicable prospectus supplement, The Bank of New York Mellon, formerly known as The Bank of New York, will be the calculation agent and for each interest reset date will determine the interest rate with respect to any floating rate note as described below. The calculation agent will notify the relevant issuer, the paying agent and the trustee of each determination of the interest rate applicable to a floating rate note promptly after such determination is made. The calculation agent will, upon the request of the holder of any floating rate note, provide the interest rate then in effect and, if determined, the interest rate which will become effective as a result of a determination made with respect to the most recent interest determination date relating to such floating rate note. Unless otherwise specified in the applicable prospectus supplement, the "calculation date," where applicable, pertaining to any interest determination date will be the earlier of (a) the tenth calendar day after that interest determination date or, if such day is not a business day, the next succeeding business day or (b) the business day preceding the applicable interest payment date or maturity date, as the case may be.

16

Exhibit 1

139

Unless otherwise specified in the applicable prospectus supplement, the calculation agent will determine the interest rate basis with respect to floating rate notes as follows:

*CD Rate Notes.*   CD rate debt securities, which we refer to as CD rate notes, will bear interest at the interest rate (calculated with reference to the CD rate and the spread and/or spread multiplier, if any) specified in the CD rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, "CD rate" means, with respect to any interest determination date relating to a CD rate note, the rate on the date for negotiable certificates of deposit having the index maturity designated in the applicable prospectus supplement as published by the Board of Governors of the Federal Reserve System in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the Board of Governors of the Federal Reserve System ("H.15(519)") under the heading "CDs (secondary market)," or any successor publication or, if not so published by 3:00 p.m., New York City time, on the calculation date pertaining to such interest determination date, the CD rate will be the rate on such interest determination date for negotiable certificates of deposit of the index maturity designated in the applicable prospectus supplement as published by the Federal Reserve Bank of New York in its daily update of H.15 available through the website of the Board of Governors of the Federal Reserve System at "*http://www.federalreserve.gov/ releases/h15/update*" ("H.15 daily update") or any successor site or publication of the Board of Governors under the heading "Certificates of Deposit." If such rate is not yet published in either H.15(519) or H.15 daily update by 3:00 p.m., New York City time, on the calculation date pertaining to an interest determination date, the calculation agent will calculate the CD rate on that interest determination date, which will be the arithmetic mean of the secondary market offered rates as of 10:00 a.m., New York City time, on that interest determination date, for negotiable certificates of deposit of major United States money market banks with a remaining maturity closest to the index maturity designated in the applicable prospectus supplement in an amount that is representative for a single transaction in that market at that time as quoted by three leading non-bank dealers in negotiable U.S. dollar certificates of deposit in The City of New York selected by the calculation agent (after consultation with us); provided, however, that if the dealers selected as aforesaid by the calculation agent are not quoting as set forth above, the CD rate with respect to such interest determination date will be the same as the CD rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest shall be the initial interest rate).

*Commercial Paper Rate Notes.*   Commercial Paper rate debt securities, which we refer to as Commercial Paper rate notes, will bear interest at the interest rate (calculated with reference to the Commercial Paper rate and the spread and/or spread multiplier, if any) specified in the Commercial Paper rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, "Commercial Paper rate" means, with respect to any interest determination date relating to a Commercial Paper rate note, the money market yield (as defined below) of the rate on that date for commercial paper having the index maturity designated in the applicable prospectus supplement, as published in H.15(519), under the heading "Commercial Paper—Non-financial." In the event that the rate is not published prior to 3:00 p.m., New York City time, on the calculation date pertaining to such interest determination date, then the Commercial Paper rate will be the money market yield of the rate on the interest determination date for commercial paper of the specified index maturity as published in H.15 daily update under the heading "Commercial Paper—Non-financial" (with an index maturity of one month or three months being deemed to be equivalent to an index maturity of 30 days or 90 days, respectively). If by 3:00 p.m., New York City time, on that calculation date, the rate is not yet available in either H.15(519) or H.15 daily update, the calculation agent will calculate the Commercial Paper rate on that interest determination date, which will be the money market yield corresponding to the arithmetic mean of the offered rates as of approximately 11:00 a.m., New York City time, on that interest determination date for commercial paper of the specified index maturity placed for a non-financial issuer whose bond rating is "AA" or the equivalent, from a nationally recognized rating

Exhibit 1

140

agency as quoted by three leading dealers of commercial paper in The City of New York selected by the calculation agent (after consultation with us); provided, however, that if the dealers selected as aforesaid by the calculation agent are not quoting offered rates as set forth above, the Commercial Paper rate with respect to such interest determination date will be the same as the Commercial Paper rate for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

"Money market yield" will be a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal, and "M" refers to the actual number of days in the period for which interest is being calculated.

*Federal Funds Rate Notes/Federal Funds Open Rate Notes.* Federal Funds rate debt securities, which we refer to as Federal Funds rate notes, will bear interest at the interest rate (calculated with reference to the Federal Funds rate and the spread and/or spread multiplier, if any) specified in the Federal Funds rate notes and in the applicable prospectus supplement. Federal Funds open rate debt securities, which we refer to as Federal Funds open rate notes, will bear interest at the interest rate (calculated with reference to the Federal Funds open rate and the spread and/or spread multiplier, if any) specified in the Federal Funds open rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, the "Federal Funds rate" means, with respect to any interest determination date relating to a Federal Funds rate note, the rate applicable to such date for Federal Funds opposite the caption "Federal funds (effective)," as displayed on Reuters on page 118 (or any page which may replace such page on such service) under the heading "EFFECT" on the business day immediately following such interest determination date. If such rate is not so published by 3:00 p.m., New York City time, on the business day immediately following such interest determination date, the Federal Funds rate will be the rate applicable to such interest determination date as published in H.15 daily update (or such other recognized electronic source used for the purpose of displaying such rate) under the heading "Federal Funds (effective)." If that rate is not published in H.15 daily update (or such other recognized electronic source used for the purpose of displaying such rate) by 4:15 p.m., New York City time, on the business day immediately following such interest determination date, the calculation agent will calculate the Federal Funds rate applicable to such interest determination date, which will be the arithmetic mean of the rates for the last transaction in overnight United States dollar Federal Funds as of 9:00 a.m., New York City time, on such interest determination date arranged by three leading brokers (which may include any underwriters, agents or their affiliates) of Federal Funds transactions in The City of New York selected by the calculation agent (after consultation with us); provided, however, that if the brokers selected as aforesaid by the calculation agent are not quoting as set forth above, the Federal Funds rate applicable to such interest determination date will be the same as the Federal Funds rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

Unless otherwise specified in the applicable prospectus supplement, the "Federal Funds open rate" means, with respect to any interest determination date relating to a Federal Funds open rate note, the rate for such day for federal funds transactions among members of the Federal Reserve System arranged by federal funds brokers on such day, as published under the heading "Federal Funds" opposite the caption "Open" as such rate is displayed on Reuters (or any successor service) on page 5 (or any page which may replace such page on such service) ("Reuters Page 5"). In the event that on any interest determination date no reported rate appears on Reuters Page 5 by 3:00 p.m., New York City time, the rate for the interest determination date will be the rate for that day displayed on

18

Exhibit 1
141

FFPREBON Index page on Bloomberg which is the Fed Funds Opening Rate as reported by Prebon Yamane (or any successor) on Bloomberg. In the event that on any interest determination date no reported rate appears on Reuters Page 5 or the FFPREBON Index page on Bloomberg or another recognized electronic source by 3 p.m., New York City time, the interest rate applicable to the next interest reset period will be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar Federal Funds prior to 9:00 a.m., New York City time, on such interest determination date arranged by three leading brokers (which may include any underwriters, agents or their affiliates) of Federal Funds transactions in New York City selected by the calculation agent (after consultation with us); provided, however, that if the brokers selected by the calculation agent are not quoting as set forth above, the Federal Funds open rate with respect to such interest determination date will be the same as the Federal Funds open rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate). Notwithstanding the foregoing, the Federal Funds open rate in effect for any day that is not a business day shall be the Federal Funds open rate in effect for the prior business day.

*LIBOR Notes.*   LIBOR debt securities, which we refer to as LIBOR notes, will bear interest at the interest rate (calculated with reference to LIBOR and the spread and/or spread multiplier, if any) specified in the LIBOR notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, the calculation agent will determine "LIBOR" for each interest reset date as follows:

- With respect to an interest determination date relating to a LIBOR note, LIBOR will be the offered rate for deposits in the London interbank market in the index currency (as defined below) having the index maturity designated in the applicable prospectus supplement commencing on the second London business day immediately following such interest determination date that appears on the Designated LIBOR Page (as defined below) or a successor reporter of such rates selected by the calculation agent and acceptable to us, as of 11:00 a.m., London time, on such interest determination date (the "reported rate"). If no rate appears on the Designated LIBOR Page, LIBOR in respect of such interest determination date will be determined as if the parties had specified the rate described in the following paragraph.

- With respect to an interest determination date relating to a LIBOR note to which the last sentence of the previous paragraph applies, the calculation agent will request the principal London offices of each of four major reference banks (which may include any underwriters, agents or their affiliates) in the London interbank market selected by the calculation agent (after consultation with us) to provide the calculation agent with its offered quotation for deposits in the index currency for the period of the index maturity designated in the applicable prospectus supplement commencing on the second London business day immediately following such interest determination date to prime banks in the London interbank market at approximately 11:00 a.m., London time, on such interest determination date and in a principal amount that is representative for a single transaction in such index currency in such market at such time. If at least two such quotations are provided, LIBOR determined on such interest determination date will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR determined on such interest determination date will be the arithmetic mean of the rates quoted at approximately 11:00 a.m. (or such other time specified in the applicable prospectus supplement), in the principal financial center of the country of the specified index currency, on that interest determination date for loans made in the index currency to leading European banks having the index maturity designated in the applicable prospectus supplement commencing on the second London business day immediately following such interest determination date and in a principal amount that is representative for a single transaction in that index currency in that market at such time by three major reference banks (which may include any underwriters, agents or their affiliates) in such principal financial center selected by the calculation agent (after consultation with us); provided, however, that if fewer than three reference banks so selected by

19

Exhibit 1
142

the calculation agent are quoting such rates as mentioned in this sentence, LIBOR with respect to such interest determination date will be the same as LIBOR in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

"Index currency" means the currency (including currency units and composite currencies) specified in the applicable prospectus supplement as the currency with respect to which LIBOR will be calculated. If no currency is specified in the applicable prospectus supplement, the index currency will be U.S. dollars.

"Designated LIBOR Page" means the display on page LIBOR01 (or any other page specified in the applicable prospectus supplement) of Reuters (or any successor service) for the purpose of displaying the London interbank offered rates of major banks for the applicable index currency (or such other page as may replace that page on that service for the purpose of displaying such rates).

*Prime Rate Notes.*   Prime rate debt securities, which we refer to as Prime rate notes, will bear interest at the interest rate (calculated with reference to the Prime rate and the spread and/or spread multiplier, if any) specified in the Prime rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, "Prime rate" means, with respect to any interest determination date, the rate set forth in H.15(519) for that date opposite the caption "Bank Prime Loan" or, if not published by 3:00 p.m., New York City time, on the calculation date, the rate on such interest determination date as published in H.15 daily update under the caption "Bank Prime Loan." If that rate is not yet published by 3:00 p.m., New York City time, on the calculation date pertaining to that interest determination date, the Prime rate for that interest determination date will be the arithmetic mean of the rates of interest publicly announced by each bank named on the Reuters Screen USPRIME1 Page (as defined below) as that bank's prime rate or base lending rate as in effect as of 11:00 a.m., New York City time, for that interest determination date as quoted on the Reuters Screen USPRIME1 Page on that interest determination date, or, if fewer than four of these rates appear on the Reuters Screen USPRIME1 Page for that interest determination date, the rate will be the arithmetic mean of the prime rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on that interest determination date by at least two of the three major money center banks in The City of New York selected by the calculation agent (after consultation with us) from which quotations are requested. If fewer than two quotations are provided, the calculation agent will calculate the Prime rate, which will be the arithmetic mean of the prime rates in The City of New York quoted by the appropriate number of substitute banks or trust companies organized and doing business under the laws of the United States, or any State thereof, in each case having total equity capital of at least $500 million and being subject to supervision or examination by federal or state authority, selected by the calculation agent (after consultation with us) to quote prime rates. "Reuters Screen USPRIME1 Page" means the display designated as the "USPRIME1" page on Reuters (or such other page as may replace the USPRIME1 Page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

*Treasury Rate Notes.*   Treasury rate debt securities, which we refer to as Treasury rate notes, will bear interest at the interest rate (calculated with reference to the Treasury rate and the spread and/or spread multiplier, if any) specified in the Treasury rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, the "Treasury rate" means, with respect to any interest determination date relating to a Treasury rate note, the rate from the auction held on such interest determination date, which we refer to as the "auction," of direct obligations of the United States, which we refer to as Treasury bills, having the index maturity designated in the applicable prospectus supplement under the caption "INVESTMENT RATE" on the display on Reuters (or any successor service) on page USAUCTION10 (or any other page as may replace such page on such service) or page USAUCTION11 (or any other page as may replace such page on such service) or, if not so published by 3:00 p.m., New York City time, on the calculation date

20

Exhibit 1

143

pertaining to such interest determination date, the bond equivalent yield (as defined below) of the rate for such Treasury bills as published in H.15 daily update, or such other recognized electronic source used for the purpose of displaying such rate, under the caption "U.S. Government Securities/Treasury Bills/Auction High" or, if not so published by 3:00 p.m., New York City time, on the related calculation date, the bond equivalent yield of the auction rate of such Treasury bills as announced by the U.S. Department of the Treasury. In the event that the auction rate of Treasury bills having the index maturity designated in the applicable prospectus supplement is not so announced by the U.S. Department of the Treasury, or if no such auction is held, then the Treasury rate will be the bond equivalent yield of the rate on that interest determination date of Treasury bills having the index maturity designated in the applicable prospectus supplement as published in H.15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market" or, if not published by 3:00 p.m., New York City time, on the related calculation date, the rate on that interest determination date of such Treasury bills as published in H.15 daily update, or such other recognized electronic source used for the purpose of displaying such rate, under the caption "U.S. Government Securities/Treasury Bills/Secondary Market." In the event such rate is not published in H.15(519), H.15 daily update or another recognized electronic source by 3:00 p.m., New York City time, on such calculation date, the calculation agent will calculate the Treasury rate, which will be a bond equivalent yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m., New York City time, on such interest determination date, of three leading primary U.S. government securities dealers (which may include Credit Suisse Securities (USA) LLC) selected by the calculation agent (after consultation with us) for the issue of Treasury bills with a remaining maturity closest to the index maturity designated in the applicable prospectus supplement; provided, however, that if the dealers selected by the calculation agent are not quoting bid rates as mentioned in this sentence, the Treasury rate with respect to the interest determination date will be the same as the Treasury rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

The term "bond equivalent yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond equivalent yield} = \frac{D \times N \times 100}{360 - (D \times M)}$$

where "D" refers to the applicable per annum rate for Treasury bills quoted on a bank discount basis, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable interest reset period.

**Indexed Notes**

A series of debt securities also may be issued with the principal amount payable at maturity or interest to be paid on such series of debt securities, or both, to be determined with reference to the price or prices of specified commodities, stocks or indices, the exchange rate of a specified currency relative to one or more other currencies, currency units, composite currencies or units of account specified in an applicable prospectus supplement, or such other price or exchange rate as may be specified in such series of debt securities, as set forth in an applicable prospectus supplement relating to such series of debt securities ("indexed notes"). In certain cases, holders of indexed notes may receive a principal amount on the maturity date that is greater than or less than the face amount of the indexed notes, or an interest rate that is greater than or less than the stated interest rate on the indexed notes, or both, depending upon the structure of the indexed note and the relative value on the maturity date or at the relevant interest payment date, as the case may be, of the specified indexed item. However, the amount of interest or principal payable with respect to an indexed note will not be less than zero. Information as to the method for determining the principal amount payable on the maturity date, the manner of determining the interest rate, certain historical information with respect

21

Exhibit 1
144

to the specified indexed item and tax considerations associated with an investment in indexed notes will be set forth in the applicable prospectus supplement.

An investment in indexed notes may be much riskier than a similar investment in conventional fixed-rate debt securities. If the interest rate of an indexed note is indexed, it may result in an interest rate that is less than that payable on conventional fixed-rate debt securities issued by us at the same time, including the possibility that no interest will be paid. If the principal amount of an indexed note is indexed, the principal amount payable at maturity may be less than the original purchase price of such indexed note, including the possibility that no principal will be paid, resulting in an entire loss of investment. Additionally, if the formula used to determine the principal amount or interest payable with respect to such indexed notes contains a multiple or leverage factor, the effect of any change in the applicable currency, commodity, stock or interest rate index may be increased. We refer you to "Foreign Currency Risks."

**Dual Currency Notes**

Dual currency debt securities, which we refer to as dual currency notes, are any series of debt securities as to which we have a one-time option, exercisable on a specified date in whole, but not in part, with respect to all dual currency notes issued on the same day and having the same terms, of making all payments of principal, premium, if any, and interest after the exercise of such option, whether at maturity or otherwise (which payments would otherwise be made in the face amount currency of such series of debt securities specified in the applicable prospectus supplement), in the optional payment currency specified in the applicable prospectus supplement. The terms of the dual currency notes together with information as to the relative value of the face amount currency compared to the optional payment currency and as to tax considerations associated with an investment in dual currency notes will also be set forth in the applicable prospectus supplement.

If we elect on any option election date specified in the applicable prospectus supplement to pay in the optional payment currency instead of the face amount currency, payments of interest, premium, if any, and principal made after such option election date may be worth less, at the then current exchange rate, than if we had made such payments in the face amount currency. We refer you to "Foreign Currency Risks."

**Renewable Notes**

The relevant issuer may also issue from time to time variable rate renewable debt securities, which we refer to as renewable notes, which will mature on an interest payment date specified in the applicable prospectus supplement unless the maturity of all or a portion of the principal amount of the renewable notes is extended in accordance with the procedures set forth in the applicable prospectus supplement.

**Short-Term Notes**

The relevant issuer may offer from time to time series of debt securities with maturities of less than one year, which we refer to as short-term notes. Unless otherwise indicated in the applicable prospectus supplement, interest on short-term notes will be payable at maturity. Unless otherwise indicated in the applicable prospectus supplement, interest on short-term notes that are floating rate notes (other than Treasury rate notes) will be computed on the basis of the actual number of days elapsed divided by 360, and interest on short-term notes that are Treasury rate notes will be computed on the basis of the actual number of days elapsed divided by a year of 365 or 366 days, as the case may be.

**Extension of Maturity**

The applicable prospectus supplement will indicate whether the relevant issuer has the option to extend the maturity of a series of debt securities (other than an amortizing note) for one or more periods up to but not beyond the final maturity date set forth in the applicable prospectus supplement.

Exhibit 1
145

If the relevant issuer has that option with respect to any series of debt securities (other than an amortizing note), we will describe the procedures in the applicable prospectus supplement.

**Amortizing Notes**

Amortizing debt securities, which we refer to as amortizing notes, are a series of debt securities for which payments combining principal and interest are made in installments over the life of such series of debt securities. Payments with respect to amortizing notes will be applied first to interest due and payable on the amortizing notes and then to the reduction of the unpaid principal amount of the amortizing notes. The relevant issuer will provide further information on the additional terms and conditions of any issue of amortizing notes in the applicable prospectus supplement. A table setting forth repayment information in respect of each amortizing note will be included in the applicable prospectus supplement and set forth on the amortizing notes.

**Original Issue Discount Notes**

The relevant issuer may offer series of debt securities, which we refer to as original issue discount notes, from time to time at an issue price (as specified in the applicable prospectus supplement) that is less than 100% of the principal amount of such series of debt securities (i.e., par). Original issue discount notes may not bear any interest currently or may bear interest at a rate that is below market rates at the time of issuance. The difference between the issue price of an original issue discount note and par is referred to herein as the "discount." In the event of redemption, repayment or acceleration of maturity of an original issue discount note, the amount payable to the holder of an original issue discount note will be equal to the sum of (a) the issue price (increased by any accruals of discount) and, in the event of any redemption by us of such original issue discount note (if applicable), multiplied by the initial redemption percentage specified in the applicable prospectus supplement (as adjusted by the initial redemption percentage reduction, if applicable) and (b) any unpaid interest on such original issue discount note accrued from the date of issue to the date of such redemption, repayment or acceleration of maturity.

Unless otherwise specified in the applicable prospectus supplement, for purposes of determining the amount of discount that has accrued as of any date on which a redemption, repayment or acceleration of maturity occurs for an original issue discount note, the discount will be accrued using a constant yield method. The constant yield will be calculated using a 30-day month, 360-day year convention, a compounding period that, except for the initial period (as defined below), corresponds to the shortest period between interest payment dates for the applicable original issue discount note (with ratable accruals within a compounding period), a coupon rate equal to the initial coupon rate applicable to such original issue discount note and an assumption that the maturity of such original issue discount note will not be accelerated. If the period from the date of issue to the initial interest payment date, or the initial period, for an original issue discount note is shorter than the compounding period for such original issue discount note, a proportionate amount of the yield for an entire compounding period will be accrued. If the initial period is longer than the compounding period, then such period will be divided into a regular compounding period and a short period with the short period being treated as provided in the preceding sentence. The accrual of the applicable discount may differ from the accrual of original issue discount for purposes of the Internal Revenue Code of 1986, as amended.

Certain original issue discount notes may not be treated as having original issue discount for federal income tax purposes, and debt securities other than original issue discount notes may be treated as issued with original issue discount for federal income tax purposes. We refer you to "Taxation—United States Taxation."

**Redemption at the Option of the Relevant Issuer**

Unless otherwise provided in the applicable prospectus supplement, the relevant issuer cannot redeem debt securities prior to maturity. The relevant issuer may redeem a series of debt securities at

Exhibit 1

146

its option prior to the maturity date only if an initial redemption date is specified in the applicable prospectus supplement. If so specified, the relevant issuer can redeem the debt securities of such series at its option on any date on and after the applicable initial redemption date in whole or from time to time in part in increments of $2,000 or such other minimum denomination specified in such applicable prospectus supplement (provided that any remaining principal amount of the debt securities of such series will be at least $2,000 or such other minimum denomination), at the applicable redemption price, together with unpaid interest accrued to the date of redemption, on notice given not more than 60 nor less than 30 calendar days prior to the date of redemption and in accordance with the provisions of the indenture. By redemption price for a debt security of a series, we mean an amount equal to the initial redemption percentage specified in the applicable prospectus supplement (as adjusted by the annual redemption percentage reduction specified in the applicable prospectus supplement, if any) multiplied by the unpaid principal amount of the debt security to be redeemed. The initial redemption percentage, if any, applicable to a series of debt securities may decline on each anniversary of the initial redemption date by an amount equal to the applicable annual redemption percentage reduction, if any, until the redemption price is equal to 100% of the unpaid principal amount to be redeemed. The redemption price of original issue discount notes is described above under "—Original Issue Discount Notes."

Foreign currency denominated debt securities may be subject to different restrictions on redemption. We refer you to "Special Provisions Relating to Foreign Currency Denominated Debt Securities—Minimum Denominations, Restrictions on Maturities, Repayment and Redemption."

**Repayment at the Option of the Holders; Repurchase**

Holders may require the relevant issuer to repay a series of debt securities prior to maturity only if one or more optional repayment dates are specified in the applicable prospectus supplement. If so specified, the relevant issuer will repay debt securities of such series at the option of the holders on any optional repayment date in whole or in part from time to time in increments of $2,000 or such other minimum denomination specified in the applicable prospectus supplement (provided that any remaining principal amount thereof will be at least $2,000 or such other minimum denomination specified in the applicable prospectus supplement), at a repayment price equal to 100% of the unpaid principal amount to be repaid, together with unpaid interest accrued to the date of repayment. A holder who wants the relevant issuer to repay a debt security prior to maturity must deliver the debt security, together with the form "Option to Elect Repayment" properly completed, to the trustee at its corporate trust office (or any other address that the relevant issuer specifies in the applicable prospectus supplement or notifies holders from time to time) no more than 60 nor less than 30 calendar days prior to the date of repayment. Exercise of a repayment option by the holder will be irrevocable. The repayment price of original issue discount notes is described above under "—Original Issue Discount Notes." Notwithstanding the foregoing, the relevant issuer will comply with Section 14(e) under the Exchange Act to the extent applicable, and any other tender offer rules under the Exchange Act which may then be applicable, in connection with any obligation to repurchase a series of debt securities.

Only the depositary may exercise the repayment option in respect of global securities representing book-entry debt securities. Accordingly, beneficial owners of global securities that desire to have all or any portion of book-entry debt securities represented by global securities repaid must direct the participant of the depositary through which they own their interest to direct the depositary to exercise the repayment option on their behalf by delivering the related global security and duly completed election form to the trustee as aforesaid. In order to ensure that the global security and election form are received by the trustee on a particular day, the applicable beneficial owner must so direct the participant through which it owns its interest before that participant's deadline for accepting instructions for that day. Different firms may have different deadlines for accepting instructions from their customers. Accordingly, beneficial owners should consult the participants through which they own their interest for the respective deadlines of those participants. All instructions given to participants from beneficial owners of global securities relating to the option to elect repayment will be irrevocable. In addition, at the time instructions are given by a beneficial owner, the beneficial owner must cause the participant through which it owns its interest to transfer that beneficial owner's interest in the global security or securities representing the related book-entry debt securities, on the depositary's records, to the trustee. We refer you to "—Book-Entry System."

Exhibit 1
147

Foreign currency denominated debt securities may be subject to different restrictions on repayment. We refer you to "Special Provisions Relating to Foreign Currency Denominated Debt Securities—Minimum Denominations, Restrictions on Maturities, Repayment and Redemption."

The relevant issuer may at any time purchase debt securities at any price in the open market or otherwise. Such debt securities purchased by the relevant issuer may, at its discretion, be held, resold or surrendered to the trustee for cancellation.

**Tax Redemption**

If specifically provided by the applicable prospectus supplement, the relevant issuer may redeem a series of debt securities at its option at any time, in whole but not in part, on giving not less than 30 nor more than 60 days' notice, at the principal amount of such series of debt securities being redeemed, together with accrued interest to the date of redemption, if it has or will (or the guarantor would, if required to pay under the guarantee) become obligated to pay additional interest on such series of debt securities as described under "—Payment of Additional Amounts" below as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of the United States, Switzerland, or Guernsey, as applicable, or any political subdivision or taxing authority thereof or therein, or any change in the application or official interpretation of such laws, regulations or rulings, which change or amendment becomes effective on or after the date of the applicable prospectus supplement, and such obligation cannot be avoided by the relevant issuer (or the guarantor, as the case may be) taking reasonable measures available to it, provided that no such notice of redemption will be given earlier than 90 days prior to the earliest date on which it would be obliged to pay such additional interest were a payment in respect of the debt securities of such series (or the guarantee thereof, as the case may be) then due. Prior to the giving of any notice of redemption pursuant to this paragraph, the relevant issuer or the guarantor (as applicable) will deliver to the trustee a certificate stating that it is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to its right to redeem have occurred, and an opinion of independent counsel of recognized standing to the effect that the relevant issuer (or the guarantor, as the case may be) has or will become obligated to pay such additional interest as a result of such change or amendment.

**Payment of Additional Amounts**

If specifically provided by the applicable prospectus supplement, the relevant issuer (or the guarantor, as the case may be) will, subject to the exceptions and limitations set forth below, pay such additional amounts to the holder of a series of debt securities that is a non-U.S. holder (which we define under the heading "Taxation—United States Taxation") as may be necessary so that every net payment on such series of debt securities (including amounts paid by the guarantor), after deduction or withholding for or on account of any present or future tax, assessment or other governmental charge imposed upon or as a result of such payment by the United States, Switzerland or Guernsey, as applicable, or any political subdivision or taxing authority thereof or therein, will not be less than the amount provided in such series of debt securities to be then due and payable.

*Switzerland*

If the relevant issuer is a company or finance subsidiary other than Credit Suisse Group or Credit Suisse, or if the relevant issuer is Credit Suisse Group or Credit Suisse acting through a branch outside Switzerland, or if the guarantor is Credit Suisse Group and, in each case, the net proceeds from the issue of the debt securities are used outside Switzerland, all payments of principal and interest in respect of the debt securities (including amounts paid by the guarantor) shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within Switzerland or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In that event, the relevant issuer (or the guarantor, as the case may be) shall pay such additional amounts as will result in receipt by the holders of such amounts as would have been received by them

25

Exhibit 1
148

had no such withholding or deduction been required, except that no such additional amounts shall be payable by the relevant issuer or the guarantor to any such holder for or on account of:

(i) any such taxes, duties, assessments or other governmental charges imposed in respect of such debt security by reason of the holder having some connection with Switzerland other than the mere holding of the debt security;

(ii) any such taxes, duties, assessments or other governmental charges imposed in respect of any debt security presented for payment more than 30 days after the Relevant Date (as defined below) except to the extent that the holder would have been entitled to such additional amounts on presenting such debt security for payment on the last day of such period of 30 days;

(iii) any such taxes, duties, assessments or other governmental charges where such withholding or deduction (i) is required to be made pursuant to the European Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income (the "EU Savings Tax Directive") or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, such EU Savings Tax Directive, or (ii) is required to be made pursuant to the Agreement between the European Community and the Confederation of Switzerland dated as of October 26, 2004 providing for measures equivalent to those laid down in the EU Savings Tax Directive or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, such agreement; or

(iv) any combination of two or more items (i) through (iii) above.

"Relevant Date" as used herein means whichever is the later of (x) the date on which such payment first becomes due and (y) if the full amount payable has not been received by the trustee on or prior to such date, the date on which the full amount having been so received, notice to that effect shall have been given to the holders.

### United States

If the relevant issuer is a U.S. entity, it will not be required to make any such payment of additional amounts for or on account of:

• any tax, assessment or other governmental charge that would not have been imposed but for (a) the existence of any present or former connection between such holder and the United States, including, without limitation, such holder being or having been a citizen or resident thereof or being or having been engaged in trade or business or present therein or having or having had a permanent establishment therein or (b) such holder's past or present status as a personal holding company, foreign personal holding company or private foundation or other tax-exempt organization with respect to the United States or as a corporation that accumulates earnings to avoid U.S. federal income tax;

• any estate, inheritance, gift, sales, transfer or personal property tax or any similar tax, assessment or other governmental charge;

• any tax, assessment or other governmental charge that would not have been imposed but for the presentation by the holder of a debt security for payment more than 15 days after the date on which such payment became due and payable or on which payment thereof was duly provided for, whichever occurs later;

• any tax, assessment or other governmental charge that is payable otherwise than by deduction or withholding from a payment on such series of debt securities;

• any tax, assessment or other governmental charge required to be deducted or withheld by any paying agent from a payment on such series of debt securities, if such payment can be made without such deduction or withholding by any other paying agent;

• any tax, assessment or other governmental charge that would not have been imposed but for a failure to comply with any applicable certification, documentation, information or other

26

Exhibit 1
149

reporting requirement concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of such series of debt securities if, without regard to any tax treaty, such compliance is required by statute or regulation of the United States as a precondition to relief or exemption from such tax, assessment or other governmental charge;

- any tax, assessment or other governmental charge imposed on a holder of such series of debt securities that actually or constructively owns 10 percent or more of the combined voting power of all classes of the relevant issuer's stock or that is a controlled foreign corporation related to the relevant issuer through stock ownership; or

- as discussed in "Taxation—European Union Directive on Taxation of Certain Interest Payments," any withholding or deduction that is imposed on a payment to an individual and is required to be made pursuant to any European Union Directive on the taxation of savings income implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 (including Directive 2003/48/EC adopted by the Council of the European Union on June 3, 2003), or any law implementing or complying with, or introduced in order to conform to, such directive;

nor will such additional amounts be paid with respect to a payment on such series of debt securities to a holder that is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of such series of debt securities.

### *Guernsey*

If the relevant issuer is a Guernsey entity, no such additional amounts will be payable:

- to the extent the withholding or deduction is imposed or levied because the holder of the debt security has some connection with the relevant jurisdiction other than merely being a holder of the debt security;

- to the extent the withholding or deduction is imposed or levied because the holder (or beneficial owner) of the debt security has not made a declaration of non-residence or other claim for exemption, if such holder is able to avoid such deduction or withholding by making such a declaration or claim;

- more than 30 days after the date on which the related payments on the debt security becomes due, except to the extent that the holder of the debt security would have been entitled to such additional amounts on the thirtieth such day;

- to the extent of any such taxes, duties, assessments or other governmental charges where such withholding or deduction is required to be made pursuant to agreements between Guernsey and the EU Member States dated November 19, 2004 (the "Guernsey Savings Tax Agreements"), the Foreign Tax (Retention Arrangements) (Guernsey and Alderney) Law, 2005 and Foreign Tax (Retention Arrangements) (Guernsey and Alderney) Ordinance, 2005 which provide for measures equivalent to those laid down in the EU Savings Tax Directive or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, such Guernsey Savings Tax Agreements; or

- to a holder who would have been able to avoid such withholding or deduction by receiving such payment through another paying agent in a member state of the European Union.

### Credit Suisse Group Guarantees

Debt securities issued by a finance subsidiary will be fully and unconditionally guaranteed by Credit Suisse Group or a branch of Credit Suisse Group. If, for any reason, the relevant finance subsidiary does not make any required payment in respect of its debt securities when due, whether on the normal due date, on acceleration, redemption or otherwise, Credit Suisse Group will cause the

Exhibit 1
150

payment to be made to or to the order of the trustee. Such guarantees by Credit Suisse Group will be on a senior basis, to the extent they guarantee senior debt securities of the relevant finance subsidiary, and on a subordinated basis, to the extent they guarantee subordinated debt securities of the relevant finance subsidiary. The extent of subordination will be as set forth under "—Subordination" below or in the applicable prospectus supplement. The holder of a guaranteed debt security will be entitled to payment under the relevant guarantee of Credit Suisse Group without taking any action whatsoever against the relevant finance subsidiary.

**Payment and Transfer**

The debt securities will be issued only as registered securities, which means that the name of the holder will be entered in a register that will be kept by the trustee or another agent appointed by the relevant issuer. Unless stated otherwise in a prospectus supplement, and except as described under "—Book-Entry System" below, principal and interest payments will be made at the office of the paying agent or agents named in the prospectus supplement or by check mailed to you at your address as it appears in the register.

Unless other procedures are described in a prospectus supplement, and except as described under "—Book-Entry System" below, you will be able to transfer registered debt securities at the office of the transfer agent or agents named in the prospectus supplement. You may also exchange registered debt securities at the office of the transfer agent for an equal aggregate principal amount of registered debt securities of the same series having the same maturity date, interest rate and other terms as long as the debt securities are issued in authorized denominations.

Neither the relevant issuer nor the trustee will impose any service charge for any transfer or exchange of a debt security. The relevant issuer may, however, ask you to pay any taxes or other governmental charges in connection with a transfer or exchange of debt securities.

**Book-Entry System**

Debt securities may be issued under a book-entry system in the form of one or more global securities. The global securities will be registered in the name of a depositary or its nominee and deposited with that depositary or its custodian. Unless stated otherwise in the prospectus supplement, The Depository Trust Company, New York, New York, or DTC, will be the depositary if a depositary is used.

Following the issuance of a global security in registered form, the depositary will credit the accounts of its participants with the debt securities upon the relevant issuer's instructions. Only persons who hold directly or indirectly through financial institutions that are participants in the depositary can hold beneficial interests in the global securities. Since the laws of some jurisdictions require certain types of purchasers to take physical delivery of such securities in definitive form, you may encounter difficulties in your ability to own, transfer or pledge beneficial interests in a global security.

So long as the depositary or its nominee is the registered owner of a global security, the relevant issuer, the guarantor (if any) and the trustee will treat the depositary as the sole owner or holder of the debt securities for purposes of the applicable indenture. Therefore, except as set forth below, you will not be entitled to have debt securities registered in your name or to receive physical delivery of certificates representing the debt securities. Accordingly, you will have to rely on the procedures of the depositary and the participant in the depositary through whom you hold your beneficial interest in order to exercise any rights of a holder under the indenture. We understand that under existing practices, the depositary would act upon the instructions of a participant or authorize that participant to take any action that a holder is entitled to take.

Unless stated otherwise in an applicable prospectus supplement, you may elect to hold interests in the global securities through either DTC (in the United States) or Clearstream Banking, société anonyme, which we refer to as Clearstream, Luxembourg, or Euroclear Bank, S.A./N.V., or its successor, as operator of the Euroclear System, which we refer to as Euroclear (outside of the United States), if you are participants of such systems, or indirectly through organizations which are

28

Exhibit 1
151

participants in such systems. Interests held through Clearstream, Luxembourg and Euroclear will be recorded on DTC's books as being held by the U.S. depositary for each of Clearstream, Luxembourg and Euroclear, which U.S. depositaries will in turn hold interests on behalf of their participants' customers' securities accounts.

As long as the debt securities of a series are represented by the global securities, the relevant issuer will pay principal of and interest and premium on those securities to or as directed by DTC as the registered holder of the global securities. Payments to DTC will be in immediately available funds by wire transfer. DTC, Clearstream, Luxembourg or Euroclear, as applicable, will credit the relevant accounts of their participants on the applicable date. Neither the relevant issuer nor the trustee will be responsible for making any payments to participants or customers of participants or for maintaining any records relating to the holdings of participants and their customers, and you will have to rely on the procedures of the depositary and its participants. If an issue of debt securities is denominated in a currency other than the U.S. dollar, the relevant issuer will make payments of principal and any interest in the foreign currency in which the debt securities are denominated or in U.S. dollars. DTC has elected to have all payments of principal and interest paid in U.S. dollars unless notified by any of its participants through which an interest in the debt securities is held that it elects, in accordance with, and to the extent permitted by, the applicable supplement and the relevant debt security, to receive payment of principal or interest in the foreign currency. On or prior to the third business day after the record date for payment of interest and 12 days prior to the date for payment of principal, a participant will be required to notify DTC of (a) its election to receive all, or the specified portion, of payment in the foreign currency and (b) its instructions for wire transfer of payment to a foreign currency account.

DTC, Clearstream, Luxembourg and Euroclear have, respectively, advised us as follows:

- *As to DTC:* DTC has advised us that it is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities deposited with it by its participants and facilitates the settlement of transactions among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations, some of whom (and/or their representatives) own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

  According to DTC, the foregoing information with respect to DTC has been provided to the financial community for informational purposes only and is not intended to serve as a representation, warranty or contract modification of any kind.

- *As to Clearstream, Luxembourg:* Clearstream, Luxembourg has advised us that it was incorporated as a limited liability company under Luxembourg law. Clearstream, Luxembourg is owned by Cedel International, société anonyme, and Deutsche Börse AG. The shareholders of these two entities are banks, securities dealers and financial institutions.

  Clearstream, Luxembourg holds securities for its customers and facilitates the clearance and settlement of securities transactions between Clearstream, Luxembourg customers through electronic book-entry changes in accounts of Clearstream, Luxembourg customers, thus eliminating the need for physical movement of certificates. Transactions may be settled by Clearstream, Luxembourg in many currencies, including United States dollars. Clearstream, Luxembourg provides to its customers, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities, securities lending

29

Exhibit 1

152

and borrowing. Clearstream, Luxembourg also deals with domestic securities markets in over 30 countries through established depository and custodial relationships. Clearstream, Luxembourg interfaces with domestic markets in a number of countries. Clearstream, Luxembourg has established an electronic bridge with Euroclear Bank S.A./N.V., the operator of Euroclear, or the Euroclear operator, to facilitate settlement of trades between Clearstream, Luxembourg and Euroclear.

As a registered bank in Luxembourg, Clearstream, Luxembourg is subject to regulation by the Luxembourg Commission for the Supervision of the Financial Sector. Clearstream, Luxembourg customers are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. In the United States, Clearstream, Luxembourg customers are limited to securities brokers and dealers and banks, and may include any underwriters or agents for the debt securities. Other institutions that maintain a custodial relationship with a Clearstream, Luxembourg customer may obtain indirect access to Clearstream, Luxembourg. Clearstream, Luxembourg is an indirect participant in DTC.

Distributions with respect to the debt securities held beneficially through Clearstream, Luxembourg will be credited to cash accounts of Clearstream, Luxembourg customers in accordance with its rules and procedures, to the extent received by Clearstream, Luxembourg.

- *As to Euroclear:* Euroclear has advised us that it was created in 1968 to hold securities for participants of Euroclear and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thus eliminating the need for physical movement of certificates and risk from lack of simultaneous transfers of securities and cash. Transactions may now be settled in many currencies, including United States dollars and Japanese Yen. Euroclear provides various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described below.

Euroclear is operated by the Euroclear operator, under contract with Euroclear plc, a U.K. corporation. The Euroclear operator conducts all operations, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear operator, not Euroclear plc. Euroclear plc establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries and may include any underwriters for the debt securities. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly. Euroclear is an indirect participant in DTC.

The Euroclear operator is a Belgian bank. The Belgian Banking Commission and the National Bank of Belgium regulate and examine the Euroclear operator.

The Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, or the Euroclear Terms and Conditions, and applicable Belgian law govern securities clearance accounts and cash accounts with the Euroclear operator. Specifically, these terms and conditions govern:

- transfers of securities and cash within Euroclear;
- withdrawal of securities and cash from Euroclear; and
- receipt of payments with respect to securities in Euroclear.

All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear operator acts under the terms and conditions only on behalf of Euroclear participants and has no record of or relationship with persons holding securities through Euroclear participants.

30

Exhibit 1
153

Distributions with respect to debt securities held beneficially through Euroclear will be credited to the cash accounts of Euroclear participants in accordance with the Euroclear Terms and Conditions, to the extent received by the Euroclear operator.

Global certificates generally are not transferable. Physical certificates will be issued to beneficial owners of a global security if:

- the depositary notifies the relevant issuer that it is unwilling or unable to continue as depositary and the relevant issuer does not appoint a successor within 90 days;

- the depositary ceases to be a clearing agency registered under the Exchange Act and the relevant issuer does not appoint a successor within 90 days;

- the relevant issuer decides in its sole discretion (subject to the procedures of the depositary) that it does not want to have the debt securities of that series represented by global certificates; or

- in the case of a global security representing debt securities issued under an indenture, if an event of default has occurred with regard to those debt securities and has not been cured or waived.

If any of the events described in the preceding paragraph occurs, the relevant issuer will issue definitive securities in certificated form in an amount equal to a holder's beneficial interest in the securities. Unless otherwise specified in the applicable prospectus supplement, definitive securities will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof, and will be registered in the name of the person DTC specifies in a written instruction to the registrar of the debt securities.

In the event definitive securities are issued:

- holders of definitive securities will be able to receive payments of principal and interest on their debt securities at the office of the relevant issuer's paying agent maintained in the Borough of Manhattan;

- holders of definitive securities will be able to transfer their debt securities, in whole or in part, by surrendering the debt securities for registration of transfer at the office of The Bank of New York Mellon, formerly known as The Bank of New York, the trustee under the indentures. The relevant issuer will not charge any fee for the registration or transfer or exchange, except that it may require the payment of a sum sufficient to cover any applicable tax or other governmental charge payable in connection with the transfer; and

- any moneys the relevant issuer pays to its paying agents for the payment of principal and interest on the debt securities which remains unclaimed at the second anniversary of the date such payment was due will be returned to the relevant issuer, and thereafter holders of definitive securities may look only to the relevant issuer, as general unsecured creditors, for payment.

**Global Clearance and Settlement Procedures**

You will be required to make your initial payment for the debt securities in immediately available funds. Secondary market trading between DTC participants will occur in the ordinary way in accordance with DTC rules and will be settled in immediately available funds using DTC's Same-Day Funds Settlement System, or any successor thereto. Secondary market trading between Clearstream, Luxembourg customers and/or Euroclear participants will occur in the ordinary way in accordance with the applicable rules and operating procedures of Clearstream, Luxembourg and Euroclear and will be settled using the procedures applicable to conventional eurobonds in immediately available funds.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream, Luxembourg customers or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by a U.S. depositary; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established

31

Exhibit 1
154

deadlines (based on European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the U.S. depositary to take action to effect final settlement on its behalf by delivering or receiving debt securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Clearstream, Luxembourg customers and Euroclear participants may not deliver instructions directly to their respective U.S. depositaries.

Because of time-zone differences, credits of debt securities received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions in such debt securities settled during such processing will be reported to the relevant Clearstream, Luxembourg customers or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of debt securities by or through a Clearstream, Luxembourg customer or a Euroclear participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

Although DTC, Clearstream, Luxembourg and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of debt securities among participants of DTC, Clearstream, Luxembourg and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

**Subordination**

The discussion of subordination in this section applies only to the subordinated debt securities of Credit Suisse Group and Credit Suisse and the subordinated debt securities of the finance companies and related subordinated guarantee of Credit Suisse Group. If Credit Suisse issues capital securities or subordinated debt securities that qualify as Tier 1 capital or other capital for regulatory purposes, the subordination provisions may vary from those described below as set forth in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, when the term "senior indebtedness" is used in the context of the subordinated debt securities or the subordinated guarantee (if any), it means, with respect to an issuer or the guarantor (if any):

- any money such entity has borrowed, including any senior debt securities or guarantees of senior debt securities issued under the relevant senior indenture;
- any money borrowed by someone else where such entity has assumed or guaranteed the obligations, directly or indirectly;
- any letters of credit and acceptances made by banks on such entity's behalf; and
- indebtedness that such entity has incurred or assumed in connection with the acquisition of any property.

Senior indebtedness shall not include any indebtedness that is expressed to be subordinated to or on par with the subordinated debt securities or the subordinated guarantee, as applicable, or any money owed to an entity's subsidiaries.

The subordinated indentures provide that the relevant issuer or the guarantor (if any) cannot:

- make any payments of principal, premium or interest on the subordinated debt securities or the subordinated guarantee (if any);
- acquire any subordinated debt securities; or

Exhibit 1

155

- defease any subordinated debt securities;

if

- any senior indebtedness in an aggregate principal amount of more than $100 million has become due either on maturity or as a result of acceleration or otherwise and the principal, premium and interest on that senior indebtedness has not yet been paid in full by such entity; or
- such entity has defaulted in the payment of any principal, premium or interest on any senior indebtedness in an aggregate principal amount of more than $100 million at the time the payment was due, unless and until the payment default is cured by such entity or waived by the holders of the senior indebtedness.

If the relevant issuer or the guarantor (if any) is liquidated, the holders of the senior indebtedness will be entitled to receive payment in full in cash for principal, premium and interest on the senior indebtedness before the holders of subordinated debt securities or subordinated guarantees (if any) receive any of such entity's assets. As a result, holders of subordinated debt securities or subordinated guarantees (if any) may receive a smaller proportion of such entity's assets in liquidation than holders of senior indebtedness. In such a situation, holders of the subordinated debt securities could lose all or part of their investment.

Even if the subordination provisions prevent the relevant issuer or the guarantor (if any) from making any payment when due on the subordinated debt securities or the subordinated guarantee (if any), the relevant issuer will be in default on its obligations under the subordinated indenture if it does not make the payment when due. This means that the trustee and the holders of subordinated debt securities or subordinated guarantees (if any) can take action against the relevant issuer or the guarantor (if any), but they would not receive any money until the claims of the senior indebtedness have been fully satisfied.

The subordinated indentures allow the holders of senior indebtedness to obtain specific performance of the subordination provisions from the relevant issuer, the guarantor (if any) or any holder of subordinated debt securities or subordinated guarantees (if any).

There is no restriction on the amount of further debt securities that the relevant issuer may issue or guarantee which rank senior to or pari passu with the subordinated debt securities. The issue of any such further debt securities may reduce the amount that may be recovered by holders of subordinated debt securities in the event that the relevant issuer is wound up and/or may limit the ability of the relevant issuer to meet its obligations under the subordinated debt securities.

**Consolidation, Merger or Sale**

The relevant issuer and the guarantor (if any) will agree in the indentures not to consolidate with or merge with or into any other person or convey or transfer all or substantially all of its properties and assets to any person (other than in the case of the issuer into the guarantor and in the case of the guarantor into the issuer), unless:

- it is the continuing person; or
- the successor expressly assumes by supplemental indenture its obligations under such indenture.

In either case, the relevant issuer or the guarantor, as applicable, will also have to deliver a certificate to the trustee stating that after giving effect to the merger there will not be any defaults under the applicable indenture and, if the relevant issuer or the guarantor is not the continuing person, an opinion of counsel stating that the merger and the supplemental indentures comply with these provisions and that the supplemental indentures are legal, valid and binding obligations of the successor corporation enforceable against it.

When Credit Suisse or Credit Suisse Group is the issuer of debt securities, Credit Suisse or Credit Suisse Group may issue debt securities directly or through one or more branches and Credit Suisse may, at any time, transfer its obligations under the debt securities from the head office to any branch of Credit Suisse or from any branch of Credit Suisse to another branch or to its head office.

Exhibit 1
156

**Modification of the Indentures**

In general, rights and obligations of the relevant issuer, the guarantor (if any) and the holders under the indentures may be modified if the holders of a majority in aggregate principal amount of the outstanding debt securities of each series affected by the modification consent to such modification. However, each of the indentures provides that, unless each affected holder agrees, an amendment cannot:

- make any adverse change to any payment term of a debt security such as extending the maturity date, extending the date on which the relevant issuer has to pay interest or make a sinking fund payment, reducing the interest rate, reducing the amount of principal the relevant issuer has to repay, reducing the amount of principal of a debt security issued with original issue discount that would be due and payable upon an acceleration of the maturity thereof or the amount thereof provable in bankruptcy, insolvency or similar proceeding, changing the currency or place in which the relevant issuer has to make any payment of principal, premium or interest, modifying any redemption or repurchase right to the detriment of the holder, modifying any right to convert or exchange the debt securities for another security to the detriment of the holder, and impairing any right of a holder to bring suit for payment;
- reduce the percentage of the aggregate principal amount of debt securities needed to make any amendment to the applicable indenture or to waive any covenant or default;
- waive any payment default; or
- make any change to the amendment provisions of the applicable indenture.

However, other than in the circumstances mentioned above, if the relevant issuer, the guarantor (if any) and the trustee agree, the applicable indenture may be amended without notifying any holders or seeking their consent if the amendment does not materially and adversely affect any holder, including if the guarantor assumes the obligations of the relevant issuer in connection with a guaranteed debt security.

In particular, if the relevant issuer, the guarantor (if any) and the trustee agree, the applicable indenture may be amended without notifying any holders or seeking their consent to add a guarantee from a third party on the outstanding and future debt securities to be issued under an applicable indenture.

**Covenants**

The relevant issuer or the guarantor (if any) may be subject to additional covenants, including restrictive covenants in respect of a particular series of debt securities. Such additional covenants will be set forth in the applicable prospectus supplement and, to the extent necessary, in the supplemental indenture or board resolution relating to that series of debt securities.

**Events of Default**

Unless otherwise specified in a prospectus supplement, an event of default with respect to a series of debt securities occurs upon:

- a default in payment of the principal or any premium on any debt security of that series when due;
- a default in payment of interest when due on any debt security of that series for 30 days;
- a default in performing any other covenant in the indenture applicable to that series for 60 days after written notice from the trustee or from the holders of 25% in principal amount of the outstanding debt securities of such series; or
- certain events of bankruptcy, insolvency or reorganization of the relevant issuer or the guarantor (if any).

Any additional or different events of default applicable to a particular series of debt securities will be described in the prospectus supplement relating to such series.

34

Exhibit 1

157

The trustee may withhold notice to the holders of debt securities of any default (except in the payment of principal, premium or interest) if it considers such withholding of notice to be in the best interests of the holders. A default is any event which is an event of default described above or would be an event of default but for the giving of notice or the passage of time.

Unless otherwise specified in the applicable prospectus supplement, if an event of default occurs and continues, the trustee or the holders of the aggregate principal amount of the debt securities specified below may require the relevant issuer to repay immediately, or accelerate:

- the entire principal of the debt securities of such series; or
- if the debt securities are original issue discount securities, such portion of the principal as may be described in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, if the event of default occurs because of a default in a payment of principal or interest on the debt securities, then the trustee or the holders of at least 25% of the aggregate principal amount of debt securities of that series can accelerate that series of debt securities. If the event of default occurs because of a failure to perform any other covenant in the applicable indenture for the benefit of one or more series of debt securities, then the trustee or the holders of at least 25% of the aggregate principal amount of debt securities of all series affected, voting as one class, can accelerate all of the affected series of debt securities. If the event of default occurs because of bankruptcy proceedings, then all of the debt securities under the indenture will be accelerated automatically. Therefore, except in the case of a default on a payment of principal or interest on the debt securities of your series or a default due to bankruptcy or insolvency of the relevant issuer or guarantor (if any), it is possible that you may not be able to accelerate the debt securities of your series because of the failure of holders of other series to take action.

The holders of a majority of the aggregate principal amount of the debt securities of all affected series, voting as one class, can rescind this accelerated payment requirement or waive any past default or event of default or allow noncompliance with any provision of the applicable indenture. However, they cannot waive a default in payment of principal of, premium, if any, or interest on, any of the debt securities.

After an event of default, the trustee must exercise the same degree of care a prudent person would exercise under the circumstances in the conduct of her or his own affairs. Subject to these requirements, the trustee is not obligated to exercise any of its rights or powers under the applicable indenture at the request, order or direction of any holders, unless the holders offer the trustee reasonable indemnity. If they provide this reasonable indemnity, the holders of a majority in principal amount of all affected series of debt securities, voting as one class, may direct the time, method and place of conducting any proceeding or any remedy available to the trustee, or exercising any power conferred upon the trustee, for any series of debt securities.

**Defeasance**

The term defeasance means discharge from some or all of the obligations under the indentures. If the relevant issuer deposits with the trustee sufficient cash or government securities to pay the principal, interest, any premium and any other sums due to the stated maturity date or a redemption date of the debt securities of a particular series, then at the relevant issuer's option:

- the relevant issuer and the guarantor (if any) will be discharged from their respective obligations with respect to the debt securities of such series; or
- the relevant issuer and the guarantor (if any) will no longer be under any obligation to comply with the restrictive covenants, if any, contained in the applicable indenture and any supplemental indenture or board resolution with respect to the debt securities of such series, and the events of default relating to failures to comply with covenants will no longer apply to them.

If this happens, the holders of the debt securities of the affected series will not be entitled to the benefits of the applicable indenture except for registration of transfer and exchange of debt securities

35

Exhibit 1
158

and replacement of lost, stolen or mutilated debt securities. Instead, the holders will only be able to rely on the deposited funds or obligations for payment.

The relevant issuer must deliver to the trustee an officers' certificate and an opinion of counsel to the effect that the deposit and related defeasance would not cause the holders of the debt securities to recognize income, gain or loss for U.S. federal income tax purposes. In the case of a complete discharge, the relevant issuer may, in lieu of an opinion of counsel, deliver a ruling to such effect received from or published by the U.S. Internal Revenue Service if the relevant issuer and the guarantor (if any) are discharged from their respective obligations with respect to the debt securities.

**Information Concerning the Trustee**

The Bank of New York Mellon, formerly known as The Bank of New York (as successor to JPMorgan Chase Bank, N.A., in the case of senior and subordinated indentures with Credit Suisse Group), with its corporate trust office at 101 Barclay Street, Floor 8W, New York, New York 10286, will be the trustee. The trustee will be required to perform only those duties that are specifically set forth in the indentures, except when a default has occurred and is continuing with respect to the debt securities. After a default, the trustee must exercise the same degree of care that a prudent person would exercise under the circumstances in the conduct of her or his own affairs. Subject to these requirements, the trustee will be under no obligation to exercise any of the powers vested in it by the indentures at the request of any holder of debt securities unless the holder offers the trustee reasonable indemnity against the costs, expenses and liabilities that might be incurred by exercising those powers.

The Bank of New York Mellon, formerly known as The Bank of New York, has loaned money to Credit Suisse Group and certain of its subsidiaries and affiliates and provided other services to it and has acted as trustee or fiscal agent under certain of its and its subsidiaries' and affiliates' indentures or fiscal agency agreements in the past and may do so in the future as a part of its regular business.

**Governing Law**

The debt securities, the related guarantees (if any) and the indentures will be governed by and construed in accordance with the laws of the State of New York, except for, in the case of subordinated debt securities issued by Credit Suisse Group or Credit Suisse, the subordination provisions thereof, which will be governed by Swiss law.

**SPECIAL PROVISIONS RELATING TO FOREIGN CURRENCY DENOMINATED DEBT SECURITIES**

Unless otherwise specified in the applicable prospectus supplement, the following additional provisions will apply to foreign currency denominated debt securities.

**Payment Currency**

Unless otherwise indicated in the applicable prospectus supplement, you will be required to pay for foreign currency denominated debt securities in the specified currency. Currently, there are limited facilities in the United States for the conversion of U.S. dollars into foreign currencies. Therefore, unless otherwise indicated in the applicable prospectus supplement, the exchange rate agent the relevant issuer appoints and identifies in the applicable prospectus supplement will arrange for the conversion of U.S. dollars into the specified currency on behalf of any purchaser of a foreign currency denominated debt security to enable a prospective purchaser to deliver the specified currency in payment for a foreign currency denominated debt security. The exchange rate agent must receive a request for any conversion on or prior to the third business day preceding the date of delivery of the foreign currency denominated debt security. You must pay all costs of currency exchange.

36

Exhibit 1

159

Unless otherwise specified in the applicable prospectus supplement or unless the holder of a foreign currency denominated debt security elects to receive payments in the specified currency, payments made by the relevant issuer of principal of, premium, if any, and interest, if any, on a foreign currency denominated debt security will be made in U.S. dollars. The U.S. dollar amount to be received by a holder will be based on the highest bid quotation in The City of New York received by the exchange rate agent at approximately 11:00 a.m., New York City time, on the second business day preceding the applicable payment date from three recognized foreign exchange dealers (one of which may be the exchange rate agent) for the purchase by the quoting dealer of the specified currency for U.S. dollars for settlement on the payment date in the aggregate amount of the specified currency payable to the holders of debt securities scheduled to receive U.S. dollar payments and at which the applicable dealer commits to execute a contract. If these bid quotations are not available, payments to holders will be made in the specified currency.

Unless otherwise specified in the applicable prospectus supplement, a holder of a foreign currency denominated debt security may elect to receive payment in the specified currency for all payments and need not file a separate election for each payment, and such election will remain in effect until revoked by written notice to the paying agent at its corporate trust office in The City of New York received on a date prior to the record date for the relevant interest payment date or at least 10 calendar days prior to the maturity date (or any redemption date or repayment date), as the case may be; provided, that such election is irrevocable as to the next succeeding payment to which it relates; if such election is made as to full payment on a debt security, the election may thereafter be revoked so long as the paying agent is notified of the revocation within the time period set forth above.

Banks in the United States offer non-U.S. dollar-denominated checking or savings account facilities in the United States only on a limited basis. Accordingly, unless otherwise indicated in the applicable prospectus supplement, payments of principal of, premium, if any, and interest, if any, on, foreign currency denominated debt securities to be made in a specified currency other than U.S. dollars will be made to an account at a bank outside the United States, unless alternative arrangements are made.

If a specified currency (other than the U.S. dollar) in which a debt security is denominated or payable: (a) ceases to be recognized by the government of the country which issued such currency or for the settlement of transactions by public institutions of or within the international banking community, (b) is a currency unit and such currency unit ceases to be used for the purposes for which it was established, or (c) is not available to the relevant issuer for making payments due to the imposition of exchange controls or other circumstances beyond its control, in each such case, as determined in good faith by the relevant issuer, then with respect to each date for the payment of principal of and interest, if any, on a debt security denominated or payable in such specified currency occurring after the last date on which such specified currency was so used, which we refer to as the conversion date, the U.S. dollar or such foreign currency or currency unit as may be specified by the relevant issuer, which we refer to as the substitute currency, will become the currency of payment for use on each such payment date (but such specified currency will, at the relevant issuer's election, resume being the currency of payment on the first such payment date preceded by 15 business days during which the circumstances which gave rise to the change of currency no longer prevail, in each case, as determined in good faith by the relevant issuer). The substitute currency amount to be paid by the relevant issuer to the trustee and by the trustee or any paying agent to the holder of a debt security with respect to such payment date will be the currency equivalent or currency unit equivalent (each as defined below) of the specified currency as determined by the exchange rate agent (which determination will be delivered in writing to the trustee not later than the fifth business day prior to the applicable payment date) as of the conversion date or, if later, the date most recently preceding the payment date in question on which such determination is possible of performance, but not more than 15 business days before such payment date. We refer to such conversion date or date preceding a payment date as aforesaid as the valuation date. Any payment in a substitute currency under the

37

Exhibit 1

160

circumstances described above will not constitute an event of default under the indenture or the debt securities.

The "currency equivalent" will be determined by the exchange rate agent as of each valuation date and will be obtained by converting the specified currency (unless the specified currency is a currency unit) into the substitute currency at the market exchange rate (as defined below) on the valuation date.

The "currency unit equivalent" will be determined by the exchange rate agent as of each valuation date and will be the sum obtained by adding together the results obtained by converting the specified amount of each initial component currency into the substitute currency at the market exchange rate on the valuation date for such component currency.

"Component currency" means any currency which, on the conversion date, was a component currency of the relevant currency unit.

"Market exchange rate" means, as of any date, for any currency or currency unit, the noon U.S. dollar buying rate for that currency or currency unit, as the case may be, for cable transfers quoted in The City of New York on such date as certified for customs purposes by the Federal Reserve Bank of New York. If such rates are not available for any reason with respect to one or more currencies or currency units for which an exchange rate is required, the exchange rate agent will use, in its sole discretion and without liability on its part, such quotation of the Federal Reserve Bank of New York as of the most recent available date, or quotations from one or more major banks in The City of New York or in the country of issue of the currency or currency unit in question, or such other quotations as the exchange rate agent will deem appropriate. Unless otherwise specified by the exchange rate agent, if there is more than one market for dealing in any currency or currency unit by reason of foreign exchange regulations or otherwise, the market to be used in respect of such currency or currency unit will be that upon which a non-resident issuer of securities designated in such currency or currency unit would, as determined in its sole discretion and without liability on the part of the exchange rate agent, purchase such currency or currency unit in order to make payments in respect of such securities.

"Specified amount" of a component currency means the number of units (including decimals) which such component currency represented in the relevant currency unit, on the conversion date or the valuation date or the last date the currency unit was so used, whichever is later. If after such date the official unit of any component currency is altered by way of combination or subdivision, the specified amount of such component currency will be divided or multiplied in the same proportion. If after such date two or more component currencies are consolidated into a single currency, the respective specified amounts of such component currencies will be replaced by an amount in such single currency equal to the sum of the respective specified amounts of such consolidated component currencies expressed in such single currency, and such amount will thereafter be a specified amount and such single currency will thereafter be a component currency. If after such date any component currency will be divided into two or more currencies, the specified amount of such component currency will be replaced by specified amounts of such two or more currencies, the sum of which, at the market exchange rate of such two or more currencies on the date of such replacement, will be equal to the specified amount of such former component currency and such amounts will thereafter be specified amounts and such currencies will thereafter be component currencies.

All determinations referred to above made by the relevant issuer or its agents will be at its or their sole discretion and will, in the absence of manifest error, be conclusive for all purposes and binding on you.

Specific information about the currency, currency unit or composite currency in which a particular foreign currency denominated debt security is denominated, including historical exchange rates and a description of the currency and any exchange controls, will be set forth in the applicable prospectus supplement. The information therein concerning exchange rates is furnished as a matter of information

38

Exhibit 1
161

only and should not be regarded as indicative of the range of or trends in fluctuations in currency exchange rates that may occur in the future.

**Minimum Denominations, Restrictions on Maturities, Repayment and Redemption**

Debt securities denominated in specified currencies other than U.S. dollars will have the minimum denominations and will be subject to the restrictions on maturities, repayment and redemption that are set forth in the applicable prospectus supplement. Any other restrictions applicable to debt securities denominated in specified currencies other than U.S. dollars, including restrictions related to the distribution of such debt securities, will be set forth in the applicable prospectus supplement.

FOREIGN CURRENCY RISKS

This prospectus and any applicable prospectus supplement do not describe all of the possible risks of an investment in debt securities whose payment will be made in, or affected by the value of, a foreign currency or a composite currency. You should not invest in foreign currency denominated debt securities if you are not knowledgeable about foreign currency and indexed transactions. You should consult your own financial and legal advisors about such risks as such risks may change from time to time.

We are providing the following information for the benefit of U.S. residents. If you are not a U.S. resident, you should consult your own financial and legal advisors before investing in any debt securities.

**Exchange Rates and Exchange Controls**

A series of debt securities denominated in, or affected by the value of, a currency other than U.S. dollars has additional risks that do not exist for U.S. dollar denominated debt securities. The most important risks are (a) possible changes in exchange rates between the U.S. dollar and the specified currency after the issuance of the debt securities resulting from market changes in rates or from the official redenomination or revaluation of the specified currency and (b) imposition or modification of foreign exchange controls by either the U.S. government or foreign governments. Such risks generally depend on economic events, political events and the supply of, and demand for, the relevant currencies, over which we have no control.

Exchange rates have fluctuated greatly in recent years and are likely to continue to fluctuate in the future. These fluctuations are caused by economic forces as well as political factors. However, you cannot predict future fluctuations based on past exchange rates. If the foreign currency decreases in value relative to the U.S. dollar, the yield on a foreign currency denominated debt security or currency-linked indexed debt security for a U.S. investor will be less than the coupon rate and you may lose money at maturity if you sell such debt security. In addition, you may lose all or most of your investment in a currency-linked indexed debt-security as a result of changes in exchange rates.

Governments often impose exchange controls which can affect exchange rates or the availability of the foreign currency to make payments of principal, premium, if any, and interest on the debt securities. We cannot assure you that exchange controls will not restrict or prohibit payments of principal, premium, if any, or interest denominated in any specified currency.

Even if there are no actual exchange controls, it is possible that the specified currency would not be available to the relevant issuer when payments on the debt securities are due because of circumstances beyond its control. If the specified foreign currency is not available, the relevant issuer will make the required payments in U.S. dollars on the basis of the market exchange rate on the date of such payment, or if such rate of exchange is not then available, on the basis of the market exchange rate as of a recent date. We refer you to "Special Provisions Relating to Foreign Currency Denominated Debt Securities—Payment Currency." You should consult your own financial and legal

39

Exhibit 1

162

advisors as to the risk of an investment in debt securities denominated in a currency other than your home currency.

Any applicable prospectus supplement relating to debt securities having a specified currency other than U.S. dollars will contain a description of any material exchange controls affecting that currency and any other required information concerning the currency.

**Foreign Currency Judgments**

The indentures and the debt securities, except for, in the case of the subordinated indentures and the subordinated debt securities issued by Credit Suisse Group or Credit Suisse, the subordination provisions thereof which are governed by Swiss law, are governed by New York State law. Courts in the United States customarily have not rendered judgments for money damages denominated in any currency other than the U.S. dollar. A 1987 amendment to the Judiciary Law of New York State provides, however, that an action based upon an obligation denominated in a currency other than U.S. dollars will be rendered in the foreign currency of the underlying obligation. Accordingly, if you bring a lawsuit in a New York state court or in a federal court located in New York State for payment of a foreign currency denominated debt security, the court would award a judgment in the foreign currency and convert the judgment into U.S. dollars, on the date of the judgment. U.S. courts located outside New York State would probably award a judgment in U.S. dollars but it is unclear what rate of exchange they would use.

Enforcement of claims or court judgments under Swiss debt collection or bankruptcy proceedings may only be made in Swiss francs. Thus, holders in any such proceedings would not be able to recover judgment in the currency of their debt securities, and the amount of any claim or court judgment denominated in a currency other than Swiss francs would be converted into Swiss francs at the rate obtained on (i) the date the enforcement proceedings are instituted or (ii) the date of the filing for the continuation of the bankruptcy procedure (*Fortsetzungsbegehren*), with respect to enforcing creditors, and at the rate obtained at the time of adjudication of bankruptcy (*Konkurseröffnung*), with respect to non-enforcing creditors.

## DESCRIPTION OF WARRANTS

**General**

Credit Suisse Group and Credit Suisse, directly or through any branch, may issue warrants, including warrants or warrants in the form of subscription rights to purchase equity or debt securities, as well as other types of warrants. If Credit Suisse issues warrants to purchase equity securities, those equity securities will not be shares of Credit Suisse Group or Credit Suisse. Credit Suisse Group or Credit Suisse may issue warrants in such amounts or in as many distinct series as we wish. Warrants may be issued independently or together with any equity or debt securities and may be attached to or separate from such equity or debt securities. Each series of warrants will be issued under a separate warrant agreement to be entered into between us and a warrant agent. The forms of each of the warrant agreements will be filed as exhibits to the registration statement of which this prospectus forms a part or will be furnished to the SEC on a Form 6-K that is incorporated by reference in the registration statement of which this prospectus forms a part. This prospectus briefly outlines certain general terms and provisions of the warrants we may issue. Further terms of the warrants and applicable warrant agreement will be set forth in the applicable prospectus supplement. The specific terms of a warrant as described in the applicable prospectus supplement will supplement and, if applicable, may modify or replace the general terms described in this section. If there are differences between the applicable prospectus supplement and this prospectus, the prospectus supplement will control.

Exhibit 1

163

**Warrants to Purchase Equity Securities**

We will describe the terms of any warrants, or warrants in the form of subscription rights, to purchase equity securities that we are authorized to issue in a prospectus supplement. These terms may include:

- the title of such warrants;
- the aggregate number of such warrants and whether such warrants may be settled in cash or by means of net share settlement;
- the price or prices at which such warrants will be issued;
- the currency or currencies (including composite currencies) in which the price of such warrants may be payable;
- the terms of the equity securities purchasable upon exercise of such warrants, which, in the case of Credit Suisse Group, may include shares or American depositary shares of Credit Suisse Group;
- the price at which and currency or currencies (including composite currencies) in which the equity securities purchasable upon exercise of such warrants may be purchased;
- the date on which the right to exercise such warrants will commence and the date on which such right shall expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;
- if applicable, the minimum or maximum amount of such warrants that may be exercised at any one time;
- if applicable, the designation and terms of the equity securities with which such warrants are issued and the number of such warrants issued with each such equity security;
- if applicable, the date on and after which such warrants and the related equity securities will be separately transferable;
- anti-dilution provisions, if any;
- information with respect to book-entry procedures, if any; and
- any other terms of such warrants, including terms, procedures and limitations relating to the exchange or exercise of such warrants.

The prospectus supplement relating to any warrants to purchase equity securities may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

**Warrants to Purchase Debt Securities**

We will describe in a prospectus supplement the terms of any warrants, or warrants in the form of subscription rights, that we are authorized to issue for the purchase of our debt securities, the guaranteed debt securities of a finance subsidiary or the debt securities of third-party issuers. These terms may include:

- the title of such warrants;
- the aggregate number of such warrants and whether such warrants may be settled in cash;
- the price or prices at which such warrants will be issued;
- the currency or currencies (including composite currencies) in which the price of such warrants may be payable;
- the aggregate principal amount and terms of the debt securities purchasable upon exercise of such warrants;

41

Exhibit 1

164

- the price at which and currency or currencies (including composite currencies) in which the debt securities purchasable upon exercise of such warrants may be purchased;

- the date on which the right to exercise such warrants will commence and the date on which such right shall expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;

- if applicable, the minimum or maximum amount of such warrants that may be exercised at any one time;

- if applicable, the designation and terms of the debt securities with which such warrants are issued and the number of such warrants issued with each such debt security;

- if applicable, the date on and after which such warrants and the related debt securities will be separately transferable;

- information with respect to book-entry procedures, if any; and

- any other terms of such warrants, including terms, procedures and limitations relating to the exchange or exercise of such warrants.

The prospectus supplement relating to any warrants to purchase debt securities may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

**Other Warrants**

We may also issue other warrants to purchase or sell, on terms to be determined at the time of sale,

- securities of any entity unaffiliated with us, a basket of such securities, an index or indices of such securities or any combination of the foregoing;

- currencies or composite currencies; or

- commodities.

We may satisfy our obligations, if any, with respect to any such warrants by delivering the underlying securities, currencies or commodities or, in the case of underlying securities or commodities, the cash value thereof, as set forth in the applicable prospectus supplement. We will describe the terms of any such warrants that we are authorized to issue in a prospectus supplement. These terms may include:

- the title of such warrants;

- the aggregate number of such warrants;

- the price or prices at which such warrants will be issued;

- the currency or currencies (including composite currencies) in which the price of such warrants may be payable;

- whether such warrants are put warrants or call warrants;

- (a) the specific security, basket of securities, index or indices of securities or any combination of the foregoing and the amount thereof, (b) currencies or composite currencies or (c) commodities (and, in each case, the amount thereof or the method for determining the same) to be purchased or sold upon exercise of such warrants;

- the purchase price at which and the currency or currencies (including composite currencies) with which such underlying securities, currencies or commodities may be purchased or sold upon such exercise (or the method of determining the same);

- whether such exercise price may be paid in cash, by the exchange of any other security offered with such warrants or both and the method of such exercise;

42

Exhibit 1

165

- whether the exercise of such warrants is to be settled in cash or by the delivery of the underlying securities or commodities or both;

- the date on which the right to exercise such warrants will commence and when such right will expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;

- if applicable, the minimum or maximum number of such warrants that may be exercised at any one time;

- if applicable, the designation and terms of the securities with which such warrants are issued and the number of warrants issued with each such security;

- if applicable, the date on and after which such warrants and the related securities will be separately transferable;

- information with respect to book-entry procedures, if any; and

- any other terms of such warrants, including terms, procedures and limitations relating to the exchange and exercise of such warrants.

The prospectus supplement relating to any such warrants may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

### DESCRIPTION OF SHARES

The following summary describes the material terms of Credit Suisse Group's shares. A detailed description of the terms of the shares is incorporated by reference into this prospectus from Credit Suisse Group's annual report on Form 20-F for the year ended December 31, 2008, filed with the SEC on March 24, 2009, which you may obtain as described under "Where You Can Find More Information." We will only issue shares, which may be in the form of American depositary shares, under this prospectus and the applicable prospectus supplement in connection with the conversion or exchange of debt securities, guaranteed debt securities or capital securities of Credit Suisse Group convertible into or exchangeable for our shares or the exercise of warrants on our shares.

As of December 31, 2008, we had fully paid and issued share capital of CHF 47,385,426, consisting of 1,184,635,653 registered shares (inclusive of 20,743,620 treasury shares) with a par value of CHF 0.04 each. As of the same date, we had additional authorized share capital in the amount of CHF 1,482,192, consisting of 37,054,788 registered shares with a par value of CHF 0.04 each. Our shareholders have authorized the Board of Directors to issue such shares to finance acquisitions.

In addition, as of December 31, 2008, we had conditional share capital in the amount of CHF 3,558,498, consisting of 88,962,446 registered shares with a par value of CHF 0.04 each. Conditional share capital is reserved for issuance of fully paid shares to holders of convertible instruments such as options, convertible bonds or warrants in the event that such holders exercise their right to obtain shares. Our conditional share capital includes 88,538,482 shares reserved for share-based compensation plans. We are also able to satisfy our obligations under the share-based compensation plans through share repurchases. We have a further 423,964 conditional shares reserved for the exercise of warrants or convertible bonds outstanding or still to be issued by us.

Shares issued as a result of the conversion of conditional capital and the corresponding increase in share capital are generally recorded only once a year, and this recording entails a revision of the Articles of Association and new registration of the total share capital in the Commercial Register. Credit Suisse Group's Articles of Association were last revised on  January 28, 2009. Credit Suisse Group's Articles of Association are included as an exhibit to its registration statement on Form 20-F for the year ended December 31, 2008, which is incorporated by reference into this prospectus and registration statement.

Exhibit 1

166

Our registered shares are listed on the SIX Swiss Exchange (and traded since June 25, 2001 through SWX Europe (formerly known as virt-x)) and, in the form of American depositary shares, on the New York Stock Exchange.

**Shareholder Rights**

Under Swiss law, dividends may be paid out only if and to the extent a corporation has distributable profits from previous business years, or if the free reserves of the corporation are sufficient to allow distribution of a dividend. In addition, at least 5% of the annual net profits must be retained and booked as general legal reserves for so long as these reserves amount to less than 20% of the paid-in share capital. Our reserves currently exceed this 20% threshold. In any event, dividends may be paid out only after approval of the shareholders. The Board of Directors may propose that a dividend be paid out, but cannot itself set the dividend. The auditors must confirm that the dividend proposal of the Board conforms to statutory law. In practice, the shareholders usually approve the dividend proposal of the Board of Directors. Dividends are usually due and payable after the shareholders' resolution relating to the allocation of profits has been passed. Under Swiss law, the statute of limitations in respect of dividend payments is five years.

**Voting and Transfer**

There is no limitation under Swiss law or our Articles of Association on the right of non-Swiss residents or nationals to own or vote our shares.

Each share carries one vote at our shareholders' meetings. Voting rights may be exercised only after a shareholder has been recorded in the share register as a shareholder with voting rights. Registration with voting rights is subject to certain restrictions that we describe below.

Our Articles of Association provide that we may elect not to print and deliver certificates in respect of registered shares. Shareholders may, however, request at any time that we print and deliver such certificates free of charge.

The transfer of shares is effected by corresponding entry in the books of a bank or depositary institution following an assignment in writing by the selling shareholder and notification of such assignment to us by the transferor, the bank or depositary institution. The transfer of shares further requires that the purchaser file a share registration form to be registered in our share register as a shareholder. Failing such registration, the purchaser may not vote at or participate in shareholders' meetings.

A purchaser of shares will be recorded in the share register with voting rights upon disclosure of its name, citizenship and address, and upon confirmation that it acquired the shares in its own name for its own account. Any person not expressly stating in its application for registration that the relevant shares have been acquired for its own account, which person we refer to as a nominee, may be entered for a maximum of 2% of the total outstanding share capital with voting rights in the share register. In excess of this limit, registered shares held by a nominee will be granted voting rights only if such nominee discloses in writing the name, address and shareholding of any person for whose account it is holding 0.5% or more of the outstanding share capital.

Each shareholder, whether registered in our share register or not, is entitled to receive the dividends approved by the shareholders. The same principle applies for capital repayments in the event of a reduction of the share capital, and for liquidation proceeds in the event we are dissolved or liquidated. Under Swiss law, a shareholder has no liability for capital calls, but is also not entitled to reclaim its capital contribution. Swiss law further requires us to apply the principle of equal treatment to all shareholders.

44

Exhibit 1
167

**Pre-Emptive Rights**

Generally under Swiss law, any share issue, whether for cash or non-cash consideration or no consideration, is subject to the prior approval of the shareholders. Shareholders of a Swiss corporation have certain pre-emptive rights to subscribe for new issues of shares in proportion to the nominal amount of shares held. A resolution adopted at a shareholders' meeting with a supermajority may, however, limit or suspend pre-emptive rights in certain limited circumstances.

**Liquidation**

Under Swiss law and our Articles of Association, we may be dissolved at any time by a shareholders' resolution, which must be passed by (1) a supermajority of at least three-quarters of the votes cast at the meeting in the event we are to be dissolved by way of liquidation, or (2) a supermajority of at least two-thirds of the votes represented and an absolute majority of the par value of the shares represented at the meeting in other events. Dissolution by court order is possible if we become bankrupt. Under Swiss law, any surplus arising out of liquidation (after the settlement of all claims of all creditors) is distributed to shareholders in proportion to the paid up par value of shares held.

**DESCRIPTION OF CAPITAL SECURITIES OF CREDIT SUISSE GROUP**

As more fully described below or set forth in the applicable prospectus supplement, Credit Suisse Group may sell capital securities of one or multiple series through trusts, companies or similar entities. If any such capital securities are issued, they will be fully and unconditionally guaranteed on a subordinated basis by Credit Suisse Group or any branch of Credit Suisse Group. If any such capital securities are issued, the relevant issuer may invest the net proceeds thereof in the securities of another issuer, in our subordinated debt securities or in other eligible investments. Any such capital securities may afford the holders thereof beneficial interests in the underlying assets of the relevant issuer or may entitle the holders only to the benefits of a subordinated guarantee of Credit Suisse Group, all as more fully described in the applicable prospectus supplement.

Set forth below is a description of the trust preferred securities, company preferred securities and related instruments we may issue in connection with an issuance of capital securities. Issuances of capital securities in the future may or may not conform to the descriptions below, and such descriptions may be modified or superseded by the terms of any particular series of capital securities set forth in the relevant prospectus supplement.

**Description of Trust Preferred Securities**

This prospectus describes the general terms and provisions of the trust preferred securities that the trusts may issue. When a trust offers to sell its trust preferred securities, we will describe the specific terms of those securities in the applicable prospectus supplement. We will also indicate in the applicable prospectus supplement whether the general terms and provisions that we describe in this prospectus apply to those securities. If there are any differences between the applicable prospectus supplement and this prospectus, the prospectus supplement will control. For a complete description of the material terms of the particular issue of trust preferred securities, you must refer to both the applicable prospectus supplement and to the following description.

Each trust may issue, from time to time, in one or more series, trust preferred securities under the relevant amended and restated trust agreement, or trust agreement. The trust agreements do not limit the aggregate amount of trust preferred securities that may be issued or the aggregate amount of any particular series. Each of the trust agreements will be qualified as an indenture under the Trust Indenture Act. The trusts may issue trust preferred securities and other securities at any time without your consent and without notifying you.

45

Exhibit 1

168

Each of the trust agreements will authorize the trustee of the relevant trusts, on behalf of the relevant trust, to issue the trust preferred securities. These securities will be certificates of beneficial interests in the assets of the relevant trust, or a series of trust preferred securities issued thereunder, the terms of which are set forth in the relevant trust agreement. The form of a trust agreement has been filed as an exhibit to the registration statement of which this prospectus forms a part, and you should read the trust agreement for provisions that may be important to you. You should read the applicable prospectus supplement for the specific terms of any authorized series of trust preferred securities, including:

- the specific designation of the trust preferred securities;

- the number or liquidation amount of trust preferred securities;

- the distribution rate or rates, or method of calculation, the date or dates on which the trust will pay distributions and the record date for any distributions;

- the amount or amounts that the trust will pay out of its assets to the holders of the trust preferred securities upon the trust's liquidation;

- the obligation or option, if any, of the trust to purchase or redeem the trust preferred securities and the price or prices (or formula for determining the price) at which, the period or periods within which, and the terms and conditions upon which the trust will or may purchase or redeem trust preferred securities, in whole or in part, pursuant to the obligation or option;

- the voting rights, if any, of the trust preferred securities, including any vote required to amend the relevant trust agreement;

- the criteria for determining whether and to what extent the trust will be required to pay distributions on the trust preferred securities or will be prohibited from paying distributions on the trust preferred securities;

- terms for any optional or mandatory conversion or exchange of trust preferred securities into other securities, including shares of Credit Suisse Group, or withdrawal of any securities represented by the trust preferred securities;

- the right, if any, of the trust to change the distribution preference of the trust preferred securities; and

- any other relative rights, preferences, privileges, limitations or restrictions of the trust preferred securities not inconsistent with the relevant trust agreement or applicable law.

The prospectus supplement relating to the particular trust preferred securities may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

In the event of an offering of trust preferred securities, the proceeds from the sale of the trust preferred securities may be used by the relevant trust to purchase corresponding company preferred securities, subordinated debt securities of Credit Suisse Group or one of its branches or subsidiaries or other eligible investments. The company preferred securities or subordinated debt securities, if any, and the rights under the subordinated guarantee of Credit Suisse Group will be held by the trust for the benefit of the holders of the trust preferred securities.

Each trust preferred security may represent a corresponding amount of the company preferred securities or subordinated debt securities and will entitle the holder thereof to rights under the subordinated guarantee. Except as provided in the applicable prospectus supplement, the trust preferred securities will be perpetual and non-cumulative. The relevant trust may pass through the dividends it receives on the company preferred securities or the interest it receives on the subordinated debt securities as distributions on the trust preferred securities. It may also pass through any redemption payment it receives on the company preferred securities or subordinated debt securities to redeem a corresponding amount of the trust preferred securities as well as any liquidation payment it receives on the company preferred securities upon liquidation of the relevant company.

Exhibit 1

169

Each of the trusts (and any series of trust preferred securities issued thereunder) is a legally separate entity and the assets of one trust or series will not be available to satisfy the obligations of any of the other trusts or series.

Holders of the trust preferred securities will have the benefit of Credit Suisse Group's subordinated guarantee of the dividend, redemption and liquidation payment obligations under the company preferred securities as set forth in the applicable prospectus supplement and in this prospectus under "—Description of Subordinated Guarantees in Connection with Capital Securities."

Any capital raised by the offering of trust preferred securities is intended to qualify as Tier 1 capital for Credit Suisse Group, calculated on a consolidated (*Finanzgruppe*) basis, in accordance with Swiss banking law and under the relevant regulatory capital guidelines of the Swiss Financial Market Supervisory Authority FINMA, as successor to the Swiss Federal Banking Commission.

### Information Concerning the Trustees

BNY Mellon Trust of Delaware (as successor to Chase Bank USA, National Association), with its corporate trust office at White Clay Center, Route 273, Newark, Delaware 19711, will be the Delaware trustee of each of the trusts and The Bank of New York Mellon, with its corporate trust office at 101 Barclay Street, Floor 8W, New York, New York 10286, will be the property trustee of each of the trusts. The trustees are required to perform only those duties that are specifically set forth in the relevant trust agreement, except, in the case of the property trustee, when a default has occurred and is continuing with respect to the trust preferred securities. After a default, the property trustee must exercise the same degree of care a prudent person would exercise under the circumstances in the conduct of her or his own affairs.

Subject to these requirements, the property trustee will be under no obligation to exercise any of the powers vested in it by the relevant trust agreement at the request of any holder of trust preferred securities, unless the holder offers the property trustee reasonable indemnity against the cost, expenses and liabilities that might be incurred by exercising those powers.

The Bank of New York Mellon, an affiliate of BNY Mellon Trust of Delaware, has loaned money to us and certain of our subsidiaries and affiliates and provided other services to us and has acted as trustee or fiscal agent under certain of our and our subsidiaries' and affiliates' indentures or fiscal agency agreements in the past and may do so in the future as a part of its regular business.

### Governing Law

The trust preferred securities and the trust agreements will be governed by and construed in accordance with the laws of the State of Delaware.

## Description of Company Preferred Securities

This prospectus describes the general terms and provisions of the company preferred securities that the companies may issue. When a company issues company preferred securities, we will describe the specific terms of those securities in a supplement to this prospectus. We will also indicate in the applicable prospectus supplement whether the general terms and provisions that we describe in this prospectus apply to those securities. If there are any differences between the applicable prospectus supplement and this prospectus, the prospectus supplement will control. For a complete description of the material terms of the particular issue of company preferred securities, you must refer to both the applicable prospectus supplement and to the following description.

Each company may issue, from time to time, in one or more series, company preferred securities under an amended and restated LLC agreement, or the LLC agreement, in the case of the Delaware companies, or under its Memorandum and Articles of Incorporation, in the case of the Guernsey

Exhibit 1

170

companies. The companies may issue company preferred securities and other securities at any time without your consent and without notifying you.

The relevant LLC agreement or Memorandum and Articles of Incorporation, as applicable, will authorize a company to issue company preferred securities, which will be held initially by a trust or sold directly to investors, and to issue company common securities to Credit Suisse Group or one of its branches or subsidiaries. For each of the companies, the LLC agreement and Memorandum and Articles of Incorporation will be filed as an exhibit to the registration statement of which this prospectus forms a part. You should read the LLC agreement or Memorandum and Articles of Incorporation, as applicable, for provisions that may be important for you. You should read the applicable prospectus supplement for the specific terms of any authorized series of company preferred securities, including:

- the specific designation of the company preferred securities;

- the number or liquidation preference of company preferred securities;

- the dividend rate or rates, or method of its calculation, the date or dates on which the company will pay dividends and the record date for any dividends;

- the amount or amounts that the company will pay out of its assets to the holders of the company preferred securities upon the company's liquidation;

- the obligation or option, if any, of the company to purchase or redeem the company preferred securities and the price or prices (or formula for determining the price) at which, the period or periods within which, and the terms and conditions upon which the company will or may purchase or redeem company preferred securities, in whole or in part, pursuant to the obligation or option;

- the voting rights, if any, of the company preferred securities and company common securities, including any vote required to amend the relevant LLC agreement or Memorandum and Articles of Incorporation, as applicable;

- the criteria for determining whether and to what extent the company will be required to pay dividends on the company preferred securities or will be prohibited from paying dividends on the company preferred securities;

- terms for any optional or mandatory conversion or exchange of company preferred securities into other securities, including shares of Credit Suisse Group, or withdrawal of any securities represented by the company preferred securities;

- whether and to what extent the company will be required to pay any additional amounts in respect of withholding taxes;

- the right, if any, of the company to change the dividend preference of the company preferred securities; and

- any other relative rights, preferences, privileges, limitations or restrictions of the company preferred securities not inconsistent with the relevant LLC agreement, Memorandum and Articles of Incorporation or applicable law.

The prospectus supplement relating to the particular company preferred securities may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

In the event of an offering of company preferred securities, the proceeds from the sale of the company preferred securities to the trust or directly to investors and the company common securities to Credit Suisse Group or one of its branches or subsidiaries may be used by the relevant company to purchase subordinated debt securities of Credit Suisse Group or one of its branches or subsidiaries or other eligible investments. The company preferred securities may or may not give investors in such

Exhibit 1

171

securities any beneficial interest in the underlying assets of the relevant company but will afford them rights under the subordinated guarantee of Credit Suisse Group as described below.

Except as otherwise set forth in the applicable prospectus supplement, the company preferred securities will be perpetual and non-cumulative. As will be more fully described in the applicable prospectus supplement, each of the companies' obligations to pay dividends will be subject to provisions that generally require the relevant company to pay full or proportional dividends on the company preferred securities when Credit Suisse Group pays dividends on its shares or on other securities of Credit Suisse Group that rank equally with or junior to the subordinated guarantee of the company preferred securities. The company preferred securities will provide the trust as the initial holder thereof (and accordingly the holders of the trust preferred securities) or any other holder of company preferred securities with rights to dividends and redemption and liquidation payments that are similar to those of the most senior ranking non-cumulative non-voting perpetual preferred equity securities that could be issued directly by Credit Suisse Group that have financial terms substantially similar to those of the company preferred securities.

Credit Suisse Group will guarantee the obligations under the company preferred securities that the relevant company offers as set forth in the applicable prospectus supplement and in this prospectus under "—Description of Subordinated Guarantees in Connection with Capital Securities of Credit Suisse Group." The terms of the company common securities issued to Credit Suisse Group will be set forth in the relevant LLC agreement or Memorandum and Articles of Incorporation, as applicable, and described in the applicable prospectus supplement.

**Description of Subordinated Guarantees of Credit Suisse Group in Connection with Capital Securities**

Set forth below is a summary of information concerning the guarantees that Credit Suisse Group will execute and deliver concurrently with any issuance of capital securities of Credit Suisse Group. Each of the guarantees will be qualified as an indenture under the Trust Indenture Act. The guarantees are for the benefit of the holders from time to time of the capital securities of any series issued by the relevant trust or the relevant company. The terms of the subordinated guarantees will include both those stated in the subordinated guarantee agreements and those made part of the subordinated guarantee agreements by the Trust Indenture Act. Forms of the subordinated guarantee agreements have been filed as exhibits to the registration statement of which this prospectus forms a part. The subordinated guarantee agreements may be amended or supplemented in connection with the issuance of any series of capital securities, and such amendment or supplement will be filed on a Form 6-K and incorporated by reference in the registration statement of which this prospectus forms a part. You should read the relevant subordinated guarantee agreement and any such amendment or supplement for provisions that may be important to you.

### *Guaranteed Obligations*

Under the subordinated guarantees, Credit Suisse Group will fully and unconditionally guarantee, on a subordinated basis, the payment by the relevant trust or the relevant company, as applicable, of the following, without duplication, with respect to capital securities of any series:

- any distributions due and payable on the trust preferred securities, or dividends due and payable on the company preferred securities;

- the redemption price payable with respect to any capital securities called for redemption by the relevant issuer;

- the liquidating distribution on each capital security payable upon liquidation of the relevant issuer; and

- any additional amounts payable by the relevant issuer,

49

Exhibit 1

172

in each case, to the extent provided in the applicable prospectus supplement.

Subject to the subordination provisions described below, Credit Suisse Group will be obligated to make such payments as and when due, regardless of any defense, right of set-off or counterclaim that Credit Suisse Group may have or assert, other than the defense of payment, and whether or not the company has legally available funds for the payments so guaranteed. Credit Suisse Group's obligations under the relevant subordinated guarantee will be several and independent of the obligations of the relevant issuer with respect to the capital securities.

### Subordination

The subordinated guarantees will be general, subordinated and unsecured obligations of Credit Suisse Group and, in liquidation of Credit Suisse Group, will rank, both as to payment and in liquidation:

- subordinate and junior to all liabilities (including those in respect of bonds, notes, debentures and guarantees of Credit Suisse Group, including the other senior and subordinated debt securities and guarantees in respect thereof of Credit Suisse Group issued under this prospectus) that do not expressly rank equally with the obligations of Credit Suisse Group under the subordinated guarantees; and

- senior to the shares of Credit Suisse Group and any other securities of Credit Suisse Group expressed to rank junior to the most senior preference shares of Credit Suisse Group (if any) from time to time outstanding.

The foregoing liabilities that rank senior to the subordinated guarantees are collectively called "senior liabilities."

The subordination provisions set out above will be irrevocable. Except as set forth in the applicable prospectus supplement, Credit Suisse Group may not create or permit to exist any charge or other security interest over its assets to secure its obligations in respect of the subordinated guarantees.

Subject to applicable law, no holder of subordinated guarantees shall be entitled to exercise, claim or plead any right of set-off, compensation or retention in respect of any amount owed to it by Credit Suisse Group, arising under or in connection with any subordinated guarantee and each holder shall, by virtue of being a holder of such subordinated guarantees, be deemed to have waived all such rights of set-off, compensation or retention.

### Additional Amounts

If Credit Suisse Group is required to withhold or deduct any portion of a payment under the relevant subordinated guarantee, the applicable prospectus supplement will provide whether and to what extent it will pay additional amounts in order to cause the net amounts received by the holders of capital securities to be the same as the holders would have received in the absence of the withholding or deduction.

### Other Provisions

The guarantee trustee, on behalf of the holders of capital securities, will have the right to enforce the relevant subordinated guarantee directly against Credit Suisse Group if Credit Suisse Group defaults under such subordinated guarantee. Each of the subordinated guarantee agreements will provide that, to the fullest extent permitted by law, without the need for any action on the part of the guarantee trustee or any other holder of capital securities, each holder of capital securities will be entitled to enforce its rights directly under the relevant subordinated guarantee with respect to Credit Suisse Group's payment obligations thereunder.

50

Exhibit 1

173

*Covenants*

Credit Suisse Group may be subject to additional covenants, including restrictive covenants. Such additional covenants in respect of the subordinated guarantees will be set forth in the applicable prospectus supplement.

*No Assignment*

Credit Suisse Group may not assign its obligations under the subordinated guarantees, except (i) in the case of merger, consolidation, sale, lease or other transfer of substantially all of its assets in which Credit Suisse Group is not the surviving entity or (ii) to one of its branches.

*Termination*

The subordinated guarantees will terminate on the earlier of:

- the payment of the redemption price for all capital securities or purchase and cancellation of all capital securities of the relevant series; and

- the full payment of the liquidating distribution on all capital securities of the relevant series.

However, the subordinated guarantees will continue to be effective or will be reinstated, as the case may be, if the holder is required to return any liquidation or redemption payment made under the capital securities or the subordinated guarantees.

*Amendments*

Any changes to the subordinated guarantees that affect the amount and timing of the payments under the subordinated guarantees or reduce the amount of capital securities whose holders must consent to an amendment must be approved by each holder of capital securities of each affected series. Any other provision of the subordinated guarantees, including ranking, may be modified only with the prior approval of the holders of not less than a majority (based on the aggregate liquidation preference) of the outstanding capital securities of each affected series (voting as a class).

Notwithstanding the foregoing, without the consent of any holder of capital securities of any series, Credit Suisse Group may amend or supplement the subordinated guarantee agreements:

- to evidence the succession of another entity to Credit Suisse Group and the assumption by any such successor of any covenants of Credit Suisse Group in the subordinated guarantee agreements;

- to add to the covenants, restrictions or obligations of Credit Suisse Group for the benefit of the holders of capital securities of such series, or to surrender any right or power conferred upon Credit Suisse Group under the subordinated guarantee agreements;

- to correct or supplement any provision in the subordinated guarantee agreements that may be defective or inconsistent with any other provision therein;

- to modify, eliminate and add to any provision in the subordinated guarantee agreements to such extent as may be necessary or desirable, so long as any such action shall not materially adversely affect the interests of the holders of capital securities of such series;

- to modify or supplement the subordinated guarantee agreement to give effect to any provision made invalid by any changes in the Investment Company Act of 1940, as amended, or the Trust Indenture Act or any other applicable law, provided that any such action does not cause any other provision of the relevant trust agreement, LLC agreement or Memorandum and Articles of Incorporation, as applicable, to become invalid and does not materially adversely affect the interests of the holders of the capital securities of such series in any other manner;

51

Exhibit 1

174

- to cure any ambiguity or correct any mistake; or

- in connection with the creation of any series of capital securities and the establishment of the particular terms thereof.

### *Information Concerning the Guarantee Trustee*

The Bank of New York Mellon, with its corporate trust office at 101 Barclay Street, Floor 8W, New York, New York 10286, will be the guarantee trustee. The guarantee trustee will be required to perform only those duties that are specifically set forth in the relevant subordinated guarantee, except when a default has occurred and is continuing with respect to the relevant subordinated guarantee. After a default, the guarantee trustee must exercise the same degree of care that a prudent person would exercise under the circumstances in the conduct of her or his own affairs. Subject to these requirements, the guarantee trustee will be under no obligation to exercise any of the powers vested in it by the relevant subordinated guarantee at the request of any holder of capital securities unless the holder offers the guarantee trustee reasonable indemnity against the costs, expenses and liabilities that might be incurred by exercising those powers.

The Bank of New York Mellon has loaned money to us and certain of our subsidiaries and affiliates and provided other services to us and has acted as trustee or fiscal agent under certain of our and our subsidiaries' and affiliates' indentures or fiscal agency agreements in the past and may do so in the future as a part of its regular business.

### *Governing Law*

The subordinated guarantees will be governed by and construed in accordance with the laws of the State of New York, except for the subordination provisions thereof, which will be governed by Swiss law.

### Description of Subordinated Debt Securities in Connection with Certain Capital Securities of Credit Suisse Group

In connection with an offering of capital securities of Credit Suisse Group, Credit Suisse Group or one of its branches or subsidiaries may issue subordinated debt securities to the relevant company or the relevant trust. In such case, Credit Suisse Group or such branch or subsidiary will issue the subordinated debt securities to the relevant company or the relevant trust at the same time that the capital securities are issued. This prospectus briefly outlines certain general terms and provisions of the subordinated debt securities we may issue. You should read the applicable prospectus supplement for additional terms relating to the subordinated debt securities. The specific terms of a subordinated debt security as described in the applicable prospectus supplement will supplement and, if applicable, may modify or replace the general terms described in this section. If there are differences between the applicable prospectus supplement and this prospectus, the prospectus supplement will control. Holders of capital securities may or may not have any beneficial interests in debt securities issued in connection with their capital securities but will have rights under the relevant subordinated guarantee of Credit Suisse Group as described under "—Description of Subordinated Guarantees in Connection with Capital Securities of Credit Suisse Group." The following description assumes that debt securities will be issued in connection with an issuance of capital securities and that holders will have beneficial interests or other rights with respect to such debt securities. If they do not, some or all of the terms described below may be included in the relevant subordinated guarantee of Credit Suisse Group.

Unless otherwise specified in the applicable prospectus supplement, the subordinated debt securities will be perpetual obligations of Credit Suisse Group or one of its branches or subsidiaries and will have the aggregate principal amount set forth in the applicable prospectus supplement. Interest on the subordinated debt securities will be payable on the interest payment dates and at the rate or rates, including fixed or floating rates, specified in the applicable prospectus supplement.

Exhibit 1

175

Interest due on an interest payment date may be deferrable at the option of Credit Suisse Group or such branch or subsidiary as specified in the applicable prospectus supplement.

### Redemption

The subordinated debt securities may be redeemable with the consent of the Swiss Financial Market Supervisory Authority FINMA, as successor to the Swiss Federal Banking Commission, and at the option of Credit Suisse Group or its branch or subsidiary at the price or prices, within the period or periods and upon the terms, conditions or events specified in the applicable prospectus supplement.

### Additional Amounts

The applicable prospectus supplement will specify any additional amounts payable if Credit Suisse Group or its branch or subsidiary is required to withhold any taxes, duties or other governmental charges with respect to any payment in respect of the subordinated debt securities.

### Subordination

If issued by Credit Suisse Group or one of its branches, the subordinated debt securities will be a general, subordinated and unsecured obligation of Credit Suisse Group and, in liquidation of Credit Suisse Group, will rank, both as to payment and in liquidation:

- subordinate and junior to Credit Suisse Group's senior liabilities, as defined under "—Description of Subordinated Guarantees in Connection with Capital Securities of Credit Suisse Group—Subordination" and other subordinated debt securities issued under this prospectus, and

- senior to the shares of Credit Suisse Group and any other securities of Credit Suisse Group expressed to rank junior to the most senior preference shares of Credit Suisse Group (if any) from time to time outstanding.

The debt securities of any subsidiary of Credit Suisse Group designated as subordinated will be subordinated obligations of such subsidiary and may be guaranteed on a subordinated basis by Credit Suisse Group.

Payments under the subordinated debt securities will be conditional upon Credit Suisse Group's or Credit Suisse's not being in default in the payment of Credit Suisse Group's or Credit Suisse's senior liabilities. The applicable prospectus supplement will set forth any other conditions, including the solvency of Credit Suisse Group or Credit Suisse, to which some or all of the payments under the subordinated debt securities may also be subject. The subordination provisions are irrevocable.

Credit Suisse Group may not create or permit to exist any pledge or other security interest over Credit Suisse Group's assets to secure Credit Suisse Group's obligations in respect of any subordinated debt securities.

Subject to applicable law, no holder of subordinated debt securities shall be entitled to exercise, claim or plead any right of set-off, compensation or retention in respect of any amount owed to it by Credit Suisse Group or by the branch through which it has issued the subordinated debt securities, arising under or in connection with subordinated debt securities and each holder shall, by virtue of being a holder of such subordinated debt securities, be deemed to have waived all such rights of set-off, compensation or retention.

### Enforcement of the Subordinated Debt Securities

Any consent, notice or other action (including any enforcement action) given or taken by or on behalf of the relevant trust or company may be given or taken by the trustee or at the discretion of the management of the company, as applicable, as described in the applicable prospectus supplement.

Exhibit 1

176

*Transfer of the Subordinated Debt Securities*

The subordinated debt securities will be represented by a single definitive note registered in the name of the relevant company or trust. The relevant LLC agreement or Memorandum and Articles of Association, as applicable, will provide that the relevant issuer may sell the subordinated debt securities only upon the approval of the management of the company as described in the applicable prospectus supplement and/or by the affirmative vote of the holders of a majority (based on the aggregate liquidation preference) of the relevant capital securities and other securities ranking equally with the capital securities (if any), voting together as a single class.

Except as set forth in the applicable prospectus supplement, the subordinated debt securities will provide that they may be sold in whole and not in part and may not be divided into denominations of less than $2,000.

*Events of Default*

Except as set forth in the applicable prospectus supplement, the subordinated debt securities will not provide for acceleration if Credit Suisse Group or its branch or subsidiary fails to make a payment when due. If Credit Suisse Group or its branch or subsidiary fails to make a payment when due of an installment of interest on the subordinated debt securities, the relevant issuer will be entitled to seek to enforce payment only of the defaulted installment but not in respect of any failure to pay interest due under the subordinated debt securities that was deferred to the extent permitted as specified in the applicable prospectus supplement. A "default" under the subordinated debt securities will occur if Credit Suisse Group or its branch or subsidiary fails to make a payment when due of an installment of principal or interest.

*Modification and Amendment of the Subordinated Debt Securities*

The subordinated debt securities may be modified or amended only by the written agreement of Credit Suisse Group or its branch or subsidiary, on the one hand, and the relevant trust or company, on the other. However, the relevant LLC agreement or Memorandum and Articles of Incorporation, as applicable, will provide that the company may not agree to any such modification or amendment for so long as any capital securities of the relevant series or other securities ranking equally with such capital securities (if any) are outstanding unless holders of a majority (based on the aggregate liquidation preference) of such capital securities and other securities ranking equally with such capital securities (if any), voting as a class, consent to such modification or amendment, except if the proposed amendment or modification would not materially and adversely affect the rights, preferences, powers or privileges of the relevant company, or as otherwise set forth in the applicable prospectus supplement.

*Governing Law*

The subordinated debt securities will be governed by and construed in accordance with the laws of the State of New York, except for, in the case of subordinated debt securities issued by Credit Suisse Group, the subordination provisions thereof, which will be governed by Swiss law.

54

Exhibit 1

177

**DESCRIPTION OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA)**

**Description of Debt Securities**

The Guaranteed Senior Debt Securities of Credit Suisse (USA) consist of the following debt securities as well as any other debt securities issued pursuant to the indentures listed under "—Description of Indentures," below:

$1,383,000 5.625% Notes due February 15, 2016

$3,000,000,000 6⅛% Notes due November 15, 2011

$2,000,000,000 6½% Notes due January 15, 2012

$750,000,000 6½% Notes due January 15, 2012

$1,000,000,000 7⅛% Notes due July 15, 2032

$1,000,000,000 5½% Notes due August 15, 2013

$300,000,000 6⅛% Notes due November 15, 2011

$1,000,000,000 5⅛% Notes due January 15, 2014

$1,350,000,000 4.70% Notes due June 1, 2009

$1,000,000,000 4⅛% Notes due January 15, 2010

$500,000,000 Floating Rate Notes due January 15, 2010

$2,000,000,000 4⅞% Notes due January 15, 2015

$2,805,000 ProNotes due March 31, 2009 Linked to the Value of a Global Basket of Indices

$1,250,000,000 Floating Rate Notes due August 15, 2010

$1,000,000,000 4⅞% Notes due August 15, 2010

$1,750,000,000 5⅛% Notes due August 15, 2015

$2,250,000 ProNotes due June 30, 2009 Linked to the Value of a Global Basket of Equity Indices

$5,100,000 Buffered Accelerated Return Equity Securities (BARES) due June 30, 2009 Linked to the Value of a Global Basket of Equity Indices

$65,000 Buffered Accelerated Return Equity Securities (BARES) due October 30, 2009 Linked to the Value of the PHLX Housing SectorSM Index

$2,000,000 ProNotes due October 30, 2009 Linked to the Value of the Nikkei 225 Index (NKY)

$64,000 ProNotes due August 17, 2009 Linked to the Value of a Basket of Commodities and Exchange Rates

$14,258,000 ProNotes due August 31, 2010 Linked to the Value of a Global Basket of Equity Indices

$750,000,000 5¼% Notes due March 2, 2011

$1,250,000,000 Floating Rate Notes due March 2, 2011

$1,000,000,000 5⅜% Notes due March 2, 2016

$4,353,000 ProNotes Linked to the Value of a Basket of Commodities due September 30, 2009

$1,000,000,000 Floating Rate Notes due April 12, 2013

$1,950,000 ProNotes Linked to the Value of a Global Basket of Indices due October 30, 2009

55

Exhibit 1

178

$2,772,000 ProNotes Linked to the Value of a Global Basket of Equity Indices due July 28, 2010

$101,000 ProNotes Linked to the Value of the S&P 500 Index due April 29, 2013

$80,596,413.46 8.82% Senior Notes due May 15, 2016

$15,567,000 ProNotes Linked to the Value of a Basket of Equity Indices and Exchange Rates due May 26, 2009

$1,794,000 ProNotes Linked to the Value of a Global Basket of Indices due August 31, 2010

$1,050,000,000 Floating Rate Notes Due June 5, 2009

$700,000,000 Floating Rate Notes Due June 5, 2009

$1,000,000,000 Floating Rate Notes Due June 5, 2009

$8,077,000 ProNotes Linked to the Value of a Basket of Commodities due July 28, 2010

$1,000,000 ProNotes Linked to the Value of the S&P 500 Index due January 29, 2010

$1,250,000,000 Floating Rate Notes Due August 16, 2011

$750,000,000 5.5% Notes Due August 16, 2011

$500,000,000 5.85% Notes Due August 16, 2016

$12,295,000 Buffered Accelerated Return Equity Securities (BARES) Linked to the Value of a Global Basket of Equity Indices due September 30, 2009

$6,398,000 ProNotes Linked to the Value of a Global Basket of Indices due June 30, 2010

$300,000 ProNotes Linked to the Value of a Basket of Commodities due September 30, 2010

$9,202,000 ProNotes Linked to the Value of a Basket of Equity Indices and Exchange Rates due April 30, 2010

$4,160,000 ProNotes Linked to the Value of a Global Basket of Indices due October 29, 2010

$989,000 Buffered Accelerated Return Equity Securities (BARES) Linked to the Value of a Global Basket of Equity Indices due October 29, 2010

$1,255,000 ProNotes Linked to the Value of a Global Basket of Indices due October 29, 2010

$1,900,000,000 Floating Rate Notes Due November 20, 2009

$700,000,000 Floating Rate Notes Due November 20, 2009

$400,000,000 Floating Rate Notes Due November 20, 2009

$850,000 ProNotes Linked to the Value of a Global Basket of Indices due November 30, 2010

$777,000 ProNotes Linked to the Value of a Global Basket of Indices due January 14, 2011

$2,699,000 ProNotes Linked to the Value of a Global Basket of Indices due January 31, 2011

$4,300,000 ProNotes Linked to the Value of a Global Basket of Indices due November 30, 2011

$41,387,000 Buffered Accelerated Return Equity Securities (BARES) due March 31, 2011 Linked to the Value of a Global Basket of Equity Indices

The description of these debt securities is incorporated in the registration statement of which this prospectus forms a part by reference to the relevant prospectus, prospectus supplement, product supplement, if any, and pricing supplement, if any, filed by Credit Suisse (USA) in connection with the initial issuance of the Guaranteed Senior Debt Securities. A prospectus, prospectus supplement,

Exhibit 1

179

product supplement, if any, and pricing supplement, if any, describing each such security (each, a "disclosure document") have been filed with the SEC by Credit Suisse (USA) under Registration Statement numbers 333-131970, 333-116241; 333-86720; 333-71850; 333-62422; 333-07657; 333-34149; 333-53499; 333-73405; 333-30928 and each of these disclosure documents is incorporated by reference herein in its entirety, except for any portion of each disclosure document that incorporates by reference Credit Suisse (USA)'s prior and future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act.

**Description of Indentures**

Each of the Guaranteed Senior Debt Securities of Credit Suisse (USA) listed in "—Description of Debt Securities" above was issued under one of the following indentures:

- Senior Indenture, dated as of June 1, 2001, between Credit Suisse (USA), formerly known as Credit Suisse First Boston (USA), Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to The Chase Manhattan Bank, as Trustee;

- Senior Indenture, dated as of June 8, 1998, between Credit Suisse (USA), as successor to Donaldson, Lufkin & Jenrette, Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to The Chase Manhattan Bank, as Trustee;

- Indenture, dated as of September 3, 1997, between Credit Suisse (USA), as successor to Donaldson, Lufkin & Jenrette, Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to The Chase Manhattan Bank, as Trustee; and

- Indenture, dated as of October 25, 1995, between Credit Suisse (USA), as successor to Donaldson, Lufkin & Jenrette, Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as Trustee.

Each of the indentures above has been filed with the Securities and Exchange Commission and is incorporated by reference in the registration statement of which this prospectus forms a part. The description of these indentures is incorporated in the registration statement by reference to the relevant prospectus and prospectus supplement filed by Credit Suisse (USA) in connection with the initial issuance of the Guaranteed Senior Debt Securities.

Exhibit 1
180

## DESCRIPTION OF THE GUARANTEES OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA)

Credit Suisse (USA)'s Guaranteed Senior Debt Securities have been fully and unconditionally guaranteed by Credit Suisse Group and Credit Suisse on a several basis. If Credit Suisse (USA), for any reason, does not make a required payment in respect of these securities when due, whether on the normal due date, on acceleration, redemption or otherwise, either or both of Credit Suisse Group and Credit Suisse will cause the payment to be made to or to the order of the trustee. The Credit Suisse Group guarantees are on a subordinated basis as described below. The holder of a Guaranteed Senior Debt Security will be entitled to payment under the relevant guarantees of Credit Suisse Group and Credit Suisse without taking any action whatsoever against Credit Suisse (USA).

The terms of the guarantees have been set forth in a supplemental indenture to each of the indentures under which Guaranteed Senior Debt Securities of Credit Suisse (USA) have been issued. The indentures, as so supplemented, have been qualified under the Trust Indenture Act.

### Subordination of Credit Suisse Group Guarantee

The discussion of subordination in this section applies only to the guarantees by Credit Suisse Group of the Guaranteed Senior Debt Securities of Credit Suisse (USA).

When the term "senior indebtedness" is used in the context of these guarantees, it means:

- any money Credit Suisse Group has borrowed, including any senior debt securities or guarantees of senior debt securities issued under the relevant senior indenture of Credit Suisse Group;

- any money borrowed by someone else where Credit Suisse Group has assumed or guaranteed the obligations, directly or indirectly;

- any letters of credit and acceptances made by banks on Credit Suisse Group's behalf;

- indebtedness that Credit Suisse Group has incurred or assumed in connection with the acquisition of any property; and

- all deferrals, renewals, extensions and refundings of, and amendments, modifications and supplements to, any of the above.

Senior indebtedness does not include any indebtedness that is expressed to be subordinated to or on par with the Credit Suisse Group guarantees or any money owed to Credit Suisse Group's subsidiaries.

The indentures, as supplemented, provide that Credit Suisse Group cannot:

- make any payments of principal or interest on the Guaranteed Senior Debt Securities of Credit Suisse (USA);

- redeem any Guaranteed Senior Debt Securities;

- acquire any Guaranteed Senior Debt Securities; or

- defease any Guaranteed Senior Debt Securities;

if

- any senior indebtedness in an aggregate principal amount of more than $100 million has become due either on maturity or as a result of acceleration or otherwise and the principal, premium and interest on that senior indebtedness has not yet been paid in full by Credit Suisse Group; or

- Credit Suisse Group has defaulted in the payment of any principal, premium or interest on any senior indebtedness in an aggregate principal amount of more than $100 million at the time the

58

Exhibit 1
181

payment was due, unless and until the payment default is cured by such entity or waived by the holders of the senior indebtedness.

If Credit Suisse Group is liquidated, the holders of senior indebtedness will be entitled to receive payment in full in cash or cash equivalents for principal, premium and interest on the senior indebtedness before the holders of Guaranteed Senior Debt Securities receive any of Credit Suisse Group's assets. As a result, holders of Guaranteed Senior Debt Securities may receive a smaller proportion of Credit Suisse Group's assets in liquidation than holders of senior indebtedness.

Even if the subordination provisions prevent Credit Suisse Group from making any payment when due on the Guaranteed Senior Debt Securities or the relevant guarantee, Credit Suisse Group will be in default on its obligations under the relevant indenture, as supplemented, if it does not make the payment when due. This means that the trustee and the holders of Guaranteed Senior Debt Securities can take action against Credit Suisse Group, but they would not receive any money until the claims of the senior indebtedness have been fully satisfied.

The indentures allow the holders of senior indebtedness to obtain specific performance of the subordination provisions from Credit Suisse Group.

Exhibit 1
182

**ERISA**

ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, or the Code impose certain restrictions on (a) employee benefit plans, including entities such as collective investment funds and separate accounts, that are subject to Title I of ERISA, (b) plans described in Section 4975(e)(1) of the Code, including individual retirement accounts and Keogh plans, subject to Section 4975 of the Code and (c) any entities whose underlying assets include "plan assets" by reason of the Plan Asset Regulation (as defined below) or otherwise. Each of (a), (b) and (c) is herein referred to as a Plan. ERISA also imposes certain duties on persons who are fiduciaries with respect to Plans subject to ERISA. In accordance with ERISA's general fiduciary requirements, a fiduciary with respect to any such Plan who is considering the purchase of securities on behalf of such Plan should determine whether such purchase is permitted under the governing plan documents and is prudent and appropriate for the Plan in view of its overall investment policy and the composition and diversification of its portfolio.

The Department of Labor has issued a regulation (29 C.F.R. Section 2510.3-101) concerning the definition of what constitutes the assets of a Plan for purposes of ERISA and Section 4975 of the Code, or the Plan Asset Regulation. The Plan Asset Regulation, as modified by Section 3(42) of ERISA, provides that, as a general rule, the underlying assets and properties of corporations, partnerships, trusts and certain other entities that are not "operating companies" in which a Plan purchases an equity interest will be deemed for purposes of ERISA and Section 4975 of the Code to be assets of the investing Plan unless certain exceptions apply. Under one such exception, the assets of such an entity are not considered to be plan assets where a Plan makes an investment in an equity interest that is a "publicly-offered security." A "publicly-offered security" is a security that is (a) "freely transferable," (b) part of a class of securities that is "widely held" and (c) either part of a class of securities that is registered under Section 12 of the Exchange Act or sold to the Plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act and the class of securities of which such security is a part is registered under the Exchange Act within 120 days (or such later time as may be allowed by the SEC) after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving Plans, and certain persons, referred to as "parties in interest" under ERISA or "disqualified persons" under the Code, having certain relationships with such Plans. We and certain of our subsidiaries, controlling shareholders and other affiliates may each be considered a "party in interest" or "disqualified person" with respect to many Plans. Prohibited transactions within the meaning of ERISA or the Code may arise, for example, if these securities are acquired by or with the assets of a Plan with respect to which one of these entities is a service provider, unless the securities are acquired pursuant to a statutory or an administrative exemption.

The acquisition of the securities may be eligible for one of the exemptions noted below if the acquisition:

- is made solely with the assets of a bank collective investment fund and satisfies the requirements and conditions of Prohibited Transaction Class Exemption, or PTCE, 91-38 issued by the Department of Labor;

- is made solely with assets of an insurance company pooled separate account and satisfies the requirements and conditions of PTCE 90-1 issued by the Department of Labor;

- is made solely with assets managed by a qualified professional asset manager and satisfies the requirements and conditions of PTCE 84-14 issued by the Department of Labor;

- is made solely with assets of an insurance company general account and satisfies the requirements and conditions of PTCE 95-60 issued by the Department of Labor;

60

Exhibit 1

183

- is made solely with assets managed by an in-house asset manager and satisfies the requirements and conditions of PTCE 96-23 issued by the Department of Labor; or

- is made by a Plan with respect to which the issuing entity is a party in interest solely by virtue of it being a service provider and satisfies the requirements and conditions of Section 408(b) of ERISA.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the prohibited transaction provisions of ERISA or Section 4975 of the Code, may nevertheless be subject to local, state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any such plan should consult legal counsel before purchasing these securities.

Please consult the applicable prospectus supplement for further information with respect to a particular offering. Depending upon the security offered, restrictions on purchase or transfer to, by or on behalf of a Plan may apply.

61

Exhibit 1

184

## TAXATION

### United States Taxation

The following discussion summarizes certain U.S. federal income tax considerations that may be relevant to you if you invest in debt securities. For a discussion of certain U.S. federal income tax considerations of holding convertible or exchangeable debt, warrants or capital securities we refer you to the applicable prospectus supplement.

This summary deals only with U.S. holders (as defined below) that hold debt securities as capital assets. It does not address considerations that may be relevant to you if you are an investor that is subject to special tax rules, such as a bank, thrift, real estate investment trust, regulated investment company, insurance company, dealer in securities or currencies, trader in securities or commodities that elects mark to market treatment, persons that will hold debt securities as a hedge against currency risk or as a position in a "straddle" or conversion transaction, tax-exempt organization or a person whose "functional currency" is not the U.S. dollar.

This summary is based on laws, regulations, rulings and decisions now in effect, all of which may change. Any change could apply retroactively and could affect the continued validity of this summary.

You should consult your tax adviser about the tax consequences of holding debt securities, including the relevance to your particular situation of the considerations discussed below, as well as the relevance to your particular situation of state, local or other tax laws.

You are a U.S. holder if you are an individual who is a citizen or resident of the United States, a U.S. domestic corporation, or any other person that is subject to U.S. federal income tax on a net income basis in respect of an investment in the debt securities. You are a non-U.S. holder if you are not a United States person for U.S. federal income tax purposes.

### *U.S. Holder*

#### *Payments or Accruals of Interest*

Payments or accruals of "qualified stated interest" (as defined below) on a debt security will be taxable to you as ordinary interest income at the time that you receive or accrue such amounts (in accordance with your regular method of tax accounting). If you use the cash method of tax accounting and you receive payments of interest pursuant to the terms of a debt security in a currency other than U.S. dollars, which we refer to as a foreign currency, the amount of interest income you will realize will be the U.S. dollar value of the foreign currency payment based on the exchange rate in effect on the date you receive the payment, regardless of whether you convert the payment into U.S. dollars. If you are an accrual-basis U.S. holder, the amount of interest income you will realize will be based on the average exchange rate in effect during the interest accrual period (or with respect to an interest accrual period that spans two taxable years, at the average exchange rate for the partial period within the taxable year). Alternatively, as an accrual-basis U.S. holder, you may elect to translate all interest income on foreign currency-denominated debt securities at the spot rate on the last day of the accrual period (or the last day of the taxable year, in the case of an accrual period that spans more than one taxable year) or on the date that you receive the interest payment if that date is within five business days of the end of the accrual period. If you make this election, you must apply it consistently to all debt instruments from year to year and you cannot change the election without the consent of the Internal Revenue Service. If you use the accrual method of accounting for tax purposes, you will recognize foreign currency gain or loss on the receipt of a foreign currency interest payment if the exchange rate in effect on the date the payment is received differs from the rate applicable to a previous accrual of that interest income. This foreign currency gain or loss will be treated as ordinary income or loss, but generally will not be treated as an adjustment to interest income received on the debt security.

Exhibit 1

185

*Purchase, Sale and Retirement of Debt Securities*

Initially, your tax basis in a debt security generally will equal the cost of the debt security to you. Your basis will increase by any amounts that you are required to include in income under the rules governing original issue discount and market discount, and will decrease by the amount of any amortized premium and any payments other than qualified stated interest made on the debt security. (The rules for determining these amounts are discussed below.) If you purchase a debt security that is denominated in a foreign currency, the cost to you (and therefore generally your initial tax basis) will be the U.S. dollar value of the foreign currency purchase price on the date of purchase calculated at the exchange rate in effect on that date. If the foreign currency denominated debt security is traded on an established securities market and you are a cash-basis taxpayer (or if you are an accrual-basis taxpayer that makes a special election), you will determine the U.S. dollar value of the cost of the debt security by translating the amount of the foreign currency that you paid for the debt security at the spot rate of exchange on the settlement date of your purchase. The amount of any subsequent adjustments to your tax basis in a debt security in respect of foreign currency-denominated original issue discount, market discount and premium will be determined in the manner described below. If you convert U.S. dollars into a foreign currency and then immediately use that foreign currency to purchase a debt security, you generally will not have any taxable gain or loss as a result of the conversion or purchase.

When you sell or exchange a debt security, or if a debt security that you hold is retired, you generally will recognize gain or loss equal to the difference between the amount you realize on the transaction (less any accrued qualified stated interest, which will be subject to tax in the manner described above under "—Payments or Accruals of Interest") and your tax basis in the debt security. If you sell or exchange a debt security for a foreign currency, or receive foreign currency on the retirement of a debt security, the amount you will realize for U.S. tax purposes generally will be the U.S. dollar value of the foreign currency that you receive calculated at the exchange rate in effect on the date the foreign currency denominated debt security is disposed of or retired. If you dispose of a foreign currency denominated debt security that is traded on an established securities market and you are a cash-basis U.S. holder (or if you are an accrual-basis holder that makes a special election), you will determine the U.S. dollar value of the amount realized by translating the amount of the foreign currency that you received on the debt security at the spot rate of exchange on the settlement date of the sale, exchange or retirement.

The special election available to you if you are an accrual-basis taxpayer in respect of the purchase and sale of foreign currency denominated debt securities traded on an established securities market, which is discussed in the two preceding paragraphs, must be applied consistently to all debt instruments from year to year and cannot be changed without the consent of the Internal Revenue Service.

Except as discussed below with respect to market discount and foreign currency gain or loss, the gain or loss that you recognize on the sale, exchange or retirement of a debt security generally will be capital gain or loss. The gain or loss on the sale, exchange or retirement of a debt security will be long-term capital gain or loss if you have held the debt security for more than one year on the date of disposition. Net long-term capital gain recognized by an individual U.S. holder generally will be subject to tax at the lower rate than net short-term capital gain or ordinary income. The ability of U.S. holders to offset capital losses against ordinary income is limited.

Despite the foregoing, the gain or loss that you recognize on the sale, exchange or retirement of a foreign currency denominated debt security generally will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which you held the debt security. This foreign currency gain or loss will not be treated as an adjustment to interest income that you receive on the debt security.

Exhibit 1
186

*Original Issue Discount*

If we issue a series of debt securities at a discount from their stated redemption price at maturity, and the discount is equal to or more than the product of one-fourth of one percent (0.25%) of the stated redemption price at maturity of the series of debt securities multiplied by the number of full years to their maturity, the series of debt securities will be original issue discount notes. The difference between the issue price and the stated redemption price at maturity of the series of debt securities will be the "original issue discount". The "issue price" of the original discount notes will be the first price at which a substantial amount of the original issue discount notes are sold to the public (i.e., excluding sales of original issue discount notes to Credit Suisse Securities (USA) LLC, underwriters, placement agents, wholesalers, or similar persons). The "stated redemption price at maturity" will include all payments under the original issue discount notes other than payments of qualified stated interest. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments issued by us) at least annually during the entire term of an original issue discount note at a single fixed interest rate or, subject to certain conditions, based on one or more interest indices.

If you invest in an original issue discount note, you generally will be subject to the special tax accounting rules for original issue discount obligations provided by the Internal Revenue Code and certain U.S. Treasury regulations. You should be aware that, as described in greater detail below, if you invest in an original issue discount note, you generally will be required to include original issue discount in ordinary gross income for U.S. federal income tax purposes as it accrues, although you may not yet have received the cash attributable to that income.

In general, and regardless of whether you use the cash or the accrual method of tax accounting, if you are the holder of an original issue discount note with a maturity greater than one year, you will be required to include in ordinary gross income the sum of the "daily portions" of original issue discount on that original issue discount note for all days during the taxable year that you own the original issue discount note. The daily portions of original issue discount on an original issue discount note are determined by allocating to each day in any accrual period a ratable portion of the original issue discount allocable to that period. Accrual periods may be any length and may vary in length over the term of an original issue discount note, so long as no accrual period is longer than one year and each scheduled payment of principal or interest occurs on the first or last day of an accrual period. If you are the initial holder of the original issue discount note, the amount of original issue discount on an original issue discount note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the original issue discount note at the beginning of the accrual period by a fraction, the numerator of which is the annual yield to maturity (defined below) of the original issue discount note and the denominator of which is the number of accrual periods in a year; and (b) subtracting from that product the amount (if any) payable as qualified stated interest allocable to that accrual period.

In the case of an original issue discount note that is a floating rate note, both the "annual yield to maturity" and the qualified stated interest will be determined for these purposes as though the original issue discount note will bear interest in all periods at a fixed rate generally equal to the rate that would be applicable to interest payments on the original issue discount note on its date of issue or, in the case of some floating rate notes, the rate that reflects the yield that is reasonably expected for the original issue discount note. (Additional rules may apply if interest on a floating rate note is based on more than one interest index.) The "adjusted issue price" of an original issue discount note at the beginning of any accrual period will generally be the sum of its issue price (including any accrued interest) and the amount of original issue discount allocable to all prior accrual periods, reduced by the amount of all payments other than any qualified stated interest payments on the original issue discount note in all prior accrual periods. All payments on an original issue discount note (other than qualified stated interest) will generally be viewed first as payments of previously accrued original issue discount (to the

64

Exhibit 1

187

extent of the previously accrued discount and to the extent that the discount has not been allocated to prior cash payments on the note), and then as a payment of principal. The "annual yield to maturity" of an original issue discount note is the discount rate (appropriately adjusted to reflect the length of accrual periods) that causes the present value on the issue date of all payments on the original issue discount note to equal the issue price. As a result of this "constant yield" method of including original issue discount income, the amounts you will be required to include in your gross income if you invest in an original issue discount note denominated in U.S. dollars generally will be lesser in the early years and greater in the later years than amounts that would be includible on a straight-line basis.

You generally may make an irrevocable election to include in income your entire return on a debt security (i.e., the excess of all remaining payments to be received on the debt security, including payments of qualified stated interest, over the amount you paid for the debt security) under the constant yield method described above. If you purchase debt securities at a premium or market discount and if you make this election, you will also be deemed to have made the election (discussed below under "—Premium" and "—Market Discount") to amortize premium or to accrue market discount currently on a constant yield basis in respect of all other premium or market discount bonds that you hold.

In the case of an original issue discount note that is also a foreign currency denominated debt security, you should determine the U.S. dollar amount includible as original issue discount for each accrual period by (a) calculating the amount of original issue discount allocable to each accrual period in the foreign currency using the constant yield method described above and (b) translating that foreign currency amount at the average exchange rate in effect during that accrual period (or, with respect to an interest accrual period that spans two taxable years, at the average exchange rate for each partial period). Alternatively, you may translate the foreign currency amount at the spot rate of exchange on the last day of the accrual period (or the last day of the taxable year, for an accrual period that spans two taxable years) or at the spot rate of exchange on the date of receipt, if that date is within five business days of the last day of the accrual period, provided that you have made the election described above under "—Payments or Accruals of Interest". Because exchange rates may fluctuate, if you are the holder of an original issue discount note that is also a foreign currency denominated debt security, you may recognize a different amount of original issue discount income in each accrual period than would be the case if you were the holder of an otherwise similar original issue discount note denominated in U.S. dollars. Upon the receipt of an amount attributable to original issue discount (whether in connection with a payment of an amount that is not qualified stated interest or the sale or retirement of the original issue discount note), you will recognize ordinary income or loss measured by the difference between the amount received (translated into U.S. dollars at the exchange rate in effect on the date of receipt or on the date of disposition of the original issue discount note, as the case may be) and the amount accrued (using the exchange rate applicable to such previous accrual).

If you purchase an original issue discount note outside of the initial offering at a cost less than its remaining redemption amount (i.e., the total of all future payments to be made on the original issue discount note other than payments of qualified stated interest), or if you purchase an original issue discount note in the initial offering at a price other than the original issue discount note's issue price, you generally will also be required to include in gross income the daily portions of original issue discount, calculated as described above. However, if you acquire an original issue discount note at a price greater than its adjusted issue price, you will be required to reduce your periodic inclusions of original issue discount to reflect the premium paid over the adjusted issue price.

Floating rate notes generally will be treated as "variable rate debt instruments" under the original issue discount regulations. Accordingly, the stated interest on a floating rate note generally will be treated as "qualified stated interest" and such a floating rate note will not have original issue discount solely as a result of the fact that it provides for interest at a variable rate. If a floating rate note does not qualify as a "variable rate debt instrument", the floating rate note will be subject to special rules

65

Exhibit 1
188

that govern the tax treatment of debt obligations that provide for contingent payments. We will provide a detailed description of the tax considerations relevant to U.S. holders of any such debt securities in the applicable prospectus supplement.

Certain original issue discount notes may be redeemed prior to maturity, either at our option or at the option of the holder, or may have special repayment or interest rate reset features as indicated in the applicable prospectus supplement. Original issue discount notes containing these features may be subject to rules that differ from the general rules discussed above. If you purchase original issue discount notes with these features, you should carefully examine the applicable prospectus supplement and consult your tax adviser about their treatment since the tax consequences of original issue discount will depend, in part, on the particular terms and features of the original issue discount notes.

*Short-Term Notes*

The rules described above will also generally apply to original issue discount notes with maturities of one year or less, which we refer to as short-term notes, but with some modifications.

First, the original issue discount rules treat none of the interest on a short-term note as qualified stated interest, but treat a short-term note as having original issue discount. Thus, all short-term notes will be original issue discount notes. Except as noted below, if you are a cash-basis holder of a short-term note and you do not identify the short-term note as part of a hedging transaction you will generally not be required to accrue original issue discount currently, but you will be required to treat any gain realized on a sale, exchange or retirement of the short-term note as ordinary income to the extent such gain does not exceed the original issue discount accrued with respect to the short-term note during the period you held the short-term note. You may not be allowed to deduct all of the interest paid or accrued on any indebtedness incurred or maintained to purchase or carry a short-term note until the maturity of the short-term note or its earlier disposition in a taxable transaction. Notwithstanding the foregoing, if you are a cash-basis U.S. holder of a short-term note, you may elect to accrue original issue discount on a current basis (in which case the limitation on the deductibility of interest described above will not apply). A U.S. holder using the accrual method of tax accounting and some cash method holders (including banks, securities dealers, regulated investment companies and certain trust funds) generally will be required to include original issue discount on a short-term note in gross income on a current basis. Original issue discount will be treated as accruing for these purposes on a ratable basis or, at the election of the holder, on a constant yield basis based on daily compounding.

Second, regardless of whether you are a cash-basis or accrual-basis holder, if you are the holder of a short-term note you may elect to accrue any "acquisition discount" with respect to the short-term note on a current basis. Acquisition discount is the excess of the remaining redemption amount of the short-term note at the time of acquisition over the purchase price. Acquisition discount will be treated as accruing ratably or, at the election of the holder, under a constant yield method based on daily compounding. If you elect to accrue acquisition discount, the original issue discount rules will not apply.

Finally, the market discount rules described below will not apply to short-term notes.

*Premium*

If you purchase a debt security at a cost greater than the debt security's remaining redemption amount, you will be considered to have purchased the debt security at a premium, and you may elect to amortize the premium as an offset to interest income, using a constant yield method, over the remaining term of the debt security. If you make this election, it generally will apply to all debt instruments that you hold at the time of the election, as well as any debt instruments that you subsequently acquire. In addition, you may not revoke the election without the consent of the Internal

66

Exhibit 1

189

Revenue Service. If you elect to amortize the premium, you will be required to reduce your tax basis in the debt security by the amount of the premium amortized during your holding period. Original issue discount notes purchased at a premium will not be subject to the original issue discount rules described above. In the case of premium on a foreign currency denominated debt security, you should calculate the amortization of the premium in the foreign currency. Premium amortization deductions attributable to a period reduce interest income in respect of that period, and therefore are translated into U.S. dollars at the rate that you use for interest payments in respect of that period. Exchange gain or loss will be realized with respect to amortized premium on a foreign currency denominated debt security based on the difference between the exchange rate computed on the date or dates the premium is amortized against interest payments on the debt security and the exchange rate on the date the holder acquired the debt security. If you do not elect to amortize premium, the amount of premium will be included in your tax basis in the debt security. Therefore, if you do not elect to amortize premium and you hold the debt security to maturity, you generally will be required to treat the premium as capital loss when the debt security matures.

*Market Discount*

If you purchase a debt security at a price that is lower than the debt security's remaining redemption amount (or in the case of an original issue discount note, the original issue discount note's adjusted issue price), by 0.25% or more of the remaining redemption amount (or adjusted issue price), multiplied by the number of remaining whole years to maturity, the debt security will be considered to bear "market discount" in your hands. In this case, any gain that you realize on the disposition of the debt security generally will be treated as ordinary interest income to the extent of the market discount that accrued on the debt security during your holding period. In addition, you may be required to defer the deduction of a portion of the interest paid on any indebtedness that you incurred or maintained to purchase or carry the debt security. In general, market discount will be treated as accruing ratably over the term of the debt security, or, at your election, under a constant yield method. You must accrue market discount on a foreign currency denominated debt security in the specified currency. The amount that you will be required to include in income in respect of accrued market discount will be the U.S. dollar value of the accrued amount, generally calculated at the exchange rate in effect on the date that you dispose of the debt security.

You may elect to include market discount in gross income currently as it accrues (on either a ratable or constant yield basis), in lieu of treating a portion of any gain realized on a sale of the debt security as ordinary income. If you elect to include market discount on a current basis, the interest deduction deferral rule described above will not apply. If you do make such an election, it will apply to all market discount debt instruments that you acquire on or after the first day of the first taxable year to which the election applies. The election may not be revoked without the consent of the Internal Revenue Service. Any accrued market discount on a foreign currency denominated debt security that is currently includible in income will be translated into U.S. dollars at the average exchange rate for the accrual period (or portion thereof within the holder's taxable year).

*Indexed Notes and Other Debt Securities Providing for Contingent Payments*

Special rules govern the tax treatment of debt obligations that provide for contingent payments, which we refer to as contingent debt obligations. These rules generally require accrual of interest income on a constant yield basis in respect of contingent debt obligations at a yield determined at the time of issuance of the obligation, and may require adjustments to these accruals when any contingent payments are made. We will provide a detailed description of the tax considerations relevant to U.S. holders of any contingent debt obligations in the applicable prospectus supplement.

67

Exhibit 1

190

*Non-U.S. Holder*

Under present United States federal tax law, and subject to the discussion below concerning backup withholding:

(a) Payments of interest (including original issue discount) on a debt security to you will not be subject to the 30% U.S. federal withholding tax, provided that:

1.  you do not actually or constructively own 10% or more of the total combined voting power of all classes of our stock (or the stock of the guarantor) entitled to vote and are not a controlled foreign corporation related to us (or the guarantor) through stock ownership; and

2.  you provide a statement signed under penalties of perjury that includes your name and address and certify that you are a non-U.S. holder in compliance with applicable requirements by completing a Form W-8BEN, or otherwise satisfy documentary evidence requirements for establishing that you are a non-U.S. holder.

Payments of interest (including original issue discount) on the debt security that do not qualify for the portfolio interest exception and that are not effectively connected with your conduct of a trade or business in the United States will be subject to the 30% U.S. federal withholding tax, unless a U.S. income tax treaty applies to reduce or eliminate withholding. Interest effectively connected with the active conduct of a trade or business in the United States will be subject to U.S. federal income tax on a net income basis (although exempt from the 30% U.S. federal withholding tax if you provide us with a Form W-8ECI (or successor form)) in the same manner as if you were a U.S. holder as defined above.

(b) You will not be subject to U.S. federal income tax on any gain realized on the sale, exchange or retirement of the debt security unless the gain is effectively connected with your trade or business in the United States or, in the case of an individual, the holder is present in the United States for 183 days or more in the taxable year in which the sale, exchange or retirement occurs and certain other conditions are met. In the case that you are subject to U.S. federal income taxation on a net basis in respect of the debt security, you will generally be taxable under the same rules that govern the taxation of a U.S. holder.

*Information Reporting and Backup Withholding*

The paying agent must file information returns with the Internal Revenue Service in connection with debt security payments made to certain United States persons. If you are a United States person, you generally will not be subject to a United States backup withholding tax (currently at a rate of 28%) on such payments if you provide your taxpayer identification number to the paying agent. You may also be subject to information reporting and backup withholding tax requirements with respect to the proceeds from a sale of the debt securities. If you are a non-U.S. holder, you may have to comply with certification procedures to establish that you are a non-U.S. holder in order to avoid information reporting and backup withholding tax requirements.

Information reporting and backup withholding requirements will not apply to any payment of the proceeds of the sale of a debt security effected outside the United States by a foreign office of a foreign broker, provided that such broker:

1.  derives less than 50% of its gross income for a particular period from the conduct of a trade or business in the United States;

2.  is not a controlled foreign corporation for U.S. federal income tax purposes; and

3.  is not a foreign partnership that, at any time during its taxable year, is 50% or more, by income or capital interest, owned by U.S. holders or is engaged in the conduct of a U.S. trade or business.

Exhibit 1
191

Payment of the proceeds of the sale of a debt security effected outside the United States by a foreign office of any other broker will not be subject to backup withholding tax, but will be subject to information reporting requirements unless such broker has documentary evidence in its records that the beneficial owner is a non-U.S. holder and certain other conditions are met, or the beneficial owner otherwise establishes an exemption. Payment of the proceeds of a sale of a debt security by the U.S. office of a broker will be subject to information reporting requirements and backup withholding tax unless the beneficial owner certifies its non-U.S. status under penalties of perjury or otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules may be allowed as a credit against the holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the required information is furnished to the Internal Revenue Service.

**Swiss Taxation**

The following is a summary of the principal tax consequences for holding debt securities issued by a company or finance subsidiary under the laws of Switzerland for investors who are not residents of Switzerland for tax purposes and have no Swiss permanent establishment and do not conduct a Swiss-based trade or business. It does not address the tax treatment of holders of debt securities who are residents of Switzerland for tax purposes or who are subject to Swiss taxes for other reasons. This summary is based on legislation as of the date of this prospectus and does not aim to be a comprehensive description of all the Swiss tax considerations that may be relevant to a decision to invest in debt securities.

*Withholding Tax*

According to the present practice of the Swiss Federal Tax Administration, payments of interest on the debt securities issued by a company or finance subsidiary (other than Credit Suisse Group and Credit Suisse) or by a branch of Credit Suisse Group or Credit Suisse outside Switzerland are not subject to Swiss withholding tax, even if guaranteed by Credit Suisse Group, provided, however, that the net proceeds from the issue of the debt securities are used outside of Switzerland.

Payments of interest on debt securities issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) may be subject to Swiss withholding tax at a rate of 35% regardless of whether such interest is paid regularly in coupons or in a one-time payment upon redemption.

The holder of debt securities issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) who is resident in Switzerland and who, at the time the payment of interest on such debt securities is due, is the beneficial owner of such payment of interest and, in the case of a holder who is an individual, duly reports the gross payment of interest in his or her tax return and, in case of a holder who is an entity or an individual required to maintain accounts, includes such payments in its profit and loss statement, is entitled to a full refund of or a full tax credit for the Swiss withholding tax, as the case may be. A holder of debt securities issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) who is not resident in Switzerland at the time the interest on such debt securities is due may be able to claim a full or partial refund of the Swiss withholding tax if such holder is entitled to claim the benefits with regard to such interest payment of a double taxation treaty between Switzerland and his or her country of residence.

*Issue and Transfer Stamp Tax*

The issue and redemption of debt securities (other than in the case of debt securities issued by Credit Suisse Group or Credit Suisse but not through a branch outside Switzerland) should, under applicable Swiss tax law, not be subject to Swiss Issue Stamp Tax on the issue of securities, even if the debt securities are guaranteed by Credit Suisse Group or Credit Suisse, provided, however, that in such

Exhibit 1
192

a case the relevant issuer uses the proceeds from such guaranteed debt securities outside of Switzerland. The issue of debt securities (but not redemption) by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) will be liable to Swiss stamp duty on the issue of securities in the case of debt securities with a maturity in excess of one year at a rate of 0.12% for each year of the whole term (fractional years count as full years) and in the case of debt securities with a maturity of up to twelve months at a rate of 0.06%, calculated for each day of the whole term on the basis of 1/360th of such tax rate.

A transfer or sale of debt securities is subject to the Swiss Transfer Stamp Tax, currently at the rate of up to 0.3% of the consideration paid in case of debt securities issued by a company or finance subsidiary (other than Credit Suisse Group or Credit Suisse) or by a branch of Credit Suisse Group or Credit Suisse outside Switzerland or up to 0.15% of the consideration paid in case of debt securities issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland), if such transfer or sale is made by or through a bank or securities dealer (as defined in the Swiss Federal Stamp Tax Act) resident in Switzerland or Liechtenstein, unless an exemption from the Transfer Stamp Tax applies.

### *Other Taxes*

Under current Swiss law, a holder of debt securities who is not resident in Switzerland and who during the taxable year has not engaged in trade or business through a permanent establishment within Switzerland and who is not subject to taxation by Switzerland for any other reason will be exempted from any Swiss federal, cantonal or municipal income or other tax on gains on the sale of, or payments received under, the debt securities.

### European Union Directive on Taxation of Certain Interest Payments

Under European Council Directive 2003/48/EC on the taxation of savings income, Member States of the European Union are required to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria are instead required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating to information exchange with certain other countries). A number of non-EU countries, including Switzerland, and territories have agreed to adopt similar measures (some of which involve a withholding system, such as in Switzerland). As indicated above under "Description of Debt Securities—Payment of Additional Amounts", no additional amounts will be payable if a payment on a debt security to an individual is subject to any withholding or deduction that is required to be made pursuant to any European Union Directive on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, any such Directive.

You should consult your own tax advisors regarding the application of Directive 2003/48/EC or any similar Directive or similar measures of non-EU countries and territories.

Exhibit 1
193

## PLAN OF DISTRIBUTION

We may sell our securities through agents, underwriters, dealers or directly to purchasers.

Our agents may solicit offers to purchase our securities.

- We will name any agent involved in offering or selling our securities, and any commissions that we will pay to the agent, in the applicable prospectus supplement.

- Unless we indicate otherwise in the applicable prospectus supplement, our agents will act on a best efforts basis for the period of their appointment.

- Our agents may be deemed to be underwriters under the Securities Act of any of our securities that they offer or sell.

We may use an underwriter or underwriters in the offer or sale of our securities.

- If we use an underwriter or underwriters, we will execute an underwriting agreement with the underwriter or underwriters at the time that we reach an agreement for the sale of our securities.

- We will include the names of the specific managing underwriter or underwriters, as well as any other underwriters, and the terms of the transactions, including the compensation the underwriters and dealers will receive, in the applicable prospectus supplement.

- The underwriters will use the applicable prospectus supplement and any free writing prospectuses to sell our securities.

- If we use an underwriter or underwriters, the underwriter or underwriters will acquire our securities for their own account and may resell our securities in one or more transactions, including negotiated transactions. These sales will be made at a fixed price or at varying prices determined at the time of the sale.

We may use a dealer to sell our securities.

- If we use a dealer, we, as principal, will sell our securities to the dealer.

- The dealer will then sell our securities to the public at varying prices that the dealer will determine at the time it sells our securities.

- We will include the name of the dealer and the terms of our transactions with the dealer in the applicable prospectus supplement.

The securities we distribute by any of these methods may be sold to the public, in one or more transactions, either:

- at a fixed price or prices, which may be changed;

- at market prices prevailing at the time of sale;

- at prices related to prevailing market prices; or

- at negotiated prices.

In connection with an offering, the underwriters may purchase and sell securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of securities than they are required to purchase in an offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the securities while an offering is in progress. The underwriters also may impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the underwriters have repurchased securities sold by or for the account of that underwriter in stabilizing or short-covering transactions.

71

Exhibit 1
194

These activities by the underwriters may stabilize, maintain or otherwise affect the market price of the securities. As a result, the price of the securities may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the underwriters at any time. These transactions may be effected on an exchange or automated quotation system, if the securities are listed on that exchange or admitted for trading on that automated quotation system, or in the over-the-counter market or otherwise.

In connection with these sales of securities, underwriters may be deemed to have received compensation from us in the form of underwriting discounts or commissions and may also receive commissions from purchasers of the securities for whom they may act as agents. Underwriters may resell the securities to or through dealers, and those dealers may receive compensation in the form of discounts, concessions or commissions from the underwriters and/or commissions from purchasers for whom they may act as agents. The applicable prospectus supplement will include any required information about underwriting compensation we pay to underwriters, and any discounts, concessions or commissions underwriters allow to participating dealers, in connection with an offering of securities.

Credit Suisse Securities (USA) LLC, or Credit Suisse Securities, is an indirect subsidiary of Credit Suisse Group. Rule 2720 of the Conduct Rules of the Financial Industry Regulatory Authority, or FINRA, imposes certain requirements when a member of FINRA, such as Credit Suisse Securities, distributes an affiliated company's securities. If Credit Suisse Securities or our other U.S.-registered broker-dealer subsidiaries or affiliates participate in the distribution of our securities, we will conduct the offering in accordance with the applicable provisions of Section 2720 of the Conduct Rules of FINRA. In addition, because FINRA views capital securities as a direct participation program, any offering of capital securities will be conducted in accordance with Rule 2810 of the Conduct Rules of FINRA. The underwriters will not confirm initial sales to accounts over which they exercise discretionary authority without the prior written approval of the customer.

In compliance with FINRA guidelines, the maximum commission or discount to be received by any FINRA member or independent broker dealer may not exceed 8% of the aggregate amount of the securities offered pursuant to this prospectus and any applicable prospectus supplement; however, it is anticipated that the maximum commission or discount to be received in any particular offering of securities will be significantly less than this amount.

We may solicit directly offers to purchase our securities, and we may directly sell our securities to institutional or other investors. We will describe the terms of our direct sales in the applicable prospectus supplement.

We may indemnify agents, underwriters and dealers against certain liabilities, including liabilities under the Securities Act. Our agents, underwriters and dealers, or their affiliates, may be customers of, engage in transactions with or perform services for, us or our subsidiaries and affiliates in the ordinary course of business.

We may authorize our agents and underwriters to solicit offers by certain institutions to purchase our securities at the public offering price under delayed delivery contracts.

- If we use delayed delivery contracts, we will disclose that we are using them in the applicable prospectus supplement and will tell you when we will demand payment and delivery of the securities under the delayed delivery contracts.

- These delayed delivery contracts will be subject only to the conditions that we set forth in the applicable prospectus supplement.

- We will indicate in the applicable prospectus supplement the commission that underwriters and agents soliciting purchases of our securities under delayed delivery contracts will be entitled to receive.

Exhibit 1

195

**Selling Restrictions**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each underwriter or agent will represent and agree that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of securities to the public in that Relevant Member State prior to the publication of a prospectus in relation to the securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of securities to the public in that Relevant Member State at any time:

(a)  to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)  to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c)  to fewer than 100 natural or legal persons (other than qualified institutional investors as defined in the Prospectus Directive); or

(d)  in any other circumstances which do not require the publication by relevant issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

An "offer of securities to the public" in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe for the securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive. The expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State. References to "€" are to euros.

In addition, each underwriter or agent will represent and agree that:

(a)  the securities may not and will not be publicly offered, distributed or re-distributed, directly or indirectly, in or from Switzerland and neither the prospectus nor any other offering material relating to the securities may be communicated or distributed in Switzerland in any way that could constitute a public offering within the meaning of Articles 1156 or 652a of the Swiss Code of Obligations or Articles 3 and 5 of the Swiss Federal Act on Collective Investment Schemes. The prospectus or any other offering material relating to the securities may not be copied, reproduced, distributed or passed on to others without our prior written consent. The prospectus or any other offering material relating to the securities does not constitute an offering prospectus within the meaning of Articles 1156 and 652a of the Swiss Code of Obligations or a listing prospectus according to the Listing Rules of the SIX Swiss Exchange (and may not comply with the information standards required thereunder) nor a simplified prospectus within the meaning of Article 5 of the Swiss Federal Act on Collective Investment Schemes. No application for a listing of the securities on any Swiss stock exchange or other Swiss regulated market has been or will be made, and the prospectus or any other offering material relating to the securities may not comply with the information required under the relevant listing rules. The securities will not constitute investment fund units or a participation in another collective investment scheme in the meaning of the Swiss Federal Act on Collective Investment Schemes and are not authorized by or registered with the Swiss Financial Market Supervisory Authority FINMA, as successor to the Swiss Federal Banking Commission, for public distribution in Switzerland. Accordingly, neither the securities nor holders of the securities benefit from protection under the Swiss Federal Act on Collective Investment Schemes or supervision by the Swiss Financial Market Supervisory Authority

Exhibit 1
196

FINMA, as successor to the Swiss Federal Banking Commission. Investors are subject to the credit risk of the relevant issuer;

(b)(i) no prospectus (including any amendment, supplement or replacement thereto) has been prepared in connection with the offering of the securities that has been approved by the *Autorité des marchés financiers* or by the competent authority of another State that is a contracting party to the Agreement on the European Economic Area and notified to the *Autorité des marchés financiers*, and (ii) it has not offered or sold and will not offer or sell, directly or indirectly, the securities to the public in France, and has not distributed or caused to be distributed and will not distribute or cause to be distributed to the public in France, this prospectus or any other offering material relating to the securities, and that such offers, sales and distributions have been and shall only be made in France to persons licensed to provide the investment service of portfolio management for the account of third parties, qualified investors (*investisseurs qualifiés*) and/or a restricted circle of investors (*cercle restreint d'investisseurs*), in each case investing for their own account, all as defined in Articles L. 411-2, D. 411-1 and D. 411-2 of the *Code monétaire et financier*. The direct or indirect distribution to the public in France of any so acquired securities may be made only as provided by Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 to L. 621-8-3 of the *Code monétaire et financier* and applicable regulations thereunder;

(c) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 (the "FSMA")) received by it in connection with the issue or sale of the securities in circumstances in which Section 21(1) of the FSMA does not apply to the relevant issuer;

(d) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the securities in, from or otherwise involving the United Kingdom;

(e) the securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan. Each underwriter or agent has represented and agreed that it has not offered or sold, and will not offer or sell any securities directly or indirectly in Japan or to, or for the benefit of, any Japanese person or to others, for re-offering or resale directly or indirectly in Japan or to any Japanese person, except in each case pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law of Japan and any other applicable laws and regulations of Japan. For purposes of this paragraph, "Japanese person" means any person resident in Japan, including any corporation or other entity organized under the laws of Japan;

(f) The securities have not been offered or sold, and will not be offered or sold, in Hong Kong, by means of any document, other than (i) to persons whose ordinary business is to buy or sell shares or debentures (whether as principal or agent) or (ii) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32) (the "CO"), or (iii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) (the "SFO") and any rules made under the SFO, or (iv) in other circumstances which do not result in the document being a "prospectus" within the meaning of the CO;

(g) This prospectus has not been and will not be registered as a prospectus with the Monetary Authority of Singapore under the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"). Accordingly, this prospectus, any applicable Final Terms relating to any securities and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of any securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to any person in Singapore other than (i) to an institutional investor under

74

Exhibit 1
197

Section 274 of the SFA, (ii) to a relevant person, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise than pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Each of the following relevant persons specified in Section 275 of the SFA which has subscribed or purchased securities, namely a person who is:

> (i)  a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

> (ii)  a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an individual who is an accredited investor, should note that shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the securities under Section 275 of the SFA except:

>> (1)  to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA;

>> (2)  where no consideration is or will be given for the transfer; or

>> (3)  where the transfer is by operation of law;

(h)  the securities may not be offered, sold or delivered, directly or indirectly, in the People's Republic of China (excluding Hong Kong, Macau and Taiwan);

(i)  no prospectus supplement or accompanying prospectus, product disclosure statement or supplementary product disclosure statement, or other disclosure document (as defined in the Corporations Act 2001 of Australia) in relation to the securities has been or will be lodged with the Australian Securities and Investments Commission ("ASIC"). Accordingly, each underwriter and agent has represented and agreed that it:

> (x)  has not made or invited, and will not make or invite, an offer of the securities for issue or sale in Australia (including an offer or invitation which is received by a person in Australia); and

> (y)  has not distributed or published, and will not distribute or publish, the prospectus or any other offering material relating to the securities in Australia,

unless (i) the offer otherwise does not require disclosure to investors under Part 6D.2, Part 7.7 or Part 7.9 of the Corporations Act 2001 of Australia, (ii) such action complies with all applicable laws, regulations and directives, and (iii) does not require any document to be lodged with the ASIC;

(j)  it has not offered or sold, and will not offer or sell, any securities, directly or indirectly, in Canada or any province or territory thereof or to, or for the benefit of, any resident of Canada in contravention of the securities laws and regulations of the provinces and territories of Canada and represents that any offer of securities in Canada will be made only pursuant to an exemption from the requirement to file a prospectus in the province or territory of Canada in which such offer is made; and that it has not and it will not distribute or deliver the prospectus or any other offering material relating to the securities in Canada or to any resident of Canada in contravention of the securities law and regulations of the provinces and territories of Canada; and

(k)  the securities have not been and will not be registered with the National Securities Registry (*Registro Nacional de Valores*) maintained by the National Banking and Securities

75

Exhibit 1

198

Commission (*Comisión Nacional Bancaria y de Valores*), and may not be offered or sold publicly in Mexico. The securities may be privately placed in Mexico, pursuant to the exemption set forth in the Article 8 of the Mexican Securities Market Law.

This document is only being distributed to and is only directed at (i) persons who are outside the United Kingdom or (ii) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (iii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). The securities are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such securities will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

Exhibit 1

199

## MARKET-MAKING ACTIVITIES

Any of our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities, may use this prospectus and our prospectus supplements in connection with offers and sales of our securities, in connection with market-making transactions by and through our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities, at prices that relate to the prevailing market prices of our securities at the time of the sale or otherwise. Any of our broker-dealer subsidiaries and affiliates, including Credit Suisse Securities, may act as principal or agent in these transactions. In addition, this prospectus, together with the relevant prospectus, prospectus supplement, product supplement, if any, and pricing supplement, if any, describing the terms of the specific series of securities being offered and sold, applies to market-making offers and sales of all outstanding securities of Credit Suisse (USA). None of our broker-dealer subsidiaries and affiliates has any obligation to make a market in any of our offered securities and may discontinue any market-making activities at any time without notice, at its sole discretion.

## LEGAL MATTERS

Certain legal matters with respect to U.S. law relating to the offering of our securities will be passed upon for us by Cleary Gottlieb Steen & Hamilton LLP, New York, New York, our U.S. counsel. Certain legal matters with respect to Swiss law relating to the offering of our securities will be passed upon for us by Homburger AG, Zurich, Switzerland, our Swiss counsel. Any agents or underwriters will be represented by Cravath, Swaine & Moore LLP, New York, New York. Cravath, Swaine & Moore LLP regularly provides legal services to us and our subsidiaries and affiliates. Certain matters of law relating to the offering of the trust preferred securities, the company preferred securities and the guaranteed debt securities of the finance subsidiaries will be passed upon for the companies, trusts and finance subsidiary organized in Delaware by Richards, Layton & Finger, P.A., Wilmington, Delaware and for the companies and finance subsidiary organized in Guernsey by Carey Olsen, Guernsey, Channel Islands.

## EXPERTS

The consolidated financial statements of Credit Suisse Group and Credit Suisse as of December 31, 2008 and 2007, and for each of the years in the three-year period ended December 31, 2008, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2008, have been incorporated by reference into this prospectus in reliance upon the reports of KPMG Klynveld Peat Marwick Goerdeler SA, independent registered public accounting firm, which are included in the combined Annual Report on Form 20-F of Credit Suisse Group and Credit Suisse for the year ended December 31, 2008 and incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

The audit report on the consolidated financial statements of Credit Suisse Group and Credit Suisse as of December 31, 2008 and 2007, and for each of the years in the three-year period ended December 31, 2008 contains an explanatory paragraph that states that, in 2007, Credit Suisse Group and Credit Suisse changed their method of accounting for certain financial instruments accounted for at fair value and in 2006 Credit Suisse Group and Credit Suisse changed their method of accounting for defined benefit plans.

Exhibit 1

200



Home USA   >   About Us   >   Media   >   Latest News

# Press Release

### Credit Suisse Temporarily Suspends Further Issuance of VelocityShares Daily 2x Long VIX Short-Term ETN (Ticker Symbol: "TVIX")

New York,  February 21, 2012 **Credit Suisse announced today that it has temporarily suspended further issuances of the VelocityShares Daily 2x VIX Short-Term ETNs (Ticker Symbol: "TVIX") due to internal limits on the size of the ETNs. This suspension does not affect the Early Redemption rights of noteholders as described in the pricing supplement. Other ETNs issued by Credit Suisse are not affected by this suspension.**

As disclosed in the pricing supplement relating to the ETNs under the heading "Risk Factors—The Market Price of Your ETNs May Be Influenced By Many Unpredictable Factors," the market value of the ETNs may be influenced by, among other things, the levels of supply and demand for the ETNs. It is possible that the suspension, as described above, may influence the market value of the ETNs. Credit Suisse believes it is possible that the temporary suspension of further issuances may cause an imbalance of supply and demand in the secondary market for the ETNs, which may cause the ETNs to trade at a premium or discount in relation to their indicative value. Therefore, any purchase of the ETNs in the secondary market may be at a purchase price significantly different from their indicative value.

The pricing supplement relating to the ETNs can be found on EDGAR, the SEC website at: www.sec.gov.

### Enquiries

- Steven Vames, Tel. +1 212 325 0932, steven.vames@credit-suisse.com

Credit Suisse AG
Credit Suisse AG is one of the world's leading financial services providers and is part of the Credit Suisse group of companies (referred to here as 'Credit Suisse'). As an integrated bank, Credit Suisse offers clients its combined expertise in the areas of private banking, investment banking and asset management. Credit Suisse provides advisory services, comprehensive solutions and innovative products to companies, institutional clients and high-net-worth private clients globally, as well as to retail clients in Switzerland. Credit Suisse is headquartered in Zurich and operates in over 50 countries worldwide. The group employs approximately 49,700 people. The registered shares (CSGN) of Credit Suisse's parent company, Credit Suisse Group AG, are listed in Switzerland and, in the form of American Depositary Shares (CS), in New York. Further information about Credit Suisse can be found at www.credit-suisse.com.

Exhibit 1
201

All businesses of Credit Suisse are subject to distinct regulatory requirements; certain products and services may not be available in all jurisdictions or to all client types.

# # #

Credit Suisse has filed a registration statement (including a prospectus) with the Securities and Exchange Commission, or SEC, for the offering to which this press release relates. Before you invest, you should read the prospectus in that registration statement and the applicable pricing supplement, the prospectus supplement dated March 25, 2009 and the prospectus dated March 25, 2009 that Credit Suisse has filed with the SEC for more complete information about Credit Suisse and this offering. You may obtain these documents without cost by visiting EDGAR on the SEC website at www.sec.gov. Alternatively, Credit Suisse or any agent or any dealer participating in this offering will arrange to send you the applicable pricing supplement and the prospectus supplement and prospectus if you so request by calling 1-800-221-1037.

"VelocityShares" and the VelocityShares logo are registered trademarks of VelocityShares Index & Calculation Services, a division of VelocityShares, LLC.

"VIX" is a trademark of the Chicago Board Options Exchange, Incorporated ("CBOE") and has been licensed for use by S&P. S&P does not sponsor, promote, or sell any product based on the Index and neither S&P nor CBOE make any representation herein regarding the advisability of investing in any product based on the Index.

This document was produced by and the opinions expressed are those of Credit Suisse as of the date of writing and are subject to change.

Copyright © 2012, CREDIT SUISSE GROUP AG and/or its affiliates. All rights reserved.

**Contact**

- Press Contacts
- Investor Contacts
- Where To Find Us

**Web Services**

- News via RSS
- E-mail this page

Follow us on:

Accessibility   Sitemap   Index A-Z

Copyright © 1997 - 2012 CREDIT SUISSE GROUP AG and/or its affiliates. All

Exhibit 1

202

rights reserved. Terms of Use, Internet Security, Privacy & Cookie Policy and
Global Patriot Act Certificate.

Exhibit 1
203



# Press Release

### Credit Suisse Plans to Reopen Issuance of VelocityShares Daily 2x Long VIX Short-Term ETN (Ticker Symbol: "TVIX") on a Limited Basis

New York,  March 22, 2012 **Credit Suisse announced today that it plans to reopen issuance of the VelocityShares Daily 2x Long VIX Short-Term ETNs (Ticker Symbol: "TVIX") on a limited basis. The ETNs were temporarily suspended from further issuance by Credit Suisse on February 21, 2012 due to internal limits on the size of the ETNs. At present, the ETNs are trading at a premium to their indicative value.**

Beginning March 23, 2012, Credit Suisse may from time to time issue the ETNs into inventory of its affiliates to make the ETNs available for lending at or about rates that prevailed prior to the temporary suspension of issuances of the ETNs. Also, beginning as soon as March 28, 2012, Credit Suisse may issue additional ETNs from time to time to be sold solely to authorized market makers. Credit Suisse may condition its acceptance of a market maker's offer to purchase the ETNs on its agreeing to sell to Credit Suisse specified hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps. Any such hedging instruments will be executed on the basis of the indicative value of the ETNs at that time, will not reflect any premium or discount in the trading price of the ETNs over their indicative value and will be on terms acceptable to Credit Suisse, including the counterparty meeting Credit Suisse's creditworthiness requirements, margin requirements, minimum size and duration requirements and such other terms as Credit Suisse deems appropriate in its sole discretion. This action does not affect the Early Redemption rights of noteholders as described in the pricing supplement. The other ETNs issued by Credit Suisse are not affected by this action.

As disclosed in the pricing supplement relating to the ETNs under the heading "Risk Factors—The Market Price of Your ETNs May Be Influenced By Many Unpredictable Factors," the market value of the ETNs may be influenced by, among other things, the levels of supply and demand for the ETNs. It is possible that the reopening of the ETNs on a limited basis, as described above, may influence the market value of the ETNs. Credit Suisse cannot predict with certainty what impact, if any, the reopening described above will have on the public trading price of the ETNs. It is possible that the resumption of new issuances of the ETNs, even on a limited basis, could reduce or remove any premium in the trading price of the ETNs over their indicative value. Investors are cautioned that paying a premium purchase price over the indicative value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when the premium is no longer

Exhibit 1
204

present in the market place or the ETNs are accelerated (including at our option), in which case investors will receive a cash payment in an amount equal to the closing indicative value on the accelerated valuation date.

The pricing supplement relating to the ETNs can be found on EDGAR, the SEC website at www.sec.gov.

**Enquiries**

- Jack Grone, Tel. +1 212 325 2590, jack.grone@credit-suisse.com
- Katherine Herring, Tel. +1 212 325 7545, katherine.herring@credit-suisse.com
- Investor Inquiries, Credit Suisse ETN Desk, Tel. +1 212 538 7333

Credit Suisse AG
Credit Suisse AG is one of the world's leading financial services providers and is part of the Credit Suisse group of companies (referred to here as 'Credit Suisse'). As an integrated bank, Credit Suisse offers clients its combined expertise in the areas of private banking, investment banking and asset management. Credit Suisse provides advisory services, comprehensive solutions and innovative products to companies, institutional clients and high-net-worth private clients globally, as well as to retail clients in Switzerland. Credit Suisse is headquartered in Zurich and operates in over 50 countries worldwide. The group employs approximately 49,700 people. The registered shares (CSGN) of Credit Suisse's parent company, Credit Suisse Group AG, are listed in Switzerland and, in the form of American Depositary Shares (CS), in New York. Further information about Credit Suisse can be found at www.credit-suisse.com.

All businesses of Credit Suisse are subject to distinct regulatory requirements; certain products and services may not be available in all jurisdictions or to all client types.

# # #

Credit Suisse has filed a registration statement (including a prospectus) with the Securities and Exchange Commission, or SEC, for the offering to which this press release relates. Before you invest, you should read the prospectus in that registration statement and the applicable pricing supplement, the prospectus supplement dated March 25, 2009 and the prospectus dated March 25, 2009 that Credit Suisse has filed with the SEC for more complete information about Credit Suisse and this offering. You may obtain these documents without cost by visiting EDGAR on the SEC website at www.sec.gov. Alternatively, Credit Suisse or any agent or any dealer participating in this offering will arrange to send you the applicable pricing supplement and the prospectus supplement and prospectus if you so request by calling 1-800-221-1037.

"VelocityShares" and the VelocityShares logo are registered trademarks of VelocityShares Index & Calculation Services, a division of VelocityShares, LLC.

"VIX" is a trademark of the Chicago Board Options Exchange, Incorporated ("CBOE") and has been licensed for use by S&P. S&P does not sponsor, promote, or sell any product based on the Index and neither S&P nor CBOE make any representation herein regarding the advisability of investing in any product based on the Index.

This document was produced by and the opinions expressed are those of Credit Suisse as of the date of writing and are subject to change.

Exhibit 1
205

**Copyright © 2012, CREDIT SUISSE GROUP AG and/or its affiliates. All rights reserved.**

**Contact**

- Press Contacts
- Investor Contacts
- Where To Find Us

**Web Services**

- News via RSS
- E-mail this page

Follow us on:

Accessibility    Sitemap    Index A-Z

Copyright © 1997 - 2012 CREDIT SUISSE GROUP AG and/or its affiliates. All rights reserved. Terms of Use, Internet Security, Privacy & Cookie Policy and Global Patriot Act Certificate.

Exhibit 1

206

**PRICING SUPPLEMENT No. VLS ETN-1/A14**[†]
To the Prospectus Supplement dated March 23, 2012 and
Prospectus dated March 23, 2012

Filed Pursuant to Rule 424(b)(2)
Registration Statement No. 333-180300-03
March 23, 2012



## Issued by Credit Suisse AG

$1,500,000,000[±±] VelocityShares™ Daily Inverse VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030

$100,000,000[±±] VelocityShares™ Daily Inverse VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030

$500,000,000[±±] VelocityShares™ VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030

$100,000,000[±±] VelocityShares™ VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030

$10,000,000,000[±±] VelocityShares™ Daily 2x VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030[±]

$100,000,000[±±] VelocityShares™ Daily 2x VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030

| ETNs | Leverage Amount | ETN Type | Exchange Ticker | Indicative Value Ticker | CUSIP | ISIN |
|---|---|---|---|---|---|---|
| Inverse VIX Short Term ETNs | -1 | "Inverse" | XIV | XIVIV | 22542D795 | US22542D7957 |
| Inverse VIX Medium Term ETNs | | | ZIV | ZIVIV | 22542D829 | US22542D8294 |
| Long VIX Short Term ETNs | 1 | "Long" | VIIX | VIIXIV | 22542D811 | US22542D8112 |
| Long VIX Medium Term ETNs | | | VIIZ | VIIZIV | 22542D787 | US22542D7874 |
| 2x Long VIX Short Term ETNs[±] | 2 | "2x Long" or "Leveraged" | TVIX | TVIXIV | 22542D761 | US22542D7619 |
| 2x Long VIX Medium Term ETNs | | | TVIZ | TVIZIV | 22542D779 | US22542D7791 |

[±] **On February 21, 2012, we temporarily suspended further issuances of the 2x Long VIX Short Term ETNs due to internal limits on the size of ETNs. On March 22, 2012, we announced that we planned to reopen issuance of the 2x Long VIX Short Term ETNs on a limited basis. Beginning March 23, 2012, we may from time to time issue the ETNs into inventory of our affiliates to make the 2x Long VIX Short Term ETNs available for lending at or about rates that prevailed prior to the temporary suspension of issuances of the 2x Long VIX Short Term ETNs. Also, beginning as soon as March 28, 2012, we may issue additional 2x Long VIX Short Term ETNs from time to time to be sold solely to authorized market makers. We may condition our acceptance of a market maker's offer to purchase the 2x Long VIX Short Term ETNs on its agreeing to sell to us specified hedging instruments consistent with our hedging strategy, including but not limited to swaps. None of these events affect the early redemption right of holders as described herein. The other ETNs issued by us are not affected by any of these events.**

We are offering six separate series of exchange traded notes (collectively, the "**ETNs**"), the VelocityShares™ Daily Inverse VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030 (the "**Inverse VIX Short Term ETNs**"), the VelocityShares™ Daily Inverse VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030 (the "**Inverse VIX Medium Term ETNs**" and collectively with the Inverse VIX Short Term ETNs, the "**Inverse ETNs**"), the VelocityShares™ VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030 (the "**Long VIX Short Term ETNs**"), the VelocityShares™ VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030 (the "**Long VIX Medium Term ETNs**" and collectively with the VIX Short Term ETNs, the "**Long ETNs**"), the VelocityShares™ Daily 2x VIX Short Term ETN linked to the S&P 500 VIX Short-Term Futures™ Index due December 4, 2030 (the "**2x Long VIX Short Term ETNs**") and the VelocityShares™ Daily 2x VIX Medium Term ETN linked to the S&P 500 VIX Mid-Term Futures™ Index due December 4, 2030 (the "**2x Long VIX Medium Term ETNs**" and collectively with the Leveraged Short Term ETNs, the "**2x Long ETNs**").

We have listed each series of the ETNs on the NYSE Arca under the exchange ticker symbols as set forth in the table above. As long an active secondary market in the ETNs exists, we expect that investors will purchase and sell the ETNs primarily in this secondary market. We have no obligation to maintain any listing on NYSE Arca or any other exchange or quotation system.

**The ETNs, and in particular the 2x Long ETNs, are intended to be trading tools for sophisticated investors to manage daily trading risks. They are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives. The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day. Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable. Investors should actively and frequently monitor their investments in the ETNs, even intra-day.**

**As explained in "Risk Factors" in this pricing supplement, because of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment. In almost any potential scenario the Closing Indicative Value (as defined below) of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity.**

**Investing in the ETNs involves a number of risks. See "Risk Factors" beginning on page PS-26 of this pricing supplement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined that this pricing supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

*The ETNs are not deposit liabilities and are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction.*

## Credit Suisse

March 23, 2012

*(cover continued on next page)*

Exhibit 1

*(continued from previous page)*

**General**

- The ETNs are designed for investors who seek exposure to the applicable underlying Index. The ETNs do not guarantee any return of principal at maturity and do not pay any interest during their term. For each ETN, investors will receive a cash payment at maturity, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee (each as defined herein). Investors should be willing to forgo interest payments and, if the applicable underlying Index declines or increases, as applicable, be willing to lose up to 100% of their investment. Any payment on the ETNs is subject to our ability to pay our obligations as they become due.

- The ETNs are senior medium-term notes of Credit Suisse AG, acting through its Nassau Branch, maturing December 4, 2030 (the "**Maturity Date**").[*]

- Prior to June 27, 2011, the denomination and stated principal amount of each ETN was $100. On June 16, 2011, Credit Suisse AG announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011. On and after June 27, 2011, the denomination and stated principal amount will be $10 for the Inverse VIX Short Term ETNs, $12.50 for the Inverse VIX Medium Term ETNs and $100 for each of the Long VIX Short Term ETNs, the Long VIX Medium Term ETNs, the 2x Long VIX Short Term ETNs and the 2x Long VIX Medium Term ETNs. Any ETNs issued in the future may be issued at a price that is higher or lower than the stated principal amount, based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs.

- The initial issuance of ETNs of each series priced on November 29, 2010 (the "**Inception Date**") and settled on December 2, 2010 (the "**Initial Settlement Date**"). Delivery of the ETNs in book-entry form only will be made through The Depository Trust Company ("**DTC**").

CSSU is expected to charge normal commissions for the purchase of the ETNs. In exchange for providing certain services relating to the distribution of the ETNs, CSSU, a member of the Financial Industry Regulatory Authority ("**FINRA**"), or another FINRA member may receive all or a portion of the investor fee. In addition, CSSU may charge investors a redemption charge of up to 0.05% of the stated principal amount of any ETN that is redeemed at the investor's option. Please see "Supplemental Plan of Distribution (Conflicts of Interest)" in this pricing supplement for more information.

We sold a portion of the ETNs on the Inception Date at, and received proceeds equal to, 100% of their stated principal amount. We expect to receive proceeds equal to 100% of the issue price to the public of the ETNs we issue and sell after the Inception Date.

VLS Securities, LLC ("**VLS**") will receive all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing the securities under the "VelocityShares™" brand. See "Supplemental Plan of Distribution" in this pricing supplement for further information.

This pricing supplement provides specific pricing information in connection with the issuance of each series of the ETNs. Prospective investors should read this pricing supplement together with the prospectus supplement dated March 23, 2012 and the prospectus dated March 23, 2012 for a description of the specific terms and conditions of the ETNs. This pricing supplement amends and supersedes the accompanying prospectus supplement and prospectus to the extent that the information provided in this pricing supplement is different from the terms set forth in the prospectus supplement or the prospectus.

Additional ETNs of each series may be issued and sold from time to time through CSSU and one or more dealers at a price that is higher or lower than the stated principal amount, based on the indicative value of the ETNs of such series at that time. If there is a substantial demand for the ETNs, we may issue additional ETNs frequently. However, we are under no obligation to sell additional ETNs of any series at any time, and if we do sell additional ETNs of any series, we may limit or restrict such sales, and we may stop selling additional ETNs of such series at any time. If we stop selling additional ETNs, the price and liquidity in the secondary market could be materially and adversely affected.

The agent for this offering, Credit Suisse Securities (USA) LLC ("CSSU"), is our affiliate. We will receive proceeds equal to 100% of the offering price of the ETNs issued and sold after the initial settlement date. Delivery of the ETNs in book-entry form only will be made through The Depository Trust Company ("DTC"). Any further issuances of ETNs of any series will form a single series with the offered ETNs of such series, will have the same CUSIP number and will trade interchangeably with the offered ETNs of such series upon settlement. Any further issuances will increase the outstanding aggregate principal amount of the applicable series of the ETNs. See "Supplemental Plan of Distribution" in this pricing supplement for further information.

[†]This amended and restated pricing supplement amends and restates and supersedes Pricing Supplement No. VLS ETN-1 dated November 29, 2010, Pricing Supplement No. VLS ETN-1/A dated December 8, 2010, Pricing Supplement No. VLS ETN-1/A2 dated March 30, 2011, Pricing Supplement No. VLS ETN-1/A3 dated April 8, 2011, Pricing Supplement No. VLS ETN-1/A4 dated May 31, 2011, Pricing Supplement No. VLS ETN-1/A5 dated June 27, 2011, Pricing Supplement No. VLS ETN-1/A6 dated July 1, 2011, Pricing Supplement No. VLS ETN-1/A7 dated August 10, 2011, Pricing Supplement No. VLS ETN-1/A8 dated January 19, 2012, Pricing Supplement No. VLS ETN-1/A9 dated January 27, 2012, Pricing Supplement No. VLS ETN-1/A10 dated February 2, 2012, Pricing Supplement No. VLS ETN-1/A11 dated February 3, 2012, Pricing Supplement No. VLS ETN-1/A12 dated February 16, 2012 and Pricing Supplement No. VLS ETN-1/A13 dated March 7, 2012. We refer to this amended and restated pricing supplement as the "pricing supplement."

[‡‡]Reflects the stated principal amount of such ETNs offered hereby plus the principal amount of such ETNs outstanding as of March 19, 2012. As of March 19, 2012, there are outstanding the following:

- $431,500,000 in stated principal amount of the Inverse VIX Short Term ETNs (43,150,000 Inverse VIX Short Term ETNs, reflecting a 10-for-1 split).

- $8,375,000 in stated principal amount of the Inverse VIX Medium Term ETNs (670,000 Inverse VIX Medium Term ETNs, reflecting an 8-for-1 split).

- $95,000,000 in stated principal amount of the Long VIX Short Term ETNs (950,000 Long VIX Short Term ETNs).

- $10,000,000 in stated principal amount of the Long VIX Medium Term ETNs (100,000 Long VIX Medium Term ETNs).

- $4,072,500,000 in stated principal amount of the 2x Long VIX Short Term ETNs (40,725,000 2x Long VIX Short Term ETNs).

- $15,000,000 in stated principal amount of the 2x Long VIX Medium Term ETNs (150,000 2x Long VIX Medium Term ETNs).

*(continued on next page)*

Exhibit 1

208

*(continued from previous page)*

[*] The Maturity Date will be postponed if such date is not a Business Day or if the scheduled Final Valuation Date is not an Index Business Day or if a Market Disruption Event occurs and is continuing on the Final Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.  See "Specific Terms of the ETNs—Market Disruption Events".

**Key Terms**

| | |
|---|---|
| Issuer: | Credit Suisse AG ("**Credit Suisse**"), acting through its Nassau Branch |
| Index: | The return on the ETNs of any series will be based on the performance of the applicable underlying Index during the term of such ETNs. Each series of ETNs tracks the daily performance of either the S&P 500 VIX Short-Term Futures™ Index ER or S&P 500 VIX Mid-Term Futures™ Index ER (each such index, an "**Index**" and collectively the "**Indices**"). The Indices are designed to provide investors with exposure to one or more maturities of futures contracts on the CBOE Volatility Index® (the "**VIX Index**"), which reflect implied volatility of the S&P 500® Index at various points along the volatility forward curve. The calculation of the level of the VIX Index is based on prices of put and call options on the S&P 500® Index. Futures contracts on the VIX Index allow investors the ability to invest in forward volatility based on their view of the future direction of movement of the VIX Index. Each Index is intended to reflect the returns that are potentially available through an unleveraged investment in the relevant futures contract or contracts on the VIX Index. The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average futures contracts maturity of one month and the S&P 500 VIX Mid-Term Futures™ Index ER targets a constant weighted average futures contracts maturity of five months. The Indices were created by Standard & Poor's Financial Services LLC ("**S&P**" or the "**Index Sponsor**"). The Index Sponsor calculates the level of the relevant Index daily when the Chicago Board Options Exchange, Incorporated (the "**CBOE**") is open (excluding holidays and weekends) and publishes it on the Bloomberg pages specified below as soon as practicable thereafter. Each Index, or any successor index to such Index, may be modified, replaced or adjusted from time to time, as determined by the Calculation Agents as set forth below. See "The Indices" in this pricing supplement for further information on the Indices. |

| ETNs | Underlying Index | Underlying Index Ticker |
|---|---|---|
| Inverse VIX Short Term ETNs, Long VIX Short Term ETNs, 2x Long VIX Short Term ETNs | S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| Inverse VIX Medium Term ETNs, Long VIX Medium Term ETNs, 2x LongVIX Medium Term ETNs | S&P 500 VIX Mid-Term Futures™ Index ER | SPVXMP |

| | |
|---|---|
| | The Calculation Agents, may modify, replace or adjust the Indices under certain circumstances even if the Index Sponsor continues to publish the applicable Index without modification, replacement or adjustment. See "Specific Terms of the ETNs—Discontinuance or Modification of the Index" and "Risk Factors—The Calculation Agents may modify the applicable underlying Index" in this pricing supplement for further information. |
| Payment at Maturity: | If your ETNs have not been previously redeemed or accelerated, on the Maturity Date you will receive for each $100 stated principal amount of your ETNs (for each $10 stated principal amount in the case of Inverse VIX Short Term ETNs and for each $12.50 stated principal amount in the case of Inverse VIX Medium Term ETNs) a cash payment equal to the applicable Closing Indicative Value on the Final Valuation Date (the "**Final Indicative Value**"), as calculated by the Calculation Agents. We refer to the amount of such payment as the "**Maturity Redemption Amount**." |
| | ***If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero.*** |
| Closing Indicative Value: | The Closing Indicative Value for any series of ETNs on the Inception Date equaled $100 (the "**Initial Indicative Value**"). The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day. The Closing Indicative Value will never be less than zero. **The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value equals zero at any time or Closing Indicative Value equals zero.** The Closing Indicative Value for each series of ETNs on each Index Business Day will be published on such Index Business Day under the applicable Indicative Value ticker set forth above. The Closing Indicative Value for each series of ETNs is not the closing price or any other trading price of such series of ETNs in the secondary market. The trading price of any series of the ETNs at any time may vary significantly from the Indicative Value of such series of ETNs at such time. See "Description of the ETNs—Intraday Indicative Value" in this pricing supplement. |

On March 19, 2012, the Closing Indicative Value and closing price of each series of ETNs was:

| ETNs | Closing Price | Closing Indicative Value |
|---|---|---|
| Inverse VIX Short Term ETNs | $10.58 (exchange ticker XIV) | $10.6722 (Indicative Value Ticker XIVIV) |
| Inverse VIX Medium Term ETNs | $14.51 (exchange ticker ZIV) | $14.5755 (Indicative Value Ticker ZIVIV) |
| Long VIX Short Term ETNs | $43.68 (exchange ticker VIIX) | $43.2440 (Indicative Value Ticker VIIXIV) |
| Long VIX Medium Term ETNs | $70.49 (exchange ticker VIIZ) | $70.1498 (Indicative Value Ticker VIIZIV) |
| 2x Long VIX Short Term ETNs[±] | $15.07 (exchange ticker TVIX) | $9.3163 (Indicative Value Ticker TVIXIV) |
| 2x Long VIX Medium Term ETNs | $41.782 (exchange ticker TVIZ) | $41.6027 (Indicative Value Ticker TVIZIV) |

*(continued on next page)*

Exhibit 1
209

*(continued from previous page)*

The Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs underwent a 10-for-1 split and an 8-for-1 split, respectively, effective June 27, 2011. The Closing Indicative Value of the Inverse VIX Short Term ETNs on June 24, 2011 was $157.89294145 and the Closing Indicative Value of the Inverse VIX Medium Term ETNs on June 24, 2011 was $127.46917437. Such values were divided by 10 and 8, respectively, and rounded to 8 decimal places, prior to the open of trading on June 27, 2011. On and after June 27, 2011, the Closing Indicative Value for the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs will be expressed in an amount per denomination and stated principal amount of $10 and $12.50, respectively.

If the ETNs undergo any subsequent splits or reverse splits, the Closing Indicative Value will be adjusted accordingly (see "Description of the ETNs—Split or Reverse Split of the ETNs" in this pricing supplement). VLS or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

**Daily ETN Performance:** The Daily ETN Performance for any series of ETNs on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Daily Index Performance on such Index Business Day *times* (b) the Leverage Amount. The Daily ETN Performance is deemed to be one on any day that is not an Index Business Day.

**Daily Accrual:** The Daily Accrual represents the rate of interest that could be earned on a notional capital reinvestment at the three month U.S. Treasury rate as reported on Bloomberg under ticker USB3MTA. The Daily Accrual for any series of ETNs on any Index Business Day will equal:

$$\left(\frac{1}{1 - Tbills_{t-1} * \frac{91}{360}}\right)^{\frac{d}{91}} - 1$$

Where $Tbills_{t-1}$ is the three month treasury rate reported on Bloomberg on the prior Index Business Day and $d$ is the number of calendar days that have elapsed since the prior Index Business Day. The Daily Accrual is deemed to be zero on any day that is not an Index Business Day.

**Daily Index Performance:** The Daily Index Performance for any series of ETNs on any Index Business Day will equal (1)(a) the closing level of the applicable underlying Index on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index on the immediately preceding Index Business Day *minus* (2) the number one. If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event. The Daily Index Performance is deemed to be zero on any day that is not an Index Business Day.

**Leverage Amount:** The Leverage Amount for each series of ETNs is as follows:

| | |
|---|---|
| Inverse VIX Short Term ETNs: | -1 |
| Inverse VIX Medium Term ETNs: | -1 |
| Long VIX Short Term ETNs: | 1 |
| Long VIX Medium Term ETNs: | 1 |
| 2x Long VIX Short Term ETNs: | 2 |
| 2x Long VIX Medium Term ETNs: | 2 |

**Daily Investor Fee:** On any calendar day (the "**calculation day**"), the Daily Investor Fee for any series of ETNs will be equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Daily ETN Performance for that series on the calculation day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365.

The "**Daily Investor Fee Factor**" will be equal to (i) 0.0089 for each of the Long ETNs, (ii) 0.0135 for each of the Inverse ETNs and (iii) 0.0165 for each of the 2x Long ETNs.

**If the level of the Index decreases or does not increase sufficiently in the case of the Long ETNs or 2x Long ETNs or if it increases or does not decrease sufficiently in the case of the Inverse ETNs (in each case in addition to the Daily Accrual) to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over the term of the ETNs, you will receive less than the principal amount of your investment at maturity or upon early redemption or acceleration of the ETNs.** See "Risk Factors — Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the applicable underlying Index on the date of your investment, you may receive less than the principal amount of your ETNs" and "Hypothetical Examples" in this pricing supplement for additional information on how the Daily Investor Fee affects the overall value of the ETNs.

**Intraday Indicative Value:** The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor. The Intraday Indicative Value at any time is based on the most recent intraday level of the underlying Index. **If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero. See "Description of the ETNs—Intraday Indicative Value" in this pricing supplement.** VLS or its affiliate is responsible for computing and disseminating the Intraday Indicative Value.

*(continued on next page)*

Exhibit 1

210

*(continued from previous page)*

| | |
|---|---|
| Valuation Dates: | November 30, 2030 or, if such date is not an Index Business Day, the next following Index Business Day (the "**Final Valuation Date**"), any Early Redemption Valuation Date and the Accelerated Valuation Date. |
| Early Redemption: | Prior to maturity, you may, subject to certain restrictions described below, offer the applicable minimum number of your ETNs to us for redemption on an Early Redemption Date during the term of the ETNs until November 28, 2030. If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount. |
| | You must offer for redemption at least 25,000 ETNs, or an integral multiple of 25,000 ETNs in excess thereof, at one time in order to exercise your right to cause us to redeem your ETNs on any Early Redemption Date (the "**Minimum Redemption Amount**"); provided that we or Credit Suisse International ("**CSI**") as one of the Calculation Agents, may from time to time reduce, in part or in whole, the Minimum Redemption Amount. Any such reduction will be applied on a consistent basis for all holders of the relevant series of ETNs at the time the reduction becomes effective. If the ETNs undergo a split or reverse split, the minimum number of ETNs needed to exercise your right to redeem will remain the same. |
| Early Redemption Mechanics: | You may exercise your early redemption right by causing your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein). If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**". Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date. See "Specific Terms of the ETNs—Redemption Procedures" in this pricing supplement. |
| Early Redemption Date: | The third Business Day following an Early Redemption Valuation Date.** |
| Early Redemption Amount: | A cash payment per ETN equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge. |
| Early Redemption Charge: | The Early Redemption Charge will be equal to 0.05% *times* the Closing Indicative Value on the Early Redemption Valuation Date. |
| Acceleration at Our Option or Upon Acceleration Event: | We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date. In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration. In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day). The Accelerated Redemption Amount will be payable on the third Business Day following the Accelerated Valuation Date (such third Business Day the "**Acceleration Date**").*** We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes. |
| Acceleration Event: | As discussed in more detail under "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" in this pricing supplement, an Acceleration Event includes any event that adversely affects our ability to hedge or our rights in connection with the ETNs, including, but not limited to, if the Intraday Indicative Value is equal to or less than 20% of the prior day's Closing Indicative Value. |
| Business Day: | Any day that is not (a) a Saturday or Sunday or (b) a day on which banking institutions generally are authorized or obligated by law or executive order to close in New York. |
| Index Business Day: | An Index Business Day, with respect to the applicable underlying Index, is a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on NYSE Arca, in each case as determined by VLS, as one of the Calculation Agents. |
| Calculation Agents: | CSI and VLS. See "Specific Terms of the ETNs—Role of Calculation Agents" in this pricing supplement. |

** An Early Redemption Date will be postponed if a Market Disruption Event occurs and is continuing on the applicable Early Redemption Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of any Early Redemption Date. See "Specific Terms of the ETNs—Market Disruption Events".

*** The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date. See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1

211

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Summary | PS-1 |
| Hypothetical Examples | PS-12 |
| Risk Factors | PS-26 |
| The Indices | PS-40 |
| Description of the ETNs | PS-49 |
| Specific Terms of the ETNs | PS-51 |
| Clearance and Settlement | PS-59 |
| Supplemental Use of Proceeds and Hedging | PS-59 |
| Material United States Federal Income Tax Considerations | PS-60 |
| Supplemental Plan of Distribution (Conflicts of Interest) | PS-65 |
| Benefit Plan Investor Considerations | PS-67 |
| Legal Matters | PS-68 |
| Annex A | A-1 |

You should read this pricing supplement together with the accompanying prospectus supplement dated March 23, 2012 and the prospectus dated March 23, 2012, relating to our Medium-Term Notes of which these ETNs are a part. You may access these documents on the SEC website at www.sec.gov as follows (or if such address has changed, by reviewing our filings for the relevant date on the SEC website):

- Prospectus supplement dated March 23, 2012 and Prospectus dated March 23, 2012

  http://www.sec.gov/Archives/edgar/data/1053092/000104746912003186/a2208088z424b2.htm

Our Central Index Key, or CIK, on the SEC website is 1053092.

This pricing supplement, together with the documents listed above, contains the terms of the ETNs of any series and supersedes all other prior or contemporaneous oral statements as well as any other written materials including preliminary or indicative pricing terms, fact sheets, correspondence, trade ideas, structures for implementation, sample structures, brochures or other educational materials of ours. You should carefully consider, among other things, the matters set forth in "Risk Factors" in this pricing supplement and the accompanying prospectus supplement and prospectus, as the ETNs of any series involve risks not associated with conventional debt securities. You should consult your investment, legal, tax, accounting and other advisers before deciding to invest in the ETNs of any series. You should rely only on the information contained in this document or in any documents to which we have referred you. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these ETNs. The information in this document may only be accurate on the date of this document.

The distribution of this pricing supplement and the accompanying prospectus supplement and prospectus and the offering of the ETNs of any series in some jurisdictions may be restricted by law. If you possess this pricing supplement, you should find out about and observe these restrictions.

In this pricing supplement and the accompanying prospectus supplement and prospectus, unless otherwise specified or the context otherwise requires, references to "Credit Suisse", the "Company", "we", "us" and "our" are to Credit Suisse AG, acting through its Nassau Branch, and references to "dollars" and "$" are to United States dollars.

i

Exhibit 1
212

## SUMMARY

The following is a summary of terms of the ETNs, as well as a discussion of risks and other considerations you should take into account when deciding whether to invest in any of the series of the ETNs. References to the "prospectus" mean our accompanying prospectus, dated March 23, 2012 and references to the "prospectus supplement" mean our accompanying prospectus supplement, dated March 23, 2012.

We may, without providing you notice or obtaining your consent, create and issue ETNs of each series in addition to those offered by this pricing supplement having the same terms and conditions as the ETNs of such series. We may consolidate the additional ETNs to form a single class with the outstanding ETNs of such series. However, we are under no obligation to sell additional ETNs of any series at any time, and if we do sell additional ETNs of any series, we may limit or restrict such sales, and we may stop selling additional ETNs of such series at any time. If we stop selling additional ETNs of any series, the price and liquidity of the ETNs of such series could be materially and adversely affected.

### What are the ETNs and how do they work?

The ETNs are medium-term notes of Credit Suisse AG (**"Credit Suisse"**), the return on which is linked to the performance of either the S&P 500 VIX Short-Term Futures™ Index ER or the S&P 500 VIX Mid-Term Futures™ Index ER (each such index, an "**Index**" and collectively the "**Indices**").

We will not pay you interest during the term of the ETNs. The ETNs do not have a minimum payment at maturity or acceleration amount and are fully exposed to any decline or increase, as applicable, in the applicable underlying Index.

If you invest in the Long ETNs or the 2x Long ETNs, depreciation of the applicable underlying Index will reduce your payment at maturity, upon redemption or acceleration, and you could lose your entire investment.

If you invest in the Inverse ETNs, appreciation of the applicable underlying Index will reduce your payment at maturity, upon redemption or acceleration, and you could lose your entire investment.

The ETNs, and in particular the 2x Long ETNs, are intended to be trading tools for sophisticated investors to manage daily trading risks. They are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives. The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day. Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable. Investors should actively and frequently monitor their investments in the ETNs, even intra-day.

**As explained in "Risk Factors" in this pricing supplement, because of the way in which the Closing Indicative Value of the ETNs and the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment. In almost any potential scenario the Closing Indicative Value (as defined below) of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity.**

For a description of how the payment at maturity, upon redemption or upon acceleration is calculated, please refer to the "Specific Terms of the ETNs—Payment at Maturity," "—Payment Upon Early Redemption" and "—Acceleration at Our Option or Upon an Acceleration Event" sections herein.

Prior to June 27, 2011, the denomination and stated principal amount of each ETN was $100. On June 16, 2011, Credit Suisse AG announced that it expected to implement a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011. On and after June 27, 2011, the denomination and stated principal amount will be $10 for the Inverse VIX Short Term ETNs, $12.50 for the Inverse VIX Medium Term ETNs and $100 for each of the Long VIX Short Term ETNs, the Long VIX Medium

Exhibit 1
213

Term ETNs, the 2x Long VIX Short Term ETNs and the 2x Long VIX Medium Term ETNs.  Any ETNs issued in the future may be issued at a price higher or lower than the stated principal amount, based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs.  You will not have the right to receive physical certificates evidencing your ownership except under limited circumstances.  Instead, we will issue the ETNs in the form of a global certificate, which will be held by DTC or its nominee.  Direct and indirect participants in DTC will record beneficial ownership of the ETNs by individual investors.  Accountholders in the Euroclear or Clearstream Banking clearance systems may hold beneficial interests in the ETNs through the accounts those systems maintain with DTC.  You should refer to the section "Description of Notes—Book-Entry, Delivery and Form" in the accompanying prospectus supplement and the section "Description of Debt Securities—Book-Entry System" in the accompanying prospectus.

**What are the Indices and who publishes the level of the Indices?**

The Indices are designed to provide investors with exposure to one or more maturities of futures contracts on the CBOE Volatility Index® (the "**VIX Index**"), which reflect implied volatility of the S&P 500® Index at various points along the volatility forward curve.  The calculation of the level of the VIX Index is based on prices of put and call options on the S&P 500® Index.  Futures contracts on the VIX Index allow investors the ability to invest in forward volatility based on their view of the future direction of movement of the VIX Index.  Each Index is intended to reflect the returns that are potentially available through an unleveraged investment in the relevant futures contract or contracts on the VIX Index.  The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average futures maturity of one month and the S&P 500 VIX Mid-Term Futures™ Index ER targets a constant weighted average futures maturity of five months.

The Indices were created by Standard & Poor's Financial Services LLC ("**S&P**" or the "**Index Sponsor**").  The Index Sponsor calculates the level of the relevant Index daily when the Chicago Board Options Exchange, Incorporated (the "**CBOE**") is open (excluding holidays and weekends) and publishes it on the Bloomberg pages specified herein as soon as practicable thereafter.  Each Index, or any successor index to such Index, may be modified, replaced or adjusted from time to time, as determined by the Calculation Agents as set forth below.  See "The Indices" in this pricing supplement for further information on the Indices.

| ETNs | Underlying Index | Underlying Index Ticker |
|---|---|---|
| Inverse VIX Short Term, Long VIX Short Term, 2x VIX Short Term | S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| Inverse VIX Medium-Term, Long VIX Medium Term, 2xVIX  Medium Term | S&P 500 VIX Medium-Term Futures™ Index ER | SPVXMP |

The Calculation Agents, may modify, replace or adjust the Indices under certain circumstances even if the Index Sponsor continues to publish the applicable Index without modification, replacement or adjustment.  See "Specific Terms of the ETNs—Discontinuation or Modification of the Index" and "Risk Factors—The Calculation Agents may modify the Indices" in this pricing supplement for further information.

**How have the Indices performed historically?**

The inception date for the Indices is January 22, 2009 at the market close.  The Indices were not in existence prior to that date.  The chart below shows the closing level of each Index since the base date, December 20, 2005 through March 19, 2012.  The historical performance is presented from January 22, 2009 through March 19, 2012.  The closing levels from the base date of December 22, 2005 through January 22, 2009 represents hypothetical values determined by S&P, as the Index Sponsor, as if the relevant Index had been established on December 20, 2005 each with a base value of 100,000 on such date and calculated according to the methodology described below since that date.  The closing levels from January 22, 2009 through March 19, 2012 represent the actual closing levels of the Indices as calculated on such dates.  The closing levels of the Indices on March 19, 2012 were 7317.02 and 104862.40, respectively. We obtained the levels below from Bloomberg, without independent

Exhibit 1

214

verification.  We have derived all information regarding each of the Indices contained in this pricing supplement, including, without limitation, their make-up, method of calculation and changes to their components, from publicly available information, and we have not participated in the preparation of, or verified, such publicly available information.  We make no representation or warranty as to the accuracy or completeness of this publicly available information.  Such information reflects the policies of, and is subject to change by the Index Sponsor.  We and our affiliates make no representation or warranty as to, and assume no responsibility for, the accuracy or completeness of such information.  **The hypothetical and historical Index performance should not be taken as an indication of future performance, and no assurance can be given as to the level of either Index on any given date.  See "The Indices" in this pricing supplement for more information on the Indices.**



**Will I receive interest on the ETNs?**

You will not receive any interest payments on your ETNs.  The ETNs are not designed for investors who are looking for periodic cash payments.  Instead, the ETNs are designed for investors who are willing to forgo cash payments and, if the applicable underlying Index declines or does not increase enough (or increases or does not decline enough in the case of the Inverse ETNs) to offset the effect of the Daily Investor Fee as described below, are willing to lose some or all of the their principal.

**How will payment at maturity, at redemption or upon acceleration be determined for the ETNs?**

Unless your ETNs have been previously redeemed or accelerated, the ETNs will mature on December 4, 2030 (the "**Maturity Date**").

*Payment at Maturity*

If your ETNs have not been previously redeemed or accelerated, on the Maturity Date you will receive a cash payment per ETN equal to the applicable Closing Indicative Value on the Final Valuation Date (the "**Final Indicative Value**"), as calculated by the Calculation Agents.  We refer to the amount of such payment as the "**Maturity Redemption Amount**."  If the scheduled Maturity Date is not a Business Day, the Maturity Date will be postponed to the first Business Day following the scheduled Maturity Date.  If the scheduled Final Valuation Date is not an Index Business Day, the Final Valuation Date will be postponed to the next following Index Business Day, in which case the Maturity Date will be postponed to the third Business Day following the Final Valuation Date as so

Exhibit 1
215

postponed.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.

**If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero.**

The "**Closing Indicative Value**" for any given series of ETNs on any given calendar day will be calculated in the following manner:  The Closing Indicative Value on the Inception Date will equal $100 (the "**Initial Indicative Value**").  The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day.  The Closing Indicative Value will never be less than zero.  **The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value equals zero at any time or Closing Indicative Value equals zero.**

The Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs underwent a 10-for-1 split and an 8-for-1 split, respectively, effective June 27, 2011.  The Closing Indicative Value of the Inverse VIX Short Term ETNs on June 24, 2011 was 157.89294145 and the Closing Indicative Value of the Inverse VIX Medium Term ETNs on June 24, 2011 was 127.46917437.  Such values were divided by 10 and 8, respectively, and rounded to 8 decimal places, prior to the open of trading on June 27, 2011.  On and after June 27, 2011, the Closing Indicative Value for the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs will be expressed in an amount per denomination and stated principal amount of $10 and $12.50, respectively.

If the ETNs undergo any subsequent splits or reverse splits, the Closing Indicative Value will be adjusted accordingly (see "Description of ETNs—Split or Reverse Split of the ETNs" herein).  VLS Securities, LLC ("**VLS**") or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

The "**Daily ETN Performance**" for any series of ETNs on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Daily Index Performance on such Index Business Day *times* (b) the Leverage Amount.  The Daily ETN Performance is deemed to be one on any day that is not an Index Business Day.

An "**Index Business Day**", with respect to the applicable underlying Index, is a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on NYSE Arca, in each case as determined by VLS, as one of the Calculation Agents.

The "**Daily Accrual**" represents the rate of interest that could be earned on a notional capital reinvestment at the three month U.S. Treasury rate as reported on Bloomberg under ticker USB3MTA.  The Daily Accrual for any series of ETNs on any Index Business Day will equal:

$$\left(\frac{1}{1 - Tbills_{t-1} * \frac{91}{360}}\right)^{\frac{d}{91}} - 1$$

Where *Tbills_{t-1}* is the three month treasury rate reported on Bloomberg on the prior Index Business Day and *d* is the number of calendar days which have elapsed since the prior Index Business Day.  The Daily Accrual is deemed to be zero on any day which is not an Index Business Day.

The "**Daily Index Performance**" for any series of ETNs on any Index Business Day will equal (1)(a) the closing level of the applicable underlying Index for that series on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index for that series on the immediately preceding Index Business Day *minus* (2) the number one.  If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such

PS-4

Exhibit 1
216

Market Disruption Event.  The Daily Index Performance is deemed to be zero on any day that is not an Index Business Day.

The "**Leverage Amount**" for each series of ETNs is as follows:

Daily Inverse VIX Short Term ETN:      -1
Daily Inverse VIX Medium Term ETN:  -1
VIX Short Term ETN:                            1
VIX Medium Term ETN:                        1
Daily 2x VIX Short Term ETN:              2
Daily 2x VIX Medium Term ETN:          2

On any calendar day (the "**calculation day**"), the "**Daily Investor Fee**" for any series of ETNs will be equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Daily ETN Performance for that series on the calculation day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365.

The "**Daily Investor Fee Factor**" will be equal to (i) 0.0089 for each of the Long ETNs, (ii) 0.0135 for each of the Inverse ETNs and (iii) 0.0165 for each of the 2x Long ETNs.

**If the level of the applicable underlying Index decreases or does not increase sufficiently in the case of the Long or 2x Long ETNs or if it increases or does not decrease sufficiently in the case of the Inverse ETNs (in each case in addition to Daily Accrual) to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over the term of the ETNs, you will receive less than the principal amount of your investment at maturity, upon early redemption or acceleration of the ETNs.**  See "Risk Factors—Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the Index on the date of your investment, you may receive less than the principal amount of your ETNs" and "Hypothetical Examples" in this pricing supplement for additional information on how the Daily Investor Fee affects the overall value of the ETNs.

The closing level of the applicable underlying Index on any Index Business Day will be the closing level reported by the Index Sponsor on the applicable Bloomberg page as set forth in the table below or any successor page on Bloomberg or any successor service, as applicable, as determined by the Calculation Agents, provided that in the event a Market Disruption Event is continuing on an Index Business Day, the Calculation Agents will determine the closing level of the applicable underlying Index for such Index Business Day according to the methodology described below in "Specific Terms of the ETNs—Market Disruption Events."

| Index | Bloomberg Page Ticker |
|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| S&P 500 VIX Mid-Term Futures™ Index ER | SPVXMP |

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

For a further description of how your payment at maturity will be calculated, see "Hypothetical Examples" and "Specific Terms of the ETNs" in this pricing supplement.

*Payment Upon Early Redemption*

Prior to maturity, you may, subject to certain restrictions described below, offer the applicable Minimum Redemption Amount or more of your ETNs to us for redemption on an Early Redemption Date during the term of the ETNs until November 28, 2030.  If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount.

Exhibit 1
217

You may exercise your early redemption right by causing your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein).  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  See "Specific Terms of the ETNs—Redemption Procedures" in this pricing supplement.

You must offer for redemption at least 25,000 ETNs, or an integral multiple of 25,000 ETNs in excess thereof, at one time in order to exercise your right to cause us to redeem your ETNs on any Early Redemption Date (the "**Minimum Redemption Amount**"); provided that we or CSI as one of the Calculation Agents may from time to time reduce, in part or in whole, the Minimum Redemption Amount.  Any such reduction will be applied on a consistent basis for all holders of the relevant series of ETNs at the time the reduction becomes effective.  If the ETNs undergo a split or reverse split, the minimum number of ETNs needed to exercise your right to redeem will remain the same.

The "**Early Redemption Date**" is the third Business Day following an Early Redemption Valuation Date.[*]

The "**Early Redemption Charge**" is equal to 0.05% *times* the Closing Indicative Value on the Early Redemption Valuation Date.

The "**Early Redemption Amount**" is a cash payment per ETN equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge and will be calculated by the Calculation Agents.

*Payment Upon Acceleration*

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration"**). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration"**). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date.  In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration.  In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day).  The Accelerated Redemption Amount will be payable on the third Business Day following the Accelerated Valuation Date (such third Business Day the "**Acceleration Date**").[*] We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.  See "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" in this pricing supplement.

Any ETNs previously redeemed by us at your or our option or accelerated following an Acceleration Event will be cancelled on the Early Redemption Date or the Acceleration Date, as applicable.  Consequently, as of such Early Redemption Date or the Acceleration Date, as applicable, the redeemed ETNs will no longer be considered outstanding.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

---

[*] An Early Redemption Date will be postponed if a Market Disruption Event occurs and is continuing on the applicable Early Redemption Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of any Early Redemption Date.  See "Specific Terms of the ETNs—Market Disruption Events".

[*] The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date.  See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1

218

For a further description of how your payment at maturity, on redemption or upon acceleration will be calculated, see "Hypothetical Examples" and "Specific Terms of the ETNs" in this pricing supplement.

**What will be the Intraday Indicative Value of the ETNs?**

The "**Intraday Indicative Value**" of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor.  The Intraday Indicative Value at any time is based on the most recent intraday level of the underlying Index.  **If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero.  See "Description of the ETNs—Intraday Indicative Value" in this pricing supplement.**  VLS or its affiliate is responsible for computing and disseminating the Intraday Indicative Value.

The Indicative Value of the ETNs is not the same as the trading price of the ETNs in the secondary market at such time. The trading price of the ETNs at any time is the price at which you may be able to sell your ETNs in the secondary market at such time, if one exists. The trading price of any series of the ETNs at any time may vary significantly from Indicative Value of such ETNs at such time. Paying a premium purchase price over the Indicative Value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when such premium is no longer present in the market place or such ETNs are accelerated (including at our option), in which case investors will receive a cash payment in an amount equal to the Closing Indicative Value on the Accelerated Valuation Date.

**How do you sell your ETNs?**

We have listed each series of the ETNs on the NYSE Arca under the exchange ticker symbols as set forth in the table above. As long an active secondary market in the ETNs exists, we expect that investors will purchase and sell the ETNs primarily in this secondary market. We have no obligation to maintain any listing on NYSE Arca or any other exchange or quotation system.

**How do you offer your ETNs for redemption by Credit Suisse?**

If you wish to offer your ETNs to Credit Suisse for redemption, your broker must follow the following procedures:

- Deliver a notice of redemption, in substantially the form as Annex A (the "**Redemption Notice**"), to VLS (the "**Redemption Agent**") via email or other electronic delivery (including, without limitation, the Redemption Agent's proprietary technology system, TENZING) as requested by the Redemption Agent.  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  If the Redemption Agent receives your Redemption Notice no later than 4:00 p.m., New York City time, on any Business Day, the Redemption Agent will respond by sending your broker an acknowledgment of the Redemption Notice accepting your redemption request by 7:30 p.m., New York City time, on the Business Day prior to the applicable Early Redemption Valuation Date.  The Redemption Agent or its affiliate must acknowledge to your broker acceptance of the Redemption Notice in order for your redemption request to be effective;

- Cause your DTC custodian to book a delivery vs. payment trade with respect to the ETNs on the applicable Early Redemption Valuation Date at a price equal to the applicable Early Redemption Amount, facing us; and

- Cause your DTC custodian to deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. New York City time, on the applicable Early Redemption Date (the third Business Day following the Early Redemption Valuation Date).

Exhibit 1

219

You are responsible for (i) instructing or otherwise causing your broker to provide the Redemption Notice and (ii) your broker satisfying the additional requirements as set forth in the second and third bullet above in order for the redemption to be effected.  Different brokerage firms may have different deadlines for accepting instructions from their customers. Accordingly, you should consult the brokerage firm through which you own your interest in the ETNs in respect of such deadlines.  If the Redemption Agent does not (i) receive the Redemption Notice from your broker by 4:00 p.m. and (ii) deliver an acknowledgment of such Redemption Notice to your broker accepting your redemption request by 7:30 p.m., on the Business Day prior to the applicable Early Redemption Valuation Date, such notice will not be effective for such Business Day and the Redemption Agent will treat such Redemption Notice as if it was received on the next Business Day.  Any redemption instructions for which the Redemption Agent receives a valid confirmation in accordance with the procedures described above will be irrevocable.

**What are some of the risks of the ETNs?**

An investment in the ETNs involves risks.  Some of these risks are summarized here, but we urge you to read the more detailed explanation of risks in "Risk Factors" in this pricing supplement.

- **Uncertain Principal Repayment**—The ETNs are designed for investors who seek exposure to the applicable underlying Index.  The ETNs do not guarantee any return of principal at maturity.  For each ETN, investors will receive a cash payment at maturity, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee.  If the applicable underlying Index declines or increases, as applicable, investors should be willing to lose up to 100% of their investment.  Any payment on the ETNs is subject to our ability to pay our obligations as they become due. **As explained in "Risk Factors" in this pricing supplement, because of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment.  In almost any potential scenario the Closing Indicative Value (as defined below) of your ETNs is likely to be close to zero after 20 years and we do not intend or expect that any investor to hold the ETNs from inception to maturity.**

- **Credit Risk of the Issuer**—Any payments you are entitled to receive on your ETNs are subject to the ability of Credit Suisse to pay its obligations as they come due.

- **Market and Volatility Risk**—The return on each series of ETNs is linked to the performance of an applicable underlying Index which, in turn is linked to the performance of one or more futures contracts on the VIX Index.  The VIX Index measures the 30-day forward volatility of the S&P 500® Index as calculated based on the prices of certain put and call options on the S&P 500® Index.  The level of the S&P 500® Index, the prices of options on the S&P 500® Index, and the level of the VIX Index may change unpredictably, affecting the value of futures contracts on the VIX Index and, consequently, the level of each Index and the value of your ETNs in unforseeable ways.

- **No Interest Payments**—You will not receive any periodic interest payments on the ETNs.

- **Long Holding Period Risk**—The ETNs, and in particular the 2x Long ETNs, are intended to be trading tools for sophisticated investors to manage daily trading risks.  They are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives.  The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day.  Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.  Investors should actively and frequently monitor their investments in the ETNs, even intra-day.

- **A Trading Market for the ETNs May Not Continue Over the Term of the ETNs**—Although the ETNs are currently listed on NYSE Arca, a trading market for your ETNs may not continue for the

Exhibit 1

220

term of the ETNs.  We are not required to maintain any listing of the ETNs on NYSE Arca or any other exchange or quotation system.

- **Requirements on Redemption by Credit Suisse**—You must offer at least the applicable Minimum Redemption Amount to Credit Suisse and satisfy the other requirements described herein for your offer for redemption to be considered.

- **Your Offer for Redemption Is Irrevocable**—You will not be able to rescind your offer for redemption after it is received by the Redemption Agent, so you will be exposed to market risk in the event market conditions change after the Redemption Agent receives your offer.

- **Uncertain Tax Treatment**—No ruling is being requested from the Internal Revenue Service ("**IRS**") with respect to the tax consequences of the ETNs.  There is no direct authority dealing with securities such as the ETNs, and there can be no assurance that the IRS will accept, or that a court will uphold, the tax treatment described in this pricing supplement.  In addition, you should note that the IRS and the U.S. Treasury Department have announced a review of the tax treatment of prepaid forward contracts.  Accordingly, no assurance can be given that future tax legislation, regulations or other guidance may not change the tax treatment of the ETNs.  Potential investors should consult their tax advisors regarding the United States federal income tax consequences of an investment in the ETNs, including possible alternative treatments.

- **Acceleration Feature**—Your ETNs may be accelerated by us at any time on or after the Inception Date or accelerated by us at any time if an Acceleration Event occurs, and upon any such acceleration you may receive less, and possibly significantly less, than your original investment in the ETNs.

**Is this the right investment for you?**

The ETNs may be a suitable investment for you if:

- You seek an investment with a return linked to the performance of the applicable underlying Index.

- You are willing to accept the risk of fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You are a sophisticated investor seeking to manage daily trading risk using a short-term investment, and are knowledgeable and understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.

- You believe the level of the applicable underlying Index will increase (if you invest in the Long ETNs or 2x Long ETNs) or decline (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You do not seek current income from this investment.

- You do not seek a guaranteed return of principal.

- You are a sophisticated investor using the ETNs to manage daily trading risks and you understand that the ETNs are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives.

- You understand that the Daily Investor Fees and the Early Redemption Charge, if applicable, will reduce your return (or increase your loss, as applicable) on your investment.

Exhibit 1

221

The ETNs may not be a suitable investment for you if:

- You are not willing to be exposed to fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You seek a guaranteed return of principal.

- You seek a long-term investment objective.

- You believe the level of the applicable underlying Index will decrease (if you invest in the Long ETNs or 2x Long ETNs) or increase (if you invest in the Inverse ETNs) or will not increase (if you invest in the Long ETNs or 2x Long ETNs) or decrease (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You prefer the lower risk and therefore accept the potentially lower returns of fixed income investments with comparable maturities and credit ratings.

- You seek current income from your investment.

- You are not a sophisticated investor and you seek an investment for other purposes than managing daily trading risks.

- You seek an investment with a longer duration than a daily basis.

- You do not want to pay Daily Investor Fees and the Early Redemption Charge, if applicable, which are charged on the ETNs and which will reduce your return (or increase your loss, as applicable) on your investment.

**Will the ETNs be distributed by our affiliates?**

Our affiliate, Credit Suisse Securities (USA) LLC ("**CSSU**"), a member of the Financial Industry Regulatory Authority ("**FINRA**") has participated in the distribution of the ETNs from the initial settlement date to the date of this pricing supplement, and will likely participate in any future distribution of the ETNs. CSSU is expected to charge normal commissions for the purchase of any ETNs and may also receive all or a portion of the investor fee. Any offering in which CSSU participates will be conducted in compliance with the requirements of FINRA Rule 5121 of FINRA regarding a FINRA member firm's distribution of the securities of an affiliate and related conflicts of interest. In accordance with FINRA Rule 5121, CSSU may not make sales in offerings of the ETNs to any of its discretionary accounts without the prior written approval of the customer. Please see the section entitled "Supplemental Plan of Distribution (Conflicts of Interest)" in this pricing supplement.

**What is the United States Federal income tax treatment of an investment in the ETNs?**

Please refer to "Material United States Federal Income Tax Considerations" on page PS-60 for a discussion of material United States federal income tax considerations for making an investment in the ETNs.

**What is the role of our affiliates?**

Our affiliate, CSSU, is the underwriter for the offering and sale of the ETNs of each series. After the initial offering, CSSU and/or other of our affiliated dealers currently intend, but are not obligated, to buy and sell the ETNs of any series to create a secondary market for holders of the ETNs of any such series, and may engage in other activities described in the section "Supplemental Plan of Distribution" in this pricing supplement, the accompanying prospectus supplement and prospectus. However, neither CSSU nor any of these affiliates will be obligated to engage in any market-making activities, or continue those activities once it has started them.

Exhibit 1

222

CSI will also act as one of the Calculation Agents for the ETNs.  In addition, we may in the future become a minority investor in an affiliate of VLS, and may in connection with such investment obtain customary rights to nominate a director of such affiliate.  As Calculation Agents CSI and VLS will make determinations with respect to the ETNs.  The determinations may be adverse to you.  You should refer to "Risk Factors—There Are Potential Conflicts of Interest Between You and the Calculation Agents" in this pricing supplement for more information.

**Can you tell me more about the effect of Credit Suisse's hedging activity?**

We expect to hedge our obligations under the ETNs through one or more of our affiliates.  This hedging activity will likely involve purchases or sales of equity securities underlying the S&P 500® Index and/or trading in instruments, such as options, swaps or futures, related to the VIX Index (including the VIX futures contracts which are used to calculate the Indices), the S&P 500® Index (including the put and call options used to calculate the level of the VIX Index) and the equity securities underlying the S&P 500® Index.  The costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the ETNs.  Moreover, this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the ETNs declines.  You should refer to "Risk Factors—Trading and other transactions by us, our affiliates or third parties with whom we transact, in securities or financial instruments related to the applicable underlying Index may impair the market value of the ETNs" and "Risk Factors—There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents" and "Supplemental Use of Proceeds and Hedging" in this pricing supplement.

**Does ERISA Impose Any Limitations on Purchases of the ETNs?**

Employee benefit plans subject to ERISA, entities the assets of which are deemed to constitute the assets of such plans, governmental or other plans subject to laws substantially similar to ERISA and retirement accounts (including Keogh, SEP and SIMPLE plans, individual retirement accounts and individual retirement annuities) are permitted to purchase the ETNs as long as either (A) (1) no CSSU affiliate or employee is a fiduciary to such plan or retirement account that has or exercises any discretionary authority or control with respect to the assets of such plan or retirement account used to purchase the ETNs or renders investment advice with respect to those assets, and (2) such plan or retirement account is paying no more than adequate consideration for the ETNs or (B) its acquisition and holding of the ETNs is not prohibited by any such provisions or laws or is exempt from any such prohibition. However, individual retirement accounts, individual retirement annuities and Keogh plans, as well as employee benefit plans that permit participants to direct the investment of their accounts, will not be permitted to purchase or hold the ETNs if the account, plan or annuity is for the benefit of an employee of CSSU or a family member and the employee receives any compensation (such as, for example, an addition to bonus) based on the purchase of ETNs by the account, plan or annuity. Please refer to the section "ERISA Matters" in this pricing supplement for further information.

Exhibit 1

223

**HYPOTHETICAL EXAMPLES**

**Hypothetical Examples**

The following examples show how the ETNs would perform in hypothetical circumstances.  These hypothetical examples are meant to illustrate the effect that different factors may have on the Maturity Redemption Amount.  These factors include fees, compounding of returns, underlying futures volatility, and underlying T-Bill rates.  Many other factors may affect the value of your ETNs, and these figures are provided for purposes of illustration only.  They should not be taken as an indication or prediction of future investment results and are intended merely to illustrate a few of the potential possible Closing Indicative Values for the ETNs.  The figures in these examples have been rounded for convenience.

The information in the tables reflects hypothetical rates of return on the ETNs assuming that they are purchased on the Inception Date at the Closing Indicative Value and disposed of on the Maturity Date for the Maturity Redemption Amount.  We have not considered early redemption or acceleration for simplicity.  Your ETNs may be accelerated early under certain circumstances.  Although your payment upon redemption or acceleration would be based on the Closing Indicative Value of the ETNs, which is calculated in the manner illustrated in the examples below, your payment upon early redemption would be subject to the Early Redemption Charge.

Any rate of return you may earn on an investment in the ETNs may be lower than that which you could earn on a comparable investment in the underlying futures.  The examples below assume no Market Disruption Event occurs.  Also, the hypothetical rates of return shown below do not take into account the effects of applicable taxes.  Because of the U.S. tax treatment applicable to your ETN, tax liabilities could affect the after-tax rate of return on your ETNs to a comparatively greater extent than the after-tax return on the underlying futures.

The prices of the futures contracts underlying the Indices have been highly volatile in the past and the performance of the Indices cannot be predicted for any future period.  The actual performance of the Indices over the life of the ETNs, as well as the amount payable at the relevant Early Redemption Date, Acceleration Date or the Maturity Date, as applicable, may bear little relation to the hypothetical return examples set forth below or to the hypothetical historical closing levels of the Index set forth elsewhere in this pricing supplement.  The examples included below are broken into sections to highlight some of the most significant factors that may affect the return on your ETNs.  Each section is based upon numerous assumptions related to interest rate levels, interest rate volatilities, interest rate spreads, underlying futures returns, underlying futures volatilities, and underlying futures funding and borrow costs.  No single example can easily capture all the possible influences on the value of your ETNs, and each example is a simplified hypothetical example intended purely to illustrate the effect of various key factors which can influence the value of your ETNs. Many of the factors will primarily affect the value of your ETNs by affecting the level of the Index.  These factors include, among others, interest rate levels, interest rate volatilities, interest rate spreads, underlying futures returns, underlying futures volatilities, and underlying futures funding and borrow costs.

Two of the most important factors that will affect the value of your ETNs are the directional change in the in the level of the applicable underlying Index (either up or down) and the annualized volatility of the applicable underlying Index itself.  The annualized volatility of each underlying Index is a measure of the magnitude and frequency of changes in the underlying Index closing level, and is equal to the standard deviation of the underlying Index's daily returns over twenty years, annualized by multiplying by the square root of 252.  When we refer to "volatility in the daily change in Index levels" we mean that the annualized volatility of the daily closing levels of the applicable underlying Index over the relevant term.  We therefore provide four examples below that reflect four different scenarios related to these two factors.  The hypothetical examples highlight the negative impact of higher annualized volatility of the applicable underlying Index on the rate of return on your ETNs.  In Example 1 we show increasing Index levels with 10.21% annualized volatility in the daily change in Index levels over the relevant term.  In example 2 we show decreasing Index levels with 10.10% annualized volatility in the daily change in Index levels over the relevant term.  In example 3 we show increasing Index levels with 60.53% annualized volatility in the daily change in Index levels over the relevant term.  In Example 4 we show decreasing Index levels with 49.69% annualized volatility in the daily change in Index levels over the relevant term.  Because the Investor Fee is

Exhibit 1

224

calculated on a daily basis, its effect on the value of your ETNs is dependent upon the path the applicable underlying Index takes rather than just the endpoint of the applicable underlying Index.  Each of these four examples is a random possibility generated by a computer among an infinite number of possible outcomes.  Your return may be materially worse.  As explained in "Risk Factors—The ETNs do not pay interest nor guarantee return of principal and you may lose all or a significant part of your investment in the ETNs" in this pricing supplement, in almost any potential scenario the Closing Indicative Value of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

As of March 19, 2012, the actual annualized index return since the Inception Date for the S&P 500 VIX Short-Term Futures™ Index ER and the S&P 500 VIX Mid-Term Futures™ Index ER was -46.984% and -23.173%, respectively. The actual annualized ETN return since the Inception Date (based on the Closing Indicative Value for such series of ETNs) was:

- for the Inverse VIX Short Term ETNs, 5.115%;
- for the Inverse VIX Medium Term ETNs, 12.501%;
- for the Long VIX Short Term ETNs, -47.419%;
- for the Long VIX Medium Term ETNs, -23.804%;
- for the 2x Long VIX Short Term ETNs -83.796%; and
- for the 2x Long VIX Medium Term ETNs, -48.957%.

The figures set forth in the examples below are for purposes of illustration only (including for periods of time that have elapsed since the Inception Date for the ETNs) and are not actual historical results. For information relating to the historical performance of the Indices, see "—How have the Indices performed historically?" above.

Exhibit 1

225

Example 1. This example assumes the index increases by 478% with 10.21% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At year end | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 109.74 | 5.01% | 9.74% | -5.22% | $1.25 | $93.51 | 9.74% | -6.49% |
| 02 | 104.37 | 5.48% | -4.89% | 9.87% | $1.30 | $101.30 | -4.89% | 8.33% |
| 03 | 122.23 | 5.63% | 17.11% | -11.73% | $1.31 | $89.25 | 17.11% | -11.90% |
| 04 | 138.52 | 4.80% | 13.32% | -8.49% | $1.19 | $80.71 | 13.32% | -9.57% |
| 05 | 155.58 | 4.57% | 12.32% | -7.72% | $1.07 | $73.47 | 12.32% | -9.00% |
| 06 | 189.37 | 4.77% | 21.72% | -15.75% | $0.95 | $61.80 | 21.72% | -16.08% |
| 07 | 253.09 | 5.50% | 33.64% | -22.99% | $0.75 | $47.73 | 33.64% | -23.78% |
| 08 | 280.79 | 5.02% | 10.95% | -5.93% | $0.63 | $44.12 | 10.95% | -7.55% |
| 09 | 270.35 | 5.06% | -3.72% | 8.07% | $0.63 | $47.05 | -3.72% | 5.07% |
| 10 | 295.24 | 5.60% | 9.21% | -3.62% | $0.59 | $44.40 | 9.21% | -5.63% |
| 11 | 304.69 | 5.62% | 3.20% | 0.54% | $0.64 | $44.36 | 3.20% | -0.09% |
| 12 | 331.19 | 5.40% | 8.70% | -5.35% | $0.58 | $42.06 | 8.70% | -5.73% |
| 13 | 317.61 | 4.50% | -4.10% | 7.83% | $0.56 | $44.78 | -4.10% | 6.46% |
| 14 | 387.27 | 4.73% | 21.93% | -16.04% | $0.57 | $37.58 | 21.93% | -16.08% |
| 15 | 491.85 | 4.98% | 27.00% | -18.92% | $0.46 | $30.36 | 27.00% | -19.20% |
| 16 | 514.06 | 4.68% | 4.52% | -1.69% | $0.40 | $29.69 | 4.52% | -2.23% |
| 17 | 471.37 | 4.42% | -8.30% | 12.00% | $0.43 | $33.05 | -8.30% | 11.32% |
| 18 | 448.43 | 4.53% | -4.87% | 8.22% | $0.46 | $35.42 | -4.87% | 7.81% |
| 19 | 499.34 | 5.07% | 11.35% | -6.15% | $0.48 | $32.67 | 11.35% | -7.77% |
| 20 | 577.98 | 4.61% | 15.75% | -9.95% | $0.42 | $28.90 | 15.75% | -11.56% |

| Total Return | 477.98% | -71.10% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount.  The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

Exhibit 1

226

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At year end | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 109.74 | 5.01% | 9.74% | 15.37% | $0.99 | $114.36 | 9.74% | 14.36% |
| 02 | 104.37 | 5.48% | -4.89% | 0.49% | $1.02 | $113.87 | -4.89% | -0.42% |
| 03 | 122.23 | 5.63% | 17.11% | 25.35% | $1.11 | $139.83 | 17.11% | 22.79% |
| 04 | 138.52 | 4.80% | 13.32% | 19.12% | $1.30 | $164.78 | 13.32% | 17.84% |
| 05 | 155.58 | 4.57% | 12.32% | 17.57% | $1.57 | $192.00 | 12.32% | 16.54% |
| 06 | 189.37 | 4.77% | 21.72% | 29.24% | $1.87 | $242.81 | 21.72% | 26.83% |
| 07 | 253.09 | 5.50% | 33.64% | 43.64% | $2.51 | $339.80 | 33.64% | 41.85% |
| 08 | 280.79 | 5.02% | 10.95% | 16.31% | $3.20 | $392.87 | 10.95% | 15.62% |
| 09 | 270.35 | 5.06% | -3.72% | 1.27% | $3.42 | $394.33 | -3.72% | 1.85% |
| 10 | 295.24 | 5.60% | 9.21% | 14.65% | $3.93 | $451.39 | 9.21% | 14.47% |
| 11 | 304.69 | 5.62% | 3.20% | 9.99% | $3.99 | $488.36 | 3.20% | 8.19% |
| 12 | 331.19 | 5.40% | 8.70% | 16.64% | $4.65 | $555.33 | 8.70% | 14.47% |
| 13 | 317.61 | 4.50% | -4.10% | 0.46% | $5.20 | $552.12 | -4.10% | -0.58% |
| 14 | 387.27 | 4.73% | 21.93% | 29.51% | $5.36 | $699.51 | 21.93% | 26.70% |
| 15 | 491.85 | 4.98% | 27.00% | 34.85% | $7.18 | $925.48 | 27.00% | 32.30% |
| 16 | 514.06 | 4.68% | 4.52% | 10.43% | $8.80 | $1,004.59 | 4.52% | 8.55% |
| 17 | 471.37 | 4.42% | -8.30% | -3.42% | $8.65 | $954.20 | -8.30% | -5.02% |
| 18 | 448.43 | 4.53% | -4.87% | 0.02% | $8.39 | $941.44 | -4.87% | -1.85% |
| 19 | 499.34 | 5.07% | 11.35% | 16.77% | $8.65 | $1,093.03 | 11.35% | 16.10% |
| 20 | 577.98 | 4.61% | 15.75% | 20.69% | $10.69 | $1,313.01 | 15.75% | 20.13% |

| Total Return | 477.98% | 1213.01% |
|---|---|---|

PS-15

Exhibit 1

227

2x Long ETNs

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At year end | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 109.74 | 5.01% | 9.74% | 25.25% | $1.99 | $123.21 | 9.74% | 23.21% |
| 02 | 104.37 | 5.48% | -4.89% | -5.52% | $2.00 | $114.49 | -4.89% | -7.08% |
| 03 | 122.23 | 5.63% | 17.11% | 46.79% | $2.21 | $161.52 | 17.11% | 41.08% |
| 04 | 138.52 | 4.80% | 13.32% | 33.88% | $2.82 | $211.93 | 13.32% | 31.21% |
| 05 | 155.58 | 4.57% | 12.32% | 30.76% | $3.85 | $272.54 | 12.32% | 28.67% |
| 06 | 189.37 | 4.77% | 21.72% | 57.65% | $5.22 | $412.17 | 21.72% | 52.06% |
| 07 | 253.09 | 5.50% | 33.64% | 93.19% | $8.96 | $757.40 | 33.64% | 88.70% |
| 08 | 280.79 | 5.02% | 10.95% | 27.16% | $13.56 | $953.33 | 10.95% | 25.87% |
| 09 | 270.35 | 5.06% | -3.72% | -3.55% | $14.54 | $904.39 | -3.72% | -2.28% |
| 10 | 295.24 | 5.60% | 9.21% | 22.74% | $18.12 | $1,108.24 | 9.21% | 22.54% |
| 11 | 304.69 | 5.62% | 3.20% | 12.98% | $17.32 | $1,213.37 | 3.20% | 9.49% |
| 12 | 331.19 | 5.40% | 8.70% | 27.46% | $22.31 | $1,473.17 | 8.70% | 22.97% |
| 13 | 317.61 | 4.50% | -4.10% | -4.58% | $26.26 | $1,379.15 | -4.10% | -6.38% |
| 14 | 387.27 | 4.73% | 21.93% | 58.22% | $26.38 | $2,091.65 | 21.93% | 51.66% |
| 15 | 491.85 | 4.98% | 27.00% | 71.15% | $44.78 | $3,451.46 | 27.00% | 65.01% |
| 16 | 514.06 | 4.68% | 4.52% | 15.00% | $63.26 | $3,841.11 | 4.52% | 11.29% |
| 17 | 471.37 | 4.42% | -8.30% | -11.67% | $57.65 | $3,286.80 | -8.30% | -14.43% |
| 18 | 448.43 | 4.53% | -4.87% | -5.61% | $51.69 | $3,024.54 | -4.87% | -8.97% |
| 19 | 499.34 | 5.07% | 11.35% | 28.20% | $51.73 | $3,839.70 | 11.35% | 26.95% |
| 20 | 577.98 | 4.61% | 15.75% | 37.82% | $74.63 | $5,250.19 | 15.75% | 36.73% |

| Total Return | 477.98% | 5150.19% |
|---|---|---|

PS-16

Exhibit 1

228

Example 2. This example assumes the index decreases by 67% with 10.10% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 90.39 | 4.92% | -9.61% | 15.19% | $1.46 | $113.64 | -9.61% | 13.64% |
| 02 | 77.69 | 4.21% | -14.05% | 20.31% | $1.62 | $134.66 | -14.05% | 18.49% |
| 03 | 87.35 | 3.02% | 12.43% | -9.04% | $1.75 | $120.50 | 12.43% | -10.52% |
| 04 | 74.30 | 2.99% | -14.94% | 19.31% | $1.81 | $142.57 | -14.94% | 18.32% |
| 05 | 72.83 | 3.46% | -1.98% | 4.48% | $1.96 | $146.94 | -1.98% | 2.96% |
| 06 | 64.19 | 3.37% | -11.86% | 15.28% | $2.30 | $168.08 | -11.86% | 13.61% |
| 07 | 61.89 | 3.42% | -3.58% | 5.01% | $2.33 | $175.97 | -3.58% | 3.93% |
| 08 | 53.73 | 3.41% | -13.18% | 17.05% | $2.41 | $204.55 | -13.18% | 16.24% |
| 09 | 53.90 | 3.13% | 0.32% | 1.68% | $2.76 | $205.19 | 0.32% | -0.56% |
| 10 | 47.05 | 3.69% | -12.71% | 17.91% | $2.97 | $237.98 | -12.71% | 15.98% |
| 11 | 42.97 | 3.90% | -8.67% | 12.11% | $3.47 | $264.49 | -8.67% | 11.14% |
| 12 | 36.83 | 4.30% | -14.29% | 22.30% | $3.82 | $314.77 | -14.29% | 19.84% |
| 13 | 43.33 | 4.07% | 17.65% | -12.02% | $3.90 | $272.16 | 17.65% | -13.54% |
| 14 | 40.43 | 3.53% | -6.69% | 10.32% | $3.92 | $294.97 | -6.69% | 8.38% |
| 15 | 37.88 | 3.23% | -6.31% | 9.42% | $4.15 | $317.61 | -6.31% | 7.68% |
| 16 | 36.11 | 2.97% | -4.67% | 6.99% | $4.27 | $335.77 | -4.67% | 5.72% |
| 17 | 32.83 | 3.33% | -9.08% | 11.78% | $4.80 | $372.29 | -9.08% | 10.88% |
| 18 | 35.77 | 3.35% | 8.96% | -4.96% | $5.04 | $344.90 | 8.96% | -6.76% |
| 19 | 30.57 | 3.27% | -14.54% | 19.75% | $4.85 | $407.13 | -14.54% | 18.05% |
| 20 | 32.56 | 3.29% | 6.51% | -4.34% | $5.52 | $385.23 | 6.51% | -5.38% |

| Total Return | -67.44% | 285.23% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount.  The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

PS-17

Exhibit 1

229

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 90.39 | 4.92% | -9.61% | -5.05% | $0.85 | $94.11 | -9.61% | -5.89% |
| 02 | 77.69 | 4.21% | -14.05% | -10.43% | $0.82 | $83.62 | -14.05% | -11.14% |
| 03 | 87.35 | 3.02% | 12.43% | 15.56% | $0.78 | $96.04 | 12.43% | 14.85% |
| 04 | 74.30 | 2.99% | -14.94% | -11.89% | $0.78 | $83.43 | -14.94% | -13.13% |
| 05 | 72.83 | 3.46% | -1.98% | 1.47% | $0.76 | $83.90 | -1.98% | 0.65% |
| 06 | 64.19 | 3.37% | -11.86% | -8.30% | $0.67 | $75.78 | -11.86% | -9.04% |
| 07 | 61.89 | 3.42% | -3.58% | 0.89% | $0.67 | $74.94 | -3.58% | -0.34% |
| 08 | 53.73 | 3.41% | -13.18% | -9.54% | $0.67 | $66.72 | -13.18% | -10.97% |
| 09 | 53.90 | 3.13% | 0.32% | 3.51% | $0.61 | $68.44 | 0.32% | 3.48% |
| 10 | 47.05 | 3.69% | -12.71% | -9.68% | $0.58 | $61.44 | -12.71% | -10.23% |
| 11 | 42.97 | 3.90% | -8.67% | -4.56% | $0.52 | $57.83 | -8.67% | -5.88% |
| 12 | 36.83 | 4.30% | -14.29% | -11.68% | $0.49 | $51.28 | -14.29% | -11.89% |
| 13 | 43.33 | 4.07% | 17.65% | 22.15% | $0.51 | $62.28 | 17.65% | 21.45% |
| 14 | 40.43 | 3.53% | -6.69% | -3.73% | $0.53 | $59.67 | -6.69% | -4.20% |
| 15 | 37.88 | 3.23% | -6.31% | -3.46% | $0.52 | $57.23 | -6.31% | -4.09% |
| 16 | 36.11 | 2.97% | -4.67% | -1.64% | $0.52 | $55.70 | -4.67% | -2.67% |
| 17 | 32.83 | 3.33% | -9.08% | -5.47% | $0.48 | $51.89 | -9.08% | -6.84% |
| 18 | 35.77 | 3.35% | 8.96% | 11.38% | $0.47 | $57.95 | 8.96% | 10.98% |
| 19 | 30.57 | 3.27% | -14.54% | -11.72% | $0.51 | $50.72 | -14.54% | -12.48% |
| 20 | 32.56 | 3.29% | 6.51% | 10.37% | $0.46 | $55.33 | 6.51% | 9.10% |

| Total Return | -67.44% | -44.67% |
|---|---|---|

PS-18

Exhibit 1

230

2x Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 90.39 | 4.92% | -9.61% | -14.93% | $1.47 | $83.68 | -9.61% | -16.32% |
| 02 | 77.69 | 4.21% | -14.05% | -23.91% | $1.30 | $62.77 | -14.05% | -24.99% |
| 03 | 87.35 | 3.02% | 12.43% | 28.19% | $1.13 | $79.59 | 12.43% | 26.80% |
| 04 | 74.30 | 2.99% | -14.94% | -25.42% | $1.07 | $57.79 | -14.94% | -27.40% |
| 05 | 72.83 | 3.46% | -1.98% | -1.60% | $0.96 | $55.92 | -1.98% | -3.04% |
| 06 | 64.19 | 3.37% | -11.86% | -19.65% | $0.72 | $43.67 | -11.86% | -20.83% |
| 07 | 61.89 | 3.42% | -3.58% | -2.78% | $0.69 | $40.85 | -3.58% | -5.02% |
| 08 | 53.73 | 3.41% | -13.18% | -21.83% | $0.68 | $30.98 | -13.18% | -24.17% |
| 09 | 53.90 | 3.13% | 0.32% | 2.65% | $0.52 | $31.28 | 0.32% | 2.76% |
| 10 | 47.05 | 3.69% | -12.71% | -22.26% | $0.46 | $24.06 | -12.71% | -23.09% |
| 11 | 42.97 | 3.90% | -8.67% | -13.34% | $0.35 | $20.30 | -8.67% | -15.60% |
| 12 | 36.83 | 4.30% | -14.29% | -26.03% | $0.30 | $15.17 | -14.29% | -26.27% |
| 13 | 43.33 | 4.07% | 17.65% | 41.75% | $0.31 | $21.30 | 17.65% | 40.37% |
| 14 | 40.43 | 3.53% | -6.69% | -11.48% | $0.31 | $18.69 | -6.69% | -12.22% |
| 15 | 37.88 | 3.23% | -6.31% | -10.67% | $0.29 | $16.51 | -6.31% | -11.70% |
| 16 | 36.11 | 2.97% | -4.67% | -6.87% | $0.28 | $15.07 | -4.67% | -8.70% |
| 17 | 32.83 | 3.33% | -9.08% | -14.59% | $0.23 | $12.52 | -9.08% | -16.93% |
| 18 | 35.77 | 3.35% | 8.96% | 18.65% | $0.21 | $14.96 | 8.96% | 17.97% |
| 19 | 30.57 | 3.27% | -14.54% | -25.37% | $0.23 | $10.99 | -14.54% | -26.53% |
| 20 | 32.56 | 3.29% | 6.51% | 16.50% | $0.18 | $12.53 | 6.51% | 13.98% |

| Total Return | -67.44% | -87.47% |
|---|---|---|

PS-19

Exhibit 1

231

Example 3. This example assumes the index increases by 3973% with 60.53% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 188.36 | 5.58% | 88.36% | -61.68% | $0.81 | $37.80 | 88.36% | -62.20% |
| 02 | 215.66 | 5.27% | 14.49% | -29.76% | $0.38 | $24.86 | 14.49% | -34.24% |
| 03 | 335.67 | 4.59% | 55.65% | -50.69% | $0.17 | $11.63 | 55.65% | -53.22% |
| 04 | 158.43 | 4.17% | -52.80% | 49.70% | $0.15 | $17.11 | -52.80% | 47.15% |
| 05 | 74.70 | 4.60% | -52.85% | 52.51% | $0.26 | $25.74 | -52.85% | 51.11% |
| 06 | 31.32 | 5.39% | -58.07% | 64.61% | $0.41 | $43.27 | -58.07% | 58.33% |
| 07 | 52.63 | 5.51% | 68.03% | -57.57% | $0.55 | $18.87 | 68.03% | -56.47% |
| 08 | 34.20 | 4.99% | -35.02% | 5.03% | $0.19 | $19.26 | -35.02% | 2.04% |
| 09 | 85.79 | 5.41% | 150.88% | -69.55% | $0.13 | $5.79 | 150.88% | -70.02% |
| 10 | 131.01 | 6.52% | 52.71% | -53.54% | $0.05 | $2.64 | 52.71% | -54.30% |
| 11 | 168.71 | 5.48% | 28.78% | -44.95% | $0.03 | $1.46 | 28.78% | -44.61% |
| 12 | 867.35 | 4.41% | 414.10% | -85.25% | $0.01 | $0.20 | 414.10% | -85.84% |
| 13 | 878.95 | 2.78% | 1.34% | -42.71% | $0.00 | $0.12 | 1.34% | -36.89% |
| 14 | 1168.16 | 2.31% | 32.90% | -50.87% | $0.00 | $0.06 | 32.90% | -50.53% |
| 15 | 911.00 | 2.58% | -22.01% | -3.30% | $0.00 | $0.06 | -22.01% | -8.37% |
| 16 | 493.33 | 3.20% | -45.85% | 34.34% | $0.00 | $0.07 | -45.85% | 29.49% |
| 17 | 450.78 | 3.02% | -8.62% | -21.55% | $0.00 | $0.05 | -8.62% | -24.76% |
| 18 | 898.54 | 3.56% | 99.33% | -59.15% | $0.00 | $0.02 | 99.33% | -61.55% |
| 19 | 1995.54 | 3.46% | 122.09% | -68.16% | $0.00 | $0.01 | 122.09% | -68.96% |
| 20 | 4073.34 | 2.27% | 104.12% | -65.32% | $0.00 | $0.00 | 104.12% | -64.66% |

| Total Return | 3973.34% | -100.00% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount. The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

PS-20

Exhibit 1

232

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 188.36 | 5.58% | 88.36% | 99.13% | $1.48 | $197.37 | 88.36% | 97.37% |
| 02 | 215.66 | 5.27% | 14.49% | 14.29% | $2.16 | $236.09 | 14.49% | 19.61% |
| 03 | 335.67 | 4.59% | 55.65% | 56.47% | $3.76 | $381.29 | 55.65% | 61.50% |
| 04 | 158.43 | 4.17% | -52.80% | -50.95% | $3.15 | $186.02 | -52.80% | -51.21% |
| 05 | 74.70 | 4.60% | -52.85% | -50.61% | $1.34 | $91.04 | -52.85% | -51.28% |
| 06 | 31.32 | 5.39% | -58.07% | -54.35% | $0.61 | $39.92 | -58.07% | -53.58% |
| 07 | 52.63 | 5.51% | 68.03% | 84.98% | $0.36 | $70.25 | 68.03% | 76.47% |
| 08 | 34.20 | 4.99% | -35.02% | -32.69% | $0.72 | $47.56 | -35.02% | -32.30% |
| 09 | 85.79 | 5.41% | 150.88% | 164.79% | $0.89 | $124.82 | 150.88% | 162.94% |
| 10 | 131.01 | 6.52% | 52.71% | 62.50% | $1.46 | $201.60 | 52.71% | 61.51% |
| 11 | 168.71 | 5.48% | 28.78% | 38.72% | $2.18 | $271.78 | 28.78% | 34.81% |
| 12 | 867.35 | 4.41% | 414.10% | 389.96% | $6.72 | $1,446.76 | 414.10% | 399.12% |
| 13 | 878.95 | 2.78% | 1.34% | 15.14% | $17.56 | $1,494.10 | 1.34% | 3.27% |
| 14 | 1168.16 | 2.31% | 32.90% | 38.77% | $14.79 | $2,014.06 | 32.90% | 34.80% |
| 15 | 911.00 | 2.58% | -22.01% | -23.25% | $18.38 | $1,597.61 | -22.01% | -20.68% |
| 16 | 493.33 | 3.20% | -45.85% | -45.39% | $9.97 | $885.45 | -45.85% | -44.58% |
| 17 | 450.78 | 3.02% | -8.62% | -8.50% | $7.64 | $826.51 | -8.62% | -6.66% |
| 18 | 898.54 | 3.56% | 99.33% | 84.68% | $9.39 | $1,692.01 | 99.33% | 92.29% |
| 19 | 1995.54 | 3.46% | 122.09% | 127.29% | $21.63 | $3,855.10 | 122.09% | 127.84% |
| 20 | 4073.34 | 2.27% | 104.12% | 115.49% | $49.46 | $7,978.48 | 104.12% | 106.96% |

| Total Return | 3973.34% | 7878.48% |
|---|---|---|

PS-21

Exhibit 1

233

2x Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 188.36 | 5.58% | 88.36% | 157.83% | $3.85 | $253.62 | 88.36% | 153.62% |
| 02 | 215.66 | 5.27% | 14.49% | -10.32% | $5.33 | $250.38 | 14.49% | -1.28% |
| 03 | 335.67 | 4.59% | 55.65% | 64.52% | $11.55 | $440.22 | 55.65% | 75.82% |
| 04 | 158.43 | 4.17% | -52.80% | -84.28% | $5.51 | $68.56 | -52.80% | -84.43% |
| 05 | 74.70 | 4.60% | -52.85% | -84.04% | $0.65 | $10.76 | -52.85% | -84.45% |
| 06 | 31.32 | 5.39% | -58.07% | -86.75% | $0.09 | $1.32 | -58.07% | -86.27% |
| 07 | 52.63 | 5.51% | 68.03% | 127.84% | $0.02 | $2.74 | 68.03% | 107.95% |
| 08 | 34.20 | 4.99% | -35.02% | -72.67% | $0.05 | $0.76 | -35.02% | -72.30% |
| 09 | 85.79 | 5.41% | 150.88% | 383.39% | $0.05 | $3.61 | 150.88% | 377.34% |
| 10 | 131.01 | 6.52% | 52.71% | 65.26% | $0.08 | $5.90 | 52.71% | 63.49% |
| 11 | 168.71 | 5.48% | 28.78% | 24.21% | $0.11 | $6.93 | 28.78% | 17.52% |
| 12 | 867.35 | 4.41% | 414.10% | 1432.36% | $0.79 | $126.23 | 414.10% | 1493.73% |
| 13 | 878.95 | 2.78% | 1.34% | -19.23% | $3.38 | $82.90 | 1.34% | -34.33% |
| 14 | 1168.16 | 2.31% | 32.90% | 22.97% | $1.38 | $96.35 | 32.90% | 16.23% |
| 15 | 911.00 | 2.58% | -22.01% | -59.58% | $1.46 | $41.73 | -22.01% | -56.68% |
| 16 | 493.33 | 3.20% | -45.85% | -80.15% | $0.31 | $8.55 | -45.85% | -79.52% |
| 17 | 450.78 | 3.02% | -8.62% | -45.05% | $0.11 | $4.90 | -8.62% | -42.68% |
| 18 | 898.54 | 3.56% | 99.33% | 133.21% | $0.11 | $14.16 | 99.33% | 153.82% |
| 19 | 1995.54 | 3.46% | 122.09% | 237.68% | $0.40 | $48.14 | 122.09% | 239.91% |
| 20 | 4073.34 | 2.27% | 104.12% | 226.79% | $1.42 | $145.43 | 104.12% | 202.12% |

| Total Return | 3973.34% | 45.43% |
|---|---|---|

PS-22

Exhibit 1

234

Example 4. This example assumes the index decreases by 99% with 49.69% annualized volatility in the daily change in Index levels over the relevant term.

Inverse ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value[1] | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 44.21 | 3.30% | -55.79% | 75.99% | $1.69 | $173.64 | -55.79% | 73.64% |
| 02 | 35.88 | 3.42% | -18.85% | 1.08% | $2.11 | $170.95 | -18.85% | -1.55% |
| 03 | 34.53 | 2.64% | -3.76% | -13.60% | $2.09 | $143.92 | -3.76% | -15.81% |
| 04 | 18.35 | 2.74% | -46.86% | 52.35% | $2.52 | $212.67 | -46.86% | 47.77% |
| 05 | 16.25 | 2.59% | -11.42% | -11.17% | $2.42 | $186.35 | -11.42% | -8.17% |
| 06 | 14.11 | 2.97% | -13.20% | -10.46% | $2.24 | $164.26 | -13.20% | -9.65% |
| 07 | 7.82 | 3.44% | -44.60% | 51.04% | $2.26 | $234.36 | -44.60% | 48.84% |
| 08 | 6.55 | 4.17% | -16.20% | -6.25% | $2.48 | $222.57 | -16.20% | -5.03% |
| 09 | 5.68 | 4.16% | -13.21% | -8.04% | $2.69 | $201.92 | -13.21% | -9.95% |
| 10 | 13.53 | 4.06% | 138.03% | -65.70% | $2.33 | $67.36 | 138.03% | -66.64% |
| 11 | 10.98 | 2.85% | -18.87% | -4.46% | $1.18 | $65.86 | -18.87% | -2.22% |
| 12 | 11.53 | 2.96% | 5.00% | -22.83% | $0.82 | $51.15 | 5.00% | -23.64% |
| 13 | 13.91 | 2.79% | 20.71% | -36.75% | $0.79 | $33.06 | 20.71% | -35.37% |
| 14 | 9.89 | 2.39% | -28.89% | 4.29% | $0.55 | $36.89 | -28.89% | 11.58% |
| 15 | 7.44 | 2.75% | -24.75% | 7.68% | $0.42 | $38.14 | -24.75% | 3.39% |
| 16 | 3.91 | 2.01% | -47.49% | 54.14% | $0.62 | $56.48 | -47.49% | 48.07% |
| 17 | 5.60 | 1.68% | 43.36% | -44.62% | $0.60 | $30.68 | 43.36% | -45.67% |
| 18 | 3.98 | 2.13% | -29.03% | 12.73% | $0.59 | $34.20 | -29.03% | 9.18% |
| 19 | 3.22 | 2.41% | -19.03% | -6.12% | $0.43 | $32.45 | -19.03% | -5.11% |
| 20 | 1.11 | 2.29% | -65.39% | 121.57% | $0.79 | $72.84 | -65.39% | 124.44% |

| Total Return | -98.89% | -27.16% |
|---|---|---|

[1] The Closing Indicative Values presented in this table are based on a hypothetical $100 denomination and stated principal amount.  The actual denominations and stated principal amounts of the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs are $10 and $12.50, respectively.

Exhibit 1
235

Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 44.21 | 3.30% | -55.79% | -54.30% | $0.68 | $45.30 | -55.79% | -54.70% |
| 02 | 35.88 | 3.42% | -18.85% | -17.06% | $0.42 | $37.71 | -18.85% | -16.76% |
| 03 | 34.53 | 2.64% | -3.76% | -2.42% | $0.34 | $36.93 | -3.76% | -2.07% |
| 04 | 18.35 | 2.74% | -46.86% | -46.31% | $0.24 | $19.99 | -46.86% | -45.87% |
| 05 | 16.25 | 2.59% | -11.42% | -9.09% | $0.19 | $18.01 | -11.42% | -13.86% |
| 06 | 14.11 | 2.97% | -13.20% | -10.87% | $0.17 | $15.96 | -13.20% | -13.60% |
| 07 | 7.82 | 3.44% | -44.60% | -45.16% | $0.13 | $9.07 | -44.60% | -45.60% |
| 08 | 6.55 | 4.17% | -16.20% | -10.29% | $0.10 | $7.85 | -16.20% | -13.41% |
| 09 | 5.68 | 4.16% | -13.21% | -9.52% | $0.07 | $7.04 | -13.21% | -9.67% |
| 10 | 13.53 | 4.06% | 138.03% | 144.35% | $0.07 | $17.30 | 138.03% | 145.69% |
| 11 | 10.98 | 2.85% | -18.87% | -13.50% | $0.11 | $14.31 | -18.87% | -17.27% |
| 12 | 11.53 | 2.96% | 5.00% | 10.37% | $0.13 | $15.35 | 5.00% | 9.05% |
| 13 | 13.91 | 2.79% | 20.71% | 28.49% | $0.11 | $18.88 | 20.71% | 23.03% |
| 14 | 9.89 | 2.39% | -28.89% | -21.49% | $0.12 | $13.63 | -28.89% | -27.81% |
| 15 | 7.44 | 2.75% | -24.75% | -24.76% | $0.13 | $10.45 | -24.75% | -23.33% |
| 16 | 3.91 | 2.01% | -47.49% | -47.86% | $0.07 | $5.55 | -47.49% | -46.90% |
| 17 | 5.60 | 1.68% | 43.36% | 44.98% | $0.06 | $8.02 | 43.36% | 44.49% |
| 18 | 3.98 | 2.13% | -29.03% | -27.37% | $0.05 | $5.76 | -29.03% | -26.66% |
| 19 | 3.22 | 2.41% | -19.03% | -15.04% | $0.05 | $4.74 | -19.03% | -17.79% |
| 20 | 1.11 | 2.29% | -65.39% | -63.65% | $0.02 | $1.66 | -65.39% | -64.89% |

| Total Return | -98.89% | -98.34% |
|---|---|---|

PS-24

Exhibit 1
236

2x Long ETNs:

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Index Level | Daily Accrual | Daily Index Factor | Daily ETN Performance | Daily Investor Fee | Closing Indicative Value | Annualized Index Return | Annualized ETN Return |
| | | Total for year | Total for year | Total for year | Total for year | At Year End | Total for year | Total for year |
| 00 | 100.00 | 0.00% | 0.00% | 0.00% | $0.00 | $100.00 | 0.00% | 0.00% |
| 01 | 44.21 | 3.30% | -55.79% | -84.90% | $0.94 | $14.85 | -55.79% | -85.15% |
| 02 | 35.88 | 3.42% | -18.85% | -47.95% | $0.24 | $7.80 | -18.85% | -47.49% |
| 03 | 34.53 | 2.64% | -3.76% | -26.06% | $0.11 | $5.82 | -3.76% | -25.42% |
| 04 | 18.35 | 2.74% | -46.86% | -78.44% | $0.05 | $1.28 | -46.86% | -78.05% |
| 05 | 16.25 | 2.59% | -11.42% | -38.57% | $0.02 | $0.77 | -11.42% | -44.66% |
| 06 | 14.11 | 2.97% | -13.20% | -42.22% | $0.01 | $0.44 | -13.20% | -45.61% |
| 07 | 7.82 | 3.44% | -44.60% | -77.60% | $0.01 | $0.11 | -44.60% | -77.93% |
| 08 | 6.55 | 4.17% | -16.20% | -40.17% | $0.00 | $0.06 | -16.20% | -44.12% |
| 09 | 5.68 | 4.16% | -13.21% | -40.06% | $0.00 | $0.04 | -13.21% | -40.17% |
| 10 | 13.53 | 4.06% | 138.03% | 346.42% | $0.00 | $0.16 | 138.03% | 352.05% |
| 11 | 10.98 | 2.85% | -18.87% | -43.39% | $0.00 | $0.08 | -18.87% | -48.08% |
| 12 | 11.53 | 2.96% | 5.00% | -5.06% | $0.00 | $0.07 | 5.00% | -7.19% |
| 13 | 13.91 | 2.79% | 20.71% | 23.31% | $0.00 | $0.08 | 20.71% | 13.36% |
| 14 | 9.89 | 2.39% | -28.89% | -53.05% | $0.00 | $0.03 | -28.89% | -60.05% |
| 15 | 7.44 | 2.75% | -24.75% | -58.06% | $0.00 | $0.01 | -24.75% | -56.36% |
| 16 | 3.91 | 2.01% | -47.49% | -79.57% | $0.00 | $0.00 | -47.49% | -78.77% |
| 17 | 5.60 | 1.68% | 43.36% | 60.14% | $0.00 | $0.00 | 43.36% | 59.27% |
| 18 | 3.98 | 2.13% | -29.03% | -59.69% | $0.00 | $0.00 | -29.03% | -58.82% |
| 19 | 3.22 | 2.41% | -19.03% | -46.53% | $0.00 | $0.00 | -19.03% | -49.83% |
| 20 | 1.11 | 2.29% | -65.39% | -90.12% | $0.00 | $0.00 | -65.39% | -90.77% |

| Total Return | -98.89% | -100.00% |
|---|---|---|

PS-25

Exhibit 1

237

## RISK FACTORS

The ETNs are senior unsecured debt obligations of Credit Suisse AG ("**Credit Suisse**"). The ETNs are Senior Medium-Term Notes as described in the accompanying prospectus supplement and prospectus and are riskier than ordinary unsecured debt securities. The return on the ETNs of any series will be based on the performance of the applicable underlying Index. Investing in the ETNs is not equivalent to investing directly in the Index itself. See "The Indices" below for more information.

This section describes the most significant risks relating to an investment in the ETNs. **We urge you to read the following information about these risks, together with the other information in this pricing supplement and the accompanying prospectus supplement and prospectus before investing in the ETNs.**

**The ETNs do not pay interest nor guarantee return of principal and you may lose all or a significant part of your investment in the ETNs**

The terms of the ETNs differ from those of ordinary debt securities in that the ETNs neither pay interest nor guarantee payment of the stated principal amount at maturity, on early redemption or upon acceleration, and may incur a loss of principal due to fluctuations in the Closing Indicative Value. Because the payment due at maturity may be less than the amount originally invested in the ETNs, the return on the ETNs (the effective yield to maturity) may be negative. Even if it is positive, the return payable on the ETNs may not be enough to compensate you for any loss in value due to inflation and other factors relating to the value of money over time.

The Early Redemption Amount, Accelerated Redemption Amount and Maturity Redemption Amount, as applicable (each, a "**Redemption Amount**"), will each depend on the change in the level of the applicable underlying Index. Because of the manner in which the underlying Indices are calculated and because the ETNs are linked to the daily returns of the applicable underlying Index *(including inverse or leveraged exposure for the Inverse ETNs and 2x Long ETNs respectively)*, the applicable redemption amount is very likely to be less than the initial principal amount of the ETNs, and you are likely to lose part or all of your initial investment.

Each Index seeks to replicate exposure to one or more maturities of futures contracts on the VIX Index, which reflect implied volatility of the S&P 500® Index at various points along the volatility forward curve. The calculation of the level of the VIX Index is based on prices of put and call options on the S&P 500® Index. Futures on the VIX Index allow investors the ability to invest in forward volatility based on their view of the future direction of movement of the VIX Index. Each underlying Index is intended to reflect the returns that are potentially available through an unleveraged investment in the futures contract or contracts on the VIX Index. The S&P 500 VIX Short-Term Futures™ Index ER targets a constant weighted average futures maturity of one month. The S&P 500 VIX Mid-Term Futures™ Index ER targets a constant weighted average futures maturity of five months. *Because of the large and sudden price movement associated with futures on the VIX Index, and the daily objective of the ETNs (including inverse or leveraged exposure), the ETNs are intended specifically for short term trading.* You should monitor the performance of your ETNs as frequently as possible, even intraday.

The ETNs do not accurately provide exposure to the level of the VIX Index (and, in any event, are subject to fees and other costs). Instead the ETNs track an index of futures on the VIX Index. The impact of rolling futures contracts, compounding of returns *(including inverse and leveraged exposure for the Inverse ETNs and 2x Long ETNs respectively)*, and volatility will very likely erode any potential returns of the VIX Index.

Investors with a horizon longer than one Index Business Day should carefully consider whether the ETNs are appropriate for their investment portfolio. As discussed above, because the ETNs are meant to provide daily exposure *(including inverse or leveraged exposure for the Inverse ETNs and 2x Long ETNs respectively)* to the underlying futures, their performance over any period of time—over days, weeks, months or years—can differ significantly from the performance of the applicable underlying Index during the same period of time. *Therefore, it is likely that you will suffer significant losses even if the long-term performance of the applicable underlying Index was in the desired direction. For instance, it is possible for the level of the applicable underlying Index to decrease while the market value of the Inverse ETNs declines, or for the level of the applicable underlying Index to increase while the market value of the Long ETNs or 2x Long ETNs declines.* **You should proceed with extreme caution in considering an investment in the ETNs.**

Even if the amount payable on your ETNs on the Early Redemption Date, Acceleration Date or the Maturity Date, as applicable, is greater than the price you paid for your ETNs, it may not compensate you for a loss

Exhibit 1

238

in value due to inflation and other factors relating to the value of money over time. Thus, even in those circumstances, the overall return you earn on your ETNs may be less than what you would have earned by investing in a debt security that bears interest at a prevailing market rate.

**The ETNs are subject to the credit risk of Credit Suisse**

Although the return on the ETNs of each series will be based on the performance of the applicable underlying Index, the payment of any amount due on the ETNs, including any payment at maturity, is subject to the credit risk of Credit Suisse. Investors are dependent on Credit Suisse's ability to pay all amounts due on the ETNs, and therefore investors are subject to our credit risk. In addition, any decline in our credit ratings, any adverse changes in the market's view of our creditworthiness or any increase in our credit spreads is likely to adversely affect the market value of the ETNs prior to maturity.

**The ETNs may not be a suitable investment for you**

The ETNs may not be a suitable investment for you if:

- You are not willing to be exposed to fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You seek a guaranteed return of principal.

- You seek a long-term investment objective.

- You believe the level of the applicable underlying Index will decrease (if you invest in the Long ETNs or 2x Long ETNs) or increase (if you invest in the Inverse ETNs) or will not increase (if you invest in the Long ETNs or 2x Long ETNs) or decrease (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You prefer the lower risk and therefore accept the potentially lower returns of fixed income investments with comparable maturities and credit ratings.

- You seek current income from your investment.

- You are not a sophisticated investor and you seek an investment for other purposes than managing daily trading risks.

- You seek an investment with a longer duration than a daily basis.

- You do not want to pay Daily Investor Fees and the Early Redemption Charge, if applicable, which are charged on the ETNs and which will reduce your return (or increase your loss, as applicable) on your investment.

**Long holding period risk**

The ETNs are only suitable for a very short investment horizon. The relationship between the level of the VIX Index and the underlying futures on the VIX Index will begin to break down as the length of an investor's holding period increases, even within the course of a single Index Business Day. The relationship between the level of the applicable underlying Index and the Closing Indicative Value and Intraday Indicative Value of the ETNs will also begin to break down as the length of an investor's holding period increases. The ETNs are not long term substitutes for long or short positions in the futures underlying the VIX Index. Further, over a longer holding period, the applicable underlying Index is more likely to experience a dramatic price movement that may result in the Intraday Indicative Value becoming equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value. Upon such an event, your ETNs would be subject to acceleration and you will likely lose all or a

Exhibit 1

239

substantial portion of your investment.  **The long term expected value of your ETNs is zero.  If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment.**

**The ETNs are not linked to the VIX Index**

The ETNs are linked to the daily performance of the applicable underlying Index, which in turn is linked to prices of futures contracts on the VIX Index.  The applicable underlying Index takes notional long positions in futures contracts on the VIX Index.  The Index and these futures will not necessarily track the performance of the VIX Index.  Your ETNs may not benefit from increases (or in the case of the Inverse ETNs, decreases) in the level of the VIX Index because such increases (or in the case of the Inverse ETNs, decreases) will not necessarily cause the level of the relevant futures contracts on the VIX Index to increase (or in the case of the Inverse ETNs, decrease). Additionally, the rolling of the futures contracts reflected in the applicable underlying Index may decrease your returns.  A hypothetical investment that was linked directly to the performance of the VIX Index could generate a higher return than your ETNs.

**Your ETNs are not linked to the options used to calculate the VIX Index, to the actual volatility of the S&P 500® Index or to the equity securities included in the S&P 500® Index**

The VIX Index measures the 30-day forward volatility of the S&P 500® Index as calculated based on the prices of certain put and call options on the S&P 500® Index.  The actual volatility of the S&P 500® Index may differ significantly from the level predicted by the VIX Index.  The Closing Indicative Value and the Intraday Indicative Value of the ETNs are based on the value of the applicable underlying Index, which is based on the relevant futures on the VIX Index.  Your ETNs are not linked to the realized volatility of the S&P 500® Index and will not reflect the return you would realize if you owned, or held a short position in, the equity securities underlying the S&P 500® Index or if you traded the put and call options used to calculate the level of the VIX Index.

**The VIX Index is a theoretical calculation and is not a tradable index**

The VIX Index is a theoretical calculation and cannot be traded on a spot price basis.  The settlement price at maturity of the futures contracts on the VIX Index contained in the Indices is based on this theoretically derived calculation.  As a result the behavior of the futures contracts may be different from futures contracts whose settlement price is based on a tradable asset.

**Changes in the Treasury Bill Rate may affect the value of your ETNs**

The value of the ETNs is linked, in part, to the rate of interest that could be earned on an investment of the Closing Indicative Value of the ETNs at the T-Bill rate, which comprises the weekly investment rate for 90-day U.S. Treasury bills (as described in further detail under "Daily Accrual").  Changes in the prevailing investment rate for U.S. Treasury bills, and therefore the T-Bill rate, may affect the amount payable on your ETNs at maturity or upon redemption and, therefore, the market value of your ETNs. Any decrease in T-Bill rate will decrease the rate at which the accrued interest increases and will, therefore, adversely affect the amount payable on your ETNs at maturity or upon redemption.

**Lower or higher prices for futures contracts underlying the Indices relative to the level of the VIX Index may adversely affect the Closing Indicative Value of the ETNs**

The Indices are linked to futures contracts on the spot level of the VIX Index.  Some of these futures contracts are rolled forward every day.  If the value of the futures contracts being bought is less than the value of the futures contracts being sold, the level of the applicable underlying Index may increase relative to the VIX Index.  This increase in the level of the applicable underlying Index would adversely affect the Closing Indicative Value of the Inverse ETNs.  If the value of the futures contracts being bought is more than the value of the futures contracts being sold, the applicable underlying Index may decrease relative to the VIX Index.  This decrease in the level of the applicable underlying Index would adversely affect the Closing Indicative Value of the Long ETNs and 2x Long ETNs.

**Daily rebalancing of the Indices may impact trading in the underlying futures contracts**

The daily rebalancing of the futures contracts underlying the Indices may cause the Issuer, our affiliates, or third parties with whom we transact to adjust their hedges accordingly.  The trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying Index.

Exhibit 1

240

**If the Closing Indicative Value for an ETN increases above its denomination and stated principal amount, at any time, any subsequent adverse daily performance of the applicable underlying Index will result in a larger decrease in the level of such Closing Indicative Value than if the current respective Closing Indicative Value had remained constant at its denomination and stated principal amount**

If the current Closing Indicative Value for an ETN increases above its denomination and stated principal amount, the amount of decrease of such Closing Indicative Value resulting from an adverse daily performance of the applicable underlying Index will increase accordingly. This is because the applicable Daily Index Performance will be applied to a Closing Indicative Value larger than its denomination and stated principal amount. As such, the amount of decrease from any adverse daily performance of the applicable underlying Index will be more than if the Closing Indicative Value were maintained constant at its denomination and stated principal amount. This means that if the Closing Indicative Value increases above its denomination and stated principal amount, it will take smaller adverse daily performances to decrease the Closing Indicative Value (and subsequently the value of your investment) back to the amount of the Initial Indicative Value than would have been the case if the Closing Indicative Value were maintained at its denomination and stated principal amount. Further, if you invest in the Inverse ETNs or 2x Long ETNs, you could lose more than 1% of your initial investment for each 1% of adverse daily performance of the applicable underlying Index and if you invest in the 2x Long ETNs, you could lose more than 2% of your initial investment for each 1% of adverse daily performance of the applicable underlying Index.

**If the Closing Indicative Value for an ETN decreases below its denomination and stated principal amount, at any time, any subsequent beneficial daily performance of the applicable underlying Index will result in a smaller increase in the level of such Closing Indicative Value than if the current respective Closing Indicative Value had remained constant at its denomination and stated principal amount**

If the current Closing Indicative Value for an ETN decreases below its denomination and stated principal amount, the amount of increase of such Closing Indicative Value resulting from a beneficial daily performance of the applicable underlying Index will decrease correspondingly. This is because the applicable Daily Index Performance will be applied to a smaller Closing Indicative Value than its denomination and stated principal amount. As such, the amount of increase from any beneficial daily performance of the applicable underlying Index will be less than if the Closing Indicative Value were maintained constant at its denomination and stated principal amount. This means that if the Closing Indicative Value decreases below its denomination and stated principal amount, it will take larger beneficial daily performances to restore the Closing Indicative Value (and subsequently the value of your investment) back to the amount the Initial Indicative Value than would have been the case if the Closing Indicative Value were maintained at its denomination and stated principal amount. Further, if you invest in the Inverse ETNs or 2x Long ETNs, you could gain less than 1% of your initial investment for each 1% of beneficial daily performance of the applicable underlying Index and if you invest in the 2x Long ETNs, you could gain less than 2% of your initial investment for each 1% of beneficial daily performance of the Index.

**If the Intraday Indicative Value is zero at any time or the Closing Indicative Value is zero you will lose all of your investment**

If the Intraday Indicative Value is equal to or less than zero at any time or the Closing Indicative Value is equal to zero on any Index Business Day, the Closing Indicative Value on that day, and all future days, will be zero and you will lose all of your investment in the ETNs.

**It is possible that your ETNs will be accelerated due to a fall in the Intraday Indicative Value to 20% or less than the prior day's Closing Indicative Value and your investment will be lost before the scheduled maturity of the ETNs**

Because the Intraday Indicative Value is calculated throughout each Index Business Day, adverse daily performances of the applicable underlying Index on an Index Business Day will be reflected in the current Closing Indicative Value rather than only upon redemption, acceleration or at maturity. If there are severe or repeated adverse daily performances for the applicable underlying Index during the term of the ETNs, the Intraday Indicative Value on any Index Business Day could be reduced to 20% or less of the prior day's Closing Indicative Value. If this occurs, the ETNs will automatically accelerate for an amount equal to that day's Closing Indicative Value and you may not receive any of your initial investment.

Exhibit 1
241

**Your ETNs may be accelerated at any time on or after the Inception Date or if an Acceleration Event has occurred**

We have the right to accelerate the ETNs and pay you an amount equal to the Closing Indicative Value on the applicable Accelerated Valuation Date, on any Business Day occurring on or after the Inception Date or if an Acceleration Event has occurred in our or the Calculation Agents' determination.  As discussed in the section "Specific Terms of the ETNs—Acceleration at Our Option or Upon an Acceleration Event" the type of events that may trigger this acceleration are (a) an amendment to or change (including any officially announced proposed change) in the laws, regulations or rules of the United States (or any political subdivision thereof), any jurisdiction in which a Primary Exchange or Related Exchange (each as defined herein) is located that (i) makes it illegal to hold, acquire or dispose of the applicable underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on any of these party's ability to perform their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents; (b) any official administrative decision, judicial decision, administrative action, regulatory interpretation or other official pronouncement interpreting or applying those laws, regulations or rules that is announced on or after the Inception Date that (i) makes it illegal to hold, acquire or dispose of the applicable underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on the Issuer's, our affiliates, third parties with whom we transact or similarly situated third party's ability to perform our or their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents; (c) any event, as determined by us or the Calculation Agents that we or any of our affiliates or a similarly situated party would, after using commercially reasonable efforts, be unable to, or would incur a materially increased amount of tax, duty, expense or fee (other than brokerage commissions) to acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction or asset it deems necessary to hedge the risk of the ETNs, or realize, recover or remit the proceeds of any such transaction or asset; (d) if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value; (e) if the primary exchange or market for trading for the ETNs, if any, announces that pursuant to the rules of such exchange or market, as applicable, the ETNs cease (or will cease) to be listed, traded or publicly quoted on such exchange or market, as applicable, for any reason and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as such exchange or market, as applicable.   If we accelerate the ETNs, you will only receive the Closing Indicative Value and will not receive any other compensation or amount for the loss of the investment opportunity of holding the ETNs; or (f) VLS exercises their right to cause an early acceleration due to the termination of our agreement with them under certain circumstances. See "Supplemental Plan of Distribution" in this pricing supplement for further information.

**The Calculation Agents may modify the applicable underlying Index**

The Calculation Agents may modify the applicable underlying Index or adjust the method of its calculation if they determine that the publication of the applicable underlying Index is discontinued and there is no Successor Index.  In that case, the Calculation Agents will determine the applicable level of the applicable underlying Index as the case may be, and thus the applicable Redemption Amount by a computation methodology that the Calculation Agents determine will as closely as reasonably possible replicate the applicable underlying Index.

If the Calculation Agents determine that the applicable underlying Index, the underlying futures or the method of calculating the applicable underlying Index is changed at any time in any respect — including whether the change is made by the Index Sponsor under its existing policies or following a modification of those policies, is due to the publication of a Successor Index, is due to events affecting the underlying futures or its issuer, or is due to any other reason and is not otherwise reflected in the level of the applicable underlying Index by the Index Sponsor pursuant to the methodology described herein, then the Calculation Agents will be permitted (but not required) to make such adjustments in the applicable underlying Index or the method of its calculation as they believe are appropriate to ensure that the applicable closing level of the applicable underlying Index used to determine the applicable Redemption Amount is equitable. The Calculation Agents may make any such modification or adjustment even if the Index Sponsor continues to publish the applicable underlying Index without a similar modification or adjustment.

Exhibit 1

242

Any modification to the applicable underlying Index or adjustment to its method of calculation will affect the amount you will receive upon redemption or maturity and will result in the ETNs having a value different (higher or lower) from the value they would have had if there had been no such modification or adjustment.

**Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the applicable underlying Index on the date of your investment, you may receive less than the principal amount of your ETNs**

Because the Daily Investor Fee (and in the case of Early Redemption, the Early Redemption Charge) reduces the amount of your return upon redemption, acceleration or maturity, the level of the applicable underlying Index must increase significantly (or decrease significantly in the case of the Inverse ETNs) in order for you to receive at least the principal amount of your investment upon redemption, acceleration or maturity of your ETNs. If the level of the applicable underlying Index decreases or does not increase sufficiently (increases or does not decrease sufficiently in the case of the Inverse ETNs) to offset the effect of the Daily Investor Fee over the term of the ETNs (and in the case of Early Redemption, the Early Redemption Charge), you will receive less than the principal amount of your investment upon redemption, acceleration or maturity of your ETNs. For more information on how the Daily Investor Fee affects the value of the ETNs, see "Hypothetical Examples".

**There are restrictions on the minimum number of ETNs you may redeem and on the dates on which you may redeem them**

You must redeem at least 25,000 ETNs, the Minimum Redemption Amount, at one time and you must cause your broker to deliver a notice of redemption, substantially in the form as Annex A (the "**Redemption Notice**"), to VLS (the "**Redemption Agent**") via email or other electronic delivery (including, without limitation, the Redemption Agent's proprietary technology system, TENZING) as requested by the Redemption Agent.  If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**".  Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date.  If the Redemption Agent receives your Redemption Notice no later than 4:00 p.m., New York City time, on any Business Day, the Redemption Agent will respond by sending your broker an acknowledgment of the Redemption Notice accepting your redemption request by 7:30 p.m., New York City time, on the Business Day prior to the applicable Early Redemption Valuation Date.  The Redemption Agent or its affiliate must acknowledge to your broker acceptance of the Redemption Notice in order for your redemption request to be effective.

Also, because of the timing requirements of your offer for early redemption, settlement of any early redemption by us will be prolonged when compared to a sale and settlement in the secondary market. As your Redemption Notice is irrevocable, this will subject you to market risk in the event the market fluctuates after the Redemption Agent receives your offer.

The redemption feature is intended to induce arbitrageurs to counteract any trading of the ETNs at a premium or discount to their indicative value. There can be no assurance that arbitrageurs will employ the redemption feature in this manner.

**An Early Redemption Charge of up to 0.05% per ETN will be charged upon an early redemption**

We will charge a fee of up to 0.05% *times* the Closing Indicative Value per ETN upon an early redemption. The imposition of the fee will mean that you will not receive the full amount of the Closing Indicative Value upon an early redemption at your election.

**You will not know the Early Redemption Amount for any ETNs you elect to redeem prior to maturity at the time you make such election**

In order to exercise your right to redeem your ETNs prior to maturity you must cause your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein) by no later than 4:00 p.m., New York City time, on the Business Day prior to your desired Valuation Date. The Early Redemption Amount cannot be determined until the Valuation Date, and as such you will not know the Early Redemption Amount for your ETNs at the time you make an irrevocable election to redeem your ETNs. The Early Redemption Amount for your ETNs on the relevant Valuation Date may be substantially less than it would have been on the prior day and may be zero.

Exhibit 1

243

**You will not benefit from any change in the level of the applicable underlying Index if such change is not reflected in the level of the applicable underlying Index on the applicable Valuation Date**

If the applicable underlying Index does not increase (or decrease in the case of the Inverse ETNs) by an amount sufficient to offset the effect of the Daily Investor Fee and, in the case of an early redemption, the Early Redemption Charge, between the Trade Date and the applicable Valuation Date, we will pay you less than the principal amount of your ETNs upon redemption. This will be true even if the level of the applicable underlying Index as of some date or dates prior to the applicable Valuation Date would have been sufficiently high (or low in the case of the Inverse ETNs) to offset the effect of the Daily Investor Fee and Early Redemption Charge.

**Past performance of the Indices is no guide to future performance, and the Indices and VIX Futures have limited historical information**

The actual performance of the applicable underlying Index over the term of the offered ETNs, as well as the amount payable on the relevant Early Redemption Date, Acceleration Date or the Maturity Date, may bear little relation to the historical values of that Index or to the hypothetical return examples set forth elsewhere in this pricing supplement. We cannot predict the future performance of the Indices.

The payment amount, if any, for each of your ETNs is linked to the performance of the applicable underlying Index, each of which was launched in January 2009 with an inception date of January 22, 2009 at the market close and has limited history. Because the Indices have no historical performance information prior to that date, very limited historical index level information is available for you to consider in making an independent investigation of the performance of the Indices, which may make it difficult for you to make an informed decision with respect to an investment in your ETNs. The Index Sponsor has calculated hypothetical historical performance data to illustrate how the Indices may have performed had it been created in the past, but those calculations are subject to many limitations. Unlike actual historical performance, such calculations do not reflect actual trading, liquidity constraints, fees and other costs. In addition, the models used to calculate these hypothetical returns are based on certain data, assumptions and estimates. Different models or models using different data assumptions, and estimates might result in materially different hypothetical performance.

In addition, prior to April 2008 not all consecutive first to seventh month futures contracts on the VIX Index have been listed and not all futures of relevant maturities have traded consistently during that time. This lack of historical information makes it even more difficult to perform an independent investigation of the likely performance of the index or make an informed decision with respect to an investment in your ETNs.

**The formula for determining the applicable Redemption Amount does not take into account all developments in the applicable underlying Index**

Changes in the levels of the applicable underlying Index during the term of the ETNs before the applicable Valuation Date will not necessarily be reflected in the calculation of the applicable Redemption Amount. The Calculation Agents will calculate the applicable Redemption Amount by utilizing the Closing Indicative Value on the applicable Valuation Date. No other levels of the applicable underlying Index, Closing Indicative Values or Intraday Indicative Values will be taken into account. As a result, you may lose a significant part of your initial investment even if the level of the applicable underlying Index has risen (or declined in the case of the Inverse ETNs) at certain times during the term of the ETNs.

**Any decline in our credit ratings may affect the market value of your ETNs**

Our credit ratings are an assessment of our ability to pay our obligations, including those on the offered ETNs. Consequently, actual or anticipated declines in our credit ratings may affect the market value of your ETNs.

**The ETNs do not give you rights in the underlying futures or the component securities of the S&P 500® Index**

As an owner of the ETNs, you will not have rights that investors in the underlying futures may have. Your ETNs will be paid in cash, and you will have no right to receive delivery of any components of the applicable underlying Index.  You will have no right to receive delivery of any equity securities comprising the S&P 500® Index, of any dividends or distributions relating to such securities, of payment or delivery of amounts in respect of the options used to calculate the level of the VIX Index or of payment or delivery of amounts in respect of the futures contracts included in the Index underlying your ETNs.

Exhibit 1

244

**The Calculation Agents will have the authority to make determinations that could affect the market value of your ETNs and the amount you receive at maturity**

The Calculation Agents for your ETNs will have discretion in making various determinations that affect your ETNs, including the Closing Indicative Values, the applicable Redemption Amount, the occurrence and effects of an Acceleration Event and the existence and effects of Market Disruption Events. The exercise of this discretion by the Calculation Agents could adversely affect the value of your ETNs and may present the Calculation Agents with a conflict of interest of the kind described below under "There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents".

**The market price of your ETNs may be influenced by many unpredictable factors**

The market value of your ETNs will fluctuate between the date you purchase them and the applicable Valuation Date.  You may also sustain a significant loss if you sell the ETNs in the secondary market.  In addition to others, the following factors, many of which are beyond our control, will influence the market value of your ETNs, as well as the applicable Redemption Amount:

- the level of the applicable underlying Index at any time,

- the volatility of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures,

- the liquidity of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures,

- economic, financial, regulatory, political, judicial, military and other events that affect stock markets generally, the applicable underlying Index, the equity securities included in the S&P 500® Index, the S&P 500® Index, the VIX Index or the relevant futures contracts on the VIX Index,

- supply and demand for the ETNs in the secondary market, including but not limited to, inventory positions with any market maker or other person or entity who is trading the ETNs (supply and demand for the ETNs will be affected by the total issuance of ETNs, and we are under no obligation to issue additional ETNs to increase the supply),

- interest and yield rates and rate spreads in the markets,

- the time remaining until your ETNs mature, and

- the actual or perceived creditworthiness of Credit Suisse.

You cannot predict the future performance of the Indices based on the historical performance of the option or futures contracts relating to the Indices, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures.  The factors interrelate in complex ways, and the effect of one factor on the market value of your ETNs may offset or enhance the effect of another factor.

**The liquidity of the market for the ETNs may vary materially over time**

We sold a portion of the ETNs on the Initial Settlement Date, and additional ETNs may be issued and sold from time to time through CSSU, an affiliate of ours. Additionally, the number of ETNs outstanding could be reduced at any time due to redemptions of the ETNs by Credit Suisse as described in this pricing supplement. Furthermore, any ETNs held by us or an affiliate in inventory may be resold at prevailing market prices or lent to market participants who may have made short sales of the ETNs.  Accordingly, the liquidity of the market for the ETNs could vary materially over the term of the ETNs. While you may elect to offer your ETNs for early redemption by Credit Suisse prior to maturity, such early redemption is subject to restrictive conditions and procedures described elsewhere in this pricing supplement, including the condition that you must offer at least the applicable Minimum Repurchase Amount to us at one time.

**There may not be an active trading market for your ETNs**

Although we have listed the ETNs on the NYSE Arca, there is no assurance that a trading market for the offered ETNs will continue. Even if there is a secondary market for your ETNs, it may not be sufficiently liquid to

Exhibit 1

245

enable you to sell your ETNs readily and you may suffer substantial losses and/or sell your ETNs at prices substantially less than their Intraday Indicative Value or Closing Indicative Value, including being unable to sell them at all or only for a price of zero in the secondary market.

No assurance can be given as to the continuation of the listing for the life of the offered ETNs, or the liquidity or trading market for the offered ETNs. We are not required to maintain any listing of your ETNs on the NYSE Arca and the liquidity of the market for any series of ETNs could vary materially over the term of the ETNs.

**The Intraday Indicative Value and the Closing Indicative Value are not the same as the closing price or any other trading price of the ETNs in the secondary market**

The Intraday Indicative Value and the Closing Indicative Value of each series of the ETNs are not the same as the closing price or any other trading price of such ETNs in the secondary market. The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day. The Closing Indicative Value will never be less than zero. The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value is less than or equal to zero at any time or Closing Indicative Value equals zero. The Closing Indicative Value for each series of ETNs will be published on each Index Business Day under the applicable Indicative Value ticker for such series of ETNs, as set forth on the cover of this pricing supplement. If your ETNs have not been previously redeemed or accelerated, on the Maturity Date you will receive for each $100 stated principal amount of your ETNs (for each $10 stated principal amount in the case of Inverse VIX Short Term ETNs and for each $12.50 stated principal amount in the case of Inverse VIX Medium Term ETNs) a cash payment equal to the applicable Closing Indicative Value on the Final Valuation Date, as calculated by the Calculation Agents. If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge.

The Intraday Indicative Value of each series the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor. The Intraday Indicative Value at any time is based on the most recent intraday level of the underlying Index. If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero.

The trading price of the ETNs at any time is the price that you may be able to sell your ETNs in the secondary market at such time, if one exists. The trading price of any series of the ETNs at any time may vary significantly from the Intraday Indicative Value of such ETNs at such time. Paying a premium purchase price over the Intraday Indicative Value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when such premium is no longer present in the market place or such ETNs are accelerated (including at our option), in which case investors will receive a cash payment in an amount equal to the Closing Indicative Value on the Accelerated Valuation Date.

**We may sell additional ETNs of any series at different prices but we are under no obligation to issue or sell additional ETNs of any series at any time, and if we do sell additional ETNs of any series, we may limit or restrict such sales, and we may stop selling additional ETNs of such series at any time**

In our sole discretion, we may decide to issue and sell additional ETNs of any series from time to time at a price that is higher or lower than the stated principal amount, based on the indicative value of such series of ETNs at that time. The price of the ETNs in any subsequent sale may differ substantially (higher or lower) from the issue price paid in connection with any other issuance of such series ETNs. Additionally, any ETNs held by us or an affiliate in inventory may be resold at prevailing market prices or lent to market participants who may have made short sales of any series of the ETNs. However, we are under no obligation to issue or sell additional ETNs of any series at any time, and if we do sell additional ETNs of any series, we may limit or restrict such sales, and we may stop selling additional ETNs of such series at any time. If we start selling additional ETNs of any series, we may stop selling additional ETNs of such series for any reason, which could materially and adversely affect the price and liquidity of such ETNs in the secondary market.

**Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the applicable underlying Index may impair the value of your ETNs**

Exhibit 1

246

We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

**There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents**

CSI will also act as one of the Calculation Agents for the ETNs. In addition, we may in the future become a minority investor in an affiliate of VLS, and may in connection with such investment obtain customary rights to nominate a director of such affiliate. As Calculation Agents CSI and VLS will make determinations with respect to the ETNs. Among other things, VLS or one of its affiliates is responsible for computing and disseminating the Closing Indicative Value. The determinations may be adverse to you.

As noted above, we, our affiliates, or third parties with whom we transact, including VLS, may engage in trading activities related to the applicable underlying Index and underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. These trading activities may present a conflict between your interest in your ETNs and the interests we, our affiliates, or third parties with whom we transact, including VLS, will have in our or their proprietary accounts, in facilitating transactions, including block trades, for our or their customers and in accounts under our or their management. These trading activities, if they influence the level of the applicable underlying Index, could be adverse to your interests as a beneficial owner of your ETNs.

Exhibit 1

247

We, our affiliates, or third parties with whom we transact, the Redemption Agent, the Calculation Agents and their affiliates may have published, and in the future may publish, research reports with respect to the underlying futures and with respect to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index. Any of these activities by us, our affiliates, or third parties with whom we transact, the Redemption Agent, the Calculation Agents or any of their affiliates may affect the levels of the Index and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

In our sole discretion, we may decide to issue and sell additional ETNs of any series from time to time at a price that is higher or lower than the stated principal amount, based on the indicative value of the ETNs of such series at that time, and any ETNs held by us or an affiliate in inventory may be resold at prevailing market prices or lent to market participants who may have made short sales of the ETNs. See "—We may sell additional ETNs of any series at different prices but we are under no obligation to issue or sell additional ETNs of any series at any time, and if we do sell additional ETNs of any series, we may limit or restrict such sales, and we may stop selling additional ETNs of such series at any time" above.

**The policies of the Index Sponsor or CBOE and changes that affect the S&P 500® Index, the VIX Index or any underlying Index could affect the applicable Redemption Amount of your ETNs and their market value**

The policies of the Index Sponsor or CBOE concerning the calculation of the level of the applicable underlying Index and the manner in which changes affecting the underlying futures or option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index or the underlying futures, are reflected in the level of the applicable underlying Index could affect the applicable Redemption Amount of your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date and the market value of your ETNs prior to that date. The applicable Redemption Amount of your ETNs and their market value could also be affected if the Index Sponsor or CBOE changes these policies, for example by changing the manner in which it calculates the level of the applicable underlying Index, or if the Index Sponsor or CBOE discontinues or suspends calculation or publication of the level of the applicable underlying Index, in which case it may become difficult to determine the market value of your ETNs. If events such as these occur, or if the level of the applicable underlying Index is not available because of a Market Disruption Event or for any other reason, the Calculation Agents for your ETNs may determine the level of the applicable underlying Index on the applicable Valuation Date (including, without limitation, the Final Valuation Date, Accelerated Valuation Date or Early Redemption Valuation Date), as the case may be.

**The occurrence of a Market Disruption Event will affect certain valuations and delay certain payments under the ETNs**

If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event. In addition, if a Market Disruption Event occurs or is continuing on a Valuation Date, the Maturity Date, the corresponding Early Redemption Date or the Acceleration Date, as the case may be, will be postponed until the date three Business Days following the earlier of (i) the first Index Business Day following such Valuation Date on which no Market Disruption Event occurs or is continuing or (ii) the fifth Index Business Day following such Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date, any Early Redemption Date or the Acceleration Date. See "Specific Terms of the ETNs—Market Disruption Events" in this Pricing Supplement.

**The Maturity Date may be postponed**

In addition to the postponement for Market Disruption Events described above, if the scheduled Maturity Date is not a Business Day, the Maturity Date will be postponed to the first Business Day following the scheduled Maturity Date. If the scheduled Final Valuation Date is not an Index Business Day, the Final Valuation Date will be postponed to the next following Index Business Day, in which case the Maturity Date will be postponed to the third Business Day following the Final Valuation Date as so postponed. No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.

Exhibit 1

248

**Suspension or disruptions of market trading in futures contracts may adversely affect the value of your notes**

Futures markets like the CBOE, the market for the VIX futures, are subject to temporary distortions or other disruptions due to various factors, including the lack of liquidity in the markets, the participation of speculators, and government regulation and intervention. In addition, some U.S. futures have regulations that limit the amount of fluctuation in some futures contract prices that may occur during a single business day. These limits are generally referred to as "daily price fluctuation limits" and the maximum or minimum price of a contract on any given day as a result of these limits is referred to as a "limit price." Once the limit price has been reached in a particular contract, no trades may be made at a price beyond the limit, or trading may be limited for a set period of time. Limit prices have the effect of precluding trading in a particular contract or forcing the liquidation of contracts at potentially disadvantageous times or prices. These circumstances could affect the value of the Index and therefore could adversely affect the value of your notes.

**Concentration risks associated with the Indices may adversely affect the value of your securities**

Each Index is comprised of futures contracts on the VIX Index and thus is less diversified than other funds, investment portfolios or indices investing in or tracking a broader range of products and, therefore, could experience greater volatility. You will not benefit, with respect to the securities, from any of the advantages of a diversified investment and will bear the risks of a highly concentrated investment.

**The United States federal income tax treatment on the ETNs is uncertain and the terms of the ETNs require you to follow the treatment that we will adopt**

The United States federal income tax consequences of an investment in your ETNs are uncertain, both as to the timing and character of any inclusion in income in respect of your ETNs. Some of these consequences are summarized below but you should read the more detailed discussion in "Material United States Federal Income Tax Considerations" in this pricing supplement and in the accompanying prospectus supplement and prospectus and also consult your tax advisor as to the tax consequences of investing in the ETNs.

By purchasing an ETN, you and us agree, in the absence of a change in law, an administrative determination or a judicial ruling to the contrary, to characterize such ETN for all tax purposes as a pre-paid forward contract with respect to the Index. Under this characterization of the ETNs, you generally should recognize capital gain or loss upon the sale, redemption or maturity of your ETNs in an amount equal to the difference between the amount you receive at such time and the amount you paid for the ETNs.

Notwithstanding our agreement to treat the ETNs as a pre-paid forward contract with respect to the Index, the Internal Revenue Service ("**IRS**") could assert that the ETNs should be taxed in a manner that is different than described in this pricing supplement. As discussed further below, on December 7, 2007, the IRS issued a notice indicating that it and the Treasury Department ("**Treasury**") are actively considering whether, among other issues, you should be required to accrue ordinary income over the term of an instrument such as the ETNs even though you will not receive any payments with respect to the ETNs until maturity and whether all or part of the gain you may recognize upon sale or maturity of an instrument such as the ETNs could be treated as ordinary income. The outcome of this process is uncertain and could apply on a retroactive basis.

<u>**Additional Risk Factors Related to the Inverse ETNs and/or 2x Long ETNs**</u>

**Intraday purchase risk for Inverse ETNs or 2x Long ETNs**

The ETNs may be purchased in the secondary market at prices other than the Closing Indicative Value, which will have an effect on the effective leverage amount of any Inverse ETNs or 2x Long ETNs. Because the exposure is fixed each night and does not change intraday as the level of the applicable underlying Index moves in favor of the relevant ETN (*i.e.*, the level of the applicable underlying Index decreases for the Inverse ETNs, or the level of the applicable underlying Index increases for the 2x Long ETNs), the actual exposure in the applicable ETNs decreases. The reverse is also true. The table below presents the hypothetical exposure an investor has (ignoring all costs, fees and other factors) when purchasing an ETN intraday given the movement of the applicable underlying Index since the prior Index Business Day's market close. The resulting effective exposure amount will then be constant for that purchaser until the earlier of (i) a sale or (ii) the end of the Index Business Day.

PS-37

Exhibit 1

249

| A: Index level | B: % change in Index | C: hypothetical inverse ETN price C=A*(1-B) | D: hypothetical inverse ETN notional exposure D=A*-1 | E: Inverse ETN effective leverage amount E=D/C | F: hypothetical 2x ETN price E=A*(1+2B) | G: hypothetical 2x Long ETNs notional exposure G=A*2 | E: 2x Long ETNs effective leverage amount E=G/F |
|---|---|---|---|---|---|---|---|
| 120.00 | 20% | $80.00 | -$120.00 | -1.50 | $140.00 | $240.00 | 1.71 |
| 115.00 | 15% | $85.00 | -$115.00 | -1.35 | $130.00 | $230.00 | 1.77 |
| 110.00 | 10% | $90.00 | -$110.00 | -1.22 | $120.00 | $220.00 | 1.83 |
| 105.00 | 5% | $95.00 | -$105.00 | -1.11 | $110.00 | $210.00 | 1.91 |
| 104.00 | 4% | $96.00 | -$104.00 | -1.08 | $108.00 | $208.00 | 1.93 |
| 103.00 | 3% | $97.00 | -$103.00 | -1.06 | $106.00 | $206.00 | 1.94 |
| 102.00 | 2% | $98.00 | -$102.00 | -1.04 | $104.00 | $204.00 | 1.96 |
| 101.00 | 1% | $99.00 | -$101.00 | -1.02 | $102.00 | $202.00 | 1.98 |
| 100.00 | 0% | $100.00 | -$100.00 | -1.00 | $100.00 | $200.00 | 2.00 |
| 99.00 | -1% | $101.00 | -$99.00 | -0.98 | $98.00 | $198.00 | 2.02 |
| 98.00 | -2% | $102.00 | -$98.00 | -0.96 | $96.00 | $196.00 | 2.04 |
| 97.00 | -3% | $103.00 | -$97.00 | -0.94 | $94.00 | $194.00 | 2.06 |
| 96.00 | -4% | $104.00 | -$96.00 | -0.92 | $92.00 | $192.00 | 2.09 |
| 95.00 | -5% | $105.00 | -$95.00 | -0.90 | $90.00 | $190.00 | 2.11 |
| 85.00 | -15% | $115.00 | -$85.00 | -0.74 | $70.00 | $170.00 | 2.43 |
| 80.00 | -20% | $120.00 | -$80.00 | -0.67 | $60.00 | $160.00 | 2.67 |

The above chart shows that if the level of the applicable underlying Index increases during the Index Business Day, your effective exposure (a) increases from one times inverse for the Inverse ETNs and (b) decreases from two times leveraged for the 2x Long ETNs. For example, if the level of the applicable underlying Index increases by 20%, your effective exposure increases from negative 1 to negative 1.5 for the Inverse ETNs and decreases from 2 to 1.71 for the 2x Long ETNs.

The above chart also shows that if the level of the applicable underlying Index decreases during the Index Business Day, your effective exposure (a) decreases from one times inverse for the Inverse ETNs and (b) increases from two times leveraged for the 2x Long ETNs. For example, if the level of the applicable underlying Index decreases by 20%, your effective exposure decreases from negative 1 to negative 0.67 for the Inverse ETNs and increases from 2 to 2.67 for the 2x Long ETNs.

The following table shows the leverage amounts for an intraday purchaser based on the percentage change in the level of the Index since the close of the prior Index Business Day.

| % change in the level of the Index | Effective Leverage Amount for Inverse ETNs | Effective Leverage Amount for 2x ETNs |
|---|---|---|
| 20% | -1.50 | 1.71 |
| 15% | -1.35 | 1.77 |
| 10% | -1.22 | 1.83 |
| 5% | -1.11 | 1.91 |
| 4% | -1.08 | 1.93 |
| 3% | -1.06 | 1.94 |
| 2% | -1.04 | 1.96 |
| 1% | -1.02 | 1.98 |
| 0% | -1.00 | 2.00 |
| -1% | -0.98 | 2.02 |
| -2% | -0.96 | 2.04 |
| -3% | -0.94 | 2.06 |

PS-38

Exhibit 1

250

| | | |
|---|---|---|
| -4% | -0.92 | 2.09 |
| -5% | -0.90 | 2.11 |
| -15% | -0.74 | 2.43 |
| -20% | -0.67 | 2.67 |

**Sensitivity of the ETNs to large changes in the market price of the underlying futures contracts**

Because the Inverse ETNs and 2x Long ETNs are linked to the daily performance of the applicable underlying Index and include either inverse or leveraged exposure, changes in the market price of the underlying futures will have a greater likelihood of causing such ETNs to be worth zero than if such ETNs were not linked to the inverse or leveraged return of the applicable underlying Index.  In particular, any significant increase in the market price of the underlying futures on any Index Business Day will result in a significant decrease in the Closing Indicative Value and Intraday Indicative Value of the Inverse ETNs, and any significant decrease in the market price of the underlying futures on any Index Business Day will result in a significant decrease in the Closing Indicative Value and Intraday Indicative Value of the 2x Long ETNs.

If the price of the underlying futures contracts increases by more than 80% in a day, it is extremely likely that the Inverse ETNs will depreciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration.  If the price of the underlying futures contracts decreases by more than 40% in a day, it is extremely likely that the 2x Long ETNs will depreciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration.  If the price of the underlying futures contracts decreases by more than 80% in a day, it is extremely likely that the Long ETNs will depreciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration.

**Daily rebalancing of the leverage amount may impact trading in the underlying futures contracts**

The daily rebalancing of the leverage amount of each ETN back to its target may cause us, our affiliates, or third parties with whom we transact to adjust their hedges accordingly.  The trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures and may adversely affect the market price of such underlying futures.

**Daily rebalancing and market volatility risk**

Each ETN seeks to provide a return which is related to the daily performance of its Index (as adjusted for costs and fees). The ETNs do not attempt to, and should not be expected to, provide returns which achieve the inverse or 2x leveraged return of the Index for periods other than a single day.  Each of the Inverse ETNs and 2x Long ETNs rebalances its theoretical exposure on a daily basis, increasing exposure in response to that day's gains or reducing exposure in response to that day's losses.

Daily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility and such performance will be dependent on the path of daily returns during the holder's holding period. At higher ranges of volatility, there is a significant chance of a complete loss of the value of the ETNs even if the performance of the applicable underlying Index is flat. ***The ETNs are designed as short-term trading vehicles for investors managing their portfolios on a daily basis***. They are not intended to be used by, and are not appropriate for, investors who intend to hold positions in an attempt to generate returns over longer periods of time.

Exhibit 1
251

## THE INDICES

We have derived all information regarding each of the Indices, the S&P 500® Index and the VIX Index contained in this pricing supplement, including, without limitation, their make-up, method of calculation and changes to their components, from publicly available information, and we have not participated in the preparation of, or verified, such publicly available information. We make no representation or warranty as to the accuracy or completeness of this publicly available information. Such information reflects the policies of, and is subject to change by, the Index Sponsor, in the case of the Indices and the S&P 500® Index, and the CBOE, in the case of the VIX Index. We and our affiliates make no representation or warranty as to, and assume no responsibility for, the accuracy or completeness of such information.

### Description of the Indices

The return on the ETNs is linked to the daily performance of one of the Indices. Each of the Indices models returns from a long position in VIX futures contracts that is rolled continuously throughout the period between futures expiration dates. The S&P 500 VIX Short-Term Futures™ Index ER measures the return from a rolling long position in the first and second month VIX futures contracts, and rolls continuously throughout each month from the first month VIX futures contract into the second month VIX futures contract. The S&P 500 VIX Mid-Term Futures™ Index ER measures the return from a rolling long position in the fourth, fifth, sixth and seventh month VIX futures contracts, and rolls continuously throughout each month from the fourth month contract into the seventh month contract while maintaining positions in the fifth month and sixth month contracts.

As described in more detail below, the roll for each VIX futures contract occurs on each Index Business Day according to a pre-determined schedule that has the effect of keeping constant the weighted average maturity of the relevant VIX futures contracts. The constant weighted average maturity for the futures underlying the S&P 500 VIX Short-Term Futures™ Index ER is one month and for the futures underlying the S&P 500 VIX Mid-Term Futures™ Index ER is five months.

The Index Sponsor calculates, publishes and disseminates the daily closing levels of each of the Indices. All determinations made by the Index Sponsor will be at its sole discretion and will be conclusive for all purposes, absent manifest error. The Index Sponsor employs the methodology described herein and its application of the methodology shall be conclusive and binding. The index committee of the Index Sponsor is responsible for reviewing the design, composition and calculation of each of the Indices. The Index Sponsor has no obligation to continue to publish, and may discontinue or suspend publication of, the Indices at any time.

### Index Values

The level of each Index is calculated in accordance with the method described below. The value of each Index will be published by Bloomberg in real time and after the close of trading on each Index Business Day under the following ticker symbols:

| Index Name | End of Day Ticker | Intraday Ticker |
|---|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP | SPVXSPID |
| S&P 500 VIX Medium-Term Futures™ Index ER | SPVXMP | SPVXMPID |

The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day using the same methodology as for calculation of the closing level but applying real time prices of the relevant VIX futures contracts.

### The S&P 500® Index

The S&P 500® Index is intended to provide a performance benchmark for the U.S. equity markets. The calculation of the level of the S&P 500® Index is based on the relative value of the aggregate market value of the common stocks of 500 companies as of a particular time as compared to the aggregate average market value of the common stocks of 500 similar companies during the base period of the years 1941 through 1943. Historically, the

Exhibit 1
252

market value of any S&P 500® component stock was calculated as the product of the market price per share and the number of the then outstanding shares of such S&P 500® component stock. As discussed below, on March 21, 2005, S&P began to use a new methodology to calculate the market value of the component stocks and on September 16, 2005, S&P completed its transition to the new calculation methodology. The 500 companies are not the 500 largest companies listed on the NYSE and not all 500 companies are listed on such exchange. S&P chooses companies for inclusion in the S&P 500® Index with an aim of achieving a distribution by broad industry groupings that approximates the distribution of these groupings in the common stock population of the U.S. equity market. S&P may from time to time, in its sole discretion, add companies to, or delete companies from, the S&P 500® Index to achieve the objectives stated above. Relevant criteria employed by S&P include the viability of the particular company, the extent to which that company represents the industry group to which it is assigned, the extent to which the market price of that company's common stock is generally responsive to changes in the affairs of the respective industry and the market value and trading activity of the common stock of that company. The S&P 500® Index is reported by Bloomberg under the ticker symbol "SPX."

**The VIX Index**

The VIX Index is a benchmark index designed to measure the market price of volatility in large cap U.S. stocks over 30 days in the future, and is calculated based on the prices of certain put and call options on the S&P 500® Index.  The VIX Index measures the premium paid by investors for certain options linked to the level of the S&P 500® Index.  During periods of market instability, the implied level of volatility of the S&P 500® Index typically increases and, consequently, the prices of options linked to the S&P 500® Index typically increase (assuming all other relevant factors remain constant or have negligible changes).  This, in turn, causes the level of the VIX Index to increase.  The VIX Index has historically had negative correlations to the S&P 500® Index.

The VIX Index was developed by the CBOE and is calculated, maintained and published by the CBOE. The CBOE has no obligation to continue to publish, and may discontinue the publication of, the VIX Index.  The VIX Index is reported by Bloomberg L.P. under the ticker symbol "VIX."

The calculation of the VIX Index involves a formula that uses the prices of a weighted series of out-of-the money put and call options on the level of the S&P 500® Index ("**SPX Options**") with two adjacent expiry terms to derive a constant 30-day forward measure of market volatility.  The VIX Index is calculated independent of any particular option pricing model and in doing so seeks to eliminate any biases that may otherwise be included in using options pricing methodology based on certain assumptions.

Although the VIX Index measures the 30-day forward volatility of the S&P 500® Index as implied by the SPX Options, 30-day options are only available once a month. To arrive at the VIX Index level, a broad range of out-of-the money SPX Options expiring on the two closest nearby months ("near term options" and "next term options," respectively) are selected in order to bracket a 30-day calendar period. SPX Options having a maturity of less than eight days are excluded at the outset and, when the near term options have eight days or less left to expiration, the VIX Index rolls to the second and third contract months in order to minimize pricing anomalies that occur close to expiration. The model-free implied volatility using prices of the near term options and next term options are then calculated on a strike price weighted average basis in order to arrive at a single average implied volatility value for each month. The results of each of the two months are then interpolated to arrive at a single value with a constant maturity of 30 days to expiration.

**Overview of Futures Markets**

Each of the Indices is composed of one or more futures contracts on the VIX Index.  Futures contracts on the VIX Index are traded on regulated futures exchanges, in the over-the-counter market and on various types of electronic trading facilities and markets. At present, all of the contracts included in each of Indices are exchange-traded futures contracts.  An exchange-traded futures contract provides for the purchase and sale of a specified type and quantity of an underlying asset or financial instrument during a stated delivery month for a fixed price.  Because the VIX Index is not a tangible item that can be purchased and sold directly, a futures contract on the VIX Index provides for the payment and receipt of cash based on the level of the VIX Index at settlement or liquidation of the contract.

Exhibit 1

253

No purchase price is paid or received on the purchase or sale of a futures contract. Instead, an amount of cash or cash equivalents must be deposited with the broker as "initial margin". This amount varies based on the requirements imposed by the exchange clearing houses, but may be lower than 5% of the notional value of the contract. This margin deposit provides collateral for the obligations of the parties to the futures contract. By depositing margin, which may vary in form depending on the exchange, with the clearing house or broker involved, a market participant may be able to earn interest on its margin funds, thereby increasing the total return that it may realize from an investment in futures contracts.

In the United States, futures contracts are traded on organized exchanges known as "designated contract markets." At any time prior to the expiration of a futures contract, a trader may elect to close out its position by taking an opposite position on the exchange on which the trader obtained the position, subject to the availability of a liquid secondary market. This operates to terminate the position and fix the trader's profit or loss. Futures contracts are cleared through the facilities of a centralized clearing house and a brokerage firm, referred to as a "futures commission merchant", which is a member of the clearing house.

Unlike equity securities, futures contracts, by their terms, have stated expirations. As a result, at a specified point in time prior to expiration, trading in a futures contract for the current delivery month will cease. As a result, a market participant wishing to maintain its exposure to a futures contract on a particular asset or financial instrument with the nearest expiration must close out its position in the expiring contract and establish a new position in the contract for the next delivery month, a process referred to as "rolling". For example, a market participant with a long position in November VIX Index futures that wishes to maintain a position in the nearest delivery month will, as the November contract nears expiration, sell November futures, which serves to close out the existing long position, and buy December futures. This will "roll" the November position into a December position, and, when the November contract expires, the market participant will still have a long position in the nearest delivery month.

Futures exchanges and clearing houses in the United States are subject to regulation by the Commodities Futures Trading Commission. Exchanges may adopt rules and take other actions that affect trading, including imposing speculative position limits, maximum price fluctuations and trading halts and suspensions and requiring liquidation of contracts in certain circumstances. Futures markets outside the United States are generally subject to regulation by comparable regulatory authorities. The structure and nature of trading on non-U.S. exchanges, however, may differ from this description.

**Calculation of the Levels of the Indices**

On any S&P 500 VIX Futures Business Day, $t$, the level of each Index is calculated as follows:

$$IndexER_t = IndexER_{t-1} * (1 + CDR_t)$$

where:

$IndexER_t$ = The Index Excess Return on the preceding business day, defined as any date on which such Index is calculated.

$CDR_t$ = Contract Daily Return, as determined by the following formula for each of the Indices:

$$CDR_t = \frac{TDWO_t}{TDWI_{t-1}} - 1$$

where:

$t-1$ = the preceding business day

$TDWO_t$ = Total Dollar Weight Obtained on $t$, as determined by the following formula for each of the Indices:

$$TDWO_t = \sum_{i=m}^{n} CRW_{i,t-1} * DCRP_{i,t}$$

Exhibit 1
254

$TDWI_{t-1}$ = Total Dollar Weight Invested on *t-1*, as determined by the following formula for each of the Indices:

$$TDWI_{t-1} = \sum_{i=m}^{n} CRW_{i,t-1} * DCRP_{i,t-1}$$

where:

$CRW_{i,t}$ = Contract Roll Weight of the *i*th VIX Futures Contract on date *t*.

$DCRP_{i,t}$ = Daily Contract Reference Price of the *i*th VIX Futures Contract on date *t*.

For the S&P 500 VIX Short-Term Futures™ Index ER *m* =1.  For the S&P 500 VIX Mid-Term Futures™ Index ER *m* =4.

For the S&P 500 VIX Short-Term Futures™ Index ER *n* = 2. For the S&P 500 VIX Mid-Term Futures™ Index ER *n* =7.

**Contract Rebalancing**

The Roll Period for each Index starts on the Tuesday prior to the monthly CBOE VIX Futures Settlement Date (the Wednesday falling 30 calendar days before the S&P 500 option expiration for the following month), and runs through the Tuesday prior to the subsequent month's CBOE VIX Futures Settlement Date.  Thus, the Indices are rolling on a continual basis.  On the business day after the current Roll Period ends the following Roll Period will begin.

In calculating the Excess Return of each of the Indices, the Contract Roll Weights (*CRWi,t*) of each of the contracts in the index, on a given day, *t*, are determined as follows:

*S&P 500 VIX Short-Term Futures Index*

$$CRW_{1,t} = 100 * \frac{dr}{dt}$$

$$CRW_{2,t} = 100 * \frac{dt - dr}{dt}$$

where:

dt = The total number of business days in the current Roll Period beginning with, and including, the starting CBOE VIX Futures Settlement Date and ending with, but excluding, the following CBOE VIX Futures Settlement Date. The number of business days will not change for purposes of this calculation in cases of a new holiday introduced intra-month or an unscheduled market closure.

dr =The total number of business days within a roll period beginning with, and including, the following business day and ending with, but excluding, the following CBOE VIX Futures Settlement Date. The number of business days includes a new holiday introduced intra-month up to the business day preceding such a holiday.

At the close on the Tuesday corresponding to the start of the Roll Period, all of the weight is allocated to the first month contract.  On each subsequent business day a fraction of the first month VIX futures contracts are sold and an equal notional amount of the second month VIX futures contracts is bought.  The fraction, or quantity, is proportional to the number of first month VIX futures contracts as of the previous index roll day, and inversely proportional to the length of the current Roll Period.  In this way the initial position in the first month contract is

PS-43

Exhibit 1

255

progressively moved to the second month over the course of the month, until the next following Roll Period starts when the old second month VIX futures contract becomes the new first month VIX futures contract.

In addition to the transactions described above, the weight of each index component is also adjusted every day to ensure that the change in total dollar exposure for the index is only due to the price change of each contract and not due to using a different weight for a contract trading at a higher price.

*S&P 500 VIX Mid-Term Futures Index*

$$CRW_{4,t} = 100 * \frac{dr}{dt}$$

$$CRW_{5,t} = 100$$

$$CRW_{6,t} = 100$$

$$CRW_{7,t} = 100 * \frac{dt - dr}{dt}$$

At the close on the Tuesday corresponding to the start of the Roll Period, an equal weight is allocated to the fourth, fifth and sixth month contracts. Then on each subsequent business day a fraction of the fourth month VIX futures are sold and an equal notional amount of the seventh month VIX futures is bought. The fraction, or quantity, is proportional to the number of fourth month VIX futures contracts as of the previous index roll day, and inversely proportional to the length of the current Roll Period. In this way the initial position in the fourth month contract is progressively moved to the seventh month contract over the course of the month, until the next following Roll Period starts when the old fifth month VIX futures contract becomes the new fourth month VIX futures contract.

In addition to the transactions described above, the weight of each index component is also adjusted every day to ensure that the change in total dollar exposure for the index is only due to the price change of each contract and not due to using a different weight for a contract trading at a higher price.

*Index Maintenance*

**Base Date**

The base date for the S&P 500 VIX Short-Term Futures™ Index ER and the S&P 500 VIX Mid- Term Futures™ Index ER is December 20, 2005 and the base value for each of the Indices is 100,000.

**Historical Assumptions and Performance**

Prior to April 2008, not all consecutive first to seventh month VIX futures were listed. For the purpose of the historical calculations for the Indices, the following assumptions have been made in interpolating VIX futures contract prices from near-by listed contracts.

When the *ith* VIX future contract was not listed, but *i th+1* and *i th-1* VIX futures contracts were listed, the following interpolation has been assumed:

$$DCRP_{i,t}^{2} = DCRP_{i-1,t}^{2} + \frac{BDays(T_i - T_{i-1})}{BDays(T_{i+1} - T_{i-1})}(DCRP_{i+1,t}^{2} - DCRP_{i-1,t}^{2})$$

When *ith* and *i th+1* VIX futures contracts were not listed, but *i th+2* and *i th-1* VIX futures contracts were listed, the following interpolation has been assumed:

Exhibit 1

256

$$DCRP_{i,t}^{2} = DCRP_{i-1,t}^{2} + \frac{BDays(T_i - T_{i-1})}{BDays(T_{i+2} - T_{i-1})}(DCRP_{i+2,t}^{2} - DCRP_{i-1,t}^{2})$$

When *i th*, *i th+1* and *i th+2* VIX futures contracts were not listed, the following interpolation has been assumed:

$$DCRP_{i,t}^{2} = DCRP_{i-1,t}^{2} + \frac{BDays(T_i - T_{i-1})}{BDays(T_{i-1} - T_{i-2})}(DCRP_{i-1,t}^{2} - DCRP_{i-2,t}^{2})$$

where:

$T_i$ = Expiration Day of the *ith* VIX futures contract

*BDays* = Number of business days between VIX Futures Expiration Days

The inception date for the Indices is January 22, 2009 at the market close. The Indices were not in existence prior to that date. The chart below shows the closing level of each Index since the base date, December 20, 2005 through March 19, 2012. The historical performance is presented from January 22, 2009 through March 19, 2012. The closing levels from the base date of December 22, 2005 through January 22, 2009 represents hypothetical values determined by S&P, as the Index Sponsor, as if the relevant Index had been established on December 20, 2005 each with a base value of 100,000 on such date and calculated according to the methodology described below since that date. The closing levels from January 22, 2009 through March 19, 2012 represent the actual closing levels of the Indices as calculated on such dates. The closing levels of the S&P 500 VIX Short-Term Futures™ Index ER and the S&P 500 VIX Mid-Term Futures™ Index ER on March 19, 2012 were 7317.02 and 104862.40, respectively. We obtained the levels below from Bloomberg, without independent verification. **The hypothetical and historical Index performance should not be taken as an indication of future performance, and no assurance can be given as to the level of either Index on any given date.**



Exhibit 1
257

**Index Committee**

The S&P 500 VIX Futures Index Committee maintains the Indices. The Index Committee meets regularly and at each meeting, the Index Committee reviews any significant market events.  In addition, the Index Committee may revise index policy for timing of rebalancings or other matters.

Standard & Poor's considers information about changes to its Indices and related matters to be potentially market moving and material. Therefore, all Index Committee discussions are confidential.

**Announcements**

Announcements of the daily values for each Index are made after the market close each day.

**Holiday Schedule**

The value of each Index is calculated daily when the CBOE Futures Exchange is open, excluding holidays and weekends.

**Unscheduled Market Closures and New Holidays**

If the Index Sponsor determines, in its sole discretion, that an exchange is forced to close early due to unforeseen events, such as computer or electric power failures, weather conditions or other events, the Index Sponsor will calculate the value of each Index based on the most recent prior closing futures price published by the CBOE Futures Exchange and the roll for that day will be carried to the next Business Day when the CBOE Futures Exchange is open as described above under "—Contract Rebalancing."

If an exchange fails to open due to unforeseen circumstances, the Index Sponsor may determine not to publish a value of an Index for that day.  In situations where an exchange introduces a holiday during the month of an index calculation the value of the Indices will not be published and the roll for that day will be carried to the next business day when the CBOE Futures Exchange is open as described above under "—Contract Rebalancing."

**Delisting of Futures Contracts**

If one or more futures contracts included in one of the Indices is no longer listed, the Index Sponsor may choose to cease publication of the effected index at that time.

**License Agreement**

We have entered into a non-exclusive license agreement with the Index Sponsor providing for the license to us, in exchange for a fee, of the right to use each of the Indices, which are owned by the Index Sponsor, in connection with certain securities, including the ETNs.

Standard & Poor's®", "S&P®", "S&P 500®", "Standard & Poor's 500™", "S&P 500 VIX Short-Term Futures" and "S&P 500 VIX Mid-Term Futures" are trademarks of Standard & Poor's Financial Services LLC ("Standard & Poor's") and have been licensed for use by Credit Suisse. "VIX" is a trademark of the Chicago Board Options Exchange, Incorporated and has been licensed for use by Standard & Poor's. The ETNs are not sponsored, endorsed, sold or promoted by Standard & Poor's or CBOE and neither Standard & Poor's nor CBOE make any representation regarding the advisability of investing in the ETNs.

The ETNs are not sponsored, endorsed, sold or promoted by Standard & Poor's ("S&P") or its third party licensors.  Neither S&P nor its third party licensors makes any representation or warranty, express or implied, to the owners of the ETNs or any member of the public regarding the advisability of investing in securities generally or in the ETNs particularly or the ability of the Indices to track general stock market performance. S&Pss and its third party licensor's only relationship to Credit Suisse is the licensing of certain trademarks and trade names of S&P and the third party licensors and of the Indices which are determined, composed and calculated by S&P or its third party licensors without regard to Credit Suisse or the ETNs. S&P and its third party licensors have no obligation to take the needs of Credit Suisse or the owners of the ETNs into consideration in determining, composing or calculating

Exhibit 1

258

the Indices. Neither S&P nor its third party licensors is responsible for and has not participated in the determination of the prices and amount of the ETNs or the timing of the issuance or sale of the ETNs or in the determination or calculation of the equation by which the ETNs are to be converted into cash. S&P has no obligation or liability in connection with the administration, marketing or trading of the ETNs.

NEITHER S&P, ITS AFFILIATES NOR THEIR THIRD PARTY LICENSORS GUARANTEE THE ADEQUACY, ACCURACY, TIMELINESS OR COMPLETENESS OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY COMMUNICATIONS, INCLUDING BUT NOT LIMITED TO, ORAL OR WRITTEN COMMUNICATIONS (INCLUDING ELECTRONIC COMMUNICATIONS) WITH RESPECT THERETO.  S&P, ITS AFFILIATES AND THEIR THIRD PARTY LICENSORS SHALL NOT BE SUBJECT TO ANY DAMAGES OR LIABILITY FOR ANY ERRORS, OMISSIONS OR DELAYS THEREIN. S&P MAKES NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE MARKS, THE INDICES OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT WHATSOEVER SHALL S&P, ITS AFFILIATES OR THEIR THIRD PARTY LICENSORS BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, TRADING LOSSES, LOST TIME OR GOODWILL, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE.

**VELOCITYSHARES LLC**

We have entered into a non-exclusive license agreement with VelocityShares Index & Calculation Services, ("VIC"), an affiliate of VelocityShares LLC, the parent entity of VLS, to license to us, in exchange for a fee, the right to use certain trade names, trademarks and servicemarks, which are owned by VelocityShares, in connection with certain securities, including the ETNs.

The license agreement between VIC and us provides that the following language must be set forth in this pricing supplement:

"VelocityShares", "Geared for Traders", the "V Logo" and the "V VelocityShares Logo" are trademarks of Velocity Shares Index and Calculation Services, a division of VelocityShares, LLC and have been licensed for use by Credit Suisse AG.  The ETNs are not sponsored, endorsed, sold or promoted by VelocityShares, LLC, nor does VelocityShares, LLC make any representation regarding the advisability of investing in any of the ETNs.

Neither VelocityShares Index & Calculation Services, VelocityShares, LLC (together, "VelocityShares") nor any other party makes any representation or warranty, express or implied, to the owners of the ETNs or any member of the public regarding the advisability of investing in the ETNs generally or the similarities or variations between the performance of the ETNs or the Index and the performance of the underlying securities or Financial instruments. VelocityShares is the licensor of certain trademarks, service marks and trade names of VelocityShares.  Neither VelocityShares nor any other party guarantees the accuracy and/or the completeness of the indices or any data included therein or any calculations made with respect to the ETNs.  VelocityShares disclaims all warranties of merchantability or fitness for any particular purpose with respect to the indices or any data included therein.

NEITHER VELOCITYSHARES NOR ANY OTHER PARTY GUARANTEES THE ACCURACY AND/OR THE COMPLETENESS OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE ETNs.  NEITHER VELOCITYSHARES NOR ANY OTHER PARTY MAKES ANY WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY LICENSEE, LICENSEE'S CUSTOMERS AND COUNTERPARTIES, HOLDERS OF THE ETNs, OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE ETNs IN CONNECTION WITH THE RIGHTS LICENSED HEREUNDER OR FOR ANY OTHER USE.  NEITHER VELOCITYSHARES NOR ANY OTHER PARTY MAKES ANY EXPRESS OR IMPLIED WARRANTIES, AND VELOCITYSHARES HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE ETNs.  WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT

Exhibit 1

259

SHALL VELOCITYSHARES OR ANY OTHER PARTY HAVE ANY LIABILITY FOR ANY DIRECT, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR ANY OTHER DAMAGES (INCLUDING LOST PROFITS) EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

Exhibit 1

260

## DESCRIPTION OF THE ETNS

The market value of the ETNs will be affected by several factors, many of which are beyond our control. We expect that generally the level of the applicable underlying Index on any day will affect the market value of the ETNs more than any other factor. Other factors that may influence the market value of the ETNs include, but are not limited to, prevailing market prices and forward volatility levels of the U.S. stock markets, the equity securities included in the S&P 500® Index and the S&P 500® Index, the prevailing market prices of options on the S&P 500® Index, options on the VIX Index or and other financial instruments related to the S&P 500® Index and the VIX Index, supply and demand for the ETNs including inventory positions with any market maker, the volatility of the applicable underlying Index, prevailing rates of interest, the volatility of securities markets, economic, financial, political, regulatory or judicial events that affect the level of the applicable underlying Index or the market price or forward volatility of the U.S. stock markets, the equity securities included in the S&P 500® Index, the S&P 500® Index, the VIX Index or the relevant futures contracts on the VIX Index, the general interest rate environment, the perceived creditworthiness of Credit Suisse, supply and demand in the listed and over-the-counter equity derivative markets, or supply and demand as well as hedging activities in the equity-linked structured product markets. See "Risk Factors" in this pricing supplement for a discussion of the factors that may influence the market value of the ETNs prior to maturity.

### Intraday Indicative Value

The "**Intraday Indicative Value**" of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor, and will be equal to (1) (a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Intraday ETN Performance for that series at such time on such Index Business *minus* (2) the Intraday Investor Fee at such time on such Index Business Day. The "**Intraday ETN Performance**" for any series of ETNs at any time on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Intraday Index Performance at such time on such Index Business Day *times* (b) the Leverage Amount. The "**Intraday Index Performance**" for any series of ETNs at any time on any Index Business Day will equal (1)(a) the most recent published intraday level of the applicable underlying Index at such time on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index on the immediately preceding Index Business Day *minus* (2) the number one. At any time on any Index Business Day, the "**Intraday Investor Fee**" for any series of ETNs is equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Intraday ETN Performance for that series at such time on such Index Business Day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365. **If the Intraday Indicative Value is equal to or less than zero at any time, the Closing Indicative Value on that day, and all future days, will be zero.**

| ETNs | Indicative Value Ticker |
| --- | --- |
| Inverse VIX Short Term ETNs | XIVIV |
| Inverse VIX Medium Term ETNs | ZIVIV |
| Long VIX Short Term ETNs | VIIXIV |
| Long VIX Medium Term ETNs | VIIZIV |
| 2x Long VIX Short Term ETNs | TVIXIV |
| 2x Long VIX Medium Term ETNs | TVIZIV |

The Intraday Indicative Value calculation is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of your ETNs, nor will it reflect hedging or transaction costs, credit considerations, market liquidity or bid-offer spreads. Published underlying Index levels from the Index Sponsor may occasionally be subject to delay or postponement. Any such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of your ETNs. The actual trading price of the ETNs of any series may be different from their Intraday Indicative Value. VLS or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

Exhibit 1

261

**The actual trading prices of the ETNs may vary significantly from their Intraday Indicative Values. The trading prices of the ETNs at any time is the price that you may be able to sell your ETNs in the secondary market at such time, if one exists.**

As discussed in "Specific Terms of the ETNs—Payment Upon Early Redemption" below, you may, subject to certain restrictions, choose to offer your ETNs for redemption by Credit Suisse on any Business Day during the term of the ETNs beginning on December 2, 2010 (for an anticipated December 3, 2010 Early Redemption Valuation Date and an anticipated Early Redemption Date of December 6, 2010) through November 28, 2030 (for an anticipated November 29, 2030 Early Redemption Valuation Date and an anticipated Early Redemption Date of December 4, 2030). If you elect to offer your ETNs to Credit Suisse for redemption, you must offer at least the applicable Minimum Redemption Amount at one time for redemption by Credit Suisse on any Redemption Date. In addition, we have the right to accelerate the ETNs in whole but not in part at any time on any Business Day occurring on or after the Inception Date or upon the occurrence of certain events described herein. If your ETNs are redeemed or accelerated, on the corresponding Early Redemption Date or Acceleration Date, as applicable, you will receive a cash payment on such date in an amount equal to the Early Redemption Amount, which is the Closing Indicative Value of the ETNs on the applicable Early Redemption Valuation Date, or the Accelerated Redemption Amount, which is the Closing Indicative Value on the Accelerated Valuation Date, as applicable. The last date on which Credit Suisse will redeem your ETNs at your option will be December 4, 2030. As such, you must offer your ETNs for redemption no later than November  28, 2030. The daily redemption feature is intended to induce arbitrageurs to counteract any trading of the ETNs at a premium or discount to their intraday indicative value, although there can be no assurance that arbitrageurs will employ the redemption feature in this manner.

**Split or Reverse Split of the ETNs**

VLS as one of the Calculation Agents may initiate a split or reverse split of the ETNs on any trading day. If VLS, as one of the Calculation Agents, decides to initiate a split or reverse split, the Calculation Agents will issue a notice to holders of the ETNs and a press release announcing the split or reverse split, specifying the effective date of the split or reverse split. The Calculation Agents will determine the ratio of such split or reverse split, as the case may be, using relevant market indicia, and will adjust the terms of the ETNs accordingly. Any adjustment of the closing value will be rounded to 8 decimal places.

In the case of a reverse split, we reserve the right to address odd numbers of ETNs (commonly referred to as "partials") in a manner determined by the Calculation Agents in their sole discretion. For example, if the ETNs undergo a 1 for 4 reverse split, holders who own a number of ETNs on the record date that is not evenly divisible by 4 will receive the same treatment as all other holders for the maximum number of ETNs they hold that is evenly divisible by 4, and we will have the right to compensate holders for their remaining or "partial" ETNs in a manner determined by the Calculation Agents in their sole discretion. Our current intention is to provide holders with a cash payment for their partials in an amount equal to the appropriate percentage of the Closing Indicative Value of the ETNs on a specified trading day following the announcement date.

A split or reverse split of the ETNs will not affect the aggregate principal amount of ETNs held by an investor, other than to the extent of any "partial" ETNs, but it will affect the number of ETNs an investor holds and the denominations used for trading purposes on the exchange.

On June 16, 2011, Credit Suisse announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs in accordance with the procedures described above. The record date for the split of each of the ETNs was June 23, 2011 and the splits became effective prior to the opening of trading on June 27, 2011.

Exhibit 1

262

## SPECIFIC TERMS OF THE ETNS

In this section, references to "holders" mean those who own the ETNs registered in their own names, on the books that we or the trustee maintain for this purpose, and not those who own beneficial interests in the ETNs registered in street name or in the ETNs issued in book-entry form through The Depository Trust Company ("**DTC**") or another depositary.  Owners of beneficial interests in the ETNs should read the section entitled "Description of Notes—Book-Entry, Delivery and Form" in the accompanying prospectus supplement.

The ETNs are Senior Medium-Term Notes as described in the accompanying prospectus supplement and prospectus which also contain a detailed summary of additional provisions of the ETNs and of the senior indenture, dated as of March 29, 2007, as amended, between Credit Suisse AG (formerly Credit Suisse) and The Bank of New York Mellon (formerly The Bank of New York), as trustee, under which the ETNs will be issued (the "**indenture**"). You should read all the provisions of the accompanying prospectus and prospectus supplement, including information incorporated by reference, and the indenture.

Please note that the information about the price to the public and the proceeds to Credit Suisse on the front cover of this pricing supplement relates only to the initial sale of the ETNs.  If you have purchased the ETNs after the initial sale, information about the price and date of sale to you will be provided in a separate confirmation of sale.

### Coupon

We will not make any coupon or interest payment during the term of the ETNs.

### Denomination

Prior to June 27, 2011, the denomination and stated principal amount of each ETN was $100.  On June 16, 2011, Credit Suisse announced a 10-for-1 split of the Inverse VIX Short Term ETNs and an 8-for-1 split of the Inverse VIX Medium Term ETNs, effective June 27, 2011.  On and after June 27, 2011, the denomination and stated principal amount will be $10 for the Inverse VIX Short Term ETNs, $12.50 for the Inverse VIX Medium Term ETNs and $100 for each of the Long VIX Short Term ETNs, the Long VIX Medium Term ETNs, the 2x Long VIX Short Term ETNs and the 2x Long VIX Medium Term ETNs.  ETNs of any series issued in the future may be issued at a price higher or lower than the stated principal amount, based on the most recent Intraday Indicative Value or Closing Indicative Value of the ETNs.

### Payment at Maturity

If you hold your ETNs to maturity, you will receive a cash payment on December 4, 2030 (the "**Maturity Date**") that is linked to the percentage change in the closing level of the applicable underlying Index from the inception date to the closing level calculated on the Final Valuation Date.  Your cash payment at maturity will be equal to the Closing Indicative Value of the ETNs on the Final Valuation Date (the "**Final Indicative Value**"), as calculated by the Calculation Agents.  We refer to the amount of such payment as the "**Maturity Redemption Amount**."  If the scheduled Maturity Date is not a Business Day, the Maturity Date will be postponed to the first Business Day following the scheduled Maturity Date.  If the scheduled Final Valuation Date is not an Index Business Day, the Final Valuation Date will be postponed to the next following Index Business Day, in which case the Maturity Date will be postponed to the third Business Day following the Final Valuation Date as so postponed. No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date.

**If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero.**

The "**Closing Indicative Value**" for any given series of ETNs on any given calendar day will be calculated in the following manner:  The Closing Indicative Value on the Inception Date will equal $100 (the "**Initial Indicative Value**").  The Closing Indicative Value on each calendar day following the Inception Date for each series of ETNs will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day.  The Closing Indicative Value will never be less than zero. **The Closing Indicative Value will be zero on and subsequent to any calendar day on which the Intraday Indicative Value is less than or equal to zero at any time or Closing Indicative Value equals zero.**  The Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs underwent a 10-for-1 split and an 8-for-1 split, respectively, effective June 27, 2011.  The Closing Indicative Value of the Inverse VIX Short Term ETNs on June 24, 2011 was 157.89294145 and the Closing Indicative Value of the Inverse VIX Medium Term Notes on June 24, 2011 was

Exhibit 1

263

127.46917437. Such values were divided by 10 and 8, respectively, and rounded to 8 decimal places, prior to the open of trading on June 27, 2011. On and after June 27, 2011, the Closing Indicative Value for the Inverse VIX Short Term ETNs and the Inverse VIX Medium Term ETNs will be expressed in an amount per denomination and stated principal amount of $10 and $12.50, respectively. If the ETNs undergo any subsequent splits or reverse splits, the Closing Indicative Value will be adjusted accordingly (see "Description of ETNs—Split or Reverse Split of the ETNs" herein). VLS Securities, LLC ("**VLS**") or its affiliate is responsible for computing and disseminating the Closing Indicative Value.

The "**Daily ETN Performance**" for any series of ETNs on any Index Business Day will equal (1) the number one *plus* (2) the Daily Accrual for that series on such Index Business Day *plus* (3) the product of (a) the Daily Index Performance on such Index Business Day *times* (b) the Leverage Amount. The Daily ETN Performance is deemed to be one on any day that is not an Index Business Day.

An "**Index Business Day**", with respect to the applicable underlying Index, is a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on NYSE Arca, in each case as determined by VLS, as one of the Calculation Agents.

The "**Daily Accrual**" represents the rate of interest that could be earned on a notional capital reinvestment at the three month U.S. Treasury rate as reported on Bloomberg under ticker USB3MTA. The Daily Accrual for any series of ETNs on any Index Business Day will equal:

$$\left( \frac{1}{1 - Tbills_{t-1} * \frac{91}{360}} \right)^{\frac{d}{91}} - 1$$

Where $Tbills_{t-1}$ is the three month treasury rate reported on Bloomberg on the prior Index Business Day and $d$ is the number of calendar days which have elapsed since the prior Index Business Day. The Daily Accrual is deemed to be zero on any day which is not an Index Business Day.

The "**Daily Index Performance**" for any series of ETNs on any Index Business Day will equal (1)(a) the closing level of the applicable underlying Index for that series on such Index Business Day *divided by* (b) the closing level of the applicable underlying Index for that series on the immediately preceding Index Business Day *minus* (2) the number one. If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event. The Daily Index Performance is deemed to be zero on any day that is not an Index Business Day.

The "**Leverage Amount**" for each series of ETN is as follows:

Daily Inverse VIX Short Term ETN:      -1
Daily Inverse VIX Medium Term ETN:   -1
VIX Short Term ETN:                               1
VIX Medium Term ETN:                          1
Daily 2x VIX Short Term ETN:                2
Daily 2x VIX Medium Term ETN:           2

On any calendar day (the "**calculation day**"), the "**Daily Investor Fee**" for any series of ETNs will be equal to the product of (1) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (2) the Daily ETN Performance for that series on the calculation day *times* (3)(a) the Daily Investor Fee Factor for that series *divided by* (b) 365.

The "**Daily Investor Fee Factor**" will be equal to (i) 0.0089 for each of the Long ETNs, (ii) 0.0135 for each of the Inverse ETNs and (iii) 0.0165 for each of the 2x Long ETNs.

**If the level of the applicable underlying Index decreases or does not increase sufficiently in the case of the Long or 2x Long ETNs or if it increases or does not decrease sufficiently in the case of the Inverse ETNs (in each case in addition to Daily Accrual) to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over the term of the ETNs, you will receive less than the**

Exhibit 1
264

**principal amount of your investment at maturity, upon early redemption or acceleration of the ETNs.** See "Risk Factors—Even if the closing level of the Index on the applicable Valuation Date exceeds (or is less than in the case of the Inverse ETNs) the initial closing level of the Index on the date of your investment, you may receive less than the principal amount of your ETNs" and "Hypothetical Examples" in this pricing supplement for additional information on how the Daily Investor Fee affects the overall value of the ETNs.

The closing level of the applicable underlying Index on any Index Business Day will be the closing level reported by the Index Sponsor on the applicable Bloomberg page as set forth in the table below or any successor page on Bloomberg or any successor service, as applicable, as determined by the Calculation Agents, provided that in the event a Market Disruption Event is continuing on an Index Business Day, the Calculation Agents will determine the closing level of the applicable underlying Index for such Index Business Day according to the methodology described below in "Specific Terms of the ETNs—Market Disruption Events."

| Index | Bloomberg Page Ticker |
|---|---|
| S&P 500 VIX Short-Term Futures™ Index ER | SPVXSP |
| S&P 500 VIX Mid-Term Futures™ Index ER | SPVXMP |

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

For a further description of how your payment at maturity will be calculated, see "Hypothetical Examples" and "Specific Terms of the ETNs" in this pricing supplement.

**Payment Upon Early Redemption**

Prior to maturity, you may, subject to certain restrictions described below, offer the applicable Minimum Redemption Amount or more of your ETNs to us for redemption on an Early Redemption Date during the term of the ETNs until November 28, 2030. If you elect to offer your ETNs for redemption, and the requirements for acceptance by us are met, you will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount.

You may exercise your early redemption right by causing your broker or other person with whom you hold your ETNs to deliver a Redemption Notice (as defined herein) to the Redemption Agent (as defined herein). If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**". Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date. See "—Redemption Procedures."

You must offer for redemption at least 25,000 ETNs, or an integral multiple of 25,000 ETNs in excess thereof, at one time in order to exercise your right to cause us to redeem your ETNs on any Early Redemption Date (the "**Minimum Redemption Amount**"); provided that we or CSI as one of the Calculation Agents may from time to time reduce, in part or in whole, the Minimum Redemption Amount. Any such reduction will be applied on a consistent basis for all holders of the relevant series of ETNs at the time the reduction becomes effective. If the ETNs undergo a split or reverse split, the minimum number of ETNs needed to exercise your right to redeem will remain the same.

The "**Early Redemption Date**" is the third Business Day following an Early Redemption Valuation Date.[*]

The "**Early Redemption Charge**" is equal to 0.05% *times* the Closing Indicative Value on the Early Redemption Valuation Date.

The "**Early Redemption Amount**" is a cash payment per ETN equal to the greater of (A) zero and (B) (1) the Closing Indicative Value on the Early Redemption Valuation Date *minus* (2) the Early Redemption Charge and will be calculated by the Calculation Agents.

---

[*] An Early Redemption Date will be postponed if a Market Disruption Event occurs and is continuing on the applicable Early Redemption Valuation Date. No interest or additional payment will accrue or be payable as a result of any postponement of any Early Redemption Date. See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1

265

**Redemption Procedures**

If you wish to offer your ETNs to Credit Suisse for redemption, your broker must follow the following procedures:

- Deliver a notice of redemption, in substantially the form as Annex A (the "**Redemption Notice**"), to VLS (the "**Redemption Agent**") via email or other electronic delivery (including, without limitation, the Redemption Agent's proprietary technology system, TENZING) as requested by the Redemption Agent. If your Redemption Notice is delivered prior to 4:00 p.m., New York City time, on any Business Day, the immediately following Index Business Day will be the applicable "**Early Redemption Valuation Date**". Otherwise, the second following Index Business Day will be the applicable Early Redemption Valuation Date. If the Redemption Agent receives your Redemption Notice no later than 4:00 p.m., New York City time, on any Business Day, the Redemption Agent will respond by sending your broker an acknowledgment of the Redemption Notice accepting your redemption request by 7:30 p.m., New York City time, on the Business Day prior to the applicable Early Redemption Valuation Date. The Redemption Agent or its affiliate must acknowledge to your broker acceptance of the Redemption Notice in order for your redemption request to be effective;

- Cause your DTC custodian to book a delivery vs. payment trade with respect to the ETNs on the applicable Early Redemption Valuation Date at a price equal to the applicable Early Redemption Amount, facing us; and

- Cause your DTC custodian to deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. New York City time, on the applicable Early Redemption Date (the third Business Day following the Early Redemption Valuation Date).

You are responsible for (i) instructing or otherwise causing your broker to provide the Redemption Notice and (ii) your broker satisfying the additional requirements as set forth in the second and third bullet above in order for the redemption to be effected. Different brokerage firms may have different deadlines for accepting instructions from their customers. Accordingly, you should consult the brokerage firm through which you own your interest in the ETNs in respect of such deadlines. If the Redemption Agent does not (i) receive the Redemption Notice from your broker by 4:00 p.m. and (ii) deliver an acknowledgment of such Redemption Notice to your broker accepting your redemption request by 7:30 p.m., on the Business Day prior to the applicable Early Redemption Valuation Date, such notice will not be effective for such Business Day and the Redemption Agent will treat such Redemption Notice as if it was received on the next Business Day. Any redemption instructions for which the Redemption Agent receives a valid confirmation in accordance with the procedures described above will be irrevocable.

If the Redemption Agent cease to perform its role described in this pricing supplement, we will either, at our sole discretion, perform such role or appoint another party to do so.

Any ETNs previously redeemed by us at your option will be cancelled on the Early Redemption Date. Consequently, as of such Early Redemption Date, the redeemed ETNs will no longer be considered outstanding.

**Acceleration at Our Option or Upon an Acceleration Event**

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date. In the case of an Optional Acceleration, the "**Accelerated Valuation Date**" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration. In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day). The Accelerated Redemption Amount will be payable on the third

Exhibit 1

266

Business Day following the Accelerated Valuation Date (such third Business Day the "**Acceleration Date**").[*] We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

An "**Acceleration Event**" means:

(a)  an amendment to or change (including any officially announced proposed change) in the laws, regulations or rules of the United States (or any political subdivision thereof), any jurisdiction in which a Primary Exchange or Related Exchange (each as defined herein) is located that (i) makes it illegal to hold, acquire or dispose of the underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on any of these party's ability to perform their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents;

(b)  any official administrative decision, judicial decision, administrative action, regulatory interpretation or other official pronouncement interpreting or applying those laws, regulations or rules that is announced on or after the Inception Date that (i) makes it illegal to hold, acquire or dispose of the underlying futures (including but not limited to exchange imposed position limits), (ii) shall materially increase the cost to the Issuer, our affiliates, third parties with whom we transact or similarly situated third parties in performing our or their obligations in connection with the ETNs, (iii) shall have a material adverse effect on the Issuer's, our affiliates, third parties with whom we transact or similarly situated third parties ability to perform our or their obligations in connection with the ETNs or (iv) shall materially affect our ability to issue or transact in exchange traded notes similar to the ETNs, each as determined by us or the Calculation Agents;

(c)  any event, as determined by us or the Calculation Agents that we or any of our affiliates or a similarly situated party would, after using commercially reasonable efforts, be unable to, or would incur a materially increased amount of tax, duty, expense or fee (other than brokerage commissions) to acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction or asset it deems necessary to hedge the risk of the ETNs, or realize, recover or remit the proceeds of any such transaction or asset;

(d)  if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value;

(e)  if the primary exchange or market for trading for the ETNs, if any, announces that pursuant to the rules of such exchange or market, as applicable, the ETNs cease (or will cease) to be listed, traded or publicly quoted on such exchange or market, as applicable, for any reason and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as such exchange or market, as applicable;

(f)  if any of the initial Calculation Agents ceases to be a Calculation Agent hereunder; or

(g)  VLS exercises their right to cause an early acceleration due to the termination of our agreement with them in certain circumstances. See "*Supplemental Plan of Distribution*" in this pricing supplement for further information.

If VLS exercises their right to cause an early acceleration due to a termination of our agreement with them in certain circumstances, we will be obligated to accelerate all of the outstanding ETNs within ten (10) calendar days of such termination.

"**Primary Exchange**" means the CBOE.

---

[*] The Acceleration Date will be postponed if a Market Disruption Event occurs and is continuing on the Accelerated Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Acceleration Date.  See "Specific Terms of the ETNs—Market Disruption Events".

Exhibit 1

267

"**Related Exchange**" means each exchange or quotation system where trading has a material effect (as determined by the Calculation Agents) for the overall market for futures or options contracts relating to (i) the Index or (ii) the underlying futures.

Any ETNs accelerated following an Acceleration Event will be cancelled on the Acceleration Date. Consequently, as of such Acceleration Date, the ETNs will no longer be considered outstanding.

**Market Disruption Events**

A "**Market Disruption Event**" will be any event that, in the determination of the Calculation Agents, could materially interfere with our, our affiliates, third parties with whom we transact, or similarly situated third party's ability to establish, maintain or unwind all or a material portion of a hedge that could be effected with respect to the ETNs, including, but not limited to:

- a suspension, absence or material limitation of trading in option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,

- option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, if available, not trading on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,

- the Index Sponsor or the CBOE fails to publish or compute the Indices or VIX Index, or

- any trading restriction imposed upon, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange due to a price change in that respective instrument exceeding limits set by that market before the close of trading in that market on any day, as determined by the Calculation Agents.

The following events will not be a Market Disruption Event:

- a limitation on the hours or numbers of days of trading, but only if the limitation results from a previously announced change in the regular business hours of the relevant market, and

- a decision to permanently discontinue trading in the option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures.

For this purpose, an "absence or material limitation of trading" in, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange will not include any time when that market is itself closed for trading under ordinary circumstances. In contrast, a suspension or limitation of trading in such instruments, by reason of:

- a price change exceeding limits set by that market, or

- an imbalance of orders relating to that stock, instrument or those contracts, or

- a disparity in bid and ask quotes relating to that stock, instrument or those contracts,

will constitute a suspension or material limitation of trading in, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, in that primary market.

If a Market Disruption Event occurs and continues on any Index Business Day, the Calculation Agents will determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event. In addition, if a Market Disruption Event occurs or is continuing on a Valuation Date, the Maturity Date, the corresponding Early Redemption Date or the Acceleration Date, as the case may be, will be postponed until the date three Business Days following the earlier of (i) the first Index Business Day following such Valuation Date on which no Market Disruption Event occurs or is continuing or (ii) the fifth Index Business Day

Exhibit 1
268

following such Valuation Date.  No interest or additional payment will accrue or be payable as a result of any postponement of the Maturity Date, any Early Redemption Date or the Acceleration Date.

**Default Amount on Acceleration**

For the purpose of determining whether the holders of our senior medium-term notes, of which the ETNs are a part, are entitled to take any action under the indenture, we will treat the stated principal amount of each ETN of any series outstanding as the principal amount of that ETN.  Although the terms of the ETNs may differ from those of the other senior medium-term notes, holders of specified percentages in principal amount of all senior medium-term notes, together in some cases with other series of our debt securities, will be able to take action affecting all the senior medium-term notes, including the ETNs of any series.  This action may involve changing some of the terms that apply to the senior medium-term notes, accelerating the maturity of the senior medium-term notes (in accordance with the acceleration provisions set forth in the accompanying prospectus) after a default or waiving some of our obligations under the indenture.

In case an event of default (as defined in the accompanying prospectus) with respect to ETNs of any series shall have occurred and be continuing, the amount declared due and payable upon any acceleration of the ETNs of such series will be determined by the Calculation Agents and will equal, for each ETN of such series that you then hold, the Closing Indicative Value determined by the Calculation Agents occurring on the-Index Business Day following the date on which the ETNs of such series were declared due and payable.

**Further Issuances**

We may, from time to time, without notice to or the consent of the holders of the ETNs, create and issue additional securities having the same terms and conditions as the ETNs offered by this pricing supplement, and ranking on an equal basis with the ETNs in all respects. If there is substantial demand for the ETNs, we may issue additional ETNs frequently. We may sell additional ETNs of any series at different prices but we are under no obligation to issue or sell additional ETNs of any series at any time, and if we do sell additional ETNs of any series, we may limit or restrict such sales, and we may stop selling additional ETNs of such series at any time. If we stop selling additional ETNs, the trading price and liquidity of the ETNs could be materially and adversely affected. The maximum aggregate principal amount of ETNs linked to the Indices that we will issue under this pricing supplement will be $1,500,000,000 in principal amount of the Inverse VIX Short Term ETNs (150,000,000 Inverse VIX Short Term ETNs), $100,000,000 in principal amount of the Inverse VIX Medium Term ETNs (8,000,000 Inverse VIX Medium Term ETNs), $500,000,000 in principal amount of the Long VIX Short Term ETNs (5,000,000 Long VIX Short Term ETNs), $100,000,000 in principal amount of the Long VIX Medium Term ETNs (1,000,000 Long VIX Medium Term ETNs), $10,000,000,000 in principal amount of the 2x Long VIX Short Term ETNs (100,000,000 2x Long VIX Short Term ETNs) and $100,000,000 in principal amount of the 2x Long VIX Medium Term ETNs (1,000,000 2x Long VIX Medium Term ETNs), in each case, less the amount of such ETNs outstanding at any time. However, we have no obligation to issue up to this amount or any specific amount of ETNs and, in our sole discretion, may issue ETNs in excess of this amount.

Any additional ETNs will be consolidated and form a single series with the ETNs of the applicable series. We have no obligation to take your interests into account when deciding to issue additional securities. If, on any valuation date on which we price an additional ETN creation, a Market Disruption Event occurs or is occurring, we will determine the closing level of the applicable underlying Index applicable to such creation in accordance with the procedures under "—Market Disruption Events" in this pricing supplement.

**On February 21, 2012, we temporarily suspended further issuances of the 2x Long VIX Short Term ETNs due to internal limits on the size of ETNs.  On March 22, 2012, we announced that we planned to reopen issuance of the 2x Long VIX Short Term ETNs on a limited basis. Beginning March 23, 2012, we may from time to time issue the ETNs into inventory of our affiliates to make the 2x Long VIX Short Term ETNs available for lending at or about rates that prevailed prior to the temporary suspension of issuances of the 2x Long VIX Short Term ETNs. Also, beginning as soon as March 28, 2012, we may issue additional 2x Long VIX Short Term ETNs from time to time to be sold solely to authorized market makers. We may condition our acceptance of a market maker's offer to purchase the 2x Long VIX Short Term ETNs on its agreeing to sell to us specified hedging instruments consistent with our hedging strategy, including but not limited to swaps. Any such hedging instruments will be executed on the basis of the indicative value of the 2x Long VIX Short Term ETNs at that time, will not reflect any premium or discount in the trading price of the 2x Long VIX Short Term ETNs over their indicative value and will be on terms acceptable to us, including the**

Exhibit 1

269

**counterparty meeting our creditworthiness requirements, margin requirements, minimum size and duration requirements and such other terms as we deems appropriate in out sole discretion. None of these events affect the early redemption right of holders as described herein. The other ETNs issued by us are not affected by any of these events.**

**Discontinuation or Modification of the Index**

If the Index Sponsor discontinues publication of the applicable underlying Index and the Index Sponsor or anyone else publishes a substitute index that the Calculation Agents determine is comparable to that Index, then the Calculation Agents will determine the Early Redemption Amount, Accelerated Redemption Amount or Maturity Redemption Amount (each a "**Redemption Amount**"), as applicable, by reference to the substitute index (the "**Successor Index**").

If the Calculation Agents determine that the publication of the applicable underlying Index is discontinued and there is no Successor Index, the Calculation Agents will determine the applicable level of the applicable underlying Index as the case may be, and thus the applicable Redemption Amount by a computation methodology that the Calculation Agents determine will as closely as reasonably possible replicate the applicable underlying Index.

If the Calculation Agents determine that the applicable underlying Index, the underlying futures contracts or the method of calculating the applicable underlying Index is changed at any time in any respect — including whether the change is made by the Index Sponsor under its existing policies or following a modification of those policies, is due to the publication of a Successor Index, is due to events affecting the underlying futures contracts, or is due to any other reason and is not otherwise reflected in the level of the applicable underlying Index by the Index Sponsor pursuant to the methodology described herein, then the Calculation Agents will be permitted (but not required) to make such adjustments in the applicable underlying Index or the method of its calculation as they believe are appropriate to ensure that the applicable closing level of the applicable underlying Index used to determine the applicable Redemption Amount is equitable.

**Manner of Payment and Delivery**

Any payment on or delivery of the ETNs at maturity will be made to accounts designated by you and approved by us, or at the office of the trustee in New York City, but only when the ETNs are surrendered to the trustee at that office. We also may make any payment or delivery in accordance with the applicable procedures of the depositary.

**Role of Calculation Agents**

Credit Suisse International ("**CSI**"), an affiliate of ours, and VLS will serve as the Calculation Agents. The Calculation Agents will, in their reasonable discretion, make all calculations and determinations regarding the value of the ETNs, including at maturity or upon redemption by Credit Suisse, Market Disruption Events (see "—Market Disruption Events"), Business Days and Index Business Days, the Daily Investor Fee amount, the Daily Accrual, the closing level of the applicable underlying Index on any Index Business Day, the Maturity Date, any Early Redemption Dates, the Acceleration Date, the amount payable in respect of your ETNs at maturity, upon redemption or upon acceleration by Credit Suisse and any other calculations or determinations to be made by the Calculation Agents as specified herein. CSI will have the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and calculation of default amounts. VLS will have the sole ability to calculate and disseminate the Closing Indicative Value, make determinations regarding an Index Business Day, and determinations of splits and reverse splits. All other determinations will be made by the Calculation Agents jointly. Absent manifest error, all determinations of the Calculation Agents will be final and binding on you and us, without any liability on the part of the Calculation Agents. You will not be entitled to any compensation from us for any loss suffered as a result of any of the above determinations by the Calculation Agents.

Although VLS obtains information for including in or for use in calculations related to the ETNs from sources that VLS considers reliable, neither VLS nor any other party guarantees the accuracy and/or the completeness of the Indices or any data included therein or any calculations made with respect to the ETNs. Neither VLS nor any other party makes any warranty, express or implied, as to the data included therein or any calculations made with respect to the ETNs. Neither VLS nor another other party makes any express or implied warranties, and VLS hereby expressly disclaims all warranties of merchantability or fitness for a particular purpose with respect to the Indices or any data included therein or any calculations made with respect to the ETNs. Without limiting any of

Exhibit 1

270

the foregoing, in no event shall VLS or any other party have any liability for any direct, indirect, special, punitive, consequential or any other damages (including lost profits) even if notified of the possibility of such damages.

If any of the Calculation Agents cease to perform their respective roles described in this pricing supplement, we will either, at our sole discretion, perform such roles, appoint another party to do so or accelerate the relevant series of ETNs.

### CLEARANCE AND SETTLEMENT

DTC participants that hold the ETNs of any series through DTC on behalf of investors will follow the settlement practices applicable to equity securities in DTC's settlement system with respect to the primary distribution of the ETNs of any series and secondary market trading between DTC participants.

### SUPPLEMENTAL USE OF PROCEEDS AND HEDGING

We intend to use the net proceeds from this offering for our general corporate purposes, which may include the refinancing of our existing indebtedness outside Switzerland. We may also use some or all of the net proceeds from this offering to hedge our obligations under the ETNs of the applicable series.

One or more of our affiliates before and following the issuance of the ETNs of any series may acquire or dispose of the futures contracts underlying the applicable Index, or listed or over-the-counter options contracts in, or other derivatives or synthetic instruments related to, the applicable underlying Index or the S&P 500® Index or the VIX Index to hedge our obligations under the ETNs of such series. In the course of pursuing such a hedging strategy, the price at which such positions may be acquired or disposed of may be a factor in determining the levels of the applicable underlying Index. Although we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index, there can be no assurance that the level of the applicable underlying Index will not be affected.

From time to time after issuance and prior to the maturity of any series of ETNs, depending on market conditions (including the level of the applicable underlying Index), in connection with hedging certain of the risks associated with the ETNs of the series, we expect that one or more of our affiliates will increase or decrease their initial hedging positions using dynamic hedging techniques and may take long or short positions in listed or over-the-counter options contracts in, or other derivative or synthetic instruments related to, the applicable underlying Index, or the S&P 500® Index. In addition, we or one or more of our affiliates may take positions in other types of appropriate financial instruments that may become available in the future. To the extent that we or one or more of our affiliates have a hedge position in the applicable underlying Index or S&P 500® Index, we or one or more of our affiliates may liquidate a portion of those holdings on or before the Final Valuation Date. Depending, among other things, on future market conditions, the aggregate amount and the composition of such positions are likely to vary over time. Our or our affiliates' hedging activities will not be limited to any particular securities exchange or market.

The hedging activity discussed above may adversely affect the level of the applicable underlying Index and, as a consequence, the market value of the ETNs and the amount payable at maturity, upon redemption or upon acceleration. See "Risk Factors" in this pricing supplement for a discussion of possible adverse effects related to our hedging activities.

Exhibit 1
271

**MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS**

Subject to the limitation and qualifications contained herein, the following discussion summarizes the material United States federal income tax consequences of owning and disposing of securities that may be relevant to holders of securities that acquire their securities from us as part of the original issuance of the securities.  This discussion applies only to holders that hold their securities as capital assets within the meaning of the Internal Revenue Code of 1986, as amended (the "**Code**").  Further, this discussion does not address all of the United States federal income tax consequences that may be relevant to you in light of your individual circumstances or if you are subject to special rules, such as if you are:

- a financial institution,
- a mutual fund,
- a tax-exempt organization,
- a grantor trust,
- certain U.S. expatriates,
- an insurance company,
- a dealer or trader in securities or foreign currencies,
- a person (including traders in securities) using a mark-to-market method of accounting,
- a person who holds securities as a hedge or as part of a straddle with another position, constructive sale, conversion transaction or other integrated transaction, or
- an entity that is treated as a partnership  for United States federal income tax purposes.

The discussion is based upon the Code, law, regulations, rulings and decisions, in each case, as available and in effect as of the date hereof, all of which are subject to change, possibly with retroactive effect.  Tax consequences under state, local and foreign laws are not addressed herein.  No ruling from the U.S. Internal Revenue Service (the "**IRS**") has been or will be sought as to the United States federal income tax consequences of the ownership and disposition of securities, and the following discussion is not binding on the IRS.

**You should consult your tax advisor as to the specific tax consequences to you of owning and disposing of securities, including the application of federal, state, local and foreign income and other tax laws based on your particular facts and circumstances.**

**IRS CIRCULAR 230 REQUIRES THAT WE INFORM YOU THAT ANY TAX STATEMENT HEREIN REGARDING ANY U.S. FEDERAL TAX IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES. ANY SUCH STATEMENT HEREIN WAS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTION(S) OR MATTER(S) TO WHICH THE STATEMENT RELATES. A PROSPECTIVE INVESTOR (INCLUDING A TAX-EXEMPT INVESTOR) IN THE SECURITIES SHOULD CONSULT ITS OWN TAX ADVISOR IN DETERMINING THE TAX CONSEQUENCES OF AN INVESTMENT IN THE SECURITIES, INCLUDING THE APPLICATION OF STATE, LOCAL OR OTHER TAX LAWS AND THE POSSIBLE EFFECTS OF CHANGES IN FEDERAL OR OTHER TAX LAWS.**

**Characterization of the Securities**

There are no statutory provisions, regulations, published rulings, or judicial decisions addressing the characterization for United States federal income tax purposes of securities with terms that are substantially the same as those of your securities.  In the opinion of Milbank, Tweed, Hadley & McCloy, acting as special tax counsel ("Special Tax Counsel"), for United States federal income tax purposes, the securities should be treated as a prepaid forward contract, with respect to the Index that is eligible for open transaction treatment.  Thus, we intend to so treat the securities.  In the absence of an administrative or judicial ruling to the contrary, we and, by acceptance of the securities, you, agree to treat your securities for all tax purposes in accordance with such characterization.

You should be aware that the characterization of the securities as described above is not certain, nor is it binding on the IRS or the courts.  Thus, it is possible that the IRS would seek to characterize your securities in a

Exhibit 1

272

manner that results in tax consequences to you that are different from those described above.  For example, the IRS might assert that the securities constitute debt instruments that are "contingent payment debt instruments" that are subject to special tax rules under the applicable Treasury regulations governing the recognition of income over the term of your securities.  If the securities were to be treated as contingent payment debt instruments, you would be required to include in income on an economic accrual basis over the term of the securities an amount of interest that is based upon the yield at which we would issue a non-contingent fixed-rate debt instrument with other terms and conditions similar to your securities, or the comparable yield.  The characterization of securities as contingent payment debt instruments under these rules is likely to be adverse.  You should consult your tax advisor regarding the possible tax consequences of characterization of the securities as contingent payment debt instruments.

It is also possible that the IRS would seek to characterize your securities as regulated futures contracts or options that may be subject to the provisions of Code section 1256.  In such case, the securities would be marked to market at the end of each taxable year and 40% of any gain or loss would be treated as short-term capital gain or loss, and the remaining 60% of any gain or loss would be treated as long-term capital gain or loss.  We are not responsible for any adverse consequences that you may experience as a result of any alternative characterization of the securities for United States federal income tax or other tax purposes.  In light of the fact that we agree to treat the securities as a prepaid forward contract, the balance of this discussion assumes that the securities will be so treated.

**You should consult your tax advisor as to the tax consequences of such characterization and any possible alternative characterizations of your securities for United States federal income tax purposes.**

**U.S. Holders**

For purposes of this discussion, the term "U.S. Holder," for United States federal income tax purposes, means a beneficial owner of securities that is (1) a citizen or resident of the United States, (2) a corporation (or an entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (3) an estate, the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust, if (a) a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has in effect a valid election to be treated as a domestic trust for United States federal income tax purposes.  If a partnership (or an entity treated as a partnership for United States federal income tax purposes) holds securities, the United States federal income tax treatment of such partnership and a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership.  If you are a partnership, or a partner of a partnership, holding securities, you should consult your tax advisor regarding the tax consequences to you from the partnership's purchase, ownership and disposition of the securities.

In accordance with the agreed-upon tax treatment described above, upon receipt of the redemption amount of the securities from us, a U.S. Holder will recognize gain or loss equal to the difference between the amount of cash received from us and the U.S. Holder's tax basis in the security at that time.  For securities with a term of more than one year, such gain or loss will be long-term capital gain or loss if the U.S. Holder has held the security for more than one year at maturity.  For securities with a term of one year or less, such gain or loss will be short-term capital gain or loss.  The deductibility of capital losses is subject to certain limitations.

Upon the sale or other taxable disposition of a security, a U.S. Holder generally will recognize capital gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and the U.S. Holder's tax basis in the security (generally its cost).  For securities with a term of more than one year, such gain or loss will be long-term capital gain or loss if the U.S. Holder has held the security for more than one year at the time of disposition.  For securities with a term of one year or less, such gain or loss will be short-term capital gain or loss.  The deductibility of capital losses is subject to certain limitations.

However, even if the agreed-upon tax characterization of the securities (as described above) were upheld, it is possible that the IRS could assert that each reconstitution or rebalancing (collectively, "**Rebalancing**") of the applicable underlying Index is considered a taxable event to you.  If the IRS were to prevail in treating each Rebalancing of the Index as a taxable event, you would recognize capital gain or, possibly, loss on the securities on the date of each Rebalancing to the extent of the difference between the fair market value of the securities and your adjusted basis in the securities at that time.  Such gain or loss generally would be short-term capital gain or loss.

Exhibit 1

273

**Legislation Affecting Securities Held Through Foreign Accounts**

Under the "Hiring Incentives to Restore Employment Act" (the "**Act**"), a 30% withholding tax is imposed on "withholdable payments" and certain "passthru payments" made to foreign financial institutions (and their more than 50% affiliates) unless the payee foreign financial institution agrees, among other things, to disclose the identity of any U.S. individual with an account at the institution (or the institution's affiliates) and to annually report certain information about such account. "Withholdable payments" include payments of interest (including original issue discount), dividends, and other items of fixed or determinable annual or periodical gains, profits, and income ("**FDAP**"), in each case, from sources within the United States, as well as gross proceeds from the sale of any property of a type which can produce interest or dividends from sources within the United States. The Act also requires withholding agents making withholdable payments to certain foreign entities that do not disclose the name, address, and taxpayer identification number of any substantial U.S. owners (or certify that they do not have any substantial United States owners) to withhold tax at a rate of 30%. We will treat payments on the securities as withholdable payments for these purposes.

Withholding under the Act will apply to all withholdable payments without regard to whether the beneficial owner of the payment is a U.S. person, or would otherwise be entitled to an exemption from the imposition of withholding tax pursuant to an applicable tax treaty with the United States or pursuant to U.S. domestic law. Unless a foreign financial institution is the beneficial owner of a payment, it will be subject to refund or credit in accordance with the same procedures and limitations applicable to other taxes withheld on FDAP payments provided that the beneficial owner of the payment furnishes such information as the IRS determines is necessary to determine whether such beneficial owner is a United States owned foreign entity and the identity of any substantial United States owners of such entity. Generally, the Act's withholding and reporting regime will apply to withholdable payments made after December 31, 2013 with respect to securities that are issued after March 18, 2012 (or under proposed regulations, securities issued after December 31, 2012). For passthru payments, the estimated date for withholding and reporting under the Act is December 31, 2014 (or under the proposed regulations, December 31, 2016). Thus, if you fail to provide us with the information described herein, or hold your securities through a foreign financial institution or foreign corporation or trust, a portion of any of your payments made after December 31, 2013 may be subject to 30% withholding.

**Non-U.S. Holders Generally**

In the case of a holder of the securities that is not a U.S. Holder and has no connection with the United States other than holding its securities (a "**Non-U.S. Holder**"), payments made with respect to the securities will not be subject to U.S. withholding tax, provided that such Non-U.S. Holder complies with applicable certification requirements (including the requirements discussed in the preceding section). Any gain realized upon the sale or other disposition of the securities by a Non-U.S. Holder will generally not be subject to United States federal income tax unless (i) such gain is effectively connected with a U.S. trade or business of such Non-U.S. Holder or (ii) in the case of an individual, such individual is present in the United States for 183 days or more in the taxable year of the sale or other disposition and certain other conditions are met.

Non-U.S. Holders that are subject to United States federal income taxation on a net income basis with respect to their investment in the securities should refer to the discussion above relating to U.S. Holders.

*Legislation Affecting Substitute Dividend and Dividend Equivalent Payments*

The Act treats a "dividend equivalent" payment as a dividend from sources within the United States. Under the Act, unless reduced by an applicable tax treaty with the United States, such payments generally would be subject to U.S. withholding tax. A "**dividend equivalent**" payment is (i) a substitute dividend payment made pursuant to a securities lending or a sale-repurchase transaction that (directly or indirectly) is contingent upon, or determined by reference to, the payment of a dividend from sources within the United States, (ii) a payment made pursuant to a "specified notional principal contract" that (directly or indirectly) is contingent upon, or determined by reference to, the payment of a dividend from sources within the United States, and (iii) any other payment determined by the IRS to be substantially similar to a payment described in the preceding clauses (i) and (ii). These changes will apply to payments made on or after September 14, 2010. Under recently issued proposed regulations (the "Proposed Regulations"), the securities may be treated as specified notional principal contracts and certain

Exhibit 1

274

amounts payable under the securities may be treated as dividend equivalent payments.  The provisions of the Proposed Regulations are proposed to be effective after publication of final regulations.  Non-U.S holders should consult their tax advisors regarding the potential withholding on dividend equivalent amounts.

**U.S. Federal Estate Tax Treatment of Non-U.S. Holders**

The securities may be subject to U.S. federal estate tax if an individual Non-U.S. Holder holds the securities at the time of his or her death.  The gross estate of a Non-U.S. Holder domiciled outside the United States includes only property situated in the United States. Individual Non-U.S. Holders should consult their tax advisors regarding the U.S. federal estate tax consequences of holding the securities at death.

**IRS Notice on Certain Financial Transactions**

The IRS and the Treasury Department have stated they are considering issuing new regulations or other guidance on whether holders of an instrument such as the securities should be required to accrue income during the term of the instrument.  The IRS and Treasury Department also requested taxpayer comments on (1) the appropriate method for accruing income or expense (*e.g.*, a mark-to-market methodology or a method resembling the noncontingent bond method), (2) whether income and gain on such an instrument should be ordinary or capital, and (3) whether foreign holders should be subject to withholding tax on any deemed income accrual.

Accordingly, it is possible that regulations or other guidance may be issued that require holders of the securities to recognize income in respect of the securities prior to receipt of any payments thereunder or sale thereof.  Any regulations or other guidance that may be issued could result in income and gain (either at maturity or upon sale) in respect of the securities being treated as ordinary income.  It is also possible that a Non-U.S. Holder of the securities could be subject to U.S. withholding tax in respect of the securities under such regulations or other guidance.  It is not possible to determine whether such regulations or other guidance will apply to your securities (possibly on a retroactive basis).  You are urged to consult your tax advisor regarding the potential guidance that the IRS and the Treasury Department may issue and its possible impact on you.

**Information Reporting Regarding Specified Foreign Financial Assets**

The Act requires individual U.S. Holders (and certain U.S. entities that may be specified in future IRS guidance) with an interest in any "specified foreign financial asset" to file an annual report on new IRS Form 8938 with information relating to the asset, including the maximum value thereof, for any taxable year in which the aggregate value of all such assets is greater than $50,000 (or such higher dollar amount as prescribed by Treasury regulations). Penalties apply to any failure to file IRS Form 8938.  Additionally, in the event a U.S. Holder does not file such form, the statute of limitations on the assessment and collection of United States federal income taxes of such U.S. Holder for the related tax year may not close before the date which is three years after the date such information is filed. You should consult your own tax advisor as to the possible application to you of this information reporting requirement and related statute of limitations tolling provision.

Specified foreign financial assets include any depository or custodial account held at a foreign financial institution; any debt or equity interest in a foreign financial institution if such interest is not regularly traded on an established securities market; and, if not held at a financial institution, (i) any stock or security issued by a non-U.S. person, (ii) any financial instrument or contract held for investment where the issuer or counterparty is a non-U.S. person, and (iii) any interest in an entity which is a non-U.S. person.  Depending on the aggregate value of your investment in specified foreign financial assets, you may be obligated to file an IRS Form 8938 under this provision. The IRS has suspended the requirement to file IRS Form 8938 with income tax returns for returns that are filed before the date of release of IRS Form 8938.  However, following the release of IRS Form 8938, U.S. Holders for which the filing of IRS Form 8938 has been suspended for a taxable year will be required to attach IRS Form 8938 for each suspended taxable year to their next income tax or information return required to be filed with the IRS. Penalties apply to any failure to file a required report.  Additionally, in the event a U.S. Holder does not file the information report relating to disclosure of specified foreign financial assets, the statute of limitations on the assessment and collection of U.S. federal income taxes of such U.S. Holder for the related tax year may not close before such information is filed.  You should consult your own tax advisor as to the possible application to you of this information reporting requirement and related statute of limitations tolling provision.

Exhibit 1

275

PS-64

**Backup Withholding and Information Reporting**

A holder of the securities (whether a U.S. Holder or a Non-U.S. Holder) may be subject to information reporting requirements and to backup withholding with respect to certain amounts paid to such holder unless it provides a correct taxpayer identification number, complies with certain certification procedures establishing that it is not a U.S. Holder or establishes proof of another applicable exemption, and otherwise complies with applicable requirements of the backup withholding rules.

PS-64

Exhibit 1
276

### SUPPLEMENTAL PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST)

As of March 19, 2012, there are outstanding the following:

- $431,500,000 in stated principal amount of the Inverse VIX Short Term ETNs (43,150,000 Inverse VIX Short Term ETNs, reflecting a 10-for-1 split).

- $8,375,000 in stated principal amount of the Inverse VIX Medium Term ETNs (670,000 Inverse VIX Medium Term ETNs, reflecting an 8-for-1 split).

- $95,000,000 in stated principal amount of the Long VIX Short Term ETNs (950,000 Long VIX Short Term ETNs).

- $10,000,000 in stated principal amount of the Long VIX Medium Term ETNs (100,000 Long VIX Medium Term ETNs).

- $4,072,500,000 in stated principal amount of the 2x Long VIX Short Term ETNs (40,725,000 2x Long VIX Short Term ETNs).

- $15,000,000 in stated principal amount of the 2x Long VIX Medium Term ETNs (150,000 2x Long VIX Medium Term ETNs).

Additional ETNs of each series may be issued and sold from time to time at a price that is higher or lower than the stated principal amount, based on the indicative value of the ETNs of such series at that time, through CSSU, acting as principal or as our agent, to investors and to dealers acting as principals for resale to investors. We may also sell ETNs to CSSU for sale directly to investors or for the purpose of lending the ETNs to broker-dealers and other market participants who may have made short sales of such ETNs and who may cover such short positions by borrowing or purchasing ETNs from us or our affiliates. We may issue and sell additional ETNs solely to authorized market makers and we may condition our acceptance of an offer to purchase any series of the ETNs on such market maker's agreement to sell to us specified hedging instruments consistent with our hedging strategy. If these activities are commenced, they may be discontinued at any time.

We intend to receive proceeds equal to 100% of the offering price of the ETNs sold after the Inception Date. Any agent in the initial and any subsequent distribution are expected to charge normal commissions for the purchase of ETNs.

Broker-dealers may make a market in the ETNs of any series, although none of them are obligated to do so and any of them may stop doing so at any time without notice. This pricing supplement (including the accompanying prospectus supplement and prospectus) may be used by such dealers in connection with market-making transactions. In these transactions, dealers may resell an ETN covered by this pricing supplement (including the accompanying prospectus supplement and prospectus) that they acquire from other holders after the original offering and sale of the ETNs of any series, or they may sell an ETN covered by this pricing supplement (including the accompanying prospectus supplement and prospectus) in short sale transactions.

Broker-dealers and other market participants are cautioned that some of their activities, including covering short sales with ETNs borrowed from one of our affiliates, may result in their being deemed participants in the distribution of the ETNs of any series in a manner that would render them statutory underwriters and subject them to the prospectus delivery and liability provisions of the Securities Act of 1933. A determination of whether a particular market participant is an underwriter must take into account all the facts and circumstances pertaining to the activities of the participant in the particular case, and the example mentioned above should not be considered a complete description of all the activities that would lead to designation as an underwriter and subject a market participant to the prospectus-delivery and liability provisions of the Securities Act. This prospectus will be deemed to cover any short sales of ETNs of any series by market participants who cover their short positions with ETNs of such series borrowed or acquired from us or our affiliates in the manner described above.

We have retained VLS Securities, LLC ("**VLS**"), a member of the Financial Industry Regulatory Authority ("**FINRA**"), to provide certain services relating to the placement and marketing of the ETNs of any series. VLS will receive all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing the securities. The actual amount received by VLS in a given year will depend on the number of ETNs of any series then outstanding and the number of other then outstanding ETNs of any series issued by us and marketed and/or placed by VLS. From time to time, VLS and its affiliates have, and in the future may, engage in transactions with and perform services for us for which they have been, and may be, paid customary fees. The terms of our agreement

PS-65

Exhibit 1

277

with VLS give them the right to cause an early acceleration should that agreement be terminated.  VLS or its affiliates are responsible for computing and disseminating the Closing Indicative Value and Intraday Indicative Value.

We may deliver ETNs against payment therefore on a date that is greater than three Business Days following the date of sale of any ETNs. Under Rule 15c6-1 of the Securities Exchange Act of 1934, trades in the secondary market generally are required to settle in three Business Days, unless parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade ETNs that are to be issued more than three Business Days prior to the related issue date will be required to specify alternative settlement arrangements to prevent a failed settlement.

Exhibit 1

278

**BENEFIT PLAN INVESTOR CONSIDERATIONS**

The Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and Section 4975 of the Internal Revenue Code of 1986, (the "Code"), impose certain requirements on (a) employee benefit plans subject to Title I of ERISA, (b) individual retirement accounts, Keogh plans or other arrangements subject to Section 4975 of the Code, (c) entities whose underlying assets include "plan assets" by reason of any such plan's or arrangement's investment therein (we refer to the foregoing collectively as "Plans") and (d) persons who are fiduciaries with respect to Plans. In addition, certain governmental, church and non-U.S. plans ("Non-ERISA Arrangements") are not subject to Section 406 of ERISA or Section 4975 of the Code, but may be subject to other laws that are substantially similar to those provisions (each, a "Similar Law").

In addition to ERISA's general fiduciary standards, Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of a Plan and persons who have specified relationships to the Plan, *i.e.*, "parties in interest" as defined in ERISA or "disqualified persons" as defined in Section 4975 of the Code (we refer to the foregoing collectively as "parties in interest") unless exemptive relief is available under an exemption issued by the U.S. Department of Labor. Parties in interest that engage in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and Section 4975 of the Code. We, and our current and future affiliates, including Credit Suisse Securities (USA) LLC and Credit Suisse International, may be parties in interest with respect to many Plans. Thus, a Plan fiduciary considering an investment in ETNs should also consider whether such an investment might constitute or give rise to a prohibited transaction under ERISA or Section 4975 of the Code. For example, the ETNs may be deemed to represent a direct or indirect sale of property, extension of credit or furnishing of services between us and an investing Plan which would be prohibited if we are a party in interest with respect to the Plan unless exemptive relief were available under an applicable exemption.

In this regard, each prospective purchaser that is, or is acting on behalf of, a Plan, and proposes to purchase ETNs, should consider the exemptive relief available under the following prohibited transaction class exemptions, or PTCEs: (A) the in-house asset manager exemption (PTCE 96-23), (B) the insurance company general account exemption (PTCE 95-60), (C) the bank collective investment fund exemption (PTCE 91-38), (D) the insurance company pooled separate account exemption (PTCE 90-1) and (E) the qualified professional asset manager exemption (PTCE 84-14). In addition, ERISA Section 408(b)(17) and Section 4975(d)(20) of the Code provide a limited exemption for the purchase and sale of ETNs and related lending transactions, provided that neither the issuer of the ETNs nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Plan involved in the transaction and provided further that the Plan pays no more, and receives no less, than adequate consideration in connection with the transaction (the so-called "service provider exemption"). There can be no assurance that any of these statutory or class exemptions will be available with respect to transactions involving the ETNs.

Each purchaser or holder of a security, and each fiduciary who causes any entity to purchase or hold a security, shall be deemed to have represented and warranted, on each day such purchaser or holder holds such ETNs, that either (i) it is neither a Plan nor a Non-ERISA Arrangement and it is not purchasing or holding ETNs on behalf of or with the assets of any Plan or Non-ERISA Arrangement; or (ii) its purchase, holding and subsequent disposition of such ETNs shall not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA, Section 4975 of the Code or any provision of Similar Law.

Fiduciaries of any Plans and Non-ERISA Arrangements should consult their own legal counsel before purchasing the ETNs. We also refer you to the portions of the offering circular addressing restrictions applicable under ERISA, the Code and Similar Law.

Each purchaser of a security will have exclusive responsibility for ensuring that its purchase, holding and subsequent disposition of the security does not violate the fiduciary or prohibited transaction rules of ERISA, the Code or any Similar Law. Nothing herein shall be construed as a representation that an investment in the ETNs would meet any or all of the relevant legal requirements with respect to investments by, or is appropriate for, Plans or Non-ERISA Arrangements generally or any particular Plan or Non-ERISA Arrangement.

Exhibit 1

279

**LEGAL MATTERS**

Davis Polk & Wardwell LLP has acted as special counsel to the agent.  Milbank, Tweed, Hadley & McCloy LLP has acted as special tax counsel to the issuer.

Exhibit 1

280

**ANNEX A**

## FORM OF OFFER FOR REDEMPTION

Email: ETNOrders@velocityshares.com

The undersigned holder of VelocityShares™        Exchange Traded Notes due December 4, 2030  issued by Credit Suisse AG ("**Credit Suisse**") CUSIP No.          (the "**VelocityShares™ ETNs**") hereby irrevocably offers to Credit Suisse for redemption the VelocityShares™ ETNs in the amounts and on the date set forth below as described in the pricing supplement relating to the VelocityShares™ ETNs (the "**Pricing Supplement**").  Terms not defined herein have the meanings given to such terms in the Pricing Supplement.

**Name:**

**DTC Account Number:**

**Ticker:**

**Number of VelocityShares™ ETNs offered for redemption:**

**Desired valuation date:**

In addition to any other requirements specified in the Pricing Supplement being satisfied, the undersigned acknowledges that the VelocityShares™ ETNs specified above will not be redeemed unless (i) this offer for redemption is delivered to VLS Securities, LLC on a Business Day, (ii) the Redemption Agent has responded by sending an acknowledgment of the Redemption Notice accepting the redemption request, (iii) the DTC Participant has booked a "delivery vs. payment" ("**DVP**") trade on the applicable Early Redemption Valuation Date facing Credit Suisse AG, DTC #355, and (iv) the DTC Participant instructs DTC to deliver the DVP trade for settlement via DTC at or prior to 10:00 a.m. New York City time on the applicable Early Redemption Date (the third Business Day following the Early Redemption Valuation Date, subject to postponement if such Early Redemption Valuation Date is not an Index Business Day or if a Market Disruption Event occurs or is continuing on such date).

The undersigned acknowledges that the redemption obligation is solely an obligation of Credit Suisse and VLS Securities, LLC is acting only to facilitate the redemption for Credit Suisse.

A-1

Exhibit 1

281

**Credit Suisse AG,**

**Acting through its Nassau Branch**

**Exchange Traded Notes**

**due December 4, 2030**

**March 23, 2012**

**Credit Suisse**

Exhibit 1

282

PROSPECTUS SUPPLEMENT TO PROSPECTUS DATED MARCH 23, 2012

# Credit Suisse AG

## Senior Medium-Term Notes

## Subordinated Medium-Term Notes

We may offer from time to time our medium-term notes, which may be senior or subordinated (collectively, the "notes"), directly or through any one of our branches.

The notes will bear interest, if any, at either a fixed or a floating rate. Interest will be paid on the dates stated in the applicable pricing supplement.

The notes may be either callable by us or puttable by you, if specified in the applicable pricing supplement.

The specific terms of each note offered will be described in the applicable pricing supplement, and the terms may differ from those described in this prospectus supplement.

Investing in the notes may involve risks. See "Foreign Currency Risks" on page 60 of the accompanying prospectus, the risk factors we describe in the combined Annual Report on Form 20-F of Credit Suisse Group AG and us incorporated by reference herein, and any additional risk factors we describe in future filings we make with the Securities and Exchange Commission, or the SEC, under the Securities Exchange Act of 1934, as amended.

Unless otherwise provided in the applicable pricing supplement, we will sell the notes to the public at 100% of their principal amount. Unless otherwise provided in the applicable pricing supplement, we will receive between 99.875% and 99.250% of the proceeds from the sale of the senior notes and between 99.500% and 99.125% of the proceeds from the sale of the subordinated notes, after paying the agents' commissions or discounts of between 0.125% and 0.750% for senior notes and between 0.500% and 0.875% for subordinated notes; provided that, commissions with respect to notes with a stated maturity of more than thirty years from date of issue will be negotiated at the time of sale.

These notes may be offered directly or to or through underwriters, agents or dealers, including Credit Suisse Securities (USA) LLC, an affiliate of Credit Suisse AG. Because of this relationship, Credit Suisse Securities (USA) LLC would have a "conflict of interest" within the meaning of Rule 5121 of the Financial Industry Regulatory Authority, Inc., or FINRA. If Credit Suisse Securities (USA) LLC or our other U.S.-registered broker-dealer subsidiaries or affiliates participate in the distribution of our securities, we will conduct the offering in accordance with the applicable provisions of FINRA Rule 5121. See "Plan of Distribution (Conflicts of Interest)."

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement or any accompanying prospectus or pricing supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

The notes are not deposit liabilities and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction. Unless otherwise provided in the applicable pricing supplement, the notes will not have the benefit of any agency or governmental guarantee.

# Credit Suisse

**The date of this prospectus supplement is March 23, 2012.**

Exhibit 1

283

## TABLE OF CONTENTS

**PAGE**

### PROSPECTUS SUPPLEMENT

| | |
|---|---|
| DESCRIPTION OF NOTES | S-3 |
| PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST) | S-7 |
| INCORPORATION BY REFERENCE | S-13 |

**PAGE**

### PROSPECTUS

| | |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| LIMITATIONS ON ENFORCEMENT OF U.S. LAWS | 2 |
| WHERE YOU CAN FIND MORE INFORMATION | 3 |
| FORWARD-LOOKING STATEMENTS | 4 |
| USE OF PROCEEDS | 6 |
| RATIO OF EARNINGS TO FIXED CHARGES | 7 |
| CAPITALIZATION AND INDEBTEDNESS | 8 |
| CREDIT SUISSE GROUP | 9 |
| CREDIT SUISSE | 10 |
| CREDIT SUISSE (USA) | 11 |
| THE FINANCE SUBSIDIARIES | 12 |
| DESCRIPTION OF DEBT SECURITIES | 14 |
| DESCRIPTION OF CONTINGENT CONVERTIBLE SECURITIES | 39 |
| DESCRIPTION OF CERTAIN PROVISIONS RELATING TO DEBT SECURITIES AND CONTINGENT CONVERTIBLE SECURITIES | 52 |
| SPECIAL PROVISIONS RELATING TO DEBT SECURITIES OR CONTINGENT CONVERTIBLE SECURITIES DENOMINATED IN A FOREIGN CURRENCY | 57 |
| FOREIGN CURRENCY RISKS | 60 |
| DESCRIPTION OF WARRANTS | 62 |
| DESCRIPTION OF SHARES | 65 |
| DESCRIPTION OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA) | 69 |
| DESCRIPTION OF THE GUARANTEES OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA) | 71 |
| ERISA | 73 |
| TAXATION | 75 |
| PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST) | 92 |
| MARKET-MAKING ACTIVITIES | 94 |
| LEGAL MATTERS | 95 |
| EXPERTS | 96 |

Exhibit 1

284

## DESCRIPTION OF NOTES

**General**

The notes will be direct and unsecured, senior or subordinated, obligations of Credit Suisse AG (Credit Suisse). At our option, we may issue senior notes or subordinated notes. We will issue the senior notes under a senior indenture, dated as of March 29, 2007, as supplemented by a second supplemental indenture, dated as of March 25, 2009, in each case between Credit Suisse and The Bank of New York Mellon (formerly known as The Bank of New York) (together, the "senior indenture"), and we will issue the subordinated notes under a subordinated indenture, dated as of March 29, 2007, as supplemented by a sixth supplemental indenture, dated as of March 25, 2009, in each case between Credit Suisse and The Bank of New York Mellon (formerly known as The Bank of New York) (together, the "subordinated indenture," and together with the senior indenture, the "indentures"). The indentures may be further amended or supplemented from time to time. The following description of the particular terms of the notes offered by this prospectus supplement (referred to in the accompanying prospectus as the debt securities, the senior debt securities or the subordinated debt securities) supplements the description of the general terms and provisions of the debt securities set forth in the accompanying prospectus, which description you should also read. If this description differs in any way from the description in the accompanying prospectus, you should rely on this description.

The following summaries of certain provisions of the indentures do not purport to be complete, and are subject to, and are qualified in their entirety by reference to, all the provisions of the applicable indenture, including the definitions in the applicable indenture of certain terms.

The senior notes will constitute a single series of senior notes under the senior indenture. The subordinated notes will constitute a single series of subordinated notes under the subordinated indenture. The indentures do not limit the amount of senior notes, subordinated notes or other debt securities that we may issue under the indentures.

We will use the accompanying prospectus, this prospectus supplement and any pricing supplement in connection with the offer and sale from time to time of the notes.

The pricing supplement relating to a note will describe the following terms:

- the branch, if any, through which we are issuing the notes;

- the currency or currency unit in which the note is denominated and, if different, the currency or currency unit in which payments of principal and interest on the note will be made (and, if the specified currency is other than U.S. dollars, any other terms relating to that foreign currency denominated note and the specified currency);

- if the note bears interest, whether the note bears a fixed rate of interest or bears a floating rate of interest (including whether the note is a regular floating rate note, a floating rate/fixed rate note or an inverse floating rate note (each as described in the accompanying prospectus));

  - if the note is a fixed rate note, the interest rate and interest payment dates;

  - if the note is a floating rate note, the interest rate basis (or bases), the initial interest rate, the interest reset dates, the interest reset period, the interest payment dates, the index maturity, if any, the spread and/or spread multiplier, if any (each as defined in the accompanying prospectus), the maximum interest rate and minimum interest rate, if any; the index currency, if any, and any other terms relating to the particular method of calculating the interest rate for that note;

- whether the note is senior or subordinated and, if not specified, the note will be senior;

- the issue price;

Exhibit 1

285

- the issue date;

- the maturity date, if any, and whether we can extend the maturity of a note;

- if the note is an indexed note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is a dual currency note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is a renewable note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is a short-term note (as defined in the accompanying prospectus), the terms relating to the particular note;

- if the note is an amortizing note (as defined in the accompanying prospectus), the amortization schedule and any other terms relating to the particular note;

- whether the note is an original issue discount note (as defined in the accompanying prospectus);

- whether the note may be redeemed at our option, or repaid at the option of the holder, prior to its stated maturity as described under "Description of Debt Securities—Redemption at the Option of the Relevant Issuer" and "Description of Debt Securities—Repayment at the Option of the Holders; Repurchase" in the accompanying prospectus and, if so, the provisions relating to redemption or repayment, including, in the case of any original issue discount notes, the information necessary to determine the amount due upon redemption or repayment;

- whether we may be required to pay "additional amounts" in respect of payments on the notes as described under "Description of Debt Securities—Payment of Additional Amounts" in the accompanying prospectus and whether the notes may be redeemed at our option as described under "Description of Debt Securities—Tax Redemption" in the accompanying prospectus;

- any relevant tax consequences associated with the terms of the notes which have not been described under "Taxation" in the accompanying prospectus; and

- any other terms not inconsistent with the provisions of the applicable indenture.

Subject to the additional restrictions described under "Special Provisions Relating to Debt Securities or Contingent Convertible Securities Denominated in a Foreign Currency" in the accompanying prospectus, each note will mature on a day specified in the applicable pricing supplement. Except as may be provided in the applicable pricing supplement and except for indexed notes, all notes will mature at par.

We are offering the notes on a continuing basis in denominations of $2,000 and any integral multiples of $1,000 in excess thereof unless otherwise specified in the applicable pricing supplement, except that notes in specified currencies other than U.S. dollars will be issued in the denominations set forth in the applicable pricing supplement. We refer you to "Special Provisions Relating to Debt Securities or Contingent Convertible Securities Denominated in a Foreign Currency" in the accompanying prospectus.

**Interest and Interest Rates**

Unless otherwise specified in the applicable pricing supplement, each note will bear interest at either:

- a fixed rate specified in the applicable pricing supplement; or

Exhibit 1

286

- a floating rate specified in the applicable pricing supplement determined by reference to an interest rate basis, which may be adjusted by a spread and/or spread multiplier. Any floating rate note may also have either or both of the following:

  - a maximum interest rate limitation, or ceiling, on the rate at which interest may accrue during any interest period; and

  - a minimum interest rate limitation, or floor, on the rate at which interest may accrue during any interest period.

In addition, the interest rate on floating rate notes will in no event be higher than the maximum rate permitted by New York or other applicable state law, as such law may be modified by United States law of general application.

Unless otherwise specified in the applicable pricing supplement for a fixed rate note, in the event that any date for any payment on any fixed rate note is not a business day, payment of interest, premium, if any, or principal otherwise payable on such fixed rate note will be made on the next succeeding business day. Credit Suisse will not pay any additional interest as a result of the delay in payment.

Unless otherwise specified in the applicable pricing supplement for a floating rate note, if an interest payment date (other than the maturity date, but including any redemption date or repayment date) would fall on a day that is not a business day (as defined in the accompanying prospectus), such interest payment date (or redemption date or repayment date) will be the following day that is a business day, and interest shall accrue to, and be payable on, such following business day, except that if the interest rate basis is LIBOR and such business day falls in the next calendar month, the interest payment date (or redemption date or repayment date) will be the immediately preceding day that is a business day and interest shall accrue to, and be payable on, such preceding business day.

Unless otherwise specified in the applicable pricing supplement for a floating rate note, if the maturity date falls on a day that is not a business day, the required payment of principal, premium, if any, and interest shall be made on the next succeeding business day with the same force and effect as if made on the date such payment was due, and interest shall not accrue and be payable with respect to such payment for the period from and after the maturity date to the date of such payment on the next succeeding business day.

### Subordination

Unless otherwise specified in the applicable pricing supplement, the subordinated notes will be direct, unconditional, unsecured and subordinated obligations of Credit Suisse. In the event of any dissolution, liquidation or winding-up of Credit Suisse, in bankruptcy or otherwise, the payment of principal and interest on the subordinated notes will be subordinated to the prior payment in full of all of Credit Suisse's present and future unsubordinated creditors but not further or otherwise.

Credit Suisse may not create or permit to exist any pledge or other security interest over Credit Suisse's assets to secure Credit Suisse's obligations in respect of any subordinated notes.

Subject to applicable law, no holder of subordinated notes shall be entitled to exercise, claim or plead any right of set-off, compensation or retention in respect of any amount owed to it by Credit Suisse or by the branch through which it has issued the subordinated notes, arising under or in connection with a tranche of subordinated notes and each holder shall, by virtue of being a holder of such notes, be deemed to have waived all such rights of set-off, compensation or retention.

S-5

Exhibit 1

287

**Currency Indemnity**

If the notes are denominated in U.S. dollars, the U.S. dollar will be the sole currency of account and payment for all sums payable by Credit Suisse under or in connection with such notes, including damages. Any amount received or recovered in a currency other than the U.S. dollar by any holder in respect of any sum expressed to be due to it from Credit Suisse shall only constitute a discharge to Credit Suisse to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any such note, Credit Suisse shall indemnify it against any resulting loss sustained by the recipient. In any event, Credit Suisse shall indemnify the recipient against the cost of making any such purchase. For the purposes of this condition, it will be sufficient for a holder to demonstrate that it would have suffered a loss had an actual purchase been made. These indemnities constitute a separate and independent obligation from Credit Suisse's other obligations, shall be subordinated to the claims of Credit Suisse's unsubordinated creditors to the same extent as the notes, shall give rise to a separate and independent cause of action, shall apply irrespective of any waiver granted by any holder of the notes and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under the notes or any other judgment or order.

**Governing Law**

The notes and the indentures will be governed by and construed in accordance with the laws of the State of New York, except for, in the case of subordinated notes, the subordination provisions thereof, which will be governed by Swiss law.

**Other Provisions; Addenda**

Any provisions with respect to notes, including the determination of an interest rate basis, the specification of interest rates bases, calculation of the interest rate applicable to a floating rate note, interest payment dates or any other matter relating thereto may be modified by the terms specified under "Other Provisions" on the face of the note in an addendum relating thereto, if so specified on the face thereof and in the applicable pricing supplement.

**Book-Entry, Delivery and Form**

We will issue the notes in the form of one or more fully registered global certificates, or global notes. Unless we state otherwise in the applicable pricing supplement, we will deposit the notes with, or on behalf of, The Depository Trust Company, New York, New York, or DTC, as the depositary, and will register the notes in the name of Cede & Co., DTC's nominee. Your beneficial interests in the global notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. Except under the circumstances described in the accompanying prospectus under the caption "Description of Certain Provisions Relating to Debt Securities and Contingent Convertible Securities—Book-Entry System," book-entry notes will not be exchangeable for certificated notes and will not otherwise be issuable as certificated notes.

Unless we state otherwise in an applicable pricing supplement, you may elect to hold interests in the global securities through either DTC (in the United States) or Clearstream Banking, société anonyme, which we refer to as Clearstream, Luxembourg, or Euroclear Bank, S.A./N.V., or its successor, as operator of the Euroclear System, which we refer to as Euroclear (outside of the United States), if you are participants of such systems, or indirectly through organizations which are participants in such systems. Interests held through Clearstream, Luxembourg and Euroclear will be

S-6

Exhibit 1

288

recorded on DTC's books as being held by the U.S. depositary for each of Clearstream, Luxembourg and Euroclear, which U.S. depositaries will in turn hold interests on behalf of their participants' customers' securities accounts.

For a further description of procedures regarding global securities representing book-entry notes, we refer you to "Description of Certain Provisions Relating to Debt Securities and Contingent Convertible Securities—Book-Entry System" in the accompanying prospectus.

### PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST)

Under the terms of a distribution agreement for senior notes dated May 7, 2007, and a distribution agreement for subordinated notes dated March 25, 2009 (together, the "distribution agreements"), we are offering the applicable notes on a continuing basis through Credit Suisse Securities (USA) LLC, which we refer to as the agent, which has agreed to use its reasonable efforts to solicit purchases of the notes. Except as otherwise agreed by us and the agent with respect to a particular note, we will pay the agent a commission or discount ranging from 0.125% to 0.750% of the principal amount of each senior note and a commission or discount ranging from 0.500% to 0.875% of the principal amount of each subordinated note, depending on its maturity, sold through the agent. We will have the sole right to accept offers to purchase notes and may reject any offer in whole or in part. The agent shall have the right, in its sole discretion, to reject any offer to purchase notes received by it, in whole or in part, that it reasonably considers to be unacceptable.

We also may sell notes to the agent, acting as principal, at a discount or concession to be agreed upon at the time of sale, for resale to one or more investors or other purchasers at a fixed offering price or at varying prices related to prevailing market prices at the time of such resale or otherwise, as determined by the agent and specified in the applicable pricing supplement. The agent may offer the notes it has purchased as principal to other dealers. The agent may sell notes to any dealer at a discount and, unless otherwise specified in the applicable pricing supplement, the discount allowed to any dealer will not be in excess of the discount to be received by the agent from us. Unless otherwise indicated in the applicable pricing supplement, any note sold to the agent as principal will be purchased by the agent at a price equal to 100% of the principal amount less a percentage equal to the commission applicable to any agency sale of a note of identical maturity, and may be resold by the agent to investors and other purchasers from time to time in one or more transactions, including negotiated transactions as described above. After the initial public offering of notes to be resold to investors and other purchasers, the public offering price, concession and discount may be changed.

We may also sell notes directly to investors (other than broker-dealers) in those jurisdictions in which we are permitted to do so. We will not pay any commission on any notes we sell directly. We may also sell notes to one or more banks, acting as agents for their customers, in jurisdictions where we are permitted to do so. Unless otherwise indicated in the applicable pricing supplement, any note sold to a bank as agent for its customer will be sold at a price equal to 100% of the principal amount and we, or one of our affiliates, will pay such bank a commission equal to the commission applicable to a sale of a note of identical maturity through the agent.

We may appoint, from time to time, one or more additional agents with respect to particular notes or with respect to the senior or subordinated notes in general, acting either as agent or principal, on substantially the same terms as those applicable to sales of notes to or through Credit Suisse Securities (USA) LLC pursuant to the distribution agreements.

We reserve the right to withdraw, cancel or modify the offer made hereby without notice.

Each purchaser of a note will arrange for payment as instructed by the agent. The agent is required to deliver the proceeds of the notes to us in immediately available funds, to a bank designated by us in accordance with the terms of the distribution agreement, on the date of settlement.

Exhibit 1

289

We estimate that the total expenses for the offering, excluding underwriting commissions, discounts and SEC registration fees (which are deferred in accordance with Rules 456(b) and 457(r)) will be approximately $500,000.

The agent, whether acting as agent or principal, may be deemed to be an "underwriter" within the meaning of the Securities Act of 1933, as amended, or the Securities Act. We have agreed to indemnify the agent against liabilities under the Securities Act, or contribute to payments which the agent may be required to make in that respect. We have also agreed to reimburse the agent for certain expenses.

No note will have an established trading market when issued. Unless otherwise specified in the applicable pricing supplement, the notes will not be listed on a national securities exchange in the United States. We have been advised that Credit Suisse Securities (USA) LLC intends to make a market in the notes, as permitted by applicable laws and regulations. Credit Suisse Securities (USA) LLC is not obligated to do so, however, and may discontinue making a market at any time without notice. No assurance can be given as to how liquid the trading market for the notes will be.

Any of our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, may use this prospectus supplement, together with the accompanying prospectus and applicable pricing supplement, in connection with offers and sales of notes related to market-making transactions by and through our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, at negotiated prices related to prevailing market prices at the time of sale or otherwise. Any of our broker-dealer subsidiaries and affiliates, including Credit Suisse Securities (USA) LLC, may act as principal or agent in such transactions. None of our broker-dealer subsidiaries and affiliates has any obligation to make a market in the notes and may discontinue any market-making activities at any time without notice, at its sole discretion.

**Conflicts of Interest**

Credit Suisse Securities (USA) LLC, one of our wholly-owned subsidiaries, is the agent for offers and sales of the notes and the offering of the notes is therefore being conducted in accordance with the applicable provisions of FINRA Rule 5121. No broker-dealer will confirm initial sales to accounts over which it exercises discretionary authority without the prior written approval of the customer. We refer you to "Plan of Distribution (Conflicts of Interest)—Conflicts of Interest" in the accompanying prospectus.

No action has been or will be taken by us or the agent that would permit a public offering of the notes or possession or distribution of this prospectus supplement and the accompanying prospectus or any pricing supplement in any jurisdiction other than the United States except in accordance with the distribution agreements.

Concurrently with the offering of the notes through the agent as described in this prospectus supplement, we may issue other securities from time to time as described in the accompanying prospectus.

Our agents and their affiliates have engaged and may in the future engage in commercial banking and investment banking and other transactions with us and our affiliates in the ordinary course of business.

**Selling Restrictions**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") an offer of securities to the public may not be made in that Relevant Member State except that an offer of securities to the public in that Relevant Member State may be made at

Exhibit 1

290

any time with effect from and including the Relevant Implementation Date under the following exemptions under the Prospectus Directive:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;

- to fewer than 100 or, if the Relevant Member State has implemented the relevant provisions of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant dealer or underwriter nominated by the relevant issuer for any such offer; or

- in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of securities shall require the relevant issuer or any dealer or underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of securities to the public" in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe for the securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State. The expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in the Relevant Member State. The expression "2010 PD Amending Directive" means Directive 2010/73/EU.

In addition, each underwriter or agent will represent, warrant and agree that:

a) the notes may not be publicly offered, sold or advertised, directly or indirectly, in, into or from Switzerland and will not be listed on the SIX Swiss Exchange or on any other exchange or regulated trading facility in Switzerland. Neither this prospectus supplement nor any other offering or marketing material relating to the notes constitutes a prospectus as such term is understood pursuant to article 652a or article 1156 of the Swiss Code of Obligations or a listing prospectus within the meaning of the listing rules of the SIX Swiss Exchange or any other regulated trading facility in Switzerland or a simplified prospectus as such term is defined in the Swiss Collective Investment Scheme Act, and neither this prospectus supplement nor any other offering or marketing material relating to the notes may be publicly distributed or otherwise made publicly available in Switzerland. Neither this prospectus supplement nor any other offering or marketing material relating to the offering, Credit Suisse or Credit Suisse Group AG or the notes have been or will be filed with or approved by any Swiss regulatory authority. The notes are not subject to the supervision by any Swiss regulatory authority, e.g., the Swiss Financial Market Supervisory Authority, or "FINMA," and investors in the notes will not benefit from protection or supervision by such authority;

b) (i) no prospectus (including any amendment, supplement or replacement thereto) has been prepared in connection with the offering of the notes that has been approved by the Autorité des marchés financiers or by the competent authority of another State that is a contracting party to the Agreement on the European Economic Area and notified to the Autorité des marchés financiers, and (ii) it has not offered or sold and will not offer or sell, directly or indirectly, the notes to the public in France, and has not distributed or caused to be distributed and will not distribute or cause to be distributed to the public in France, this prospectus supplement or any other offering material relating to the notes, and that such offers, sales and distributions have been and shall only be made in France to persons licensed to provide the investment service of portfolio management for the account of third parties,

Exhibit 1
291

qualified investors (investisseurs qualifiés) and/or a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in Articles L. 411-2, D. 411-1, D. 411-2, D. 411-4, D.744-1, D. 754-1 and D. 764-1 of the Code monétaire et financier. The direct or indirect distribution to the public in France of any so acquired notes may be made only as provided by Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 to L. 621-8-3 of the Code monétaire et financier and applicable regulations thereunder;

c)    it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (ii) it has not offered or sold and will not offer or sell the notes other than to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or as agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the notes would otherwise constitute a contravention of Section 19 of the Financial Services and Markets Act 2000 (the "FSMA") by the Issuer;

d)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of the notes in circumstances in which Section 21(1) of the FSMA does not apply to the relevant issuer;

e)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom;

f)    the notes have not been and will not be registered under the Financial Instruments and Exchange Law of Japan. Each underwriter or agent has represented and agreed that it has not offered or sold, and will not offer or sell any notes directly or indirectly in Japan or to, or for the benefit of, any Japanese person or to others, for re-offering or resale directly or indirectly in Japan or to any Japanese person, except in each case pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law of Japan and any other applicable laws and regulations of Japan. For purposes of this paragraph, "Japanese person" means any person resident in Japan, including any corporation or other entity organized under the laws of Japan;

g)    the notes have not been offered or sold, and will not be offered or sold, in Hong Kong, by means of any document, other than (i) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) (the "SFO") and any rules made thereunder, or (ii) in circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance of Hong Kong (Cap 32, Laws of Hong Kong) (the "CO") or (iii) in other circumstances which do not constitute an offer or invitation to the public within the meaning of the CO or the SFO; and it has not issued and will not issue any advertisement, invitation or document relating to the notes and has not caused and shall not cause such to be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which advertisement, invitation or document relating to such notes is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to the notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the SFO and any rules made thereunder;

Exhibit 1

292

h)   this prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275, of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where notes are subscribed or purchased under Section 275 by a relevant person which is:

i. a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

ii. a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor, securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within 6 months after that corporation or that trust has acquired the securities pursuant to an offer made under Section 275 except:

1)   to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

2)   where no consideration is or will be given for the transfer;

3)   where the transfer is by operation of law; or

4)   as specified in Section 276(7) of the SFA.

i)   this prospectus has not been and will not be circulated or distributed in the People's Republic of China (excluding Hong Kong, Macau and Taiwan, the "PRC"), and the notes have not been offered or sold, and will not be offered or sold, directly or indirectly, to any resident of the PRC, or to any person for re-offering or re-sale, directly or indirectly, to any resident of the PRC, except pursuant to applicable laws and regulations of the PRC;

j)   no prospectus or other disclosure document (as defined in the Corporations Act 2001 of Australia (the "Corporations Act")) in relation to the securities has been, or will be, lodged with the Australian Securities and Investments Commission ("ASIC") or the Australian securities exchange operated by ASX Limited ("ASX Limited").

Each underwriter and agent has represented and agreed that (unless a prospectus supplement or pricing supplement otherwise provides) it:

i. has not offered, and will not offer for issue or sale and has not invited, and will not invite applications for issue, or offers to purchase, the securities in Australia (including an offer or invitation which is received by a person in Australia); and

ii. has not distributed or published, and will not distribute or publish, any draft, preliminary or definitive prospectus, supplement, advertisement or any other offering material relating to the securities in Australia,

Exhibit 1

293

unless:

1) the aggregate consideration payable by each offeree or invitee is at least A$500,000 (or its equivalent in other currencies but, in either case, disregarding moneys lent by the offeror or its associates);

2) the offer or invitation otherwise does not require disclosure to investors under Parts 6D.2 or 7.9 of the Corporations Act;

3) the offer does not constitute an offer to a "retail client" for the purposes of section 761G of the Corporations Act;

4) such action complies with all applicable laws, regulations and directives (including, without limitation, the licensing requirements of Chapter 7 of the Corporations Act); and

5) such action does not require any document to be lodged with ASIC or ASX.

Section 708(19) of the Corporations Act provides that an offer of debentures for issue or sale does not need disclosure to investors under Part 6D.2 of the Corporations Act if the issuer is an Australian ADI (as defined in the Corporations Act). As at the date of this prospectus supplement Credit Suisse AG is an Australian ADI.

In addition, in the event that an Australian branch of Credit Suisse (the "Australian Issuer") issues notes (the "Australian notes"), each underwriter may be required to agree to offer the Australian notes in a particular manner in order to allow payments of interest, or amounts in the nature of interest, on the Australian notes to be exempt from withholding tax under section 128F of the Income Tax Assessment Act of 1936 of Australia and to give certain representations and warranties in favor of the Issuer in this regard;

k) it has not offered or sold, and will not offer or sell, any notes, directly or indirectly, in Canada or any province or territory thereof or to, or for the benefit of, any resident of Canada in contravention of the securities laws and regulations of the provinces and territories of Canada and represents that any offer of the notes in Canada will be made only pursuant to an exemption from the requirement to file a prospectus in the province or territory of Canada in which such offer is made; and that it has not and it will not distribute or deliver this prospectus supplement or any other offering material relating to the notes in Canada or to any resident of Canada in contravention of the securities law and regulations of the provinces and territories of Canada;

l) the notes have not been and will not be registered with the National Securities Registry (*Registro Nacional de Valores*) maintained by the National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores,* or the "CNBV"), and may not be offered or sold publicly, or otherwise be the subject of brokerage activities, in Mexico, except pursuant to a private placement exemption set forth under Article 8 of the Mexican Securities Market Law (*Ley del Mercado de Valores*). The information relating to the notes contained in this prospectus supplement or any accompanying prospectus or pricing supplement is exclusively the responsibility of Credit Suisse and has not been filed, reviewed or authorized by the CNBV. In making an investment decision, all investors, including any Mexican investors who may acquire notes from time to time, must rely on their own review and examination of the information contained in this prospectus supplement and any accompanying prospectus or pricing supplement; and

m) the notes may not be offered or sold to or be held by any person resident for the purposes of the Income Tax (Guernsey) Law 1975 in the Islands of Guernsey, Alderney or Herm, Channel Islands.

Exhibit 1
294

This document is only being distributed to and is only directed at (i) persons who are outside the United Kingdom or (ii) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (iii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). The notes are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such notes will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

## INCORPORATION BY REFERENCE

We file annual and current reports and other information with the SEC. For information on the documents we incorporate by reference in this prospectus supplement and the accompanying prospectus, we refer you to "Where You Can Find More Information" on page 3 of the accompanying prospectus.

We incorporate by reference in this prospectus supplement our report on Form 6-K dated March 21, 2012 and the combined Annual Report on Form 20-F of Credit Suisse Group AG and us for the year ended December 31, 2011 and any future documents we file with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act from the date of this prospectus supplement until the offering of the securities is completed.

Exhibit 1

295

# Credit Suisse Group AG
**Debt Securities**
**Warrants**
**Guarantees**

# Credit Suisse AG
**Debt Securities**
**Warrants**
**Guarantees**

# Credit Suisse (USA), Inc.
**Certain Guaranteed Senior Debt Securities issued previously and further described herein**

# Credit Suisse Group (Guernsey) I Limited
**Senior or Subordinated Guaranteed Exchangeable or Convertible Debt Securities**

# Credit Suisse Group (Guernsey) III Limited
**Senior or Subordinated Guaranteed Exchangeable or Convertible Debt Securities**

Credit Suisse Group AG (Credit Suisse Group) or Credit Suisse AG (Credit Suisse) (in each case, acting through its head office or any one of its branches) may from time to time offer to sell debt securities, which may consist of senior and subordinated notes or other types of debt, including debt convertible into or exchangeable for shares or American depositary shares of Credit Suisse Group (in the case of Credit Suisse Group only), securities of any entity unaffiliated with Credit Suisse Group, a basket of such securities, an index or indices of such securities or any combination of the foregoing.

In addition, Credit Suisse Group or Credit Suisse (in each case, acting through its head office or any one of its branches) may from time to time offer to sell warrants or warrants in the form of subscription rights to purchase equity securities (in the case of Credit Suisse Group only) or debt securities of Credit Suisse Group, securities of any entity unaffiliated with Credit Suisse Group, a basket of such securities, an index or indices of such securities or any combination of the foregoing.

Credit Suisse Group (Guernsey) I Limited or Credit Suisse Group (Guernsey) III Limited may from time to time offer to sell senior or subordinated guaranteed exchangeable or convertible debt securities, convertible or exchangeable into shares or American depositary shares, as specified in the applicable prospectus supplement, of Credit Suisse Group, which we refer to in this prospectus as "contingent convertible securities." Such contingent convertible securities will be fully and unconditionally guaranteed by Credit Suisse Group.

Credit Suisse Group may from time to time offer to sell senior or subordinated guarantees of contingent convertible securities in conjunction with the issuance and sale of the contingent convertible securities issued by Credit Suisse Group (Guernsey) I Limited or Credit Suisse Group (Guernsey) III Limited.

Credit Suisse Group and Credit Suisse have fully and unconditionally guaranteed all the obligations of Credit Suisse (USA), Inc. (Credit Suisse (USA)) under its guaranteed senior debt securities, or the Guaranteed Senior Debt Securities, further described in "Description of the Guaranteed Senior Debt Securities of Credit Suisse (USA)" and "Description of the Guarantees of the Guaranteed Senior Debt Securities of Credit Suisse (USA)." The obligations of Credit Suisse Group under its guarantees of these securities are subordinated as described in this prospectus.

We will provide the specific terms of these securities in supplements to this prospectus. You should read this prospectus and any supplement carefully before you invest. We will not use this prospectus to issue any securities unless it is attached to a prospectus supplement.

Unless we state otherwise in a prospectus supplement, we will not list any of these securities on a securities exchange.

These securities may be offered directly or to or through underwriters, agents or dealers, including Credit Suisse Securities (USA) LLC, an affiliate of Credit Suisse Group, Credit Suisse, Credit Suisse Group (Guernsey) I Limited and Credit Suisse Group (Guernsey) III Limited. Because of this relationship, Credit Suisse Securities (USA) LLC would have a "conflict of interest" within the meaning of Rule 5121 of the Financial Industry Regulatory Authority, Inc., or FINRA. If Credit Suisse Securities (USA) LLC or our other U.S.-registered broker-dealer subsidiaries or affiliates participate in the distribution of our securities, we will conduct the offering in accordance with the applicable provisions of FINRA Rule 5121. See "Plan of Distribution (Conflicts of Interest)—Conflicts of Interest." The names of any other underwriters, agents or dealers will be included in a supplement to this prospectus.

**Investing in our securities involves risks. We may include specific risk factors in an applicable prospectus supplement under the heading "Risk Factors."**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus or any accompanying prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.

The debt securities of Credit Suisse Group, the debt securities of Credit Suisse, the contingent convertible securities of Credit Suisse Group (Guernsey) I Limited and the contingent convertible securities of Credit Suisse Group (Guernsey) III Limited are not deposit liabilities and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland, the Bailiwick of Guernsey or any other jurisdiction. Unless otherwise provided in the applicable prospectus supplement, the debt securities and the contingent convertible securities will not have the benefit of any agency or governmental guarantee.

Our registered shares are listed on the SIX Swiss Exchange under the symbol "CSGN" and, in the form of American depositary shares, on the New York Stock Exchange under the symbol "CS." The last reported sale price of our shares on March 22, 2012 was CHF 26.08 and the last reported sale price of our American depositary shares on March 22, 2012 was USD 28.50.

Any of our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, may use this prospectus and our prospectus supplements in connection with offers and sales of our securities, including outstanding securities of Credit Suisse (USA), in connection with market-making transactions by and through our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, at prices that relate to the prevailing market prices of our securities at the time of the sale or otherwise. Any of our broker-dealer subsidiaries and affiliates, including Credit Suisse Securities (USA) LLC, may act as principal or agent in these transactions. None of our broker-dealer subsidiaries and affiliates has any obligation to make a market in any of our offered securities and may discontinue any market-making activities at any time without notice, at its sole discretion.

# Credit Suisse

The date of this prospectus is March 23, 2012.

Exhibit 1
296

## TABLE OF CONTENTS

| | Page |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| LIMITATIONS ON ENFORCEMENT OF U.S. LAWS | 2 |
| WHERE YOU CAN FIND MORE INFORMATION | 3 |
| FORWARD-LOOKING STATEMENTS | 4 |
| USE OF PROCEEDS | 6 |
| RATIO OF EARNINGS TO FIXED CHARGES | 7 |
| CAPITALIZATION AND INDEBTEDNESS | 8 |
| CREDIT SUISSE GROUP | 9 |
| CREDIT SUISSE | 10 |
| CREDIT SUISSE (USA) | 11 |
| THE FINANCE SUBSIDIARIES | 12 |
| DESCRIPTION OF DEBT SECURITIES | 14 |
| DESCRIPTION OF CONTINGENT CONVERTIBLE SECURITIES | 39 |
| DESCRIPTION OF CERTAIN PROVISIONS RELATING TO DEBT SECURITIES AND CONTINGENT CONVERTIBLE SECURITIES | 52 |
| SPECIAL PROVISIONS RELATING TO DEBT SECURITIES OR CONTINGENT CONVERTIBLE SECURITIES DENOMINATED IN A FOREIGN CURRENCY | 57 |
| FOREIGN CURRENCY RISKS | 60 |
| DESCRIPTION OF WARRANTS | 62 |
| DESCRIPTION OF SHARES | 65 |
| DESCRIPTION OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA) | 69 |
| DESCRIPTION OF THE GUARANTEES OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA) | 71 |
| ERISA | 73 |
| TAXATION | 75 |
| PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST) | 92 |
| MARKET-MAKING ACTIVITIES | 94 |
| LEGAL MATTERS | 95 |
| EXPERTS | 96 |

---

WE ARE RESPONSIBLE FOR THE INFORMATION CONTAINED AND INCORPORATED BY REFERENCE IN THIS PROSPECTUS. AT THE DATE OF THIS PROSPECTUS, WE HAVE NOT AUTHORIZED ANYONE ELSE TO PROVIDE YOU WITH DIFFERENT INFORMATION, AND WE TAKE NO RESPONSIBILITY FOR ANY OTHER INFORMATION OTHERS MAY GIVE YOU. WE ARE NOT MAKING AN OFFER OF THESE SECURITIES IN ANY STATE WHERE THE OFFER IS NOT PERMITTED. YOU SHOULD NOT ASSUME THAT THE INFORMATION IN THIS PROSPECTUS OR ANY PROSPECTUS SUPPLEMENT IS ACCURATE AS OF ANY DATE OTHER THAN THE DATE ON THE FRONT OF THIS DOCUMENT.

Exhibit 1
297

## ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement on Form F-3 that we filed with the Securities and Exchange Commission, or the SEC, using a "shelf" registration process. Under this shelf process, we may sell any combination of the securities described in this prospectus in one or more offerings. This prospectus provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with the additional information described under the heading "Where You Can Find More Information."

Unless the context otherwise requires and except as otherwise indicated:

- in this prospectus, the terms "we," "our," and "us" refer to Credit Suisse Group and include Credit Suisse Group's wholly-owned bank subsidiary, Credit Suisse, the finance subsidiaries and our other subsidiaries; and

- in the sections of this prospectus titled "Description of Debt Securities," the terms "we," "our," and "us" refer to each of Credit Suisse Group and Credit Suisse, as applicable, as issuer of the debt securities; and

- in the sections of this prospectus titled "Description of Contingent Convertible Securities" the terms "we," "our," and "us" refer to each of the finance subsidiaries, as applicable, as issuer, and Credit Suisse Group, as guarantor, of the contingent convertible securities; and

- in the sections of this prospectus titled "Description of Certain Provisions Relating to Debt Securities and Contingent Convertible Securities," "Special Provisions Relating to Debt Securities or Contingent Convertible Securities Denominated in a Foreign Currency" and "Foreign Currency Risks," the terms "we," "our," and "us," when used in reference to the debt securities, refer to each of Credit Suisse Group and Credit Suisse, as applicable, as issuer of the debt securities and, when used in reference to the contingent convertible securities, refer to each of the finance subsidiaries, as applicable, as issuer, and Credit Suisse Group, as guarantor, of the contingent convertible securities; and

- in the section of this prospectus entitled "Description of Warrants," the terms "we," "our," and "us" refer to Credit Suisse Group or Credit Suisse, as issuer of the securities described in that section; and

- in the section of this prospectus entitled "Description of Shares," the terms "we," "our" and "us" refer to Credit Suisse Group, as issuer of the securities described in that section, on a consolidated basis.

In this prospectus, the term "finance subsidiary" refers to Credit Suisse Group (Guernsey) I Limited or Credit Suisse Group (Guernsey) III Limited, as the context may require, each of which is a Guernsey incorporated non-cellular company limited by shares, which may issue contingent convertible securities fully and unconditionally guaranteed by Credit Suisse Group. Credit Suisse Group (Guernsey) I Limited and Credit Suisse Group (Guernsey) III Limited are each wholly-owned subsidiaries of Credit Suisse Group. Credit Suisse Group will fully and unconditionally guarantee any contingent convertible securities issued by each of the finance subsidiaries pursuant to this registration statement. There are various legal and regulatory requirements, including the satisfaction of a solvency test under Guernsey law, applicable to some of Credit Suisse Group's subsidiaries that limit their ability to pay dividends or distributions and make loans and advances to Credit Suisse Group.

Credit Suisse Group's and Credit Suisse's consolidated financial statements, which are incorporated by reference into this prospectus, have been prepared in accordance with accounting principles

Exhibit 1

298

generally accepted in the United States of America, which we refer to as U.S. GAAP. Credit Suisse Group's and Credit Suisse's financial statements are denominated in Swiss francs, the legal tender of Switzerland. When we refer to "CHF," we mean Swiss francs. When we refer to "USD" or "$," we mean U.S. dollars. On March 16, 2012, the Swiss franc to U.S. dollar exchange rate was 0.9160 Swiss francs = 1 U.S. dollar.

Credit Suisse Group does not expect the finance subsidiaries to file reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, with the SEC.

As permitted by Rule 12h-5 under the Exchange Act, Credit Suisse (USA) no longer files reports under the Exchange Act with the SEC. In accordance with Rule 3-10 of Regulation S-X under the Securities Act of 1933, as amended, or the Securities Act, Credit Suisse Group's financial statements include condensed consolidating financial information for Credit Suisse (USA) in a footnote to those financial statements.

## LIMITATIONS ON ENFORCEMENT OF U.S. LAWS

Credit Suisse Group is a holding company for financial services companies domiciled in Switzerland and Credit Suisse is a bank domiciled in Switzerland. Many of their directors and executive officers (as well as certain directors, managers and executive officers of the finance subsidiaries), and certain experts named in this prospectus, are resident outside the United States, and all or a substantial portion of their assets and the assets of such persons are located outside the United States. As a result, it may be difficult for you to serve legal process on Credit Suisse Group, Credit Suisse or their respective directors and executive officers (as well as certain directors, managers and executive officers of the finance subsidiaries) or have any of them appear in a U.S. court. We have been advised by Homburger AG, Swiss counsel to Credit Suisse Group and Credit Suisse, and Carey Olsen, Guernsey counsel to the finance subsidiaries, that, due to the lack of reciprocal legislation between Switzerland, Guernsey and the United States, there is doubt as to enforceability in Switzerland and Guernsey, as applicable, in original actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the federal securities laws of the United States.

Exhibit 1
299

## WHERE YOU CAN FIND MORE INFORMATION

Credit Suisse Group and Credit Suisse file periodic reports and other information with the SEC. You may read and copy any document Credit Suisse Group or Credit Suisse files at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference room. In addition, the SEC maintains an Internet site at *http://www.sec.gov* that contains information regarding issuers that file electronically with the SEC. Reports and other information concerning the business of Credit Suisse Group or Credit Suisse may also be inspected at the offices of the New York Stock Exchange at 11 Wall Street, New York, New York 10005.

The SEC allows Credit Suisse Group and Credit Suisse to "incorporate by reference" the information they file with the SEC, which means that Credit Suisse Group and Credit Suisse can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that Credit Suisse Group and Credit Suisse file later with the SEC and which is incorporated by reference will automatically update and supersede this information.

Credit Suisse Group and Credit Suisse incorporate by reference into the registration statement of which this prospectus forms a part their report on Form 6-K dated March 21, 2012 and their combined annual report on Form 20-F for the year ended December 31, 2011 as filed with the SEC and any future filings they make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act. Credit Suisse Group's and Credit Suisse's reports on Form 6-K filed with the SEC after the date of this prospectus (or portions thereof) are incorporated by reference in this prospectus only to the extent that the reports expressly state such reports are filed (and not furnished) with the SEC and Credit Suisse Group or Credit Suisse, as the case may be, incorporates them (or such portions) by reference in the registration statement of which this prospectus forms a part.

You may request a copy of these filings, at no cost, by writing or telephoning Credit Suisse Group or Credit Suisse at their principal executive offices at the following address:

<table>
<tr><td>Credit Suisse Group AG</td><td>Credit Suisse AG</td></tr>
<tr><td>Paradeplatz 8</td><td>Paradeplatz 8</td></tr>
<tr><td>CH 8001 Zurich, Switzerland</td><td>CH 8001 Zurich, Switzerland</td></tr>
<tr><td>Attention: Investor Relations</td><td>Attention: Investor Relations</td></tr>
<tr><td>+41 44 212 1616</td><td>+41 44 333 1111</td></tr>
</table>

Internet: *https://www.credit-suisse.com/investors/en/*

We are not incorporating the contents of the website into this prospectus.

We have filed or incorporated by reference exhibits to the registration statement of which this prospectus forms a part. You should read the exhibits carefully for provisions that may be important to you.

3

Exhibit 1

300

## FORWARD-LOOKING STATEMENTS

This prospectus, any prospectus supplement and the information incorporated by reference in this prospectus include forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. You should not place undue reliance on these statements. In addition, in the future we, and others on our behalf, may make statements that constitute forward-looking statements. Such forward-looking statements may include, without limitation, statements relating to the following:

- our plans, objectives or goals;

- our future economic performance or prospects;

- the potential effect on our future performance of certain contingencies; and

- assumptions underlying any such statements.

Words such as "believes," "anticipates," "expects," "intends" and "plans" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. We do not intend to update these forward-looking statements except as may be required by applicable securities laws.

By their very nature, forward-looking statements involve inherent risks and uncertainties, both general and specific, and risks exist that predictions, forecasts, projections and other outcomes described or implied in forward-looking statements will not be achieved. We caution you that a number of important factors could cause results to differ materially from the plans, objectives, expectations, estimates and intentions expressed in such forward-looking statements. These factors include:

- the ability to maintain sufficient liquidity and access capital markets;

- market and interest rate fluctuations and interest rate levels;

- the strength of the global economy in general and the strength of the economies of the countries in which we conduct our operations, in particular the risk of continued slow economic recovery or downturn in the US or other developed countries in 2012 and beyond;

- the direct and indirect impacts of continuing deterioration or slow recovery in residential and commercial real estate markets;

- adverse rating actions by credit rating agencies in respect of sovereign issuers, structured credit products or other credit-related exposures;

- the ability to achieve our strategic objectives, including improved performance, reduced risks, lower costs and more efficient use of capital;

- the ability of counterparties to meet their obligations to us;

- the effects of, and changes in, fiscal, monetary, trade and tax policies, and currency fluctuations;

- political and social developments, including war, civil unrest or terrorist activity;

- the possibility of foreign exchange controls, expropriation, nationalization or confiscation of assets in countries in which we conduct our operations;

- operational factors such as systems failure, human error, or the failure to implement procedures properly;

- actions taken by regulators with respect to our business and practices in one or more of the countries in which we conduct our operations;

- the effects of changes in laws, regulations or accounting policies or practices;

4

Exhibit 1
301

- competition in geographic and business areas in which we conduct our operations;

- the ability to retain and recruit qualified personnel;

- the ability to maintain our reputation and promote our brand;

- the ability to increase market share and control expenses;

- technological changes;

- the timely development and acceptance of our new products and services and the perceived overall value of these products and services by users;

- acquisitions, including the ability to integrate acquired businesses successfully, and divestitures, including the ability to sell non-core assets;

- the adverse resolution of litigation and other contingencies;

- the ability to achieve our cost efficiency goals and cost targets; and

- our success at managing the risks involved in the foregoing.

We caution you that the foregoing list of important factors is not exclusive. When evaluating forward-looking statements, you should carefully consider the foregoing factors and other uncertainties and events, as well as the risk factors and other information set forth in Credit Suisse Group's and Credit Suisse's annual report on Form 20-F for the year ended December 31, 2011, and subsequent annual reports on Form 20-F filed by Credit Suisse Group and Credit Suisse with the SEC; Credit Suisse Group's and Credit Suisse's reports on Form 6-K filed with the SEC; and the risk factors relating to Credit Suisse Group and Credit Suisse, a particular security offered by this prospectus or a particular offering discussed in the applicable prospectus supplement.

Exhibit 1

302

## USE OF PROCEEDS

Unless we tell you otherwise in a prospectus supplement, we will use the net proceeds from the sale of the securities described in this prospectus by Credit Suisse Group, Credit Suisse or the finance subsidiaries for general corporate purposes, including refinancing existing indebtedness. We may also invest the net proceeds temporarily in short-term securities. With the exception of certain situations described in more detail in the applicable prospectus supplement, the net proceeds will be applied exclusively outside Switzerland unless Swiss fiscal laws allow such usage in Switzerland without triggering Swiss withholding taxes on interest payments on debt instruments.

None of Credit Suisse Group, Credit Suisse or Credit Suisse (USA) will receive any of the proceeds from the sale of the outstanding Guaranteed Senior Debt Securities of Credit Suisse (USA). All offers and sales of these securities will be for the accounts of the broker-dealer subsidiaries of Credit Suisse Group in connection with market-making transactions.

Exhibit 1

303

**RATIO OF EARNINGS TO FIXED CHARGES**

The following table sets forth Credit Suisse Group's and Credit Suisse's ratio of earnings to fixed charges for the periods indicated:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2008** | **2007** |
| Ratio of Earnings to Fixed Charges(1) | | | | | |
| Credit Suisse Group | 1.14 | 1.33 | 1.44 | 0.70(2) | 1.16 |
| Credit Suisse | 1.08 | 1.27 | 1.43 | 0.69(3) | 1.13 |

(1) For purposes of calculating the ratio of earnings to fixed charges, earnings consist of profit/loss from continuing operations before taxes, extraordinary items, cumulative effect of changes in accounting principles and non-controlling interests less income from investments in associates plus fixed charges. Fixed charges for these purposes consist of (a) interest expense, (b) a portion of premises and real estate expenses, deemed representative of the interest factor and (c) preferred dividend requirements in connection with preferred securities of subsidiaries.

(2) The deficiency in the coverage of fixed charges by earnings before fixed charges was CHF 12,201 million for the year ended December 31, 2008.

(3) The deficiency in the coverage of fixed charges by earnings before fixed charges was CHF 12,362 million for the year ended December 31, 2008.

7

Exhibit 1

304

## CAPITALIZATION AND INDEBTEDNESS

The table below shows the consolidated capitalization and indebtedness of Credit Suisse Group and Credit Suisse as of December 31, 2011. You should read this table along with our consolidated financial statements and other financial information, which are included in the documents incorporated by reference in this prospectus.

| | As of December 31, 2011 | |
| --- | --- | --- |
| | Credit Suisse Group | Credit Suisse |
| | (in CHF millions) | |
| Debt: | | |
| Short-term borrowings | 26,116 | 24,643 |
| Long-term debt | 162,655 | 159,407 |
| All other liabilities | 819,309 | 802,675 |
| Total liabilities | **1,080,080** | **986,725** |
| Equity: | | |
| Shareholder's Equity: | | |
| Common shares | 49 | 4,400 |
| Additional paid-in capital | 21,796 | 23,170 |
| Retained earnings | 27,053 | 10,870 |
| Treasury shares, at cost | (90) | — |
| Accumulated other comprehensive income/(loss) | (15,134) | (10,938) |
| Total shareholder's equity | **33,674** | **27,502** |
| Noncontrolling interests | 7,411 | 8,948 |
| Total Equity | **41,085** | **36,450** |
| Total capitalization and indebtedness | **1,049,165** | **1,023,175** |

Exhibit 1

305

## CREDIT SUISSE GROUP

Credit Suisse Group is a holding company for financial services companies and is domiciled in Switzerland. Its activities are operated and managed in three reporting segments: Investment Banking, Private Banking and Asset Management.

Credit Suisse Group is a publicly held corporation and its registered shares are listed on the SIX Swiss Exchange and, in the form of American depositary shares, on the New York Stock Exchange. Credit Suisse Group's registered head office is located at Paradeplatz 8, CH-8001 Zurich, Switzerland, and its telephone number is +41-44-212-1616.

Credit Suisse Group, Guernsey branch, was established in 1986 and is a vehicle for various funding activities of Credit Suisse Group. The Guernsey branch exists as part of Credit Suisse Group and is not a separate legal entity, although it has independent status for certain tax and Guernsey regulatory purposes. The Guernsey branch is located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey GY1 3WF, Channel Islands, and its telephone number is +44-1481-724-605.

Exhibit 1

306

**CREDIT SUISSE**

Credit Suisse, a corporation established under the laws of, and licensed as a bank in, Switzerland, is a wholly-owned subsidiary of Credit Suisse Group. Credit Suisse's registered head office is in Zurich, and it has additional executive offices and principal branches located in London, New York, Hong Kong, Singapore and Tokyo. Credit Suisse's registered head office is located at Paradeplatz 8, CH-8001 Zurich, Switzerland, and its telephone number is +41-44-333-1111.

Credit Suisse may act through any of its branches in connection with the debt securities, warrants and guarantees as described in this prospectus and the applicable prospectus supplement. Credit Suisse, Guernsey branch, was established in 1997 in Guernsey, Channel Islands, and is, among other things, a vehicle for various funding activities of Credit Suisse. The Guernsey branch exists as part of Credit Suisse and is not a separate legal entity, although it has independent status for certain tax and Guernsey regulatory purposes. The Guernsey branch is located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey GY1 3WF, Channel Islands, and its telephone number is +44-1481-724-605.

Credit Suisse, Nassau branch, was established in Nassau, Bahamas in 1971 and is, among other things, a vehicle for various funding activities of Credit Suisse. The Nassau branch exists as part of Credit Suisse and is not a separate legal entity, although it has independent status for certain tax and regulatory purposes. The Nassau branch is located at Shirley & Charlotte Streets, Bahamas Financial Centre, 4th Floor, P.O. Box N-4928, Nassau, Bahamas, and its telephone number is 242-356-8125.

Credit Suisse, New York branch, was established in 1940 in New York, New York, and is, among other things, a vehicle for various funding activities of Credit Suisse. The New York branch exists as part of Credit Suisse and is not a separate legal entity, although it has independent status for certain tax and regulatory purposes. The New York branch is located at Eleven Madison Avenue, New York, New York 10010, and its telephone number is (212) 325-2000.

10

Exhibit 1
307

**CREDIT SUISSE (USA)**

Credit Suisse (USA) is a holding company for financial services companies. Credit Suisse (USA) is an indirect wholly-owned subsidiary of Credit Suisse Group. Credit Suisse (USA)'s principal executive office is in New York. Credit Suisse (USA)'s principal subsidiary is Credit Suisse Securities (USA) LLC, Credit Suisse Group's principal U.S. registered broker-dealer subsidiary. Effective January 16, 2006, Credit Suisse (USA) changed its name from Credit Suisse First Boston (USA), Inc. to Credit Suisse (USA), Inc.

The principal executive offices of Credit Suisse (USA) are located at Eleven Madison Avenue, New York, New York 10010, and its telephone number is (212) 325-2000.

11

Exhibit 1

308

## THE FINANCE SUBSIDIARIES

### General

Credit Suisse Group (Guernsey) I Limited (registration number 52976) and Credit Suisse Group (Guernsey) III Limited (registration number 52978) are each Guernsey incorporated non-cellular companies limited by shares. Credit Suisse Group (Guernsey) I Limited and Credit Suisse Group (Guernsey) III Limited were both incorporated on January 28, 2011 in Guernsey and each will continue in existence until it is removed from the Register of Companies in accordance with Guernsey law. The registered office of the finance subsidiaries is located at Helvetia Court, South Esplanade, St. Peter Port, Guernsey GY1 3WF, Channel Islands. The telephone number is +44 1481 719088.

The finance subsidiaries are both wholly-owned by Credit Suisse Group. Each finance subsidiary exists for the purpose of issuing debt instruments, the proceeds of which will be advanced to, or otherwise invested in, subsidiaries or affiliates of Credit Suisse Group. Accordingly, the finance subsidiaries are dependent on Credit Suisse Group and other members of the Group servicing these advances. Unless stated otherwise in the applicable prospectus supplement, Credit Suisse Group will fully and unconditionally guarantee, on a senior or subordinated basis, the guaranteed contingent convertible securities issued by each finance subsidiary as to payment of principal, premium, if any, interest and any other amounts due, as well as the delivery of shares or, at our option, American depositary shares.

The share capital of Credit Suisse Group (Guernsey) I Limited is an unlimited number of shares of no par value which may be issued as ordinary shares. The issued share capital of Credit Suisse Group (Guernsey) I Limited is U.S.$170,000 divided into 170,000 fully paid up ordinary shares with an issue price of U.S.$1 each.

The share capital of Credit Suisse Group (Guernsey) III Limited is an unlimited number of shares of no par value which may be issued as ordinary shares. The issued share capital of Credit Suisse Group (Guernsey) III Limited is U.S.$50,000 divided into 50,000 fully paid up ordinary shares with an issue price of U.S.$1 each.

### Management

The directors of Credit Suisse Group (Guernsey) I Limited and Credit Suisse Group (Guernsey) III Limited are as follows:

| Name | Position | Principal Activities outside Credit Suisse Group (Guernsey) I Limited and Credit Suisse Group (Guernsey) III Limited |
| --- | --- | --- |
| Roy McGregor | Director | Chief Executive Officer, Credit Suisse (Guernsey) Ltd |
| Kenneth Wallbridge | Director | Member of the Executive Board and Head of Operations, Credit Suisse (Guernsey) Ltd |
| Kim Fox-Moertl | Director | Head of Capital Management, Credit Suisse |
| Roger Rimann | Director | Member of the Executive Board and Treasurer, Credit Suisse (Guernsey) Ltd |
| Anthony Le Conte | Director | Head of New Business, Credit Suisse (Guernsey) Ltd |

The service address of the directors is Helvetia Court, South Esplanade, St. Peter Port, Guernsey GY1 3WF, Channel Islands. There are no conflicts of interest between the private interests or other duties of the directors listed above and their duties to each finance subsidiary.

12

Exhibit 1

309

**Dividends and Distributions**

Neither finance subsidiary has paid any dividends nor made any distributions as those terms are defined under the Companies (Guernsey) Law, 2008 (as amended) since its incorporation. To the extent that a dividend may be declared or a distribution may be made, it will be paid subject to a solvency test in compliance with the Companies (Guernsey) Law, 2008 (as amended).

**Assets and Liabilities**

Other than in connection with the $2,000,000,000 7.875%. Tier 2 Buffer Capital Notes due 2041 issued by Credit Suisse Group (Guernsey) I Limited, neither finance subsidiary has acquired any assets nor incurred any loan capital or other borrowings or indebtedness or any contingent liabilities since its formation.

**Financial Statements**

Each finance subsidiary's accounting reference date is December 31 and its first accounts were prepared in accordance with International Financing Reporting Standards (IFRS) as at, and for the period ended, December 31, 2011.

The finance subsidiaries do not have an audit committee. As subsidiaries of Credit Suisse Group, each finance subsidiary complies with Credit Suisse Group's overall corporate governance regime.

**Business Purpose**

Each finance subsidiary's business purpose is unrestricted and is set out in its respective Memorandum of Incorporation each of which has been incorporated by reference to the Registration Statement of which this prospectus forms a part.

Exhibit 1

310

## DESCRIPTION OF DEBT SECURITIES

This section describes the general terms that will apply to any debt securities that may be offered by Credit Suisse Group or Credit Suisse, directly or through one of its branches pursuant to this prospectus (each referred to in this section as a "relevant issuer"). The specific terms of the offered debt securities, and the extent to which the general terms described in this section apply to debt securities, will be described in the related prospectus supplement at the time of the offer.

**General**

As used in this prospectus, "debt securities" means the senior and subordinated debentures, notes, bonds and other evidences of indebtedness that the relevant issuer issues and, in each case, the trustee authenticates and delivers under the applicable indenture. The term "debt securities" does not include the "contingent convertible securities" described under "Description of Contingent Convertible Securities."

Credit Suisse Group may issue senior debt securities or subordinated debt securities (including convertible or exchangeable debt securities), directly or through one of its branches. Convertible or exchangeable debt securities of Credit Suisse Group may be converted or exchanged into shares of Credit Suisse Group. Credit Suisse may issue senior debt securities, subordinated debt securities, including convertible debt securities and debt securities that qualify as tier 1 or tier 2 capital, directly or through one of its branches. Any convertible debt securities issued by Credit Suisse will not be convertible into shares of Credit Suisse Group or Credit Suisse. Senior debt securities, subordinated debt securities, including debt securities that qualify as tier 1 or tier 2 capital will be issued in one or more series under the senior indenture or the subordinated indenture between Credit Suisse Group and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to JPMorgan Chase Bank, N.A., as trustee (in the case of Credit Suisse Group) or the senior indenture or subordinated indenture (each as may be amended or supplemented from time to time) between Credit Suisse and The Bank of New York Mellon, formerly known as The Bank of New York, as trustee (in the case of Credit Suisse). The senior indentures and the subordinated indentures have been qualified under the Trust Indenture Act of 1939, as amended, or the Trust Indenture Act. In this section, we sometimes refer to these indentures collectively as the "indentures."

This section of the prospectus briefly outlines the provisions of the indentures related to the debt securities. The terms of the indentures will include both those stated in the indentures and those made part of the indentures by the Trust Indenture Act. The forms of the indentures have been filed as exhibits to the registration statement of which this prospectus forms a part, and you should read the applicable indentures for provisions that may be important to you.

Credit Suisse Group is a holding company and depends upon the earnings and cash flow of its subsidiaries to meet its obligations under the debt securities. Since the creditors of any of its subsidiaries would generally have a right to receive payment that is superior to Credit Suisse Group's right to receive payment from the assets of that subsidiary, holders of debt securities will be effectively subordinated to creditors of Credit Suisse Group's subsidiaries. In addition, there are various regulatory requirements applicable to some of Credit Suisse Group's and Credit Suisse's subsidiaries that limit their ability to pay dividends and make loans and advances to Credit Suisse Group and Credit Suisse, as the case may be.

The indentures do not contain any covenants or other provisions designed to protect holders of the debt securities against a reduction in the creditworthiness of the relevant issuer in the event of a highly leveraged transaction or that would prohibit other transactions that might adversely affect holders of the debt securities, including a change in control of the relevant issuer.

Exhibit 1

311

**Issuances in Series**

The indentures do not limit the amount of debt that may be issued. The debt securities may be issued in one or more series with the same or various maturities, at a price of 100% of their principal amount or at a premium or a discount. Not all debt securities of any one series need be issued at the same time and, unless otherwise provided, any series may be reopened for issuances of additional debt securities of that series. The debt securities will not be secured by any property or assets of the relevant issuer.

The terms of any authorized series of debt securities will be described in a prospectus supplement. These terms may include:

- the issue date;

- whether the debt securities are issued by Credit Suisse Group or Credit Suisse;

- whether the debt securities are senior or subordinated and whether they qualify as tier 1 or tier 2 capital;

- the total principal amount of the debt securities;

- the percentage of the principal amount at which the debt securities will be issued and whether the debt securities will be "original issue discount" securities for U.S. federal income tax purposes. If original issue discount debt securities are issued (securities that are issued below their principal amount by more than a statutory de minimis amount because they pay no interest or pay interest that is below market rates at the time of issuance), the special U.S. federal income tax and other considerations of a purchase of original issue discount debt securities will be described (to the extent not already described herein);

- the date or dates on which principal will be payable, whether the debt securities will be payable on demand by the holders on any date, and whether we can extend the maturity date of the debt securities;

- the manner in which payments of principal, premium or interest will be calculated and whether any rate will be fixed or based on an index or formula or the value of one or more securities, commodities, currencies or other assets, including but not limited to:

  - whether the debt security bears a fixed rate of interest or bears a floating rate of interest, including whether the debt security is a regular floating rate note, a floating rate/fixed rate note or an inverse floating rate note (each as described below);

  - if the debt security is an indexed note (as defined below) the terms relating to the particular series of debt securities;

  - if the debt security is an amortizing note (as defined below), the amortization schedule and any other terms relating to the particular series of debt securities;

- the interest payment dates;

- whether any sinking fund is required;

- optional or mandatory redemption terms;

- authorized denominations, if other than $2,000 and integral multiples of $1,000 in excess thereof;

- the terms on which holders of the debt securities issued by Credit Suisse Group may or are required to exercise, convert or exchange these securities into or for securities of Credit Suisse Group or one or more other entities and any specific terms relating to the exercise, conversion or exchange feature;

15

Exhibit 1

312

- the terms on which holders of the debt securities issued by Credit Suisse may or are required to exercise, convert or exchange these securities into or for securities of one or more other entities other than Credit Suisse Group and Credit Suisse and any specific terms relating to the exercise, conversion or exchange feature

- the currency or currency unit in which the debt securities will be denominated and, if different, the currency or currency unit in which payments of principal, premium or interest will be payable, if the specified currency is other than U.S. dollars, and any other terms relating to the debt securities denominated in a foreign currency and the specified currency;

- whether the debt securities are to be issued as individual certificates to each holder or in the form of global certificates held by a depositary on behalf of holders;

- information describing any book-entry features;

- whether and under what circumstances additional amounts will be paid on any debt securities as a result of withholding taxes and whether the debt securities can be redeemed if additional amounts must be paid;

- selling restrictions applicable to any series of debt securities, if any;

- the names and duties of any co-trustees, depositaries, authenticating agents, paying agents, transfer agents or registrars for any series; and

- any other terms consistent with the above.

The prospectus supplement relating to any series of debt securities may also include, if applicable, a discussion of certain U.S. federal income tax considerations and considerations under the Employee Retirement Income Security Act of 1974, as amended, or ERISA.

**Interest and Interest Rates**

Each series of debt securities that bears interest will bear interest from its date of issue or from the most recent date to which interest on that series of debt securities has been paid or duly provided for, at the fixed or floating rate specified in the series of debt securities, until the principal amount has been paid or made available for payment. Interest will be payable on each interest payment date (except for certain original issue discount notes (as defined below) and except for a series of debt securities issued between a regular record date and an interest payment date) and at maturity or on redemption or repayment, if any. Unless otherwise provided in the applicable prospectus supplement, in the event that the maturity date of any series of debt securities is not a business day, principal and interest payable at maturity will be paid on the next succeeding business day with the same effect as if that following business day were the date on which the payment were due, except that the relevant issuer will not pay any additional interest as a result of the delay in payment except as otherwise provided under "—Payment of Additional Amounts." Unless otherwise indicated in the applicable prospectus supplement, interest payments in respect of a series of debt securities will equal the amount of interest accrued from and including the immediately preceding interest payment date in respect of which interest has been paid or duly made available for payment (or from and including the date of issue, if no interest has been paid with respect to the applicable series of debt securities) to but excluding the related interest payment date, maturity date or redemption or repayment date, if any, as the case may be.

Interest will be payable to the person in whose name a debt security is registered at the close of business on the regular record date next preceding the related interest payment date, except that:

- if the relevant issuer fails to pay the interest due on an interest payment date, the defaulted interest will be paid to the person in whose name the debt security is registered at the close of

16

Exhibit 1

313

business on the record date the relevant issuer will establish for the payment of defaulted interest; and

- interest payable at maturity, redemption or repayment will be payable to the person to whom principal shall be payable.

In addition, the interest rate on floating rate notes will in no event be higher than the maximum rate permitted by New York or other applicable law, as such law may be modified by any applicable United States law of general application.

The first payment of interest on any series of debt securities originally issued between a regular record date and an interest payment date will be made on the interest payment date following the next succeeding regular record date to the registered owner on such next succeeding regular record date.

### Fixed Rate Notes

Each fixed rate debt security, which we refer to as a fixed rate note, will bear interest at the annual rate specified in the applicable prospectus supplement. The interest payment dates for fixed rate notes will be specified in the applicable prospectus supplement and the regular record dates will be the fifteenth calendar day (whether or not a business day) prior to each interest payment date unless otherwise specified in the applicable prospectus supplement. Unless otherwise specified in the applicable prospectus supplement, interest on fixed rate notes will be computed and paid on the basis of a 360-day year of twelve 30-day months. In the event that any date for any payment on any fixed rate note is not a business day, payment of interest, premium, if any, or principal otherwise payable on such fixed rate note will be made on the next succeeding business day. The relevant issuer will not pay any additional interest as a result of the delay in payment.

### Floating Rate Notes

Unless otherwise specified in an applicable prospectus supplement, floating rate debt securities, which we refer to as floating rate notes, will be issued as described below. Each applicable prospectus supplement will specify certain terms with respect to which such floating rate note is being delivered, including:

- whether the floating rate note is a regular floating rate note, an inverse floating rate note or a floating rate/fixed rate note (if not specified, the floating rate note will be a regular floating rate note);
- the interest rate basis or bases;
- initial interest rate;
- interest reset dates;
- interest reset period;
- interest payment dates;
- index maturity, if any;
- maximum interest rate and minimum interest rate, if any;
- the spread and/or spread multiplier, if any; and
- if one or more of the specified interest rate bases is LIBOR, the index currency, if any, as described below.

17

Exhibit 1

314

Unless otherwise specified in the applicable prospectus supplement, each regular record date for a floating rate note will be the fifteenth calendar day (whether or not a business day) prior to each interest payment date.

The interest rate borne by the floating rate notes will be determined as follows:

- Unless a floating rate note is a floating rate/fixed rate note or an inverse floating rate note, the floating rate note will be a regular floating rate note and, except as described below or in an applicable prospectus supplement, will bear interest at the rate determined by reference to the applicable interest rate basis or bases:

    - plus or minus the applicable spread, if any; and/or

    - multiplied by the applicable spread multiplier, if any.

Unless otherwise specified in the applicable prospectus supplement, commencing on the initial interest reset date, the rate at which interest on such regular floating rate note will be payable will be reset as of each interest reset date; provided, however, that the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate.

If a floating rate note is a floating rate/fixed rate note, then, except as described below or in an applicable prospectus supplement, the floating rate/fixed rate note will initially bear interest at the rate determined by reference to the applicable interest rate basis or bases:

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Commencing on the initial interest reset date, the rate at which interest on the floating rate/fixed rate note will be payable shall be reset as of each interest reset date, except that:

- the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate; and

- the interest rate in effect commencing on, and including, the fixed rate commencement date (as specified in the applicable prospectus supplement) to the maturity date will be the fixed interest rate specified in the applicable prospectus supplement, or if no fixed interest rate is so specified and the floating rate/fixed rate note is still outstanding on the fixed rate commencement date, the interest rate in effect on the floating rate/fixed rate note on the day immediately preceding the fixed rate commencement date.

If a floating rate note is an inverse floating rate note, then, except as described below or in an applicable prospectus supplement, the inverse floating rate note will bear interest equal to the fixed interest rate specified in the applicable prospectus supplement:

- minus the rate determined by reference to the interest rate basis or bases;

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Unless otherwise specified in the applicable prospectus supplement, the interest rate on an inverse floating rate note will not be less than zero. Commencing on the initial interest reset date, the rate at which interest on such inverse floating rate note is payable will be reset as of each interest reset date; provided, however, that the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate.

Exhibit 1
315

Unless otherwise provided in the applicable prospectus supplement, each interest rate basis will be the rate determined in accordance with the applicable provisions below. Except as set forth above or in the applicable prospectus supplement, the interest rate in effect on each day will be:

- if such day is an interest reset date, the interest rate as determined on the interest determination date (as defined below) immediately preceding such interest reset date; or

- if such day is not an interest reset date, the interest rate determined on the interest determination date immediately preceding the next preceding interest reset date.

Except for the fixed rate period described above for floating rate/fixed rate notes, interest on floating rate notes will be determined by reference to an interest rate basis, which may be one or more of:

- the CD rate;

- the Commercial Paper rate;

- the Federal Funds rate/Federal Funds open rate;

- LIBOR;

- the Prime rate;

- the Treasury rate; or

- any other interest rate basis or interest rate formula described in the applicable prospectus supplement.

The "spread" is the number of basis points to be added to or subtracted from the related interest rate basis or bases applicable to a floating rate note. The "spread multiplier" is the percentage of the related interest rate basis or bases applicable to a floating rate note by which such interest rate basis or bases will be multiplied to determine the applicable interest rate on such floating rate note. The "index maturity" is the period to maturity of the instrument or obligation with respect to which the interest rate basis or bases will be calculated.

Each applicable prospectus supplement will specify whether the rate of interest on the related floating rate note will be reset daily, weekly, monthly, quarterly, semi-annually, annually or such other specified interest reset period and the dates on which such interest rate will be reset. Unless otherwise specified in the applicable prospectus supplement, the interest reset date will be, in the case of floating rate notes which reset:

- daily, each business day;

- weekly, a business day that occurs in each week as specified in the applicable prospectus supplement (with the exception of weekly reset Treasury rate notes, which will reset the Tuesday of each week except as specified below);

- monthly, a business day that occurs in each month as specified in the applicable prospectus supplement;

- quarterly, a business day that occurs in each third month as specified in the applicable prospectus supplement;

- semi-annually, a business day that occurs in each of two months of each year as specified in the applicable prospectus supplement; and

- annually, a business day that occurs in one month of each year as specified in the applicable prospectus supplement.

19

Exhibit 1
316

If any interest reset date for any floating rate note would otherwise be a day that is not a business day, that interest reset date will be postponed to the next succeeding day that is a business day, except that in the case of a floating rate note as to which LIBOR is an applicable interest rate basis, if that business day falls in the next succeeding calendar month, the interest reset date will be the immediately preceding business day.

The term "business day" means, unless otherwise specified in the applicable prospectus supplement, any day that is not a Saturday or Sunday and that is not a day on which banking institutions are generally authorized or obligated by law, regulation or executive order to close in The City of New York and any other place of payment with respect to the applicable series of debt securities and:

- with respect to LIBOR notes, "business day" will also include a London business day;

- with respect to any series of debt securities denominated in euros, "business day" will also include any day on which the TransEuropean Real-Time Gross Settlement Express Transfer (TARGET) System is in place; and

- with respect to any series of debt securities denominated in a specified currency other than U.S. dollars or euros, "business day" will not include a day on which banking institutions are generally authorized or obligated by law, regulation or executive order to close in the principal financial center of the country of the specified currency.

- "London business day" means any day that is both a business day and a day on which dealings in deposits in any currency specified in the applicable prospectus supplement are transacted, or with respect to any future date are expected to be transacted, in the London interbank market.

Except as provided below or in an applicable prospectus supplement, interest will be payable on the maturity date and in the case of floating rate notes which reset:

- daily, weekly or monthly, on a business day that occurs in each month as specified in the applicable prospectus supplement;

- quarterly, on a business day that occurs in each third month as specified in the applicable prospectus supplement;

- semi-annually, on a business day that occurs in each of two months of each year as specified in the applicable prospectus supplement; and

- annually, on a business day that occurs in one month of each year as specified in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, if any interest payment date for any floating rate note (other than the maturity date, but including any redemption date or repayment date) would otherwise be a day that is not a business day, that interest payment date or redemption date or repayment date will be the next succeeding day that is a business day and interest shall accrue to, and be payable on, such following business day, except that if a floating rate note is a LIBOR note and if the next business day falls in the next succeeding calendar month, the interest payment date or redemption date or repayment date will be the immediately preceding business day and interest shall accrue to, and be payable on, such preceding business day. If the maturity date of a floating rate note falls on a day that is not a business day, the payment of principal, premium, if any, and interest, if any, will be made on the next succeeding business day, and we will not pay any additional interest for the period from and after the maturity date.

All percentages resulting from any calculation on floating rate notes will be to the nearest one hundred-thousandth of a percentage point, with five one millionths of a percentage point rounded upwards (e.g., 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655)), and all dollar amounts used in or resulting from such calculation will be rounded to the nearest cent (with one-half cent being rounded upward).

20

Exhibit 1
317

With respect to each floating rate note, accrued interest is calculated by multiplying its face amount by an accrued interest factor. The accrued interest factor is computed by adding the interest factor calculated for each day from and including the later of (a) the date of issue and (b) the last day to which interest has been paid or duly provided for to but excluding the last date for which accrued interest is being calculated. Unless otherwise specified in the applicable prospectus supplement, the interest factor for each such day will be computed by dividing the interest rate applicable to such day by 360, in the case of floating rate notes for which the interest rate basis is the CD rate, the Commercial Paper rate, the Federal Funds rate, the Federal Funds open rate, LIBOR or the Prime rate, or by the actual number of days in the year in the case of floating rate notes for which the interest rate basis is the Treasury rate. The accrued interest factor for floating rate notes for which the interest rate may be calculated with reference to two or more interest rate bases will be calculated in each period by selecting one such interest rate basis for such period in accordance with the provisions of the applicable prospectus supplement.

The interest rate applicable to each interest reset period commencing on the interest reset date with respect to that interest reset period will be the rate determined as of the interest determination date. Unless otherwise specified in the applicable prospectus supplement, the interest determination date with respect to the CD rate, the Commercial Paper rate, the Federal Funds rate, the Federal Funds open rate and the Prime rate will be the second business day preceding each interest reset date for the related floating rate note; and the interest determination date with respect to LIBOR will be the second London business day preceding each interest reset date. With respect to the Treasury rate, unless otherwise specified in an applicable prospectus supplement, the interest determination date will be the day in the week in which the related interest reset date falls on which day Treasury bills (as defined below) are normally auctioned (Treasury bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is normally held on the following Tuesday, except that such auction may be held on the preceding Friday); provided, however, that if an auction is held on the Friday on the week preceding the related interest reset date, the related interest determination date will be such preceding Friday; and provided, further, that if an auction falls on any interest reset date then the related interest reset date will instead be the first business day following such auction. Unless otherwise specified in the applicable prospectus supplement, the interest determination date pertaining to a floating rate note, the interest rate of which is determined with reference to two or more interest rate bases, will be the latest business day which is at least two business days prior to each interest reset date for such floating rate note. Each interest rate basis will be determined and compared on such date, and the applicable interest rate will take effect on the related interest reset date, as specified in the applicable prospectus supplement.

Unless otherwise provided for in the applicable prospectus supplement, The Bank of New York Mellon, formerly known as The Bank of New York, will be the calculation agent and for each interest reset date will determine the interest rate with respect to any floating rate note as described below. The calculation agent will notify the relevant issuer, the paying agent and the trustee of each determination of the interest rate applicable to a floating rate note promptly after such determination is made. The calculation agent will, upon the request of the holder of any floating rate note, provide the interest rate then in effect and, if determined, the interest rate which will become effective as a result of a determination made with respect to the most recent interest determination date relating to such floating rate note. Unless otherwise specified in the applicable prospectus supplement, the "calculation date," where applicable, pertaining to any interest determination date will be the earlier of (a) the tenth calendar day after that interest determination date or, if such day is not a business day, the next succeeding business day or (b) the business day preceding the applicable interest payment date or maturity date, as the case may be.

21

Exhibit 1

318

Unless otherwise specified in the applicable prospectus supplement, the calculation agent will determine the interest rate basis with respect to floating rate notes as follows:

*CD Rate Notes.*   CD rate debt securities, which we refer to as CD rate notes, will bear interest at the interest rate (calculated with reference to the CD rate and the spread and/or spread multiplier, if any) specified in the CD rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, "CD rate" means, with respect to any interest determination date relating to a CD rate note, the rate on the date for negotiable certificates of deposit having the index maturity designated in the applicable prospectus supplement as published by the Board of Governors of the Federal Reserve System in "Statistical Release H.15(519), Selected Interest Rates" or any successor publication of the Board of Governors of the Federal Reserve System ("H.15(519)") under the heading "CDs (secondary market)," or any successor publication or, if not so published by 3:00 p.m., New York City time, on the calculation date pertaining to such interest determination date, the CD rate will be the rate on such interest determination date for negotiable certificates of deposit of the index maturity designated in the applicable prospectus supplement as published by the Federal Reserve Bank of New York in its daily update of H.15 available through the website of the Board of Governors of the Federal Reserve System at "*http://www.federalreserve.gov/releases/h15/update*" ("H.15 daily update") or any successor site or publication of the Board of Governors under the heading "Certificates of Deposit." If such rate is not yet published in either H.15(519) or H.15 daily update by 3:00 p.m., New York City time, on the calculation date pertaining to an interest determination date, the calculation agent will calculate the CD rate on that interest determination date, which will be the arithmetic mean of the secondary market offered rates as of 10:00 a.m., New York City time, on that interest determination date, for negotiable certificates of deposit of major United States money market banks with a remaining maturity closest to the index maturity designated in the applicable prospectus supplement in an amount that is representative for a single transaction in that market at that time as quoted by three leading non-bank dealers in negotiable U.S. dollar certificates of deposit in The City of New York selected by the calculation agent (after consultation with us); provided, however, that if the dealers selected as aforesaid by the calculation agent are not quoting as set forth above, the CD rate with respect to such interest determination date will be the same as the CD rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest shall be the initial interest rate).

*Commercial Paper Rate Notes.*   Commercial Paper rate debt securities, which we refer to as Commercial Paper rate notes, will bear interest at the interest rate (calculated with reference to the Commercial Paper rate and the spread and/or spread multiplier, if any) specified in the Commercial Paper rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, "Commercial Paper rate" means, with respect to any interest determination date relating to a Commercial Paper rate note, the money market yield (as defined below) of the rate on that date for commercial paper having the index maturity designated in the applicable prospectus supplement, as published in H.15(519), under the heading "Commercial Paper—Non-financial." In the event that the rate is not published prior to 3:00 p.m., New York City time, on the calculation date pertaining to such interest determination date, then the Commercial Paper rate will be the money market yield of the rate on the interest determination date for commercial paper of the specified index maturity as published in H.15 daily update under the heading "Commercial Paper—Non-financial" (with an index maturity of one month or three months being deemed to be equivalent to an index maturity of 30 days or 90 days, respectively). If by 3:00 p.m., New York City time, on that calculation date, the rate is not yet available in either H.15(519) or H.15 daily update, the calculation agent will calculate the Commercial Paper rate on that interest determination date, which will be the money market yield corresponding to the arithmetic mean of the offered rates as of approximately 11:00 a.m., New York City time, on that

Exhibit 1
319

interest determination date for commercial paper of the specified index maturity placed for a non-financial issuer whose bond rating is "AA" or the equivalent, from a nationally recognized rating agency as quoted by three leading dealers of commercial paper in The City of New York selected by the calculation agent (after consultation with us); provided, however, that if the dealers selected as aforesaid by the calculation agent are not quoting offered rates as set forth above, the Commercial Paper rate with respect to such interest determination date will be the same as the Commercial Paper rate for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

"Money market yield" will be a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Money Market Yield} = \frac{D \times 360}{360 - (D \times M)} \times 100$$

where "D" refers to the applicable per annum rate for commercial paper quoted on a bank discount basis and expressed as a decimal, and "M" refers to the actual number of days in the period for which interest is being calculated.

*Federal Funds Rate Notes/Federal Funds Open Rate Notes.*  Federal Funds rate debt securities, which we refer to as Federal Funds rate notes, will bear interest at the interest rate (calculated with reference to the Federal Funds rate and the spread and/or spread multiplier, if any) specified in the Federal Funds rate notes and in the applicable prospectus supplement. Federal Funds open rate debt securities, which we refer to as Federal Funds open rate notes, will bear interest at the interest rate (calculated with reference to the Federal Funds open rate and the spread and/or spread multiplier, if any) specified in the Federal Funds open rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, the "Federal Funds rate" means, with respect to any interest determination date relating to a Federal Funds rate note, the rate applicable to such date for Federal Funds opposite the caption "Federal funds (effective)," as displayed on Reuters on page 118 (or any page which may replace such page on such service) under the heading "EFFECT" on the business day immediately following such interest determination date. If such rate is not so published by 3:00 p.m., New York City time, on the business day immediately following such interest determination date, the Federal Funds rate will be the rate applicable to such interest determination date as published in H.15 daily update (or such other recognized electronic source used for the purpose of displaying such rate) under the heading "Federal Funds (effective)." If that rate is not published in H.15 daily update (or such other recognized electronic source used for the purpose of displaying such rate) by 4:15 p.m., New York City time, on the business day immediately following such interest determination date, the calculation agent will calculate the Federal Funds rate applicable to such interest determination date, which will be the arithmetic mean of the rates for the last transaction in overnight United States dollar Federal Funds as of 9:00 a.m., New York City time, on such interest determination date arranged by three leading brokers (which may include any underwriters, agents or their affiliates) of Federal Funds transactions in The City of New York selected by the calculation agent (after consultation with us); provided, however, that if the brokers selected as aforesaid by the calculation agent are not quoting as set forth above, the Federal Funds rate applicable to such interest determination date will be the same as the Federal Funds rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

Unless otherwise specified in the applicable prospectus supplement, the "Federal Funds open rate" means, with respect to any interest determination date relating to a Federal Funds open rate note, the rate for such day for federal funds transactions among members of the Federal Reserve System arranged by federal funds brokers on such day, as published under the heading "Federal Funds"

23

Exhibit 1
320

opposite the caption "Open" as such rate is displayed on Reuters (or any successor service) on page 5 (or any page which may replace such page on such service) ("Reuters Page 5"). In the event that on any interest determination date no reported rate appears on Reuters Page 5 by 3:00 p.m., New York City time, the rate for the interest determination date will be the rate for that day displayed on FFPREBON Index page on Bloomberg which is the Fed Funds Opening Rate as reported by Prebon Yamane (or any successor) on Bloomberg. In the event that on any interest determination date no reported rate appears on Reuters Page 5 or the FFPREBON Index page on Bloomberg or another recognized electronic source by 3 p.m., New York City time, the interest rate applicable to the next interest reset period will be the arithmetic mean of the rates for the last transaction in overnight U.S. dollar Federal Funds prior to 9:00 a.m., New York City time, on such interest determination date arranged by three leading brokers (which may include any underwriters, agents or their affiliates) of Federal Funds transactions in New York City selected by the calculation agent (after consultation with us); provided, however, that if the brokers selected by the calculation agent are not quoting as set forth above, the Federal Funds open rate with respect to such interest determination date will be the same as the Federal Funds open rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate). Notwithstanding the foregoing, the Federal Funds open rate in effect for any day that is not a business day shall be the Federal Funds open rate in effect for the prior business day.

*LIBOR Notes.* LIBOR debt securities, which we refer to as LIBOR notes, will bear interest at the interest rate (calculated with reference to LIBOR and the spread and/or spread multiplier, if any) specified in the LIBOR notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, the calculation agent will determine "LIBOR" for each interest reset date as follows:

- With respect to an interest determination date relating to a LIBOR note, LIBOR will be the offered rate for deposits in the London interbank market in the index currency (as defined below) having the index maturity designated in the applicable prospectus supplement commencing on the second London business day immediately following such interest determination date that appears on the Designated LIBOR Page (as defined below) or a successor reporter of such rates selected by the calculation agent and acceptable to us, as of 11:00 a.m., London time, on such interest determination date (the "reported rate"). If no rate appears on the Designated LIBOR Page, LIBOR in respect of such interest determination date will be determined as if the parties had specified the rate described in the following paragraph.

- With respect to an interest determination date relating to a LIBOR note to which the last sentence of the previous paragraph applies, the calculation agent will request the principal London offices of each of four major reference banks (which may include any underwriters, agents or their affiliates) in the London interbank market selected by the calculation agent (after consultation with us) to provide the calculation agent with its offered quotation for deposits in the index currency for the period of the index maturity designated in the applicable prospectus supplement commencing on the second London business day immediately following such interest determination date to prime banks in the London interbank market at approximately 11:00 a.m., London time, on such interest determination date and in a principal amount that is representative for a single transaction in such index currency in such market at such time. If at least two such quotations are provided, LIBOR determined on such interest determination date will be the arithmetic mean of such quotations. If fewer than two quotations are provided, LIBOR determined on such interest determination date will be the arithmetic mean of the rates quoted at approximately 11:00 a.m. (or such other time specified in the applicable prospectus supplement), in the principal financial center of the country of the specified index currency, on that interest determination date for loans made in the index currency to leading European banks having the index maturity designated in the applicable prospectus supplement commencing on

Exhibit 1

321

the second London business day immediately following such interest determination date and in a principal amount that is representative for a single transaction in that index currency in that market at such time by three major reference banks (which may include any underwriters, agents or their affiliates) in such principal financial center selected by the calculation agent (after consultation with us); provided, however, that if fewer than three reference banks so selected by the calculation agent are quoting such rates as mentioned in this sentence, LIBOR with respect to such interest determination date will be the same as LIBOR in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

"Index currency" means the currency (including currency units and composite currencies) specified in the applicable prospectus supplement as the currency with respect to which LIBOR will be calculated. If no currency is specified in the applicable prospectus supplement, the index currency will be U.S. dollars.

"Designated LIBOR Page" means the display on page LIBOR01 (or any other page specified in the applicable prospectus supplement) of Reuters (or any successor service) for the purpose of displaying the London interbank offered rates of major banks for the applicable index currency (or such other page as may replace that page on that service for the purpose of displaying such rates).

Unless otherwise specified in the applicable prospectus supplement, "principal financial center" means the principal financial center of the country of the specified currency or specified index currency, as applicable, except that with respect to U.S. dollars and euro, the principal financial center shall be New York City and Brussels, respectively.

*Prime Rate Notes.*   Prime rate debt securities, which we refer to as Prime rate notes, will bear interest at the interest rate (calculated with reference to the Prime rate and the spread and/or spread multiplier, if any) specified in the Prime rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, "Prime rate" means, with respect to any interest determination date, the rate set forth in H.15(519) for that date opposite the caption "Bank Prime Loan" or, if not published by 3:00 p.m., New York City time, on the calculation date, the rate on such interest determination date as published in H.15 daily update under the caption "Bank Prime Loan." If that rate is not yet published by 3:00 p.m., New York City time, on the calculation date pertaining to that interest determination date, the Prime rate for that interest determination date will be the arithmetic mean of the rates of interest publicly announced by each bank named on the Reuters Screen USPRIME1 Page (as defined below) as that bank's prime rate or base lending rate as in effect as of 11:00 a.m., New York City time, for that interest determination date as quoted on the Reuters Screen USPRIME1 Page on that interest determination date, or, if fewer than four of these rates appear on the Reuters Screen USPRIME1 Page for that interest determination date, the rate will be the arithmetic mean of the prime rates quoted on the basis of the actual number of days in the year divided by 360 as of the close of business on that interest determination date by at least two of the three major money center banks in The City of New York selected by the calculation agent (after consultation with us) from which quotations are requested. If fewer than two quotations are provided, the calculation agent will calculate the Prime rate, which will be the arithmetic mean of the prime rates in The City of New York quoted by the appropriate number of substitute banks or trust companies organized and doing business under the laws of the United States, or any State thereof, in each case having total equity capital of at least $500 million and being subject to supervision or examination by federal or state authority, selected by the calculation agent (after consultation with us) to quote prime rates. "Reuters Screen USPRIME1 Page" means the display designated as the "USPRIME1" page on Reuters (or such other page as may replace the USPRIME1 Page on that service for the purpose of displaying prime rates or base lending rates of major United States banks).

25

Exhibit 1
322

*Treasury Rate Notes.*    Treasury rate debt securities, which we refer to as Treasury rate notes, will bear interest at the interest rate (calculated with reference to the Treasury rate and the spread and/or spread multiplier, if any) specified in the Treasury rate notes and in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, the "Treasury rate" means, with respect to any interest determination date relating to a Treasury rate note, the rate from the auction held on such interest determination date, which we refer to as the "auction," of direct obligations of the United States, which we refer to as Treasury bills, having the index maturity designated in the applicable prospectus supplement under the caption "INVESTMENT RATE" on the display on Reuters (or any successor service) on page USAUCTION10 (or any other page as may replace such page on such service) or page USAUCTION11 (or any other page as may replace such page on such service) or, if not so published by 3:00 p.m., New York City time, on the calculation date pertaining to such interest determination date, the bond equivalent yield (as defined below) of the rate for such Treasury bills as published in H.15 daily update, or such other recognized electronic source used for the purpose of displaying such rate, under the caption "U.S. Government Securities/Treasury Bills/Auction High" or, if not so published by 3:00 p.m., New York City time, on the related calculation date, the bond equivalent yield of the auction rate of such Treasury bills as announced by the U.S. Department of the Treasury. In the event that the auction rate of Treasury bills having the index maturity designated in the applicable prospectus supplement is not so announced by the U.S. Department of the Treasury, or if no such auction is held, then the Treasury rate will be the bond equivalent yield of the rate on that interest determination date of Treasury bills having the index maturity designated in the applicable prospectus supplement as published in H.15(519) under the caption "U.S. Government Securities/Treasury Bills/Secondary Market" or, if not published by 3:00 p.m., New York City time, on the related calculation date, the rate on that interest determination date of such Treasury bills as published in H.15 daily update, or such other recognized electronic source used for the purpose of displaying such rate, under the caption "U.S. Government Securities/Treasury Bills/Secondary Market." In the event such rate is not published in H.15(519), H.15 daily update or another recognized electronic source by 3:00 p.m., New York City time, on such calculation date, the calculation agent will calculate the Treasury rate, which will be a bond equivalent yield of the arithmetic mean of the secondary market bid rates, as of approximately 3:30 p.m., New York City time, on such interest determination date, of three leading primary U.S. government securities dealers (which may include Credit Suisse Securities (USA) LLC) selected by the calculation agent (after consultation with us) for the issue of Treasury bills with a remaining maturity closest to the index maturity designated in the applicable prospectus supplement; provided, however, that if the dealers selected by the calculation agent are not quoting bid rates as mentioned in this sentence, the Treasury rate with respect to the interest determination date will be the same as the Treasury rate in effect for the immediately preceding interest reset period (or, if there was no preceding interest reset period, the rate of interest will be the initial interest rate).

The term "bond equivalent yield" means a yield (expressed as a percentage) calculated in accordance with the following formula:

$$\text{Bond equivalent yield} \ = \ \frac{D \times N \times 100}{360 - (D \times M)}$$

where "D" refers to the applicable per annum rate for Treasury bills quoted on a bank discount basis, "N" refers to 365 or 366, as the case may be, and "M" refers to the actual number of days in the applicable interest reset period.

26

Exhibit 1
323

**Indexed Notes**

A series of debt securities also may be issued with the principal amount payable at maturity or interest to be paid on such series of debt securities, or both, to be determined with reference to the price or prices of specified commodities, stocks or indices, the exchange rate of a specified currency relative to one or more other currencies, currency units, composite currencies or units of account specified in an applicable prospectus supplement, or such other price or exchange rate as may be specified in such series of debt securities, as set forth in an applicable prospectus supplement relating to such series of debt securities ("indexed notes"). In certain cases, holders of indexed notes may receive a principal amount on the maturity date that is greater than or less than the face amount of the indexed notes, or an interest rate that is greater than or less than the stated interest rate on the indexed notes, or both, depending upon the structure of the indexed note and the relative value on the maturity date or at the relevant interest payment date, as the case may be, of the specified indexed item. However, the amount of interest or principal payable with respect to an indexed note will not be less than zero. Information as to the method for determining the principal amount payable on the maturity date, the manner of determining the interest rate, certain historical information with respect to the specified indexed item and tax considerations associated with an investment in indexed notes will be set forth in the applicable prospectus supplement.

An investment in indexed notes may be much riskier than a similar investment in conventional fixed-rate debt securities. If the interest rate of an indexed note is indexed, it may result in an interest rate that is less than that payable on conventional fixed-rate debt securities issued by us at the same time, including the possibility that no interest will be paid. If the principal amount of an indexed note is indexed, the principal amount payable at maturity may be less than the original purchase price of such indexed note, including the possibility that no principal will be paid, resulting in an entire loss of investment. Additionally, if the formula used to determine the principal amount or interest payable with respect to such indexed notes contains a multiple or leverage factor, the effect of any change in the applicable currency, commodity, stock or interest rate index may be increased. We refer you to "Foreign Currency Risks."

**Dual Currency Notes**

Dual currency debt securities, which we refer to as dual currency notes, are any series of debt securities as to which we have a one-time option, exercisable on a specified date in whole, but not in part, with respect to all dual currency notes issued on the same day and having the same terms, of making all payments of principal, premium, if any, and interest after the exercise of such option, whether at maturity or otherwise (which payments would otherwise be made in the face amount currency of such series of debt securities specified in the applicable prospectus supplement), in the optional payment currency specified in the applicable prospectus supplement. The terms of the dual currency notes together with information as to the relative value of the face amount currency compared to the optional payment currency and as to tax considerations associated with an investment in dual currency notes will also be set forth in the applicable prospectus supplement.

If we elect on any option election date specified in the applicable prospectus supplement to pay in the optional payment currency instead of the face amount currency, payments of interest, premium, if any, and principal made after such option election date may be worth less, at the then current exchange rate, than if we had made such payments in the face amount currency. We refer you to "Foreign Currency Risks."

27

Exhibit 1
324

**Renewable Notes**

The relevant issuer may also issue from time to time variable rate renewable debt securities, which we refer to as renewable notes, which will mature on an interest payment date specified in the applicable prospectus supplement unless the maturity of all or a portion of the principal amount of the renewable notes is extended in accordance with the procedures set forth in the applicable prospectus supplement.

**Short-Term Notes**

The relevant issuer may offer from time to time series of debt securities with maturities of less than one year, which we refer to as short-term notes. Unless otherwise indicated in the applicable prospectus supplement, interest on short-term notes will be payable at maturity. Unless otherwise indicated in the applicable prospectus supplement, interest on short-term notes that are floating rate notes (other than Treasury rate notes) will be computed on the basis of the actual number of days elapsed divided by 360, and interest on short-term notes that are Treasury rate notes will be computed on the basis of the actual number of days elapsed divided by a year of 365 or 366 days, as the case may be.

**Extension of Maturity**

The applicable prospectus supplement will indicate whether the relevant issuer has the option to extend the maturity of a series of debt securities (other than an amortizing note) for one or more periods up to but not beyond the final maturity date set forth in the applicable prospectus supplement. If the relevant issuer has that option with respect to any series of debt securities (other than an amortizing note), we will describe the procedures in the applicable prospectus supplement.

**Amortizing Notes**

Amortizing debt securities, which we refer to as amortizing notes, are a series of debt securities for which payments combining principal and interest are made in installments over the life of such series of debt securities. Payments with respect to amortizing notes will be applied first to interest due and payable on the amortizing notes and then to the reduction of the unpaid principal amount of the amortizing notes. The relevant issuer will provide further information on the additional terms and conditions of any issue of amortizing notes in the applicable prospectus supplement. A table setting forth repayment information in respect of each amortizing note will be included in the applicable prospectus supplement and set forth on the amortizing notes.

**Original Issue Discount Notes**

The relevant issuer may offer series of debt securities, which we refer to as original issue discount notes, from time to time at an issue price (as specified in the applicable prospectus supplement) that is less than 100% of the principal amount of such series of debt securities (i.e., par). Original issue discount notes may not bear any interest currently or may bear interest at a rate that is below market rates at the time of issuance. The difference between the issue price of an original issue discount note and par is referred to herein as the "discount." In the event of redemption, repayment or acceleration of maturity of an original issue discount note, the amount payable to the holder of an original issue discount note will be equal to the sum of (a) the issue price (increased by any accruals of discount) and, in the event of any redemption by us of such original issue discount note (if applicable), multiplied by the initial redemption percentage specified in the applicable prospectus supplement (as adjusted by the initial redemption percentage reduction, if applicable) and (b) any unpaid interest on such original issue discount note accrued from the date of issue to the date of such redemption, repayment or acceleration of maturity.

Exhibit 1

325

Unless otherwise specified in the applicable prospectus supplement, for purposes of determining the amount of discount that has accrued as of any date on which a redemption, repayment or acceleration of maturity occurs for an original issue discount note, the discount will be accrued using a constant yield method. The constant yield will be calculated using a 30-day month, 360-day year convention, a compounding period that, except for the initial period (as defined below), corresponds to the shortest period between interest payment dates for the applicable original issue discount note (with ratable accruals within a compounding period), a coupon rate equal to the initial coupon rate applicable to such original issue discount note and an assumption that the maturity of such original issue discount note will not be accelerated. If the period from the date of issue to the initial interest payment date, or the initial period, for an original issue discount note is shorter than the compounding period for such original issue discount note, a proportionate amount of the yield for an entire compounding period will be accrued. If the initial period is longer than the compounding period, then such period will be divided into a regular compounding period and a short period with the short period being treated as provided in the preceding sentence. The accrual of the applicable discount may differ from the accrual of original issue discount for purposes of the Internal Revenue Code of 1986, as amended.

Certain original issue discount notes may not be treated as having original issue discount for federal income tax purposes, and debt securities other than original issue discount notes may be treated as issued with original issue discount for U.S. federal income tax purposes. We refer you to "Taxation—United States Taxation."

**Redemption at the Option of the Relevant Issuer**

Unless otherwise provided in the applicable prospectus supplement, the relevant issuer cannot redeem debt securities prior to maturity. The relevant issuer may redeem a series of debt securities at its option prior to the maturity date only if an initial redemption date is specified in the applicable prospectus supplement. If so specified, the relevant issuer can redeem the debt securities of such series at its option on any date on and after the applicable initial redemption date in whole or from time to time in part in increments of $2,000 or such other minimum denomination specified in such applicable prospectus supplement (provided that any remaining principal amount of the debt securities of such series will be at least $2,000 or such other minimum denomination), at the applicable redemption price, together with unpaid interest accrued to the date of redemption, on notice given not more than 60 nor less than 30 calendar days prior to the date of redemption and in accordance with the provisions of the applicable indenture. By redemption price for a debt security of a series, we mean an amount equal to the initial redemption percentage specified in the applicable prospectus supplement (as adjusted by the annual redemption percentage reduction specified in the applicable prospectus supplement, if any) multiplied by the unpaid principal amount of the debt security to be redeemed. The initial redemption percentage, if any, applicable to a series of debt securities may decline on each anniversary of the initial redemption date by an amount equal to the applicable annual redemption percentage reduction, if any, until the redemption price is equal to 100% of the unpaid principal amount to be redeemed. The redemption price of original issue discount notes is described above under "—Original Issue Discount Notes."

Debt securities denominated in a foreign currency may be subject to different restrictions on redemption. We refer you to "Special Provisions Relating to Debt Securities or Contingent Convertible Securities Denominated in a Foreign Currency—Minimum Denominations, Restrictions on Maturities, Repayment and Redemption."

**Repayment at the Option of the Holders; Repurchase**

Holders may require the relevant issuer to repay a series of debt securities prior to maturity only if one or more optional repayment dates are specified in the applicable prospectus supplement. If so

Exhibit 1

326

specified, the relevant issuer will repay debt securities of such series at the option of the holders on any optional repayment date in whole or in part from time to time in increments of $2,000 or such other minimum denomination specified in the applicable prospectus supplement (provided that any remaining principal amount thereof will be at least $2,000 or such other minimum denomination specified in the applicable prospectus supplement), at a repayment price equal to 100% of the unpaid principal amount to be repaid, together with unpaid interest accrued to the date of repayment. A holder who wants the relevant issuer to repay a debt security prior to maturity must deliver the debt security, together with the form "Option to Elect Repayment" properly completed, to the trustee at its corporate trust office (or any other address that the relevant issuer specifies in the applicable prospectus supplement or notifies holders from time to time) no more than 60 nor less than 30 calendar days prior to the date of repayment. Exercise of a repayment option by the holder will be irrevocable. The repayment price of original issue discount notes is described above under "—Original Issue Discount Notes." Notwithstanding the foregoing, the relevant issuer will comply with Section 14(e) under the Exchange Act to the extent applicable, and any other tender offer rules under the Exchange Act which may then be applicable, in connection with any obligation to repurchase a series of debt securities.

Only the depositary may exercise the repayment option in respect of global securities representing book-entry debt securities. Accordingly, beneficial owners of global securities that desire to have all or any portion of book-entry debt securities represented by global securities repaid must direct the participant of the depositary through which they own their interest to direct the depositary to exercise the repayment option on their behalf by delivering the related global security and duly completed election form to the trustee as aforesaid. In order to ensure that the global security and election form are received by the trustee on a particular day, the applicable beneficial owner must so direct the participant through which it owns its interest before that participant's deadline for accepting instructions for that day. Different firms may have different deadlines for accepting instructions from their customers. Accordingly, beneficial owners should consult the participants through which they own their interest for the respective deadlines of those participants. All instructions given to participants from beneficial owners of global securities relating to the option to elect repayment will be irrevocable. In addition, at the time instructions are given by a beneficial owner, the beneficial owner must cause the participant through which it owns its interest to transfer that beneficial owner's interest in the global security or securities representing the related book-entry debt securities, on the depositary's records, to the trustee. We refer you to "—Book-Entry System."

Debt securities denominated in a foreign currency may be subject to different restrictions on repayment. We refer you to "Special Provisions Relating to Debt Securities or Contingent Convertible Securities Denominated in a Foreign Currency—Minimum Denominations, Restrictions on Maturities, Repayment and Redemption."

The relevant issuer may at any time purchase debt securities at any price in the open market or otherwise. Such debt securities purchased by the relevant issuer may, at its discretion, be held, resold or surrendered to the trustee for cancellation.

**Tax Redemption**

If specifically provided by the applicable prospectus supplement, the relevant issuer may redeem a series of debt securities at its option at any time, in whole but not in part, on giving not less than 30 nor more than 60 days' notice, at the principal amount of such series of debt securities being redeemed, together with accrued interest to the date of redemption, if it has or will become obligated to pay additional interest on such series of debt securities as described under "—Payment of Additional Amounts" below as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of Switzerland, the United States or Guernsey, as applicable, or any political subdivision or taxing authority thereof or therein, or any change in the application or official interpretation of such laws, regulations or rulings, which change or amendment becomes effective on or

30

Exhibit 1
327

after the date of the applicable prospectus supplement, and such obligation cannot be avoided by the relevant issuer taking reasonable measures available to it, provided that no such notice of redemption will be given earlier than 90 days prior to the earliest date on which it would be obliged to pay such additional interest were a payment in respect of the debt securities of such series then due. Prior to the giving of any notice of redemption pursuant to this paragraph, the relevant issuer will deliver to the trustee a certificate stating that it is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to its right to redeem have occurred, and an opinion of independent counsel of recognized standing to the effect that the relevant issuer has or will become obligated to pay such additional interest as a result of such change or amendment.

**Payment of Additional Amounts**

If specifically provided by the applicable prospectus supplement, the relevant issuer will, subject to the exceptions and limitations set forth below, pay such additional amounts to the holder of a series of debt securities that is a non-U.S. holder (which we define under the heading "Taxation—United States Taxation") as may be necessary so that every net payment on such series of debt securities, after deduction or withholding for or on account of any present or future tax, assessment or other governmental charge imposed upon or as a result of such payment by Switzerland, the United States or Guernsey, as applicable, or any political subdivision or taxing authority thereof or therein, will not be less than the amount provided in such series of debt securities to be then due and payable.

*Switzerland*

If the relevant issuer is Credit Suisse Group or Credit Suisse, in either case, acting through a branch outside Switzerland and the net proceeds from the issue of the debt securities are used outside Switzerland, all payments of principal and interest in respect of the debt securities shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within Switzerland or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In that event, the relevant issuer shall pay such additional amounts as will result in receipt by the holders of such amounts as would have been received by them had no such withholding or deduction been required, except that no such additional amounts shall be payable by the relevant issuer to any such holder for or on account of:

(i) any such taxes, duties, assessments or other governmental charges imposed in respect of such debt security by reason of the holder having some connection with Switzerland other than the mere holding of the debt security;

(ii) any such taxes, duties, assessments or other governmental charges imposed in respect of any debt security presented for payment more than 30 days after the Relevant Date (as defined below) except to the extent that the holder would have been entitled to such additional amounts on presenting such debt security for payment on the last day of such period of 30 days;

(iii) any such taxes, duties, assessments or other governmental charges where such withholding or deduction is imposed on a payment to an individual and is (A) required to be made pursuant to European Council Directive 2003/48/EC on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive, (B) required to be made pursuant to the Agreement between the European Community and the Confederation of Switzerland dated as of 26th October 2004 (the "Swiss Savings Tax Agreement") providing for measures equivalent to those laid down in the EU Savings Tax Directive or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, the Swiss Savings Tax Agreement, (C) required to be made

31

Exhibit 1
328

pursuant to agreements between Guernsey and the EU Member States dated 19th November 2004 (the "Guernsey Savings Tax Agreement") providing for measures equivalent to those laid down in the EU Savings Tax Directive or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, such Guernsey Savings Tax Agreements, or (D) required to be made pursuant to any agreements between the European Community and other countries or territories providing for measures equivalent to those laid down in the EU Savings Tax Directive or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, such agreements; or

(iv) any tax required to be withheld or deducted from a payment pursuant to laws enacted by Switzerland providing for the taxation of payments according to principles similar to those laid down (i) in the EU Savings Tax Directive or (ii) in the draft legislation proposed by the Swiss Federal Council on August 24, 2011, including the principle to have a person other than the relevant issuer withhold or deduct tax; or

(v) any such taxes, duties, assessments or other governmental charges imposed in respect of the relevant debt security presented for payment by or on behalf of a holder who would have been able to avoid such withholding or deduction by presenting the relevant debt security to another paying agent in a member state of the European Union; or

(vi) any such taxes, duties, assessments or other governmental charges imposed in respect of the relevant debt security where, if the relevant issuer is Credit Suisse Group or Credit Suisse, in either case, acting through its Zurich head office, such withholding or deduction is required by the Swiss Federal Withholding Tax Code of 13 October 1965 (*Bundesgesetz über die Verrechnungssteuer vom 13 Oktober 1965*); or

(vii) any combination of two or more items (i) through (vi) above.

"Relevant Date" as used herein means whichever is the later of (x) the date on which such payment first becomes due and (y) if the full amount payable has not been received by the trustee on or prior to such date, the date on which the full amount having been so received, notice to that effect shall have been given to the holders.

### United States

If the relevant issuer is Credit Suisse Group or Credit Suisse, in either case, acting through a U.S. branch, it will not be required to make any such payment of additional amounts for or on account of:

- any tax, assessment or other governmental charge that would not have been imposed but for (a) the existence of any present or former connection between such holder and the United States, including, without limitation, such holder being or having been a citizen or resident thereof or being or having been engaged in trade or business or present therein or having or having had a permanent establishment therein or (b) such holder's past or present status as a personal holding company, foreign personal holding company or private foundation or other tax-exempt organization with respect to the United States or as a corporation that accumulates earnings to avoid U.S. federal income tax;

- any estate, inheritance, gift, sales, transfer or personal property tax or any similar tax, assessment or other governmental charge;

- any tax, assessment or other governmental charge that would not have been imposed but for the presentation by the holder of a debt security for payment more than 15 days after the date on which such payment became due and payable or on which payment thereof was duly provided for, whichever occurs later;

32

Exhibit 1
329

- any tax, assessment or other governmental charge that is payable otherwise than by deduction or withholding from a payment on such series of debt securities;

- any tax, assessment or other governmental charge required to be deducted or withheld by any paying agent from a payment on such series of debt securities, if such payment can be made without such deduction or withholding by any other paying agent;

- any tax, assessment or other governmental charge that would not have been imposed but for a failure to comply with any applicable certification, documentation, information or other reporting requirement concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of such series of debt securities if, without regard to any tax treaty, such compliance is required by statute or regulation of the United States as a precondition to relief or exemption from such tax, assessment or other governmental charge;

- any tax, assessment or other governmental charge that would not have been imposed but for a failure by the holder or beneficial owner of the debt securities (or any financial institution through which the holder or beneficial owner holds the debt securities or through which payment on the debt security is made) to enter into or to comply with any applicable certification, documentation, information or other reporting requirement or agreement concerning United States accounts maintained by the holder or beneficial owner (or any such financial institution), including by reason of holding the debt securities, or concerning United States ownership of the holder or beneficial owner (or any such financial institution), or any substantially similar requirement or agreement, if entering into or complying with such requirement or agreement is required by statute or regulation of the United States as a precondition to relief or exemption from such tax, assessment or other governmental charge;

- any tax, assessment or other governmental charge imposed on a holder of such series of debt securities that actually or constructively owns 10 percent or more of the combined voting power of all classes of the relevant issuer's stock or that is a controlled foreign corporation related to the relevant issuer through stock ownership; or

- as discussed in "Taxation—European Union Directive on Taxation of Certain Interest Payments," any withholding or deduction that is imposed on a payment to an individual and is required to be made pursuant to any European Union Directive on the taxation of savings income implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 (including Directive 2003/48/EC adopted by the Council of the European Union on June 3, 2003), or any law implementing or complying with, or introduced in order to conform to, such directive;

nor will such additional amounts be paid with respect to a payment on such series of debt securities to a holder that is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of such series of debt securities.

### *Guernsey*

If the relevant issuer is Credit Suisse Group or Credit Suisse, in either case, acting through its Guernsey branch, no such additional amounts will be payable:

- to the extent the withholding or deduction is imposed or levied because the holder of the debt security has some connection with the relevant jurisdiction other than merely being a holder of the debt security;

Exhibit 1
330

- to the extent the withholding or deduction is imposed or levied because the holder (or beneficial owner) of the debt security has not made a declaration of non-residence or other claim for exemption, if such holder is able to avoid such deduction or withholding by making such a declaration or claim;

- more than 30 days after the date on which the related payments on the debt security becomes due, except to the extent that the holder of the debt security would have been entitled to such additional amounts on the thirtieth such day; or

- to a holder who would have been able to avoid such withholding or deduction by receiving such payment through another paying agent in a member state of the European Union.

**Subordination**

If Credit Suisse issues subordinated debt securities that qualify as tier 1 or tier 2 capital or other capital for regulatory purposes, the subordination provisions may vary from those described below as set forth in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, when the term "senior indebtedness" is used in the context of the subordinated debt securities, it means, with respect to an issuer:

- any money such entity has borrowed, including any senior debt securities issued under the relevant senior indenture;

- any money borrowed by someone else where such entity has assumed or guaranteed the obligations, directly or indirectly;

- any letters of credit and acceptances made by banks on such entity's behalf; and

- indebtedness that such entity has incurred or assumed in connection with the acquisition of any property.

Senior indebtedness shall not include any indebtedness that is expressed to be subordinated to or on par with the subordinated debt securities or any money owed to an entity's subsidiaries.

The subordinated indentures provide that the relevant issuer cannot:

- make any payments of principal, premium or interest on the subordinated debt securities;

- acquire any subordinated debt securities; or

- defease any subordinated debt securities;

if

- any senior indebtedness in an aggregate principal amount of more than $100 million has become due either on maturity or as a result of acceleration or otherwise and the principal, premium and interest on that senior indebtedness has not yet been paid in full by such entity; or

- such entity has defaulted in the payment of any principal, premium or interest on any senior indebtedness in an aggregate principal amount of more than $100 million at the time the payment was due, unless and until the payment default is cured by such entity or waived by the holders of the senior indebtedness.

If the relevant issuer is liquidated, the holders of the senior indebtedness will be entitled to receive payment in full in cash for principal, premium and interest on the senior indebtedness before the holders of subordinated debt securities receive any of such entity's assets. As a result, holders of subordinated debt securities may receive a smaller proportion of such entity's assets in liquidation than

34

Exhibit 1

331

holders of senior indebtedness. In such a situation, holders of the subordinated debt securities could lose all or part of their investment.

Even if the subordination provisions prevent the relevant issuer from making any payment when due on the subordinated debt securities, the relevant issuer will be in default on its obligations under the applicable subordinated indenture if it does not make the payment when due. This means that the trustee and the holders of subordinated debt securities can take action against the relevant issuer, but they would not receive any money until the claims of the senior indebtedness have been fully satisfied.

The subordinated indentures allow the holders of senior indebtedness to obtain specific performance of the subordination provisions from the relevant issuer or any holder of subordinated debt securities.

There is no restriction on the amount of further debt securities that the relevant issuer may issue or guarantee which rank senior to or pari passu with the subordinated debt securities. The issue of any such further debt securities may reduce the amount that may be recovered by holders of subordinated debt securities in the event that the relevant issuer is wound up and/or may limit the ability of the relevant issuer to meet its obligations under the subordinated debt securities.

**Consolidation, Merger or Sale**

The relevant issuer will agree in the applicable indentures not to consolidate with or merge with or into any other person or convey or transfer all or substantially all of its properties and assets to any person unless:

- it is the continuing person; or
- the successor expressly assumes by supplemental indenture its obligations under such indenture.

In either case, the relevant issuer will also have to deliver a certificate to the trustee stating that after giving effect to the merger there will not be any defaults under the applicable indenture and, if the relevant issuer is not the continuing person, an opinion of counsel stating that the merger and the supplemental indentures comply with these provisions and that the supplemental indentures are legal, valid and binding obligations of the successor corporation enforceable against it.

Credit Suisse or Credit Suisse Group may issue debt securities directly or through one or more branches and Credit Suisse may, at any time, transfer its obligations under the debt securities from the head office to any branch of Credit Suisse or from any branch of Credit Suisse to another branch or to its head office.

**Modification of the Indentures**

In general, rights and obligations of the relevant issuer and the holders under each applicable indenture may be modified if the holders of a majority in aggregate principal amount of the outstanding debt securities of each series affected by the modification consent to such modification. However, each of the indentures provides that, unless each affected holder agrees, an amendment cannot:

- make any adverse change to any payment term of a debt security such as extending the maturity date, extending the date on which the relevant issuer has to pay interest or make a sinking fund payment, reducing the interest rate, reducing the amount of principal the relevant issuer has to repay, reducing the amount of principal of a debt security issued with original issue discount that would be due and payable upon an acceleration of the maturity thereof or the amount thereof provable in bankruptcy, insolvency or similar proceeding, changing the currency or place in which the relevant issuer has to make any payment of principal, premium or interest, modifying any redemption or repurchase right to the detriment of the holder, modifying any right to convert or exchange the debt securities for another security to the detriment of the holder, and impairing any right of a holder to bring suit for payment;

35

Exhibit 1

332

- reduce the percentage of the aggregate principal amount of debt securities needed to make any amendment to the applicable indenture or to waive any covenant or default;

- waive any payment default; or

- make any change to the amendment provisions of the applicable indenture.

However, other than in the circumstances mentioned above, if the relevant issuer and the trustee agree, the applicable indenture may be amended without notifying any holders or seeking their consent if the amendment does not materially and adversely affect any holder.

In particular, if the relevant issuer and the trustee agree, the applicable indenture may be amended without notifying any holders or seeking their consent to add a guarantee from a third party on the outstanding and future debt securities to be issued under an applicable indenture.

### Covenants

The relevant issuer may be subject to additional covenants, including restrictive covenants in respect of a particular series of debt securities. Such additional covenants will be set forth in the applicable prospectus supplement and, to the extent necessary, in the supplemental indenture or board resolution relating to that series of debt securities.

### Events of Default

Unless otherwise specified in a prospectus supplement, an event of default with respect to a series of debt securities occurs upon:

- a default in payment of the principal or any premium on any debt security of that series when due;

- a default in payment of interest when due on any debt security of that series for 30 days;

- a default in performing any other covenant in the indenture applicable to that series for 60 days after written notice from the trustee or from the holders of 25% in principal amount of the outstanding debt securities of such series; or

- certain events of bankruptcy, insolvency or reorganization of the relevant issuer.

Any additional or different events of default applicable to a particular series of debt securities will be described in the prospectus supplement relating to such series.

The trustee may withhold notice to the holders of debt securities of any default (except in the payment of principal, premium or interest) if it considers such withholding of notice to be in the best interests of the holders. A default is any event which is an event of default described above or would be an event of default but for the giving of notice or the passage of time.

Unless otherwise specified in the applicable prospectus supplement, if an event of default occurs and continues, the trustee or the holders of the aggregate principal amount of the debt securities specified below may require the relevant issuer to repay immediately, or accelerate:

- the entire principal of the debt securities of such series; or

- if the debt securities are original issue discount securities, such portion of the principal as may be described in the applicable prospectus supplement.

Unless otherwise specified in the applicable prospectus supplement, if the event of default occurs because of a default in a payment of principal or interest on the debt securities, then the trustee or the holders of at least 25% of the aggregate principal amount of debt securities of that series can accelerate that series of debt securities. If the event of default occurs because of a failure to perform

Exhibit 1

333

any other covenant in the applicable indenture for the benefit of one or more series of debt securities, then the trustee or the holders of at least 25% of the aggregate principal amount of debt securities of all series affected, voting as one class, can accelerate all of the affected series of debt securities. If the event of default occurs because of bankruptcy proceedings, then all of the debt securities under the applicable indenture will be accelerated automatically. Therefore, except in the case of a default on a payment of principal or interest on the debt securities of your series or a default due to bankruptcy or insolvency of the relevant issuer, it is possible that you may not be able to accelerate the debt securities of your series because of the failure of holders of other series to take action.

The holders of a majority of the aggregate principal amount of the debt securities of all affected series, voting as one class, can rescind this accelerated payment requirement or waive any past default or event of default or allow noncompliance with any provision of the applicable indenture. However, they cannot waive a default in payment of principal of, premium, if any, or interest on, any of the debt securities.

After an event of default, the trustee must exercise the same degree of care a prudent person would exercise under the circumstances in the conduct of her or his own affairs. Subject to these requirements, the trustee is not obligated to exercise any of its rights or powers under the applicable indenture at the request, order or direction of any holders, unless the holders offer the trustee reasonable indemnity. If they provide this reasonable indemnity, the holders of a majority in principal amount of all affected series of debt securities, voting as one class, may direct the time, method and place of conducting any proceeding or any remedy available to the trustee, or exercising any power conferred upon the trustee, for any series of debt securities.

**Defeasance**

The term defeasance means discharge from some or all of the obligations under the applicable indenture. If the relevant issuer deposits with the trustee sufficient cash or government securities to pay the principal, interest, any premium and any other sums due to the stated maturity date or a redemption date of the debt securities of a particular series, then at the relevant issuer's option:

- the relevant issuer will be discharged from their respective obligations with respect to the debt securities of such series; or

- the relevant issuer will no longer be under any obligation to comply with the restrictive covenants, if any, contained in the applicable indenture and any supplemental indenture or board resolution with respect to the debt securities of such series, and the events of default relating to failures to comply with covenants will no longer apply to them.

If this happens, the holders of the debt securities of the affected series will not be entitled to the benefits of the applicable indenture except for registration of transfer and exchange of debt securities and replacement of lost, stolen or mutilated debt securities. Instead, the holders will only be able to rely on the deposited funds or obligations for payment.

The relevant issuer must deliver to the trustee an officers' certificate and an opinion of counsel to the effect that the deposit and related defeasance would not cause the holders of the debt securities to recognize income, gain or loss for U.S. federal income tax purposes. In the case of a complete discharge, the relevant issuer may, in lieu of an opinion of counsel, deliver a ruling to such effect received from or published by the U.S. Internal Revenue Service if the relevant issuer is discharged from its obligations with respect to the debt securities.

**Information Concerning the Trustee for the Debt Securities**

The Bank of New York Mellon, formerly known as The Bank of New York (as successor to JPMorgan Chase Bank, N.A., in the case of senior and subordinated indentures with Credit Suisse

Exhibit 1
334

Group), with its corporate trust office at 101 Barclay Street, Floor 8W, New York, New York 10286, will be the trustee for the debt securities. The trustee will be required to perform only those duties that are specifically set forth in the applicable indenture, except when a default has occurred and is continuing with respect to the debt securities. After a default, the trustee must exercise the same degree of care that a prudent person would exercise under the circumstances in the conduct of her or his own affairs. Subject to these requirements, the trustee will be under no obligation to exercise any of the powers vested in it by the applicable indenture at the request of any holder of debt securities unless the holder offers the trustee reasonable indemnity against the costs, expenses and liabilities that might be incurred by exercising those powers.

The Bank of New York Mellon, formerly known as The Bank of New York, has loaned money to Credit Suisse Group and certain of its subsidiaries and affiliates and provided other services to it and has acted as trustee or fiscal agent under certain of its and its subsidiaries' and affiliates' indentures or fiscal agency agreements in the past and may do so in the future as a part of its regular business.

**Governing Law**

The debt securities and the related indentures will be governed by and construed in accordance with the laws of the State of New York, except for, in the case of subordinated debt securities issued by Credit Suisse Group or Credit Suisse, the subordination provisions thereof, which will be governed by Swiss law.

Exhibit 1

335

## DESCRIPTION OF CONTINGENT CONVERTIBLE SECURITIES

This section describes the general terms that will apply to any contingent convertible securities that may be offered pursuant to this prospectus by either or both of the finance subsidiaries. In this section of the prospectus, the term "relevant issuer" refers, individually or severally, as applicable, to Credit Suisse Group (Guernsey) I Limited or Credit Suisse Group (Guernsey) III Limited, as set forth in the applicable prospectus supplement. The specific terms of the offered contingent convertible securities, and the extent to which the general terms described in this section apply to the contingent convertible securities, will be described in the applicable prospectus supplement at the time of the offer.

### General

As used in this prospectus, "contingent convertible securities" means the senior or subordinated guaranteed exchangeable or convertible debt securities convertible into shares or, at the relevant issuer's option, American depositary shares of Credit Suisse Group that the relevant finance subsidiary issues and that Credit Suisse Group fully and unconditionally guarantees on a senior or subordinated basis (as described below under "—Credit Suisse Group Guarantees") and, in each case, the trustee authenticates and delivers under the applicable indenture.

Contingent convertible securities will be issued in one or more series under the applicable indenture and any supplements thereto among the relevant finance subsidiary, Credit Suisse Group and HSBC Bank USA, N.A., as trustee. In this section, we sometimes refer to these indentures collectively as the "contingent convertible indentures." Each contingent convertible indenture is governed by English law, except that the provisions relating to the status and degree of subordination of the contingent convertible securities and the guarantee are governed by, and shall be construed in accordance with, the laws of the Island of Guernsey, in the case of the finance subsidiaries, and the laws of Switzerland, in the case of Credit Suisse Group and except that with respect to those provisions of the Trust Indenture Act that are included or deemed to be included in the applicable contingent convertible indenture or that are deemed by the Trust Indenture Act to be part of and to govern the applicable contingent convertible indenture, the Trust Indenture Act shall govern.

This section of the prospectus briefly outlines the provisions of the contingent convertible indentures related to the contingent convertible securities. Additional terms of the applicable contingent convertible indentures, including any supplements thereto, may be outlined in a supplement to this prospectus. The terms of the contingent convertible indentures will include both those stated in the applicable contingent convertible indenture and those made part of the applicable contingent convertible indenture by the Trust Indenture Act. Each contingent convertible indenture has been filed as an exhibit to the registration statement of which this prospectus forms a part, and you should read the applicable contingent convertible indenture for provisions that may be important to you.

The contingent convertible indentures do not contain any covenants or other provisions designed to protect holders of the contingent convertible securities against a reduction in the creditworthiness of Credit Suisse Group or the relevant finance subsidiary in the event of a highly leveraged transaction or that would prohibit other transactions that might adversely affect holders of the contingent convertible securities, including a change in control of Credit Suisse Group or the relevant finance subsidiary.

Credit Suisse Group is a holding company and depends upon the earnings and cash flow of its subsidiaries to meet its obligations under the guarantees. Since the creditors of any of its subsidiaries would generally have a right to receive payment that is superior to Credit Suisse Group's right to receive payment from the assets of that subsidiary, payments to holders under the guarantees, if any, will be effectively subordinated to creditors of Credit Suisse Group's subsidiaries. In addition, there are various legal and regulatory requirements, including the satisfaction of a solvency test under Guernsey law, applicable to some of Credit Suisse Group's subsidiaries that limit their ability to pay dividends and distributions and make loans and advances to Credit Suisse Group.

Exhibit 1

336

**Issuances in Series**

The contingent convertible indentures do not limit the amount of debt that may be issued. The contingent convertible securities may be issued in one or more series with the same or various maturities, at a price of 100% of their principal amount or at a premium or a discount. Not all contingent convertible securities of any one series need be issued at the same time and, unless otherwise provided, any series may be reopened for issuances of additional contingent convertible securities of that series. The contingent convertible securities will not be secured by any property or assets of the finance subsidiaries or Credit Suisse Group.

The terms of any authorized series of contingent convertible securities will be described in a prospectus supplement. These terms may include:

- whether the contingent convertible securities will be issued by Credit Suisse Group (Guernsey) I Limited or Credit Suisse Group (Guernsey) III Limited;

- the designation of the contingent convertible securities of a series, which shall distinguish the contingent convertible securities of that series from the contingent convertible securities of all other series;

- under what conditions, if any, Credit Suisse Group may be substituted as the issuer of the contingent convertible securities of the series;

- any limit on the aggregate principal amount of the contingent convertible securities that may be authenticated or delivered;

- the place or places where principal of, and any interest on, the contingent convertible securities shall be payable, where the contingent convertible securities may be surrendered for exchange or conversion, if applicable, and where notices, demands to or upon the relevant issuer in respect of the contingent convertible securities may be served and notice to holders may be published;

- the terms on which holders of the contingent convertible securities may or are required to convert or exchange these securities into or for shares or, at the relevant issuer's option, American depositary shares, of Credit Suisse Group and any specific terms relating to the conversion or exchange feature;

- whether the contingent convertible securities qualify as tier 1 capital or tier 2 capital;

- the total principal amount of the contingent convertible securities;

- the date or dates on which principal will be payable and whether the contingent convertible securities will be payable on demand by the holders on any date;

- whether the contingent convertible securities of the series or any portion thereof will be issuable as registered securities (and if so, whether such contingent convertible securities will be issuable as registered global securities) or unregistered securities (with or without coupons), or any combination of the following, any restrictions applicable to the offer, sale or delivery of unregistered securities or the payment of interest thereon and, if other than as provided herein, the terms upon which unregistered securities may be exchanged for registered securities of such series and vice versa;

- whether and under what circumstances the relevant issuer will pay additional amounts on the contingent convertible securities in respect of any tax, assessment or governmental charge withheld or deducted and, if so, whether the relevant issuer will have the option to redeem such contingent convertible securities rather than pay such additional amounts;

- if the contingent convertible securities are to be issuable in definitive form (whether upon original issue or upon exchange of a temporary contingent convertible security of such series);

40

Exhibit 1

337

- the subordination provisions, if any, applicable to the contingent convertible securities;

- the subordination provisions, if any, applicable to the guarantees of the contingent convertible securities;

- the manner in which payments of principal, premium or interest will be calculated and whether any contingent convertible security bears a fixed rate of interest or bears a floating rate of interest, including whether any contingent convertible security is a regular floating rate note, a floating rate/fixed rate note or an inverse floating rate note (each as described below);

- provisions, if any, for the defeasance of the contingent convertible securities;

- the interest payment dates;

- any applicable events of default, whether of the relevant issuer or Credit Suisse Group as guarantor, and whether related to senior or subordinated contingent convertible securities, including acceleration provisions and covenant defaults;

- any covenants applicable to the series;

- whether any sinking fund is required;

- whether and under what circumstances the contingent convertible securities of a series will be issued as original issue discount securities, and if other than the principal amount, the portion of the principal amount of contingent convertible securities of a series which shall be payable upon declaration of acceleration of the maturity thereof;

- optional or mandatory redemption terms;

- authorized denominations, if other than $2,000 and integral multiples of $1,000 in excess thereof;

- the currency in which the contingent convertible securities will be denominated or principal, premium or interest will be payable, if other than U.S. dollars;

- whether the contingent convertible securities are to be issued as individual certificates to each holder or in the form of global certificates held by a depositary on behalf of holders;

- information describing any book-entry features;

- the terms of redemption and repurchase, if any;

- selling restrictions applicable to any series of contingent convertible securities, if any;

- the names and duties of any co-trustees, depositaries, authenticating agents, paying agents, transfer agents or registrars for any series; and

- any other terms consistent with the above.

The prospectus supplement relating to any series of contingent convertible securities may also include, if applicable, a discussion of certain U.S. federal income tax considerations and considerations under the Employee Retirement Income Security Act of 1974, as amended, or ERISA.

**Interest and Interest Rates**

Each series of contingent convertible securities that bears interest will bear interest from its date of issue or from the most recent date to which interest on that series of contingent convertible securities has been paid or duly provided for, at the fixed or floating rate specified in the series of contingent convertible securities, until the principal amount has been paid or made available for payment or the contingent convertible securities have been cancelled. Interest will be payable on each interest payment date and at maturity or on redemption, repurchase, conversion or exchange, if any.

41

Exhibit 1

338

Unless otherwise provided in the applicable prospectus supplement, in the event that the maturity date of any series of contingent convertible securities is not a business day, principal and interest payable at maturity will be paid on the next succeeding business day with the same effect as if that following business day were the date on which the payment were due, and the relevant issuer will not pay any additional interest as a result of the delay in payment except as otherwise provided in the applicable prospectus supplement. Unless otherwise indicated in the applicable prospectus supplement, interest payments in respect of a series of contingent convertible securities will equal the amount of interest accrued from and including the immediately preceding interest payment date in respect of which interest has been paid or duly made available for payment (or from and including the date of issue, if no interest has been paid with respect to the applicable series of contingent convertible securities) to but excluding the related interest payment date, maturity date or redemption or repurchase date, if any, as the case may be.

Interest will be payable to the person in whose name a contingent convertible security is registered at the close of business on the regular record date next preceding the related interest payment date, except that:

- if the relevant issuer fails to pay the interest due on an interest payment date, the defaulted interest will be paid to the person in whose name the contingent convertible security is registered at the close of business on the record date the relevant issuer will establish for the payment of defaulted interest; and

- interest payable at maturity, redemption or repurchase will be payable to the person to whom principal shall be payable.

The first payment of interest on any contingent convertible securities originally issued between a regular record date and an interest payment date will be made on the interest payment date following the next succeeding regular record date to the registered owner on such next succeeding regular record date.

The prospectus supplement relating to the issuance of a particular series of contingent convertible securities may also provide that the interest rate for such series will be automatically reset after any one or more reset dates specified therein.

### Fixed Rate Notes

Each fixed rate contingent convertible security, which is referred to as a contingent convertible fixed rate note, will bear interest at the annual rate specified in the applicable prospectus supplement. The interest payment dates for contingent convertible fixed rate notes will be specified in the applicable prospectus supplement and, unless specified in the applicable prospectus supplement, the regular record dates will be the fifteenth calendar day (whether or not a business day) prior to each interest payment date. Unless otherwise specified in the applicable prospectus supplement, interest on contingent convertible fixed rate notes will be computed and paid on the basis of a 360-day year of twelve 30-day months. In the event that any date for any payment on any contingent convertible fixed rate note is not a business day, payment of interest, premium, if any, or principal otherwise payable on such contingent convertible fixed rate note will be made on the next succeeding business day. The relevant issuer will not pay any additional interest as a result of the delay in payment.

### Floating Rate Notes

Unless otherwise specified in an applicable prospectus supplement, each floating rate contingent convertible security, which is referred to as a contingent convertible floating rate note, will be issued as

Exhibit 1
339

described below. Each applicable prospectus supplement will specify certain terms with respect to which such contingent convertible floating rate note is being delivered, including:

- whether the contingent convertible floating rate note is a regular contingent convertible floating rate note, an inverse contingent convertible floating rate note or a contingent convertible floating rate/contingent convertible fixed rate note (if not specified, the contingent convertible floating rate note will be a regular contingent convertible floating rate note);

- the interest rate basis or bases;

- initial interest rate;

- interest reset dates;

- interest reset period;

- interest payment dates;

- index maturity, if any;

- maximum interest rate and minimum interest rate, if any;

- the spread and/or spread multiplier, if any; and

- if one or more of the specified interest rate bases is LIBOR, the index currency, if any.

Unless otherwise specified in the applicable prospectus supplement, each regular record date for a contingent convertible floating rate note will be the fifteenth calendar day (whether or not a business day) prior to each interest payment date.

The interest rate borne by the contingent convertible floating rate notes will be determined as follows:

- Unless a contingent convertible floating rate note is a contingent convertible floating rate/contingent convertible fixed rate note or an inverse contingent convertible floating rate note, the contingent convertible floating rate note will be a regular contingent convertible floating rate note and, except as described below or in an applicable prospectus supplement, will bear interest at the rate determined by reference to the applicable interest rate basis or bases:

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Unless otherwise specified in the applicable prospectus supplement, commencing on the initial interest reset date, the rate at which interest on such regular contingent convertible floating rate note will be payable will be reset as of each interest reset date; provided, however, that the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate.

If a contingent convertible floating rate note is a contingent convertible floating rate/contingent convertible fixed rate note, then, except as described below or in an applicable prospectus supplement, the contingent convertible floating rate/contingent convertible fixed rate note will initially bear interest at the rate determined by reference to the applicable interest rate basis or bases:

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Exhibit 1
340

Commencing on the initial interest reset date, the rate at which interest on the contingent convertible floating rate/contingent convertible fixed rate note will be payable shall be reset as of each interest reset date, except that:

- the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate; and

- the interest rate in effect commencing on, and including, the fixed rate commencement date (as specified in the applicable prospectus supplement) to the maturity date will be the fixed interest rate specified in the applicable prospectus supplement, or if no fixed interest rate is so specified and the contingent convertible floating rate/contingent convertible fixed rate note is still outstanding on the fixed rate commencement date, the interest rate in effect on the contingent convertible floating rate/contingent convertible fixed rate note on the day immediately preceding the fixed rate commencement date.

If a contingent convertible floating rate note is an inverse contingent convertible floating rate note, then, except as described below or in an applicable prospectus supplement, the inverse contingent convertible floating rate note will bear interest equal to the fixed interest rate specified in the applicable prospectus supplement:

- minus the rate determined by reference to the interest rate basis or bases;

- plus or minus the applicable spread, if any; and/or

- multiplied by the applicable spread multiplier, if any.

Unless otherwise specified in the applicable prospectus supplement, the interest rate on an inverse contingent convertible floating rate note will not be less than zero. Commencing on the initial interest reset date, the rate at which interest on such inverse contingent convertible floating rate note is payable will be reset as of each interest reset date; provided, however, that the interest rate in effect for the period from the original issue date to the initial interest reset date will be the initial interest rate.

Unless otherwise provided in the applicable prospectus supplement, each interest rate basis will be the rate determined in accordance with the applicable provisions below. Except as set forth above or in the applicable prospectus supplement, the interest rate in effect on each day will be:

- if such day is an interest reset date, the interest rate as determined on the interest determination date immediately preceding such interest reset date; or

- if such day is not an interest reset date, the interest rate determined on the interest determination date immediately preceding the next preceding interest reset date.

The "spread" is the number of basis points to be added to, or subtracted from, the related interest rate basis or bases applicable to a contingent convertible floating rate note. The "spread multiplier" is the percentage of the related interest rate basis or bases applicable to a contingent convertible floating rate note by which such interest rate basis or bases will be multiplied to determine the applicable interest rate on such contingent convertible floating rate note. The "index maturity" is the period to maturity of the instrument or obligation with respect to which the interest rate basis or bases will be calculated. The "index currency" means the currency (including currency units and composite currencies) specified in the applicable prospectus supplement as the currency with respect to which LIBOR will be calculated. If no currency is specified in the applicable prospectus supplement, the index currency will be U.S. dollars.

Each applicable prospectus supplement will specify whether the rate of interest on the related contingent convertible floating rate note will be reset daily, weekly, monthly, quarterly, semi-annually, annually or such other specified interest reset period and the dates on which such interest rate will be reset.

44

Exhibit 1
341

The term "business day" means, unless otherwise specified in the applicable prospectus supplement, any day that is not a Saturday or Sunday and that is not a day on which banking institutions are generally authorized or obligated by law, regulation or executive order to close in The City of New York or in the City of Zurich, or in the Island of Guernsey.

Unless otherwise specified in the applicable prospectus supplement, if any interest payment date for any contingent convertible floating rate note (other than the maturity date, but including any redemption date or repurchase date) would otherwise be a day that is not a business day, that interest payment date or redemption date or repurchase date will be the next succeeding day that is a business day and interest shall accrue to, and be payable on, such following business day, except that if a contingent convertible floating rate note is a LIBOR note and if the next business day falls in the next succeeding calendar month, the interest payment date or redemption date or repurchase date will be the immediately preceding business day and interest shall accrue to, and be payable on, such preceding business day. If the maturity date of a contingent convertible floating rate note falls on a day that is not a business day, the payment of principal, premium, if any, and interest, if any, will be made on the next succeeding business day, and no additional interest will be paid for the period from and after the maturity date.

All percentages resulting from any calculation on contingent convertible floating rate notes will be to the nearest one hundred-thousandth of a percentage point, with five one millionths of a percentage point rounded upwards (e.g., 9.876545% (or .09876545) would be rounded to 9.87655% (or .0987655)), and all dollar amounts used in or resulting from such calculation will be rounded to the nearest cent (with one-half cent being rounded upward).

Unless otherwise provided for in the applicable prospectus supplement, HSBC Bank USA, N.A. will be the calculation agent and for each interest reset date will determine the interest rate with respect to any contingent convertible floating rate note as described below. The calculation agent will notify the relevant issuer, the paying agent and the trustee of each determination of the interest rate applicable to a contingent convertible floating rate note promptly after such determination is made. The calculation agent will, upon the request of the holder of any contingent convertible floating rate note, provide the interest rate then in effect and, if determined, the interest rate which will become effective as a result of a determination made with respect to the most recent interest determination date relating to such contingent convertible floating rate note. Unless otherwise specified in the applicable prospectus supplement, the "calculation date," where applicable, pertaining to any interest determination date will be the earlier of (a) the tenth calendar day after that interest determination date or, if such day is not a business day, the next succeeding business day or (b) the business day preceding the applicable interest payment date or maturity date, as the case may be.

### Redemption, Substitution, Variation, Repurchase and Conversion

#### Redemption at the Option of the Issuer

If so provided in the accompanying prospectus supplement, and subject, in certain instances, to the prior approval of Credit Suisse Group's primary regulator in Switzerland, the Swiss Financial Market Supervisory Authority FINMA, or FINMA, the relevant issuer may redeem the contingent convertible securities of any series in whole or from time to time in part prior to maturity on notice given at least 30 calendar days and not more than 60 calendar days prior to the date fixed for redemption upon the terms and subject to the conditions set forth in the accompanying prospectus supplement. The notice of redemption of contingent convertible securities of any series to be redeemed at the option of the relevant issuer shall be given by the relevant issuer or, at the relevant issuer's or Credit Suisse Group's request, by the trustee in the name and at the expense of the relevant issuer or Credit Suisse Group; provided, however, that the relevant issuer or Credit Suisse Group shall have delivered to the trustee, at least 45 calendar days prior to the date of redemption (or such shorter period as may be acceptable

Exhibit 1
342

to the trustee), an officers' certificate requesting that the trustee give such notice and setting forth the information to be stated in such notice. If notice of redemption has been given as provided herein, the contingent convertible securities or portions of contingent convertible securities specified in such notice shall become due and payable on the date and at the place stated in such notice at the applicable redemption price, together with interest accrued to (but excluding) the date fixed for redemption. By applicable redemption price, we mean the price specified in the redemption notice as calculated pursuant to the accompanying prospectus supplement.

### *Redemption upon the Occurrence of Certain Events*

Unless otherwise provided in the accompanying prospectus supplement, and subject, in certain instances, to the prior approval of FINMA, upon the occurrence of certain triggering events specified in the accompanying prospectus supplement (which may include, but shall not be limited to, regulatory events, takeover events, taxation events or capital events), the relevant issuer may, in accordance with the provisions of the accompanying prospectus supplement, redeem all, but not some only, of the contingent convertible securities of any series, together with any accrued but unpaid interest to (but excluding) the relevant redemption date.

Notwithstanding anything herein to the contrary, the relevant issuer may not give notice of redemption in cash of the contingent convertible securities of any series if mandatory conversion of the contingent convertible securities of such series has been triggered as described in the applicable prospectus supplement.

If so provided by the accompanying prospectus supplement, the relevant issuer may redeem all, but not some only, of the contingent convertible securities of a series at its option at any time on giving not less than 30 calendar days nor more than 60 calendar days notice, at the redemption price set forth in the accompanying prospectus supplement, together with accrued interest to (but excluding) the relevant redemption date, if it has or will (or Credit Suisse Group would, if required to pay under the guarantee) become obligated to pay additional amounts on such series of contingent convertible securities, as described in the accompanying prospectus supplement, as a result of certain changes in, or amendments to, the laws (or any regulations or rulings promulgated thereunder) of Switzerland or Guernsey.

### *Repurchase at the Option of the Holders*

Unless otherwise provided in the accompanying prospectus supplement, holders of the contingent convertible securities may not require the relevant issuer to repurchase a series of contingent convertible securities prior to maturity.

Subject to the prior approval of FINMA, the relevant issuer or Credit Suisse Group (or any subsidiary of Credit Suisse Group) may at any time purchase or procure others to purchase beneficially for its account contingent convertible securities in any manner and at any price.

### *Substitution or Variation of Terms*

Subject, in certain circumstances, to the prior approval of FINMA, upon the occurrence of certain triggering events (which may include, but shall not be limited to, regulatory events, takeover events, tax events and capital events) and in accordance with the provisions specified in the accompanying prospectus supplement, the relevant issuer may, without any requirement for the consent or approval of the holders of the contingent convertible securities or the trustee, either substitute all, but not some only, of the contingent convertible securities of a series for another series of contingent convertible securities, or vary the terms of all, but not some only, of the contingent convertible securities, in order to meet or continue to meet certain regulatory requirements; provided that the right of any holder of contingent convertible securities to receive payment of the principal of, and interest on, any contingent

46

Exhibit 1
343

convertible security on or after the respective due dates for such payment, or the right of any holder to institute suit for the enforcement of any such payment on or after such respective dates, or certain other rights of a holder as described in the applicable prospectus supplement shall not be impaired or affected without the consent of such holder. In connection with any substitution or variation, the relevant issuer shall comply with the rules of any stock exchange, if any, on which the contingent convertible securities are for the time being listed or admitted to trading.

The notice of substitution or variation of contingent convertible securities of any series to be substituted or varied at the option of the relevant issuer shall be given by the relevant issuer or, at the relevant issuer's or Credit Suisse Group's request, by the trustee in the name and at the expense of the relevant issuer or Credit Suisse Group by mailing notice of such substitution or variation to holders of contingent convertible securities at least 30 calendar days and not more than 60 calendar days prior to the date fixed for such substitution or variation; provided, however, that the relevant issuer or Credit Suisse Group shall have delivered to the trustee, at least 45 calendar days prior to the date of substitution or variation (or such shorter period as may be acceptable to the trustee), an officers' certificate requesting that the trustee give such notice and setting forth the information to be stated in such notice.

### Substitution of the Issuer

*Substitution at the Option of the Issuer.*    The relevant issuer may at any time, without the consent of the holders or the trustee, and on the terms and subject to the conditions, if any, set forth in the accompanying prospectus supplement, substitute Credit Suisse Group for itself as principal obligor under the contingent convertible securities of a series, provided that no payment in respect of the contingent convertible securities of such series is at the relevant time overdue. In order to give effect to such substitution, the relevant issuer shall give no more than 30 calendar days nor less than 10 calendar days notice of the substitution date to the trustee and the holders of such contingent convertible securities. With effect from the substitution date, Credit Suisse Group will, without the need for the amendment of existing, or the entry into of additional, documentation, be substituted as, and assume all of the obligations of the relevant issuer as, principal obligor under the contingent convertible securities of such series.

*Substitution upon a Reorganization.*    In the event of a reorganization or similar proceeding involving the interposition of a limited liability company between the shareholders of Credit Suisse Group immediately prior to such reorganization, and Credit Suisse Group, as set forth in the accompanying prospectus supplement, without the consent of holders or the trustee, the relevant issuer shall, and shall cause Credit Suisse Group to, enter into such agreements and arrangements and make such amendments to the terms of the contingent convertible securities and the guarantee as are necessary to ensure that following such reorganization or similar proceeding, the contingent convertible securities shall be convertible into ordinary shares of the newly formed company as provided in the accompanying prospectus supplement. Upon the occurrence of such a reorganization or similar proceeding, the other obligations of the relevant issuer under the contingent convertible securities and/or Credit Suisse Group under the guarantee shall be unaffected.

### Conversion

Upon the occurrence of certain triggering events specified in the accompanying prospectus supplement (which may include, but shall not be limited to, certain regulatory events or certain capital events), at any time while the contingent convertible securities are outstanding, the contingent convertible securities of a series shall, upon the terms and subject to the conditions set forth in the accompanying prospectus supplement, be redeemed in whole, but not in part, and settled by the delivery of new fully paid shares or American depositary shares, as specified in the accompanying prospectus supplement, to a reputable independent financial institution, trust company or similar entity

Exhibit 1
344

to be appointed by the relevant issuer, referred to in this prospectus as the "settlement shares depository," on behalf of the holders on the date specified therefor in the accompanying prospectus supplement. Receipt by the settlement shares depository of the shares or, if so provided in the accompanying prospectus supplement, American depositary shares, shall be a good and complete discharge of the relevant issuer's obligations in respect of the contingent convertible securities and those of Credit Suisse Group under the guarantee.

Following the occurrence of a triggering event but prior to the delivery of shares or American depositary shares (as applicable) to the settlement shares depository, holders shall have recourse only to the relevant issuer or, in accordance with, and under the provisions of, the guarantee, to Credit Suisse Group, for the issue and delivery of shares or American depositary shares (as applicable) to the settlement shares depository. After such delivery to the settlement shares depository, holders shall have recourse only to the settlement shares depository for the delivery to them of such shares or American depositary shares, as applicable.

Upon conversion, the relevant issuer shall, or shall cause Credit Suisse Group to, pay to the holders of the contingent convertible securities any interest accrued up to (but excluding) the date of conversion in respect of the contingent convertible securities.

**Credit Suisse Group Guarantees**

Unless otherwise specified in the applicable prospectus supplement, any contingent convertible securities issued by any finance subsidiary will be fully and unconditionally guaranteed by Credit Suisse Group. Whether the guarantees of the contingent convertible securities will be senior or subordinated under the terms of any guarantees will be set forth in the applicable prospectus supplement. If, for any reason, the relevant issuer does not make any required payment of principal, premium, if any, of, and interest, if any, on the contingent convertible securities when due, whether on the normal due date, on acceleration, redemption or otherwise, Credit Suisse Group will cause the payment to be made to, or to the order of, the trustee. The holder of a guaranteed contingent convertible security will be entitled to payment under the guarantee of Credit Suisse Group without taking any action whatsoever against the relevant finance subsidiary. As specified in the applicable prospectus supplement, Credit Suisse Group will fully and unconditionally guarantee the delivery of Credit Suisse Group's shares, or American depositary shares, if applicable, or any monetary claim in respect thereof, in each case according to the terms thereof and of the contingent convertible indenture, the applicable contingent convertible indenture supplement, and the applicable prospectus supplement.

**Modification of the Contingent Convertible Indentures; Substitution or Variation of Terms; Substitution of Issuer**

In general, rights and obligations of the relevant finance subsidiary, Credit Suisse Group and the holders under each applicable contingent convertible indenture may be modified if the holders of a majority in aggregate principal amount of the outstanding contingent convertible securities of each series affected by the modification consent to such modification. In addition, the applicable prospectus supplement may provide that the relevant issuer may, subject to certain conditions, at its option, and without the consent or approval of the holders of the contingent convertible securities, either substitute or vary the terms of all (but not some only) of the contingent convertible securities, the related guarantee and the applicable contingent convertible indenture as it considers necessary or desirable in order to meet or continue to meet certain regulatory requirements. Similarly, the applicable prospectus supplement may provide that, in the event that any series of contingent convertible securities is issued by a finance subsidiary, Credit Suisse Group may at any time, subject to certain conditions, at its option and without the consent or approval of the holders of such series of contingent convertible securities, be substituted as the relevant issuer, whereupon the guarantee shall be terminated. However, each contingent convertible indenture provides that (subject to certain limited exceptions), the right of any

48

Exhibit 1

345

holder of any contingent convertible security to receive payment of the principal of, and interest on, such contingent convertible security, on or after the respective due dates expressed in such contingent convertible security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

However, other than in the circumstances mentioned above, if the relevant finance subsidiary, Credit Suisse Group and the trustee agree, the applicable contingent convertible indenture may be amended without notifying any holders or seeking their consent if the amendment does not materially and adversely affect any holder, including if Credit Suisse Group assumes the obligations of the relevant finance subsidiary in connection with a contingent convertible security.

In particular, if the relevant finance subsidiary, Credit Suisse Group and the trustee agree, the applicable contingent convertible indenture may be amended without notifying any holders or seeking their consent to add a guarantee from a third party on any outstanding and future contingent convertible security issued or to be issued under the applicable contingent convertible indenture.

Notwithstanding anything in this prospectus to the contrary, in the event that Credit Suisse Group is substituted as the relevant issuer, Swiss law may require that certain mandatory provisions of Swiss law in relation to meetings of holders of contingent convertible securities shall apply and prevail in the case of any conflict with the provisions outlined herein or in the applicable prospectus supplement.

**Defeasance**

The term defeasance means discharge from some or all of the obligations under the applicable contingent convertible indenture. If the relevant issuer deposits with the trustee sufficient cash or government securities to pay the principal, interest, premium, if any, and any other sums due to the stated maturity date or a redemption date of the contingent convertible securities of a particular series, then at the relevant issuer's option:

   i. the relevant issuer and the guarantor will be discharged from their respective obligations with respect to the contingent convertible securities of such series; or

   ii. the relevant issuer and the guarantor will no longer be under any obligation to comply with the restrictive covenants, if any, contained in the applicable contingent convertible indenture and any supplemental contingent convertible indenture with respect to the contingent convertible securities of such series, and the events of default relating to failures to comply with covenants will no longer apply to them.

In the case of defeasance pursuant to (i) above, the holders of the contingent convertible securities of the affected series will not be entitled to the benefits of the applicable contingent convertible indenture except for registration of transfer and exchange of such contingent convertible securities and replacement of lost, stolen or mutilated contingent convertible securities. Instead, the holders will only be able to rely on the deposited funds or obligations for payment.

The relevant issuer must deliver to the trustee an officers' certificate and an opinion of counsel to the effect that the deposit and related defeasance would not cause the holders of the contingent convertible securities to recognize income, gain or loss for U.S. federal income tax purposes and that the holders would be subject to U.S. federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. In the case of a complete defeasance pursuant to (i) above, the relevant issuer may, in lieu of an opinion of counsel, deliver a ruling to such effect directed to the trustee received from the U.S. Internal Revenue Service if the relevant issuer and the guarantor are discharged from their respective obligations with respect to the contingent convertible securities.

Exhibit 1
346

**Covenants**

The relevant finance subsidiary or Credit Suisse Group may be subject to additional covenants, including restrictive covenants in respect of a particular series of contingent convertible securities or the related guarantee. Such additional covenants will be set forth in the applicable prospectus supplement and, to the extent necessary, in the applicable supplemental contingent convertible indenture relating to that series of contingent convertible securities.

**Currency Indemnity**

If payment on the contingent convertible securities is due to be made in a specified currency, which we refer to as the "required currency," any amount received or recovered in a currency other than the required currency by any holder in respect of any sum expressed to be due to it from the relevant issuer or the guarantor, as applicable, shall only constitute a discharge to the relevant issuer or the guarantor, as applicable, to the extent of the required currency amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that required currency amount is less than the required currency amount expressed to be due to the recipient under any such contingent convertible security, the relevant issuer or the guarantor, as applicable, shall indemnify it against any resulting loss sustained by the recipient. In any event, the relevant issuer, failing whom, the guarantor, shall indemnify the recipient against the cost of making any such purchase. For the purposes of this condition, it will be sufficient for a holder to demonstrate that it would have suffered a loss had an actual purchase been made. These indemnities constitute a separate and independent obligation from the relevant issuer's and the guarantor's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any waiver granted by any holder of the contingent convertible securities and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under the contingent convertible securities or any other judgment or order.

**Information Concerning the Trustee for the Contingent Convertible Securities**

HSBC Bank USA, N.A., with its corporate trust office at 10 East 40th Street, New York, New York 10016, will be the trustee for the contingent convertible securities. The trustee will be required to perform only those duties that are specifically set forth in the applicable contingent convertible indenture, except when certain defaults have occurred and are continuing with respect to the contingent convertible securities. After certain defaults, the trustee must exercise the same degree of care that a prudent person would exercise under the circumstances in the conduct of her or his own affairs. Subject to these requirements, the trustee will be under no obligation to exercise any of the powers vested in it by the applicable contingent convertible indenture at the request of any holder of contingent convertible securities unless the holder offers the trustee reasonable indemnity against the costs, expenses and liabilities that might be incurred by exercising those powers. The trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any Officers' Certificate, Opinion of Counsel (or both), resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper person or persons. The relevant issuer is obliged to furnish to the trustee annually a list of the names and addresses of the holders of registered securities.

HSBC Bank USA, N.A. has provided financial and other services to Credit Suisse Group and certain of its subsidiaries and affiliates in the past and may do so in the future as a part of its regular business.

Exhibit 1

347

**Governing Law**

The contingent convertible securities and the related contingent convertible indentures and any non-contractual obligations arising out of, or in connection with, them are governed by, and shall be construed in accordance with, the laws of England, save that the provisions relating to the status and degree of subordination of the contingent convertible securities and the related guarantee shall be governed by the laws of the Island of Guernsey in the case of the finance subsidiaries and the laws of Switzerland in the case of Credit Suisse Group, and save that with respect to each of the contingent convertible indentures, such provisions of the Trust Indenture Act as are deemed to be part of and to govern the applicable contingent convertible indenture, shall govern such contingent convertible indenture.

Exhibit 1

348

## DESCRIPTION OF CERTAIN PROVISIONS RELATING TO DEBT SECURITIES AND CONTINGENT CONVERTIBLE SECURITIES

**Payment and Transfer**

Unless otherwise provided for in the applicable prospectus supplement, the debt securities and contingent convertible securities will be issued only as registered securities, which means that the name of the holder will be entered in a register that will be kept by the applicable trustee or another agent appointed by the relevant issuer. Unless stated otherwise in a prospectus supplement, and except as described under "—Book-Entry System" below, principal and interest payments will be made at the office of the paying agent or agents named in the prospectus supplement or by check mailed to you at your address as it appears in the register.

Unless other procedures are described in a prospectus supplement, and except as described under "—Book-Entry System" below, you will be able to transfer registered debt securities or contingent convertible securities, as applicable, at the office of the transfer agent or agents named in the prospectus supplement. You may also exchange registered debt securities or contingent convertible securities at the office of the transfer agent for an equal aggregate principal amount of registered debt securities or contingent convertible securities, as applicable, of the same series having the same maturity date, interest rate and other terms as long as the debt securities or contingent convertible securities, as applicable, are issued in authorized denominations.

Neither the relevant issuer nor the applicable trustee will impose any service charge for any transfer or exchange of a debt security or contingent convertible security. The relevant issuer may, however, ask you to pay any taxes or other governmental charges in connection with a transfer or exchange of debt securities or contingent convertible securities.

**Book-Entry System**

Debt securities and contingent convertible securities may be issued under a book-entry system in the form of one or more global securities. The global securities will be registered in the name of a depositary or its nominee and deposited with that depositary or its custodian. Unless stated otherwise in the prospectus supplement, The Depository Trust Company, New York, New York, or DTC, will be the depositary if a depositary is used.

Following the issuance of a global security in registered form, the depositary will credit the accounts of its participants with the debt securities or contingent convertible securities, as applicable, upon the relevant issuer's instructions. Only persons who hold directly or indirectly through financial institutions that are participants in the depositary can hold beneficial interests in the global securities. Since the laws of some jurisdictions require certain types of purchasers to take physical delivery of such securities in definitive form, you may encounter difficulties in your ability to own, transfer or pledge beneficial interests in a global security.

So long as the depositary or its nominee is the registered owner of a global security, the relevant issuer, the guarantor (if applicable) and the applicable trustee will treat the depositary as the sole owner or holder of the debt securities or contingent convertible securities, as applicable, for purposes of the applicable indenture or contingent convertible indenture. Therefore, except as set forth below, you will not be entitled to have debt securities or contingent convertible securities registered in your name or to receive physical delivery of certificates representing the debt securities or contingent convertible securities, as applicable. Accordingly, you will have to rely on the procedures of the depositary and the participant in the depositary through whom you hold your beneficial interest in order to exercise any rights of a holder under the applicable indenture or contingent convertible indenture. We understand that under existing practices, the depositary would act upon the instructions of a participant or authorize that participant to take any action that a holder is entitled to take.

52

Exhibit 1
349

Unless stated otherwise in an applicable prospectus supplement, you may elect to hold interests in the global securities through either DTC (in the United States) or Clearstream Banking, société anonyme, which we refer to as Clearstream, Luxembourg, or Euroclear Bank, S.A./N.V., or its successor, as operator of the Euroclear System, which we refer to as Euroclear (outside of the United States), if you are participants of such systems, or indirectly through organizations which are participants in such systems. Interests held through Clearstream, Luxembourg and Euroclear will be recorded on DTC's books as being held by the U.S. depositary for each of Clearstream, Luxembourg and Euroclear, which U.S. depositaries will in turn hold interests on behalf of their participants' customers' securities accounts.

As long as the debt securities or contingent convertible securities of a series are represented by global securities, the relevant issuer will pay principal of and interest and premium on those securities to, or as directed by, DTC as the registered holder of the global securities. Payments to DTC will be in immediately available funds by wire transfer. DTC, Clearstream, Luxembourg or Euroclear, as applicable, will credit the relevant accounts of their participants on the applicable date. Neither the relevant issuer nor the applicable trustee will be responsible for making any payments to participants or customers of participants or for maintaining any records relating to the holdings of participants and their customers, and you will have to rely on the procedures of the depositary and its participants. If an issue of debt securities or contingent convertible securities is denominated in a currency other than the U.S. dollar, the relevant issuer will make payments of principal and any interest in the foreign currency in which the debt securities or contingent convertible securities, as applicable, are denominated, or in U.S. dollars. DTC has elected to have all payments of principal and interest paid in U.S. dollars unless notified by any of its participants through which an interest in the debt securities or contingent convertible securities is held that it elects, in accordance with, and to the extent permitted by, the applicable supplement and the relevant debt security or contingent convertible security, to receive payment of principal or interest in the foreign currency. On or prior to the third business day after the record date for payment of interest and 12 days prior to the date for payment of principal, a participant will be required to notify DTC of (a) its election to receive all, or the specified portion, of payment in the foreign currency and (b) its instructions for wire transfer of payment to a foreign currency account.

DTC, Clearstream, Luxembourg and Euroclear have, respectively, advised us as follows:

- *As to DTC:* DTC has advised us that it is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities deposited with it by its participants and facilitates the settlement of transactions among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations, some of whom (and/or their representatives) own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

  According to DTC, the foregoing information with respect to DTC has been provided to the financial community for informational purposes only and is not intended to serve as a representation, warranty or contract modification of any kind.

- *As to Clearstream, Luxembourg:* Clearstream, Luxembourg has advised us that it was incorporated as a limited liability company under Luxembourg law. Clearstream, Luxembourg is

53

Exhibit 1

350

owned by Cedel International, société anonyme, and Deutsche Börse AG. The shareholders of these two entities are banks, securities dealers and financial institutions.

Clearstream, Luxembourg holds securities for its customers and facilitates the clearance and settlement of securities transactions between Clearstream, Luxembourg customers through electronic book-entry changes in accounts of Clearstream, Luxembourg customers, thus eliminating the need for physical movement of certificates. Transactions may be settled by Clearstream, Luxembourg in many currencies, including U.S. dollars. Clearstream, Luxembourg provides to its customers, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities, securities lending and borrowing. Clearstream, Luxembourg also deals with domestic securities markets in over 30 countries through established depository and custodial relationships. Clearstream, Luxembourg interfaces with domestic markets in a number of countries. Clearstream, Luxembourg has established an electronic bridge with Euroclear Bank S.A./N.V., the operator of Euroclear, or the Euroclear operator, to facilitate settlement of trades between Clearstream, Luxembourg and Euroclear.

As a registered bank in Luxembourg, Clearstream, Luxembourg is subject to regulation by the Luxembourg Commission for the Supervision of the Financial Sector. Clearstream, Luxembourg customers are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. In the United States, Clearstream, Luxembourg customers are limited to securities brokers and dealers and banks, and may include any underwriters or agents for the debt securities or contingent convertible securities. Other institutions that maintain a custodial relationship with a Clearstream, Luxembourg customer may obtain indirect access to Clearstream, Luxembourg. Clearstream, Luxembourg is an indirect participant in DTC.

Distributions with respect to the debt securities or contingent convertible securities held beneficially through Clearstream, Luxembourg will be credited to cash accounts of Clearstream, Luxembourg customers in accordance with its rules and procedures, to the extent received by Clearstream, Luxembourg.

• *As to Euroclear:*  Euroclear has advised us that it was created in 1968 to hold securities for participants of Euroclear and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thus eliminating the need for physical movement of certificates and risk from lack of simultaneous transfers of securities and cash. Transactions may now be settled in many currencies, including U.S. dollars and Japanese Yen. Euroclear provides various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described below.

Euroclear is operated by the Euroclear operator, under contract with Euroclear plc, a U.K. corporation. The Euroclear operator conducts all operations, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear operator, not Euroclear plc. Euroclear plc establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries and may include any underwriters for the debt securities or contingent convertible securities. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly. Euroclear is an indirect participant in DTC.

The Euroclear operator is a Belgian bank. The Belgian Banking Commission and the National Bank of Belgium regulate and examine the Euroclear operator.

54

Exhibit 1
351

The Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, or the Euroclear Terms and Conditions, and applicable Belgian law govern securities clearance accounts and cash accounts with the Euroclear operator. Specifically, these terms and conditions govern:

- transfers of securities and cash within Euroclear;

- withdrawal of securities and cash from Euroclear; and

- receipt of payments with respect to securities in Euroclear.

All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear operator acts under the terms and conditions only on behalf of Euroclear participants and has no record of or relationship with persons holding securities through Euroclear participants.

Distributions with respect to debt securities or contingent convertible securities held beneficially through Euroclear will be credited to the cash accounts of Euroclear participants in accordance with the Euroclear Terms and Conditions, to the extent received by the Euroclear operator.

Global certificates generally are not transferable. Physical certificates will be issued to beneficial owners of a global security if:

- the depositary notifies the relevant issuer that it is unwilling or unable to continue as depositary and the relevant issuer does not appoint a successor within 90 days;

- the depositary ceases to be a clearing agency registered under the Exchange Act and the relevant issuer does not appoint a successor within 90 days;

- the relevant issuer decides in its sole discretion (subject to the procedures of the depositary) that it does not want to have the debt securities or contingent convertible securities of the applicable series represented by global certificates; or

- an event of default has occurred with regard to those debt securities or contingent convertible securities, as applicable, and has not been cured or waived.

If any of the events described in the preceding paragraph occurs, the relevant issuer will issue definitive securities in certificated form in an amount equal to a holder's beneficial interest in the debt securities or contingent convertible securities, as applicable. Unless otherwise specified in the applicable prospectus supplement, definitive securities will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof, and will be registered in the name of the person DTC specifies in a written instruction to the registrar of the debt securities or contingent convertible securities, as applicable.

In the event definitive securities are issued:

- holders of definitive securities will be able to receive payments of principal and interest on their debt securities or contingent convertible securities, as applicable, at the office of the relevant issuer's paying agent maintained in the Borough of Manhattan;

- holders of definitive securities will be able to transfer their debt securities or contingent convertible securities, as applicable, in whole or in part, by surrendering the debt securities for registration of transfer at the office of The Bank of New York Mellon, formerly known as The Bank of New York (as successor to JPMorgan Chase, N.A., in the case of the senior and subordinated indentures with Credit Suisse Group), the trustee under the applicable indenture, and by surrendering the contingent convertible securities for registration of transfer at the office of HSBC Bank USA, N.A., the trustee under the applicable contingent convertible indenture. The relevant issuer will not charge any fee for the registration or transfer or exchange, except

Exhibit 1
352

that it may require the payment of a sum sufficient to cover any applicable tax or other governmental charge payable in connection with the registration, transfer or exchange; and

- any moneys the relevant issuer pays to its paying agents for the payment of principal and interest on the debt securities or contingent convertible securities, as applicable, which remain unclaimed at the second anniversary of the date such payment was due will be returned to the relevant issuer, and thereafter holders of definitive securities may look only to the relevant issuer, as general unsecured creditors, for payment, provided, however, that the paying agents must first publish notice in an authorized newspaper that such money remains unclaimed.

**Global Clearance and Settlement Procedures**

You will be required to make your initial payment for the debt securities or contingent convertible securities, as applicable, in immediately available funds. Secondary market trading between DTC participants will occur in the ordinary way in accordance with DTC rules and will be settled in immediately available funds using DTC's Same-Day Funds Settlement System, or any successor thereto. Secondary market trading between Clearstream, Luxembourg customers and/or Euroclear participants will occur in the ordinary way in accordance with the applicable rules and operating procedures of Clearstream, Luxembourg and Euroclear and will be settled using the procedures applicable to conventional eurobonds in immediately available funds.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream, Luxembourg customers or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by a U.S. depositary; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines (based on European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the U.S. depositary to take action to effect final settlement on its behalf by delivering or receiving debt securities or contingent convertible securities, as applicable, in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Clearstream, Luxembourg customers and Euroclear participants may not deliver instructions directly to their respective U.S. depositaries.

Because of time-zone differences, credits of debt securities or contingent convertible securities, as applicable, received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions in such debt securities or contingent convertible securities, as applicable, settled during such processing will be reported to the relevant Clearstream, Luxembourg customers or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of debt securities or contingent convertible securities, as applicable, by or through a Clearstream, Luxembourg customer or a Euroclear participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

Although DTC, Clearstream, Luxembourg and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of debt securities or contingent convertible securities, as applicable, among participants of DTC, Clearstream, Luxembourg and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

56

Exhibit 1
353

## SPECIAL PROVISIONS RELATING TO DEBT SECURITIES OR CONTINGENT CONVERTIBLE SECURITIES DENOMINATED IN A FOREIGN CURRENCY

Unless otherwise specified in the applicable prospectus supplement, the following additional provisions will apply to debt securities or contingent convertible securities denominated in a foreign currency.

**Payment Currency**

Unless otherwise indicated in the applicable prospectus supplement, you will be required to pay for debt securities or contingent convertible securities denominated in a foreign currency in the specified currency. Currently, there are limited facilities in the United States for the conversion of U.S. dollars into foreign currencies. Therefore, unless otherwise indicated in the applicable prospectus supplement, the exchange rate agent the relevant issuer appoints and identifies in the applicable prospectus supplement will arrange for the conversion of U.S. dollars into the specified currency on behalf of any purchaser of a debt security or contingent convertible security denominated in a foreign currency to enable a prospective purchaser to deliver the specified currency in payment for a debt security or contingent convertible security denominated in a foreign currency. The exchange rate agent must receive a request for any conversion on or prior to the third business day preceding the date of delivery of the debt security or contingent convertible security denominated in a foreign currency. You must pay all costs of currency exchange.

Unless otherwise specified in the applicable prospectus supplement or unless the holder of a debt security or contingent convertible security denominated in a foreign currency elects to receive payments in the specified currency, payments made by the relevant issuer of principal of, premium, if any, and interest, if any, on a debt security or contingent convertible security denominated in a foreign currency will be made in U.S. dollars. The U.S. dollar amount to be received by a holder will be based on the highest bid quotation in The City of New York received by the exchange rate agent at approximately 11:00 a.m., New York City time, on the second business day preceding the applicable payment date from three recognized foreign exchange dealers (one of which may be the exchange rate agent) for the purchase by the quoting dealer of the specified currency for U.S. dollars for settlement on the payment date in the aggregate amount of the specified currency payable to the holders of debt securities or contingent convertible securities scheduled to receive U.S. dollar payments and at which the applicable dealer commits to execute a contract. If these bid quotations are not available, payments to holders will be made in the specified currency.

Unless otherwise specified in the applicable prospectus supplement, a holder of a debt security or contingent convertible security denominated in a foreign currency may elect to receive payment in the specified currency for all payments and need not file a separate election for each payment, and such election will remain in effect until revoked by written notice to the paying agent at its corporate trust office in The City of New York received on a date prior to the record date for the relevant interest payment date or at least 10 calendar days prior to the maturity date (or any redemption date, repayment date or repurchase date), as the case may be; provided, that such election is irrevocable as to the next succeeding payment to which it relates. If such election is made as to full payment on a debt security or contingent convertible security, the election may thereafter be revoked so long as the paying agent is notified of the revocation within the time period set forth above.

Banks in the United States offer non-U.S. dollar-denominated checking or savings account facilities in the United States only on a limited basis. Accordingly, unless otherwise indicated in the applicable prospectus supplement, payments of principal of, premium, if any, and interest, if any, on, debt securities or contingent convertible securities denominated in a foreign currency to be made in a specified currency other than U.S. dollars will be made to an account at a bank outside the United States, unless alternative arrangements are made.

57

Exhibit 1

354

If a specified currency (other than the U.S. dollar) in which a debt security or contingent convertible security is denominated or payable: (a) ceases to be recognized by the government of the country which issued such currency or for the settlement of transactions by public institutions of or within the international banking community, (b) is a currency unit and such currency unit ceases to be used for the purposes for which it was established, or (c) is not available to the relevant issuer for making payments due to the imposition of exchange controls or other circumstances beyond its control, in each such case, as determined in good faith by the relevant issuer, then with respect to each date for the payment of principal of and interest, if any, on a debt security or contingent convertible security denominated or payable in such specified currency occurring after the last date on which such specified currency was so used, which we refer to as the conversion date, the U.S. dollar or such foreign currency or currency unit as may be specified by the relevant issuer, which we refer to as the substitute currency, will become the currency of payment for use on each such payment date (but such specified currency will, at the relevant issuer's election, resume being the currency of payment on the first such payment date preceded by 15 business days during which the circumstances which gave rise to the change of currency no longer prevail, in each case, as determined in good faith by the relevant issuer). The substitute currency amount to be paid by the relevant issuer to the applicable trustee and by the applicable trustee or any paying agent to the holder of a debt security or contingent convertible security with respect to such payment date will be the currency equivalent or currency unit equivalent (each as defined below) of the specified currency as determined by the exchange rate agent (which determination will be delivered in writing to the applicable trustee not later than the fifth business day prior to the applicable payment date) as of the conversion date or, if later, the date most recently preceding the payment date in question on which such determination is possible of performance, but not more than 15 business days before such payment date. We refer to such conversion date or date preceding a payment date as aforesaid as the valuation date. Any payment in a substitute currency under the circumstances described above will not constitute an event of default under the applicable indenture or contingent convertible indenture or the debt securities or contingent convertible securities.

The "currency equivalent" will be determined by the exchange rate agent as of each valuation date and will be obtained by converting the specified currency (unless the specified currency is a currency unit) into the substitute currency at the market exchange rate (as defined below) on the valuation date.

The "currency unit equivalent" will be determined by the exchange rate agent as of each valuation date and will be the sum obtained by adding together the results obtained by converting the specified amount of each initial component currency into the substitute currency at the market exchange rate on the valuation date for such component currency.

"Component currency" means any currency which, on the conversion date, was a component currency of the relevant currency unit.

"Market exchange rate" means, as of any date, for any currency or currency unit, the noon U.S. dollar buying rate for that currency or currency unit, as the case may be, for cable transfers quoted in The City of New York on such date as certified for customs purposes by the Federal Reserve Bank of New York. If such rates are not available for any reason with respect to one or more currencies or currency units for which an exchange rate is required, the exchange rate agent will use, in its sole discretion and without liability on its part, such quotation of the Federal Reserve Bank of New York as of the most recent available date, or quotations from one or more major banks in The City of New York or in the country of issue of the currency or currency unit in question, or such other quotations as the exchange rate agent will deem appropriate. Unless otherwise specified by the exchange rate agent, if there is more than one market for dealing in any currency or currency unit by reason of foreign exchange regulations or otherwise, the market to be used in respect of such currency or currency unit will be that upon which a non-resident issuer of securities designated in such currency or currency unit would, as determined in its sole discretion and without liability on the part of the exchange rate agent, purchase such currency or currency unit in order to make payments in respect of such securities.

58

Exhibit 1

355

"Specified amount" of a component currency means the number of units (including decimals) which such component currency represented in the relevant currency unit, on the conversion date or the valuation date or the last date the currency unit was so used, whichever is later. If after such date the official unit of any component currency is altered by way of combination or subdivision, the specified amount of such component currency will be divided or multiplied in the same proportion. If after such date two or more component currencies are consolidated into a single currency, the respective specified amounts of such component currencies will be replaced by an amount in such single currency equal to the sum of the respective specified amounts of such consolidated component currencies expressed in such single currency, and such amount will thereafter be a specified amount and such single currency will thereafter be a component currency. If after such date any component currency will be divided into two or more currencies, the specified amount of such component currency will be replaced by specified amounts of such two or more currencies, the sum of which, at the market exchange rate of such two or more currencies on the date of such replacement, will be equal to the specified amount of such former component currency and such amounts will thereafter be specified amounts and such currencies will thereafter be component currencies.

All determinations referred to above made by the relevant issuer or its agents will be at its or their sole discretion and will, in the absence of manifest error, be conclusive for all purposes and binding on you.

Specific information about the currency, currency unit or composite currency in which a particular debt security or contingent convertible security denominated in a foreign currency is denominated, including historical exchange rates and a description of the currency and any exchange controls, will be set forth in the applicable prospectus supplement. The information therein concerning exchange rates is furnished as a matter of information only and should not be regarded as indicative of the range of or trends in fluctuations in currency exchange rates that may occur in the future.

**Minimum Denominations, Restrictions on Maturities, Repayment and Redemption**

Debt securities or contingent convertible securities denominated in specified currencies other than U.S. dollars will have the minimum denominations and will be subject to the restrictions on maturities, repayment and redemption that are set forth in the applicable prospectus supplement. Any other restrictions applicable to debt securities or contingent convertible securities denominated in specified currencies other than U.S. dollars, including restrictions related to the distribution of such debt securities or contingent convertible securities, will be set forth in the applicable prospectus supplement.

Exhibit 1
356

## FOREIGN CURRENCY RISKS

This prospectus does not, and any applicable prospectus supplement will not, describe all of the possible risks of an investment in debt securities or contingent convertible securities the payment on which will be made in, or affected by the value of, a foreign currency or a composite currency. You should not invest in debt securities or contingent convertible securities denominated in a foreign currency if you are not knowledgeable about foreign currency and indexed transactions. You should consult your own financial and legal advisors about such risks as such risks may change from time to time.

We are providing the following information for the benefit of U.S. residents. If you are not a U.S. resident, you should consult your own financial and legal advisors before investing in any debt securities or contingent convertible securities.

### Exchange Rates and Exchange Controls

A series of debt securities or contingent convertible securities denominated in, or affected by the value of, a currency other than U.S. dollars has additional risks that do not exist for U.S. dollar denominated debt securities or contingent convertible securities. The most important risks are (a) possible changes in exchange rates between the U.S. dollar and the specified currency after the issuance of the debt securities or contingent convertible securities resulting from market changes in rates or from the official redenomination or revaluation of the specified currency and (b) imposition or modification of foreign exchange controls by either the U.S. government or foreign governments. Such risks generally depend on economic events, political events and the supply of, and demand for, the relevant currencies, over which we have no control.

Exchange rates have fluctuated greatly in recent years and are likely to continue to fluctuate in the future. These fluctuations are caused by economic forces as well as political factors. However, you cannot predict future fluctuations based on past exchange rates. If the foreign currency decreases in value relative to the U.S. dollar, the yield on a debt security or contingent convertible security denominated in a foreign currency or on a currency-linked indexed debt security for a U.S. investor will be less than the coupon rate and you may lose money at maturity if you sell such debt security or contingent convertible security. In addition, you may lose all or most of your investment in a currency-linked indexed debt-security as a result of changes in exchange rates.

Governments often impose exchange controls which can affect exchange rates or the availability of the foreign currency to make payments of principal, premium, if any, and interest on the debt securities or contingent convertible securities. We cannot assure you that exchange controls will not restrict or prohibit payments of principal, premium, if any, or interest denominated in any specified currency.

Even if there are no actual exchange controls, it is possible that the specified currency would not be available to the relevant issuer when payments on the debt securities or contingent convertible securities are due because of circumstances beyond its control. If the specified foreign currency is not available, the relevant issuer will make the required payments in U.S. dollars on the basis of the market exchange rate on the date of such payment, or if such rate of exchange is not then available, on the basis of the market exchange rate as of a recent date. We refer you to "Special Provisions Relating to Debt Securities or Contingent Convertible Securities Denominated in a Foreign Currency—Payment Currency." You should consult your own financial and legal advisors as to the risk of an investment in debt securities or contingent convertible securities denominated in a currency other than your home currency.

Any applicable prospectus supplement relating to debt securities or contingent convertible securities having a specified currency other than U.S. dollars will contain a description of any material exchange controls affecting that currency and any other required information concerning the currency.

Exhibit 1
357

**Foreign Currency Judgments**

The debt securities and the applicable indentures, except for, in the case of the subordinated indentures and the subordinated debt securities issued by Credit Suisse Group or Credit Suisse, the subordination provisions thereof which are governed by Swiss law, are governed by New York State law. The contingent convertible securities and the applicable contingent convertible indentures and any non-contractual obligations arising out of, or in connection with, them are governed by, and shall be construed in accordance with, the laws of England, save that the provisions relating to the status and degree of subordination of the contingent convertible securities and the related guarantee shall be governed by the laws of the Island of Guernsey in the case of the finance subsidiaries and the laws of Switzerland in the case of Credit Suisse Group, and save that with respect to the contingent convertible indenture, such provisions of the Trust Indenture Act as are deemed to be part of and to govern the applicable contingent convertible indenture, shall govern such contingent convertible indenture. Courts in the United States customarily have not rendered judgments for money damages denominated in any currency other than the U.S. dollar. A 1987 amendment to the Judiciary Law of New York State provides, however, that an action based upon an obligation denominated in a currency other than U.S. dollars will be rendered in the foreign currency of the underlying obligation. Accordingly, if you bring a lawsuit in a New York state court or in a federal court located in New York State for payment of a debt security or contingent convertible security denominated in a foreign currency, the court would award a judgment in the foreign currency and convert the judgment into U.S. dollars, on the date of the judgment. U.S. courts located outside New York State would probably award a judgment in U.S. dollars but it is unclear what rate of exchange they would use.

Enforcement of claims or court judgments under Swiss debt collection or bankruptcy proceedings may only be made in Swiss francs. Thus, the amount of any claim or court judgment denominated in a currency other than Swiss francs would be converted into Swiss francs at the rate obtained on (i) the date the enforcement proceedings are instituted or (ii) the date of the filing for the continuation of the bankruptcy procedure (*Fortsetzungsbegehren*), with respect to enforcing creditors, and at the rate obtained at the time of adjudication of bankruptcy (*Konkurseröffnung*), with respect to non-enforcing creditors.

Exhibit 1
358

## DESCRIPTION OF WARRANTS

**General**

Credit Suisse Group and Credit Suisse, directly or through any branch, may issue warrants, including warrants or warrants in the form of subscription rights to purchase equity or debt securities, as well as other types of warrants. If Credit Suisse issues warrants to purchase equity securities, those equity securities will not be shares of Credit Suisse Group or Credit Suisse. Credit Suisse Group or Credit Suisse may issue warrants in such amounts or in as many distinct series as we wish. Warrants may be issued independently or together with any equity or debt securities and may be attached to or separate from such equity or debt securities. Each series of warrants will be issued under a separate warrant agreement to be entered into between us and a warrant agent. The forms of each of the warrant agreements will be filed as exhibits to the registration statement of which this prospectus forms a part or will be furnished to the SEC on a Form 6-K that is incorporated by reference in the registration statement of which this prospectus forms a part. This prospectus briefly outlines certain general terms and provisions of the warrants we may issue. Further terms of the warrants and applicable warrant agreement will be set forth in the applicable prospectus supplement. The specific terms of a warrant as described in the applicable prospectus supplement will supplement and, if applicable, may modify or replace the general terms described in this section. If there are differences between the applicable prospectus supplement and this prospectus, the prospectus supplement will control.

**Warrants to Purchase Equity Securities**

We will describe the terms of any warrants, or warrants in the form of subscription rights, to purchase equity securities that we are authorized to issue in a prospectus supplement. These terms may include:

- the title of such warrants;

- the aggregate number of such warrants and whether such warrants may be settled in cash or by means of net share settlement;

- the price or prices at which such warrants will be issued;

- the currency or currencies (including composite currencies) in which the price of such warrants may be payable;

- the terms of the equity securities purchasable upon exercise of such warrants, which, in the case of Credit Suisse Group, may include shares or American depositary shares of Credit Suisse Group;

- the price at which and currency or currencies (including composite currencies) in which the equity securities purchasable upon exercise of such warrants may be purchased;

- the date on which the right to exercise such warrants will commence and the date on which such right shall expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;

- if applicable, the minimum or maximum amount of such warrants that may be exercised at any one time;

- if applicable, the designation and terms of the equity securities with which such warrants are issued and the number of such warrants issued with each such equity security;

- if applicable, the date on and after which such warrants and the related equity securities will be separately transferable;

62

Exhibit 1
359

- anti-dilution provisions, if any;

- selling restrictions, if any;

- information with respect to book-entry procedures, if any; and

- any other terms of such warrants, including terms, procedures and limitations relating to the exchange or exercise of such warrants.

The prospectus supplement relating to any warrants to purchase equity securities may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

**Warrants to Purchase Debt Securities**

We will describe in a prospectus supplement the terms of any warrants, or warrants in the form of subscription rights, that we are authorized to issue for the purchase of our debt securities or the debt securities of third-party issuers. These terms may include:

- the title of such warrants;

- the aggregate number of such warrants and whether such warrants may be settled in cash;

- the price or prices at which such warrants will be issued;

- the currency or currencies (including composite currencies) in which the price of such warrants may be payable;

- the aggregate principal amount and terms of the debt securities purchasable upon exercise of such warrants;

- the price at which and currency or currencies (including composite currencies) in which the debt securities purchasable upon exercise of such warrants may be purchased;

- the date on which the right to exercise such warrants will commence and the date on which such right shall expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;

- if applicable, the minimum or maximum amount of such warrants that may be exercised at any one time;

- if applicable, the designation and terms of the debt securities with which such warrants are issued and the number of such warrants issued with each such debt security;

- if applicable, the date on and after which such warrants and the related debt securities will be separately transferable;

- selling restrictions, if any;

- information with respect to book-entry procedures, if any; and

- any other terms of such warrants, including terms, procedures and limitations relating to the exchange or exercise of such warrants.

The prospectus supplement relating to any warrants to purchase debt securities may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

**Other Warrants**

We may also issue other warrants to purchase or sell, on terms to be determined at the time of sale,

- securities of any entity unaffiliated with us, a basket of such securities, an index or indices of such securities or any combination of the foregoing;

- currencies or composite currencies; or

63

Exhibit 1

360

- commodities.

We may satisfy our obligations, if any, with respect to any such warrants by delivering the underlying securities, currencies or commodities or, in the case of underlying securities or commodities, the cash value thereof, as set forth in the applicable prospectus supplement. We will describe the terms of any such warrants that we are authorized to issue in a prospectus supplement. These terms may include:

- the title of such warrants;

- the aggregate number of such warrants;

- the price or prices at which such warrants will be issued;

- the currency or currencies (including composite currencies) in which the price of such warrants may be payable;

- whether such warrants are put warrants or call warrants;

- (a) the specific security, basket of securities, index or indices of securities or any combination of the foregoing and the amount thereof, (b) currencies or composite currencies or (c) commodities (and, in each case, the amount thereof or the method for determining the same) to be purchased or sold upon exercise of such warrants;

- the purchase price at which and the currency or currencies (including composite currencies) with which such underlying securities, currencies or commodities may be purchased or sold upon such exercise (or the method of determining the same);

- whether such exercise price may be paid in cash, by the exchange of any other security offered with such warrants or both and the method of such exercise;

- whether the exercise of such warrants is to be settled in cash or by the delivery of the underlying securities or commodities or both;

- the date on which the right to exercise such warrants will commence and when such right will expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;

- if applicable, the minimum or maximum number of such warrants that may be exercised at any one time;

- if applicable, the designation and terms of the securities with which such warrants are issued and the number of warrants issued with each such security;

- if applicable, the date on and after which such warrants and the related securities will be separately transferable;

- selling restrictions, if any;

- information with respect to book-entry procedures, if any; and

- any other terms of such warrants, including terms, procedures and limitations relating to the exchange and exercise of such warrants.

The prospectus supplement relating to any such warrants may also include, if applicable, a discussion of certain U.S. federal income tax and ERISA considerations.

64

Exhibit 1

361

## DESCRIPTION OF SHARES

The following summary describes the material terms of the shares of common stock of Credit Suisse Group, par value CHF 0.04 per share, which we refer to as the "shares." A detailed description of the terms of the shares is incorporated by reference into this prospectus from Credit Suisse Group's annual report on Form 20-F for the year ended December 31, 2011, filed with the SEC on March 23, 2012, which you may obtain as described under "Where You Can Find More Information." We will issue shares, which may be in the form of American depositary shares, under this prospectus and any applicable prospectus supplement in connection with (i) the exercise of warrants on our shares or (ii) the conversion or exchange of (a) debt securities of Credit Suisse Group that are convertible into or exchangeable for our shares, (b) contingent convertible securities or (c) other securities with terms similar to the securities described in this registration statement issued in transactions exempt from registration under the Securities Act, as amended, that are convertible into or exchangeable for our shares.

As of December 31, 2011, we had fully paid and issued share capital of CHF 48,973,322.48, consisting of 1,224,333,062 registered shares (inclusive of 247,671 treasury shares) with a par value of CHF 0.04 each. As of December 31, 2011, we had additional authorized share capital in the amount of CHF 4,000,000, authorizing the Board of Directors of Credit Suisse Group (the Board of Directors) to issue at any time until April 29, 2013 up to 100,000,000 registered shares to be fully paid in, with a nominal value of CHF 0.04 per share.

Additionally, as of December 31, 2011, we had conditional share capital in the amount of CHF 21,953,643, consisting of 548,841,073 registered shares with a par value of CHF 0.04 each. Conditional share capital in the amount of CHF 19,340,245.08 through the issue of a maximum of 483,506,127 registered shares with a par value of CHF 0.04 pursuant to Article 26 of the Articles of Association of Credit Suisse Group (Articles of Association) is reserved for the purpose of increasing share capital through the conversion of bonds or other financial market instruments of Credit Suisse Group, or any of its affiliates, that allow for contingent compulsory conversion into Credit Suisse Group's shares and that are issued in order to fulfill or maintain compliance with regulatory requirements of Credit Suisse Group and/or any of its affiliates (contingent compulsory convertible bonds), of which 400,000,000 registered shares are reserved for issuance upon conversion of the Tier 1 or Tier 2 Buffer Capital Notes. Moreover, up to CHF 4,000,000 of the conditional capital pursuant to Article 26 of our Articles of Association was available for share capital increases executed through the voluntary or compulsory exercise of conversion rights and/or warrants granted in connection with bonds or other financial market instruments of Credit Suisse Group or any of its affiliates (equity-related financial market instruments). Furthermore, as of December 31, 2011 our conditional share capital included (i) CHF 2,411,794.00 through the issue of a maximum of 60,294,850 registered shares with a par value of CHF 0.04 reserved for employees and (ii) CHF 201,603.84 through the issue of a maximum of 5,040,096 shares reserved for the exercise of option rights granted to employees of all levels of Donaldson, Lufkin & Jenrette, Inc. and its group companies, which were rolled over in the merger of Donaldson, Lufkin & Jenrette, Inc. with an indirect, wholly-owned subsidiary of Credit Suisse Group. On February 8, 2012 we revised our Articles of Association such that there are no longer any shares reserved for the exercise of option rights granted to employees of Donaldson, Lufkin & Jenrette, Inc. and its group companies.

Shares issued as a result of the conversion of conditional capital and the corresponding increase in share capital are generally recorded only once a year, and this recording entails a revision of our Articles of Association and new registration of the total share capital in the Commercial Register. Our Articles of Association were last revised on February 8, 2012 and are included as an exhibit to our annual report on Form 20-F for the year ended December 31, 2011, which is incorporated by reference into this prospectus and registration statement.

65

Exhibit 1

362

Our registered shares are listed on the SIX Swiss Exchange under the symbol "CSGN" and, in the form of American depositary shares, on the New York Stock Exchange under the symbol "CS." The last reported sale price of our shares on March 22, 2012 was CHF 26.08 and the last reported sale price of our American depositary shares on March 22, 2012 was USD 28.50.

**Shareholder Rights**

Under Swiss law, dividends may be paid out only if and to the extent a corporation has distributable profits from previous business years, or if the free reserves of the corporation are sufficient to allow distribution of a dividend. In addition, at least 5% of the annual net profits must be retained and booked as general legal reserves for so long as these reserves amount to less than 20% of the paid-in share capital. Our reserves currently exceed this 20% threshold. In any event, dividends may be paid out only after approval of the shareholders. The Board of Directors may propose that a dividend be paid out, but cannot itself set the dividend. The auditors must confirm that the dividend proposal of the Board of Directors conforms to statutory law. In practice, the shareholders usually approve the dividend proposal of the Board of Directors. Dividends are usually due and payable after the shareholders' resolution relating to the allocation of profits has been passed. Under Swiss law, the statute of limitations in respect of dividend payments is five years.

**Voting and Transfer**

There is no limitation under Swiss law or our Articles of Association on the right of non-Swiss residents or nationals to own or vote our shares.

Each share carries one vote at our shareholders' meetings. Voting rights may be exercised only after a shareholder has been recorded in the share register as a shareholder with voting rights. Registration with voting rights is subject to certain restrictions that we describe below.

Credit Suisse Group may issue its shares in the form of single certificates, global certificates or uncertificated securities. Credit Suisse Group may convert the shares it has issued in one form into another form at any time, without the approval of the shareholders. Shareholders have no right to demand that shares issued in one form be converted into another form. Shareholders may, however, at any time request that Credit Suisse Group issue a certificate for the registered shares that they hold according to the share register.

The transfer of shares is effected by corresponding entry in the books of a bank, depositary institution or other financial intermediary and notification of such transfer to us by the transferor, the bank, the depositary institution or financial intermediary. The transfer of shares further requires that the purchaser file a share registration form to be registered in our share register as a shareholder. Failing such registration, the purchaser may not vote at, or participate in, shareholders' meetings. Pursuant to our Articles of Association, the transfer, or pledging as collateral, of shares by means of written assignment is not permitted.

A purchaser of shares will be recorded in the share register with voting rights upon disclosure of its name, citizenship and address, and upon confirmation that it acquired the shares in its own name for its own account. Any person not expressly stating in its application for registration that the relevant shares have been acquired for its own account, which person we refer to as a nominee, may be entered for a maximum of 2% of the total outstanding share capital with voting rights in the share register. In excess of this limit, registered shares held by a nominee will be granted voting rights only if such nominee discloses in writing the name, address and shareholding of any person for whose account it is holding 0.5% or more of the outstanding share capital.

Legal entities, partnerships or groups of joint owners or other groups in which individuals or legal entities are related to one another through capital ownership or voting rights or have a common

66

Exhibit 1

363

management or are otherwise interrelated, as well as individuals, legal entities or partnerships that act in concert (especially as a syndicate) with intent to evade the limitation on voting rights are considered as one shareholder or nominee.

Each shareholder, whether registered in our share register or not, is entitled to receive the dividends approved by the shareholders. The same principle applies for capital repayments in the event of a reduction of the share capital, and for liquidation proceeds in the event we are dissolved or liquidated. Under Swiss law, a shareholder has no liability for capital calls, but is also not entitled to reclaim its capital contribution. Swiss law further requires us to apply the principle of equal treatment to all shareholders.

**Pre-Emptive Rights**

Our Articles of Association provide that the Board of Directors is authorized to exclude shareholders' subscription rights (*Bezugsrechte*) in favor of third parties with regard to new registered shares issued out of authorized capital if such shares are used for (a) the acquisition of companies, segments of companies or participations in the banking, finance, asset management or insurance industries through an exchange of shares or (b) for financing/refinancing the acquisition of companies, segments of companies or participations in these industries, or new investment plans. Shareholders' subscription rights relating to a maximum of 15,000,000 registered shares issued out of authorized capital are excluded in favor of Credit Suisse so that Credit Suisse can fulfill its obligation to deliver shares in Credit Suisse Group in accordance with the terms of the USD 3.5 billion 11% Tier 1 Capital Notes and CHF 2.5 billion 10% Tier 1 Capital Notes issued in October 2008. If commitments to service convertible bonds or bonds with warrants are assumed in connection with company takeovers or investment plans, the Board of Directors is authorized, for the purpose of fulfilling delivery commitments under such bonds, to issue new shares out of authorized capital excluding the subscription rights of shareholders.

Further, our Articles of Association provide that the shareholders' subscription rights (*Bezugsrechte*) are excluded if new shares are issued out of our conditional share capital through the voluntary or compulsory exercise of conversion rights and/or warrants granted in connection with bonds or other financial market instruments of Credit Suisse Group, or any of its affiliates, or through compulsory conversion of contingent compulsory convertible bonds or other financial market instruments of Credit Suisse Group, or any of its affiliates, that allow for contingent compulsory conversion into shares of Credit Suisse Group. Holders of financial market instruments with conversion features and/or of warrants are entitled to subscribe to the new shares. The Board of Directors fixes the conversion/warrant conditions.

Additionally, our Articles of Association provide that when issuing contingent compulsory convertible bonds, the Board of Directors is authorized to exclude shareholders' preferential subscription rights (*Vorwegzeichnungsrechte*) if these bonds are issued on the national or international capital markets (including private placements with selected strategic investors). If preferential subscription rights are restricted or excluded by resolution of the Board of Directors when contingent compulsory convertible bonds are issued: (i) the contingent compulsory convertible bonds must be issued at prevailing market conditions, (ii) the setting of the issue price of the new shares must take due account of the stock market price of the shares and/or comparable instruments priced by the market at the time of issue or time of conversion, and (iii) conditional conversion features may remain in place indefinitely.

Furthermore, the Board of Directors is also authorized to exclude shareholders' preferential subscription rights (*Vorwegzeichnungsrechte*) when other equity-related financial market instruments are issued provided these instruments are being issued to finance or refinance the acquisition of companies, parts of companies, participations or new investment projects, and/or if the instruments are issued on

67

Exhibit 1
364

the national or international capital markets. If shareholders' preferential subscription rights are restricted or excluded for such equity-related financial market instruments: (i) these equity-related financial market instruments must be issued at prevailing market conditions, (ii) the issue price of the new shares must be set at market conditions taking due account of the stock market price of the shares and/or comparable instruments priced by the market, and (iii) it should be possible to exercise the conversion rights for a maximum of fifteen years and to exercise warrants for a maximum of seven years from the relevant issue date.

The acquisition of shares through the exercise of conversion rights and/or warrants, or through the conversion of financial market instruments with conversion features, and any subsequent transfer of the shares, are subject to the restrictions on voting rights set out above.

**Liquidation**

Under Swiss law and our Articles of Association, we may be dissolved at any time by a shareholders' resolution, which must be passed by (1) a representation at the meeting of at least half of the share capital, and (2) a supermajority of at least three-quarters of the votes cast at the meeting. Dissolution by court order is possible if we become bankrupt. Under Swiss law, any surplus arising out of liquidation (after the settlement of all claims of all creditors) is distributed to shareholders in proportion to the paid up par value of shares held.

Exhibit 1

365

**DESCRIPTION OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA)**

**Description of Debt Securities**

The Guaranteed Senior Debt Securities of Credit Suisse (USA) consist of the following debt securities as well as any other debt securities issued pursuant to the indentures listed under "—Description of Indentures," below:

$1,383,000 5.625% Notes due February 15, 2016

$1,000,000,000 7⅛% Notes due July 15, 2032

$1,000,000,000 5½% Notes due August 15, 2013

$1,000,000,000 5⅛% Notes due January 15, 2014

$2,000,000,000 4⅞% Notes due January 15, 2015

$1,750,000,000 5⅛% Notes due August 15, 2015

$1,000,000,000 5⅜% Notes due March 2, 2016

$1,000,000,000 Floating Rate Notes due April 12, 2013

$313,000 ProNotes Linked to the Value of the S&P 500 Index due April 29, 2013

$80,596,413.46 8.82% Senior Notes due May 15, 2016

$500,000,000 5.85% Notes Due August 16, 2016

The description of these debt securities is incorporated in the registration statement of which this prospectus forms a part by reference to the relevant prospectus, prospectus supplement, product supplement, if any, and pricing supplement, if any, filed by Credit Suisse (USA) in connection with the initial issuance of the Guaranteed Senior Debt Securities. A prospectus, prospectus supplement, product supplement, if any, and pricing supplement, if any, describing each such security (each, a "disclosure document") have been filed with the SEC by Credit Suisse (USA) under Registration Statement numbers 333-131970, 333-116241; 333-86720; 333-71850; 333-62422; 333-07657; 333-34149; 333-53499; 333-73405; 333-30928 and each of these disclosure documents is incorporated by reference herein in its entirety, except for any portion of each disclosure document that incorporates by reference Credit Suisse (USA)'s prior and future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act.

**Description of Indentures**

Each of the Guaranteed Senior Debt Securities of Credit Suisse (USA) listed in "—Description of Debt Securities" above was issued under one of the following indentures:

• Senior Indenture, dated as of June 1, 2001, between Credit Suisse (USA), formerly known as Credit Suisse First Boston (USA), Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to The Chase Manhattan Bank, as trustee;

• Senior Indenture, dated as of June 8, 1998, between Credit Suisse (USA), as successor to Donaldson, Lufkin & Jenrette, Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to The Chase Manhattan Bank, as trustee;

• Indenture, dated as of September 3, 1997, between Credit Suisse (USA), as successor to Donaldson, Lufkin & Jenrette, Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as successor to The Chase Manhattan Bank, as trustee; and

Exhibit 1

366

- Indenture, dated as of October 25, 1995, between Credit Suisse (USA), as successor to Donaldson, Lufkin & Jenrette, Inc., and The Bank of New York Mellon, formerly known as The Bank of New York, as trustee.

Each of the indentures above has been filed with the Securities and Exchange Commission and is incorporated by reference in the registration statement of which this prospectus forms a part. The description of these indentures is incorporated in the registration statement by reference to the relevant prospectus and prospectus supplement filed by Credit Suisse (USA) in connection with the initial issuance of the Guaranteed Senior Debt Securities.

70

Exhibit 1

367

## DESCRIPTION OF THE GUARANTEES OF THE GUARANTEED SENIOR DEBT SECURITIES OF CREDIT SUISSE (USA)

Credit Suisse (USA)'s Guaranteed Senior Debt Securities have been fully and unconditionally guaranteed by Credit Suisse Group and Credit Suisse on a several basis. If Credit Suisse (USA), for any reason, does not make a required payment in respect of these securities when due, whether on the normal due date, on acceleration, redemption or otherwise, either or both of Credit Suisse Group and Credit Suisse will cause the payment to be made to or to the order of the trustee. The Credit Suisse Group guarantees are on a subordinated basis as described below. The holder of a Guaranteed Senior Debt Security will be entitled to payment under the relevant guarantees of Credit Suisse Group and Credit Suisse without taking any action whatsoever against Credit Suisse (USA).

The terms of the guarantees have been set forth in a supplemental indenture to each of the indentures under which Guaranteed Senior Debt Securities of Credit Suisse (USA) have been issued. The indentures, as so supplemented, have been qualified under the Trust Indenture Act.

### Subordination of Credit Suisse Group Guarantee

The discussion of subordination in this section applies only to the guarantees by Credit Suisse Group of the Guaranteed Senior Debt Securities of Credit Suisse (USA).

When the term "senior indebtedness" is used in the context of these guarantees, it means:

- any money Credit Suisse Group has borrowed, including any senior debt securities or guarantees of senior debt securities issued under the relevant senior indenture of Credit Suisse Group;

- any money borrowed by someone else where Credit Suisse Group has assumed or guaranteed the obligations, directly or indirectly;

- any letters of credit and acceptances made by banks on Credit Suisse Group's behalf;

- indebtedness that Credit Suisse Group has incurred or assumed in connection with the acquisition of any property; and

- all deferrals, renewals, extensions and refundings of, and amendments, modifications and supplements to, any of the above.

Senior indebtedness does not include any indebtedness that is expressed to be subordinated to or on par with the Credit Suisse Group guarantees or any money owed to Credit Suisse Group's subsidiaries.

The indentures, as supplemented, provide that Credit Suisse Group cannot:

- make any payments of principal or interest on the Guaranteed Senior Debt Securities of Credit Suisse (USA);

- redeem any Guaranteed Senior Debt Securities;

- acquire any Guaranteed Senior Debt Securities; or

- defease any Guaranteed Senior Debt Securities;

if

- any senior indebtedness in an aggregate principal amount of more than $100 million has become due either on maturity or as a result of acceleration or otherwise and the principal, premium and interest on that senior indebtedness has not yet been paid in full by Credit Suisse Group; or

- Credit Suisse Group has defaulted in the payment of any principal, premium or interest on any senior indebtedness in an aggregate principal amount of more than $100 million at the time the

71

Exhibit 1
368

payment was due, unless and until the payment default is cured by such entity or waived by the holders of the senior indebtedness.

If Credit Suisse Group is liquidated, the holders of senior indebtedness will be entitled to receive payment in full in cash or cash equivalents for principal, premium and interest on the senior indebtedness before the holders of Guaranteed Senior Debt Securities receive any of Credit Suisse Group's assets. As a result, holders of Guaranteed Senior Debt Securities may receive a smaller proportion of Credit Suisse Group's assets in liquidation than holders of senior indebtedness.

Even if the subordination provisions prevent Credit Suisse Group from making any payment when due on the Guaranteed Senior Debt Securities or the relevant guarantee, Credit Suisse Group will be in default on its obligations under the relevant indenture, as supplemented, if it does not make the payment when due. This means that the trustee and the holders of Guaranteed Senior Debt Securities can take action against Credit Suisse Group, but they would not receive any money until the claims of the senior indebtedness have been fully satisfied.

The indentures allow the holders of senior indebtedness to obtain specific performance of the subordination provisions from Credit Suisse Group.

Exhibit 1

369

**ERISA**

ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, or the Code, impose certain restrictions on (a) employee benefit plans, including entities such as collective investment funds and separate accounts, that are subject to Title I of ERISA, (b) plans described in Section 4975(e)(1) of the Code, including individual retirement accounts and Keogh plans, subject to Section 4975 of the Code and (c) any entities whose underlying assets include "plan assets" by reason of the Plan Asset Regulation (as defined below) or otherwise. Each of (a), (b) and (c) is herein referred to as a Plan. ERISA also imposes certain duties on persons who are fiduciaries with respect to Plans subject to ERISA. In accordance with ERISA's general fiduciary requirements, a fiduciary with respect to any such Plan who is considering the purchase of securities on behalf of such Plan should determine whether such purchase is permitted under the governing plan documents and is prudent and appropriate for the Plan in view of its overall investment policy and the composition and diversification of its portfolio.

The Department of Labor has issued a regulation (29 C.F.R. Section 2510.3-101) concerning the definition of what constitutes the assets of a Plan for purposes of ERISA and Section 4975 of the Code, or the Plan Asset Regulation. The Plan Asset Regulation, as modified by Section 3(42) of ERISA, provides that, as a general rule, the underlying assets and properties of corporations, partnerships, trusts and certain other entities that are not "operating companies" in which a Plan purchases an equity interest will be deemed for purposes of ERISA and Section 4975 of the Code to be assets of the investing Plan unless certain exceptions apply. Under one such exception, the assets of such an entity are not considered to be plan assets where a Plan makes an investment in an equity interest that is a "publicly-offered security." A "publicly-offered security" is a security that is (a) "freely transferable," (b) part of a class of securities that is "widely held" and (c) either part of a class of securities that is registered under Section 12(b) or 12(g) of the Exchange Act or sold to the Plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act and the class of securities of which such security is a part is registered under the Exchange Act within 120 days (or such later time as may be allowed by the SEC) after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving Plans, and certain persons, referred to as "parties in interest" under ERISA or "disqualified persons" under the Code, having certain relationships with such Plans. We and certain of our subsidiaries, controlling shareholders and other affiliates may each be considered a "party in interest" or "disqualified person" with respect to many Plans. Prohibited transactions within the meaning of ERISA or the Code may arise, for example, if these securities are acquired by or with the assets of a Plan with respect to which one of these entities is a service provider, unless the securities are acquired pursuant to a statutory or an administrative exemption.

The acquisition of the securities may be eligible for one of the exemptions noted below if the acquisition:

- is made solely with the assets of a bank collective investment fund and satisfies the requirements and conditions of Prohibited Transaction Class Exemption, or PTCE, 91-38 issued by the Department of Labor;

- is made solely with assets of an insurance company pooled separate account and satisfies the requirements and conditions of PTCE 90-1 issued by the Department of Labor;

- is made solely with assets managed by a qualified professional asset manager and satisfies the requirements and conditions of PTCE 84-14 issued by the Department of Labor;

- is made solely with assets of an insurance company general account and satisfies the requirements and conditions of PTCE 95-60 issued by the Department of Labor;

Exhibit 1

370

- is made solely with assets managed by an in-house asset manager and satisfies the requirements and conditions of PTCE 96-23 issued by the Department of Labor; or

- is made by a Plan with respect to which the issuing entity is a party in interest solely by virtue of it being a service provider and satisfies the requirements and conditions of Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code; such exemption is herein referred to as the Service Provider Exemption.

Governmental plans, non-US plans and certain church plans, or Similar Law Plans, while not subject to the fiduciary responsibility provisions of ERISA or the prohibited transaction provisions of ERISA or Section 4975 of the Code, may nevertheless be subject to local, state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code, which we refer to as Similar Law. Fiduciaries of any such plan should consult legal counsel before purchasing these securities.

Each person that acquires securities will, by its acquisition and holding, be deemed to have represented and agreed that on each day from the date of acquisition of the securities through and including the date of disposition of such securities either (A) is not, and is not or acting on behalf of or investing the assets of, any Plan or Similar Law Plan or (B) is eligible for the exemptive relief available under PTCE 91-38, 90-1, 84-14, 95-60 or 96-23 or the Service Provider Exemption (or, if a Similar Law Plan, similar exemption from Similar Law) with respect to the purchase, holding and disposition of the securities. Any fiduciary that proposes to cause a Plan or Similar Law Plan to acquire securities should consult with its counsel with respect to the potential applicability of ERISA, the Code or Similar Law to such investment and whether any exemption would be applicable and determine on its own whether all conditions of such exemption or exemptions have been satisfied such that the acquisition, holding and disposition of securities by the purchaser are entitled to the full exemptive relief thereunder.

Please consult the applicable prospectus supplement for further information with respect to a particular offering. Depending upon the security offered, restrictions on purchase or transfer to, by or on behalf of a Plan may apply.

74

Exhibit 1

371

**TAXATION**

**United States Taxation**

The following is a summary of material U.S. federal income tax considerations that may be relevant to a beneficial owner of our debt securities and our contingent convertible securities. For a discussion of material U.S. federal income tax considerations of holding convertible or exchangeable debt, warrants or capital securities we refer you to the applicable prospectus supplement. For purposes of this summary, a "U.S. holder" means a citizen or resident of the United States or a domestic corporation or a holder that is otherwise subject to U.S. federal income tax on a net income basis in respect of our securities. A "Non-U.S. holder" means a holder that is not a U.S. holder. This summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to a decision to purchase our securities. In particular, the summary deals only with holders who will hold our securities as capital assets. This summary does not address the tax treatment of holders that may be subject to special tax rules, such as banks, insurance companies, dealers in securities or currencies, tax exempt entities, financial institutions, traders in securities that elect to use the mark-to-market method of accounting for their securities, persons subject to the alternative minimum tax, dealers in securities or currencies, partnerships that hold our securities or partners therein, or persons that hedge their exposure in our securities or will hold our securities as a position in a "straddle" or "conversion" transaction or as part of a "synthetic security" or other integrated financial transaction.

This discussion does not address U.S. state, local and non-U.S. tax consequences. You should consult your tax adviser with respect to the U.S. federal, state, local and foreign tax consequences of acquiring, owning or disposing of our securities in your particular circumstances.

*Debt Securities*

*U.S. Holder*

**Payments or Accruals of Interest**

Payments or accruals of "qualified stated interest" (as defined below) on a debt security will be taxable to you as ordinary interest income at the time that you receive or accrue such amounts (in accordance with your regular method of tax accounting). If you use the cash method of tax accounting and you receive payments of interest pursuant to the terms of a debt security in a currency other than U.S. dollars, which we refer to as a foreign currency, the amount of interest income you will realize will be the U.S. dollar value of the foreign currency payment based on the exchange rate in effect on the date you receive the payment, regardless of whether you convert the payment into U.S. dollars. If you are an accrual-basis U.S. holder, the amount of interest income you will realize will be based on the average exchange rate in effect during the interest accrual period (or with respect to an interest accrual period that spans two taxable years, at the average exchange rate for the partial period within the taxable year). Alternatively, as an accrual-basis U.S. holder, you may elect to translate all interest income on foreign currency-denominated debt securities at the spot rate on the last day of the accrual period (or the last day of the taxable year, in the case of an accrual period that spans more than one taxable year) or on the date that you receive the interest payment if that date is within five business days of the end of the accrual period. If you make this election, you must apply it consistently to all debt instruments from year to year and you cannot change the election without the consent of the U.S. Internal Revenue Service (the "IRS"). If you use the accrual method of accounting for tax purposes, you will recognize foreign currency gain or loss on the receipt of a foreign currency interest payment if the exchange rate in effect on the date the payment is received differs from the rate applicable to a previous accrual of that interest income. This foreign currency gain or loss will be treated as ordinary income or loss, but generally will not be treated as an adjustment to interest income received on the debt security.

Exhibit 1

372

**Purchase, Sale and Retirement of Debt Securities**

Initially, your tax basis in a debt security generally will equal the cost of the debt security to you. Your basis will increase by any amounts that you are required to include in income under the rules governing original issue discount and market discount, and will decrease by the amount of any amortized premium and any payments other than qualified stated interest made on the debt security. (The rules for determining these amounts are discussed below.) If you purchase a debt security that is denominated in a foreign currency, the cost to you (and therefore generally your initial tax basis) will be the U.S. dollar value of the foreign currency purchase price on the date of purchase calculated at the exchange rate in effect on that date. If the debt security denominated in a foreign currency is traded on an established securities market and you are a cash-basis taxpayer (or if you are an accrual-basis taxpayer that makes a special election), you will determine the U.S. dollar value of the cost of the debt security by translating the amount of the foreign currency that you paid for the debt security at the spot rate of exchange on the settlement date of your purchase. The amount of any subsequent adjustments to your tax basis in a debt security in respect of foreign currency-denominated original issue discount, market discount and premium will be determined in the manner described below. If you convert U.S. dollars into a foreign currency and then immediately use that foreign currency to purchase a debt security, you generally will not have any taxable gain or loss as a result of the conversion or purchase.

When you sell or exchange a debt security, or if a debt security that you hold is retired, you generally will recognize gain or loss equal to the difference between the amount you realize on the transaction (less any accrued qualified stated interest, which will be subject to tax in the manner described above under "—Payments or Accruals of Interest") and your tax basis in the debt security. If you sell or exchange a debt security for a foreign currency, or receive foreign currency on the retirement of a debt security, the amount you will realize for U.S. tax purposes generally will be the U.S. dollar value of the foreign currency that you receive calculated at the exchange rate in effect on the date the debt security denominated in a foreign currency is disposed of or retired. If you dispose of a debt security denominated in a foreign currency that is traded on an established securities market and you are a cash-basis U.S. holder (or if you are an accrual-basis holder that makes a special election), you will determine the U.S. dollar value of the amount realized by translating the amount of the foreign currency that you received on the debt security at the spot rate of exchange on the settlement date of the sale, exchange or retirement.

The special election available to you if you are an accrual-basis taxpayer in respect of the purchase and sale of debt securities denominated in a foreign currency traded on an established securities market, which is discussed in the two preceding paragraphs, must be applied consistently to all debt instruments from year to year and cannot be changed without the consent of the IRS.

Except as discussed below with respect to market discount and foreign currency gain or loss, the gain or loss that you recognize on the sale, exchange or retirement of a debt security generally will be capital gain or loss. The gain or loss on the sale, exchange or retirement of a debt security will be long-term capital gain or loss if you have held the debt security for more than one year on the date of disposition. Net long-term capital gain recognized by an individual U.S. holder generally will be subject to tax at the lower rate than net short-term capital gain or ordinary income. The ability of U.S. holders to offset capital losses against ordinary income is limited.

Despite the foregoing, the gain or loss that you recognize on the sale, exchange or retirement of a debt security denominated in a foreign currency generally will be treated as ordinary income or loss to the extent that the gain or loss is attributable to changes in exchange rates during the period in which you held the debt security. This foreign currency gain or loss will not be treated as an adjustment to interest income that you receive on the debt security.

76

Exhibit 1

373

**Original Issue Discount**

If we issue a series of debt securities at a discount from their stated redemption price at maturity, and the discount is equal to or more than a statutory de minimis amount (i.e., the product of one-fourth of one percent (0.25%) of the stated redemption price at maturity of the series of debt securities multiplied by the number of full years to their maturity), the series of debt securities will be original issue discount notes. The difference between the issue price and the stated redemption price at maturity of the series of debt securities will be the "original issue discount." The "issue price" of the original discount notes will be the first price at which a substantial amount of the original issue discount notes are sold to the public (i.e., excluding sales of original issue discount notes to Credit Suisse Securities (USA) LLC, underwriters, placement agents, wholesalers, or similar persons). The "stated redemption price at maturity" will include all payments under the original issue discount notes other than payments of qualified stated interest. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments issued by us) at least annually during the entire term of an original issue discount note at a single fixed interest rate or, subject to certain conditions, based on one or more interest indices.

If you invest in an original issue discount note, you generally will be subject to the special tax accounting rules for original issue discount obligations provided by the Internal Revenue Code of 1986, as amended, or the Code, and certain U.S. Treasury regulations. You should be aware that, as described in greater detail below, if you invest in an original issue discount note, you generally will be required to include original issue discount in ordinary gross income for U.S. federal income tax purposes as it accrues, although you may not yet have received the cash attributable to that income.

In general, and regardless of whether you use the cash or the accrual method of tax accounting, if you are the holder of an original issue discount note with a maturity greater than one year, you will be required to include in ordinary gross income the sum of the "daily portions" of original issue discount on that original issue discount note for all days during the taxable year that you own the original issue discount note. The daily portions of original issue discount on an original issue discount note are determined by allocating to each day in any accrual period a ratable portion of the original issue discount allocable to that period. Accrual periods may be any length and may vary in length over the term of an original issue discount note, so long as no accrual period is longer than one year and each scheduled payment of principal or interest occurs on the first or last day of an accrual period. If you are the initial holder of the original issue discount note, the amount of original issue discount on an original issue discount note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the original issue discount note at the beginning of the accrual period by a fraction, the numerator of which is the annual yield to maturity (defined below) of the original issue discount note and the denominator of which is the number of accrual periods in a year; and (b) subtracting from that product the amount (if any) payable as qualified stated interest allocable to that accrual period.

In the case of an original issue discount note that is a floating rate note, both the "annual yield to maturity" and the qualified stated interest will be determined for these purposes as though the original issue discount note will bear interest in all periods at a fixed rate generally equal to the rate that would be applicable to interest payments on the original issue discount note on its date of issue or, in the case of some floating rate notes, the rate that reflects the yield that is reasonably expected for the original issue discount note. (Additional rules may apply if interest on a floating rate note is based on more than one interest index.) The "adjusted issue price" of an original issue discount note at the beginning of any accrual period will generally be the sum of its issue price (including any accrued interest) and the amount of original issue discount allocable to all prior accrual periods, reduced by the amount of all payments other than any qualified stated interest payments on the original issue discount note in all prior accrual periods. All payments on an original issue discount note (other than qualified stated interest) will generally be viewed first as payments of previously accrued original issue discount (to the

77

Exhibit 1
374

extent of the previously accrued discount and to the extent that the discount has not been allocated to prior cash payments on the note), and then as a payment of principal. The "annual yield to maturity" of an original issue discount note is the discount rate (appropriately adjusted to reflect the length of accrual periods) that causes the present value on the issue date of all payments on the original issue discount note to equal the issue price. As a result of this "constant yield" method of including original issue discount income, the amounts you will be required to include in your gross income if you invest in an original issue discount note denominated in U.S. dollars generally will be lesser in the early years and greater in the later years than amounts that would be includible on a straight-line basis.

You generally may make an irrevocable election to include in income your entire return on a debt security (i.e., the excess of all remaining payments to be received on the debt security, including payments of qualified stated interest, over the amount you paid for the debt security) under the constant yield method described above. If you purchase debt securities at a premium or market discount and if you make this election, you will also be deemed to have made the election (discussed below under "—Premium" and "—Market Discount") to amortize premium or to accrue market discount currently on a constant yield basis in respect of all other premium or market discount bonds that you hold.

In the case of an original issue discount note that is also a foreign currency denominated debt security, you should determine the U.S. dollar amount includible as original issue discount for each accrual period by (a) calculating the amount of original issue discount allocable to each accrual period in the foreign currency using the constant yield method described above and (b) translating that foreign currency amount at the average exchange rate in effect during that accrual period (or, with respect to an interest accrual period that spans two taxable years, at the average exchange rate for each partial period). Alternatively, you may translate the foreign currency amount at the spot rate of exchange on the last day of the accrual period (or the last day of the taxable year, for an accrual period that spans two taxable years) or at the spot rate of exchange on the date of receipt, if that date is within five business days of the last day of the accrual period, provided that you have made the election described above under "—Payments or Accruals of Interest." Because exchange rates may fluctuate, if you are the holder of an original issue discount note that is also a foreign currency denominated debt security, you may recognize a different amount of original issue discount income in each accrual period than would be the case if you were the holder of an otherwise similar original issue discount note denominated in U.S. dollars. Upon the receipt of an amount attributable to original issue discount (whether in connection with a payment of an amount that is not qualified stated interest or the sale or retirement of the original issue discount note), you will recognize ordinary income or loss measured by the difference between the amount received (translated into U.S. dollars at the exchange rate in effect on the date of receipt or on the date of disposition of the original issue discount note, as the case may be) and the amount accrued (using the exchange rate applicable to such previous accrual).

If you purchase an original issue discount note outside of the initial offering at a cost less than its remaining redemption amount (i.e., the total of all future payments to be made on the original issue discount note other than payments of qualified stated interest), or if you purchase an original issue discount note in the initial offering at a price other than the original issue discount note's issue price, you generally will also be required to include in gross income the daily portions of original issue discount, calculated as described above. However, if you acquire an original issue discount note at a price greater than its adjusted issue price, you will be required to reduce your periodic inclusions of original issue discount to reflect the premium paid over the adjusted issue price.

Floating rate notes generally will be treated as "variable rate debt instruments" under the original issue discount regulations. Accordingly, the stated interest on a floating rate note generally will be treated as "qualified stated interest" and such a floating rate note will not have original issue discount solely as a result of the fact that it provides for interest at a variable rate. If a floating rate note does not qualify as a "variable rate debt instrument", the floating rate note will be subject to special rules

78

Exhibit 1
375

that govern the tax treatment of debt obligations that provide for contingent payments. We will provide a detailed description of the tax considerations relevant to U.S. holders of any such debt securities in the applicable prospectus supplement.

Certain original issue discount notes may be redeemed prior to maturity, either at our option or at the option of the holder, or may have special repayment or interest rate reset features as indicated in the applicable prospectus supplement. Original issue discount notes containing these features may be subject to rules that differ from the general rules discussed above. If you purchase original issue discount notes with these features, you should carefully examine the applicable prospectus supplement and consult your tax adviser about their treatment since the tax consequences of original issue discount will depend, in part, on the particular terms and features of the original issue discount notes.

### Short-Term Notes

The rules described above will also generally apply to original issue discount notes with maturities of one year or less, which we refer to as short-term notes, but with some modifications.

First, the original issue discount rules treat none of the interest on a short-term note as qualified stated interest, but treat a short-term note as having original issue discount. Thus, all short-term notes will be original issue discount notes. Except as noted below, if you are a cash-basis holder of a short-term note and you do not identify the short-term note as part of a hedging transaction you will generally not be required to accrue original issue discount currently, but you will be required to treat any gain realized on a sale, exchange or retirement of the short-term note as ordinary income to the extent such gain does not exceed the original issue discount accrued with respect to the short-term note during the period you held the short-term note. You may not be allowed to deduct all of the interest paid or accrued on any indebtedness incurred or maintained to purchase or carry a short-term note until the maturity of the short-term note or its earlier disposition in a taxable transaction. Notwithstanding the foregoing, if you are a cash-basis U.S. holder of a short-term note, you may elect to accrue original issue discount on a current basis (in which case the limitation on the deductibility of interest described above will not apply). A U.S. holder using the accrual method of tax accounting and some cash method holders (including banks, securities dealers, regulated investment companies and certain trust funds) generally will be required to include original issue discount on a short-term note in gross income on a current basis. Original issue discount will be treated as accruing for these purposes on a ratable basis or, at the election of the holder, on a constant yield basis based on daily compounding.

Second, regardless of whether you are a cash-basis or accrual-basis holder, if you are the holder of a short-term note you may elect to accrue any "acquisition discount" with respect to the short-term note on a current basis. Acquisition discount is the excess of the remaining redemption amount of the short-term note at the time of acquisition over the purchase price. Acquisition discount will be treated as accruing ratably or, at the election of the holder, under a constant yield method based on daily compounding. If you elect to accrue acquisition discount, the original issue discount rules will not apply.

Finally, the market discount rules described below will not apply to short-term notes.

### Premium

If you purchase a debt security at a cost greater than the debt security's remaining redemption amount, you will be considered to have purchased the debt security at a premium, and you may elect to amortize the premium as an offset to interest income, using a constant yield method, over the remaining term of the debt security. If you make this election, it generally will apply to all debt instruments that you hold at the time of the election, as well as any debt instruments that you subsequently acquire. In addition, you may not revoke the election without the consent of the IRS. If

Exhibit 1
376

you elect to amortize the premium, you will be required to reduce your tax basis in the debt security by the amount of the premium amortized during your holding period. Original issue discount notes purchased at a premium will not be subject to the original issue discount rules described above. In the case of premium on a foreign currency denominated debt security, you should calculate the amortization of the premium in the foreign currency. Premium amortization deductions attributable to a period reduce interest income in respect of that period, and therefore are translated into U.S. dollars at the rate that you use for interest payments in respect of that period. Exchange gain or loss will be realized with respect to amortized premium on a foreign currency denominated debt security based on the difference between the exchange rate computed on the date or dates the premium is amortized against interest payments on the debt security and the exchange rate on the date the holder acquired the debt security. If you do not elect to amortize premium, the amount of premium will be included in your tax basis in the debt security. Therefore, if you do not elect to amortize premium and you hold the debt security to maturity, you generally will be required to treat the premium as capital loss when the debt security matures.

**Market Discount**

If you purchase a debt security at a price that is lower than the debt security's remaining redemption amount (or in the case of an original issue discount note, the original issue discount note's adjusted issue price), by 0.25% or more of the remaining redemption amount (or adjusted issue price), multiplied by the number of remaining whole years to maturity, the debt security will be considered to bear "market discount" in your hands. In this case, any gain that you realize on the disposition of the debt security generally will be treated as ordinary interest income to the extent of the market discount that accrued on the debt security during your holding period. In addition, you may be required to defer the deduction of a portion of the interest paid on any indebtedness that you incurred or maintained to purchase or carry the debt security. In general, market discount will be treated as accruing ratably over the term of the debt security, or, at your election, under a constant yield method. You must accrue market discount on a foreign currency denominated debt security in the specified currency. The amount that you will be required to include in income in respect of accrued market discount will be the U.S. dollar value of the accrued amount, generally calculated at the exchange rate in effect on the date that you dispose of the debt security.

You may elect to include market discount in gross income currently as it accrues (on either a ratable or constant yield basis), in lieu of treating a portion of any gain realized on a sale of the debt security as ordinary income. If you elect to include market discount on a current basis, the interest deduction deferral rule described above will not apply. If you do make such an election, it will apply to all market discount debt instruments that you acquire on or after the first day of the first taxable year to which the election applies. The election may not be revoked without the consent of the IRS. Any accrued market discount on a foreign currency denominated debt security that is currently includible in income will be translated into U.S. dollars at the average exchange rate for the accrual period (or portion thereof within the holder's taxable year).

**Indexed Notes and Other Debt Securities Providing for Contingent Payments**

Special rules govern the tax treatment of debt obligations that provide for contingent payments, which we refer to as contingent debt obligations. These rules generally require accrual of interest income on a constant yield basis in respect of contingent debt obligations at a yield determined at the time of issuance of the obligation, and may require adjustments to these accruals when any contingent payments are made. We will provide a detailed description of the tax considerations relevant to U.S. holders of any contingent debt obligations in the applicable prospectus supplement.

80

Exhibit 1

377

*Non-U.S. Holder*

Under present United States federal tax law, and subject to the discussion below concerning backup withholding:

(a) Payments of interest (including original issue discount) on a debt security to you will not be subject to the 30% U.S. federal withholding tax, provided that:

1. you do not actually or constructively own 10% or more of the total combined voting power of all classes of our stock entitled to vote and are not a controlled foreign corporation related to us through stock ownership; and

2. you provide a statement signed under penalties of perjury that includes your name and address and certify that you are a non-U.S. holder in compliance with applicable requirements by completing a Form W-8BEN, or otherwise satisfy documentary evidence requirements for establishing that you are a non-U.S. holder.

Payments of interest (including original issue discount) on the debt security that do not qualify for the portfolio interest exception and that are not effectively connected with your conduct of a trade or business in the United States will be subject to the 30% U.S. federal withholding tax, unless a U.S. income tax treaty applies to reduce or eliminate withholding. Interest effectively connected with the active conduct of a trade or business in the United States will be subject to U.S. federal income tax on a net income basis (although exempt from the 30% U.S. federal withholding tax if you provide us with a Form W-8ECI (or successor form)) in the same manner as if you were a U.S. holder as defined above.

(b) You will not be subject to U.S. federal income tax on any gain realized on the sale, exchange or retirement of the debt security unless the gain is effectively connected with your trade or business in the United States or, in the case of an individual, the holder is present in the United States for 183 days or more in the taxable year in which the sale, exchange or retirement occurs and certain other conditions are met. In the case that you are subject to U.S. federal income taxation on a net basis in respect of the debt security, you will generally be taxable under the same rules that govern the taxation of a U.S. holder.

*Information Reporting and Backup Withholding*

Information returns will be required to be filed with the IRS in connection with debt security payments made to certain United States persons. If you are a United States person, you generally will not be subject to a United States backup withholding tax (currently at a rate of 28%) on such payments if you provide your taxpayer identification number to the paying agent. You may also be subject to information reporting and backup withholding tax requirements with respect to the proceeds from a sale of the debt securities. If you are a non-U.S. holder, you may have to comply with certification procedures to establish that you are a non-U.S. holder in order to avoid information reporting and backup withholding tax requirements. Any amounts withheld under the backup withholding rules may be allowed as a credit against the holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the required information is furnished to the IRS.

Individual U.S. holders who, during any taxable year, hold any interest in any "specified foreign financial asset" generally will be required to file with their U.S. federal income tax returns a statement setting forth certain information if the aggregate value of all such assets exceeds $50,000. A "specified foreign financial asset" generally includes any financial account maintained with a foreign financial institution and may include the debt securities if they are not held in an account maintained with a U.S. financial institution. A U.S. holder who fails to file any such form could be required to pay a penalty of $10,000, or a penalty of up to $50,000 for ongoing failure to file.

Exhibit 1

378

Pursuant to the U.S. Foreign Account Tax Compliance rules ("FATCA"), in order to avoid adverse U.S. federal tax consequences, "foreign financial institutions" will be required, for years beginning after December 31, 2013, to collect information on certain financial accounts held by U.S. persons and submit such information to the IRS. It is likely that the relevant issuer will qualify as a "foreign financial institution" under these rules. However, the application of these rules to amounts paid on or with respect to the debt securities is not clear. By purchasing the debt securities, U.S. holders agree to provide whatever information is necessary for us to comply with these reporting obligations.

The relevant issuer may be required, pursuant to FATCA, to withhold U.S. tax on a portion of payments made after December 31, 2012 on certain types of securities issued by the relevant issuer after January 1, 2013 to an investor who does not provide information sufficient for the relevant issuer to determine whether the investor is a U.S. person or should otherwise be treated as holding a "United States account" of the relevant issuer, or to an investor that is a non-U.S. financial institution that is not in compliance with FATCA, as well as under certain other circumstances. The application of these rules to amounts paid on or with respect to the debt securities is not clear. Holders should consult their own tax advisors on how these rules may apply to payments they receive under the debt securities.

If any amount of, or in respect of, U.S. withholding tax were to be deducted or withheld from payments on the debt securities as a result of a failure by an investor (or by an institution through which an investor holds the debt securities) to comply with FATCA, neither the relevant issuer nor the guarantor nor any paying agent nor any other person would, pursuant to the terms of the debt securities, be required to pay additional amounts with respect to any debt securities as a result of the deduction or withholding of such tax.

### *Contingent Convertible Securities*

This discussion applies only to holders of registered contingent convertible securities. Contingent convertible securities in bearer form are not being offered to U.S. persons. A U.S. holder who owns contingent convertible securities in bearer form characterized as indebtedness may be subject to limitations under U.S. federal income tax laws, including the limitations provided in Sections 165(j) and 1287 of the Code. Prospective holders should consult their tax advisors with respect to the U.S. federal income tax consequences of investing in contingent convertible securities in bearer form.

The U.S. federal income tax treatment of the contingent convertible securities offered pursuant to this prospectus will depend on the specific terms of the contingent convertible securities, and may depend on the nature of the assets held by the relevant finance subsidiary. This discussion deals only with holders that will acquire contingent convertible securities as part of the initial offering of the contingent convertible securities and who do not hold other securities of the relevant finance subsidiary. Additionally, special rules apply to foreign currency-denominated instruments. The prospectus supplement applicable to a particular issue of contingent convertible securities may add or modify information contained in this disclosure, depending on the specific terms of the contingent convertible securities being offered, and on the assets held by the relevant finance subsidiary at that time.

#### *Characterization of the Contingent Convertible Securities*

No statutory, judicial or administrative authority directly addresses the characterization of the contingent convertible securities or instruments similar to the contingent convertible securities for U.S. federal income tax purposes. As a result, significant aspects of the U.S. federal income tax consequences of an investment in the contingent convertible securities are not certain. We anticipate that the contingent convertible securities will be treated as equity of the relevant issuer (whether the relevant issuer is a finance subsidiary or, as a result of a substitution, Credit Suisse Group) for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not assert that the contingent convertible securities should be treated in a different manner, for example as indebtedness

Exhibit 1
379

for U.S. federal income tax purposes. If the contingent convertible securities were treated other than as equity of the relevant issuer for U.S. federal income tax purposes, the timing and character of income, gain and loss recognized by you could differ from the description herein. The following discussion assumes treatment of the contingent convertible securities as equity of the relevant issuer for U.S. federal income tax purposes.

The tax treatment of any contingent convertible securities that we believe should be characterized other than as equity of the relevant issuer for U.S. federal income tax purposes will be discussed in the applicable prospectus supplement.

*Characterization of the Finance Subsidiaries*

The finance subsidiaries have each made an election to be treated as a pass-through entity for U.S. federal income tax purposes. Based on the assumption that contingent convertible securities will be treated as equity interests in the relevant finance subsidiary, holders of the contingent convertible securities will be treated as partners in the relevant finance subsidiary. A partnership generally is not itself subject to U.S. federal income tax, unless the partnership constitutes a publicly traded partnership taxable as a corporation. Instead, each partner is required to take into account its allocable share of items of income, gain, loss, and deduction of the partnership in computing its U.S. federal income tax liability, regardless of whether distributions are made to the partner. Such income will be treated as if it were realized by the partner directly from the same source from which it was realized by the partnership. Accordingly, each U.S. holder will be required to include in gross income and expense its allocable share of the income and expense of the relevant finance subsidiary in respect of the underlying assets. U.S. holders who are individuals may be subject to limitations on their ability to deduct expenses of the finance subsidiary allocable to them. Under certain circumstances, the relevant finance subsidiary may be required to file a U.S. partnership return on maturity or conversion of the contingent convertible securities, and to provide Schedule K-1 forms to direct, and certain indirect, U.S. investors.

We anticipate that the finance subsidiaries will not be treated as publicly traded partnerships taxable as corporations. The terms of the assets held by the finance subsidiaries have not yet been determined. It is anticipated that they will be instruments of a kind for which no statutory, judicial or administrative authority directly addresses the characterization for U.S. federal income tax purposes. As a result, significant aspects of the U.S. federal income tax consequences of an investment in the contingent convertible securities may not be certain. We anticipate however that we will treat the assets of the finance subsidiaries as equity of Credit Suisse Group or a subsidiary thereof for U.S. federal income tax purposes, and the following discussion assumes such treatment. The applicable prospectus supplement for an issuance of contingent convertible securities will provide additional information on the U.S. federal income tax treatment of the finance subsidiaries and the assets held by the finance subsidiaries, to the extent relevant to the tax treatment of a U.S. holder of the contingent convertible securities.

*U.S. Holders*

**Payments of Interest and Additional Amounts**

In accordance with our expectation that the contingent convertible securities will be treated as partnership interests in the relevant finance subsidiary (as discussed above), payments of gross interest and additional amounts, if any, in respect of such contingent convertible securities will constitute distributions of your distributable share of income generated by the relevant underlying assets held by the relevant finance subsidiary. Assuming such underlying assets will be securities that are characterized for U.S. federal income tax purposes as equity of Credit Suisse Group or a subsidiary thereof, the tax treatment of such income, which will consist of payments on these securities, is described in the three paragraphs below. If, contrary to our expectations, the underlying assets held by the relevant finance

83

Exhibit 1
380

subsidiary do not qualify for treatment as equity of Credit Suisse Group or a subsidiary thereof, the prospectus supplement for an issuance of contingent convertible securities will describe the U.S. federal income tax treatment of payments in respect of such contingent convertible securities.

Subject to the discussion below under "Passive Foreign Investment Company Rules," payments of gross interest and additional amounts in respect of securities which are characterized for U.S. federal income tax purposes as equity of Credit Suisse Group or a subsidiary thereof will constitute dividend income to the extent of current or accumulated earnings and profits of Credit Suisse Group or a subsidiary thereof (as applicable), as determined under U.S. federal income tax principles. Payments of interest will be foreign source income and will not be eligible for the dividends-received deduction generally allowed to corporate U.S. holders.

To the extent, if any, that the amount of any payment of gross interest and additional amounts exceeds current and accumulated earnings and profits of Credit Suisse Group or a subsidiary thereof (as applicable), as determined under U.S. federal income tax principles, it will be treated first as a tax-free return of capital to the extent of the relevant finance subsidiary's adjusted tax basis in the securities, and to the extent it exceeds the adjusted tax basis, it will be treated as capital gain. Potential purchasers should note, however, that neither Credit Suisse Group nor any subsidiary thereof, will maintain calculations of its earnings and profits under U.S. federal income tax principles and therefore you should expect that the entire amount of a payment of interest will generally be characterized as dividend income to you.

Subject to certain exceptions for short-term and hedged positions, the U.S. dollar amount of dividends received by an individual prior to January 1, 2013 will be subject to taxation at a maximum rate of 15% if the dividends are "qualified dividends." The applicability of "qualified dividend" treatment to payments on these securities will be discussed in the applicable prospectus supplement.

The relevant finance subsidiary may substitute Credit Suisse Group for itself as the issuer of the contingent convertible securities. The discussion in the preceding three paragraphs of the tax treatment of payments made in respect of securities which are characterized for U.S. federal income tax purposes as equity of Credit Suisse Group or a subsidiary thereof applies equally to payments made in respect of such contingent convertible securities.

### Sale or Exchange of the Contingent Convertible Securities

Subject to the discussion below under "Passive Foreign Investment Company Rules," upon the sale, exchange or other disposition of the contingent convertible securities, a U.S. holder will generally recognize U.S source capital gain or loss. The amount of the gain or loss will equal the difference between the amount realized on the sale or exchange and the holder's adjusted tax basis in the contingent convertible securities. Such gain or loss will generally be long-term capital gain or loss if the U.S. holder has held the contingent convertible securities for more than one year. The deductibility of capital losses is subject to limitations.

### Conversion of the Contingent Convertible Securities

Under the circumstances described above under "Description of Contingent Convertible Securities—Redemption, Substitution, Variation, Repurchase and Conversion—Conversion," we will convert the contingent convertible securities into common shares or American depositary shares ("ADSs") of Credit Suisse Group. In the case where a finance subsidiary is the issuer of the contingent convertible securities, and a U.S. holder realizes any loss on the conversion of contingent convertible securities into common shares or ADSs of Credit Suisse Group, we believe such U.S. holder generally would not recognize such loss. In that case, the U.S. holder's tax basis in the common shares or ADSs received upon conversion generally will equal its aggregate tax basis in the contingent convertible securities converted, and the holding period of the common shares or ADSs received upon conversion

84

Exhibit 1
381

may not include the period during which the U.S. holder held the contingent convertible securities prior to the conversion.

If a U.S. holder realizes any gain on the conversion of contingent convertible securities issued by a finance subsidiary for common shares or ADSs of Credit Suisse Group, the U.S. federal income tax treatment of the conversion is uncertain, but it is possible such U.S. holder would recognize such gain. Such U.S. holders should consult their own tax advisors with respect to the tax consequences of such a conversion.

In the case where Credit Suisse Group has been substituted as the issuer of the contingent convertible securities, a U.S. holder will generally not recognize gain or loss on the conversion of contingent convertible securities into common shares or ADSs of Credit Suisse Group. The tax basis of the common shares or ADSs a U.S. holder will receive upon such conversion generally will equal its aggregate tax basis in the contingent convertible securities converted. The holding period of the common shares or ADSs a U.S. holder will receive upon conversion will generally include the period during which the U.S. holder held contingent convertible securities after the substitution and prior to the conversion.

Dividends paid with respect to the common shares or ADSs a U.S. holder will receive upon conversion will be subject to the same tax treatment as described above in "Payments of Interest and Additional Amounts," and a sale or other disposition of the common shares or ADSs will be subject to the same tax treatment as described above in "Sale or Exchange of the Contingent Convertible Securities," except that a U.S. holder's adjusted tax basis and holding period in the common shares or ADSs will be determined pursuant to the preceding paragraphs.

### Substitution of Issuer

The U.S. federal income tax treatment of a substitution of contingent convertible securities issued by a finance subsidiary for contingent convertible securities issued by Credit Suisse Group is uncertain. Although the matter is not free from doubt, U.S. holders should recognize gain, if any, if Credit Suisse Group contingent convertible securities are treated as differing materially in kind or extent from contingent convertible securities issued by a finance subsidiary. Deductibility of loss, if any, may be limited pursuant to, among other things, the wash sale rules. U.S. holders should consult their own tax advisors with respect to the tax consequences of such a substitution.

### Passive Foreign Investment Company Rules

Special U.S. federal income tax rules apply to U.S. persons owning shares of a "passive foreign investment company," or "PFIC." If Credit Suisse Group is treated as a PFIC for any year, U.S. holders of contingent convertible securities, common shares or ADSs received upon conversion, (together, the "CSG Equity Instruments") may be subject to adverse tax consequences upon a sale, exchange or other disposition of the CSG Equity Instruments or upon the receipt of certain "excess distributions" in respect of the CSG Equity Instruments. Based on audited consolidated financial statements, we believe that Credit Suisse Group was not treated as a PFIC for U.S. federal income tax purposes with respect to the 2011 taxable year. In addition, based on the audited consolidated financial statements of Credit Suisse Group and our current expectations regarding the value and nature of its assets and the sources and nature of its income, we do not anticipate Credit Suisse Group becoming a PFIC for the 2012 taxable year.

### Backup Withholding and Information Reporting

Payments of interest and sales proceeds that are made within the United States or through certain U.S.-related financial intermediaries generally are subject to information reporting and to backup withholding unless (1) you are a corporation or other exempt recipient or (2) in the case of backup

85

Exhibit 1
382

withholding, you provide a correct taxpayer identification number and certify that you are not subject to backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is furnished to the IRS.

In order to avoid adverse U.S. federal tax consequences, "foreign financial institutions" will be required, for years beginning after December 31, 2012, to collect information on certain financial accounts held by U.S. persons and submit such information to the IRS. It is likely that the relevant issuer will qualify as a "foreign financial institution" under these rules. However, the application of these rules to amounts paid on or with respect to the contingent convertible securities is not clear. By purchasing the contingent convertible securities, U.S. holders agree to provide whatever information is necessary for us to comply with these reporting obligations. If an amount of, or in respect of, U.S. withholding tax were to be deducted or withheld from payments on the contingent convertible securities as a result of an investor's failure to comply with these rules, neither the relevant issuer nor the guarantor nor any paying agent nor any other person would, pursuant to the terms of the contingent convertible securities, be required to pay additional amounts with respect to any contingent convertible securities as a result of the deduction or withholding of such tax.

Individual U.S. holders who, during any taxable year, hold any interest in any "specified foreign financial asset" generally will be required to file with their U.S. federal income tax returns a statement setting forth certain information if the aggregate value of all such assets exceeds $50,000. A "specified foreign financial asset" generally includes any financial account maintained with a foreign financial institution and may include the contingent convertible securities if they are not held in an account maintained with a U.S. financial institution. A U.S. holder who fails to file any such form could be required to pay a penalty of $10,000, or a penalty of up to $50,000 for ongoing failure to file.

**Additional Reporting Requirements for Certain Holders of Contingent Convertible Securities**

A U.S. holder that is a partner in a foreign partnership such as the finance subsidiaries may be subject to special foreign partnership information reporting requirements with respect to the acquisition, holding or disposition of an investment in contingent convertible securities issued by a finance subsidiary.

A U.S. holder generally will be required to file Form 8865 (or similar form) with the IRS, if its purchase of contingent convertible securities in the aggregate during any twelve month period exceeds $100,000. A U.S. holder will also be required to file Form 8865 for any year in which it becomes a "10 Percent holder," meaning a holder who at any time owns a 10 percent or greater share of all outstanding contingent convertible securities.

For a year when a U.S. holder becomes a 10 Percent holder, or purchases more than $100,000 of contingent convertible securities, the U.S. holder will generally be required to provide on Form 8865 the names and addresses of all U.S. holders that were 10 Percent holders in that year, among other matters. A U.S. holder who fails to file Form 8865 when required is subject to a penalty equal to 10 percent of the gross amount paid for the contingent convertible securities (subject to a maximum penalty of $100,000, except in cases of intentional disregard).

A 10 Percent holder also will generally be required to file Form 8865 for any year in which more than 50% of all outstanding contingent convertible securities are held by 10 Percent holders. Finally, a 10 Percent holder will generally be required to file Form 8865 for any year in which it ceases to be a 10 Percent holder. A U.S. holder who fails to file in such circumstances is subject to a penalty of $10,000, or a penalty of up to $50,000 for ongoing failure to file.

Special rules apply to combine the purchases and ownership interests of certain related persons in determining whether a holder meets the foregoing reporting thresholds. U.S. holders should consult

Exhibit 1
383

their own tax advisors with respect to this or any other reporting requirement that may apply to an acquisition of the contingent convertible securities.

### Non-U.S. Holders

Subject to the discussion below, assuming that the contingent convertible securities are treated as equity in a partnership holding equity securities of Credit Suisse Group or a subsidiary thereof, a Non-U.S. holder of a contingent convertible security will not be subject to U.S. federal income tax by withholding or otherwise on payments of interest (including additional amounts) on a contingent convertible security, or gain realized in connection with the sale, or other disposition of a contingent convertible security, unless the Non-U.S. holder is an individual present in the U.S. for 183 days or more in the taxable year of a disposition of the contingent convertible security in which gain was realized and certain other conditions are satisfied. Non-U.S. holders should consult their U.S. tax advisors with respect to the characterization of the contingent convertible securities and of the relevant issuer's assets for U.S. federal income tax purposes.

The relevant issuer may be required pursuant to the U.S. Foreign Account Tax Compliance rules ("FATCA") to withhold U.S. tax on a portion of payments made after December 31, 2013 on certain types of securities issued by the relevant issuer after January 1, 2013 to an investor who does not provide information sufficient for the relevant issuer to determine whether the investor is a U.S. person or should otherwise be treated as holding a "United States account" of the relevant issuer, or to an investor that is a non-U.S. financial institution that is not in compliance with FATCA, as well as under certain other circumstances. The application of these rules to amounts paid on or with respect to the contingent convertible securities is not clear. If any amount of, or in respect of, U.S. withholding tax were to be deducted or withheld from payments on the contingent convertible securities as a result of a failure by an investor (or by an institution through which an investor holds the contingent convertible securities) to comply with these rules, neither the relevant issuer nor the guarantor nor any paying agent nor any other person would, pursuant to the terms of the contingent convertible securities, be required to pay additional amounts with respect to any contingent convertible securities as a result of the deduction or withholding of such tax. Holders should consult their own tax advisors on how these rules may apply to payments they receive under the contingent convertible securities.

**Swiss Taxation**

The following is a summary of the principal tax consequences for holding debt securities or contingent convertible securities, as applicable, issued by a company or finance subsidiary under the laws of Switzerland for investors who are not residents of Switzerland for tax purposes and have no Swiss permanent establishment and do not conduct a Swiss-based trade or business. It does not address the tax treatment of holders of debt securities or contingent convertible securities, as applicable, who are residents of Switzerland for tax purposes or who are subject to Swiss taxes for other reasons. This summary is based on legislation as of the date of this prospectus and does not aim to be a comprehensive description of all the Swiss tax considerations that may be relevant to a decision to invest in debt securities or contingent convertible securities, as applicable.

### Withholding Tax

According to the present practice of the Swiss Federal Tax Administration, payments of interest on the debt securities or contingent convertible securities, as applicable, issued by a company or finance subsidiary (other than Credit Suisse Group and Credit Suisse) or by a branch of Credit Suisse Group or Credit Suisse outside Switzerland are not subject to Swiss withholding tax, even if guaranteed by Credit Suisse Group, provided, however, that the net proceeds from the issue of the debt securities or contingent convertible securities, as applicable, are used outside of Switzerland.

Exhibit 1
384

Payments of interest on debt securities or on contingent convertible securities, as applicable, issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) may be subject to Swiss withholding tax at a rate of 35% regardless of whether such interest is paid regularly in coupons or in a one-time payment upon redemption.

On August 24, 2011 the Swiss Federal Council issued a draft legislation which, if enacted, may require a paying agent in Switzerland to deduct Swiss withholding tax at a rate of 35% on any payment of interest (i) in respect of a debt security or a contingent convertible security, as applicable, issued by a non-Swiss issuer directly (or in certain cases indirectly) to an individual resident in Switzerland or (ii) in respect of a debt security or a contingent convertible security, as applicable, issued by a Swiss issuer directly (or in certain cases indirectly) to an individual resident in Switzerland or to a person resident outside of Switzerland unless certain requirements are met. If this legislation or similar legislation were enacted and an amount of, or in respect of, Swiss withholding tax were to be deducted or withheld from that payment, neither the issuer, nor the guarantor nor any paying agent nor any other person would, pursuant to the terms and conditions of the contingent convertible securities, be obliged to pay additional amounts with respect to any contingent convertible securities as a result of the deduction or imposition of such withholding tax.

The holder of debt securities or of contingent convertible securities, as applicable, issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) who is resident in Switzerland and who, at the time the payment of interest on such debt securities or contingent convertible securities, as applicable, is due, is the beneficial owner of such payment of interest and, in the case of a holder who is an individual, duly reports the gross payment of interest in his or her tax return and, in case of a holder who is an entity or an individual required to maintain accounts, includes such payments in its profit and loss statement, is entitled to a full refund of or a full tax credit for the Swiss withholding tax, as the case may be. A holder of debt securities or of contingent convertible securities, as applicable, issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) who is not resident in Switzerland at the time the interest on such debt securities or contingent convertible securities, as applicable, is due may be able to claim a full or partial refund of the Swiss withholding tax if such holder is entitled to claim the benefits with regard to such interest payment of a double taxation treaty between Switzerland and his or her country of residence. According to article 11 of the currently applicable version of the convention signed on October 2, 1996 between the United States of America and the Swiss Confederation for the avoidance of double taxation with respect to taxes on income, together with its protocole (in this section "the Treaty"), all payment of interest on debt securities or of contingent convertible securities, as applicable, issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland) and derived and beneficially owned by a non-Swiss resident holder, shall be taxable only in the state of residency of the holder, provided that such holder: (i) qualifies for benefits under the Treaty and (ii) does not conduct business through a permanent establishment or fixed base in Switzerland to which such debt securities or contingent convertible securities, as applicable, are attributable. Such eligible US holder of debt securities or contingent convertible securities, as applicable, may apply with the Swiss Federal Tax Administration for a full refund of 35% Swiss withholding tax withheld on such payments of interest.

Upon conversion of contingent convertible securities into Credit Suisse Group shares, any dividends paid and similar cash or in-kind distributions made on such shares (including bonus shares and dividends on liquidation proceeds exceeding the nominal value of such shares and, if certain conditions are met, the capital contributions paid on such shares) will be subject to Swiss withholding tax at a rate of 35%. Credit Suisse Group will be required to withhold tax at such rate from any distribution made to a shareholder. Any repayment of the nominal value of such shares and, if certain conditions are met, any distribution out of capital contribution reserves are not subject to Swiss withholding tax.

Exhibit 1
385

The recipient of a taxable distribution from Credit Suisse Group out of such shares who is an individual or a legal entity not resident in Switzerland for tax purposes may be entitled to a full or partial refund of Swiss withholding tax if the country in which such recipient resides for tax purposes has entered into a bilateral treaty for the avoidance of double taxation with Switzerland and if the further prerequisites of such treaty are met. Shareholders not resident in Switzerland should be aware that the procedures for claiming treaty benefits (and the time required for obtaining a refund) may differ from country to country. Shareholders not resident in Switzerland should consult their own legal, financial or tax advisors regarding receipt, ownership, purchases, sale or other dispositions of such shares and the procedures for claiming a refund of Swiss withholding tax.

According to article 10 of the Treaty, a non-Swiss resident holder of Credit Suisse Group shares is eligible for a reduced rate of withholding tax on taxable distribution equal to 15% of such taxable distribution, provided that the holder of such shares: (i) qualifies for benefits under the Treaty; (ii) holds, directly or indirectly, less than 10% of the Credit Suisse Group voting stock; and (iii) does not carry on business through a permanent establishment or fixed base in Switzerland to which the converted shares are attributable. Such an eligible US holder may apply with the Swiss Federal Tax Administration for a refund of the amount of the withholding tax in excess of the 15% Treaty rate.

Furthermore, in case of a repurchase of own shares by Credit Suisse Group, the portion of the repurchase price which exceeds the nominal value of such shares and the tax-free capital contribution reserves of Credit Suisse Group may, in some cases, be re-characterised as taxable liquidation which is subject to 35% Swiss withholding tax if certain conditions are met.

Neither the issuer, nor the guarantor nor any paying agent nor any other person may, pursuant to the terms and conditions of the contingent convertible securities, be obliged to pay additional amounts with respect to any shares issued upon conversion by Credit Suisse Group as a result of the deduction or imposition of such withholding tax.

### *Issue and Transfer Stamp Tax*

The issue and redemption of debt securities or of contingent convertible securities, as applicable, (other than in the case of debt securities or of contingent convertible securities, as applicable, issued by Credit Suisse Group or Credit Suisse but not through a branch outside Switzerland) are, under applicable Swiss tax law, not subject to Swiss Issue Stamp Tax on the issue of securities.

A transfer or sale of debt securities or of contingent convertible securities, as applicable, is subject to the Swiss Transfer Stamp Tax, currently at the rate of up to 0.3% of the consideration paid in case of debt securities or of contingent convertible securities, as applicable, issued by a company or finance subsidiary (other than Credit Suisse Group or Credit Suisse) or by a branch of Credit Suisse Group or Credit Suisse outside Switzerland or up to 0.15% of the consideration paid in case of debt securities or of contingent convertible securities, as applicable, issued by Credit Suisse Group or Credit Suisse (but not through a branch outside Switzerland), if such transfer or sale is made by or through a bank or securities dealer (as defined in the Swiss Federal Stamp Tax Act) resident in Switzerland or Liechtenstein, unless an exemption from the Transfer Stamp Tax applies. As regards Swiss Issue and Transfer Stamp Tax on Credit Suisse Group shares issued upon conversion of contingent convertible securities, the same principles as set out above in connection with debt securities and contingent convertible securities apply. In this case, the rate of such tax is up to 0.15% of the consideration paid.

### *Other Taxes*

Under current Swiss law, a holder of debt securities or of contingent convertible securities, as applicable, who is not resident in Switzerland and who during the taxable year has not engaged in trade or business through a permanent establishment within Switzerland and who is not subject to taxation by Switzerland for any other reason will be exempted from any Swiss federal, cantonal or municipal

89

Exhibit 1
386

income or other tax on gains on the sale of, or payments received under, the debt securities or the contingent convertible securities, as applicable. The same holds true under the same circumstances for the holder of Credit Suisse Group shares upon conversion of contingent convertible securities into such shares.

**European Union Directive on Taxation of Certain Interest Payments**

Under European Council Directive 2003/48/EC on the taxation of savings income, or the EU Savings Tax Directive, Member States of the European Union are required to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria are instead required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating to information exchange with certain other countries). A number of non-EU countries, including Switzerland, and territories have agreed to adopt similar measures (some of which involve a withholding system, such as in Switzerland). As indicated above under "Description of Debt Securities—Payment of Additional Amounts," no additional amounts will be payable if a payment on a debt security or on a contingent convertible security, as applicable, to an individual is subject to any withholding or deduction that is required to be made pursuant to any European Union Directive on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, any such Directive.

The European Commission has recently adopted a proposal to amend the EU Savings Tax Directive, with a view to closing existing loopholes and eliminating tax evasion. These changes broadly relate to the scope of, and mechanisms implemented by, the EU Savings Tax Directive. If these changes are implemented, the position of holders of debt securities or contingent convertible securities, as applicable, in relation to the EU Savings Tax Directive could be different to that set out above.

You should consult your own tax advisors regarding the application the EU Savings Tax Directive or any similar Directive or similar measures of non-EU countries and territories.

**Guernsey Taxation**

Holders of debt securities or contingent convertible securities, as applicable, who are resident for tax purposes in Guernsey, Alderney or Herm will be liable to income tax in Guernsey at the appropriate rate on income arising from their holding of the debt securities or contingent convertible securities, as applicable. However, any tax payable will not be collected by way of deduction or withholding from any payments made to them of such income.

Holders of debt securities or contingent convertible securities, as applicable, resident outside of Guernsey, Alderney or Herm will not be subject to any tax in Guernsey in respect of any payments to them in respect of the debt securities or contingent convertible securities, as applicable, provided such payments are not to be taken into account in computing the profits of any permanent establishment situate in Guernsey through which such holder carries on a business in Guernsey.

Guernsey currently does not levy taxes upon capital inheritance, capital gains, gifts, sales or turnover (unless the varying of investments and the turning of such investments to account is a business or part of a business). Nor are there any estate duties (save for registration fees and ad valorem duty payable upon an application for a Guernsey Grant of Representation where the deceased dies leaving assets in Guernsey, which require presentation of such a Grant). No duty will be chargeable in Guernsey on the issue, transfer or redemption of the debt securities or contingent convertible securities, as applicable.

Exhibit 1
387

*EU Savings Tax Directive and associated arrangements with Guernsey*

Although not a Member State of the European Union, Guernsey, in common with certain other jurisdictions, entered into agreements with EU Member States on the taxation of savings income. From July 1, 2011 paying agents in Guernsey must automatically report to the Director of Income Tax in Guernsey any interest payment which falls within the scope of the EU Savings Tax Directive as applied in Guernsey. The scope and operation of the EU Savings Tax Directive is currently being reviewed in accordance with the European Council's findings published on November 13, 2008. Any review will affect EU Member States. Guernsey, along with other dependent and associated territories, will consider the effect of any proposed changes to the EU Savings Tax Directive in the context of existing bilateral treaties and domestic law, once the outcome of that review is known. If changes are implemented, the position of the holders of debt securities or contingent convertible securities, as applicable, in relation to the EU Savings Tax Directive as applied in Guernsey may be different to that set out above.

Exhibit 1

388

## PLAN OF DISTRIBUTION (CONFLICTS OF INTEREST)

We may sell our securities through agents, underwriters, dealers or directly to purchasers.

Our agents may solicit offers to purchase our securities.

- We will name any agent involved in offering or selling our securities, and any commissions that we will pay to the agent, in the applicable prospectus supplement.

- Unless we indicate otherwise in the applicable prospectus supplement, our agents will act on a best efforts basis for the period of their appointment.

- Our agents may be deemed to be underwriters under the Securities Act of any of our securities that they offer or sell.

We may use an underwriter or underwriters in the offer or sale of our securities.

- If we use an underwriter or underwriters, we will execute an underwriting agreement with the underwriter or underwriters at the time that we reach an agreement for the sale of our securities.

- We will include the names of the specific managing underwriter or underwriters, as well as any other underwriters, and the terms of the transactions, including the compensation the underwriters and dealers will receive, in the applicable prospectus supplement.

- The underwriters will use the applicable prospectus supplement and any free writing prospectuses to sell our securities.

- If we use an underwriter or underwriters, the underwriter or underwriters will acquire our securities for their own account and may resell our securities in one or more transactions, including negotiated transactions. These sales will be made at a fixed price or at varying prices determined at the time of the sale.

We may use a dealer to sell our securities.

- If we use a dealer, we, as principal, will sell our securities to the dealer.

- The dealer will then sell our securities to the public at varying prices that the dealer will determine at the time it sells our securities.

- We will include the name of the dealer and the terms of our transactions with the dealer in the applicable prospectus supplement.

The securities we distribute by any of these methods may be sold to the public, in one or more transactions, either:

- at a fixed price or prices, which may be changed;

- at market prices prevailing at the time of sale;

- at prices related to prevailing market prices; or

- at negotiated prices.

In connection with an offering, the underwriters may purchase and sell securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of securities than they are required to purchase in an offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the securities while an offering is in progress. The underwriters also may impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount

Exhibit 1

389

received by it because the underwriters have repurchased securities sold by or for the account of that underwriter in stabilizing or short-covering transactions.

These activities by the underwriters may stabilize, maintain or otherwise affect the market price of the securities. As a result, the price of the securities may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the underwriters at any time. These transactions may be effected on an exchange or automated quotation system, if the securities are listed on that exchange or admitted for trading on that automated quotation system, or in the over-the-counter market or otherwise.

In connection with these sales of securities, underwriters may be deemed to have received compensation from us in the form of underwriting discounts or commissions and may also receive commissions from purchasers of the securities for whom they may act as agents. Underwriters may resell the securities to or through dealers, and those dealers may receive compensation in the form of discounts, concessions or commissions from the underwriters and/or commissions from purchasers for whom they may act as agents. The applicable prospectus supplement will include any required information about underwriting compensation we pay to underwriters, and any discounts, concessions or commissions underwriters allow to participating dealers, in connection with an offering of securities.

**Conflicts of Interest**

In compliance with FINRA guidelines, the maximum amount of underwriting compensation, including underwriting commissions or discounts, to be received by any FINRA member or independent broker dealer may not exceed 8% of the aggregate amount of the securities offered pursuant to this prospectus and any applicable prospectus supplement; however, it is anticipated that the maximum underwriting compensation to be received in any particular offering of our securties will be significantly less than this amount.

Credit Suisse Securities (USA) LLC is an indirect subsidiary of Credit Suisse Group. FINRA Rule 5121 imposes certain requirements when a member of FINRA, such as Credit Suisse Securities (USA) LLC, distributes an affiliated company's securities. If Credit Suisse Securities (USA) LLC or our other U.S.-registered broker-dealer subsidiaries or affiliates participate in the distribution of our securities, we will conduct the offering in accordance with the applicable provisions of FINRA Rule 5121. In any offerings subject to FINRA Rule 5121, no underwriter will confirm initial sales to accounts over which it exercises discretionary authority without the prior written approval of the customer.

We may solicit directly offers to purchase our securities, and we may directly sell our securities to institutional or other investors. We will describe the terms of our direct sales in the applicable prospectus supplement.

We may indemnify agents, underwriters and dealers against certain liabilities, including liabilities under the Securities Act. Our agents, underwriters and dealers, or their affiliates, may be customers of, engage in transactions with or perform services for, us or our subsidiaries and affiliates in the ordinary course of business.

We may authorize our agents and underwriters to solicit offers by certain institutions to purchase our securities at the public offering price under delayed delivery contracts.

- If we use delayed delivery contracts, we will disclose that we are using them in the applicable prospectus supplement and will tell you when we will demand payment and delivery of the securities under the delayed delivery contracts.

- These delayed delivery contracts will be subject only to the conditions that we set forth in the applicable prospectus supplement.

- We will indicate in the applicable prospectus supplement the commission that underwriters and agents soliciting purchases of our securities under delayed delivery contracts will be entitled to receive.

93

Exhibit 1

390

**MARKET-MAKING ACTIVITIES**

Any of our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, may use this prospectus and our prospectus supplements in connection with offers and sales of our securities, in connection with market-making transactions by and through our broker-dealer subsidiaries or affiliates, including Credit Suisse Securities (USA) LLC, at prices that relate to the prevailing market prices of our securities at the time of the sale or otherwise. Any of our broker-dealer subsidiaries and affiliates, including Credit Suisse Securities (USA) LLC, may act as principal or agent in these transactions. In addition, this prospectus, together with the relevant prospectus, prospectus supplement, product supplement, if any, and pricing supplement, if any, describing the terms of the specific series of securities being offered and sold, applies to market-making offers and sales of all outstanding securities of Credit Suisse (USA). None of our broker-dealer subsidiaries and affiliates has any obligation to make a market in any of our offered securities and may discontinue any market-making activities at any time without notice, at its sole discretion.

Exhibit 1

391

## LEGAL MATTERS

Certain legal matters with respect to U.S. law relating to the offering of our securities will be passed upon for us by Cleary Gottlieb Steen & Hamilton LLP, New York, New York, our U.S. counsel. Certain legal matters with respect to Swiss law relating to the offering of our securities will be passed upon for us by Homburger AG, Zurich, Switzerland, our Swiss counsel. Certain legal matters with respect to English law relating to the offering of the contingent convertible securities will be passed upon for us and the finance subsidiaries by Linklaters LLP, London, England, our English counsel. Any agents or underwriters will be represented by Cravath, Swaine & Moore LLP, New York, New York. Cravath, Swaine & Moore LLP regularly provides legal services to us and our subsidiaries and affiliates. Certain matters of law relating to the finance subsidiaries will be passed upon for the finance subsidiaries by Carey Olsen, Guernsey, Channel Islands.

95

Exhibit 1

392

**EXPERTS**

The consolidated financial statements of Credit Suisse Group and Credit Suisse as of December 31, 2011 and 2010, and for each of the years in the three-year period ended December 31, 2011, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2011, have been incorporated by reference into this prospectus in reliance upon the reports of KPMG AG, independent registered public accounting firm, which are included in the combined Annual Report on Form 20-F of Credit Suisse Group and Credit Suisse for the year ended December 31, 2011 and incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

The audit reports on the consolidated financial statements of Credit Suisse Group and Credit Suisse as of December 31, 2010 and 2011 each contain an explanatory paragraph that states that, in 2010, Credit Suisse Group and Credit Suisse, as applicable, changed its method of accounting for variable interest entities due to the adoption of ASU 2009-17.

Exhibit 1

393

# Credit Suisse

Exhibit 1

394

# Exhibit 2



Financial Industry Regulatory Authority

⊢ RECEIVED JAN 0 8 2013

VIA REGULAR MAIL

January 4, 2013

Pierre M. Gentin
Credit Suisse Securities (USA) LLC
One Madison Avenue, 9th Floor
New York, NY 10010-3629

Subject:    FINRA Dispute Resolution Arbitration Number 12-04094
            Kenneth Brickman, Greg and Jessica Bulette, et al. vs. Credit Suisse Securities
            (USA) LLC and VLS Securities LLC

Dear Mr. Gentin:

FINRA sponsors a forum for securities dispute resolution. Our arbitration program administers claims involving customers of brokerage firms and disputes between brokerage firms and their employees. Arbitration is a method of having a dispute between two or more parties resolved by impartial persons. Any type of dispute, claim, or controversy arising out of business dealings with any FINRA firm or registered person can be resolved in arbitration.

You have been named as a party in this arbitration, which the claimant(s) filed on **November 30, 2012**. Enclosed is a copy of the Statement of Claim filed by the claimant(s). You are required by FINRA rules to arbitrate this dispute.

This office administers arbitration cases according to the FINRA Codes of Arbitration Procedure (Codes). The Codes are separated into three parts: the Customer Code, the Industry Code, and the Mediation Code. The most up-to-date version of the Codes can be accessed or downloaded from our Web site at www.finra.org. In addition, our Web site provides various resources for parties, including the *Party's Reference Guide* which includes important information about the arbitration process. In addition, there is a short video on FINRA's Web site showing what to expect during the FINRA arbitration process (go to www.finra.org, click on the link to *Arbitration and Mediation*, and then click *Resources for Parties*). If you do not have access to the Internet, you may call our office to request a copy of arbitration materials.

### Filing a Statement of Answer

You are required, on or before **February 25, 2013**, to directly serve each party with a signed and dated submission agreement (form enclosed) and answer to the statement of claim specifying the relevant facts and available defenses to the statement of claim. At the same time that the answer to the statement of claim is served on the other parties, you must file with FINRA an original and three copies of the following: the submission agreement, the answer to the statement of claim, and any additional documents submitted with your answer. Please send these documents and all

Investor protection. Market integrity.    Dispute Resolution      300 South Grand Avenue    t  213 613 2680
                                          West Regional Office    Suite 900                  f  213 613 2677
                                                                  Los Angeles, CA            www.finra.org
                                                                  90071-3135

Exhibit 2
395

other subsequent correspondence to the attention of the undersigned. In your submission, you should also establish proof of service on the other parties to this matter, which is a signed statement indicating the date, time, and manner of service.

Rule 12308 of the *Customer Code* and Rule 13308 of the *Industry Code* provide that, if you do not answer within the time period specified above, the panel may, upon motion, bar you from presenting any defenses or facts at the hearing, unless the time to answer was extended in accordance with the Codes. In addition, if you answer a claim that alleges specific facts and contentions with a general denial, or fail to include defenses or relevant facts in your answer that were known to you at the time the answer was filed, the panel may bar you from presenting the omitted defenses or facts at the hearing.

With the claimant's written consent, you may obtain extensions of time to answer. In accordance with Rule 12207 of the *Customer Code* and Rule 13207 of the *Industry Code*, FINRA staff will not grant you an extension of time to answer, except upon a showing of good cause. If the claimant agrees to extend your time to file your answer, please notify FINRA in writing of the new deadline for filing your answer. You should also send a copy of that notice to the claimant and all other parties.

If you receive an amended statement of claim you should review Rule 12310 of the *Customer Code* or Rule 13310 of the *Industry Code* to determine your time to file a response to the amendment.

## CRD Reporting Obligations for Registered Representatives

Article V, Section 2(c) of the FINRA By-Laws provides that registered representatives must keep their CRD registration current. Therefore, you are advised to review the Form U4 to determine if disclosure of this matter is required. If so, your failure to update your registration application may result in the filing of a formal complaint based on any omission. Any questions regarding this disclosure requirement should be directed to the FINRA Member Services Phone Center at (301) 590-6500.

## Filing Other Claims

The answer to the statement of claim may include any counterclaims against the claimant, cross claims against other respondents, or third party claims, specifying all relevant facts and remedies requested, as well as any additional documents supporting such claim. When serving a third party claim, you must provide each new respondent with copies of all documents previously served by any party, or sent to the parties by FINRA. If the answer to the statement of claim contains any counterclaims, cross claims or third party claims, you must pay all required filing fees at the time of filing. Parties may pay filing fees for counterclaims, cross claims or third party claims by check or money order payable to "FINRA Dispute Resolution" and should mail payments to the FINRA Dispute Resolution Regional Office administering the case. Please write the name of the counterclaimant, cross claimant or third party claimant and case number on the check or money order.

## Hearing Location

For customer disputes, Rule 12213 of the *Customer Code* provides that FINRA will generally select the hearing location closest to the customer's residence at the time the dispute arose,

Exhibit 2

396

unless the customer requests in his/her initial filing a hearing location in the customer's state of residence at the time the dispute arose.

For industry disputes, Rule 13213 of the *Industry Code* provides that FINRA will generally select the hearing location that is closest to the location where the associated person was employed at the time the dispute arose. In industry disputes involving FINRA firms only, unless the firms are located in the same city, FINRA will consider a number of factors when deciding the hearing location. These include the following:

- signed agreements to arbitrate;
- who initiated the transactions or business at issue; and
- location of essential witnesses and documents.

If all parties in any arbitration agree to a hearing location, FINRA ordinarily will select that hearing location.

FINRA has selected **Los Angeles, CA** as the hearing location for this case. FINRA will consider changing the hearing location upon motion of a party. After the panel is appointed, however, the panel will decide any motion relating to changing the hearing location.

## Number of Arbitrators

Rule 12401 of the *Customer Code* and Rule 13401 of the *Industry Code* provide that one arbitrator will decide this case if the amount of the claim is $100,000 or less, exclusive of interest and expenses, unless all parties agree in writing to three arbitrators. If this claim is more than $100,000 or for an unspecified or non-monetary amount, a panel of three arbitrators will be selected to decide the case, unless all parties agree in writing to the appointment of a single arbitrator to decide the case.

There are several benefits to the appointment of a single arbitrator, including: 1) reduced hearing session fees because hearings sessions with one arbitrator cost substantially less than hearing sessions with three arbitrators ($450 per hearing session versus $1,200 per hearing session in cases with over $500,000 in damages), 2) reduced fees for other events such as initial pre-hearing conferences, other pre-hearings, and postponements, 3) reduced case processing times because single arbitrators do not need to coordinate their calendars with co-panelists to schedule a hearing, 4) reduced party effort in the arbitrator selection process because parties will receive one list of 10 names from which to choose their arbitrator, rather than three lists of 10 names each (i.e., parties will only need to research the disclosures and histories of 10 proposed arbitrators instead of 30), 5) reduced costs for photocopying pleadings and exhibits (by two-thirds), and 6) less likelihood of last minute changes in hearing dates because of arbitrator scheduling issues.

## Representation of Parties

Rule 12208 of the *Customer Code* and Rule 13208 of the *Industry Code* provide that parties may represent themselves or may be represented by an attorney admitted to practice and in good standing in any jurisdiction. A party may be represented by a non-attorney, unless state law prohibits such representation, the person is currently suspended or barred from the securities industry in any capacity, or the person is currently suspended from the practice of law or disbarred.

Exhibit 2
397

## Discovery

Rule 12505 of the *Customer Code* and Rule 13505 of the *Industry Code* provide that parties must cooperate to the fullest extent practicable in the exchange of documents and information to expedite the arbitration. Parties in customer cases should carefully review the *FINRA Discovery Guide* and *Document Production Lists*, which can be downloaded from our Web site at www.finra.org. Upon request, FINRA will provide the parties with a copy of the *Discovery Guide* and *Document Production Lists*. Document Production Lists 1 and 2 describe the documents that are presumed to be discoverable in all arbitrations between a customer and a firm or registered person. Parties should not file with FINRA copies of correspondence relating to the exchange of documents and information, except as provided below.

## Motions

As explained in Rule 12503 of the *Customer Code* and Rule 13503 of the *Industry Code*, written motions are not required to be in any particular form. Motions may take the form of a letter, legal motion, or any other form that the panel decides is acceptable. Motions include all requests to the arbitrators or the Director of Arbitration, including challenges for cause and recusal requests. Any written request to the arbitrators or the Director of Arbitration will be treated as a motion even when it is not expressly labeled as a motion by a party. Written motions must be served directly on all other parties, at the same time and in the same manner. Written motions must also be filed with the FINRA staff member assigned to your case, with additional copies for each arbitrator, at the same time and in the same manner in which they are served on the parties. Responses to written motions must be served directly on each other party, at the same time and in the same manner. Responses to written motions must also be filed with the FINRA staff member assigned to your case, with an additional copy for the arbitrator, at the same time and in the same manner in which they are served on the parties.

## Motion Response Deadlines

**Generally**. Under Rule 12503 of the *Customer Code* and Rule 13503 of the *Industry Code*, parties have 10 days from the receipt of a written motion to respond to the motion, unless the moving party agrees to an extension of time, or the panel decides otherwise. Parties have 5 days from the receipt of a response to a motion to reply to the response unless the responding party agrees to an extension of time, or the Director or the panel decides otherwise.

**Subpoenas**. Under Rule 12512 of the *Customer Code* and Rule 13512 of the *Industry Code*, parties have 10 calendar days from the receipt of a motion requesting that an arbitrator issue a subpoena to file a response, and moving parties have 10 calendar days from receipt of the response to submit a reply.

**Motions to Dismiss**. Motions to dismiss have different response deadlines.
Parties should review Rules 12206(b) and 12504 of the *Customer Code* and Rules 13206(b) and 13504 of the *Industry Code* for the applicable response deadlines.

## Motions to Dismiss

Rule 12504 of the *Customer Code* and Rule 13504 of the *Industry Code* limit significantly the filing of motions to dismiss in the arbitration forum and impose strict sanctions against parties who engage in abusive motion practices. These rules specify the following three limited

Exhibit 2
398

grounds on which a motion to dismiss may be granted before a claimant finishes presenting his/her case: 1) the non-moving party signed a settlement and release; 2) the moving party was not associated with the account, security, or conduct at issue; or 3) the claim does not meet the criteria of the eligibility rule (contained in *Customer Code* Rule 12206 and *Industry Code* Rule 13206).

## Fees

Any time a fee is assessed to you during the case, you will receive an invoice that reflects the fee assessed. At the conclusion of the case, you will receive a Statement of Account that reflects the fees assessed and any outstanding balance or refund due. Fees are due and payable to FINRA Dispute Resolution upon receipt of an invoice and should be sent to the address specified on the invoice. All questions regarding the assessment of fees should be directed to the regional office administering your case. All questions regarding the payment of fees and refunds should be directed to FINRA Finance at (240) 386-5910.

In the event multiple parties file a claim, and a single party pays the filing fees on behalf of the other filing parties, FINRA will credit the paying party the amount of the payment. In the event the parties' representative or non-party pays the filing fee on behalf of all the filing parties, FINRA will credit the first named party in the claim the amount of the payment.

At the conclusion of the case, FINRA will use the filing fee funds to pay fees owed by any of the parties that jointly filed the claim. FINRA will evenly distribute the funds to pay each party's fees. If any funds remain for any of the parties, FINRA will use those funds to pay the balance of fees owed by any other parties that filed the claim.

## Expungement Requests

FINRA rules provide for strict standards and procedures for expungement of customer dispute information from the CRD system. This rule protects the ability of investors to obtain accurate and meaningful data about firms and brokers by permitting expungement only under appropriate circumstances. Under Rule 2080, an arbitrator may grant expungement only when the claim, allegation, or information in the customer dispute is factually impossible or clearly erroneous; the broker was not involved in the alleged misconduct; or the claim, allegation, or information is false. In addition, Rule 12805 of the *Customer Code* and Rule 13805 of the *Industry Code* require arbitrators considering an expungement request to hold a recorded hearing session by telephone or in person, provide a brief written explanation of the reasons for ordering expungement, and, in cases involving settlement, review the settlement documents to examine the amount paid to any party and any other terms and conditions of the settlement.

## Explained Decisions

The arbitrators will provide an explained decision at the parties' joint request. An explained decision is a fact-based award stating the general reasons for the arbitrators' decision. FINRA rules require parties to submit any joint request for an explained decision at least 20 days before the first scheduled hearing date.

Exhibit 2
399

If you have any questions, please do not hesitate to contact me.

Very truly yours,

/s/ Christina Rovira

Christina Rovira
Case Administrator
Phone:   213-613-2680
Fax:       301-527-4766
christina.rovira@finra.org

CR2:ap5:LC39E
idr: 02/09/2012

Enclosures

CC:
Lance C. Arney, Esq., Manoj Wazarkar
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Yue Xu
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Hua Sun
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Liming Sun
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Nelson P. Chia Living Trust
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Zewei Zeng
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Dr. Lili Xu Defined Benefit Pension Plan
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Lili Xu, DDS
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Gary S. and Sherrie M. Kay Trust
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Nelson Chia
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Teresa Dykzeul
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Exhibit 2
400

Lance C. Arney, Esq., Kenneth Brickman
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Greg and Jessica Bulette
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Michael Gadams
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., James Ng
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Tony Schifano
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Peter Lau
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

Lance C. Arney, Esq., Khosrow Mehrany
Moulton & Arney, LLP, 800 Taft Street, Houston, TX 77019

RECIPIENTS:

Pierre M. Gentin, Credit Suisse Securities (USA) LLC
Credit Suisse Securities (USA) LLC, One Madison Avenue, 9th Floor, New York, NY 10010-3629

Richard Hoge, VLS Securities LLC
VLS Securities LLC, 19 Old Kings Highway South, Suite 120, Darien, CT 06820

Exhibit 2

401

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV13- 3085 DSF (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Neal A. Potischman (SBN 254862)
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, California 94025
Tel: (650) 752-2000 / Fax: (650) 752-2111

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| CREDIT SUISSE SECURITIES (USA) LLC and VLS SECURITIES LLC, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV13- 3085 DSF (AJWx) |
| v. | |
| KENNETH BRICKMAN, (List of Additional Defendants Attached) | SUMMONS |
| DEFENDANT(S). | |

TO:    DEFENDANT(S): To the above-named Defendants

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Neal A. Potischman_____, whose address is _Davis Polk & Wardwell LLP , 1600 El Camino Real , Menlo Park, California 94025____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

MAY - 1 2013

Dated: _____

By: _____

JULIE PRADO

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                    SUMMONS

## LIST OF ADDITIONAL DEFENDANTS

| |
| --- |
| Greg and Jessica Bulette |
| Nelson Chia, Individually and as Trustee of the Nelson P. Chia Living Trust |
| Lili Xu, Individually and as Trustee of the Dr. Lili Xu Defined Benefit Pension Plan |
| Teresa Dykzeul |
| Michael Gadams |
| Gary And Sherrie Kay, as Trustees of the Gary S. and Sherrie M. Kay Trust |
| Peter Y.C. Lau |
| Khosrow Mehrany |
| James Ng |
| Tony Schifano |
| Hua Sun |
| Liming Sun |
| Zewei Zeng |
| Manoj Wazarkar |
| Yue Xu |
| Shao Xuanhao |
| Honghua And Jin Yang |
| Xun He |
| Hasan T. Abu-Khajeel |
| 4077997 Canada Inc. |
| Cohlors Pack Inc. |
| Larex Management, Inc. |
| Shawn M. Royle |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Credit Suisse Securities (USA) LLC and
VLS Securities LLC

**DEFENDANTS**   ( Check box if you are representing yourself ☐ )

Kenneth Brickman et. al.

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, California 94025
Phone: (650) 752-2000

Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067; Phone: (310) 201-2100

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Moulton & Arney, LLP
800 Taft Street
Houston, Texas 77019
Phone: (713) 353-6699

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes  ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
9 U.S.C. § 4 - action to enjoin defendants from proceeding with claims against plaintiffs in FINRA arbitration.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | ☐ 690 Other | |
| ☒ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | **LABOR** | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

FOR OFFICE USE ONLY:  Case Number:        CV13- 3085

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Delaware, New York, Connecticut. |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | Contra Costa County, Alameda County, San Francisco County, Stanislaus County, Santa Clara County, San Diego County, Washington, Arizona, Oregon, Colorado, Nevada, Canada, China. |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

***Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE: _____May 1, 2013_____

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |